Case No. 25-2935

# United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

*Plaintiff–Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California (Hon. Yvonne Gonzalez Rogers)
No. 4:20-cv-05640-YGR

**DECLARATION OF CARSON OLIVER IN SUPPORT OF APPLE INC.'S EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 TO STAY ORDER PENDING APPEAL**

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202)-955-8500

Mark A. Perry
Zachary D. Tripp
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
(202) 682-7511

*Counsel for Apple Inc.*

I, Carson Oliver, hereby declare as follows:

1. I am the Head of the Global App Store at Apple Inc. ("Apple"), leading the App Store business across iPhone, iPad, Apple Watch, Apple TV, Apple Vision Pro, and Mac. I also served as one of the leaders of the cross-functional working group tasked with modeling, analyzing, and making recommendations on Apple's response to the Injunction. I have personal knowledge of the matters stated herein and, if called upon to do so, I could and would testify competently hereto.

**The App Store Business Model**

2. Apple invented the iPhone, the iOS operating system, and the App Store. Through its App Store, Apple provides a secure and reliable means for developers to distribute apps to hundreds of millions of customers in the US and for those customers to discover, download, and engage with those apps.

3. The App Store is one component of Apple's integrated ecosystem of hardware, software, and services. This model enables Apple to offer customers a seamless experience across Apple's products and services. It protects users by providing a safe, secure, and consistent experience; and it benefits developers by attracting customers who value those attributes. Apple's extensive investments in its products and services enables Apple to earn a profit from those offerings while ensuring the continued success of its

1

integrated ecosystem.

4. Apple provides developers access to Apple's platform technologies, which include the hardware and software technologies that developers use to build and deploy apps, and deliver content and experiences to users. Apple also provides developers with proprietary tools and technologies to help them manage and optimize app performance, acquisition, engagement, and monetization. These include software development kits ("SDKs"), frameworks, and application programming interfaces ("APIs").

5. Apple monetizes its investments in the App Store, along with its associated investments in Apple's software, tools, and proprietary technologies, in part, by charging developers a commission on the sale of digital goods and services in apps distributed through the App Store. The App Store's In-App Purchase ("IAP") mechanism serves multiple functions in this area. It provides a convenient, secure way for customers to buy digital goods and services within an app. It also provides an efficient way for Apple to collect the commission it has chosen to charge.

6. IAP's role in Apple's business model extends beyond its function as a payment solution and commission collection mechanism. IAP provides a broad suite of services to users that combine to create an integrated commerce system from which App Store developers and customers directly

2

benefit. For example, IAP contains a variety of safety tools for families and children, like Ask to Buy, and allows users to efficiently manage all their subscriptions through a centralized Subscriptions page in settings. This integrated experience is critical to the App Store.

7. The majority of apps on the App Store are free to download and do not sell digital goods and services. As a result, Apple charges no commission on those apps. Developers may opt to monetize their apps using advertising or other business models that do not use IAP. In that way, Apple does not require developers to use IAP. Apple requires only that, if a developer offers digital goods and services in its app, it must (with limited exceptions) use IAP and pay Apple a commission.

8. In operating the App Store, Apple has to balance the interests, demands, and expectations of all participants in the platform, including developers, users, and Apple itself. Rules that benefit one constituency (e.g., users) may not be favored by another constituency (e.g., developers), and Apple's ability to balance these interests is foundational to the success of its integrated ecosystem and business model.

9. Apple regulates developer engagements with users through the Developer Program License Agreement ("DPLA") (including applicable entitlement terms) and the App Review Guidelines. These materials generally serve two purposes relevant here. First, they protect users by

3

mitigating the proliferation of harmful, abusive, illegal, or fraudulent apps and content. Second, they protect against interference with the App Store's commission-based business model.

**Apple's Response to the Underlying Injunction**

10. The underlying Injunction in this case stated that Apple cannot "prohibit developers" from "including in their apps and their metadata buttons, links, or other calls to action that direct consumers to purchasing mechanisms, in addition to [IAP]."

11. Apple responded by adopting a new entitlement framework that, among other things, expressly allowed developers to include external links in their apps to purchase digital goods and services on their websites. So long as they did not disparage IAP, Apple allowed developers to place this functionality anywhere in their apps other than the IAP "buy flow." The "buy flow" is the series of steps a user takes to make a purchase within an app. Apple precluded developers from placing links within the IAP buy flow to ensure that Apple's monetization model for the App Store was not unfairly impeded.

12. The new entitlement provided that developers would pay a 12% or 27% commission on purchases made by users within 7 days after tapping a link within an app that sent users to the developer's website to complete the purchase. The commission rate on equivalent IAP transactions was 15%

4

and 30%. Developers using links to conclude transactions outside of the App Store benefited from the same Apple tools, technologies and services as those using IAP, including platform technologies, developer tools, distribution, discovery, and support.

**Apple's Response to the New Injunction**

13. On April 30, the district court issued an order including a new injunction (the "Court Order"). Among other things, it precludes Apple from: (1) "[i]mposing any commission or any fee on purchases that consumers make outside an app," and (2) "[r]estricting or conditioning developers' … language, flow or placement of links for purchases outside an app."

14. The district court required that the injunction go into effect immediately and refused to consider any request for a stay. In response, Apple updated its App Review Guidelines 3.1.1, 3.1.1(a), 3.1.3, and 3.1.3(a), affecting all apps distributed on the United States storefront of the App Store. As updated, Apple's Guidelines permit developers to include links, buttons, or other calls to action within such apps, with no restrictions on the style, language, formatting, quantity, flow or placement of links, buttons, or other calls to action within such apps.

**Irreparable Harm**

15. Two aspects of the new injunction—the prohibition on charging a commission on linked transactions, and the prohibition on restricting or

5

conditioning the language or placement of links, buttons, and calls to action—will likely cause irreparable harm to Apple and, unless the injunction is stayed, those harms will continue to grow during the appeal.

16. First, by prohibiting Apple from restricting or conditioning the language or placement of links and prohibiting a commission on linked transactions, Apple will be unable to effectively monetize its considerable investments in the App Store and Apple's integrated ecosystem—including its proprietary tools and technologies protected by intellectual property rights—through a commission on IAP.

17. Since the Court's Order was released on April 30, developers have taken a broad reading of the new requirements. Apple has received a large number of developer inquiries regarding implementation of links, buttons, and other calls to action. A number have asked whether they can make IAP less prominent, or remove IAP altogether. Some industry observers have indicated that developers may be able to avoid paying any commissions on digital transactions to Apple because of the injunction.

18. Apple has already seen apps implement link out experiences that closely mimic an IAP buy flow and apps implement link out experiences that impede the use of IAP. For example, one app only included the option to buy with IAP far down within its settings menu, while the link out to purchase was merchandised prominently at the top. Similar implementations,

6

combined with the preclusion from earning any commission revenue from linked transactions, will fundamentally undermine the App Store's established business model and will cause Apple to suffer a significant loss of revenue.

19. The exact amount of revenue Apple will lose is difficult to estimate. Before implementing the Injunction response on January 16, 2024, Apple's finance team modeled various scenarios and their likely impact on Apple's revenue. Those models suggest that the Court's Order prohibiting Apple from charging a commission on linked transactions would result in hundreds of millions to billions in lost commission revenue. However, those models assumed that Apple would be able to maintain a clear and unimpeded customer option to purchase with IAP in the buy flow, and thus may be conservative in their estimated impact.

20. Second, permitting developers to place external links within the IAP buy flow, and to impede the use of IAP, degrades the customer purchase experience for the App Store, which is a foundational element to the App Store and Apple's integrated ecosystem. Apple has built the App Store on principles of simplicity, convenience, and trust. IAP supports those principles by providing a convenient, secure way for customers to buy digital goods and services within an app, and supporting a broader suite of services that benefit the customer experience (like Ask to Buy and centralized

7

subscription management). Allowing developers to interfere with the ability of customers to transact using IAP undermines that simplicity, convenience, and trust. This will engender confusion among App Store customers and it will erode the goodwill that Apple has built over more than 15 years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 7, 2025 in San Jose, California.

By: */s/ Carson Oliver*

Carson Oliver

8