No. 25-2935

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,
*Plaintiff-Appellee*

v.

APPLE INC., et al.,
*Defendant-Appellant*

On Appeal from the United States District Court for the
Northern District of California (Hon Yvonne Gonzalez Rogers)
No. 4:20-cv-05640-YGR

**BRIEF OF INTERNATIONAL CENTER FOR LAW AND
ECONOMICS AS *AMICUS CURIAE* ON BEHALF OF DEFENDANT-
APPELLANT**

Sara T. Schneider (SBN: 298103)
ARENTFOX SCHIFF LLP
555 South Flower Street, 43rd Fl.
Los Angeles, CA 90071
Tel.:         (213) 629-7400
Email:      *sara.schneider@afslaw.com*
*Counsel for Amicus Curiae the
International Center for
Law & Economics*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTEREST OF AMICUS CURIAE ............................................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT .................................................................................................................. 3

    I.    Antitrust Courts are Not Central Planners or Price Regulators ............ 3

    II.   The Order Ignores the Supreme Court's Repeated Repudiation of Complex and Burdensome Duties to Deal ............................................. 4

    III.  The Order is not Tailored to the Harm Found at Trial .......................... 9

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

**Cases**

*Epic Games, Inc. v. Apple Inc.*,
　559 F.Supp.3d 898 (2021) ..................................................................2, 3, 5

*Epic Games, Inc. v. Apple, Inc.*,
　67 F.4th 946 (9th Cir. 2023), cert. denied, 144 S. Ct. 681 (2024).........................2

*Epic Games, Inc. v. Apple Inc.*,
　No. 4:20-cv-05640-YGR (N.D. Cal. Apr. 30, 2025), ECF No. 1508 ..............1, 6

*Fed. Trade Comm'n v. Qualcomm Inc.*,
　969 F.3d 974 (9th Cir. 2020) ..........................................................................6, 9

*Ginsburg v. InBev NV/SA*,
　623 F.3d 1229 (8th Cir. 2010) ...........................................................................10

*Nat'l Collegiate Athletic Ass'n v. Alston*,
　141 S.Ct. 2141 (2021)..................................................................................3, 4

*Pac. Bell Tel. Co. v. linkLine Comm'ns, Inc.*,
　555 U.S. 438 (2009)...............................................................................3, 4, 7, 8

*United States v. Grinnell Corp.*,
　384 U.S. 563 (1966)............................................................................................5

*United States v. Microsoft*,
　253 F.3d 34 (D.C. Cir. 2001).......................................................................9, 10

*Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
　540 U.S. 398 (2004)...................................................................................passim

## OTHER AUTHORITIES

Herbert J. Hovenkamp, *Structural Antitrust Relief Against Digital Platforms*, 7 J. LAW & INNOVATION 57, 64 (2024) ....................................... 10

Robert W. Crandall & Kenneth G. Elzinga, *Injunctive Relief in Sherman Act Monopolization Cases*, 21 RES. LAW AND ECON. 277, 335-37 (2004) .............................................................................. 5, 10, 11

## INTEREST OF AMICUS CURIAE

The International Center for Law & Economics ("ICLE")[1] is a nonprofit, non-partisan global research and policy center aimed at building the intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics to inform policy debates and has longstanding expertise evaluating antitrust law and policy.

ICLE has an interest in ensuring that antitrust law promotes the public interest by remaining grounded in sensible rules informed by sound economic analysis. That includes fostering consistency between antitrust law and other laws that proscribe unfair methods of competition, such as California's Unfair Competition Law, and advising against far-reaching injunctions that could deteriorate the quality of mobile ecosystems, thereby harming the interests of consumers and app developers.

## SUMMARY OF ARGUMENT

The District Court's Order would enjoin Apple from charging "any commission or fee" on various purchases facilitated by Apple's platform and in-app purchasing (IAP) mechanism. *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. Apr. 30, 2025), ECF No. 1508 ("Order"). The Order

---

[1] No counsel for a party contributed to authoring this brief, and no party made a monetary contribution intended to fund the preparation or submission of this brief. See Fed. R. App. P. 29(a)(4)(E).

1

claims this is required to prevent Apple from "maintaining an anticompetitive revenue stream," *id.* at 75, or "reap[ing] supracompetitive operating margins" or "profits" that are "not tied to the value of its intellectual property, and thus … anticompetitive." *Id.* at 2.

The Order would impose numerous and complex duties to deal that were not identified in the previous injunction and have not been shown necessary to prevent foreclosure. Instead, the Order reflects a maximalist interpretation of the initial injunction—requiring micromanagement of Apple's platform and dictating that Apple must offer business users free access to its ecosystem.

At the same time, the Order would effectively obviate various of Apple's legal business practices, including steps Apple might take to protect the integrity and security of its platform and IAP, the privacy and data security of consumers who use the Apple ecosystem, and the value of its intellectual property, all of which were previously identified by this Court as legitimate. *See Epic Games, Inc. v. Apple, Inc.,* 67 F.4th 946, 971 (9th Cir. 2023), cert. denied, 144 S. Ct. 681 (2024).

While the original injunction did not interfere with "Apple's business justifications [which] focus on other parts of the Apple ecosystem and will not be significantly impacted by the increase of information to and choice for consumers," *Epic Games, Inc. v. Apple Inc.*, 559 F.Supp.3d 898, 1057 (2021)

2

("*Epic v. Apple*"), the Order is premised on an interpretation of the initial injunction that is no longer a "limited measure [that] balances the justification for maintaining a cohesive ecosystem with the public interest…." *Id.* Rather, it imposes complex, long-running duties to deal that are unsupported by the record and inconsistent with the relevant jurisprudence and the Supreme Court's repeated caution that antitrust courts are not central planners.

## ARGUMENT

### I. Antitrust Courts are Not Central Planners or Price Regulators

The Order's compelled access remedy raises serious practical and legal concerns. Forcing firms to provide rivals with the "source of their advantage is in some tension with the underlying purpose of antitrust law," because it risks chilling investment and turning courts into regulators of ongoing business relations. *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–408 (2004) ("*Trinko*"). The Supreme Court has long cautioned against such remedies. *See, e.g., Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141 (2021) ("*Alston*"); *Pac. Bell Tel. Co. v. linkLine Comm'ns, Inc.*, 555 U.S. 438 (2009) ("*linkLine*"); *Trinko*.

The *Trinko* Court warned against enforced sharing precisely because it would require "courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 U.S.

3

at 408. Antitrust law does not generally require a monopolist to aid its competitors by sharing infrastructure or data because such forced sharing "may lessen the incentive for the monopolist, the rival, or both to invest" in valuable innovations. *Trinko*, 540 U.S. at 408. The *linkLine* Court clarified that *Trinko* encompasses pricing obligations like those imposed here, noting that enforcement of such a duty "would require courts simultaneously to police both the wholesale and retail prices" while "aiming at a moving target…." *linkLine*, 555 U.S. at 453 (citing *Trinko*, 540 U.S. at 408).

Courts must be cautious in fashioning *remedies* that impose such duties, lest they "wind up impairing rather than enhancing competition, impose costs that 'exceed efficiencies gained,'" and "suppress procompetitive innovation." *Alston*, 594 U.S. 69, 102 (2021) (quoting *Trinko*, 540 U.S. at 415). Compelled-access remedies raise serious practical and legal concerns, as they risk chilling investment, while turning courts into regulators of ongoing business relations.

II.   **The Order Ignores the Supreme Court's Repeated Repudiation of Complex and Burdensome Duties to Deal**

Such risks plainly are raised by the Order, which enjoins Apple from, *inter alia*, "[i]mposing any commission or any fee" on linked transactions, Order at 75, notwithstanding that "the Court did not select a rate," *Id.* at 58, and that "Apple is entitled to … guard against the uncompensated use of its intellectual property."

4

*Epic v. Apple*, 559 F.Supp.3d at 1042. The factual recitations in the Order reveal the uncertainty Apple confronted in identifying a price for linked-out transactions that would comport with the original injunction. *See, e.g.,* Order at 21.

The purported justification for a zero-price requirement is that the District Court had "found that 'Apple's 30% commission … allowed it to reap supracompetitive operating margins' and was not tied to the value of its intellectual property, and thus, was anticompetitive." *Id.* at 2. While imposing a specific commission might resolve the uncertainty, the District Court's analysis highlights the difficulty of administering such duties-to-deal and the arbitrariness of its zero price mandate.

The Order notes that Apple "never correlated the value of its intellectual property to the commission it charges." Order at 7. But what would such a correlation entail, and why would it be required of Apple? Typically, the price system tests the value of intellectual property. Antitrust law recognizes that even monopoly can arise "as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). For that reason, antitrust law does not condemn monopoly itself. *Id.* at 570–71; *see also Trinko*, 540 U.S. at 407–08.

It is conceivable that *some* price could be found exclusionary, foreclosing competition to an extent prohibited by, e.g., Section 2 of the Sherman Act. But

5

given the benefits of Apple's platform and IAP and the need to maintain incentives for future investment, competition cannot require a rate of zero percent. Apart from a conclusory declaration that a 27% commission for linked purchases is anticompetitive, neither the Order nor *Epic v. Apple* provides any analysis of a price threshold *at which* a commission would become exclusionary.

Further, attempting to maximize profits within the confines of an injunction cannot be a violation. Yet the District Court concluded that Apple's efforts to do so were inherently anticompetitive. *See, e.g.,* Order at 17. This Court has admonished such conflating of "the desire to maximize profits with an intent to 'destroy competition itself.' … [T]he goal of antitrust law is not to force businesses to forego profits or even '[t]he opportunity to charge monopoly prices,' which is 'what attracts "business acumen" in the first place.'" *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990, 994, fn. 15 (9th Cir. 2020) (internal quotation and citation omitted)) ("*Qualcomm*").

Seeking to ground its conclusion that Apple's compliance efforts were anticompetitive, the District Court contends that summing Apple's 27% rate and other costs entails that linked-out commission costs would exceed Apple's 30% IAP commission. It thus finds that Apple's linked-out commission "**forecloses competitive alternatives**." Order at 60 (emphasis in original). The Court bases its conclusion of a violation on a "price squeeze" claim—asserting that, by pricing its

6

own alternative (IAP at 30%) lower than the effective price required by its linked-out commission, Apple effectively eliminates the linked-out option as a competitive alternative.

But "[r]ecognizing price-squeeze claims would require courts simultaneously to police both the wholesale and retail prices to ensure that rival firms are not being squeezed." *linkLine,* 555 U.S. at 453. This would compound the enforcement problems inherent in duties to deal because "courts would be aiming at a moving target, since it is the interaction between these two prices that may result in a squeeze." *Id.*

The Order exemplifies the problem: the District Court contends that Apple's linked-out commission violates its prior injunction because of the *interaction* between Apple's commission and developers' other costs. To determine *when* that interaction effectively forecloses linked-out transactions thus depends on external payment processing (and other) costs over which Apple has no control—costs that are certain to vary across developers, apps, and times. It also depends on app developers' choice of payment processors. For virtually any commission Apple might set, a developer could choose a payment processor with fees that, combined with Apple's commission, exceed 30%. This moving target precludes Apple's ability to identify the price that *would* comply with the Order—

7

precisely the scenario that the *linkLine* Court found "perhaps most troubling." *Id.* at 453.

*LinkLine* explains why that is untenable: "[H]ow is a judge or jury to determine a 'fair price?' Is it the price charged by other suppliers of the primary product? None exist. Is it the price that competition 'would have set' were the primary level not monopolized? How can the court determine this price without examining costs and demands, indeed without acting like a rate-setting regulatory agency, the rate-setting proceedings of which often last for several years? Further, how is the court to decide the proper size of the price 'gap?' Must it be large enough for all independent competing firms to make a 'living profit,' no matter how inefficient they may be? … And how should the court respond when costs or demands change over time, as they inevitably will?" *Linkline*, 555 U.S. at 454 (internal citation omitted).

These concerns apply in spades when a duty to deal arises from a judicially-ordered injunction, the violation of which threatens criminal contempt. "'No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency.'" *LinkLine*, 555 U.S. at 453 (quoting *Trinko*, 540 U.S. at 415).

8

The District Court's rationale for what is manifestly rate setting is opaque. Antitrust law does not prohibit supracompetitive pricing in itself; and it recognizes that intellectual property rights are predicated on the promise of supracompetitive pricing, which provide incentives to make fixed-cost investments in research and development. *See Trinko*, 540 U.S. at 407-08; *Qualcomm*, 969 F.3d at 994. The District Court's stipulation of a zero-price commission ignores the difficulty of setting any price that will remedy prior (allegedly exclusionary) conduct, compensate for Apple's intellectual property, or account for an allegedly anticompetitive price differential (the extent of which is partly determined by the pricing decisions and conduct of non-parties).

### III. The Order is not Tailored to the Harm Found at Trial

As the D.C. Circuit has observed, "relief should be tailored to fit the wrong creating the occasion for the remedy." *United States v. Microsoft*, 253 F.3d 34, 107 (D.C. Cir. 2001) ("*Microsoft*"); and it "must base its relief on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" *Id*. at 105 (citation omitted).

The District Court insists that its order "require[s] no affirmative action on Apple's part," Order at 76, implying that no further findings are required. But this strains credulity. First, the practices enjoined—including the charging of any

9

positive price for linked-out payments—were not found unlawful at trial, and there is no explanation in the Order of how they remediate the finding of a UCL violation. At the same time, there is no practical way for Apple to comply with the Order without undertaking numerous and considerable affirmative actions, or to do so without risk to its IAP, its platform, and the consumers who choose to use them. In addition, the Order goes significantly further than the original injunction: It not only requires that Apple eliminate practices that prevent competition with IAP, but, in effect, requires the creation of a frictionless steering experience for the benefit of competitors—and to do so for free. Order at 75–6.

Remedies should target specific anticompetitive acts without deterring the competitive process that benefits consumers. *See, e.g., Microsoft*, 253 F.3d at 107; *see also* Herbert J. Hovenkamp, *Structural Antitrust Relief Against Digital Platforms*, 7 J. LAW & INNOVATION 57, 64 (2024). To ignore this principle risks doing more harm than good. "Fashioning appropriate equitable antitrust relief requires that courts balance the benefit to competition against the hardship or competitive disadvantage the remedy may cause." *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010).

The history of antitrust remedies shows that they fail precisely when they overindex on harms and ignore the benefits that may also arise from ambiguous conduct and complex market structures. *See generally* Robert W. Crandall &

10

Kenneth G. Elzinga, *Injunctive Relief in Sherman Act Monopolization Cases*, 21 RES. LAW AND ECON. 277, 335–37 (2004) (studying effects of behavioral remedies imposed in ten major monopolization cases). "Without a firm grasp of the economic forces that are driving changes in market structure, [courts] cannot be expected to design 'relief' that will result in increased competition, lower prices, and consumer benefits." *Id.* at 335.

The Order also ignores the competitive and consumer benefits of Apple's relatively "closed" distribution model, which allows Apple to curate the App Store's apps and payment options. For example, categorically and permanently enjoining Apple from excluding "certain categories of apps and developers from obtaining link access" significantly impairs Apple's ability to protect consumers against fraudulent apps. Prohibiting Apple from placing any restrictions on apps that "pass[] on product details, user details or other information that refers to the user …" ignores the risks to privacy and personal data that such practices can entail. Likewise, prohibiting Apple from requiring "anything other than a neutral message apprising users that they are going to a third-party site" prevents Apple from excluding undesirable or harmful language on its platform. Apple's App Store guidelines address these concerns by excluding apps that pose data security threats, threaten to impose physical harm on users, or undermine child-safety filters. These rules increase trust between users and previously unknown

11

developers and reduce user fears about payment fraud. Yet the Order does not weigh the costs and benefits of such restrictions or question whether they are necessary to remedy a violation of California law.

There is also a serious risk of freeriding. Rivals could mimic Apple's curation while undercutting it on price. This would not enhance competition on the merits, but eviscerate it, by eroding Apple's incentives to enforce such rules. To impose a zero price on linked-out transactions effectively assumes that the appropriate level of curation is itself zero. But that cannot be correct: Apple's closed business model enables it to maintain a high standard of performance on iOS by excluding apps and payment systems that might impair it, ensuring that unscrupulous developers cannot impose negative externalities on the entire ecosystem.

Date:   May 14, 2025

                                                     **ARENTFOX SCHIFF LLP**

                                                     */s/ Sara T. Schneider*
                                                     Sara T. Schneider

                                                     *Counsel for Amicus Curiae the*
                                                     *International Center for Law & Economics*

## CERTIFICATE OF SERVICE

On May 14, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

By: */s/ Sara T. Schneider*
Sara T. Schneider

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-2935

I am the attorney or self-represented party The International Center for Law & Economics

**This brief contains 2,594 words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Sara T. Schneider* **Date** May 14, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Form 8                                                                                          Rev. 12/01/22