## Docket No. 25-2935

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————————

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

———————————————

*Appeal from a Decision of the United States District Court for the Northern District of California,*
*No. 4:20-cv-05640-YGR · Honorable Yvonne Gonzalez Rogers*

**BRIEF OF *AMICUS CURIAE* INFORMATION TECHNOLOGY &**
**INNOVATION FOUNDATION IN SUPPORT OF DEFENDANT/APPELLANT**
**APPLE INC.'S MOTION FOR PARTIAL STAY PENDING APPEAL**

> JUSTIN H. SANDERS, ESQ.
> SANDERS ROBERTS LLP
> 1055 West 7th Street, Suite 3200
> Los Angeles, California 90017
> (213) 426-5000 Telephone
> jsanders@sandersroberts.com
>
> *Attorney for Amicus Curiae,*
> *Information Technology & Innovation Foundation*

 

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Information Technology & Innovation Foundation, a nonprofit corporation, states

that it does not have parent companies, subsidiaries, or affiliates that have issued

shares to the public.


Dated: May 15, 2025                    Respectfully submitted,


   */s/ Justin H. Sanders*

Justin H. Sanders
Sanders Roberts LLP
1055 West 7th Street, Suite 3200
Los Angeles, CA 90017
Telephone: (213) 426-5000

i

## **TABLE OF CONTENTS**

IDENTITY AND INTEREST OF AMICUS CURIAE..............................................1

ARGUMENT ..............................................................................................3

    I.     THE RELIEF ORDERED BY THE DISTRICT COURT IS
          LEGALLY AND ECONOMICALLY FLAWED .............................3

         A.    Banning Commissions on Linked Transactions Is An
              Unnecessary Remedy That Proscribes Lawful Conduct ............4

         B.    Irreparable Harm To Apple Will Result. ...................................5

         C.    User Experience, Privacy, and Security Will Likely Suffer.......6

         D.    The Public Interest Is Not Served By Judicial
              Central Planning..........................................................................7

CONCLUSION ...........................................................................................8

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ............................................................6

*Epic Games, Inc. v. Apple Inc.*,
    67 F. 4th 946 (9th Cir. 2023)................................................... 4, 5, 6

*Epic Games, Inc. v. Apple Inc.*,
    Case No. 20-cv-05640-YGR, Dkt. No. 1508 (N.D. Cal. Apr. 30, 2025) .........3

*Fed. Trade Comm'n v. Qualcomm*,
    969 F.3d 974 (9th Cir. 2020)........................................................5,

*Hilton v. Braunskill*,
    481 U.S. 770 (1987) ......................................................................3

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004)......................................................7

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ......................................................4

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004) ..................................................................6, 7

**FEDERAL RULES**

Fed. R. App. P. 29(a)(4)(E)...........................................................................1

**STATUTES**

Cal. Bus. & Prof. Code § 17200 ("UCL") .................................................3

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law
    (1st ed. 1996).........................................................................................4

James G. McGann, *2020 Global Go To Think Tank Index Report*,
    Univ. of Pa. (2021)............................................................................1

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Information Technology and Innovation Foundation ("ITIF") is an independent, non-profit, and non-partisan think tank. ITIF's mission is to formulate, evaluate, and promote policy solutions that accelerate innovation and boost productivity to spur growth, opportunity, and progress. To that end, ITIF strives to provide policymakers around the world with high-quality information, analysis, and recommendations they can trust. ITIF adheres to the highest standards of research integrity and is guided by an internal code of ethics grounded in analytical rigor, policy pragmatism, and independence from external direction or bias. The University of Pennsylvania has recognized ITIF as setting the global standard for excellence in science and technology policy, and as one of the 40 overall "Top Think Tanks in [the] United States."[2]

ITIF's core focus lies at the intersection of technological innovation and public policy—including economic issues related to innovation, productivity, and antitrust and competition policy, as well as technology policy issues in the areas of information technology, broadband telecommunications, mobile platforms, and

---

[1] In accordance with Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief in whole or in part, or contributed money to fund its preparation or submission, and no person other than amicus, its members, or its counsel have made a monetary contribution to this brief's preparation or submission.

[2] James G. McGann, *2020 Global Go To Think Tank Index Report*, Univ. of Pa. (2021), https://repository.upenn.edu/think_tanks/18/ (last visited May. 12, 2025).

1

more.  ITIF engages in policy and legal debates, both directly and indirectly, by presenting policymakers, courts, and policy influencers with compelling data, analysis, and proposals to advance effective innovation policies and oppose counterproductive ones.

ITIF's Schumpeter Project on Competition Policy promotes an understanding of antitrust law and economics that is designed to maximize dynamic competition and innovation, with a particular focus on promoting sound antitrust enforcement in the digital economy and other high-tech industries.  ITIF draws heavily from the work of the Austrian-American economist Joseph A. Schumpeter, who famously described how competition takes the form of "creative destruction" by large firms who have the incentive and ability to engage in the risk taking and research and development necessary to drive innovation.

As relevant here, ITIF has studied the mobile ecosystem at the heart of this appeal and concluded that the district court's new injunction—and, in particular, preventing Apple from charging any commission on linked transactions—troublingly goes beyond eliminating the anti-steering policy that was found to be unlawful.  This remedy is likely to harm not just Apple by hindering its ability to monetize its platform, but also the hundreds of millions of iOS users who value the privacy and security Apple provides.  At bottom, such relief would have courts engage in central planning by telling a company how it may charge for its services.

## **ARGUMENT**

## I. THE RELIEF ORDERED BY THE DISTRICT COURT IS LEGALLY AND ECONOMICALLY FLAWED

The granting of a stay is determined upon consideration of four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). All of these factors weigh in favor of granting Apple's motion for a partial stay pending appeal, especially regarding the district court's injunction prohibiting Apple from "imposing any commission or any fee on purchases that consumers make outside an app." Order Granting Epic Games, Inc.'s Motion To Enforce Injunction (the "Order"), *Epic Games, Inc. v. Apple Inc.*, Case No. 20-cv-05640-YGR, Dkt. No. 1508 at p. 75 (N.D. Cal. Apr. 30, 2025). This remedy is unnecessary to address the conduct that was found to violate California's Unfair California Law (UCL) and prevents Apple from "effectively monetize[ing] its considerable investments in the App Store and Apple's integrated ecosystem." Declaration of Carson Oliver In Support of Apple Inc.'s Emergency Motion Under Circuit Rule 27-3 To Stay Order Pending Appeal ("Oliver Decl.") ¶ 16. It also risks harming users through reduced privacy and security, as well as imposes court-ordered central planning under the guise of an antitrust remedy.

3

A.    **Banning Commissions on Linked Transactions Is An Unnecessary Remedy That Proscribes Lawful Conduct**

As the Ninth Circuit has already made clear in this litigation, "injunctive relief must be no 'more burdensome to the defendant than necessary to provide complete relief to the plaintiff[ ].'" *Epic Games, Inc. v. Apple Inc.*, 67 F. 4th 946, 1002 (9th Cir. 2023) (citation omitted).  Similarly, as the D.C. Circuit explained when vacating the district court's proposed remedy in the landmark *United States v. Microsoft*, a court must take into account causality, and specifically "base its relief on some clear 'indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended.'" *United States v. Microsoft Corp.*, 253 F. 3d 34, 105 (D.C. Cir. 2001) (quoting 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 653(b), at 91-92 (1st ed. 1996)).

No such narrow tailoring or significant causal connection exists here.  This Court held that Apple's so-called "anti-steering" restrictions, which limited the ability for developers to link to outside payment methods, violated California's UCL despite being lawful under federal standards. *Epic v. Apple*, 67 F. 4th at 972. The lower court's original Injunction set forth the proper relief: allow developers to link to alternative payment methods.  And yet, as if through some legal magic, the court below is now prohibiting Apple for charging any commission on these transactions.  However, not only was the charging of such a commission not found

4

to be illegal, but it doesn't constitute cognizable anticompetitive conduct even if the court deems the commission to be supracompetitive: such above-cost pricing is merely "profit-seeking behavior [that] alone is insufficient to establish antitrust liability." *Fed. Trade Comm'n v. Qualcomm*, 969 F. 3d 974, 1003 (9th Cir. 2020).

### B.      Irreparable Harm To Apple Will Result.

As this Court well knows, Apple has long monetized its platform through a "commission on initial app purchases (downloading an app from the App Store) and subsequent in-app purchases (purchasing add-on content within an app)." *Epic v. Apple*, 67 F. 4th at 967.  Among other things, Apple charges commissions to obtain "compensation for its intellectual property." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1012 (N.D. Cal. 2021).  However, by removing Apple's anti-steering provisions, its ability to recoup its investments in iOS is put at risk, as "this relief would create a pathway for developers to bypass Apple's 30% commission altogether." *Epic v. Apple*, 67 F. 4th at 970.  For this reason, Apple implemented a commission on linked transactions so it could continue to recover the costs associated with the substantial investments it has made in its platform.

By denying Apple the ability to ensure that it can successfully monetize its platform, the district court's new injunction thus risks upending the entire iOS ecosystem.  Indeed, the costs that will be imposed on Apple because of this new injunction are not simply the "hundreds of millions to billions" of dollars in

5

revenues that the company will lose, but a reduced incentive and ability to invest and innovate in its platform. Order 16. Even "[t]he opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004) (citation omitted).

### C.    User Experience, Privacy, and Security Will Likely Suffer.

Prohibiting Apple from charging a commission for linked transactions is likely to have harmful effects on the millions of users who depend upon Apple's platform for a seamless, secure, and privacy-centric experience. As this Court found, a core justification for Apple's anti-steering policy is "improving security and privacy features," which reflects Apple "tapping into consumer demand and differentiating its products from those of its competitors—goals that are plainly procompetitive rationales." *Epic v. Apple*, 67 F. 4th at 987 (citation omitted). In short, having users engage in transactions through Apple's in-app payment system facilitates not just a seamless user experience, but a "secure way for customers to buy digital goods and services within an app." Oliver Decl. ¶ 5.

But now, rather than Apple steering users toward the safety of its platform, the elimination of Apple's ability to charge commissions on linked transactions will create a perverse incentive structure where developers are motivated to steer

users to less secure payment methods outside of Apple's ecosystem so that the developers can avoid paying a commission. While developers may believe this is in their interests, not only are users likely to be harmed by both a worse user experience and greater risks to privacy and security vis-à-vis making payments off-app, but the iOS platform as a whole is likely to suffer, as such behavior "undermines [the] simplicity, convenience, and trust" that are fundamental to the value proposition offered by the iOS platform. Oliver Decl. ¶ 20.

**D.    The Public Interest Is Not Served By Judicial Central Planning.**

Antitrust relief should avoid "requir[ing] courts to act as central planners … a role for which they are ill-suited." *Verizon v. Trinko*, 540 U.S. at 408. Indeed, the Ninth Circuit has clearly articulated how *Trinko*'s admonition about central planning is more than applicable to cases that involve a firm changing similar pricing to direct customers as it does to those involved in some form of intermediation. *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F. 3d 1124, 1133–34 (9th Cir. 2004). To be sure, while such pricing may be viewed by the district court as undesirable by virtue of being supposedly "tied to nothing" and designed to "maintain [A]pple's anticompetitive revenue stream," Order 2, this Court has acknowledged the need for "caution about using the antitrust laws to remedy what are essentially contractual disputes between private parties engaged in the pursuit of technological innovation." *FTC v. Qualcomm*, 969 F. 3d at 997.

These facts constitute no exception to the rule against turning antitrust enforcement into a thinly veiled excuse for *de facto* regulation.  But that is exactly what the relief ordered by the district court does—namely, tell Apple how much it can charge for commissions on linked transactions.  In fact, this has been all but admitted by Epic's CEO, who tweeted that "[t]he key economic practice at stake in the [European Union's] DMA fine, Apple's anti-steering rule, is the EXACT SAME PRACTICE the US Court just found to be unlawful…"  Tim Sweeney, May 4, 2025, https://x.com/TimSweeneyEpic/status/1919037619519754731.  The truth is even worse: whereas the European Commission has not yet explicitly gone as far as to prevent Apple from charging *any* commission on linked transactions, that is precisely what the lower court's new injunction does here.

## CONCLUSION

The district court's Order substantially risks disrupting the iOS ecosystem by *sua sponte* preventing Apple from exercising its right to charge what it wishes for the use of its platform.  That is not behavior that was found to violate California's UCL and for good reason: above cost pricing is *per se* lawful and an essential part of the market system upon which the antitrust laws are premised. This Court must take action to ensure that relief in this case coheres with these

8

fundamental principles and prevents unnecessary and irreparable harm to Apple as well as the millions of users and developers who rely on iOS.

Dated: May 15, 2025                    Respectfully submitted,


  */s/ Justin H. Sanders*
Justin H. Sanders
SANDERS ROBERTS LLP
1055 West 7th Street, Suite 3200
Los Angeles, California 90017
Telephone: (213) 426-5000

*Attorney for* Amicus Curiae *Information Technology & Innovation Foundation*

9

## CERTIFICATE OF COMPLIANCE

I certify that this amicus brief contains 1,927 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). It thus complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word.

Dated: May 15, 2025                          */s/ Justin H. Sanders*
                                             Justin H. Sanders
                                             *Attorney for* Amicus Curiae
                                             *Information Technology &*
                                             *Innovation Foundation*

10

## CERTIFICATE OF SERVICE

I certify that on May 15, 2025, I electronically filed the foregoing amicus curiae brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Dated: May 15, 2025

                                  */s/ Justin H. Sanders*
                                  Justin H. Sanders
                                  *Attorney for* Amicus Curiae
                                  *Information Technology &*
                                  *Innovation Foundation*