No. 25-2935

---

IN THE
# United States Court of Appeals for the Ninth Circuit

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR
Hon. Yvonne Gonzalez Rogers

---

## EPIC GAMES, INC.'S OPPOSITION TO APPLE'S EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR A PARTIAL STAY PENDING APPEAL

---

Gary A. Bornstein
Yonatan Even
Lauren A. Moskowitz
Michael J. Zaken
M. Brent Byars
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001-1867
(212) 474-1000

Paul J. Riehle
FAEGRE DRINKER BIDDLE &
REATH LLP
Four Embarcadero Center
San Francisco, CA 94111-4180
(415) 591-7500

*Counsel for Plaintiff-Appellee Epic Games, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Epic

Games, Inc. ("Epic") states that it has no parent corporation and that

Tencent Holdings Limited owns more than 10% of Epic stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES .................................................... iii

INTRODUCTION........................................................... 1

STATEMENT OF THE CASE ................................................ 4

I.    Apple Is Not Likely to Succeed On the Merits. ............................10

    A.    The District Court Properly Found That Apple Violated
        the Injunction and Crafted an Appropriate Remedy. ......... 10

    B.    The District Court Correctly Prohibited Apple from
        Using Commissions to Prevent Steering. ........................... 16

    C.    The District Court Correctly Prohibited Apple from
        Using Link Restrictions to Prevent Steering. ...................... 19

    D.    There Is No Conflicting State Judgment............................. 21

II.   Apple Faces No Irreparable Injury Absent a Stay. .......................24

III.  Epic and the Public Interest Will Suffer Harm If a Stay Is
     Issued....................................................................................28

CONCLUSION .................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL-CIO v. OPM*,
  2025 WL 835337 (9th Cir. Mar. 17, 2025) .......................................... 26

*Am. Trucking Assn's, Inc. v. City of L.A.*,
  559 F.3d 1046 (9th Cir. 2009) ............................................................. 26

*Beverage v. Apple*,
  101 Cal. App. 5th 736 (2024) ....................................................... 21, 23

*Beverage v. Apple Inc.*,
  No. 20CV370535, 2022 WL 22823474 (Cal.Super. Dec. 21, 2022) .... 22

*Casey v. Albertson's Inc.*,
  362 F.3d 1254 (9th Cir. 2004) ............................................................. 21

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ............................................................................. 18

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020) ............................................................. 24

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ...................................................... passim

*Epic Games v. Apple*,
  73 F.4th 785 (9th Cir. 2023) (Smith, J., concurring) ........................... 3

*FTC v. Qualcomm Inc.*,
  935 F.3d 752 (9th Cir. 2019) ............................................................... 26

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*,
  493 U.S. 331 (1990) ............................................................................. 29

*Gates v. Shinn*,
  98 F.3d 463 (9th Cir. 1996) ................................................................. 15

*George v. Sullivan,*
2010 WL 5393675 (E.D. Cal. Dec. 21, 2010) ...................................... 26

*Griffith v. Dep't of Public Works,*
141 Cal. App. 2d 376 (1956) ................................................................ 23

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,*
736 F.3d 1239 (9th Cir. 2013) ............................................................ 28

*In re Google Play Store Antitrust Litig.,*
2024 WL 4438249 (N.D. Cal. Oct. 7, 2024) ....................................... 17

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y,*
774 F.3d 935 (9th Cir. 2014) .............................................................. 12

*John B. Stetson Co. v. Stephen L. Stetson Co.,*
128 F.2d 981 (2d Cir. 1942) ............................................................... 13

*Leiva-Perez v. Holder,*
640 F.3d 962 (9th Cir. 2011) .............................................................. 25

*L.A. Memorial Coliseum Comm'n v. NFL,*
634 F.2d 1197 (9th Cir. 1980) ........................................................... 27

*McComb v. Jacksonville Paper Co.,*
336 U.S. 187 (1949) ............................................................................ 14

*Miller v. Cal. Pac. Med. Ctr.,*
991 F.2d 536 (9th Cir. 1993) .............................................................. 25

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ............................................................................ 20

*Nken v. Holder,*
556 U.S. 418 (2009) ............................................................................ 10

*Philip Morris USA Inc. v. Scott,*
561 U.S. 1301 (2010) .......................................................................... 27

*Rendish v. City of Tacoma,*
123 F.3d 1216 (9th Cir. 1997) ........................................................... 28

iv

*Royal Crown Ins. Corp. v. Commonwealth of the N. Mariana Islands*,
   447 F. App'x 760 (9th Cir. 2011) ........................................................... 23

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984) ................................................................... 18, 19

*Schmidt v. Lessard*,
   414 U.S. 473 (1974) ........................................................................ 13

*SEC v. Hickey*,
   322 F.3d 1123 (9th Cir. 2003) ........................................................... 15

*Terminal R.R. Ass'n v. United States*,
   266 U.S. 17 (1924) .......................................................................... 12

*United States v. Armour*,
   402 U.S. 673 (1971) ........................................................................ 14

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ........................................................................ 23

*United States v. DAS Corp.*,
   18 F.4th 1032 (9th Cir. 2021) ........................................................... 13

*United States v. Microsoft*,
   147 F.3d 935 (D.C. Cir. 1998) ........................................................... 16

*United States v. Mitchell*,
   971 F.3d 993 (9th Cir. 2020) ........................................................... 24

*United States v. Thrasher*,
   483 F.3d 977 (9th Cir. 2007) ........................................................... 22

*Venoco v. Plains Pipeline LLP*,
   2022 WL 1090947 (9th Cir. Apr. 12, 2022) (unpublished) ................. 22

*Whaley v. Belleque*,
   520 F.3d 997 (9th Cir. 2008) ........................................................... 22

*Wolfard Glassblowing Co. v. Vanbragt*,
   118 F.3d 1320 (9th Cir. 1997) ........................................................... 16

**Statutes & Rules**

Fed. R. Civ. P. 60(b)(5) .................................................................. 21

## INTRODUCTION

By clear and convincing evidence, including nine days of in-court testimony and an extensive documentary record, the district court found that Apple willfully violated an Injunction entered by the district court in 2021 and affirmed by this Court in 2023.  (*See* Order, Mot. Ex. A; "Op.".)  Apple also engaged in an extraordinary attempt to cover up its contempt.  Aware that its actions could be subject to judicial review, Apple prepared made-for-litigation documents reflecting sham justifications for its conduct.  It then hid the real evidence of its decision-making behind specious privilege claims and "outright lied" on the witness stand.  (Op.2, 65-67.)  Apple did this because every day it delayed compliance with the Injunction, it continued to reap supracompetitive profits.  (Op.12, 65.)  Apple does not come to this Court with clean hands, and the equities do not favor a stay.

A stay would give Apple more time to continue unfairly profiting at the expense of consumers and app developers.  Tacitly acknowledging the point, Apple expressly grounds its "irreparable harm" argument on the revenues it will lose if it is not allowed to maintain its restrictions on external purchase links.  (Mot.21-23.)  But

the district court found Apple's revenues to be supracompetitive, as a result of Apple's unlawful restrictions, in a decision this Court already affirmed. Thus, Apple's loss of revenue is not a "harm"; it is the intended result of a fully adjudicated Injunction.

The facts belie Apple's other claims of irreparable harm. Apple took a full week to file its "emergency" stay motion. In the meantime, Apple complied with the Order and developers began taking advantage of its protections. The sky has not fallen. Instead, developers and consumers are *finally* beginning to see the long-awaited benefits of increased competition. Apple's arguments about harm to the "integrity" of the iOS ecosystem are simply complaints about that competition.

As for the other equitable factors, both Epic and the public interest would be harmed by a stay. As this Court previously found, "Epic is a competing game distributor" that will benefit from the Injunction, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023) ("*Apple I*"). The public interest is served by preventing Apple from further stifling competition.

Apple's merits arguments fare no better.  The extensive factual record shows Apple's deliberate effort to circumvent the Injunction and mislead the district court.  Rather than impose what Apple wrongly calls a punitive "new" injunction, the portion of the Order under review simply imposes "restrictions on the specific actions Apple took to violate th[e] Injunction".  (Op.76.)  In 2023, Apple challenged the Injunction with arguments that could not "withstand even the slightest scrutiny" and "masquerade[d] its disagreement with the district court's findings and objection to state-law liability as contentions of legal error".  *Epic Games v. Apple*, 73 F.4th 785, 785 (9th Cir. 2023) (Smith, J., concurring).  The same is true now, except that, in seeking to stay an Order finding Apple in "willful violation" of the Injunction, Apple bears a far heavier burden.  Apple's grab-bag of makeweight arguments should not stand in the way of enforcing the Injunction, and its motion should be denied.

## STATEMENT OF THE CASE

Among other things, Epic develops entertainment applications, including video games, and operates the Epic Games Store. *Apple I*, at 967-968.

On August 13, 2020, Epic brought suit challenging portions of Apple's agreement with app developers and the incorporated Guidelines (the "Guidelines"). *Id.* 969-70. The Guidelines prohibited apps from "includ[ing] buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than" Apple's in-app purchase system, known as "IAP". (Dkt. 812 31 (the "Rule 52 Order").) This restriction prevented users from learning of alternative web-purchase options and allowed Apple to maintain a supracompetitive 30% commission through IAP. (*Id.* 163-164.)

After trial, on September 10, 2021, the district court found that Apple violated California's Unfair Competition Law ("UCL") by preventing developers from "communicat[ing] lower prices on other platforms", which protected IAP from competition and allowed Apple to reap "excessive operating margins under any normative measure". (*Id.* 163.) The court further found that "the costs to developers are

4

higher because competition is not driving the commission rate". (*Id.*)
The anti-steering rules therefore "'threaten[ed] an incipient violation of
an antitrust law' by preventing informed choice among users of the iOS
platform". (*Id.* 163-164.) The court enjoined Apple from prohibiting
developers from including in their apps "buttons, external links, or
other calls to action" that direct customers to alternative purchasing
methods outside of the app. (Dkt. 813 ¶ 1 (the "Injunction").)

This Court stayed the Injunction pending appeal. (Op.8 n.4.)
On April 24, 2023, this Court affirmed the district court's Injunction.
(Op.8.) On January 16, 2024, the Supreme Court denied certiorari, the
stay expired, and the Injunction went into effect. (Op.10-11.)

In response, Apple struck the unlawful anti-steering
restrictions from its Guidelines but, in their place, introduced a scheme
that required developers to apply for an "entitlement" to use an
"external link" steering mechanism and imposed a new set of fees and
severe restrictions that were designed to be and were a "*de facto*
prohibition" on steering. (Op.62 n.66.) For the first time ever, Apple
imposed a fee on transactions made outside the app and not through
IAP, at a 27% rate that Apple "reverse engineer[ed]" to increase

developers' costs of steering above the cost of IAP.  (Op.60.)  Apple also imposed an array of new restrictions that prevented effective steering, including restrictions on where in the app a link may be placed, on link design and functionality, and on the messaging developers may use to communicate alternative purchase solutions.  (Op.29-33.)

Epic filed a motion to enforce on March 13, 2024.  (Op.11; Dkt. 897.)  After briefing, the district court set an evidentiary hearing. (Op.11.)  As the hearing progressed in May 2024, the court became "increasingly concerned that Apple was . . . withholding critical information about its business decision for complying with the Injunction".  (Op.12.)  Thus, the court ordered Apple to produce all documents related to its Injunction response efforts.  (Op.12.)

Apple then engaged in a series of "tactics to delay the proceedings"—and, consequently, enforcement—because "delay equaled profits".  (Op.12.)  The magistrate judge supervising discovery noted that complying with the mandated discovery was "all downside for Apple because it relates to Apple's alleged lack of compliance" and labeled Apple's delay tactics "bad behavior".  (Op.12; Dkt. 1017 2.)

6

By October 2024, Apple produced around 95,000 documents but withheld roughly 57,000 as privileged.  (Op.12.)  Following *in camera* review of eleven exemplar documents withheld by Apple, the magistrate judge found Apple's privilege claims almost entirely unsubstantiated. (Op.12.)  The district court affirmed.  (Op.12.)  Apple was required to re-review all of its privilege assertions, this time subject to *in camera* review by a panel of Special Masters.  (Op.12.)  Aware that the results of its re-review would be reviewed by neutrals, Apple withdrew privilege claims on approximately 56% of withheld documents—over 30,000 documents.  (Op.12 & n.8.)

The evidentiary hearing resumed on February 24, 2025, with three more days of testimony.  (Op.13.)  The hearing unequivocally confirmed Apple's concealment of important information; what Apple "hid" in 2024 was "uncovered at the second evidentiary hearing". (Op.14; *see also* Op.19, 23, 24.)  Most notably, Apple's "lies" from 2024 became "obvious" in February 2025 (Op.26), as witnesses' 2024 testimony was directly contradicted by Apple's contemporaneous documents.  (Op.25.)

7

On April 30, 2025, the district court held Apple in contempt. (Op.2.)  The court found that Apple's goal was "to dissuade customer usage of alternative purchase opportunities and maintain its anticompetitive revenue stream".  (Op.2.)  Apple's new 27% "commission rate, on its own, forecloses a developer's use of link-out purchases [and] Apple's various design restrictions and purchase-flow friction arbitrarily decrease the attractiveness of competitive alternatives".  (Op.63.)  Finding that Apple "chose to defy this Court's order and manufacture *post hoc* justifications for maintaining an anticompetitive revenue stream" and that "Apple's actions misconstrue the Injunction to impede competition", the court enjoined Apple from engaging in six "specific actions Apple took to violate [the] Court's Injunction".  (Op.76.)

The district court denied a stay in light of Apple's dilatory conduct.  (Op.76.)  The court found that Apple abused the attorney-client privilege.  The court also found that an Apple witness "outright lied under oath" and that Apple did nothing to correct the false testimony, referring Apple and the witness to the United States Attorney for criminal investigation.  (Op.76-78.)

8

That evening, on April 30, 2025, Apple changed its Guidelines to remove the requirement that developers apply for entitlements "to include buttons, external links or other calls to action" in their apps.  (Ex. A, Oliver Decl. ¶ 14.)  Within days, developers including Spotify and Amazon submitted apps that complied with the new policy, which Apple approved.  (Exs. B, C.)  Developers and consumers are finally using the steering mechanisms the Injunction protects.  That said, Apple has singled out Epic for disfavored treatment for tactical reasons.  It has expressly refused to consider Epic's submission of an app with an external purchase link while this motion to stay is pending.  (Ex. D.)

## **ARGUMENT**

Apple "bears the burden" of showing (1) it is likely to succeed on the merits; (2) it will be irreparably injured absent a stay; (3) the issuance of the stay will not substantially injure the other parties interested in the proceeding; and (4) the public interest favors a stay.

*Nken v. Holder*, 556 U.S. 418, 426 (2009).  Apple cannot meet its burden.[1]

## I.    Apple Is Not Likely to Succeed On the Merits.

### A.    The District Court Properly Found That Apple Violated the Injunction and Crafted an Appropriate Remedy.

The district court found, based on clear and convincing evidence, that Apple's conduct violated both the letter and the purpose of the Injunction.  The Injunction enjoined Apple from "prohibiting" developers from including in their apps "buttons, external links or other calls to action that direct customers to purchasing mechanisms" other than Apple's IAP mechanism.  (Dkt. 813.)  In its contemporaneous Rule 52 Order, the district court stated that the Injunction's purpose was to allow developers to "communicate lower prices on other platforms" because the prohibition on doing so caused "anticompetitive effects and excessive operating margins".  (Rule 52 Order 163.)

Apple never complied.  Rather, Apple created new rules that continued to "prohibit[] developers from using what their consumers

---

[1] Apple's amici are no help, and are funded by Apple.  Epic conditionally consented to all amicus filings *if* the amici would disclose recent funding by Apple.  All declined to do so.

10

would expect to see as an actual 'button'" (Op.33) and continued to

"prohibit developers from using calls to action other than the text of

external links" (Op.41).  The district court found that these restrictions

amounted to "quite literally, the intentional *de facto* prohibition of"

steering mechanisms that the Injunction required Apple to allow.

(Op.62 & n.66.)  And the district court found that Apple's fees and

restrictions purposefully made the use of external links so costly,

ineffective and impractical that developers were effectively *prevented*

(and thus "prohibited" within the meaning of the Injunction) from using

external links.  (Op.58 (Apple "prohibit[ed] any viable alternative"), 59-

63.)  Apple purposefully chose a 27% commission that, when coupled

with developers' costs for linked transactions (which are higher than 3%

by a "safe margin"), "renders every linked-out transaction more

expensive to a developer than an IAP transaction at 30% commission".

(Op.22, 25, 63.)  Apple fails to meaningfully engage with these findings,

leaving it no prospect of demonstrating success on the merits.  The

scattershot arguments that Apple does make are meritless.

　　　　　*First*, Apple argues that the court erred by relying "on its

separate findings of fact" entered after trial, rather than restricting its

11

analysis to the "four corners" of the Injunction. (Mot.11.) Apple is wrong.

For one, the district court determined that "even limited to the four corners of the Injunction, Apple violated the literal text". (Op.57; *see also* Op.62 (finding that "two of Apple's restrictions are explicitly at odds with the Injunction").)

Regardless, Apple concedes that the meaning of an injunction is determined "in the light of the issues and the purpose for which the suit was brought". (Mot.12-13 (citing *Terminal R.R. Ass'n v. United States*, 266 U.S. 17, 29 (1924)).) This Court also has held that "[i]n deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded". *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014)[2]; *see*

---

[2] Apple seeks to distinguish *Sea Shepherd* on the ground that "the defendant aided and abetted" a third party to engage in "the same conduct that had already been enjoined as unlawful". (Mot.12.) But *Sea Shepherd* did not turn on that aiding and abetting issue. Rather, this Court held generally that actions that "thwarted" the "objective" of an injunction were contemptuous, even if not "specifically forbid[en]" by the

*also United States v. DAS Corp.*, 18 F.4th 1032 (9th Cir. 2021) ("our obligation is to construe the judgment so as to give effect to the intention of the issuing court, considering the entire record before the issuing court, including findings of fact") (cleaned up).[3]  Apple cites *Schmidt v. Lessard* to argue that the Injunction itself supposedly did not provide "explicit notice of precisely what conduct is outlawed" (Mot.12), but the problem in *Schmidt* was that "[n]either the brief judgment order *nor the accompanying opinion*" provided the defendants sufficient notice.  414 U.S. 473, 477 (1974) (emphasis added).  Here, the district court issued a 180-page opinion accompanying the Injunction.  Apple had ample notice, and the district court found that "at every step Apple considered whether its actions would comply" and "*knew* it was violating the Injunction".  (Op.59 (emphasis added).)

---

Injunction, 774 F.3d at 949, quoting support that did not involve aiding-and-abetting.  *See John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942).

    [3] Apple argues that *DAS* allows the use of "extraneous evidence" only to interpret an injunction that is "ambiguous'" (Mot. 12), but Apple cannot show that the Injunction unambiguously supports its position.  Indeed, Apple itself has sought to rely on the contents of the Rule 52 Order to defend its conduct.  (Mot.7.)  The district court resolved all ambiguities in the Injunction in Apple's favor and rejected these arguments.  (Op.56, 57.)

*Second*, Apple erroneously argues that the Injunction "unambiguous[ly]" permits its conduct because "the Injunction nowhere mentions a commission or placement of links". (Mot.11.) Apple insists that new "full litigation" is required to address its disobedience. (Mot.17.) This argument was correctly rejected by the district court as "ludicrous" (Op.57) because it "would require courts to effectively engage in a 'whack-a-mole' game to require compliance". (Op.57.) As the Supreme Court noted in *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192-193 (1949): "It does not lie in [contemnors'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to [a] program of experimentation with disobedience of the law. . . ." No enjoined party is entitled to such experimentation, especially not one who "knew it was violating the Injunction". (Op.59.)

Apple's precedent provides it no support. *United States v. Armour*, involved a consent decree resulting from "careful negotiation", not a judgment on the merits. 402 U.S. 673, 681-82 (1971). The Supreme Court held that, unlike a contested injunction, a consent

14

decree "cannot be said to have a purpose" but rather "embodies a compromise". *Id.* And *Gates v. Shinn* relies on *Armour* to hold that the meaning of a "consent decree" must be found "within its four corners". 98 F.3d 463, 468 (9th Cir. 1996). Apple misleadingly inserts "injunction" into its quotation from *Gates* to obscure this distinction. (Mot.11.)

*Third,* Apple argues that the district court improperly imposed "punishment" on Apple without "due process protections". (Mot.17.) But Apple cites nothing in the Order that is "punitive". To the contrary, the district court took pains to emphasize that its proceedings were civil and that the decision to seek punitive proceedings would be left to the U.S. Attorney. (Op.77.)

The portions of the Order that Apple seeks to have stayed enjoined Apple from continuing "the specific actions Apple took to violate this Court's Injunction". (Op.76.) Apple's assertion that the Order imposed "new obligations" to punish Apple is wrong. (Mot.17-18.) Courts have "broad equitable power to order appropriate relief in civil contempt proceedings". *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003). Those powers necessarily include the authority to specify

15

violative conduct and enjoin it. *See, e.g.*, *Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320 (9th Cir. 1997) (barring further sales of new infringing products). Otherwise, courts could not stop contumacious conduct. Apple's own precedent, *United States v. Microsoft*, holds that "we are aware of no case raising doubts about the propriety of clarification" to prevent future violations, even absent contempt. 147 F.3d 935, 942 (D.C. Cir. 1998).

### B.    The District Court Correctly Prohibited Apple from Using Commissions to Prevent Steering.

The district court found that, when ordered to *allow* steering, Apple introduced commissions on out-of-app transactions to make steering *non-viable*. (Op.2, 14.) Apple does not dispute that its new fees made out-of-app purchases more expensive than IAP "by a safe margin". (Op.25.) Apple understood (and intended) that consequently, developers could not use steering to "communicate lower prices on other platforms"—the very purpose of the Injunction. (Op.5.)

The district court's findings dispose of Apple's claim that its steering commission reflected compensation for its "intellectual property". (Mot.13.) Apple never before charged fees on transactions made without using IAP, and obtaining compensation for its intellectual

16

property was not Apple's goal.  Instead, Apple targeted a singular type of non-IAP transactions—linked transactions intended by the Court to compete with IAP.  For those transactions only, Apple "reverse engineer[ed] a number right under 30% that would allow it to maintain its anticompetitive revenue stream" by preventing steering the Injunction required Apple to allow.  (Op.60.)  Apple's claim that it was "objectively reasonable for Apple to conclude it could charge a commission" (Mot.13) is contradicted by findings that Apple (i) was at least unsure whether imposing a commission was "fine to do" (Op.15); (ii) was fully on notice of the "many issues with the commission concept" (Op.21) and (iii) chose a commission that "made all alternatives to IAP economically non-viable", and thus "knew it was violating the Injunction".  (Op.59.)

Apple argues that precedent concerning "rate-setting" bars these findings.  (Mot.13-14.)  But none of that precedent concerns contempt, much less immunizes Apple's conduct.  Rather, Apple's precedent confirms that "[t]he restoration of free competition in the relevant markets is the best medicine for correcting fees and prices".  *In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, *9 (N.D. Cal.

Oct. 7, 2024). Here, Apple intentionally designed its commission to *block* competition. (Op.22-23.)

Apple's argument that the Order violates the Takings Clause is even more of a stretch. (Mot.14.) Apple's sole precedent, *Cedar Point Nursery v. Hassid*, addresses government actions that result in "*per se* physical takings*", such as "physical invasions" onto land. 594 U.S. 139, 143, 150 (2021). Apple cites no precedent applying the *per se* takings rule outside that context.

Even if the Takings Clause applies to regulations on intellectual property, courts do not deem such regulations *per se* takings. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1004 (1984); *see also Cedar Point*, 594 U.S. 148 ("When the government, rather than appropriating private property for itself or a third party, instead imposes regulations that restrict an owner's ability to use his own property, a different standard applies."). Here, the Order does not prevent Apple from collecting consideration on its intellectual property, which it already does in myriad ways (*e.g.*, selling iPhones, IAP commissions, developer registration fees); it prevents Apple only from collecting on the use of external links—which is a new charge intended

18

to foreclose competition.  Thus, Apple cannot show that the Order has "deprive[d] the owner of all or most of [its] interest in the subject matter".  *Id.*

### C.  The District Court Correctly Prohibited Apple from Using Link Restrictions to Prevent Steering.

The district court found that "Apple decided to replace the explicit anti-steering provisions the Injunction prohibited with a mosaic of the same:  an ensemble of requirements that significantly reduces developers' ability to steer consumers to any competitive, favorable alternatives".  (Op.61.)  The district court also found that the "design restrictions and purchase-flow friction" (Op.63) violated the Injunction.

Apple now abandons the pretextual justifications it offered the district court and *concedes* that the restrictions were an effort to "maintain the exclusivity of IAP".  (Mot.15-16.)  Apple's claim that this Court "approv[ed] that practice" is false.  (Mot.16.)  Apple refers to this Court's holding that the tie between Apple's App Store and IAP was lawful.  But the tying claim addressed purchases made *within an iOS app*, *see Apple I*, at 994-98, not Apple's separate anti-steering provisions.  Those provisions violated the UCL because they restricted consumers' ability to make *out-of-app* purchases (e.g., on the web).  *Id.*

19

This Court affirmed the Injunction to allow consumers to "substitute" *away* from IAP. *See id*. 1000. Apple's argument that this Court condoned conduct that prevents such substitution is wrong.

Apple also asserts, without elaboration, that the Order violates Apple's First Amendment rights by forcing it to "broadcast competing developer speech". (Mot.16.) Rather than forcing *Apple* to carry unwanted speech, the Order prohibits Apple's interference with *developers'* communications to their users, in apps published by those developers. Apple's cases apply only when "the regulated party is engaged in its own expressive activity". *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024). Apple's contracts with developers make clear that it is developers, not Apple, who own and are responsible for the content on their apps. (Ex. E 53.) And if that were not already clear to users, the Order permits Apple to display a "neutral message apprising users that they are going to a third-party site". (Op.75.) Apple's claim that the Order enables "disparagement of IAP" (Mot.15-16) is thus a red herring; any alleged disparagement would be a developer's expression, not Apple's. Nor has Apple presented any evidence of such "disparagement".

### D.    There Is No Conflicting State Judgment.

During the contempt proceedings, Apple moved to vacate the Injunction pursuant to Federal Rule of Civil Procedure 60(b)(5), contending that a California decision, *Beverage v. Apple*, 101 Cal. App. 5th 736 (2024), had changed California law in a way that invalidates the Injunction.  (Op.45-46.)  The district court correctly denied that motion, including because Apple itself had previously represented that *Beverage* did not change California law.  (Op.49-51.)

Apple now claims that the lack of a change in California law somehow "proves Apple's point", contending that the Injunction was improper when issued.  (Mot.18-19, 20-21.)  Apple's appeal is doomed on this issue for several reasons.  For one, Apple forfeited this argument by failing to make it below, where it argued only that the Injunction should be vacated based on an alleged *change* in law.  (*E.g.*, Dkt. 1049 1, 6.) The district court's refusal to vacate the Injunction *without* a change in law was not an abuse of discretion.  *See Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004) (decisions on Rule 60(b) motions "will not be reversed absent an abuse of discretion").  To the contrary, the district court lacked authority to vacate as "erroneous" a final judgment

21

affirmed by this Court. *See United States v. Thrasher,* 483 F.3d 977, 981 (9th Cir. 2007) (judgments of this Court are "finally settled" on remand).[4]

In any event, Apple is wrong to argue that the district court failed to address supposed conflicts between the judgments. (Mot.20.) The district court held that "this Court's judgment does not conflict with *Beverage*", finding that Apple itself denied any such conflict when it successfully opposed review of *Beverage* by the California Supreme Court. (Op.49-50.) There, Apple argued that claims of conflict between *Beverage* and this case "are wrong". (Op.50.) Judicial estoppel bars Apple's attempt to "play[] fast and loose with the courts" by taking such contradictory positions. *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008).

Apple's prior recognition that *Beverage* poses no conflict was correct. In *Beverage*, the trial court dismissed plaintiffs' complaint, finding a failure to allege sufficient facts for UCL liability. *Beverage v.*

---

[4] Apple argues that *Venoco v. Plains Pipeline LLP* held the refusal to vacate because of a "conflict" with state courts to be an abuse of discretion (Mot. 19), but that decision was based on "an intervening change of law". 2022 WL 1090947, at *1 (9th Cir. Apr. 12, 2022) (unpublished).

22

*Apple Inc.*, No. 20CV370535, 2022 WL 22823474, *1 (Cal.Super. Dec. 21, 2022). That decision could not create any conflict with this case for two reasons. *First*, a dismissal focuses only on the adequacy of the pleading "as it stands", not the ultimate merits of a party's conduct. *Griffith v. Dep't of Public Works*, 141 Cal. App. 2d 376, 381 (1956). *Second*, the trial court's rulings are not binding precedent that federal courts must follow. *Royal Crown Ins. Corp. v. Commonwealth of the N. Mariana Islands*, 447 F. App'x 760, 764 n.1 (9th Cir. 2011).

That leaves the decision of the California Court of Appeal. Critically, the *Beverage* plaintiffs did not appeal the issue that Apple relies upon to claim conflict: whether Apple's anti-steering rules constitute unilateral conduct immunized from antitrust liability by the U.S. Supreme Court's decision in *United States v. Colgate & Co.*, 250 U.S. 300 (1919). *Beverage*, 101 Cal. App. 5th 743. The Court of Appeal thus "presumed" *without deciding* that Apple's anti-steering rules are immunized by *Colgate*, *id.* 752, and reaffirmed "settled" California law that *Colgate*-immunized conduct cannot violate the UCL, *id.* 756. Contrary to Apple's claim, the Court of Appeal never determined that Apple's anti-steering rules were lawful. Rather, it accepted the

23

*Beverage* plaintiffs' *concession*, and rejected the plaintiffs' request to change California law to resuscitate their UCL claim notwithstanding that concession.  (Op.48-49.)

In this case, by contrast, neither the district court nor this Court determined that Apple's anti-steering rules were immunized by *Colgate*.  For that reason, Apple correctly explained to the California Supreme Court that this Court did not "address the applicability of the *Colgate* doctrine" to Apple's conduct and therefore "did not resolve the issue presented in [*Beverage*]".  (Op.50.)[5]

There was no abuse of discretion in the district court's denial of Apple's Rule 60(b) motion.

## II.    Apple Faces No Irreparable Injury Absent a Stay.

Apple must show that it will suffer "irreparable" harm that is "probable—as opposed to merely possible—if the stay is not granted".  *United States v. Mitchell*, 971 F.3d 993, 996 (9th Cir. 2020).  Apple "cannot meet this burden by submitting conclusory factual assertions and speculative arguments that are unsupported in the record".

---

[5] Moreover, this Court held that Apple's agreements with developers were bilateral contracts (and thus not unilateral conduct), *see Apple I*, 67 F.4th at 982, which would make *Colgate* inapplicable.

*Doe #1 v. Trump*, 957 F.3d 1050, 1059-60 (9th Cir. 2020) (citation omitted). If the applicant "has not made a certain threshold showing regarding irreparable harm . . . then a stay may not issue, regardless of [the] proof regarding the other stay factors". *See Leiva-Perez v. Holder*, 640 F.3d 962, 965, 971 (9th Cir. 2011).

Apple's arguments on irreparable harm—typically the centerpiece of a stay motion—are an afterthought. As a threshold matter, events following the issuance of the Order refute any irreparable harm. On April 30, 2025, Apple changed its Guidelines. Apple then *waited an entire week* to seek a stay, all while reviewing and approving apps incorporating the links afforded by the Injunction. In the weeks since then, no harm befell the iOS ecosystem; all that happened is that developers finally can and do "communicate lower prices on other platforms". (Rule 52 Order 163-64.) While "delay by itself is not a determinative factor", Apple's delay in seeking relief—and the lack of harm—are "nonetheless relevant in determining whether

25

relief is truly necessary." *Miller v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993).[6]

In any event, Apple does not show that any cognizable harm to Apple is probable or irreparable. Apple claims the Order "deprive[s] Apple of its basic right to control the terms of access to its own intellectual property, services and tools" (Mot.22), but that is an improper attempt to re-litigate the underlying Injunction, which required changes to such "terms of access". Moreover, that supposed harm is not irreparable. Apple relies on cases where, in the absence of a stay, "fundamental business changes that the injunction impose[d] cannot be easily undone". *FTC v. Qualcomm Inc.*, 935 F.3d 752, 756 (9th Cir. 2019); *see also Am. Trucking Assn's, Inc. v. City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009). That is not so here. Any changes Apple makes can be undone; Apple can roll back the changes to the Guidelines.

---

[6] Further, "the purpose of a stay pending appeal is to preserve the status quo". *George v. Sullivan*, 2010 WL 5393675, *2 (E.D. Cal. Dec. 21, 2010). Because several prominent developers have already had applications with external purchase links placed on the App Store (Exs. B, C) Apple's requested stay would "disrupt the status quo and turn it on its head". *AFL-CIO v. OPM*, 2025 WL 835337, *1 (9th Cir. Mar. 17, 2025).

Nor will the prohibition against a commission on linked-out purchases cause irreparable harm. At most, Apple will be prevented from receiving commissions it *could have* received during the appeal. But monetary loss alone is not irreparable. *L.A. Memorial Coliseum Comm'n v. NFL,* 634 F.2d 1197, 1202 (9th Cir. 1980). Especially so when the asserted loss stems from a revenue stream that has been adjudicated to yield supracompetitive profits. (Rule 52 Order 92.)

*Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010), is not on point. In *Scott*, the defendant would have been affirmatively required to pay out-of-pocket, and the Court found that "before this Court will be able to consider and resolve applicants' claims, a substantial portion of the fund established by their payment will be irrevocably expended". *Id.* Apple will not be required to make an affirmative payment; instead, Apple will simply be unable to collect the full supracompetitive revenues it extracted by suppressing competition.

Apple's contention that compliance with the Order "will engender confusion among App Store customers" and "erode the goodwill that Apple has built" has no basis. (Oliver Decl. ¶ 20.) Apple relies on a declaration from Carson Oliver—one of the leaders of Apple's

27

"obvious cover-up". (Op.2.) This Court should reject his testimony. In any event, specious claims of consumer confusion are insufficient to establish irreparable harm. *See Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). Apple's claims of reputational harm also fail. Apple has always allowed non-IAP transactions (both linked and in-app) for physical goods (Op.61); expanding these to digital transactions cannot irreparably tarnish Apple's brand, particularly where this Court has already affirmed an Injunction requiring such an expansion.

Apple also argues that the "deprivation of constitutional rights unquestionably constitutes irreparable injury". (Mot.23.) But Apple is not being deprived of its constitutional rights. (*See supra* I.B-C.) *See Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir. 1997) ("the finding of irreparable harm [based on constitutional rights] depend[s] upon the plaintiff's success on the merits").

### III.   Epic and the Public Interest Will Suffer Harm If a Stay Is Issued.

Contrary to Apple's argument (Mot.23), a stay would inflict considerable harm on Epic. As this Court previously found, subsidiaries of Epic are harmed as developers of apps listed on the iOS app store.

28

*Apple I*, at 1000. Epic is also a "competing game distributor" harmed by Apple's anticompetitive policies because "[i]f consumers can learn about lower app prices, which are made possible by developers' lower costs, and have the ability to substitute to the platform with those lower prices, they will do so—increasing the revenue that the Epic Games Store generates". *Apple I*, at 1000. Epic thus suffers "actual financial injury" from Apple's conduct. *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990).

To make matters worse, Apple has inequitably created the facts it relies on to argue that "Epic would not be harmed by a stay". (Mot.5.) After the Order, Epic re-submitted its *Fortnite* app for distribution in the App Store in full compliance with the current Guidelines. But Apple refused to consider the submission "until after the Ninth Circuit rules on [the] pending request" for a stay. (Ex. D.) Having created the problem, Apple cannot claim Epic will not be harmed by a stay.

The public interest will be harmed by the issuance of a stay, which would again pause the enforcement of an Injunction designed to stop Apple's anticompetitive conduct. Indeed, after Apple spent years

29

"thwart[ing] the Injunction's goals", the public interest in its enforcement has only *increased*. (Op.1-2.) Apple argues the stay should issue because consumers' "interests, as well as the security and privacy of the App store, are threatened". (Mot.24.) The district court already found "these justifications pretextual; said differently, the proffered rationales are nothing more than after-the-fact litigation posturing or outright misrepresentations to the Court". (Op.31.)

## CONCLUSION

The motion to stay should be denied.

May 19, 2025                              Respectfully submitted,

                                         /s/ *Gary A. Bornstein*

                                         Gary A. Bornstein
                                         Yonatan Even
                                         Lauren A. Moskowitz
                                         Michael J. Zaken
                                         M. Brent Byars
                                         CRAVATH, SWAINE & MOORE LLP
                                         Two Manhattan West
                                         375 Ninth Avenue
                                         New York, NY 10001
                                         (212) 474-1000

                                         Paul J. Riehle
                                         FAEGRE DRINKER BIDDLE
                                         & REATH LLP
                                         Four Embarcadero Center
                                         San Francisco, CA 94111
                                         (415) 591-7500


          *Counsel for Plaintiff-Appellee Epic Games, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Circuit Court Rule 27-1(1)(d) and Circuit Rule 32-3 because it contains 5,567 words, excluding the parts of the brief exempted by Fed. R. App. P. 27(a)(2)(B) and Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E).

May 19, 2025                    /s/ *Gary A. Bornstein*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on May 19, 2025. All participants in the case are registered ACMS users, and service will be accomplished by the appellate ACMS system.

/s/ *Gary A. Bornstein*