No. 25-2935

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

APPLE INC.,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640
Hon. Yvonne Gonzalez-Rogers

---

## BRIEF OF *AMICUS CURIAE* SPOTIFY USA INC. IN SUPPORT OF APPELLEE EPIC GAMES, INC.'S OPPOSITION TO APPELLANT APPLE INC.'S MOTION FOR PARTIAL STAY PENDING APPEAL

---

Renata B. Hesse
Brendan P. Cullen
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301
Tel: (650) 461-5600
Fax: (650) 461-5700

Shane M. Palmer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for* Amicus Curiae *Spotify USA Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Spotify USA Inc. certifies that it is a wholly owned subsidiary of Spotify Technology S.A., a publicly traded company that does not have a parent corporation. No publicly traded corporation owns 10% or more of the common stock of Spotify Technology S.A.

DATE:    May 19, 2025          /s/ *Brendan P. Cullen*
                                   Brendan P. Cullen

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ...................................................................1

INTRODUCTION.................................................................................................2

ARGUMENT ........................................................................................................5

    I.    If a Stay Were Granted, Developers and Consumers Would Suffer Substantial Injury and Lose the Benefits of the Injunction ........................................................................................6

        A.    The 2025 Order Has Enabled Price Transparency that Would Be Lost If the Link-Out Prohibition Were Stayed ....................................................................6

        B.    Consumers Would Be Subject to Supracompetitive Prices If the Fee Prohibition Were Stayed ..........................8

    II.    Preliminary Data Indicate that the 2025 Order's Enforcement of the Injunction Is Benefitting Developers and Consumers ...............................................................................10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Doe #1* v. *Trump*,
   957 F.3d 1050 (9th Cir. 2020)..................................................................5

*Epic Games, Inc.* v. *Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021)...........................................2, 7, 8

*Epic Games, Inc.* v. *Apple Inc.*,
   67 F.4th 946 (9th Cir. 2023) ...................................................................2

*Latta* v. *Otter*,
   771 F.3d 496 (9th Cir. 2014)...................................................................5

*Nken* v. *Holder*,
   556 U.S. 418 (2009)................................................................................5

# INTEREST OF *AMICUS CURIAE*

Spotify and its affiliates operate one of the world's most popular audio-streaming subscription services.[1]  Spotify's audio-streaming app has been available on the Apple App Store in the United States since 2011.  Spotify has been subject to Apple's anti-steering restrictions for many years, and is covered by the district court's September 10, 2021 injunction (the "Injunction") against Apple and its April 30, 2025 Order that Apple challenges through this appeal (the "2025 Order").  Accordingly, Spotify has a substantial interest in ensuring that the Injunction and 2025 Order are enforced.

Spotify can offer the Court an important perspective because it falls within a category of apps, called "reader" apps under Guideline 3.1.3(a) of Apple's App Review Guidelines, that do not utilize Apple's In-App Purchase payment mechanism ("IAP").  Because Spotify does not utilize IAP, Apple has since 2016 prohibited Spotify from providing basic pricing information about its products in its iOS app and from steering users to alternative

---

[1]  Apple and Epic consented to the filing of this brief.  No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than Spotify or its counsel contributed money that was intended to fund preparing or submitting the brief.

purchasing mechanisms. The Injunction, however, proscribed that anticompetitive behavior, and the 2025 Order has enforced that decision. Together, they have enabled Spotify, for the first time in nearly a decade, to communicate basic pricing and purchase information to its United States users.

## INTRODUCTION

After a 16-day bench trial, the district court held that Apple's anti-steering provisions violate California law and cause "considerable" harm to app developers and Apple mobile-device users. *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 1056 (N.D. Cal. 2021). To remedy this harm, the district court entered the Injunction to "uncloak[] the veil hiding pricing information on mobile devices and bring[] transparency to the marketplace." *Id.* at 1057. This Court affirmed, recognizing that Apple's anti-steering provisions reduced consumer choice by excluding "would-be-competitors" to IAP and enabled Apple to reap a supracompetitive 30% commission on IAP. *Epic Games, Inc.* v. *Apple Inc.*, 67 F.4th 946, 985 (9th Cir. 2023).

During the 16 months since it went into effect, Apple has flouted the Injunction "at every step" by choosing "to maintain its anticompetitive revenue stream over compliance." 2025 Order at 59. Although Apple's

2

response to the Injunction (the "Apple Plan") nominally allowed app developers to include within their apps links to external purchase mechanisms, it imposed restrictions on those links to ensure that they could never be a viable alternative to IAP. Apple also levied a 27% commission on external web purchases—effectively a rebrand of its 30% IAP commission—made within seven days after a user tapped on a link. Collectively, these restrictions ensured that external links could not be a viable alternative to IAP, foiling the Injunction's goal of fostering price competition.

Epic moved to enforce the Injunction. After two sets of evidentiary hearings, the district court entered the 2025 Order, which found that Apple had intentionally thwarted the Injunction. Apple appealed the 2025 Order and filed this emergency Motion to stay two components of the 2025 Order pending appeal: (i) the prohibition on charging any commission or fee for link-out transactions (the "Fee Prohibition"); and (ii) the prohibition on restricting the language or placement of external purchase links (the "Link-Out Prohibition").

Contrary to Apple's contentions, the Fee Prohibition and Link-Out Prohibition are not some out-of-the-blue, new injunction. They are necessary remedies that the district court tailored to ensure Apple's compliance with

3

the Injunction. In the two weeks since the 2025 Order was entered, Apple's long-belated compliance has already had a demonstrably positive effect on competition. Before the 2025 Order, Spotify was prohibited from informing iOS app users how to upgrade to a paid subscription; it could only hope that app users would navigate on their own to Spotify's website to purchase a subscription. This created a confusing user experience that prevented many users who wanted the enhanced features of a paid subscription from signing up. The 2025 Order enabled Spotify to update its iOS app to inform users about the price of paid subscriptions, with convenient buttons to direct users to Spotify's website to purchase them.

Apple's Motion requires this Court to weigh the benefits and harms to the parties and to the public interest that would flow from a stay. Apple claims that only it is harmed by the 2025 Order without any corresponding benefit to the public. This is wrong. By forcing Apple's long-overdue compliance with the Injunction, the 2025 Order has created substantial benefits for developers and—more importantly—consumers. Spotify's internal data show that its iOS app updates have already resulted in a significant increase in iOS users upgrading to a Premium subscription. Apple's compliance has also enabled new product innovations that would not

4

have been possible without the Injunction. And for "reader" apps such as Spotify that do not utilize Apple's IAP, these gains inure to consumers and developers without any corresponding loss to Apple. This Court would unwind these critical public benefits if it were to stay the 2025 Order pending an appeal that Apple is unlikely to win.

## ARGUMENT

Courts consider four factors in deciding whether to grant a stay pending appeal: (1) whether the movant has made a "strong showing" of the likelihood of success on the merits; (2) whether the movant will be "irreparably injured absent a stay"; (3) whether a stay will "substantially injure" other parties; and (4) "where the public interest lies." *Nken* v. *Holder*, 556 U.S. 418, 434 (2009). This Court has routinely considered potential harm to third parties when addressing the last two *Nken* factors. *E.g.*, *Doe #1* v. *Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020); *Latta* v. *Otter*, 771 F.3d 496, 500 (9th Cir. 2014).

I.    **If a Stay Were Granted, Developers and Consumers Would Suffer Substantial Injury and Lose the Benefits of the Injunction**.

    A.    **The 2025 Order Has Enabled Price Transparency that Would Be Lost If the Link-Out Prohibition Were Stayed**.

The Apple Plan imposed numerous restrictions on the language and placement of external purchase links that severely limited developers' ability to communicate with consumers about their purchase options.  The district court found that Apple's justifications for these restrictions were "pretextual," and that Apple's true intent was "to stifle competition by cabining developers' ability to attract users to alternate payment methods." 2025 Order at 31, 33.  The court thus imposed the Link-Out Prohibition to prevent Apple from achieving through these restrictions what its anti-steering rules had accomplished through outright prohibition.

Spotify, like other developers, offers its content through different service tiers with varying price points and features.  To encourage users to subscribe to these services, developers must be able to inform users about their apps' paid features and how to access them.  The success of these apps depends, therefore, on developers' ability to inform users of the options and benefits of each subscription offering, and to make paying for those features as convenient as possible.  This communication is most useful to users at the

6

moment when they are considering whether to access a paid feature of the app.

The Apple Plan introduced significant friction to communications between developers and users. The district court recognized that this friction was purposely designed to "decrease the attractiveness of competitive alternatives . . . and increase breakage in a purchase flow." 2025 Order at 63. And because Apple prohibited external links from appearing within the in-app payment flow *at the moment* when users are contemplating a purchase, the Apple Plan wholly undermined the Injunction's goal of increasing transparency and consumer choice. *Id.* at 61.

The district court's Link-Out Prohibition is necessary to prevent Apple's circumvention of the Injunction, and to ensure that app developers and consumers can benefit from the price transparency that the Injunction was intended to create. Now, because of the Link-Out Prohibition, Spotify and other developers are able to inform users about alternate purchasing options at the moment of purchase, and in a manner that improves the user experience by making it easier for users to understand their options and buy what they want—exactly the sort of "open flow of information" that the Injunction sought to empower. *See Epic Games*, 559 F. Supp. 3d at 1055. If

7

the Link-Out Prohibition is stayed, Apple will reinstate its limitations and stop Spotify from deploying this simple and obvious approach to informing users about the prices for Premium Spotify subscriptions and audiobooks. That will effectively return Spotify to the position that it was in before the district court entered its Injunction almost four years ago.

### B. Consumers Would Be Subject to Supracompetitive Prices If the Fee Prohibition Were Stayed.

The Apple Plan also imposed a 27% commission (or 12% for certain qualifying purchases) on any out-of-app purchases made within seven days after a user tapped on an external purchase link within an iOS app. This fee was in effect a rebranded version of the 30% commission charged for transactions made through IAP, which the district court (and this Court) already found to be "excessive" and unjustified. *Epic Games*, 559 F. Supp. 3d at 1054. As the district court recognized, Apple knew that developers' external costs (like credit-card fees) would exceed 3% when utilizing link-out transactions, meaning that the Apple Plan's fees on link-out transactions were effectively *higher* than the 30% commission on transactions through IAP. *See* 2025 Order at 22. In other words, the new commission eliminated any potential consumer benefit provided by an external link because it

8

guaranteed that a developer's out-of-app prices would be the same as or higher than the prices that developer would charge using IAP.

The district court clearly intended that the Injunction would enable actual price competition, which would exert pressure on Apple to lower its IAP commission. *See Epic Games*, 559 F. Supp. at 1054 ("The lack of competition has resulted in decrease[d] information . . . . The costs to developer[s] are higher because competition is not driving the commission rate."). Instead, for the past 16 months, Apple thwarted competition by imposing restrictions that maintained the status quo before the Injunction, just with a little extra math. Although the Apple Plan did not allow reader apps like Spotify even to apply for an external link, Spotify would not have done so in any event, for the same reason that it opted to forgo IAP in 2016— it was unwilling to pass Apple's unjustified tax onto its consumers, who ultimately bear the costs of Apple's anticompetitive conduct.[2]

---

[2]     When Epic moved to enforce the Injunction, Spotify filed an *amicus* brief in the district court to establish that the Injunction was intended to apply to all app developers, which the 2025 Order confirmed. But the Apple Plan would not have enabled price transparency within Spotify's app in any event. After the European Commission found that Apple's anti-steering rules had violated EU competition laws, Apple introduced a similar 27% fee scheme. Because of those fees, Spotify has never included external links in its EU app.

The district court's Fee Prohibition is necessary to effectuate the Injunction's goal of fostering price competition. Without the Fee Prohibition, Apple can continue to insulate itself from price competition by imposing fees that make alternatives to IAP uneconomical. Under such a scenario, developers' payment-processing costs will remain artificially inflated, and consumers will be worse off.

## II. Preliminary Data Indicate that the 2025 Order's Enforcement of the Injunction Is Benefitting Developers and Consumers.

Although Apple has only been complying with the Injunction for just over two weeks, Spotify already has noticed a significant difference in consumer behavior. Shortly after the 2025 Order issued, Spotify submitted an app update to Apple that included a revised "Premium Destination Page" where Spotify informs users of its Free service about how to upgrade to a paid Premium subscription. In accordance with the 2025 Order, this updated page includes basic information about the prices of different Premium subscriptions (*e.g.*, individual and family plans, and certain student discounts), and includes a button containing a link to a check-out page on Spotify's website where the user can purchase a Premium subscription. All of that should have been allowed under the Injunction, but the Apple Plan barred it. Hemmed in by the 2025 Order, Apple approved Spotify's update.

10

On May 2, 2025, Spotify, for the first time in nearly a decade, began informing users within its iOS app about where and how to purchase a Premium subscription and including a link directing users to an out-of-app purchase mechanism. Spotify has also been able to send users in-app messages and promotions that link to a web checkout experience.

By comparing app data from iOS users who have updated to the new Spotify app to that of iOS users who have not been exposed to the new app, Spotify has been able to observe the immediate effects of these changes. Spotify's internal data show that its iOS app updates have already resulted in a significant increase in iOS users upgrading to a Premium subscription. Comparing this data to Spotify's app on the Android mobile platform—where Spotify has long been able to provide basic pricing information—further demonstrates that these changes in iOS user behavior are the result of the recent updates. In the two weeks since Spotify updated its iOS app in accordance with the 2025 Order, the rate of conversions from the Free- to Premium-tier service has remained relatively constant on Android, while conversion among iOS users has increased substantially. This strongly suggests that the increase is due to Apple finally complying with the Injunction thanks to the 2025 Order.

11

Because it can now communicate special offers and promotions to its iOS users in-app, Spotify has also recently turned its attention to introducing users to its newer product features. For example, on May 16, Spotify launched another app update that (i) allows all iOS users to buy individual audiobooks, separately from a monthly Premium subscription, (ii) allows Premium users to purchase additional "Top Up" hours for audiobook listening beyond the 15 hours that most Premium users automatically receive each month, and (iii) allows qualifying Premium Individual subscribers to find value by transitioning to a Duo, Family, or discounted Student Plan. Absent the 2025 Order, Apple would have continued to prevent Spotify from informing iOS users about the prices of these features and how to purchase them.

Consumers are benefitting from this increased price transparency and product innovation. The immediate and substantial increase in conversions to the Premium service on iOS likely reflects that, prior to the recent app update, many iOS users who desired the Premium service's features were unable to choose the service that was most suitable for them because of the purchase friction and/or lack of price transparency created by Apple's restrictions. And Spotify is only beginning to see the effects on audiobooks

12

just three days after the new product options were launched. Because the Apple Plan was unworkable for Spotify's business and Spotify would not have participated in it, Apple is not losing anything that could offset these public gains. If a stay were granted, millions of Spotify users—and presumably many more millions of users of other developers' apps—would be denied the benefits of the Injunction and would be prevented from making fully informed choices about which products and payment methods are most suitable to them.

Date:        May 19, 2025              Respectfully submitted,

                              By:    */s/ Brendan P. Cullen*
                                     Renata B. Hesse
                                     Brendan P. Cullen
                                     SULLIVAN & CROMWELL LLP
                                     550 Hamilton Avenue
                                     Palo Alto, California 94301
                                     Tel: (650) 461-5600
                                     Fax: (650) 461-5700

                                     Shane M. Palmer
                                     SULLIVAN & CROMWELL LLP
                                     125 Broad Street
                                     New York, New York 10004-2498
                                     Tel: (212) 558-4000
                                     Fax: (212) 558-3588

                                     *Attorneys for* Amicus Curiae *Spotify USA Inc.*

13

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** ___25-02935_____

I am the attorney or self-represented party.

**This brief contains 2580 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **X** ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

A1

**Signature** __/s/ *Brendan P. Cullen* ___      **Date** __May 19, 2025_

## CERTIFICATE OF SERVICE

I hereby certify that, on May 19, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: May 19, 2025

By:  */s/ Brendan P. Cullen*
Brendan P. Cullen