**No. 25-2935**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

EPIC GAMES, INC.,
*Plaintiff-Appellee,*
v.

APPLE INC.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Northern
District of California (Hon. Yvonne Gonzalez Rogers)
No. 4:20-cv-05640-YGR

---

**BRIEF OF CIVIL PROCEDURE AND ANTITRUST
PROFESSORS AS *AMICI CURIAE* ON BEHALF OF PLAINTIFF-
APPELLEE SUPPORTING AFFIRMANCE**

---

Professor Jennifer Sturiale
Delaware Law School
Widener University
4601 Concord Pike
Wilmington, DE 19803
(646) 660-1834

H. Hunter Bruton
N.C. State Bar No. 50601
Noel F. Hudson
N.C. State Bar No. 59776
SMITH, ANDERSON, BLOUNT,
DORSETT, MITCHELL &
JERNIGAN, LLP
P.O. Box 2611
Raleigh, NC 27602
919-821-1220
*Counsel for Civil Procedure and
Antitrust Professors*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ii

INTEREST OF AMICI CURIAE ......................................................1

SUMMARY OF ARGUMENT .........................................................1

ARGUMENT ................................................................................2

I.   Federal Courts Maintain Broad Authority to Enforce
Injunctions ............................................................................2

    A.   Courts possess inherent authority to enforce litigants'
compliance with court orders ...................................3

    B.   Congress has concretized the judiciary's equitable power .....5

II.   Effective Injunctive Enforcement is Necessary to Prevent
Strategic Evasion by Powerful Litigants ...................................7

    A.   Firms that reap supracompetitive profits have asymmetrical
incentives and power to deploy such profits to outmaneuver
court orders ...........................................................7

    B.   Powerful civil contempt orders against well-resourced
corporations are appropriate and necessary to stymie abuse
of the judicial process .............................................12

CONCLUSION ............................................................................14

APPENDIX A .............................................................................16

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ...............17

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Dunn,*
  19 U.S. 204 (1821)................................................................4, 6

*Badgley v. Santacroce,*
  800 F.2d 33 (2d Cir. 1986) ......................................................1

*Chambers v. NASCO,*
  501 U.S. 32 (1991)....................................................................4

*Gompers v. Buck's Stove & Range,*
  221 U.S. 418 (1911)..................................................................4

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
  512 U.S. 821 (1994)..................................................................1

*Maggio v. Zeitz,*
  333 U.S. 56 (1948)..................................................................10

*McComb v. Jacksonville Paper,*
  336 U.S. 187 (1949)..........................................................10, 11

*Regal Knitwear v. N.L.R.B.,*
  324 U.S. 9 (1945)......................................................................6

*Roadway Exp. v. Piper,*
  447 U.S. 752 (1980)..................................................................3

*Salazar v. Buono,*
  559 U.S. 700 (2010)................................................................11

*Schering v. Ill. Antibiotics,*
  62 F.3d 903 (7th Cir. 1995)....................................................10

*Shuffler v. Heritage Bank,*
  720 F.2d 1141 (9th Cir. 1983) ............................................................... 6

*Tivo v. Echostar,*
  646 F.3d 869 (Fed. Cir. 2011) (*en banc*) ......................................... 12, 13

*Tivo v. Echostar Commc'ns,*
  No. 2:04-cv-00001-MHS-CMC (E.D. Tex. May 3, 2011) ...................... 13

*United States v. Asay,*
  614 F.2d 655 (9th Cir. 1980) .................................................................. 1

*United States v. Hudson,*
  11 U.S. 32 (1812) .................................................................................... 3

*United States v. Microsoft,*
  147 F.3d 935 (D.C. Cir. 1998) .............................................................. 11

*United States v. Swift,*
  286 U.S. 106 (1932) .............................................................................. 11

## Statutes

15 U.S.C. §§ 1–12 *et seq.* ....................................................................... 7

28 U.S.C. § 1651(a) .................................................................................. 5

Cal. Bus. & Prof. Code § 16720 *et seq.* ................................................... 7

Cal. Bus. & Prof. Code § 17200 *et seq.* ................................................... 7

Judiciary Act, ch. 20 § 14, 1 Stat. 73 (1789) ......................................... 2, 5

U.S. Const. art. III, § 2, cl. 1 .................................................................... 2

## Rules

Fed. R. of Civ. P. 65 ................................................................................. 6

Fed. R. Civ. P. 65(d)(2) .................................................................6

Fed. R. Civ. P. 70.........................................................................6

Fed. R. Civ. P. 70(e).....................................................................6

**Other Authorities**

1 William Blackstone, Commentaries on the Laws of England (1769)....3

4 William Blackstone, Commentaries on the Laws of England (1769)....3

Echostar Corp (SATS US Equity),
    Bloomberg Law,
    https://www.bloomberglaw.com/company/ticker/SATS%20US%20Equit
    y (last visited May 19, 2025)................................................13

Lauren B. Edelman & Mark C. Suchman, *When the "Haves" Hold Court:*
    *Speculations on the Organizational Internalization of Law*,
    33 Law & Soc'y Rev. 941 (1999).............................................9

John C. Fox, The History of Contempt of Court 1 (1927).......................2

Ronald Goldfarb, *The History of the Contempt Power*,
    1961 Wash. U. L.Q. 1 (1961)................................................2

Jay L. Himes, et al, *Antitrust Enforcement and Big Tech: After the*
    *Remedy Is Ordered*,
    1 Stan. Comp. Antitrust 64 (2021) .........................................9

Erik Hovenkamp & Steven C. Salop, *Litigation with Inalienable*
    *Judgments*,
    52 J. Legal Stud. 1 (2023).................................................8

Press Release, EchoStar Corp.,
    *TiVo, DISH Network and EchoStar Announce Half-Billion Dollar*
    *Settlement of Patent Litigation*, (May 2, 2011) ....................13

iv

Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*,
86 Iowa L. Rev. 735 (2001) ....................................................................6

Jennifer E. Sturiale, *Degendering Antitrust*, Jan. 7, 2025.......................8

## INTEREST OF AMICI CURIAE

Amici curiae are professors of civil procedure and antitrust law, who have taught, written, and/or litigated on the subjects of this case. Amici have no interest, financial or otherwise, in this case, and counsel for both parties have consented to Amici filing this brief. Neither party's counsel in this case authored the brief in whole or in part. Neither party, nor its counsel in this case, contributed money that was intended to fund preparing or submitting the brief. And no person—other than Amici or its counsel—contributed money that was intended to fund preparing or submitting the brief. Amici file this brief solely to provide the Court with their analysis of the Court's inherent power, which supports affirming the district court's contempt order.

## SUMMARY OF ARGUMENT

The parties to court proceedings must comply with the court's orders. Civil contempt sanctions are "those penalties designed to compel future compliance with a court order." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see United States v. Asay*, 614 F.2d 655, 659 (9th Cir. 1980); *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986) ("The purpose of civil contempt, broadly stated, is to compel

1

a reluctant party to do what a court requires of him."). A court's ability to hold unwieldy parties in civil contempt ensures orderly judicial proceedings, effective administration of justice, and adherence to court rulings. Failure to uphold those powers would encourage parties' disobedience and interfere with the judicial system's operations. Undermining the civil contempt power fractures the judiciary's foundation.

## ARGUMENT

### I. Federal Courts Maintain Broad Authority to Enforce Injunctions.

Concomitant with the power to issue injunctions is the power to enforce them. The Constitution endowed Article III courts with the historical powers of courts of equity or chancery courts. U.S. CONST. art. III, § 2, cl. 1. Congress reinforced federal courts' inherent powers at their creation through the Judiciary Act of 1789. And Congress has further developed and reinforced these inherent powers for over two centuries. *See* JOHN C. FOX, THE HISTORY OF CONTEMPT OF COURT 1 (1927) (noting the phrase "[c]ontempt of [c]ourt," enforcement of which "is the basis of all legal procedure," has been an acknowledged term in English law since the twelfth century); Ronald Goldfarb, *The History of the Contempt*

2

*Power*, 1961 WASH. U. L.Q. 1, 9 (1961) (stating the contempt power traces back to the tenth century, used to enforce the prerogatives of the crown); *see* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *124 (1769) (opining on the contempt power's importance to preserve the dignity of the court).  This Court should jealously guard its foundational authority.

### A. Courts possess inherent authority to enforce litigants' compliance with court orders.

It has long been established that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."  *United States v. Hudson*, 11 U.S. 32, 34 (1812); *see also Roadway Exp. v. Piper*, 447 U.S. 752, 764 (1980) (quoting *Hudson*, 11 U.S., at 34); 1 WILLIAM BLACKSTONE, COMMENTARIES, at *64 (explaining legal rules may be identified by their "long and immemorial usage, and by their universal reception").  Early in this country's history, the Supreme Court recognized the power of the federal courts to compel obedience to lawful orders: "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and

3

submission to their lawful mandates, and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution." *Anderson v. Dunn*, 19 U.S. 204, 227 (1821). Statutes and judicial glosses can refine the contempt power, but those refinements do not detract from the fact that the contempt power is "incidental to a grant of judicial power." *See Anderson*, 19 U.S. at 227.

Federal courts "may safely rely on [this] inherent power" to craft appropriate, equitable remedies when parties are in contempt. *Chambers v. NASCO*, 501 U.S. 32, 50 (1991). The equity power, by its very nature, requires courts to respond with evolving remedies where legal remedies would not suffice. *See id.* at 32, 49–50 (approving a district judge's inherent contempt power to require party in contempt to pay adversary's attorneys' fees, a novel sanction at the time). Contempt enforcement is consequently a "necessary and integral part" of the judiciary and is "absolutely essential" to carry out court functions. *Gompers v. Buck's Stove & Range*, 221 U.S. 418, 450 (1911). Hampering this critical characteristic of our judicial system would diminish federal courts' "inherent power" to address "a full range of litigation abuses." *Chambers*, 501 U.S. at 46; *Anderson*, 19 U.S. at 227.

4

**B. Congress has concretized the judiciary's equitable power.**

Congress has reinforced the federal courts' inherent contempt power by both passing legislation and approving Federal Rules of Civil Procedure. Both recognize and support Article III courts' critical contempt function.

Congress codified the inherent contempt power in the same breath that it created the federal courts—the Judiciary Act of 1789. An Act to Establish the Judicial Courts of the United States, ch. 20 § 14, 1 Stat. 73 (1789) (providing that the new courts shall have the "power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law"). When Congress consolidated its statutes in the 20th century, it once again reaffirmed these basic powers. For example, today as in 1789, a federal court "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a) (2024) (originally enacted as Act of June 25, 1948, ch. 646, 62 Stat. 944 and amended by the Act of May 24, 1949, ch. 139, § 90, 63 Stat. 102). Laws passed by Congress supplement courts'

5

inherent contempt power, not replace it. *Anderson*, 19 U.S., at 227–28. Indeed, since the Founding, Congress has legislated against the backdrop of the common law and historical powers of courts sitting in equity. Congressional action has occasionally guided and structured the contempt power usage. *See* Robert J. Pushaw, Jr., *The Inherent Powers of Federal Courts and the Structural Constitution*, 86 IOWA L. REV. 735, 742 (2001). But it has never *limited* that power in the ways that Apple suggests.

Federal Rules of Civil Procedure 65 and 70 likewise buttress the federal courts' inherent contempt power. Rule 65(d)(2), for instance, extends the scope of an injunction beyond the named parties to include their "officers, agents, servants, employees, and attorneys," and those "in active concert or participation" with them. *See Regal Knitwear v. N.L.R.B.*, 324 U.S. 9, 14 (1945) (approving of this ambit). And Rule 70 empowers courts to impose coercive and substantial remedies to induce party submission. *See* Fed. R. Civ. P. 70(e); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983).

## II. Effective Injunctive Enforcement is Necessary to Prevent Strategic Evasion by Powerful Litigants.

Well-resourced parties have means to evade the remedial effect of court orders. And where a plaintiff challenges the conduct giving rise to above-market profits under competition law, well-funded litigants have an asymmetrical incentive to resist judicial authority. Consequently, our federal courts are empowered to address evasion tactics and induce compliance. Where necessary, federal courts must guard against this non-compliance through timely supervision and, occasionally, civil contempt proceedings.

### A. Firms that reap supracompetitive profits have asymmetrical incentives and power to deploy such profits to outmaneuver court orders.

Supracompetitive profits are profits above the competitive level. Such profits can flow from conduct that violates federal or state competition laws, such as the federal Sherman or Clayton Acts, 15 U.S.C. §§ 1–12 *et seq.*, or California's Cartwright Act, CAL. BUS. & PROF. CODE § 16720 *et seq.*, and Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.* Lawsuits that challenge the firm's conduct put supracompetitive profits at risk. If a court finds and enjoins unlawful

conduct, the conduct should cease, along with the firm's supracompetitive profits.

Defendants to such lawsuits therefore have an incentive to skirt liability and prevent the enjoinment of the conduct yielding the supracompetitive profits. When compared to their adversaries, such defendants likely have an asymmetrical stake in the litigation. Defendants earning supracompetitive profits risk their future stream of *supracompetitive* profits in the relevant market if they lose. In contrast, their adversaries may only have the hope of earning *competitive* profits in the relevant market[1] if they win.

But such defendants do not merely have an outsized incentive to invest in litigation. Their ill-gained wealth gives them outsized power to do so. *See* Jennifer E. Sturiale, *Degendering Antitrust,* Jan. 7, 2025, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5087861; Erik Hovenkamp & Steven C. Salop, *Litigation with Inalienable Judgments*, 52 J. LEGAL STUD. 1 (2023).

---

[1] The commercial success of a plaintiff in *other markets*—not at issue in the litigation—does not speak to its competitive position in the market in which the alleged anticompetitive conduct is occurring.

These defendants have the incentive and power to devote outsized resources to every stage of the litigation—including post-trial and post-appeal—to forestall or flout any remedial relief granted. They can dedicate significant resources to developing and executing sophisticated tactics that minimize the practical effect of any behavioral remedial relief and protect the firm's future stream of supracompetitive profits. *See, e.g.*, Jay L. Himes et al., *Antitrust Enforcement and Big Tech: After the Remedy Is Ordered*, 1 STAN. COMP. ANTITRUST 64, 78 (2021) ("[Defendant's] incentives militate toward maximizing short-cuts and corner-cutting, resulting at the outset in an under-specified engineering project and an under-commitment of implementation resources.").

Moreover, these entities are institutionally equipped to absorb, reframe, and neutralize judicial constraints; they possess an internal legal capacity that enables them to perform formal compliance with such constraints, all the while sabotaging the constraints' substantive effect. *See* Lauren B. Edelman & Mark C. Suchman, *When the "Haves" Hold Court: Speculations on the Organizational Internalization of Law*, 33 LAW & SOC'Y REV. 941, 943 (1999) ("[O]rganizations construct within and around themselves a semiautonomous legal regime that simultaneously

9

mimics and absorbs even the most 'official' institutions of governmental law.").

If a firm disagrees with the scope of an order, there is "a method of relief apart from an appeal," moving for clarification or modification of the order. *McComb v. Jacksonville Paper*, 336 U.S. 187, 192 (1949). A firm cannot subvert compliance simply because the party insists its conduct complies. *Id.* at 192–93 (1949). Permitting this excuse would require a court to operate from behind, issuing new, hyper-specific injunctions as a reactionary measure to harm unabated. *See id.* at 192 ("It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined."). In turn, this would allow parties to continuously alter their behavior *just enough* to avoid direct violation of the latest injunction, thereby undermining enforcement and accountability. *Id.* at 192–93. Accepting such a principle would encourage "experimentation with disobedience of the law"—an iterative process the Supreme Court explicitly denounced. *Id.* at 192; *see Maggio v. Zeitz*, 333 U.S. 56, 69 (1948); *see also Schering v. Ill. Antibiotics*, 62 F.3d 903, 906 (7th Cir. 1995) (Posner, J.) ("If narrow literalism is the rule of interpretation,

10

injunctions will spring loopholes, and parties in whose favor injunctions run will be inundating courts with requests for modification to plug the loopholes.").

Instead, the district court may enforce compliance through civil contempt, clarification, or amendments to the injunction to ensure enforcement. *McComb*, 336 U.S. at 192–93; *see also Salazar v. Buono*, 559 U.S. 700, 718 (2010) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.") (quoting *United States v. Swift*, 286 U.S. 106, 114 (1932)); *United States v. Microsoft*, 147 F.3d 935, 942 (D.C. Cir. 1998) ("We are aware of no case raising doubts about the propriety of clarification incident to the denial of a contempt petition.").

While technological innovation is rewarded under U.S. law, tactical innovation directed at circumventing remedial relief should not be. Courts possess and exercise robust contempt power to counteract strategic resistance.

11

**B. Powerful civil contempt orders against well-resourced corporations are appropriate and necessary to stymie abuse of the judicial process.**

The federal courts' civil contempt powers serve to blunt the tools private entities may use to subvert their compliance with court-ordered behavioral remedies. Respecting the courts' authority to enforce remedies vindicates public and private rights.

Courts have always been empowered to hold wealthy entities liable for contempt when they attempted to skirt the court's orders. For instance, in *TiVo v. EchoStar*, TiVo sued EchoStar for patent infringement related to digital video recorder ("DVR") technology. 646 F.3d 869, 876 (Fed. Cir. 2011) (*en banc*). A jury found that EchoStar had literally and willfully infringed the hardware or software claims of TiVo's patent in eight distinct models of receivers. *Id.* at 877. The district court issued a permanent injunction that required EchoStar to disable DVR functionality in certain receivers. *Id.* After EchoStar modified its software, TiVo moved to hold EchoStar in contempt. *Id.* at 878. The district court reviewed EchoStar's modifications and found EchoStar had not complied with the injunction's disablement provision. *Id.* at 879. The court consequently held EchoStar in contempt of its order and imposed

12

nearly $90 million in sanctions. *Id.* An en banc panel of the Federal Circuit affirmed both the district court's contempt finding of the disablement provision and the $90 million sanctions imposed. *Id.* at 890. It mattered not that the Court had to deploy the contempt power in a coercive manner against a well-funded entity, necessitating sizeable sanctions to induce compliance. Rather, the *en banc* Court readily held application of this inherent power to be lawful and appropriate.[2]

Moreover, the *use* of the civil contempt power may itself facilitate orderly administration of civil justice. Parties may settle with favorable terms that differ from the court's sanctions. For example, twelve days after the en banc *Tivo* decision was rendered, TiVo and EchoStar reached an out-of-court settlement. The settlement provided that EchoStar would pay TiVo a total of $500 million in damages, and the parties granted each other patent licenses. Press Release, EchoStar Corp., TiVo, DISH

---

[2] Broad enforcement as approved in *TiVo* is applicable here. 646 F.3d at 890. EchoStar was, and is, a well-funded corporation as it currently holds $6.04 billion market capitalization. Echostar Corp (SATS US Equity), Bloomberg Law, https://www.bloomberglaw.com/company/ticker/SATS%20US%20Equity (last visited May 20, 2025). And the $90 million sanction against the company was upheld, notably worth much more today than in 2009 due to inflation.

Network and EchoStar Announce Half-Billion Dollar Settlement of Patent Litigation, (May 2, 2011), https://ir.echostar.com/news-releases/news-release-details/tivo-dish-network-and-echostar-announce-half-billion-dollar. Upon joint motion from the parties, the court dismissed all claims and counterclaims with prejudice, dissolved all permanent injunctions, and satisfied all monetary obligations that arose from the suit. *TiVo v. EchoStar Commc'ns*, No. 2:04-cv-00001-MHS-CMC (E.D. Tex. May 3, 2011). This real-world effect of market correction might well not have happened without the judiciary upholding the district court's sweeping contempt power.

## CONCLUSION

Through both inherent and congressionally recognized authority, courts have broad contempt power to carry out their judicial duties. Without it, pernicious incentives for litigants abound, and judicial authority is undermined. A robust and effective judicial system evaporates with the dilution of the civil contempt power. This Court's review is welcome to affirm the judiciary's innate ability to issue stringent enforcement measures.

14

Respectfully submitted, this the 20th of May, 2025.


/s/ H. Hunter Bruton
H. Hunter Bruton
N.C. State Bar No. 50601

Noel F. Hudson
N.C. State Bar No. 59776

SMITH, ANDERSON, BLOUNT,
DORSETT, MITCHELL &
JERNIGAN, LLP
P.O. Box 2611
Raleigh, NC 27602
919-821-1220
*Counsel for Civil Procedure and
Antitrust Professors*

# APPENDIX A

*Amici curiae* are professors of civil procedure and antitrust law. Their titles and institutional affiliations are provided for identification purposes only. Amici's views are their own and do not reflect those of their employers.

Rebecca Haw Allensworth, David Daniels Allen Professor of Law, Vanderbilt Law School

Darren Bush, Leonard B. Rosenberg Professor of Law, University of Houston Law Center

Peter Carstensen, Fred W. & Vi Miller Chair in Law Emeritus, University of Wisconsin Law School

Shubha Ghosh, Crandall Melvin Professor of Law, Syracuse University College of Law

John B. Kirkwood, William C. Oltman Professor of Teaching Excellence, Seattle University School of Law

John M. Newman, Professor of Law, University of Miami School of Law

Jennifer E. Sturiale, Associate Professor of Law, Widener University Delaware Law School

Arthur Wilmarth, Professor Emeritus of Law, George Washington University Law School

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>No. 25-2935</u>

I am the attorney or self-represented party.

This brief contains <u>2,622 words</u>, including words manually counted

in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R.
28.1-1.

[ **X** ] is an **amicus** brief and complies with the word limit of FRAP
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir.
R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b)
because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple
briefs.
    [ ] a party or parties are filing a single brief in response to a longer
joint brief.

[ ] complies with the length limit designated by court order dated
_____.

17

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R.
     32-2(a).


**Signature** /s/ H. Hunter Bruton         **Date** May 20, 2025