No. 25-2935

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff-Appellee*,

v.

APPLE INC.,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR
Hon. Yvonne Gonzalez Rogers

**BRIEF OF MICROSOFT CORP. AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE EPIC GAMES, INC.'S
OPPOSITION TO DEFENDANT-APPELLANT APPLE INC.'S
EMERGENCY MOTION TO STAY**

Aaron M. Panner
Alex A. Parkinson
Sven E. Henningson
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae
Microsoft Corp.*

May 20, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Microsoft Corporation states that it does not have a parent corporation and that no publicly held corporation holds 10 percent or more of its stock. Microsoft Corporation's stock is publicly listed on the NASDAQ Stock Market and its symbol or ticker is MSFT.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF *AMICUS CURIAE* ..........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

BACKGROUND ......................................................................................................4

ARGUMENT ............................................................................................................7

CONCLUSION .......................................................................................................12

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

*Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023),
    *cert. denied*, 144 S. Ct. 681 (2024) .................................................................. 4-5

*FTC v. Qualcomm Inc.*, 935 F.3d 752 (9th Cir. 2019) ............................................ 10

**STATUTES AND RULES**

Cal. Bus. & Prof. Code § 17200 ................................................................................ 5

Fed. R. App. P. 29(a)(4)(E) ........................................................................................ 1

**OTHER MATERIALS**

*Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR (N.D. Cal.):

    Br. of *Amici Curiae* Meta Platforms, Inc., Microsoft Corporation,
    X Corp., and Match Group, LLC in Support of Epic Games,
    Inc.'s Mot. To Enforce Injunction (Mar. 20, 2024),
    ECF No. 904-1 .................................................................................................. 2, 6

    Order (Apr. 30, 2025), ECF No. 1508 ............................................................ *passim*

Google Help Center, "Offering an alternative billing system for users in
    the European Economic Area (EEA)," https://perma.cc/KF69-
    DPY9 ...................................................................................................................11

Kif Leswing, "Google To Enforce 30% Take from In-App Purchases
    Next Year," CNBC (Sept. 28, 2020), https://perma.cc/B8MD-
    3BBK ..................................................................................................................11

Tom Warren, "Microsoft's New Xbox Mobile Gaming Store Is
    Launching in July," THE VERGE (May 9, 2024),
    https://perma.cc/S4KE-Y2S5 ............................................................................... 9

# INTEREST OF *AMICUS CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer hardware, software, and security features; it has been creating software platforms and application programming interfaces for application developers for more than 40 years. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate. Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft 365, Surface, Xbox and Xbox Game Pass, and Bing, in addition to a variety of commercial and enterprise technologies powered by artificial intelligence. Microsoft invests billions of dollars in the research and development of new technologies, products, and services to compete in dynamic technology markets.

Microsoft brings a unique and balanced perspective to the legal, economic, and technological issues in this case. As part of its business, Microsoft sells hardware devices and one of the leading operating systems for personal computers. Microsoft also provides online stores for applications that run on its consumer

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party to this appeal has authored this *amicus* brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this brief. All parties consented to its filing.

operating systems. In other parts of its business, Microsoft sells applications, software, and services that run on mobile operating systems produced by Apple Inc. ("Apple"). Microsoft offers products that compete with Apple, including — like Epic Games, Inc. ("Epic") — games for distribution on iOS devices. Microsoft also is a global leader in digital, online, and computer security, protecting a significant amount of critical internet and computing infrastructure throughout the United States and the world.

Among its other provisions, the order challenged in this appeal would prevent Apple from requiring consumers and app developers (like Microsoft) to use Apple's in-app payment processing system as the exclusive means for the purchase of digital goods or services for use within iOS apps available for download on the Apple App Store. In part as a response to the district court's injunction issued over a year ago, Microsoft undertook significant work to prepare new consumer offerings. However, Apple's evasion of the injunction has hampered Microsoft in delivering these offerings, as described in Microsoft's earlier submission to the district court urging the enforcement of the ordered equitable relief. *See generally* Br. of *Amici Curiae* Meta Platforms, Inc., Microsoft Corporation, X Corp., and Match Group, LLC in Support of Epic Games, Inc.'s Mot. To Enforce Injunction, No. 4:20-cv-05640-YGR (N.D. Cal. Mar. 20, 2024), ECF No. 904-1 ("District Court *Amicus* Br.").

Microsoft has a keen interest in the implementation of the court's remedy to Apple's anti-steering activities, which will enable innovation, spur technological development, and promote competition, thereby benefiting consumers.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The purpose of this brief is to explain why a denial of Apple's motion for a stay pending appeal is necessary to prevent further harm to competition: Apple's continued evasion of the injunction has frustrated the injunction's anti-steering purpose. The brief further explains why Apple will not be irreparably harmed by the district court's order requiring Apple to stop restricting developers' choices in how they present links for purchases made outside of apps.

*First*, the order contains important elements necessary to restore competition, which, contrary to Apple's argument (at 24), will increase consumer choice without harming user security and privacy. The order is thus necessary to prevent Apple from impeding the development of new, innovative, and consumer-benefitting apps and services, which Apple has achieved by implementing the new anti-steering program giving rise to the sanctions order on appeal.

*Second*, Apple's complaint of irreparable harm rests on illusory arguments regarding how digital app stores operate. Apple argues (at 22) that the order "disrupts and changes the whole nature of Apple's business" and that the "new rules compromise the integrity of Apple's integrated ecosystem by giving

3

developers unlimited free ability to interfere with [in-app purchases] while encouraging consumers to use alternative purchase options with Apple's buy flow." Mot. 22, DE7.1 (cleaned up). Apple makes no argument that the technical or policy changes cannot be undone — e.g., after a successful appeal — and Microsoft's own experience managing app stores confirms that Apple's policies could be restored if Apple ultimately prevails on appeal.

## BACKGROUND

1. ***Apple Restrained Competition Prior to the Injunction***: Apple's restraints on the iOS mobile operating system — including billing and payment requirements, in particular — limit the products and services that app developers can offer consumers. For example, Microsoft offers many of its products as mobile apps on iOS, including Microsoft Office, Teams, the Xbox app, and games that include popular titles like Candy Crush and Minecraft. And for a number of these applications, Microsoft offers cross-platform services by subscription. As this Court previously recognized, under the pre-injunction version of Apple's Developer Program Licensing Agreement, developers like Microsoft were not permitted to "communicate out-of-app payment methods through certain mechanisms such as in-app links (the anti-steering provision)." *Epic Games, Inc.*

4

*v. Apple Inc.*, 67 F.4th 946, 968 (9th Cir. 2023). These anti-steering provisions violate the California Unfair Competition Law. *See id.* at 999.

2. ***The Injunction Was Intended To Promote Competition***: The district court's injunction — already affirmed by this Court — bars Apple from "prohibiting developers from . . . including in their apps . . . external links, or other calls to action that direct customers to purchasing mechanisms." *See* Mot. 2. Under the injunction, developers like Microsoft were supposed to be free to direct users to separate platforms for payment. This freedom would unlock the ability to offer new features in the Xbox app or games like Candy Crush and Minecraft. It also could result in cost savings for Microsoft that Microsoft could pass on to users through discounts or incentives (or further and additional reinvestment in the apps to offer additional innovative services and features).

3. ***Apple Continues To Restrain Competition***: On January 16, 2024 — the same day that the U.S. Supreme Court declined to hear Apple's appeal of this Court's affirmance of the district court's injunction — Apple filed a notice with the district court identifying its approach to complying with the injunction (the "Apple Plan"). Mot. Ex. E, DE7.7. The Apple Plan circumvented the district court's injunction. As Apple's Head of the Global App Store, Carson Oliver, acknowledged in the declaration submitted in support of Apple's motion ("Oliver Declaration"), Apple decided to "allow[] developers to include external links in

5

their apps" but placed conditions on inclusion of those links. Oliver Decl. ¶¶ 10-12, DE7.2. Developers could not interrupt IAP's "buy flow" — "the series of steps a user takes to make a purchase within an app" — or avoid paying Apple a "27% commission on purchases made by users within 7 days after tapping a link within an app that sent users to the developer's website to complete the purchase." *Id.* ¶¶ 11-12. Developers also had to apply for permission to include a link to an out-of-app purchase mechanism and comply with dozens of other requirements and limitations to remain eligible to include an external purchase link. *See* Apple Plan 6-15.

As Microsoft pointed out to the district court, "the Apple Plan leaves in place anti-steering rules that this Court expressly found to be anticompetitive and imposes new restrictions on app developers that ensure the price competition that the injunction was designed to promote will never materialize." District Court *Amicus* Br. 4. After another year of litigation, extensive document discovery, and several evidentiary hearings, the district court agreed that "Apple's response to the Injunction strains credulity." *See* Order 2, 11-13, No. 4:20-cv-05640-YGR (N.D. Cal. Apr. 30, 2025), ECF No. 1508 ("District Court Order"). Instead, Apple "at every turn chose the most *anti*competitive option." *Id.* at 2. Accordingly, the district court found Apple in willful violation of the original injunction; issued an

6

additional, remedial injunction; and referred the case to the U.S. Attorney for criminal investigation. *Id.* at 75-78.

## ARGUMENT

Apple raises a variety of challenges to the district court's order, which Epic fully addresses in its stay opposition. Apple hardly disputes, however, that it can (and has) changed the App Store in response to equitable relief ordered by the district court. Indeed, the dynamic nature of app stores has permitted Apple to side-step the district court's injunction. Microsoft has experience managing its own app store — the Microsoft Store — and can confirm that app store operators frequently update, reformat, and otherwise change app store designs and policies. The injunction will not irreparably harm Apple. Instead, Apple will continue to defy the letter and spirit of the injunction absent this Court's denial of the motion to stay the district court's order.

***First***, the order contains important elements necessary to restore competition and reverse the *new* anti-steering policies that Apple has implemented to evade the district court's injunction. For example:

- The prohibition from "[i]mposing any commission or any fee on purchases that consumers make outside an app," District Court Order 75, responds directly to Apple's new policy of charging commissions for *any* new

7

purchase (in-app or not) within seven days of a user linking out of the app, *see id.* at 14.

- The prohibition from "[r]estricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app[,]" *id.* at 75, responds directly to Apple's new imposition of the "variety of restrictions on developers' ability to craft a link-out program," *id.* at 61.

- And the prohibition from "[i]nterfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message," *id.* at 75, responds directly to Apple's imposition of the new "scare screen" — a "full screen takeover" that the district court found Apple engineered to be "the most anticompetitive option," *id.* at 34-39. The record shows that Apple intentionally designed these screens to be increasingly "scarier," with the imposition of as many steps as possible before a user could complete an off-app purchase. *Id.* Apple thereby "chilled consumer conduct" to the detriment of developers like Microsoft. *Id.* at 39.

These are just some of the policies that Apple has implemented since the district court issued its injunction nearly a year and a half ago.

These new anti-steering policies have made it impracticable and uneconomical for Microsoft to offer alternatives to IAP for the "[h]undreds of

8

millions of consumers [who] use the App Store platform." Mot. 24. This is a concrete harm to competition and consumers — not an abstract possibility. Microsoft long has wished to offer users of its apps an alternative to Apple's IAP *in the apps themselves*, but Apple's policies have prohibited such alternatives. The district court's injunction allows Apple to maintain its in-app exclusivity but *at least* should have enabled Microsoft to offer consumers a workable solution by launching its own online store — accessible via link-out — for in-app items to be purchased off-app and used in games or other apps.[2] And that is what Microsoft wants to do. But even this solution has been stymied by Apple. Prior to the district court's most recent order, Microsoft had been unable to implement linked-out payments (or even inform customers that alternative purchase methods exist) because of Apple's new anti-steering policies that restrict Microsoft's communication to users and impose an even higher economic cost to Microsoft than before the injunction. The lack of a functioning in-app link has significant effects on the discoverability and viability of Microsoft's online store. Without a link, few users ever learn that an alternative to IAP exists; even fewer make use of that alternative.

---

[2] *See* Tom Warren, "Microsoft's New Xbox Mobile Gaming Store Is Launching in July," THE VERGE (May 9, 2024), https://perma.cc/S4KE-Y2S5.

9

Similarly, Microsoft has long sought to enable Xbox app users on iOS to both buy and stream games in the app from the cloud or their other devices. Apple's policies have restricted Microsoft's ability to offer these functionalities together; the injunction allows Microsoft to explore this possibility. Every day that Apple's policies block the full functionality and discoverability of Microsoft's online store or the Xbox app on iOS, Apple deprives Microsoft and consumers of the fruits of Microsoft's efforts — real innovation spurred by significant investment to benefit consumers — and discourages the application of engineering and business resources to new products that could benefit users.

**Second**, Apple's motion proves that Apple will suffer no irreparable harm absent a stay. On the contrary, a denial of stay is warranted to prevent further harm to app developers such as Epic, Microsoft, and others. Apple argues that the order requires "fundamental business changes that 'cannot be easily undone.'" Mot. 22 (quoting *FTC v. Qualcomm Inc.*, 935 F.3d 752, 756 (9th Cir. 2019)). But Apple finds no support for this proposition in the Oliver Declaration or any other material. *See* Oliver Decl. ¶¶ 15-20. Microsoft maintains its own app store — the Microsoft Store — and regularly makes changes to its app store design, dialogs, and functions. Apple notes that it has "received a large number of developer inquiries regarding implementation of links, buttons, and other calls to action." *Id*. ¶ 17. This only underscores the speed with which developers can and will respond

to whatever changes Apple implements in response to the district court's order. Those same developers would be able to revert to the pre-order state of the App Store should this Court ultimately overturn the district court's order.

The changes that Apple has made to the App Store since the district court issued its injunction further belie Apple's argument that it cannot undo changes made to the App Store. As Mr. Oliver testified, prior to the injunction, Apple did not allow linked-out purchases and did not charge any commission for purchases made off its platform. Post-injunction, it charged commissions for purchases made off-platform within seven days of clicking an in-app link. *See* District Court Order 14 & n.2 (citing testimony from Oliver and others). For many years, Apple has treated some types or categories of purchases differently from others on its iOS platform (for example, charging no commission for physical goods purchased in-app). It could readily re-apply commissions to certain categories of purchases, were this Court to later reverse the district court's order.[3]

---

[3] This also would not be the first time an app-store developer changed course and increased burdens on developers: Google announced in 2020 that it would mirror Apple's policy and impose a new 30% commission on in-app purchases. Kif Leswing, "Google To Enforce 30% Take from In-App Purchases Next Year," CNBC (Sept. 28, 2020), https://perma.cc/B8MD-3BBK. Google has also replicated Apple's link-out fee policy in certain jurisdictions. *See, e.g.*, Google Help Center, "Offering an alternative billing system for users in the European Economic Area (EEA)," https://perma.cc/KF69-DPY9.

Apple has also implemented several policy changes and technical requirements for developers seeking to implement a link-out program. *See id.* at 26-45 (identifying new anticompetitive policies). As Apple personnel observed, these were calculated to reach "the tipping point where external links would cease to be advantageous for developers." *See id.* at 34 (discussing the introduction of friction into purchasing flows). Apple has pushed Microsoft past that tipping point: Microsoft could and would implement link-out payments but-for Apple's restrictive policies. The district court's order thus unlocks the promise of competition and innovation by enabling Microsoft to do so.

## CONCLUSION

In short, users' interests in increased choice, innovation, and competition will be best served by enforcing the injunction as the district court and this Court intended. Apple's motion to stay the district court's order should be denied.

13

                                        Respectfully submitted,

                                        */s/ Aaron M. Panner*

                                        Aaron M. Panner
                                        Alex A. Parkinson
                                        Sven E. Henningson
                                        KELLOGG, HANSEN, TODD, FIGEL
                                              & FREDERICK, P.L.L.C.
                                        1615 M Street, N.W., Suite 400
                                        Washington, D.C. 20036
                                        (202) 326-7900
                                        apanner@kellogghansen.com

                                        *Counsel for Amicus Curiae*
                                        *Microsoft Corp.*

May 20, 2025

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** 25-2935

I am the attorney or self-represented party.

**This brief contains 2,598 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), as calculated under Cir. R. 32-3.

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the lengths limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Aaron M. Panner*       **Date** May 20, 2025

## CERTIFICATE OF SERVICE

I hereby certify that, on May 20, 2025, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

                                         */s/ Aaron M. Panner*
                                         Aaron M. Panner