No. 25-2935

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### EPIC GAMES, INC.,

*Plaintiff-ctr-defendant - Appellee,*

v.

### APPLE INC.,

*Defendant-ctr-claimant - Appellant.*

Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR (Yvonne Gonzalez Rogers, District Judge)

## OPENING BRIEF FOR APPLE INC.

Mark A. Perry
Zachary D. Tripp
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
(202) 682-7511

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

June 23, 2025

Gregory G. Garre
Roman Martinez
Peter E. Davis
Soren J. Schmidt
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Ben Harris
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Apple Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION...................................................5

STATEMENT OF THE ISSUES......................................................6

STATUTORY AUTHORITIES .......................................................6

STATEMENT OF THE CASE.........................................................7

    A.    Apple's Innovative Platform ............................................7

    B.    Epic's Lawsuit Challenging The App Store .......................9

    C.    Apple's Compliance With The Injunction..........................13

    D.    Enforcement Proceedings And New Injunction...................19

        1.    Epic's Challenge To Apple's Compliance.................19

        2.    Beverage And Apple's Rule 60(b) Motion .............20

        3.    The District Court's Ruling And New Injunction....................21

SUMMARY OF ARGUMENT ........................................................23

ARGUMENT ...................................................................................25

I.    THE DISTRICT COURT'S NEW INJUNCTION IS SUBSTANTIVELY AND PROCEDURALLY UNJUSTIFIED .................25

    A.    The District Court's Zero-Commission Injunction Is Unjustified ......27

    B.    The New Injunction's Other Prohibitions Are Also Unjustified........37

II.    THE DISTRICT COURT ERRED IN HOLDING APPLE IN CONTEMPT FOR VIOLATING THE ORIGINAL INJUNCTION...........42

i

**Page**

A.    The Court's Civil Contempt Finding Relied On The Injunction's "Spirit" Rather Than Its Express Terms ................................................43

B.    The District Court's Reliance On Subjective Evidence Of Apple's Supposed Bad Faith Was Erroneous .......................................54

C.    The District Court Wrongly Relied On Privileged Documents ..........58

III.   THE DISTRICT COURT ERRED IN HOLDING THAT THE ORIGINAL INJUNCTION SURVIVES THE *BEVERAGE* DECISION ................................................................................................62

IV.   ANY REMAND PROCEEDINGS SHOULD BE REASSIGNED TO A DIFFERENT JUDGE ................................................................72

CONCLUSION ...................................................................................................74

STATEMENT OF RELATED CASES .................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Agostini v. Felton*,
   521 U.S. 203 (1997)......................................................................63, 64, 67

*Ahearn ex rel. NLRB v. International Longshore & Warehouse Union,
   Locals 21 & 4*,
   721 F.3d 1122 (9th Cir. 2013) ....................................................................34

*Apple Inc. v. Epic Games, Inc.*,
   144 S. Ct. 681 (2024).................................................................................13

*Armstrong v. Brown*,
   768 F.3d 975 (9th Cir. 2014) ......................................................................36

*Balark v. City of Chicago*,
   81 F.3d 658 (7th Cir. 1996) ................................................................63, 67

*BankDirect Capital Finance, LLC v. Capital Premium Financing,
   Inc.*,
   912 F.3d 1054 (7th Cir. 2019) ....................................................................48

*Beverage v. Apple, Inc.*,
   320 Cal. Rptr. 3d 427 (Ct. App. 2024), *review denied* (July 10,
   2024) ................................................................................................*passim*

*California Grocers Association v. Bank of America*,
   27 Cal. Rptr. 2d 396 (Ct. App. 1994) .......................................................32

*Carter v. Local 556, Transport Workers Union of America*,
   138 F.4th 164 (5th Cir. 2025) ........................................................26, 34, 36

*Cedar Point Nursery v. Hassid*,
   594 U.S. 139 (2021).............................................................................33, 34

*Charitable DAF Fund, L.P. v. Highland Capital Management, L.P.
   (In re Highland Capital Management, L.P.)*,
   98 F.4th 170 (5th Cir. 2024) .......................................................................55

**Page(s)**

*Chavez v. Whirlpool Corp.*,
113 Cal. Rptr. 2d 175 (Ct. App. 2001) ..................................21, 65, 67

*Clark v. Coye*,
60 F.3d 600 (9th Cir. 1995) .......................................................28, 31

*Cunningham v. David Special Commitment Center*,
158 F.3d 1035 (9th Cir. 1998) ........................................................27

*Dr. José S. Belaval, Inc. v. Peréz-Perdomo*,
465 F.3d 33 (1st Cir. 2006)............................................................36

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .....................................................*passim*

*Epic Games, Inc. v. Apple, Inc.*,
73 F.4th 785 (9th Cir. 2023) ..........................................................13

*Epic Games, Inc. v. Apple, Inc.*,
Nos. 21-16506, 21-16695, 2021 WL 6755197 (9th Cir. Dec. 8,
2021) ........................................................................................12

*Epona LLC v. County of Ventura*,
2019 WL 4187393 (C.D. Cal. Apr. 12, 2019) ...................................50

*Erie Railroad Co. v. Tompkins*,
304 U.S. 64 (1938)......................................................................70

*FTC v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2020) ....................................................33, 57

*In re Grand Jury*,
23 F.4th 1088 (9th Cir. 2021), *certiorari granted*,
143 S. Ct. 80 (2022), *dismissed as improvidently granted*,
143 S. Ct. 543 (2023)............................................20, 59, 60, 61, 62

*Greer v. County of San Diego*,
127 F.4th 1216 (9th Cir. 2025) .......................................................59

*Guaranty Trust Co. v. York*,
326 U.S. 99 (1945)......................................................................71

**Page(s)**

*Gunn v. University Committee to End the War in Viet Nam,*
    399 U.S. 383 (1970)..................................................................................48

*Hicks v. Feiock,*
    485 U.S. 624 (1988)............................................................................4, 26

*Horne v. Department of Agriculture,*
    576 U.S. 350 (2015)................................................................................33

*Horne v. Flores,*
    557 U.S. 433 (2009)................................................................................70

*Hunter v. Hamilton County Board of Elections,*
    635 F.3d 219 (6th Cir. 2011) .................................................................27

*Institute of Cetacean Research v. Sea Shepherd Conservation Society,*
    774 F.3d 935 (9th Cir. 2014) .................................................................49

*International Longshoremen's Association, Local 1291 v.*
    *Philadelphia Marine Trade Association,*
    389 U.S. 64 (1967)..................................................................................43

*International Union, United Mine Workers of America v. Bagwell,*
    512 U.S. 821 (1994)......................................................................4, 26, 34

*In re Kellogg Brown & Root, Inc.,*
    756 F.3d 754 (D.C. Cir. 2014).........................................................61, 62

*Lamb-Weston, Inc. v. McCain Foods, Ltd.,*
    941 F.2d 970 (9th Cir. 1991) ...........................................................28, 31

*Los Angeles Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) .................................................................41

*Marroquin v. City of Los Angeles,*
    112 F.4th 1204 (9th Cir. 2024) ..............................................................63

*McComb v. Jacksonville Paper Co.,*
    336 U.S. 187 (1949)................................................................................50

*Messenger v. Anderson,*
    225 U.S. 436 (1912)................................................................................70

**Page(s)**

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ................................................................40

*National Institute of Family & Life Advocates v. Becerra,*
  585 U.S. 755 (2018) ................................................................40

*Oracle USA, Inc. v. Rimini Street, Inc.,*
  81 F.4th 843 (9th Cir. 2023) ...................................................42

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.,*
  555 U.S. 438 (2009) ..........................................................65, 69

*Pacific Gas & Electric Co. v. Public Utilities Commission of
  California,*
  475 U.S. 1 (1986) ....................................................................41

*Parsons v. Ryan,*
  949 F.3d 443 (9th Cir. 2020) ...................................................26

*Pierce v. Cook & Co.,*
  518 F.2d 720 (10th Cir. 1975) .................................................70

*Portland Feminist Women's Health Center v. Advocates for Life, Inc.,*
  859 F.2d 681 (9th Cir. 1988) ...................................................43

*Potter v. District of Columbia,*
  126 F.4th 720 (D.C. Cir. 2025) ...............................................55

*Reno Air Racing Association v. McCord,*
  452 F.3d 1126 (9th Cir. 2006) .................................................50

*Richardson v. United States,*
  841 F.2d 993 (9th Cir.), *amended*, 860 F.2d 357 (9th Cir. 1988) ...................66

*Schmidt v. Lessard,*
  414 U.S. 473 (1974) ..........................................................43, 50

*Stormans, Inc. v. Selecky,*
  586 F.3d 1109 (9th Cir. 2009) .................................................38

*Sugar v. Burnett,*
  130 F.4th 358 (4th Cir. 2025) .................................................55

vi

**Page(s)**

*Sweeton v. Brown*,
   27 F.3d 1162 (6th Cir. 1994) ...............................................................67

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019).................................................................*passim*

*United States v. Armour & Co.*,
   402 U.S. 673 (1971)..............................................................36

*United States v. BNS Inc.*,
   858 F.2d 456 (9th Cir. 1988) .................................................28

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919)..........................................................21, 65

*United States v. DAS Corp.*,
   18 F.4th 1032 (9th Cir. 2021) ..............................................44, 48

*United States v. Holtzman*,
   762 F.2d 720 (9th Cir. 1985) ...............................................44

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001)................................................28, 36

*United States v. Onyeabor*,
   649 F. App'x 442 (9th Cir. 2016) ...........................................73

*United States v. Powers*,
   629 F.2d 619 (9th Cir. 1980) ................................................34, 35

*United States v. Saccoccia*,
   433 F.3d 19 (1st Cir. 2005)...................................................44

*United States v. Walker River Irrigation District*,
   890 F.3d 1161 (9th Cir. 2018) ..............................................72

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981)............................................................62

*Venoco, LLC v. Plains Pipeline, L.P.*,
   2022 WL 1090947 (9th Cir. Apr. 12, 2022)..................64, 70, 71

**Page(s)**

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................. 57, 65

*Willard v. AT&T Communications of California, Inc.*,
    138 Cal. Rptr. 3d 636 (Ct. App. 2012) ....................................... 32

*Yokoyama v. Midland National Life Insurance Co.*,
    594 F.3d 1087 (9th Cir. 2010) ................................................... 42

## STATUTES

15 U.S.C. § 26 ................................................................................. 5

28 U.S.C. § 1291 ............................................................................. 6

28 U.S.C. § 1292(a)(1) .................................................................... 6

28 U.S.C. § 1331 ............................................................................. 5

28 U.S.C. § 1332 ............................................................................. 5

28 U.S.C. § 1337 ............................................................................. 5

28 U.S.C. § 1367 ............................................................................. 5

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(b)(2) .................................................................. 41

Fed. R. Civ. P. 60(b)(5) .................................................................. 21

Fed. R. Civ. P. 65(d)(1) ................................................... 43, 47, 50

Fed. R. Civ. P. 65(d)(1)(C) ............................................................ 48

## INTRODUCTION

The last time the Court saw this case, it rejected Epic's federal antitrust claims against Apple but allowed what the district court had described as a "limited" and "measured" injunction. 5-ER-964, 5-ER-977. That injunction barred Apple from prohibiting app developers from steering users to external purchasing mechanisms, based on a finding that Apple had violated California's Unfair Competition Law ("UCL"). Specifically, the initial injunction barred Apple from "prohibiting developers" from including "buttons, external links, or other calls to action" steering users to such alternatives. 4-ER-796. That injunction did not mention—let alone restrict—the commission Apple could charge for external purchases. *Id.* In fact, the district court's original decision was explicit that Apple *could* charge a commission for such purchases, recognizing that such a "commission" prevents developers from taking advantage of "Apple's innovation and intellectual property free of charge." 5-ER-948 & n.617. This Court recognized much the same thing in affirming that decision. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 992-93 (9th Cir. 2023).

Then things went awry. Apple responded to the original injunction by eliminating the banned practices, allowing external link purchases, and imposing a commission and guidelines to govern such purchases. It gave the district court detailed notice of its plans to do all that. But after Epic complained about these terms, the district court found Apple in civil contempt, reasoning that Apple had

1

violated the original injunction's "spirit" and acted in bad faith in its efforts to comply with the actual terms of the injunction. *See* 1-ER-57–60. Then, instead of compelling compliance with the original injunction, the court issued a brand *new*— and far broader—injunction. This new injunction categorically—and permanently—prohibits Apple from imposing "*any* commission or *any* fee" on external link purchases facilitated by Apple. 1-ER-76 (emphases added). It also adds five additional prohibitions that collectively bar Apple from regulating developers' steering in any meaningful way. 1-ER-76–77. So, today, when customers arrive at the checkout aisle of the platform Apple built, Apple must permit unlimited advertisements for purchases elsewhere and cannot recoup any fee for the investments that attracted customers to Apple's platform in the first place.

Apple respectfully—but unequivocally—disagrees with the district court's findings that it acted in civil contempt. Apple complied with the original injunction while honoring its duty to its shareholders to obtain fair value for its own innovative technologies. But even if the Court accepts all of the district court's contempt findings, the new injunction cannot stand. The civil contempt power authorizes a court to compel *compliance* with an existing injunction, not to scrap that injunction and issue a new and broader one to punish a party for its non-compliance. And the district court's new injunction here is substantively flawed on its own terms.

2

Most importantly, the district court's new, permanent prohibition on Apple charging *any* commission on external link purchases must be vacated. Both this Court and the district court recognized at earlier stages of this case that Apple is entitled to charge a commission on sales of digital content—including for purchases not processed by Apple. 5-ER-948 & n.617; *Epic Games*, 67 F.4th at 992-93. That was consistent with Epic's litigating position, as Epic had assured the district court "that its [proposed] relief would allow Apple to collect a commission." *Epic Games*, 67 F.4th at 970. And it is consistent with the fact that Epic itself charges a commission on sales on its own store. 5-ER-873. The district court's new prohibition against any commission on sales facilitated by Apple's own platform has no basis in the original injunction, is fundamentally unfair, violates the UCL, and amounts to a taking in violation of the U.S. Constitution. Indeed, the court's permanent imposition of a royalty of zero for a huge category of transactions can only be understood as a punishment. But civil contempt may not be used to punish. The new injunction's amped-up provisions barring Apple's ability to regulate steering are similarly flawed.

The district court's only meaningful response to the substantive flaws with the new injunction was that Apple had "flouted the Court's [original] order." 1-ER-61 n.65. That openly admits that the new injunction is punitive and thus impermissible. It is well-settled that civil contempt sanctions cannot be imposed as a *punishment*,

3

but rather as a means of ensuring compliance with a court's order. *See Hicks v. Feiock*, 485 U.S. 624, 631 (1988); *see also International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827-29 (1994).

Parties are of course bound to follow the terms of an injunction, and Apple did so by ending the two enjoined policies and permitting developers to steer users to out-of-app purchases. Yet that was not good enough. To find Apple in contempt, the district court invoked the injunction's "spirit" as divined from the court's 180-page September 2021 opinion, which primarily focused on federal antitrust issues and had a massive factual record. Then, the court doubled down on its departure from the objective terms of the original injunction by holding Apple in contempt based in part on Apple's supposed *subjective* bad faith, as gleaned from privileged documents reflecting Apple's efforts to balance its legal and business commitments. All this was erroneous. The Supreme Court has made clear that civil contempt is generally an *objective* standard focused on compliance with an order's objective terms. *See Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019).

If the district court believed its original injunction was too narrow, it should have held a formal proceeding to modify the injunction. In such a proceeding, for instance, the district court could have considered whether the UCL imposes a *limit* on charging commissions of a particular rate. There is a vast gulf between finding that Apple's 27% headline commission was too high and declaring that Apple is no

longer allowed to charge any commission *at all*. Apple appreciates, and regrets, that the district court found that it did not comply with the original injunction. But the district court's solution to that—a penal, new injunction that is inconsistent on its own terms with the UCL—cannot stand.

On top of the fatal flaws with the district court's new injunction, there is a more foundational problem that requires terminating *any* injunction moving forward, including the original limited injunction: An intervening state court judgment forecloses it. In *Beverage v. Apple, Inc.*, 320 Cal. Rptr. 3d 427 (Ct. App. 2024), *review denied* (July 10, 2024)—a case involving the same facts and same claims against the same defendant—the California courts have confirmed that Apple's anti-steering rules are not "unfair" under the UCL. *Beverage* rejected the district court's original "*Erie* guess" as to the meaning of the UCL in this case. California law therefore requires that the injunction be dissolved.

This Court should reverse the district court's contempt order and vacate the injunctions, both new and old.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, 1332, 1337, and 1367. On April 30, 2025, the district court entered an order modifying the injunction, holding Apple in civil contempt, and denying Apple's motion to set aside the judgment. 1-ER-46–79. Apple timely noticed this

appeal on May 5, 2025.  7-ER-1281–86.  This Court has jurisdiction under 28 U.S.C. § 1291 because the order is a final order disposing completely of the post-judgment contempt proceeding and Apple's motion to set aside the judgment.  Alternatively, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1), because the order both modifies the injunction and refuses to dissolve that injunction.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in issuing, under the guise of a civil contempt order, a new and broader injunction banning Apple from charging any commission for external link purchases or instituting reasonable guidelines applicable to such purchases.

2. Whether the district court erred in finding Apple in civil contempt based on (a) the original injunction's atextual "spirit," rather than the injunction's unambiguous terms; (b) subjective, rather than objective, evidence of compliance; and/or (c) documents protected by attorney-client privilege.

3. Whether the district court erred in declining to vacate all injunctive relief based on the California Court of Appeal's intervening decision in *Beverage v. Apple, Inc.*, 320 Cal. Rptr. 3d 427 (Ct. App. 2024).

## STATUTORY AUTHORITIES

The full text of the relevant statutory provisions is set forth in the statutory addendum filed concurrently with this brief.  *See* 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.      Apple's Innovative Platform

Apple invented the iPhone, iOS, and the App Store, a revolutionary platform connecting millions of developers and users across the world.  Apple designed iOS as a closed operating system to promote privacy, security, and reliability for iPhone users.  5-ER-800, 5-ER-826.  Apple licenses its technology to third-party developers to create iOS applications ("apps") and distribute them through the App Store.  5-ER-826.  Apple has invested billions of dollars to optimize its hardware and software for apps, including by integrating features to connect developers and users and designing industry-leading app development tools.  5-ER-911–12, *see* 5-ER-832.  The technologies born of these investments, like the broader iOS ecosystem, are protected intellectual property ("IP").  5-ER-832, 5-ER-826.[1]  To access the App Store and more advanced IP-protected tools and technologies for building iOS apps,

---

[1]   The intellectual property at issue includes an array of Apple's IP-protected tools, technologies, and services, from the hardware features that "expand the device functions to software features that improve processing speed to combinations of the two," as well as the "thousands of developer tools, SDKs [software developer kits], and APIs [application programming interfaces]" that Apple provides to iOS developers.  5-ER-911–12.

7

developers must participate in Apple's Developer Program, including abiding by the Developer Program Licensing Agreement ("DPLA"). 5-ER-826–27.

Apple prioritizes user trust in the security, privacy, and reliability of its technology—an approach that also benefits developers by encouraging transactions. 5-ER-943. To build that trust, Apple created the App Review process, which automatically scans every app distributed through the App Store to identify malware, and which includes meticulous review by human experts to "protect against fraud, privacy intrusion, and objectionable content." *Id.*; 5-ER-903. Apple also requires developers to follow the App Review Guidelines, which impose consistent standards of safety, performance, and design. *See* 5-ER-834–35.

Since 2009, Apple has allowed developers to monetize their apps using the In-App Purchase ("IAP") mechanism. 5-ER-889. IAP operates as a one-stop, checkout-aisle interface for purchases of digital content within iOS apps, like game characters. 5-ER-805, 5-ER-863. Since the App Store was launched, Apple has charged a 30% commission on certain in-app transactions, similar to the "prevalent rate" on analogous platforms. 6-ER-1279. Apple charges a lower commission (15%) on transactions with small developers and for other transactions like subscription renewals. 5-ER-995. Around 80% of apps are entirely free and so involve no commission at all. 5-ER-921. Charging a commission on paid apps and digital content allows Apple to efficiently monetize its own substantial work in

8

creating and maintaining the iPhone, iPad, iOS, and the App Store as a "two-sided" platform—allowing developers on one side to connect with and engage consumers on the other. 5-ER-864–65, 5-ER-952; *see* 4-ER-763.

**B.      Epic's Lawsuit Challenging The App Store**

1.   Epic is a video game developer and distributor recently valued at $28.7 billion. 5-ER-802. Epic's flagship game is *Fortnite*, which generates revenue through user purchases of in-game content. 5-ER-804–12. In 2018, with Apple's assistance, Epic launched an iOS version of *Fortnite* through the App Store. 5-ER-811. *Fortnite* yielded Epic "more than $700 million [in revenue] across over 100 million iOS user accounts" in "only two short years." 5-ER-812.

In August 2020, Epic filed this antitrust lawsuit alleging that Apple unlawfully maintained a monopoly by requiring that apps be distributed only through the App Store and exclusively use IAP for digital content purchases within an app. 5-ER-800–801; 7-ER-1316. Epic sought a sweeping injunction requiring Apple to give Epic access to Apple's platform and technologies at little or no cost. 5-ER-998–1002.

In September 2021, the district court issued a 180-page decision (the "liability opinion") denying all of Epic's federal antitrust claims under the Sherman Act and Cartwright Act and granting only limited relief under California's UCL. 5-ER-977–78. The district court held that Epic's antitrust claims failed because, among other

reasons, Apple had established procompetitive benefits from its developer regulations and Epic had failed to provide any less restrictive alternatives that would achieve those benefits. 5-ER-833–34, 5-ER-855, 5-ER-884–87, 5-ER-935–37, 5-ER-950.

The court's federal antitrust analysis repeatedly discussed Apple's commission on purchases of digital content. On the one hand, the court found "*some* anticompetitive effects" flowing from Apple's regulations and 30% headline commission, the latter of which the court viewed as "artificially high" absent more specific evidence about the value of developers' access to the App Store, its user base, and Apple's IP-protected platform technologies. 5-ER-916, 5-ER-935, 5-ER-942.

On the other hand, the court squarely rejected Epic's argument that Apple could not charge any commission under its current model. Rather, the court emphasized that developers' access "justifies a commission" of some kind because otherwise developers could "benefit[] from Apple's innovation and intellectual property free of charge." 5-ER-816, 5-ER-948 & n.617. The court emphasized Apple's contributions to app security, reliability, fraud prevention, and privacy, and concluded that Apple was "entitled to license its intellectual property for a fee, and to guard its intellectual property from uncompensated use by others." 5-ER-943–45.

Moreover, the court was explicit that such a commission would be appropriate even on transactions made outside of IAP—that is, transactions processed by developers or providers, rather than Apple:

> Even in the absence of IAP, Apple could still charge a commission on developers. . . . Indeed, while the Court finds no basis for the specific rate chosen by Apple (*i.e.*, the 30% rate) based on the record, the Court still concludes that Apple is entitled to *some* compensation for use of its intellectual property. As established in the prior sections, *see supra* [5-ER-863–65, 5-ER-911–12, 5-ER-916], Apple is entitled to license its intellectual property for a fee, and to further guard against the uncompensated use of its intellectual property.

5-ER-948 (footnote 617—which further explained how Apple could collect a commission on external transactions—omitted).

After rejecting Epic's federal antitrust claims, the district court partially ruled for Epic on its UCL claim, holding that two "anti-steering" provisions of the App Review Guidelines were "unfair" under California law insofar as they prevented developers from "communicat[ing] lower prices on other platforms either within iOS or to users obtained from the iOS platform." 5-ER-961–64. The first provision was Guideline 3.1.1's prohibition against apps including any "buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase." 5-ER-961. This provision meant that developers could not include links for consumers to go from the app to a different website to purchase digital content for later use in the app itself. The second was Guideline 3.1.3's prohibition against developers "encourag[ing] users to use a purchasing method other than in-

app purchase" either "within the app or through communications sent to points of contact obtained from account registrations within the app (like email or text)." *Id.* (alteration in original). In addressing those provisions deemed "unfair," the court focused on "balanc[ing] the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information." 5-ER-964.

The district court issued a targeted remedy against the conduct it found unlawful: the "limited measure" of "invalidating the offending provisions" in Guidelines 3.1.1 and 3.1.3. *Id.* It entered an injunction tracking the language of those provisions nearly verbatim. Specifically, Apple was

> permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

4-ER-796.

2. The parties cross-appealed, and in December 2021, this Court granted a stay of the injunction pending appeal. *Epic Games, Inc. v. Apple, Inc.*, 2021 WL 6755197, at *1 (9th Cir. Dec. 8, 2021).

In April 2023, this Court largely affirmed the district court. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023). The Court fully rejected Epic's federal antitrust claims, recognizing that Apple's business model is "clearly lawful." *Id.* at 984-99. Similarly, the Court recognized that Apple was entitled to compensation

12

for its IP-protected technologies. *Id.* at 985-86, 992-93. And the Court did not question the district court's conclusion that Apple could charge a "commission" in the absence of IAP. *Id.* at 993.

This Court also upheld the district court's conclusion "that Apple's anti-steering provision violates the UCL's unfairness prong" based on decreases in "'consumer information'" and upheld the injunction "prohibiting Apple from enforcing the anti-steering provision against any developer." *Id.* at 999, 1001 (brackets omitted).

On July 17, 2023, the Court stayed its mandate while Apple petitioned the Supreme Court for a writ of certiorari. *Epic Games, Inc. v. Apple, Inc.*, 73 F.4th 785, 785 (9th Cir. 2023). The Supreme Court denied the petition on January 16, 2024, 144 S. Ct. 681 (2024) (mem.), and this Court's mandate issued on January 17, 2024, 7-ER-1414 (Dkt. 879).

### C.    Apple's Compliance With The Injunction

When the district court first issued the injunction in September 2021, Apple "began immediately working on a compliance plan." 6-ER-1238–39. It paused those efforts after this Court stayed the injunction but resumed them after this Court affirmed in April 2023, when it was not clear whether the mandate would be stayed pending Supreme Court review. 6-ER-1229, 6-ER-1233, 6-ER-1246; 3-ER-588–89.

13

Apple's compliance plan proceeded from the injunction's basic command to delete the anti-steering provisions in the Guidelines that were enjoined. To fill the resulting vacuum, Apple sought to strike a balance among the interests of consumers, developers, and Apple itself. 5-ER-964. Apple thus considered multiple options for the policies that would structure its compliance. 6-ER-1075, 6-ER-1083, 6-ER-1152, 6-ER-1243, 6-ER-1250; 3-ER-383–402; 3-ER-355–82; 2-ER-220–62; 2-ER-103–17. As described below, those options included charging a commission on the newly permitted external link purchases, as well as regulating the links to such purchases.

In responding to the injunction, Apple operated on the understanding that an appropriate commission was permissible to obtain a return on its investment in the IP-protected technologies and services that Apple provides to developers. 6-ER-1094; *see* 5-ER-916, 5-ER-942, 5-ER-945, 5-ER-948 & n.617 (validating this rationale, where the commission rate is supported, including as to non-IAP purchases); *Epic Games*, 67 F.4th at 986 (similar). The commission reflected Apple's understanding that developers render digital content—whether purchased in-app or out—on an iPhone or iPad, using iOS, downloaded and updated on the App Store, and within an app built using Apple's developer tools.

To assist with Apple's inquiry into options for compliance with the injunction, Apple engaged the outside consulting firm Analysis Group in the spring of 2023,

14

"when Apple was still considering whether to impose a fee" on external link purchases. 6-ER-1087–88, 6-ER-1090. Analysis Group was carrying out its study by June 2023. 6-ER-1259, 6-ER-1261, 6-ER-1272. The "key question" that Analysis Group explored was how Apple could "fairly charge for the value that it provides to developers . . . while implementing a linkout to allow [users] to purchase from the web." 6-ER-1099.

Analysis Group concluded that (1) Apple's proprietary platform technology is worth up to ~30% of developer revenue, (2) Apple's developer tools and services are worth ~3–16%, (3) Apple's distribution services are worth ~4%–14%, and (4) Apple's discovery services are worth ~5%–14%. 2-ER-131. In addition, Analysis Group noted that similar platforms reduced their standard commissions on externally processed transactions by 1%–4%, and that some platforms charge commissions on purchases made between 24 hours and 90 days after the user followed the external link. 2-ER-161, 2-ER-163–65; 6-ER-1123.

In conjunction with the Analysis Group study, Apple's finance and business teams built financial models to project how a range of commission rates would work in practice. Based on the Analysis Group data, and in light of Apple's unique services and demand generation, Apple's internal teams proposed a commission near 30% for purchases made within 7 days of users tapping an app's link to outside purchasing mechanisms, and a 0% commission on purchases made more than 7 days

15

after users tapped the link, for an estimated overall effective commission of 18% on external link purchases. 5-ER-1011, 6-ER-1129–30, 6-ER-1134–35, 6-ER-1140; 2-ER-104. Apple's internal projections showed that the new external link purchase model would make transactions less expensive for developers overall. 5-ER-1060, 5-ER-1064–65, 6-ER-1135–36.

Apple's "Price Committee"—the senior executives responsible for determining what commission, if any, to impose—first reviewed findings from Analysis Group and Apple's internal teams on July 5, 2023, when, uncertain whether this Court would stay its mandate, the Committee considered provisional compliance measures. 3-ER-361. After the stay was granted, Apple refined its plan while seeking certiorari so that, if this Court's mandate issued, Apple could finalize its new policies and enter full compliance in short order. 2-ER-105; 6-ER-1236.

On January 16, 2024, the Supreme Court denied certiorari and the Price Committee immediately convened to further review the analytical findings, evaluate options for moving forward, and finalize Apple's compliance plan. 2-ER-103–17; *see* 2-ER-125–94; 2-ER-195–219. The Committee chose a commission rate of 12% for small developers and 27% for larger ones, charged on digital content purchases made within 7 days of tapping the external link. 6-ER-1134–35, 6-ER-1144–45; *see also* 5-ER-1037; 5-ER-1042–44, 5-ER-1051–53, 5-ER-1056–57, 6-ER-1072–73.

The same day, Apple filed a Notice of Compliance to inform the district court of the policy changes it had made and the reasons for them. 4-ER-749–66. In accordance with Part (ii) of the injunction, Apple amended the Guidelines to expressly permit developers to gather basic contact information from users and then use that contact information to communicate with users about purchasing methods other than IAP. 4-ER-776. Neither Epic nor the district court has disputed Apple's compliance with Part (ii).

With respect to Part (i) of the injunction, Apple eliminated the previous guidelines that were enjoined and enacted the "External Link Entitlement" program. Whereas Guideline 3.1.1 had previously prohibited developers from steering users to purchasing mechanisms outside of the app, the revised version expressly permitted it: Developers could use an "External Purchase Link Entitlement to include a link to the developer's website that informs users of other ways to purchase digital goods or services." 2-ER-120–22. "Entitlements" enable developers to activate certain app features and alert the App Review team that those features need special assessment. 5-ER-1027–28; 6-ER-1157.

To obtain an External Link Entitlement, Apple required developers to agree to certain technical requirements. The requirements aim to ensure that the resulting transactions are informed, private, and safe for users; protect the integrity of Apple's

17

IAP system; and permit the App Review teams to effectively assess the added features.  Most relevant here:

- **The "Plain Button" style.**  This signals to users that the link will redirect them to the web rather than to an in-app purchase.  6-ER-1185.  Like the related requirement that links "[n]ot mimic Apple's in-app purchase system," it prevents user confusion about whether they are using IAP or something else.  *See* 2-ER-89.

- **A textual template.**  Five different templates are available, reflecting typical marketing patterns—e.g., "To get XX% off, go to www.example.com."  2-ER-99.  Developers can size, style, or color the text in any way.  6-ER-1183–84.  This "defined set of examples" gives the App Review teams "a better chance of being able to check them all" for misleading advertisements or other issues.  6-ER-1179; *see also* 5-ER-1016, 5-ER-1032, 6-ER-1179–90.

- **A system disclosure sheet.**  This informs users that they are leaving the iOS and IAP ecosystem to make the purchase through a third party and that Apple therefore cannot guarantee the security or privacy of the transaction.  2-ER-99.

- **Direct and static links.**  Links may only take the user to the listed page and may not transmit data to the linked website, which (1) prevents users from being misled to unintended internet destinations, and (2) prevents outside websites from extracting user data without the user's knowledge, which can also increase the risk of that data being hacked or stolen.  6-ER-1163, 6-ER-1169, 6-ER-1172, 6-ER-1174–75.

- **Placement in a location outside the in-app purchasing pages.**  This prevents interference with a user's decision to use IAP and their experience.  6-ER-1195–96.  Like a store's decision not to advertise competitors' prices in its own checkout aisle, this also preserves the IAP business model once users have opted into it.  6-ER-1193–94, 6-ER-1197–98.

Developers could, consistent with these requirements, steer app users to third-party purchasing mechanisms outside of the app.

### D. Enforcement Proceedings And New Injunction

#### 1. Epic's Challenge To Apple's Compliance

In March 2024, Epic filed a motion asking the district court to "enforce" the original injunction. 4-ER-720–48. The motion acknowledged that Apple had deleted the enjoined "blanket prohibition on steering" as required by Part (i) of the injunction, and did not challenge Apple's compliance with Part (ii). 4-ER-725–27. Nonetheless, Epic alleged that Apple's new commission and link regulations violated the "spirit" of the injunction by making it too expensive and difficult to encourage users to make purchases on other platforms. 4-ER-725–27, 4-ER-738 (citation omitted). Epic asked the district court not only to hold Apple in contempt but also to "clarify" the injunction to prohibit the External Link Entitlement program (or anything like it) and to limit commissions on linked-out purchases. 4-ER-737–47.

In response to Epic's motion, the district court convened an evidentiary hearing on May 8, 2024. *See* 4-ER-717. Epic had not sought any discovery in connection with its motion to enforce or the May 2024 hearing. After six days of testimony, the district court decided on its own to order production of "all of Apple's documents [relevant] to its decision-making process" on the compliance plan. 6-ER-1208, 6-ER-1221.

Over the ensuing months, Apple reviewed approximately 1.3 million documents. 3-ER-630. Many reflected legal advice about the court's injunction subject to the attorney-client privilege, often in close conjunction with business analyses regarding compliance options, including analyses undertaken at the direction of counsel. Over Apple's objections, however, the district court rejected Apple's assertions of privilege because, in the court's view, legal advice was not "*the* primary purpose" of those documents. 4-ER-644 (emphasis added) (quoting *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021), *certiorari granted*, 143 S. Ct. 80 (2022), *dismissed as improvidently granted*, 143 S. Ct. 543 (2023)). Apple re-reviewed all of its assertions and produced 7,059 additional documents, maintaining the same objections to many. 3-ER-636, 3-ER-639–40.

The district court resumed the evidentiary hearing on February 24, 2025. Epic introduced approximately 30 exhibits subject to Apple's privilege objections. 3-ER-588.

### 2. Beverage *And Apple's Rule 60(b) Motion*

While the discovery process played out, the California courts in *Beverage* considered a virtually identical UCL-based challenge to Apple's anti-steering provisions. There, a putative class of *Fortnite* players had sued Apple, alleging that its developer rules—including the same anti-steering provisions enjoined here—violated California's Cartwright Act and UCL. *Beverage*, 320 Cal. Rptr. 3d at 433-

20

34. The California trial court ruled that (1) Apple's anti-steering provisions were protected as a unilateral refusal to deal under *United States v. Colgate & Co.*, 250 U.S. 300 (1919); and (2) per *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d 175 (Ct. App. 2001), such unilateral conduct is not "unfair" under the UCL. *Beverage*, 320 Cal. Rptr. 3d at 431, 434; *see infra* at 65 (explaining *Colgate*).

On April 24, 2024, the California Court of Appeal affirmed. It held that "the *Colgate* doctrine provides Apple with a 'safe harbor' against Plaintiffs' UCL claim under the 'unfair' prong." *Beverage*, 320 Cal. Rptr. 3d at 441. The court expressly declined to follow the determinations in this case that Apple's same anti-steering provisions were unfair, finding this case "'neither binding nor'" "'persuasive.'" *Id.* at 442 n.6; *see id.* at 440-42; 4-ER-712 n.7. In July 2024, the California Supreme Court refused further review. 4-ER-714.

Apple then moved under Federal Rule of Civil Procedure 60(b)(5) to set aside the original injunction in this case. 4-ER-666. Apple explained that *Beverage* rejected the federal courts' determination that Apple's anti-steering rules were "unfair" under the UCL—the sole basis for the injunction—making it improper to continue enforcing the injunction. 4-ER-681–84.

### 3. The District Court's Ruling And New Injunction

On April 30, 2025, the district court entered an order embracing Epic's civil contempt arguments and denying Apple's Rule 60(b) motion.

21

As to contempt, the court did not dispute that Apple had eliminated the two Guideline provisions specifically identified in the injunction. 1-ER-62. Nonetheless, the court held that Apple's new measures for implementing external link purchases "flouted" the "spirit" of the original one-paragraph injunction, which was the elimination of "anticompetitive conduct and anticompetitive pricing." 1-ER-2–4, 1-ER-57–58, 1-ER-61 n.65.

The court acknowledged that it had "previously recognized" that "'[e]ven in the absence of IAP, Apple could still charge a commission on developers.'" 1-ER-61 (alteration in original) (quoting 5-ER-948). But the court criticized Apple's 27% commission for nearly replicating the original commission it had called supracompetitive. 1-ER-3, 1-ER-61. Rather than analyze the commission rate on its merits, however, the Court trained its disapproval on the process Apple used for setting it: According to the court, Apple chose an anticompetitive rate and then later proffered a sham report from the Analysis Group to justify it. 1-ER-15–27, 1-ER-60–62. For that reason, the court stated, Apple had lost the "opportunity" to impose a commission based on the value of its IP-protected technologies. 1-ER-61.[2]

---

[2] The district court accused Apple of attempting to mislead the court with respect to the decision to charge a commission, and on that basis referred Apple and its Vice President of Finance for investigation of criminal contempt to the U.S. Attorney for the Northern District of California. 1-ER-26–27, 1-ER-77–79.

In addition, the district court considered Apple's technical regulations on external links too restrictive—for instance, Apple's lack of a "more effective button [that] would increase competition," and Apple's provision of templates for calls to action, which the court said it had "[n]owhere . . . authorize[d]." 1-ER-63; *see* 1-ER-27–45, 1-ER-62–64.

Rather than give Apple an opportunity to remedy any perceived non-compliance with the original injunction, the district court decided to "enjoin[] Apple from implementing its new anticompetitive acts." 1-ER-4. Most importantly, the court permanently enjoined Apple from "[i]mposing any commission or any fee on purchases that consumers make outside an app." 1-ER-76–77. In addition, the court added five other permanent bans prohibiting Apple from regulating *in any way* the content, format, or placement of external links and calls to action, and from warning users that external purchases would not be secured or verified by IAP. *Id.* The district court did not make any determination that Apple's compliance measures violated the UCL or any other law.

In the same order, the district court denied Apple's Rule 60 motion invoking *Beverage*, reasoning that California law had not changed. 1-ER-48–52.

## SUMMARY OF ARGUMENT

The district court imposed a new and far broader injunction against Apple under the guise of exercising its civil contempt power. That new injunction

23

permanently prohibits Apple from charging any commission for external link purchases or regulating developer steering to external purchasing mechanisms. This ruling is tainted by several legal errors and cannot stand.

*First*, even accepting the district court's findings of contempt, the district court's new injunction is substantively and procedurally unjustified. Most importantly, the new injunction bars Apple from charging any commission for external link purchases. That prohibition contradicts the district court's prior recognition that Apple provides developers with IP-protected technologies and services of considerable value, and that Apple is entitled to be compensated for those contributions. The new injunction's near-total ban on Apple's regulation of external links is also staggeringly overbroad, as it prevents Apple from protecting users from security or privacy risks and regulating offensive or misleading speech on its platform. These new restrictions are inherently punitive and cannot be imposed using the non-punitive civil contempt power, no matter the court's findings.

*Second*, the district court was wrong to hold Apple in civil contempt in the first place. Apple complied with the original injunction's specific command by discontinuing the policies that the district court enjoined. In concluding otherwise, the district court measured Apple's compliance not based on the injunction's text, but instead on the district court's subjective intent, or the "spirit" purportedly underlying the court's 180-page liability opinion. But Rule 65 and longstanding

24

civil contempt precedents make clear that compliance turns on the injunction's specific terms. Only when there is no "fair ground of doubt" as to a party's (non)compliance can a court resort to civil contempt. *Taggart*, 587 U.S. at 561 (emphasis omitted). The district court also improperly relied on misinterpretations of subjective evidence and privileged documents evidencing internal deliberations about how to comply with the injunction.

*Third*, the district court should have granted Apple's Rule 60(b) motion and vacated the original injunction moving forward based on the California Court of Appeal's intervening decision in *Beverage*. In *Beverage*, the California courts rejected the same UCL claim concerning Apple's anti-steering provisions, *see* 320 Cal. Rptr. 3d at 434, thereby correcting the mistaken "*Erie* guess" made by the federal courts in this case. *Beverage* establishes that if this case were now brought in California state court, it would fail on the merits. Continuing to enforce an injunction under these terms would be inequitable and contrary to principles of federalism and comity.

The district court's decision should be reversed.

## ARGUMENT

## I. THE DISTRICT COURT'S NEW INJUNCTION IS SUBSTANTIVELY AND PROCEDURALLY UNJUSTIFIED

A court's inherent power to hold parties in civil contempt is limited to "compel[ling] future compliance with a[n existing] court order" or compensating

another party for the non-compliance. *International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). As relevant here, civil contempt sanctions must be "coercive" insofar as they seek to enforce compliance with an existing order and "avoidable through obedience." *Id.* And the law is clear that courts cannot punish parties through civil contempt (such as by issuing a new injunction). *See Hicks v. Feiock*, 485 U.S. 624, 631 (1988) (explaining that "civil contempt . . . is remedial" and not "punitive" (citation omitted)); *see also Bagwell*, 512 U.S. at 827-28 (civil contempt is not "punitive"); *Parsons v. Ryan*, 949 F.3d 443, 455-56 (9th Cir. 2020) (similar); *Carter v. Local 556, Transp. Workers Union of Am.*, 138 F.4th 164, 208-09 (5th Cir. 2025) ("'civil contempt . . . seeks only to coerce the defendant to do what a court had *previously* ordered [it] to do'" (emphasis added)).

Instead of ordering Apple's compliance with the original injunction in response to its finding of contempt, the district court issued a new injunction. The original injunction covered only two discrete anti-steering prohibitions: (i) Apple cannot prohibit developers from using buttons, links, or other calls to action to steer users to external purchasing mechanisms; and (ii) Apple cannot prohibit developers from communicating with customers through points of contact (such as email addresses) obtained voluntarily through registration. 4-ER-796. The new injunction contains six prohibitions with requirements that appear nowhere in the original

26

order. 1-ER-76–77. These include a complete bar on Apple charging any commission—something the district court and this Court acknowledged was permitted under the original order. And they include provisions that categorically forbid Apple from regulating the kinds of content or language that developers provide in connection with links to external purchases—something far broader than the previous injunction's bar on Apple "prohibiting" such links. It is a new and punitive injunction.

The question whether a court modified or issued a new injunction is an issue of law, which is reviewed de novo. *See Cunningham v. David Special Commitment Ctr.*, 158 F.3d 1035, 1037 (9th Cir. 1998); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 246 (6th Cir. 2011) (affording no deference to district court's label). Here, both components of the new injunction—the no-commission rule and categorical bar on steering regulations—are unlawful and should be vacated.

### A.     The District Court's Zero-Commission Injunction Is Unjustified

1. The district court's order prohibiting Apple from charging any commission on external link purchases is an extraordinary sanction that is clearly unlawful.

a.     At the outset, the district court's zero-commission injunction is economically backwards and substantively unjustified. Apple provides app developers with products and services of immense value, without which developers would be unable to sell the digital content subject to the commission. That includes

27

"the tools and technologies to help them build their apps" (such as the underlying programming language); a "safe marketplace to distribute their apps to users all over the world" (the App Store); and "services" that help developers "acquire and retain and reengage with users." 5-ER-1017–18. Those services and underlying IP-protected technologies are essential to developers' success irrespective of the mechanism consumers use to purchase in-app digital products. Accordingly, there is no economic justification for the district court's new prohibition on "*any* commission or *any* fee" for such digital products purchased outside the app. 1-ER-76 (emphases added).

The zero-commission injunction also violates basic principles of equitable relief, which require injunctive relief to "be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991); *accord United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001). There must be a close fit between the violation found and the remedy issued, and an "overbroad" injunction is "an abuse of discretion." *United States v. BNS Inc.*, 858 F.2d 456, 460 (9th Cir. 1988); *see Lamb-Weston*, 941 F.2d at 974. These principles equally govern initial orders of injunctive relief and modifications of existing injunctions: In *Clark v. Coye*, this Court vacated a modification to an injunction because the "original judgment of liability contain[ed] no determination" that the matter later enjoined "violate[d] federal law." 60 F.3d 600, 605 (9th Cir. 1995). The

upshot is that each element of the district court's new six-part injunction requires direct support in the court's original liability opinion. The new injunction fails this basic rule.

The new injunction also flouts the earlier decisions in this case, something that the contempt order itself highlights. Before imposing the new zero-commission rule, the district court admitted that it had "previously recognized" that "'Apple could still charge a commission on developers.'" 1-ER-61 (quoting 5-ER-948). Indeed, that original opinion was littered with statements that Apple's contributions to app developers are valuable and that Apple is entitled to compensation for its services and IP-protected technologies. *See, e.g.*, 5-ER-948. The court explained, for example, that Apple invested considerable time and resources in the "creation, constant update, and modernization" of its hardware and software and provides "tools" to simplify and accelerate "the development process of native apps." 5-ER-826; 5-ER-911–12.

Based on that conclusion, the 2021 liability opinion confirmed that Apple is entitled to charge a commission for in-app purchases of digital content to "guard its intellectual property from uncompensated use by others." 5-ER-945. The district court "ha[d] concerns about the 30% rate and its appearance of being artificially higher (*i.e.*, supracompetitive) than it would be in a more competitive market." 5-ER-935. And the court believed Apple had not done enough to justify the 30%

rate based on "the value developers get from the App Store" or from Apple's IP-protected technologies. 5-ER-896. But the court made clear that "Apple is entitled to *some* compensation for use of its intellectual property." 5-ER-948.

The district court expressly recognized that a commission would be justified for external purchases as well. "Even in the absence of IAP," the court noted, "Apple could still charge a commission on developers" and thereby prevent "the uncompensated use of its intellectual property." *Id.* Consistent with Epic's "open-ended assurances at trial that its relief would allow Apple to collect a commission," *Epic Games*, 67 F.4th at 970, this Court likewise recognized that Apple would be entitled to charge a "commission" even in the absence of IAP, *id.* at 992-93.[3]

And that makes sense: While purchases via external links would not use one Apple service (IAP), developers would still avail themselves of all the other IP-protected technologies and services Apple provides, which both enable and are essential to transactions involving digital goods on iOS. For example, if an app user wants to acquire a costume for their virtual character, they can now do so using an external link to the developer's website. *See* 5-ER-809. But the developer could not deliver that costume to the user without the iPhone screen that displays the costume,

---

[3] Epic recognized the same thing in litigation against Google involving the Google Play Store. In advocating for a broader injunction than the one in this case, Epic stated that the original injunction here did "not prevent [Apple] from . . . introducing a new fee . . . on linked out-of-app transactions." 4-ER-781–82.

30

the iPhone touch controls that direct the virtual character, the Apple silicon chip that processes all iOS software, the app development tools developers use to build the app, and the App Store platform that downloads, updates, and maintains the app. *See* 6-ER-1114–15, 6-ER-1119–20. And access to Apple's user base also generates demand for the app (and thus, the costumes) in the first place, including by maintaining an ecosystem built on trust in the form of the App Store. *See* 5-ER-818; *see also* 5-ER-916.

These facts were not meaningfully disputed, either in the original liability proceeding or the contempt proceeding. *See, e.g.*, 5-ER-801; 5-ER-826; *see also* 5-ER-1017–18 (discussing Apple's tools and services to developers). Like Apple, other platforms that provide similar or related services charge a fee even when the payment is handled elsewhere. 2-ER-161 (explaining how platforms like Google Play, Shopify, Etsy, Booking.com, and One Store charge fees for listing products on their platform).

Because Apple's right to charge a commission is economically supported and consistent with the district court's opinion, the court could not later impose a new injunction zeroing out that commission. Such an injunction is not "tailored to remedy the specific harm alleged," *Lamb-Weston*, 941 F.2d at 974, nor supported by any "determination" that a commission necessarily "violate[d] federal [or state] law," *Clark*, 60 F.3d at 605.

b. The court's new prohibition on Apple charging any commission or any other fee for external link purchases violates state and federal law in other ways as well.

*First*, the zero-commission requirement is judicial ratemaking that is not permitted under the UCL. As the California Court of Appeal has explained, "[j]udicial review" of fees "is an entirely inappropriate method" for adjudicating unfair competition law claims. *California Grocers Ass'n v. Bank of Am.*, 27 Cal. Rptr. 2d 396, 405 (Ct. App. 1994). Rate-setting is a legislative, rather than a judicial function: "'[T]he control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by ad hoc decisions of the courts.'" *Id.* Issues of "'complex economic policy and regulation'"—including questions such as the "level of competition" and "whether market conditions require[] pricing regulation"—are reserved to legislative and administrative agencies. *Willard v. AT&T Commc'ns of Cal., Inc.*, 138 Cal. Rptr. 3d 636, 642 (Ct. App. 2012).

This case involves rate-setting in its most extreme form. The district court did not simply conclude that the 27% rate was unacceptably high; it set its own rate by mandating that Apple's commission rate be set at zero, in perpetuity. It did so without any finding that competition requires a rate of zero, or explaining how setting a rate at all was consistent with the UCL. Indeed, the district court did not find that Apple's property and services are *not* worth 27%—it simply rejected that

32

rate for failure to appropriately consider the underlying value of Apple's services. 1-ER-61. But the UCL requires no such justification for pricing decisions, and the court identified no such requirement under any antitrust or competition law. *Cf. FTC v. Qualcomm, Inc.*, 969 F.3d 974, 998-1000 (9th Cir. 2020) (rejecting such a requirement under the Sherman Act).

*Second*, the new, zero-commission injunctive term is so extreme that it violates the Fifth Amendment's Takings Clause. The district court acknowledged that Apple is entitled to "guard against the uncompensated use of . . . its intellectual property," and it recognized the value of the host of services Apple provides developers. 5-ER-912, 5-ER-948; *see supra* at 10-11. Now, the court has absolutely forbidden Apple from charging any commission on linked transactions, thereby enabling developers to free ride on Apple's proprietary platform without paying any commission on transactions for digital content. *See, e.g.*, *Horne v. Department of Agric.*, 576 U.S. 350, 359-60 (2015) (intellectual property protected by the Takings Clause).

The no-commission requirement is all the more troubling because it is accompanied by a total ban on Apple's ability to regulate apps now using its property for free. The Takings Clause prohibits the government from directing private companies to permanently give away free access to their property. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). Yet the court has done just that,

33

permanently depriving Apple of the right to exclude, which is "universally" held to be "fundamental" and "one of the most essential sticks" in the property bundle. *Id.* at 149-50 (citation omitted). A federal court cannot force Apple to afford all developers open and unconditional use of its products and services, including its IP-protected technologies, in perpetuity.

2. Even if the district court's prohibition on any commissions were otherwise permissible, it could not be imposed as a civil contempt sanction here. The district court offered no legal or economic basis for setting the commission at zero, nor any explanation for why the UCL would require a zero commission. The only way to understand the prohibition is as a *punishment* for Apple's supposed failure to abide by the original injunction. But even if the district court's finding of non-compliance were accepted, its sanction would be impermissible.

As noted at the outset, the purpose of civil contempt is to "compel future compliance with a court order." *Bagwell*, 512 U.S. at 827. This contrasts with *criminal* contempt, which imposes sanctions that "seek[] to punish a 'completed act of disobedience.'" *Ahearn ex rel. NLRB v. International Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013). Criminal contempt sanctions, once imposed, cannot be avoided—"[t]he punishment is unconditional and fixed." *United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980). That is fundamentally distinct from civil contempt, where the sanction is "conditional and

34

must be lifted if the contemnor obeys the order of the court." *Id.* In short, civil contempt orders "'seek[] only to coerce the defendant to do what a court had previously ordered [it] to do.'" *Carter*, 138 F.4th at 208-09.

Here, the district court did not merely compel compliance with its earlier order—it imposed a new injunction zeroing out Apple's commission. The prior injunction did not discuss commissions at all, and the district court made clear that Apple *could* charge a commission. *See supra* at 10-11.

The district court ultimately selected a commission of zero as a punishment based on its determination that Apple had violated the earlier injunction. The new injunction is "unconditional and fixed," *Powers*, 629 F.2d at 627. Indeed, in response to Apple's argument that the court setting a specific commission rate would *violate* the UCL, the court justified its no-commission rule on the view that "Apple flouted the Court's order." 1-ER-61 n.65. The court also analogized to the trademark context, where it said that a party found to have infringed "is allowed less leniency for purposes of injunction enforcement than an innocent party." *Id.* (citation omitted). The court then selected a zero percent commission rate in perpetuity—one that Apple cannot avoid no matter what justification it presents in the future.

The district court anticipated an immense financial impact. *See* 1-ER-17–18. If the court had simply imposed a fine in the "hundreds of millions to billions" of

35

dollars a year, 1-ER-17, with no opportunity to purge through compliance, there would be no question the injunction would be unduly punitive. The court's zero-commission injunction imposes essentially the same monetary penalty.

Such unconditional punishment is far beyond the permissible scope of civil contempt. Civil contempt may not be used to issue a "punitive remedy with the goal of punishing [the contemnor] for not complying with [the court's] decree." *Carter*, 138 F.4th at 209 (distinguishing civil contempt from Rule 11 sanctions and vacating "punitive" new injunction).

3. If the district court believed that Apple's new commission violated the UCL, it could have instituted proceedings to modify the injunction consistent with due process. This Court's precedent demands that "[b]efore issuing injunctive relief, the court must provide the affected party with notice and an opportunity to be heard." *Armstrong v. Brown*, 768 F.3d 975, 979-80 (9th Cir. 2014); *see also Dr. José S. Belaval, Inc. v. Peréz-Perdomo*, 465 F.3d 33, 37 (1st Cir. 2006) (same). Where a party believes that "unforeseen circumstances" make "additional relief desirable" (beyond that ordered or consented to in prior proceedings), the district court must undertake "full litigation" to address that request. *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). That rule is critical in cases like this one, because "[a] party has the right to judicial resolution of disputed facts not just as to the liability phase, but also as to appropriate relief," *Microsoft Corp.*, 253 F.3d at 101.

36

That procedure would remain open on remand should this Court or the district court have concerns about whether the specific amount of Apple's commission on external link purchases violates the UCL. On remand, the district court can hold a proceeding to consider whether the injunction should be modified to prohibit Apple's existing commission. But at the very least, Apple must have the opportunity to adopt and justify a commission, consistent with the court's earlier findings. And no part of the UCL permits a court to set a commission rate at zero. The district court's injunction forever barring *any* commission must be vacated.

### B. The New Injunction's Other Prohibitions Are Also Unjustified

The other prohibitions in the district court's new injunction are likewise invalid. In place of the narrow obligation not to prohibit developers from "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing," 4-ER-796, the district court imposed five exceptionally broad mandates eliminating Apple's ability to impose reasonable regulations on developers. The new provisions bar Apple from, among other things:

- "Restricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app";

- "[O]therwise conditioning the content, style, language, formatting, flow or placement of [buttons or other calls to action] for purchases outside an app"; and

- "Restricting a developer's use of dynamic links that bring consumers to a specific product page in a logged-in state rather than to a statically defined page, including restricting apps from passing on product details, user details or other information that refers to the user intending to make a purchase."

1-ER-76–77.

As the district court acknowledged, these are new prohibitions. For example, the court recognized that Apple's exclusion of certain developers from the Link Entitlement program did "not itself constitute a violation of the [original] Injunction," but the court then specifically enjoined that exclusion. 1-ER-43–44, 1-ER-63 n.67, 1-ER-76. As to Apple's technical requirements for the button style and template language of external links, the district court said it "need not decide whether these restrictions alone violate the Injunction" but then enjoined Apple from applying those requirements, collectively *or* individually, in any form. 1-ER-63, 1-ER-76.

These added prohibitions conflict with the district court's original September 2021 decision and cannot stand. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) (vacating overbroad injunction). Far from prohibiting such regulations,

38

the liability opinion recognized Apple's interests in regulating such conduct and the procompetitive benefits of such regulations. On security: Apple's policies "provide[] a safe and trusted user experience on iOS, which encourages both users and developers to transact freely and is mutually beneficial." 5-ER-943. On privacy: Like security, privacy is "a competitive differentiator for Apple" that makes it attractive to consumers. 5-ER-908. And Apple's regulations help "filter[] fraud and offensive content" too. 1-ER-909. So when the court did issue its injunction, the measure was "limited" in order to "balance[]" additional price transparency with Apple's legitimate "justification for maintaining a cohesive ecosystem." 5-ER-964.

The new injunction runs roughshod over those same goals. It requires Apple to permit any developer "language" or "content" in connection with link-out purchases—even if it is misleading, confusing, or offensive. It precludes Apple from informing users about the security and privacy risks of link-out transactions. It disallows Apple from working to protect users from scams by requiring advance review of link-outs. And it permits developers to create link-out mechanisms that so elevate the external link over Apple's IAP mechanism—e.g., by putting the external link in large and noticeable font and the IAP link in small or near-unreadable font—as to trample Apple's right to offer IAP entirely.

The court made no findings that these new prohibitions followed from, or were required by, the UCL. As with the no-commission rule, these restrictions were

39

imposed as punishment based on the court's finding of Apple's non-compliance with the original injunction. *See supra* at 34-36.

Indeed, these new prohibitions are so broad that they violate Apple's First Amendment rights. The First Amendment "offers protection when an entity engaging in expressive activity . . . is directed to accommodate messages it would prefer to exclude." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). And compelled speech that is unconnected to providing purely factual and uncontroversial information to consumers is subject to heightened scrutiny. *See National Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 768-69 (2018). Here, the district court's new injunction imposes an exceptionally intrusive compelled speech obligation and powerfully limits Apple's own speech. It bars Apple from "[r]estricting . . . developers' style, *language*, formatting, [or] quantity . . . of links for purchases outside an app" or "[o]therwise conditioning the *content*, style, [or] *language* . . . for purchases outside an app." 1-ER-76 (emphases added). That sweeping rule requires Apple to carry any and all developer speech, even if misleading or disparaging to Apple, in connection with links to external purchases. It undercuts Apple's carefully tailored approach to apps, relied upon by parents and others to protect against unregulated off-app content and links.

The new injunction effectively compels Apple to post an advertisement in its own check-out line directing customers to a competitor, with no control over what

40

that advertisement says or what form it takes—all while limiting Apple's own ability to speak in connection with that advertisement. Tilting the playing field in this way raises serious First Amendment problems and must survive strict scrutiny. *See Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Cal.*, 475 U.S. 1, 9-11, 19 (1986). Yet the district court did not even adjudicate this issue.

This Court should vacate the new injunction's restrictions on Apple's right to protect its users through reasonable regulations of the speech on its platform. To the extent the district court wishes to restrict Apple's conduct beyond the original injunction, it can institute a proceeding to modify the injunction. But in that proceeding, it must determine that the underlying UCL violation requires the relief ordered, and it must adjudicate Apple's arguments and defenses to the specific restrictions proposed. It cannot order a new set of constitutionally dubious prohibitions as punishment for a prior finding of civil contempt. *See supra* at 25-26, 34-36.[4]

---

[4] The new, more onerous injunction also exacerbates a problem with the prior injunction—its improper nationwide scope, in which relief is provided to parties not before this Court. *See Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011); Fed. R. Civ. P. 23(b)(2). Every developer in the United States now receives the same windfall as Epic given the prohibition on commissions. Apple recognizes that this Court upheld the injunction's nationwide scope, but Apple preserves its right to reassert this argument in light of future legal developments.

## II.   THE DISTRICT COURT ERRED IN HOLDING APPLE IN CONTEMPT FOR VIOLATING THE ORIGINAL INJUNCTION

The district court did not just err in issuing its far-reaching new injunction—with respect, it erred in holding Apple in civil contempt in the first place.  Apple appreciates that the district court believed Apple's compliance plan violated the spirit of the court's original injunctive decree.  But the plain text of the injunction did not prohibit the conduct—such as Apple's choice of a 27% commission for linked-out purchases—that the district court later identified as a basis for contempt.  The district court punished Apple for making a reasonable—but in the district court's view, wrong—determination as to what would pass muster under the court's injunction.  That is not how civil contempt is supposed to work.

Contempt orders are generally reviewed on appeal for "abuse of discretion," *Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 850 (9th Cir. 2023), and "an error of law *is* an abuse of discretion," *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010).  Here, the district court's contempt order suffers from three key flaws.  First, the court held Apple in contempt based not on a violation of the injunction's plain terms but instead on the court's assessment of the injunction's "spirit."  1-ER-57.  Second, the district court founded its contempt finding on a flawed assessment of Apple's subjective bad faith.  Third, the district court relied on documents that, applying the proper legal standard for attorney-client privilege, are protected from disclosure.  Each of these errors warrants reversal.

42

### A.    The Court's Civil Contempt Finding Relied On The Injunction's "Spirit" Rather Than Its Express Terms

1.   Because "an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive *explicit notice* of *precisely* what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (emphases added).  That requirement is embodied in Federal Rule of Civil Procedure 65(d), which provides that "[e]very order granting an injunction . . . must . . . state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or any other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

These requirements "prevent uncertainty and confusion on the part of those faced with injunctive orders." *Schmidt*, 414 U.S. at 476.  Crucially, they "avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.*  As the Supreme Court has explained, a federal court must "frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." *International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

In keeping with these requirements, any "ambiguities" in an injunction must be "construed in favor of the enjoined party." *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 F.2d 681, 685 (9th Cir. 1988).  Civil contempt "should not be resorted to where there is [a] *fair ground of doubt* as to the

43

wrongfulness of the defendant's conduct." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019). "[T]he words of the court's order" must "have clearly and unambiguously forbidden *the precise conduct on which the contempt allegation is based*." *United States v. Saccoccia*, 433 F.3d 19, 28 (1st Cir. 2005). This "standard is generally an *objective* one." *Taggart*, 587 U.S. at 561. And the proper interpretation of an injunction—and whether it violates Rule 65—are legal issues reviewed de novo. *See United States v. DAS Corp.*, 18 F.4th 1032, 1040 (9th Cir. 2021); *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985).

2. The relevant inquiry here should have been whether Apple violated the injunction's unambiguous terms—i.e., whether Apple "prohibit[ed] developers" from "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing." 4-ER-796. It did not.

Apple complied with the injunction's command: It implemented changes such that it no longer prohibits developers from linking out to alternative purchasing mechanisms. Apple's App Review Guidelines—as revised to comply with the district court's injunction—provide that "[d]evelopers may apply for an entitlement to provide a link in their app to a website the developers owns or maintains responsibility for in order to" complete purchases. 4-ER-755. Links may "inform users about where and how to purchase . . . in-app purchase items" and tell users that

44

"such items may be available for a comparatively lower price." *Id.* Links can also be accompanied by buttons and template language, complying with the district court's requirement that Apple not "prohibit[] developers" from "including . . . buttons, external links, or other calls to action that direct customers to" alternative "purchasing mechanisms." 4-ER-796. Apple thus allowed, and did not prohibit, the required buttons, links, and other calls to action.

Notably, the original injunction provided only that Apple could not "prohibit" developers from linking out. It did not go further and bar Apple from setting terms, conditions, or guidelines for external link purchases designed to promote user safety and privacy and to avoid confusion. Under Apple's guidelines, developers must certify that purchasing services meet industry standards and must inform users that they are leaving Apple's App Store environment. 4-ER-770–73. Certain design parameters on links promote technical compatibility and user safety. 4-ER-759–60; 4-ER-774–75. And developers may use a set of templates to advertise prices while avoiding misleading or confusing offers. 4-ER-774–75. Nothing in the original injunction prohibited these measures.

The district court held that Apple's regulations of button styles and links were "explicitly at odds with the injunction" because "[a] more effective button would increase competition" and because the court did not affirmatively "authorize those limitations." 1-ER-63. It elsewhere stated without explanation or elaboration that

45

Apple "violated the literal text" of the injunction. 1-ER-58. But requiring the "plain button" style plainly does not prohibit "buttons." And more fundamentally, the court's analysis gets the inquiry backward: The question is not whether the district court expressly *authorized* Apple to implement button style requirements; it is instead whether Apple's restrictions—beyond any "fair ground of doubt," *Taggart*, 587 U.S. at 562—*violate* the text of the prohibitory injunction. They do not. As the district court recognized in denying Apple's request for a stay of the original injunction, its role is not "to micromanage" which of the "numerous avenues" Apple could pursue to "comply with the injunction and yet take steps to protect users." 4-ER-794.

Apple's new commission did not violate the injunction, either. The district court's original injunction did not prohibit a commission. To the contrary, the liability opinion repeatedly acknowledged that "Apple is entitled to *some* compensation for use of its intellectual property"—including for external purchases. 5-ER-948; *see supra* at 10-11 (collecting statements supporting a commission). And Epic had not sought an injunction barring any commission in connection with external purchasing. *Epic Games*, 67 F.4th at 970 (noting Epic's assurances that "its [proposed] relief would allow Apple to collect a commission"). Apple's commission was fully consistent with the prior proceedings.

46

If the district court believed, in light of Apple's compliance measures or otherwise, that the original injunction was somehow insufficient, it could have considered whether to modify that injunction. But that would have entailed a different kind of proceeding—and set of procedural protections. *See supra* at 36-37.

3.   Despite Apple's compliance with the original injunction's terms, the district court nonetheless held Apple in civil contempt for supposedly violating the injunction's spirit. 1-ER-57–60. Although the district court's understanding of that "spirit" is not entirely clear, the court apparently meant its general desire that Apple enable "competitive alternatives to IAP." 1-ER-63. The district court's spirit-of-the-injunction analysis fails on multiple grounds.

a.   The district court's reliance on the injunction's "spirit" contravenes Federal Rule of Civil Procedure 65, which makes clear that an "order granting an injunction . . . *must* . . . state its terms specifically." Fed. R. Civ. P. 65(d)(1) (emphasis added). That means that the text itself must specify the act or acts that are prohibited or required, and compliance with the injunction turns on what acts are specified, not a "spirit" apart from the text. Here, the district court disregarded the injunction's text and found that Apple should have divined the court's broader intent to reshape Apple's business from the 180-page liability opinion. The district court even referred to its 180-page opinion *as* an "[i]njunction." 1-ER-59 (referring to "findings

47

in the Injunction" when citing reasoning from the court's 180-page opinion); 1-ER-60 (referring to "this Court's 180-page Injunction"); *see also* 1-ER-60 n.63 (same).

Rule 65 forecloses treating the district court's 180-page liability opinion as an "injunction" with which Apple had to comply. That rule is explicit: An order granting an injunction must "describe in reasonable detail . . . the act or acts restrained or required," and must do so "not by referring to the complaint *or other document*." Fed. R. Civ. P. 65(d)(1)(C) (emphasis added). Under Rule 65, therefore, an injunction must be entered "as a separate document." *BankDirect Cap. Fin., LLC v. Capital Premium Financing, Inc.*, 912 F.3d 1054, 1057 (7th Cir. 2019). "Language in an *opinion* does not comply with Rule 65(d)." *Id.* (emphasis added); *accord Gunn v. University Comm. to End the War in Viet Nam*, 399 U.S. 383, 390-91 (1970). The district court's 180-page liability opinion is not itself an "injunction" directing or limiting Apple's conduct.

Nor did the district court properly look to the 180-page opinion as a tool for interpreting the original injunction. Where an injunction is "'unambiguous, the court may not consider "extraneous" evidence to explain it.'" *DAS Corp.*, 18 F.4th at 1040 (citation omitted). That is the case here, where the "natural reading" of the injunction's "text" was clear: Apple could not prohibit developers from (1) including links to external purchasing mechanisms, or (2) communicating with customers via other points of contact. 4-ER-796. There are no other prohibitions.

48

To support its departure from the injunction's terms, the district court invoked *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 949 (9th Cir. 2014), which the court read to allow a contempt order based upon "a violation of the spirit of the injunction" alone. 1-ER-57. But *Sea Shepherd* dealt with an entirely different situation. There, an order enjoined the defendants "from physically attacking" whaling vessels or from coming within "'500 yards'" of such ships "'on the open sea.'" 774 F.3d at 941. After receiving a copy of the injunction, the defendants blatantly evaded it by transferring corporate assets and ownership, so as to allow a (technically) different entity to harass the vessels. *See id.* at 941-42. This Court held that the defendants could be "held liable for aiding and abetting others to violate the injunction." *Id.* at 944. A party "'may not nullify a decree by carrying out prohibited acts through aiders and abettors.'" *Id.* at 948.

*Sea Shepherd* does not justify the district court's invocation of "spirit" here. The court there relied on the "spirit" of the injunction to conclude that a party may not circumvent an injunction simply by transferring corporate control to a different entity that will in turn violate the injunction's plain terms. *Id.* at 949. In other words, the injunction's terms *were* objectively violated; the only question was whether the defendant could be held liable for contempt for having aided and abetted that violation. *Sea Shepherd* does not apply when—as here—the injunction's plain terms do not proscribe the conduct at issue, and there is no contention of aiding and

49

abetting. *See Epona LLC v. County of Ventura*, 2019 WL 4187393, at \*14 (C.D. Cal. Apr. 12, 2019) (explaining that *Sea Shepherd* does not permit civil contempt unless a party has violated the "terms" of an injunction). The district court also invoked *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949), to conclude that courts should not have to engage "in a 'whack-a-mole' game to require compliance" with an injunction. 1-ER-58–59. But in *McComb*, the respondents had repeatedly violated the express terms of an injunctive decree. *See* 336 U.S. at 189-90. That is, of course, far different from the situation here, in which Apple *complied* with the injunction's plain terms.

The district court's expansive resort to amorphous "spirit" would nullify Rule 65(d)'s requirements and longstanding caselaw on civil contempt. In the district court's view, it would be "ludicrous to expect any court to repeat the contents of a 180-page order issued in conjunction with a simultaneously issued one-paragraph injunction." 1-ER-58. But Rule 65(d) expressly requires a court to state "specifically" and in "reasonable detail" the "act or acts restrained or required" in the injunction itself—and not by referring to any "other document." Fed. R. Civ. P. 65(d)(1); *see also Schmidt*, 414 U.S. at 476 (requiring "explicit notice"). Enforcing that rule is necessary to ensure that the parties regulated by an injunction are not "left guessing as to what conduct is enjoined." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006).

50

b. In any event, Apple complied with the "spirit" of the original injunction as reflected in the text and the September 2021 liability decision. That decision has two different elements relevant here. The first is that the district court—and later this Court—rejected Epic's antitrust claims, concluded that Apple had "legitimate procompetitive justification[s]" for its approach, and supported Apple's use of a commission—including on non-IAP purchases—"based on the protection of intellectual property rights." 5-ER-944–45; *see also supra* at 10-11; *Epic Games*, 67 F.4th at 985-86 (agreeing with district court). The second is that the district court granted Epic "narrow" relief by finding that Apple's "anti-steering provisions are anticompetitive." 5-ER-800, 5-ER-961. The injunction's text then requires Apple to eliminate its anti-steering provisions. 4-ER-796.

Given these dual findings and the narrow text, Apple's use of a commission for external link purchases did not violate the "spirit" of the district court's specific injunctive decree. As noted, the district court recognized that Apple could charge a commission—including on non-IAP transactions—given that developers benefit from Apple's investments in its iPhone and iPad technology and App Store platform. *See supra* at 10-11. And the injunction itself did not even mention Apple's commission rate, much less suggest what rate would be justifiable. At a minimum, the injunction's silence as to Apple's commission—coupled with the district court's finding that Apple is entitled to compensation and its finding that Apple failed to

51

adequately justify the "specific rate" of 30%—leaves a "'fair ground of doubt,'" *Taggart*, 587 U.S. at 561, as to whether Apple's new 27% commission (again, something not addressed in the injunction at all) was impermissible.

c. The district court's conclusion that Apple's compliance plan amounted to a "*de facto* prohibition" on links, buttons, and calls to action to alternative purchasing mechanisms was based on legal error. 1-ER-63 n.66. Again, the district court acknowledged that Apple had *permitted* links, buttons, and calls to action— and nowhere explained how Apple's link entitlement program could operate as a prohibition. *See supra* at 44-46.

Epic's argument that the district court found Apple's *commission* to constitute a de facto prohibition on *steering*, *see* Opp. to Emergency Mot. for Partial Stay 5 (ECF No. 22.1), ignores that this statement was directed to Apple's regulation of calls to action and buttons. Nor could any such finding as to the commission be squared with *this Court's* prior opinion, which determined as a matter of fact that even if Apple maintained its then-existing *30% commission* on purchases, developers would pursue different payment processing methods for reasons other than price. *Epic Games*, 67 F.4th at 996. This Court explained that there are many reasons a consumer might choose to take advantage of non-IAP options even if such purchases were not materially cheaper than purchases via IAP. *Id.* (citing *non*-price factors such as how a platform mediates disputes, handles refunds, and addresses

52

fraud).  For this reason, the Court determined it was *clear error* for the district court to conclude that, if Apple were "entitled to collect a commission on payments," then "'no economically rational developer would choose to use'" an alternative payment to Apple's in-app purchasing platform.  *Id.* (quoting district court).

The district court appeared to fault Apple for not making it *cheaper* or simpler for developers to steer users to alternative purchasing mechanisms.  1-ER-18 ("Ultimately, Apple's 2024 response to the Injunction was the most anticompetitive option" of the compliance proposals it considered).  But Apple's obligation is not to choose the option that most promotes its competitors' business at its own expense; Apple's obligation is to comply with the injunction while also prioritizing the interests of its users and its shareholders.  And nothing in the injunction set the precise terms on which Apple could regulate steering.

Nor did Apple violate the "spirit" of the injunction by imposing certain conditions on links to external purchases, such as a pop-up screen explaining to users that they would be leaving Apple's environment and conducting transactions on the open Internet.  The district court's 2021 opinion recognized that Apple's "security" measures constituted a "procompetitive justification[]" insofar as Apple promotes privacy, quality, and trustworthiness—thanks to those measures, "users make greater use of their devices, including by storing sensitive data and downloading new apps." 5-ER-909.  And the district court's UCL analysis did not preclude Apple from

providing *additional* information to users about the risks of leaving the vetted and safe environment Apple provides through IAP. 5-ER-959–66. Here too, the district court penalized Apple for failing to guess at what exactly the court had in mind beyond its narrow requirement that Apple permit developers to offer external links, along with buttons and calls to action, to their apps. 4-ER-796.

At the end of the day, the district court's "spirit" analysis just underscores why courts insist on a showing that the specific terms of an order have been violated. This Court should enforce Rule 65(d).

### B. The District Court's Reliance On Subjective Evidence Of Apple's Supposed Bad Faith Was Erroneous

1. The district court's contempt order suffers from a separate legal defect: The court assessed compliance based on subjective evidence of Apple's intent, rather than on objective evidence of Apple's compliance plan. But "[b]ased on the traditional principles that govern civil contempt, the proper standard is an *objective* one." *Taggart*, 587 U.S. at 565 (emphasis added).

The district court repeatedly relied on its perception of Apple's subjective intent and supposed bad faith. In the district court's view, Apple "*willfully* chose to ignore the Injunction." 1-ER-59–60; 1-ER-63 ("gamesmanship"); 1-ER-64 (impugning Apple's "motive to protect its illegal revenue stream"). The court cited Apple's "real-time business documents," which the court read as "reveal[ing] the true business decision" that Apple made. 1-ER-61–62. And it refused to address

Apple's point that the effective commission on link-out purchases was actually 18% because Apple had not shown it properly "relied on" that calculation internally. 1-ER-19–20 & n.25.

Apple respectfully disagrees with the district court's findings and stands behind its executives and employees, who are people of honesty and integrity who responded in good faith to the court's original injunction. But the relevant point here is that the district court's extensive inquiry into Apple's subjective motivations has no bearing on whether Apple can be held in civil contempt. A party's "intentions" when complying with an injunction are "irrelevant to *civil* contempt." *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.*, 98 F.4th 170, 176 (5th Cir. 2024); *see also Sugar v. Burnett*, 130 F.4th 358, 377 (4th Cir. 2025) ("[T]he Supreme Court in *Taggart* reiterated that the standard for holding someone in contempt is objective, rather than subjective.").

Intent "may be relevant to mitigation at the *remedies* stage." *Potter v. District of Columbia*, 126 F.4th 720, 724 (D.C. Cir. 2025) (emphasis added); *see Taggart*, 587 U.S. at 561-62. But the district court did not rely on Apple's subjective intent only in determining an appropriate sanction—it did so in finding Apple in civil contempt in the first place. That was legal error.

2. Even if subjective intent were relevant to the civil contempt inquiry, the district court's factual findings are clearly erroneous on their own terms. Apple

55

undertook an extensive and good-faith effort to comply with the district court's injunction. It carefully considered the injunction's terms and implemented changes to its relationships with developers and in its App Store that would both comply fully with the injunction and balance Apple's multiple business objectives. *See supra* at 13-16. Space constraints foreclose a more comprehensive response, but three points bear special emphasis on why the district court unfairly impugned Apple's motives when responding to the original injunction.

*First*, the district court claimed that Apple "hid[]" from the Court information about its internal decisionmaking process with respect to its compliance efforts. 1-ER-16. That claim is wrong—Apple did not hide anything. To the contrary, as explained above, *supra* at 17, Apple filed a transparent "Notice of Compliance" advising Epic and the district court of its compliance plans. Epic did not seek discovery in advance of the first evidentiary hearing. The court did not order any at that point. And Apple was not required to provide additional details about its internal deliberations, much of which were attorney-client privileged, so its failure to do so was not proof of bad faith or non-compliance.

*Second*, the district court concluded that, "[u]ltimately, Apple's 2024 response to the Injunction was the most anticompetitive option" chosen from Apple's list of possible responses, because Apple incorporated certain restrictions to foster user safety and privacy and charged a 27% commission on external link purchases. 1-ER-

18.  In other words, the district court penalized Apple for choosing what Apple understood to be the most advantageous option for its business and shareholders. But Apple chose that option from a list of alternatives that *Apple itself* concluded were permissible under a fair interpretation of the injunction.  Apple was not required to narrow a set of allowable options and then pursue the option most favorable to developers at Apple's expense.  And, as this Court has held, it is wrong to conflate a company's pursuit of business objectives (including "profit[]") with "an intent to 'destroy competition.'"  *Qualcomm*, 969 F.3d at 994 n.15.  Apple's decision-making reflects Apple's duty to advance the interests of its business, while respecting the bounds of the district court's narrow injunctive decree.

*Third*, the district court rejected as pretextual the Analysis Group report that Apple commissioned to help assess the value of its services and IP-protected technologies.  1-ER-61.  In the court's view, because Apple did not extensively reference the report in internal discussions and prepared it after the court's September 2021 decision, and in parallel with its ongoing internal compliance discussions, the report's recommendation was "entirely manufactured," and Apple's "reliance" on it was "a sham." *Id.*  But the district court's liability opinion repeatedly emphasized that Apple had failed to "specifically justif[y] its 30% commission based on the value of [its] intellectual property."  5-ER-832; *accord* 5-ER-833.  Although Apple had (and has) no obligation to justify its prices, *see Verizon Commc'ns Inc. v.*

57

*Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 414-15 (2004), Apple retained Analysis Group in view of this particular critique from the liability opinion. Moreover, the report unquestionably factored into Apple's analysis of the relevant options, including during the period on which the district court focused—June 2023. 1-ER-25; *see supra* at 14-16. It was wrong—and unfair—for the district court to criticize the report as "manufactured" based solely on its timing, without even examining the substance of its findings.[5]

## C. The District Court Wrongly Relied On Privileged Documents

The district court's contempt decision—and especially its subjective intent findings—also improperly relied on documents that should have been protected from disclosure under the attorney-client privilege. These include draft documents prepared at the request of counsel, notes from in-house counsel regarding options to comply with the district court's injunction, and other communications by executives in the context of obtaining legal advice regarding the court's injunction. *See, e.g.*, 1-ER-20–46 (citing internal presentations and other communications, 2-ER-263–351, 2-ER-352–53, 3-ER-383–402, 3-ER-403–17, 3-ER-418–44, 3-ER-445–88, 3-ER-489–575). Whether "the attorney-client privilege applies to specific

---

[5] The district court also rejected testimony offered by Apple's Vice President of Finance, characterizing the testimony as false and referring the matter to the U.S. Attorney. *See* 1-ER-26–27, 1-ER-79. Apple strongly disagrees with the district court's characterization: Read fairly and in context, Apple's witness testified truthfully.

documents represents a 'mixed question of law and fact which this court reviews independently and without deference to the district court.'" *See Greer v. County of San Diego*, 127 F.4th 1216, 1222 (9th Cir. 2025) (noting intra-circuit split on standard of review).

For example, the district court relied heavily on an "internal presentation" that "proposed two options for achieving compliance with the Injunction." 1-ER-16–18; *see* 3-ER-383–402. Indeed, the document was titled "Proposed responses to Epic injunction" and began by analyzing the "[r]equirements" imposed by the district court's injunction. 3-ER-384–85. The district court likewise relied extensively on a June 2023 presentation titled "Epic Injunction Implementation Proposal," the first slide of which included a screenshot of the district court's injunction, 2-ER-266–67, and which walked through benefits and risks associated with various compliance routes. *See* 1-ER-22, 1-ER-28–29, 1-ER-35. That presentation unambiguously documented legal advice Apple received about how it could comply with the injunction. The district court's description of Apple's internal documents confirms the primary reason they were prepared was compliance with the injunction—it said they were "prompted by a Court order." 4-ER-645.

These documents were privileged because their "'primary purpose'" was to "receive legal advice" about injunction compliance. *In re Grand Jury*, 23 F.4th

1088, 1091 (9th Cir. 2021). In concluding otherwise, the district court not only misconstrued the relevant documents, it also applied the wrong legal standard.

This Court explained in *In re Grand Jury* that attorney-client privilege applies when "the primary purpose of the communication" is to obtain legal advice. *Id.* But *In re Grand Jury* expressly left open the question of whether that test is satisfied where, as here, a communication has a *dual* purpose of both obtaining legal *and* business advice. *See id.* at 1094-95. In such a situation, courts have recognized that the communication is still privileged so long as "*a* primary purpose" of the communication is obtaining legal advice. *Id.* at 1094 (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014) (Kavanaugh, J.)). This version of the "primary purpose test" provides that a document is privileged if "obtaining or providing legal advice" was "one of the *significant purposes* of the communication." *Kellogg*, 756 F.3d at 760 (emphasis added).

The district court adopted the most extreme version of the standard, concluding that the documents were not privileged because "*the* primary purpose of the communication[s]" at issue was not receiving legal advice. 4-ER-644 (emphasis added) (citation omitted). The court failed to engage in the second, and necessary, step of the inquiry: whether *a* primary purpose of Apple's communications was to obtain legal advice, in addition to the business advice it sought regarding its next steps following the court's injunctive decree. That was error. As *Kellogg* explained,

60

"trying to find *the* one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task." 756 F.3d at 759. No "rigid distinction" exists "between a legal purpose on the one hand and a business purpose on the other." *Id.* And this Court recognized in *In re Grand Jury* that "[w]e see the merits of the reasoning in *Kellogg*." 23 F.4th at 1094. But this Court simply saw "no need to adopt that reasoning" in that case. *Id.*

This Court should now follow *Kellogg*'s approach and hold that where, as here, a communication has *both* the purpose of obtaining business guidance and *also* a significant legal purpose of obtaining legal advice, such documents are privileged. This case illustrates the need for such an approach. Apple sought advice regarding how to implement a compliance plan following the district court's September 2021 decision. The "purpose" of those communications was two-fold: Apple sought *legal* advice regarding its compliance with the district court's injunction, and it also sought *business* advice regarding how to implement a compliance plan that would best serve Apple's users and Apple itself. Indeed, the internal presentations upon which the district court relied began by covering the key prohibitions imposed by the district court and carefully walked through a variety of potential compliance options Apple was considering for implementing external links. *See* 3-ER-383–402, 2-ER-263–351.

As in *Kellogg*, prying apart these intertwined rationales of business and legal advice in this context is "impossible." 756 F.3d at 759. Where a communication seeks to obtain both legal and business advice, applying *Kellogg*'s approach saves courts "the trouble of having to identify a predominate purpose among two (or more) potentially equal purposes." *In re Grand Jury*, 23 F.4th at 1094. That approach also promotes the guiding "purpose" of the attorney-client privilege, which "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).[6]

The district court's prejudicial reliance on these privileged communications improperly colored its views of Apple's compliance efforts and alone warrants setting aside the contempt order. On top of the other errors, the invasion of Apple's privilege confirms that reversal of the district court's contempt order (and accompanying attorney's fees sanction) is required.

## III. THE DISTRICT COURT ERRED IN HOLDING THAT THE ORIGINAL INJUNCTION SURVIVES THE *BEVERAGE* DECISION

Finally, there is an even more fundamental problem with the district court's new injunction: Intervening events have shown that even the original injunction

---

[6] The district court is continuing to resolve privilege disputes concerning documents disclosed in discovery. *See, e.g.*, 2-ER-83–85 (parties' joint discovery letter). Once the district court finally resolves all privilege disputes, Apple intends to file a separate appeal challenging the court's privilege rulings.

62

cannot remain in place. The California Court of Appeal's decision in *Beverage v. Apple, Inc.*, 320 Cal. Rptr. 3d 427 (Ct. App.), *review denied* (July 10, 2024), sweeps away the only legal basis for the injunction—Epic's UCL claim. In *Beverage*, the California courts held that the very same anti-steering provisions at issue in this case do *not* violate the UCL. *Id.* at 433-34, 442. Given the square conflict that has arisen between the federal and state court judgments on the same state-law claim against Apple, Apple is entitled to relief under Rule 60(b)(5).

Rule 60(b)(5) allows a district court to relieve a party from a judgment when "applying it prospectively is no longer equitable," and is "routinely used to challenge the continued validity" of injunctions. *Marroquin v. City of Los Angeles*, 112 F.4th 1204, 1217 (9th Cir. 2024). While the denial of relief under Rule 60(b)(5) is reviewed for abuse of discretion, "[a] court errs when it refuses to modify an injunction" where subsequent case law "undermine[s]" the injunction's legal underpinnings such that "it is no longer [based on] good law." *Agostini v. Felton*, 521 U.S. 203, 215, 217-18 (1997). Relief is appropriate when a later decision "clarifie[s] an earlier misunderstanding of the applicable law." *Balark v. City of Chicago*, 81 F.3d 658, 664 (7th Cir. 1996). This rule recognizes the common-sense point that it is inequitable to prospectively enforce an injunction when it becomes

clear that it no longer has any basis in law. *See Agostini*, 521 U.S. at 216 (granting Rule 60(b)(5) relief after overruling prior precedent).

1. Rule 60(b)(5) relief is plainly warranted here. The district court's injunction in this case was based on an "*Erie* guess"—that, had the case been litigated in California state court, the state court would have found Apple's anti-steering rules "unfair" under the UCL. *Beverage* shows that the federal courts' original *Erie* guess was wrong: In *Beverage*, the California state courts adjudicated the same UCL claim against Apple that Epic has pressed against Apple in this case and held that there was no UCL violation. The conflict in judgments means that it is improper and inequitable to enforce the UCL injunction against Apple moving forward. *See, e.g.*, *Venoco, LLC v. Plains Pipeline, L.P.*, 2022 WL 1090947, at *2-*3 (9th Cir. Apr. 12, 2022).

The plaintiffs in *Beverage* (users of *Fortnite*) brought three claims overlapping with those raised by Epic here. 320 Cal. Rptr. 3d at 433. Their first and second claims alleged that Apple violated the Cartwright Act and the "unlawful" prong of the UCL by "mak[ing] developers and consumers accept unreasonable and anticompetitive terms in order to access the iOS marketplace." *Id.* In their third claim, the *Beverage* plaintiffs alleged that Apple's anti-steering provisions were "unfair" business practices under the UCL—the same claim underlying the district court's injunction in this case. *Id.* at 434; *see* 5-ER-959–66.

64

The California trial court held that the *Beverage* plaintiffs failed as a matter of law to state a claim under either the Cartwright Act or the "'unlawful'" prong of the UCL "because they alleged only unilateral conduct by Apple that was immunized from antitrust liability by the *Colgate* doctrine." *Beverage*, 320 Cal. Rptr. 3d at 434; *see United States v. Colgate & Co.*, 250 U.S. 300, 307-08 (1919). The *Colgate* doctrine recognizes that, with a few "rare," "limited" exceptions, "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) (citing *Colgate*, 250 U.S. at 307); *accord Trinko*, 540 U.S. at 408. The trial court in *Beverage* then applied the holding of *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d 175 (Ct. App. 2001)—that unilateral conduct under *Colgate* cannot be "unfair" for UCL purposes—to reject the *Beverage* plaintiffs' final claim. *See Beverage*, 320 Cal. Rptr. 3d at 434, 438. The plaintiffs appealed only this aspect of the trial court's ruling; they did not appeal the *Colgate* finding.

The California Court of Appeal affirmed, holding that where challenged conduct is "categorically shielded from antitrust liability by the *Colgate* doctrine"— and thus reasonable *per se*—it cannot be "unfair" under the UCL. *Id.* at 441-42. In so doing, the Court of Appeal expressly "decline[d]" to "follow [this Court's decision in] *Epic Games* and the order filed after trial in the underlying district court case." *Id.* at 442 n.6. Unlike in *Beverage*, the decisions in this case held that Apple's

65

anti-steering provisions were "unfair" under the UCL even though they did not violate federal antitrust law. 5-ER-959–64; *Epic Games*, 67 F.4th at 1000-02.

Put simply, the federal courts here and the state courts in *Beverage* reached opposite results and issued conflicting judgments on the same legal claim in cases involving the same defendant. *Beverage* held that Apple's anti-steering provisions are not "unfair" because liability cannot lie under the UCL's "unfair" prong for unilateral conduct protected under *Colgate*. But here, the district court imposed (and this Court affirmed) liability under the UCL's "unfair" prong without first determining that Apple's steering provisions fell beyond *Colgate*'s protections.

As the *Beverage* court itself explained, "neither [this Court nor the district court in *Epic Games*] engaged in a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims." 320 Cal. Rptr. 3d at 442 n.6. That analysis would have established, as Apple argued and *Beverage* found, that Apple's developer guidelines fall squarely within *Colgate*'s safe harbor for unilateral refusals to deal. Indeed, in *Beverage*, the plaintiff did not even appeal the *Colgate* finding regarding unilateral conduct.

Given the incompatibility of the results here and in *Beverage*, one of those outcomes must be wrong. And "[i]n a case governed by state law, a federal court is not free to disregard an intervening decision of a state appellate court, even if it requires a reexamination of the law of the case." *Richardson v. United States*, 841

F.2d 993, 1000 (9th Cir.), *amended*, 860 F.2d 357 (9th Cir. 1988). *Beverage* thus controls the meaning of California law.

2. The district court nonetheless refused to grant Rule 60(b) relief in this case on the ground that *Beverage* "did not change California law." 1-ER-50. To be sure, Apple agrees that *Beverage* reflects the better reading of longstanding California law, including *Chavez*, 113 Cal. Rptr. 2d at 179-81—such that Epic's UCL claim was *always* baseless. But *Beverage*'s clarification of that point of state law is "precisely" the kind of circumstance where Rule 60(b)(5) relief is warranted. *Balark*, 81 F.3d at 664; *accord Sweeton v. Brown*, 27 F.3d 1162, 1164 (6th Cir. 1994).

In *Agostini*, for example, the Supreme Court granted Rule 60 relief where "more recent cases ha[d] undermined the assumptions" of earlier precedent sufficient to warrant overruling prior Supreme Court precedent. 521 U.S. at 222-23. The *change* in law came from the Supreme Court's *Agostini* decision itself, clarifying and overruling earlier decisions. Rule 60 relief was nevertheless warranted: While a district court "has discretion" under Rule 60(b)(5), "the exercise of discretion cannot be permitted to stand if we find it rests upon a legal principle that can no longer be sustained." *Id.* at 238.

Here, *Beverage* clarifies that California law requires "a rigorous analysis of the *Colgate* doctrine" before imposing liability under the UCL's "unfair" prong. 320

Cal. Rptr. 3d at 442 & n.6. The federal courts did not undertake the necessary analysis, which would have demonstrated—as the California courts held in *Beverage*—that the UCL claim lacks merit. The App Review Guidelines are unilateral conduct protected by *Colgate*, as Apple has consistently maintained. *Beverage* thus precludes prospective enforcement of the UCL judgment.

3. The district court also held that its judgment in this case "does not conflict with *Beverage*." 1-ER-50. That too is mistaken.

The district court correctly noted that *Beverage*'s rule is "'limited to situations . . . where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the "unfair" prong of the UCL.'" *Id.* (quoting *Beverage*, 320 Cal. Rptr. 3d at 442). But the court then *in*correctly concluded that this case falls outside *Beverage*'s ambit because "[n]either this Court nor the Ninth Circuit have held that Apple's conduct . . . is immune from antitrust liability under the *Colgate* doctrine." *Id.*

That quoted statement is true—but is precisely what creates the conflict between *Beverage* and this case: The federal courts imposed liability under the UCL's "unfair" prong without first concluding that Apple's anti-steering provisions were beyond *Colgate*'s protection. Put differently, the district court essentially held

that its ruling did not conflict with *Beverage* because the federal courts declined to undertake the *Colgate* analysis that *Beverage* requires. That cannot be right.[7]

The district court faulted Apple for not raising a *Colgate* or safe-harbor argument earlier in this litigation. 1-ER-51. Notably, the federalism and comity problems with the injunction exist irrespective of whether Apple raised the precise issue in earlier litigation. But more importantly, Apple *did* make such an argument. In its post-trial proposed findings of fact and conclusion of law, Apple argued that (1) under precedent reaffirming *Colgate*, Apple was "'free to choose'" the terms on which it would deal with Epic; and (2) under *Chavez*, its otherwise lawful conduct could not support "unfair" UCL liability. 5-ER-985 (defending IAP practices and quoting *linkLine*, 555 U.S. at 448, which reaffirms *Colgate*), 5-ER-986–87.

Apple reprised those arguments before this Court, invoking *linkLine* to defend a unilateral refusal to deal and explaining that *Chavez* precluded UCL liability. Apple Principal/Response Br. 62, 105, No. 21-16506 (9th Cir. Mar. 24, 2022), ECF No. 93; Apple Reply Br. 11, ECF No. 183. Apple did not forfeit the issue.

4. This Court's intervention is especially warranted here given the threat to comity posed by the clear conflict between the state-court and federal judgments.

---

[7] Nor did Apple argue otherwise before the California Supreme Court. *Contra* 1-ER-51. Apple noted, correctly, that this Court did not explicitly "address the applicability of the *Colgate* doctrine" in *Epic Games*. 4-ER-658.

For nearly a century, it has been settled that "[i]n diversity jurisdiction cases the results in federal court should be substantially the same as those in state court litigation arising out of the same transaction or occurrence." *Pierce v. Cook & Co.*, 518 F.2d 720, 723 (10th Cir. 1975) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 74-75 (1938)). Decades of federal precedent follow this principle, granting relief to litigants facing divergent judgments involving the same transaction or cause of action, including under Rule 60(b). *See, e.g.*, *Messenger v. Anderson*, 225 U.S. 436, 445 (1912); *Pierce*, 518 F.2d at 723-24. That rule reflects not just a concern about fairness to the parties, but also federalism and comity principles respecting the state courts' authority over the meaning of state law. *See also Horne v. Flores*, 557 U.S. 433, 447-48 (2009) (Rule 60(b)(5) provides courts with a tool to address "sensitive federalism concerns").

This Court's decision in *Venoco* illustrates the need for relief. There, the district court had initially ruled against Venoco on state-law grounds and the Ninth Circuit affirmed. 2022 WL 1090947, at *1. In a case applying the same "doctrine to the same defendant on the basis of virtually identical facts," the California Court of Appeal later rejected the federal courts' interpretation of state law. *Id.* at *1, *3. Finding an abuse of discretion, this Court reversed. *Id.*

*Venoco* confirms that Apple is entitled to relief here. There, the state and federal cases involved "the same oil spill, the same legal doctrine, and the same

defendant," and "the 'close connection between the two cases,'" "tip[ped] the scales heavily toward finding" extraordinary circumstances warranting relief. *Id.* at *2 (citation omitted). So too here, where this case and *Beverage* both concern the same challenged conduct by the same defendant. Moreover, *Venoco* emphasized that "[r]ejecting the California Court of Appeal's interpretation of its own state law doctrine" would "injure comity interests, especially because it applied this doctrine to the same defendant on the basis of virtually identical facts." *Id.* at *3. Comity concerns loom just as large here.

Leaving the district court's permanent injunction in place notwithstanding *Beverage* would violate the *Erie* doctrine and create stark inequities. "The nub of the policy that underlies" *Erie* is that trying a state-law claim "in a federal court instead of in a State court a block away[] should not lead to a substantially different result." *Guaranty Tr. Co. v. York*, 326 U.S. 99, 109 (1945). Upholding the injunction here would vitiate that principle: If a developer sues Apple in state court, it would lose under *Beverage*—but the same developer, bringing the same claim, would have a different case if suit were brought in federal court. And given the nationwide nature of the district court's injunction, even developers who cannot sue in federal court, or could only sue in California court, will reap the benefit of the federal courts' erroneous interpretation of California law. That state of affairs implicates serious federalism concerns and violates basic fairness.

71

This Court should apply *Beverage* and vacate the original injunction in this case. At a minimum, the Court should remand with instructions for the district court to undertake the *Colgate* analysis *Beverage* requires.

## IV. ANY REMAND PROCEEDINGS SHOULD BE REASSIGNED TO A DIFFERENT JUDGE

For any or all of the reasons set forth above, this Court should reverse the contempt order in full. To the extent this Court determines that a remand is required, however, it should assign the case to a different district judge. Reassignment is proper when "'the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings'" or when "'reassignment is advisable to preserve the appearance of justice.'" *United States v. Walker River Irrigation Dist.*, 890 F.3d 1161, 1173 (9th Cir. 2018).

Both circumstances are present here. In light of the earlier contempt proceedings, the district judge would "'reasonably be expected upon remand to have substantial difficult in putting'" the prior proceeding out of mind. *Id.* The court found that Apple and its executives had violated an earlier order, and then it ultimately imposed a new injunction against Apple as a penalty for perceived non-compliance with the original injunction. The district court's contempt order also rested on an assessment of Apple's subjective motives gleaned largely from documents that should have been deemed protected by attorney-client privilege. The

court even referred Apple to the U.S. Attorney's Office for potential criminal investigation.

Apple does not question the district court's motives in taking these actions. But this case presents an unusual combination of extraordinary circumstances, and remand to a different judge is warranted to "preserve the appearance of justice." *United States v. Onyeabor*, 649 F. App'x 442, 446 (9th Cir. 2016).

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's contempt order and denial of Apple's Rule 60(b)(5) motion. At a minimum, the court should vacate the district court's new injunction and assign the case to a different district judge for any further proceedings.

Dated: June 23, 2025                        Respectfully submitted,

                                         *s/ Gregory G. Garre*

| | |
|---|---|
| Mark A. Perry | Gregory G. Garre |
| Zachary D. Tripp | Roman Martinez |
| Joshua M. Wesneski | Peter E. Davis |
| WEIL, GOTSHAL & MANGES LLP | Soren J. Schmidt |
| 2001 M Street, NW | LATHAM & WATKINS LLP |
| Suite 600 | 555 Eleventh Street, NW |
| Washington, DC 20036 | Suite 1000 |
| (202) 682-7511 | Washington, DC 20004 |
| | (202) 637-2200 |
| Cynthia E. Richman | |
| GIBSON, DUNN & CRUTCHER LLP | Ben Harris |
| 1700 M Street, NW | Kristin C. Holladay |
| Washington, DC 20036 | LATHAM & WATKINS LLP |
| (202) 955-8500 | 1271 Avenue of the Americas |
| | New York, NY 10020 |
| | (212) 906-1200 |

*Counsel for Defendant-ctr-claimant - Appellant Apple Inc.*

74

## STATEMENT OF RELATED CASES

Defendant-Appellant is unaware of any cases pending in this Court that are related to this appeal, as defined and required by Circuit Rule 28-2.6.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  25-2935 _____

I am an attorney for Defendant-ctr-claimant - Appellant Apple Inc.

This brief contains 16,999 words, including 0 words manually counted in any visual images, (*see* Motion to Exceed Type-Volume Limitations filed June 23, 2024) and excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[x] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Gregory G. Garre* _____          **Date** _June 23, 2025_____

**STATUTORY ADDENDUM**
**Pursuant to 9th Cir. R. 28-2.7**

## TABLE OF CONTENTS

**Page**

Fed. R. Civ. P. 60(b) ........................................................................ ADD1

Fed. R. Civ. P. 65(d) ........................................................................ ADD2

**Fed. R. Civ. P. 60**

**Rule 60.  Relief From a Judgment or Order**

* * *

**(d)  Other Powers to Grant Relief**.  This rule does not limit a court's power to:

    **(1)**  entertain an independent action to relieve a party from a judgment, order, or proceeding;

    **(2)**  grant relief under 28 U.S.C. § 1655 to a defendant who was not personally notified of the action; or

    **(3)**  set aside a judgment for fraud on the court.

* * *

## Fed. R. Civ. P. 65(d)

**Rule 65. Injunctions and Restraining Orders**

\* \* \*

**(d) Contents and Scope of Every Injunction and Restraining Order.**

**(1)** *Contents*. Every order granting an injunction and every restraining order must:

**(A)** state the reasons why it issued;

**(B)** state its terms specifically; and

**(C)** describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required.

**(2)** *Persons* **Bound**. The order binds only the following who receive actual notice of it by personal service or otherwise:

**(A)** the parties;

**(B)** the parties' officers, agents, servants, employees, and attorneys; and

**(C)** other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

\* \* \*