**No. 25-2935**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

**EPIC GAMES, INC.,**

*Plaintiff-ctr-defendant - Appellee*,

v.

**APPLE INC.,**

*Defendant-ctr-claimant - Appellant.*

---

Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR (Yvonne Gonzalez Rogers, District Judge)

---

## EXCERPTS OF RECORD FOR APPLE INC.

## VOLUME 3 OF 7 (3-ER-354 to 3-ER-641)

Mark A. Perry
Zachary D. Tripp
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
(202) 682-7511

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

June 23, 2025

Gregory G. Garre
Roman Martinez
Peter E. Davis
Soren J. Schmidt
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Ben Harris
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Apple Inc.*

U.S. District Court - NDCAL
**4:20-cv-05640-YGR-TSH**
*Epic Games, Inc. v Apple Inc.*
Ex. No. __**CX-0227**__
Date Entered _____
By _____

APL-EG_11346208

# App Store Price Committee
## U.S. Linked Transactions
### 7/5/23

Apple Confidential    For Internal Use Only

Case 4:20-cv-05640-YGR    Document 1542-20    Filed 05/07/25    Page 1 of 28

CX-0227.1

CONFIDENTIAL



## Summary

### Resulting from the Epic injunction, Apple is

*"permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."*

**Compliance Requirement**

| Item | Linked Transactions |
|---|---|
| Geo | US |
| Eligibility | iOS or iPadOS App Store, US storefront |
| Compliance Date | As soon as Friday, July 7, 2023 |

**Key Pricing Considerations**

Commission Rate

Commission Time Window

Program Eligibility

Apple Confidential · For Internal Use Only

APL-EG_11346209

CX-0227.2

CONFIDENTIAL



APL-EG_11346210

CX-0227.3

CONFIDENTIAL

# Link Entitlement Policies & User Experience

- Language and design must follow templates

- One URL per app

- Link can only be displayed once in an app, on an app page user navigates to (not an interstitial, modal, or pop-up), and can't persist when user leaves page

- Link can not be displayed on any page that is part of an in-app flow to merchandise/ initiate an IAP



Apple Confidential    For Internal Use Only

APL-EG_11346211

CX-0227.4

CONFIDENTIAL

APL-EG_11346212

## Apple Platform Features

Platform Integrity

Proprietary Tools & Technologies

Developer Services & Support

Secure Distribution at Scale

Discovery

IAP Payments & Commerce

Apple IAP

Commission

Linked Transactions

Commission

Apple Confidential     For Internal Use Only

CX-0227.5

CONFIDENTIAL

APL-EG_11346213

# Existing Rates

|  | | Standard | Programs |
|---|---|---|---|
| 🌍 | **Apple IAP** | 30% | 15% |
| 🇰🇷 | **3rd Party Payments** | 26% | N/A |
| 🇫🇷 | **3rd Party Payments / Linking Out** | 27% | 12% |

Apple Confidential   For Internal Use Only

CX-0227.6

CONFIDENTIAL

## Analysis Group Valuation of Developer Offering Components

All percentages are expressed relative to customer spend

| Apple Framework | Analysis Group Framework | Costs for Small Developers | Costs to Large Developers | Notes |
|---|---|---|---|---|
| Platform Integrity | Platform Technology | 30% for single engine programming platforms (inclusive of other items) | | Provides a lower bound on the value because sizes in use do no include all capabilities of the Apple platform |
| Proprietary Tools and Technology | | 5% - 26% for platform technology with forward generation; 0.3% - 6% for platform technology with no demand generation | 5% - 18% | |
| Developer Services and Support | Developer Tools and Services | 5% - 18% | | A key benefit of current Apple model is the lowers at up costs and ... |
| Social Distribution at Scale | Distribution | 4% - 25% | 4% - 14% | Provides a lower bound on the value... |
| Discovery | Discovery | 5% - 21% | 5% - 14% | Third party discovery tools involve subscriptions or fees... |

*Not continued*

Apple Confidential   For Internal Use Only

CONFIDENTIAL

APL-EG_11346215

# Commission Levels across Mobile App Marketplaces

Legend: Full (at parity) ● / Basic ● / Limited/Selective ○

| | Listed Transactions (Apple) | Apple IAP | Google Play | Amazon Appstore | Samsung Galaxy Store | Huawei AppGallery (Mainland China) | ONE store | Codabang |
|---|---|---|---|---|---|---|---|---|
| Platform Integrity | ● | ● | ● | ○ | ○ | ○ | ● | ○ |
| Proprietary Tools & Technologies | ● | ● | ● | ○ | ● | ○ | ● | ○ |
| Developer Services & Support | ● | ● | ● | ○ | ○ | ○ | ○ | ○ |
| Secure Distribution at Scale | ● | ● | ● | ● | ○ | ● | ● | ● |
| Discovery | ● | ● | ● | ● | ● | ● | ● | ● |
| IAP Payments & Commerce | ○ | ● | ● | ● | ● | ● | ● | ● |
| Pricing | TBD | 30% standard / 15% <1Y subscriptions / 15% SBP / 15% VoIP IxeP | 30% standard / 10-15% (Play Media Experience) / 15% SBP | 30% Standard / 20% (ESP dependent, additional 10% in free AWS credits) | 30% standard / Negotiated rates | 30% (games & app purchase) / 30% (other in-app purchase) / 20% education | 20% standard / 6% with 3P billing | 10% |

Apple Confidential    For Internal Use Only

CX-0227.8

CONFIDENTIAL

# Time Windows across Discovery Channels

## Affiliate Benchmarks

| | Company | Time Window |
|---|---|---|
| First Party Affiliate Programs | Microsoft | 14 days |
| | Nielsen LinkBack | 30 days |
| | Wall Street Journal | 30 days |
| | McGraw Hill | 90 days |
| | Bluehost | 90 days |
| Platform Affiliate Programs | eBay | 24 hours |
| | Amazon | 24 hours |
| | Walmart | 3 days |
| | Etsy | 30 days |

## Advertising Benchmarks

| | Company | Time Window |
|---|---|---|
| Mobile Measurement Partners | Adjust | 7 days |
| | AppsFlyer | 7 days |
| | Branch | 7 days |
| | Singular | 7 days |
| | Kochava | 30 days |
| Self-Attributing Networks | Meta | 7 days |
| | Snapchat | 28 days |
| | Twitter | 30 days |
| | Google | 30 days |

Apple Confidential   For Internal Use Only

APL-EG_11346216

CONFIDENTIAL

CX-0227.9

# App Store Indicative P&L

## WW

| $M | FY22 | FY23 F | FY24 F |
|---|---|---|---|
| **Billings** | | | |
| Less: Developer Payout | | | |
| Gross Revenue | | | |
| Less: Gross Revenue Adj | | | |
| **Net Revenue** | | | |
| S&S COGS | | | |
| S&S OPEX | | | |
| Total Services Spend | | | |
| Apple Ecosystem OPEX & COGS | | | |
| **Total Expenses** | | | |
| **Operating Margin $** | | | |
| Operating Margin % | | | |

## US

| | FY22 | FY23 F | FY24 F |
|---|---|---|---|

Apple Confidential · For Internal Use Only

Subject to FRE Privilege

APL-EG_11346217

CX-0227.10

CONFIDENTIAL

Case 4:20-cv-05640-YGR    Document 1542-20    Filed 05/07/25    Page 11 of 28




APL-EG_11346218

CX-0227.11

CONFIDENTIAL

Program Eligibility
VPP / NPP
[redacted]
Tenured Subscriptions
[redacted] of total billings
SBP
[redacted]
Small Business Program
Continue to promote growth of small developers with minimal financial impact
Tenured Subscriptions
Discount acknowledges developer's effort in retaining customers
Video Partner Program / News Partner Program
Require participants to maintain high bar of user experience and ecosystem integration aligned with partner program goals
Apple Confidential For Internal Use Only

Case 4:20-cv-05640-YGR    Document 1542-20    Filed 05/07/25    Page 13 of 28



APL-EG_11346220

CX-0227.13

CONFIDENTIAL

**Backup**

Apple Confidential - For Internal Use Only

APL-EG_11346221

CX-0227.14

CONFIDENTIAL

APL-EG_11346222

# Key Assumptions for Financial Impact Analysis

· Efficient implementation by developers to maximize their margin

· All subsequent non-sub transactions go through developers' direct channels (with no commission)

· Every subsequent transaction that goes through the App Store will reduce Apple's revenue loss

· VPP and NPP Linked Transactions billings are not eligible for program discounts

· 10% collection/measurement risk factored into sensitivities

· 25% breakage is the break-even point for developer decisioning

Apple Confidential - For Internal Use Only

CX-0227.15

CONFIDENTIAL



APL-EG_11346223

CX-0227.16

CONFIDENTIAL

APL-EG_11346224



CX-0227.17

CONFIDENTIAL

APL-EG_11346225



CX-0227.18

CONFIDENTIAL

APL-EG_11346226

Case 4:20-cv-05640-YGR    Document 1542-20    Filed 05/07/25    Page 19 of 28



CX-0227.19

CONFIDENTIAL

APL-EG_11346227

Case 4:20-cv-05640-YGR    Document 1542-20    Filed 05/07/25    Page 20 of 28



CX-0227.20

CONFIDENTIAL



APL-EG_11346228

CX-0227.21

CONFIDENTIAL



## **US Revenue:** 72 Hrs vs 90 Days Illustration

| | 72 Hrs | 90 Days | 90 Days vs 72 hrs |
|---|---|---|---|
| **Linked Transactions Billings** | [redacted] | [redacted] | [redacted] |
| No Returning Customers | | | |
| Commission Eligible Billings | | | |
| Billings Not Eligible or Commission | | | |
| **Commission** *(No Returning Customers)* | | | |
| Returning Billings | | | |
| **Commission** *(Only on returning portion)* | | | |
| **Total Commission** | | | |

**Financials Assume:**
**27%** Standard | **12%** Program | **50%** returning customers | **30%** link out share | **10%** measurement impact | **Steady State**

Apple Confidential For Internal Use Only

# US App Store - Programs Impact

**50%** returning customers | **30%** Linked Transactions share

US Revenue Loss
*US Op Margin impact*

**Commission Rate**

| **Program Type / Duration** | 10% | 12% | 15% |
|---|---|---|---|
| VPP / NPP *(No Duration impact as all renewals are commissioned)* | [redacted] | | |
| Tenured Subscriptions - Yr 2 Rates *(No Duration impact as all renewals are commissioned)* | | | |
| Small Business Program *(Similar financial impact across durations)* | | | |

**Financials Assume:**
**50%** returning customers **| 30%** link out share **| 10%** measurement impact | **~75%** billings mix | **12 Month** ramp for FY24

Apple Confidential For Internal Use Only



APL-EG_11346231



CX-0227.24

CONFIDENTIAL

Commission Duration Considerations
Non Sub IAP
Tap out through link
7%
Session
Purchases initiated within a session
12%
24 Hrs
Purchases initiated within 24Hrs
14%
72 Hrs
Purchases initiated within 72Hrs
38%
1 Month
Purchases initiated within 1 Month
100%
1 Year
Purchase initiated within 1 Year
Subscriptions
Tap out through link
31%
Session
Purchases initiated within a session & subsequent renewals
31%
24 Hrs
Purchases initiated within 24Hrs & subsequent renewals
31%
72 Hrs
Purchases initiated within 72Hrs & subsequent renewals
36%
1 Month
Purchases initiated within 1 Month & subsequent renewals
100%
1 Year
Purchases initiated within 1 Year & subsequent renewals
* LTV estimates for linking out based on IAP payer LTV.

# Developer options for game / application distribution

| | Linked Transactions (Apple) | Apple IAP | Google Play | ONE store | Amazon Appstore | Samsung Galaxy Store | Huawei AppGallery (Mainland China) | Codashop |
|---|---|---|---|---|---|---|---|---|
| Platform Integrity | OS updates<br>Security architecture<br>App Review<br>DeviceCheck | OS updates<br>Security architecture<br>App Review<br>DeviceCheck | OS updates<br>Algorithmic review<br>Play Integrity API<br>Play Protect | None | None | None | Custom version of Android base OS | |
| Proprietary Tools & Technologies | OS SDK<br>Entitlements<br>Xcode | iOS SDK<br>Entitlements<br>Xcode | Android Game Dev Kit<br>Google Play Games Svcs | None | FireOS capabilities<br>Alexa integrations | Bixby (voice assistant)<br>Knox (MDM)<br>SmartThings (IoT)<br>Samsung Pay | Custom version of Android base OS | |
| Developer Services & Support | App Analytics<br>TestFlight<br>Ad hoc distribution<br>GameKit / SIWA / etc | App Analytics<br>TestFlight<br>Ad hoc distribution<br>GameKit / SIWA / etc | Google Play Services<br>Firebase (billed separately)<br>GCP (billed separately) | Basic developer account security | AWS (billed separately) | | | |
| Secure Distribution at Scale | Global presence<br>700M weekly visitors | Global presence<br>700M weekly visitors | Global presence<br>Over 2B active devices | Predominantly in Korea<br>19M MAU | Undisclosed | "Hundreds of millions of active users each month" | Largest app store in China | |
| Discovery | Search<br>Personalization<br>Product Pages<br>Family Sharing | Search<br>Personalization<br>Product Pages<br>Family Sharing | Google App Campaigns<br>Store listings<br>Firebase Remote Config | Store listings<br>Store integrated ads | | | China focused | Has an owned store, but doesn't appear to drive significant traffic |
| IAP Payments & Commerce | | 44 currencies<br>Expansive payment methods<br>Tax and fraud included | | | | | China focused | Focused on SEA payments, not materially adopted globally |
| Pricing | TBD | 30% standard<br>15% Y2 subscriptions<br>15% SBP<br>15% VPP/NPP | 30% standard<br>10-15% Play Media Experience<br>15% 1st $1M in billings | 20% standard<br>5% with 3P billing | 30% Standard<br>20% SBP equivalent (additional 10% in free AWS credits) | 30% standard<br>Negotiated rates | 50% games in-app purchase<br>30% other in-app purchase<br>20% education | 15% |

Apple Confidential For Internal Use Only

CONFIDENTIAL CX-0227.26 APL-EG_11346233

# Analysis Group Analysis of Effective Rates

| | Standard \| Programs |
|---|---|
| Apple IAP | 30% \| 15% |
| 3rd Party IAP | 26% \| N/A |
| 3rd Party IAP | 27% \| 12% |

| | App Store Billings | Facilitated Billings and Sales (est.) | Actual Commission rate | Effective Commission rate |
|---|---|---|---|---|
| *Games* | [redacted] | | | |
| *Video streaming* | | | | |
| *eBooks / audiobooks* | | | | |
| *Music streaming* | | | | |
| *News and magazines* | | | | |
| *Enterprise* | | | | |
| *Other* | | | | |
| Total | [redacted] | | 27.8% | 12.8%* |

Apple Confidential For Internal Use Only

CONFIDENTIAL CX-0227.27 APL-EG_11346234

| | |
|---|---|
| Control Number | APL-EG_11346208 |
| Group Identifier | APL-EG_11346208 |
| P/C | |
| FamilyStatus | |
| AllCustodians | Barton, Nate |
| Email From | |
| Email To | |
| Email CC | |
| Email BCC | |
| DateSent | |
| TimeSent | |
| DateLastModified | 6/12/2024 |
| TimeLastModified | 16:34:55 |
| DataCreated | |
| Email Subject | |
| Title | |
| Filename | Wisconsin Price Committee - Privileged and Confidential.key |
| Application | |
| Confidentiality_Rcvd | CONFIDENTIAL |
| Production Vol. | APL-EG_103 |



| | |
|---|---|
| Control Number | APL-EG_11391659 |
| Group Identifier | APL-EG_11391659 |
| P/C | |
| FamilyStatus | |
| AllCustodians | |
| Email From | |
| Email To | |
| Email CC | |
| Email BCC | |
| DateSent | |
| TimeSent | |
| DateLastModified | 5/19/2023 |
| TimeLastModified | 17:36:01 |
| DateCreated | |
| Email Subject | |
| Title | |
| Filename | 2023 05 Wisconsin Scenarios and Financial Impacts-2.key |
| Application | |
| Confidentiality_Rcvd | HighlyConfidential |
| Production Vol. | APL-EG_104 |

PLAINTIFF'S
U.S. District C NDCAL
4:20-cv-0564 GR-TSH
Epic Games, Inc   Apple Inc.
Ex. No. CX-0  2
Date Entered___  _____
By

CX-0272.1

**3-ER-383**





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CX-0272.2

APL-EG_11391659

Key elements under consideration
Requirements
In-app display of external purchase options
Persistent placement within the app, discoverable by users
Flexibility of CTA design, e.g. buttons
In-app display of pricing differences
Allowances
Single external URL per app
No interruption or mimicking of IAP purchasing experience
No in-app web views
No communication of non-price benefits
Survival of IAP mandate and commission
Ambiguous
Display placement
Display frequency
Display UI and design
Pricing language
Commission rate on link
For discussion only
Privileged and confidential – prepared at the request of counsel



APL-EG_11391661



## Working assumptions of compliance plan

Apple IAP is still required

Single external URL per app, owned / controlled by the developer

Flexibility of CTA design, e.g. buttons

No interrupting or mimicking Apple IAP

Link must resolve to external browser

For discussion only

Privileged and confidential — prepared at the request of counsel

CX-0272.4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR     Document 1542-31     Filed 05/07/25     Page 5 of 20



## Known conditions and restrictions on external links

**Developers must be able to ...**

- *show users a proactive prompt that communicates an external purchase option*
- *format these prompts as buttons or other calls to action, not just blue HTML links*
- *compare the pricing between IAP and an external purchase option for users*
- *place a persistent link in apps that resolves to the external purchase option*

**Apple may disallow ...**

- *alternative payments directly in app*
- *multiple external purchase options*
- *prompts or links from interrupting or mimicking the IAP purchasing experience*
- *subjective marketing or promotional language highlighting non-price benefits of the external purchase option*
- *links to any other websites besides those directly owned / controlled by the developer*
- *usage of in-app web views to resolve these links (i.e. link must kick out to Safari / browser)*

**For discussion only**

Privileged and confidential — prepared at the request of counsel

APL-EG_11391662

CX-0272.5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11391663



CX-0272.6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Proposal 1

| | |
|---|---|
| **Display Placement** | Standalone / Independent of buy flow |
| **Display Frequency** | Outside of the buy flow |
| **Display UI and design** | Adaptation of existing Atari approach |
| **Pricing Language** | No specific references to discounts or price differences |
| **Commission Rate** | No commission |

## Key Risks

- Diverges significantly from existing and future approaches
- Creates new in-app channel for developers without commission
- Requires Apple to review against multiple new policies and restrictions
- Review cannot prevent all policy evasion, but will allow for remediation
- ATTORNEY-CLIENT PRIVILEGE [redacted]

**For discussion only**

Privileged and Confidential - Prepared at the Request of Counsel

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY CX-0272.7 APL-EG_11391664

APL-EG_11391665



CX-0272.8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11391666



CX-0272.9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



APL-EG_11391667

CX-0272.10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Proposal 2

| | |
|---|---|
| **Display Placement** | Anywhere, including merchandising page |
| **Display Frequency** | Once per page |
| **Display UI and design** | Under explore |
| **Pricing Language** | No restrictions<br>Requires adjustments to external link customer disclosure copy |
| **Commission Rate** | Discounted commission |

## Key Risks

- Current approach to collections is manual and will not scale
- Difficult to estimate impacts of non-economic developer rationales (e.g. value of direct customer relationship)
- ATTORNEY-CLIENT PRIVILEGE

**For discussion only**

Privileged and Confidential – Prepared at the Request of Counsel

Case 4:20-cv-05640-YGR        Document 1542-31        Filed 05/07/25        Page 12 of 20



APL-EG_11391669

CX-0272.12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



APL-EG_11391670

CX-0272.13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Summary

| | Proposal 1 | Proposal 2 |
|---|---|---|
| **Display Placement** | Standalone / Independent of buy flow | Anywhere, including merchandising page |
| **Display Frequency** | Once, immediately on first app launch<br>Persistently available in settings | Once per page |
| **Display UI and design** | Adaptation of existing Atari approach | Under explore |
| **Pricing Language** | No specific references to discounts or price differences | No restrictions<br>Requires adjustments to external link customer disclosure copy |
| **Commission Rate** | No commission | Discounted commission |
| **Est. Revenue Impact** | [redacted] | |

These numbers are for illustrative purposes only, to aid discussion.

APL-EG_11391672

Case 4:20-cv-05640-YGR    Document 1542-31    Filed 05/07/25    Page 15 of 20



CX-0272.15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Revenue Loss
% US Rev (% WW Rev)
Non IAP commission

# Proposal 2 (cost of payments discount)

*Revenue Impact - 3% scenario*

Customer Adoption

| Developer Count | Total Billings | Non-Program | 10% | 20% | 30% | 40% | 50% | 60% |
|---|---|---|---|---|---|---|---|---|
| 10 | [redacted] | | | | | | | |
| 50 | | | | | | | | |
| 200 | | | | | | | | |
| All Developers | | | | | | | | |

**Assumes only non-program billings move to external purchase options*

**These numbers are for illustrative purposes only, to aid discussion.**

Privileged and Confidential - Prepared at the Request of Counsel

Case 4:20-cv-05640-YGR    Document 1542-31    Filed 05/07/25    Page 17 of 20



APL-EG_11391674

CX-0272.17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



APL-EG_11391675

CX-0272.18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11391676

CX-0272.19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Proposal 2 [redacted] discount)

*Revenue Impact - 3% scenario*

Developer count doesn't align to slide 5?

Timo to pull in new slides

Revenue Loss
% US Rev (% WW Rev)
Non IAP commission

Alternative Payments Billings Mix *(Customer Adoption)*

| Developer Count | Billings | 30% | 40% | 50% | 60% | 70% |
|---|---|---|---|---|---|---|
| 5 | [redacted] | | | | | |
| 10 | | | | | | |
| 50 | | | | | | |
| 100 | | | | | | |
| 500 | | | | | | |
| All Developers | | | | | | |

*Assumes only non-program billings move to Alt Pay*

**These numbers are for illustrative purposes only, to aid discussion.**

Privileged and confidential - prepared at the request of counsel

Case 4:20-cv-05640-YGR     Document 1542-32     Filed 05/07/25     Page 1 of 15

PLAINTIFF
U.S. District Court - NDCAL
4:20-cv-05640-YGR-TSH
*Epic Games, Inc. v Apple Inc.*
Ex. No. **CX-0274**
Date Entered_____
By_____

| Field | Value |
|---|---|
| FamilyStatus | |
| AllCustodians | |
| Email From | |
| Email To | |
| Email CC | |
| Email BCC | |
| DateSent | |
| TimeSent | |
| DateLastModified | 7/3/2023 |
| TimeLastModified | 08:23:17 |
| DateCreated | 6/12/2023 |
| Email Subject | |
| Title | |
| Filename | 2023.06 Pricing Analysis.key |

3-ER-403

Case 4:20-cv-05640-YGR    Document 1542-32    Filed 05/07/25    Page 2 of 15





# Pricing options

June 2023
Privileged and Confidential - Prepared at the Request of Counsel

APL-EG_11398868

CX-0274.2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-32    Filed 05/07/25    Page 3 of 15



APL-EG_11398869

CX-0274.3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Option A: Standard Commission Discount

*Apple would discount the commission on link-outs based on cost of payments*

### Proposed Justification

- Developer will still benefit from all of Apple's tools, technologies, and services, and only have to cover payments themselves at the end
- Our 30% commission is fair and defensible:
  - Steam charges 20-30%, but does not offer platform services
  - Codashop charges 15% but only offers IAP merchandising and payments without platform or distribution capabilities
  - EGS commission is below cost at 12%, without platform or review services
  - The App Store is a premium, comprehensive, at-scale offering

### Considerations

- Simplest approach that is most consistent with our in-market approaches in Netherlands and Korea
- No "tipping of our hand" with respect to DMA compliance and future business model changes
- ATTORNEY-CLIENT PRIVILEGE
- Developers will claim that a small discount will not provide enough margin to compete on price i.e. difficulties with Netherlands approach

Privileged and Confidential - Prepared at the Request of Counsel

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY CX-0274.4 APL-EG_11398870

# Option B: Time-limited, Discounted Commission

*Apple would charge a discounted commission for 1 year and then 0% thereafter*

## Proposed Justification

- Developers who do the work to retain customers through direct channels after the link out will eventually keep 100% of customer billings
- Our commission for 1 year is fair and defensible:
  - Developers are still benefitting from the vast majority of Apple's tools, technologies, and services
  - The effective rate drops over time as retained users drive more billings at 0% commission
  - Structurally similar to CPI and CAC calculations used by developers to evaluate distribution partners

## Considerations

- Retains many of the challenges / complications of Option A, with less financial upside
- Provides more margin opportunity for developers, ATTORNEY-CLIENT PRIVILEGE

Privileged and Confidential – Prepared at the Request of Counsel

Case 4:20-cv-05640-YGR    Document 1542-32    Filed 05/07/25    Page 6 of 15

APL-EG_11398872

## Option C: Flat Affiliate Fee
*Apple would charge a flat fee per customer tap-through on an in-app link-out*

### Proposed Justification

- The App Store is functioning as an affiliate channel driving customer discovery that resolves to the transaction flow of the developers' choice

- Our flat fee per tap-through is fair and defensible:

- This structure aligns with affiliate pricing schemas across the industry, including Apple's own affiliate programs for our 1P services

- The effective rate drops even more quickly over time after the initial one-time charge

- Flat fee allows for even more margin expansion for developers who are able to retain customers on non-Apple channels

### Considerations

- No calculation risk with fees; Apple has full visibility into tap-through data

- No need for data sharing / audit rights between developers and Apple

- Pricing framework is not grounded specifically in IP or proprietary technology

- Significant divergence from other planned changes that increase risk of inconsistencies or regulatory cherry-picking

- Significant pricing risk and complexity (i.e. single fee for all apps, apps vs games, or unique to each app)

Privileged and Confidential - Prepared at the Request of Counsel

CX-0274.6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR　　Document 1542-32　　Filed 05/07/25　　Page 7 of 15



APL-EG_11398873

CX-0274.7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11398874

Case 4:20-cv-05640-YGR     Document 1542-32     Filed 05/07/25     Page 8 of 15



## Option B: Referral Fee

CX-0274.8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



APL-EG_11398875

CX-0274.9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11398876



CX-0274.10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-32    Filed 05/07/25    Page 11 of 15

APL-EG_11398877

CX-0274.11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





Unity not a good comp bc pricing structure is hard to align

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11398878

CX-0274.12

APL-EG_11398879



## Apple Licenses

**Technology licenses are more apt comps than patent licenses**

- Technology licenses provide access to technology, services, deliverables, tools, knowhow, etc., often for a "per unit" (e.g., HW or SW unit) fee
  - E.g., ARM ISA, Microsoft ActiveSync, MFi
- "Pure" patent licenses are a bare promise not to sue and typically structured as lump sum or capped fees

**For Discussion Only**

CX-0274.13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



For Discussion Only
Per-unit pricing in software / technology
Cloud computing
Pricing
AWS
GCP
Azure
per unit compute (variable)
Heroku
per unit compute (standardized)
GoDaddy
Wix
per website (subscription)
Map services
Pricing
Google Maps
per API call (variable)
Mapbox
per user (variable)
Marketing / advertising
Pricing
Adobe / Marketo
Subscription
Hubspot
Twilio Segment
per user (variable)
Facebook
Google
per impression (auction)
Privileged and Confidential - Prepared at the Request of Counsel



**For Discussion Only**

## Per-unit pricing in other industries

| | Examples | Relevant Fees | Pricing |
|---|---|---|---|
| **Payments** | Visa<br>Mastercard<br>American Express | Interchange plus fees | per attempt<br>(variable) |
| **Electric Utilities** | PG&E<br>San Diego Gas & Electric<br>Southern California Edison | Transmission and distribution fees | per kwh<br>(fixed / regulated) |
| **MVNOs** | T-Mobile | Wholesale network access fees | per minute<br>Per GB<br>(negotiated) |
| **Legacy Telecom** | AT&T | Interconnect fees | Per call<br>(regulated) |
| **Retail** | Krogers<br>Safeway | Slotting fees | per SKU-time-space<br>(negotiated) |

Privileged and Confidential - Prepared at the Request of Counsel

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY CX-0274.15 APL-EG_11398881

| | |
|---|---|
| **Subject:** | Re: Updated Wisconsin Deck for 6/28 |
| **From:** | "Tanya Washburn" |
| **Received(Date):** | Tue, 27 Jun 2023 03:38:52 +0000 |
| **To:** | "Matt Fischer" |



| | |
|---|---|
| **Attachment:** | 2023.06.28 Wisconsin CLEAN - Team Commission - Privileged & Conf |
| **Date:** | Tue, 27 Jun 2023 03:38:52 +0000 |

Attorney Work Product
Privileged and Confidential
Prepared at the request of Counsel

Matt,

In lieu of the Box link, here is a copy of the Wisconsin deck for review.

Thanks,
Tanya

\*

> On Jun 26, 2023, at 8:20 PM, Tanya Washburn ██████████ wrote:
>
> Attorney Work Product
> Privileged and Confidential
> Prepared at the request of Counsel
>
> Matt,
>
> Here <https://apple.box.com/s/kjbqr6dcdcw6c1tdzg2jdwhlfxed0djs> is the updated
clean Wisconsin deck for review and share with Phil and Eddy ahead of the Wisconsin
meeting on Wed. 6/28.
>
> Let us know if any changes are needed.
>
> Thanks,



PLAINTIFF
U.S. District Court - NDCAL
**4:20-cv-05640-YGR-TSH**
*Epic Games, Inc. v Apple Inc.*
Ex. No. **CX-0505**

Date Entered_____
By_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     CX-0505.1

APL-EG_10674709; APL-EG_10677570
APL-EG_10680708

> Tanya
>

---

*Attorney Work Product*

*Privileged and Confidential*

*Prepared at the request of Counsel*

Matt,

In lieu of the Box link, here is a copy of the Wisconsin deck for review.

Thanks,

Tanya

---

On Jun 26, 2023, at 8:20 PM, Tanya Washburn ▮▮▮▮▮▮▮ wrote:

*Attorney Work Product*

*Privileged and Confidential*

*Prepared at the request of Counsel*

**Matt,**

**Here is the updated clean Wisconsin deck for review and share with Phil and Eddy ahead of the Wisconsin meeting on Wed. 6/28.**

**Let us know if any changes are needed.**

**Thanks,**

**Tanya**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY     CX-0505.2     APL-EG_10674709; APL-EG_10677570
APL-EG_10680709

| | |
|---|---|
| Control Number | APL-EG_10680710 |
| Group Identifier | APL-EG_10680708 |
| P/C | |
| FamilyStatus | |
| AllCustodians | Oliver, Carson |
| Email From | |
| Email To | |
| Email CC | |
| Email BCC | |
| DateSent | |
| TimeSent | |
| DateLastModified | |
| TimeLastModified | |
| DateCreated | |
| Email Subject | |
| Title | |
| Filename | 2023.06.28 Wisconsin CLEAN - Team Commission - Privileged & Confidential.key |
| Application | |
| Confidentiality_Rcvd | HighlyConfidential |
| Production Vol. | APL-EG_078 |



June 2023
Privileged and Confidential - Prepared at the Request of Outside Counsel

# Epic Injunction Implementation

[Jen]

APL-EG_10674709; APL-EG_10677570 APL-EG_10680710

CX-0505.4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR　　Document 1542-53　　Filed 05/07/25　　Page 5 of 27

APL-EG_10674709; APL-EG_10677570
APL-EG_10680711

ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT

[Jen]

# ATTORNEY-CLIENT PRIVILEGE

CX-0505.5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-53    Filed 05/07/25    Page 6 of 27

ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT

[Jen]

# ATTORNEY-CLIENT PRIVILEGE

APL-EG_10674709; APL-EG_10677570
APL-EG_10680712

CX-0505.6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Agenda

System disclosure sheet

Collections risk management

Commission duration

Programs

Commission rate

[Jen]

APL-EG_10674709; APL-EG_10677570
APL-EG_10680713

CX-0505.7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



[Ann]
Tim, based on your feedback, here is the System disclosure sheet with the updated copy on the right.

APL-EG_10674709; APL-EG_10677570
APL-EG_10680714

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CX-0505.8

Case 4:20-cv-05640-YGR    Document 1542-53    Filed 05/07/25    Page 9 of 27

APL-EG_10674709; APL-EG_10677570
APL-EG_10680715

CX-0505.9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# System disclosure sheet
## User flow



[Ann]

Here's an example of the UI flow once a customer clicks on a link out button with the updated language.

It takes a customer to a system disclosure sheet letting them know they are leaving the app and going to the web.

Case 4:20-cv-05640-YGR    Document 1542-53    Filed 05/07/25    Page 10 of 27



[Ann]
And here's how it could look for account-based products and services.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570
APL-EG_10680716

CX-0505.10

APL-EG_10674709; APL-EG_10677570
APL-EG_10680717

Legal terms

ATTORNEY-CLIENT PRIVILEGE AND WORK PRODUCT

[LING OR JEN]

CX-0505.11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Fee collections and developer escalations

| **Timeline** *(Days from end of month)* | **Escalation Path** |
|---|---|
| **15 days** | Developer must report out all applicable transactions to Apple in specified format / APIs |
| **45 days** | Payment due<br>If no payment is made:<br>Revoke link-out entitlement<br>Block app updates<br>Offset against developer IAP proceeds<br>Interest starts accruing on remaining balance |
| **90 days** | App removal from App Store<br>Blocking distribution on Apple platforms |
| **120 days** | Termination from Developer Program<br>Legal action for any balance remaining after offset |

**For discussion only**

[Timo]

## Approach to determining reasonableness of reports

| Timeline *(Days from end of month)* | Activity |
|---|---|
| 0 – 15 days | Developer must report out all applicable transactions to Apple in specified format / APIs |
| 15 – 35 days | Analytics performed to assess reasonableness of report, including:<br>• Completion rate<br>• Average prices<br>• Total volume<br>• Benchmarking against similar apps / developers |
| 35-90 days | Outreach to developers to resolve any identified anomalies |
| 90-180 days | If friendly conversations do not result in acceptable explanations, consider invoking audit rights |

**For discussion only**

[Timo]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570<br>APL-EG_10680719

CX-0505.13



[Kunnal]

APL-EG_10674709; APL-EG_10677570
APL-EG_10680720

CX-0505.14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570
APL-EG_10680721



[Kunnal]

CX-0505.15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Program eligibility
VPP / NPP
[redacted]
Tenured Subscriptions
[redacted] of total billings
SBP
[redacted]
Small Business Program
• Continue to promote growth of small developers with minimal financial impact
• Ensure Apple is not seen as limiting the majority of developers from linking out
Tenured Subscriptions
• Discount acknowledges developer's effort in retaining customers
• Ensure Apple is not seen as limiting the use of linking out for subscriptions
Video Partner Program / News Partner Program
• Require participants to maintain high bar of user experience and ecosystem integration aligned with partner program goals
• Limited number of developers impacted
For discussion only

[Kunnal]

APL-EG_10674709; APL-EG_10677570
APL-EG_10680723



CX-0505.17

[Kunnal]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570
APL-EG_10680724



CX-0505.18

[Kunnal]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

### Epic injunction proposal

**20%** standard commission

**12%** program commission

Program commission only on **Small Business Program & Tenured Subs**

Purchases initiated within **72 Hrs** Post Link Out (+ subscription renewals)

These numbers are for illustrative purposes only, to aid discussion

[Kunnal]

APL-EG_10674709; APL-EG_10677570
APL-EG_10680725

CX-0505.19

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# US steady state revenue impact

**20%** standard commission | **12%** program commission only on Small Business Program & Tenured Subs

| | | Linkout Share | | | | |
|---|---|---|---|---|---|---|
| Developer Count | Total Revenue | 10% | 20% | 30% | 40% | 50% |
| 10 | [redacted] | | | | | |
| 50 | | | | | | |
| 200 | | | | | | |
| All Developers | | | | | | |

**Key Assumptions**

- Assumes all subsequent non-sub transactions go through direct channels (with no commission)
- Every subsequent transaction that goes through the App Store will reduce the revenue loss (illustrative sensitivities on the next slide)
- VPP and NPP Link-out billings are not eligible for program discounts
- 30% collection risk factored into sensitivities for illustration purposes

**These numbers are for illustrative purposes only, to aid discussion**

[Kunnal]



## US steady state revenue impact *(returning customers)*
Illustrative sensitivities for **200 developers** based on share of customers returning through link

### Key Assumptions

- Assumes all subsequent non-sub transactions go through direct channels (with no commission)

- Every subsequent transaction that goes through the App Store will reduce the revenue loss (illustrative sensitivities on the next slide)

- VPP and NPP Link-out billings are not eligible for program discounts

- 30% collection risk factored into sensitivities for illustration purposes

*These numbers are for illustrative purposes only, to aid discussion*

[Kunnal]

APL-EG_10674709; APL-EG_10677570
APL-EG_10680727

CX-0505.21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570
APL-EG_10680728



[Kunnal]

CX-0505.22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570
APL-EG_10680729



## US steady state revenue impact *(collection risk)*

Illustrative sensitivities for 200 developers based on share of customers returning through link

*These numbers are for illustrative purposes only, to aid discussion*

[Kunnal]

CX-0505.23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## US steady state revenue impact bridge

**200** developers  **30%** rik out share  **72** hrs  **50%** returning customers  **30%** collection risk

| Commission Reduction | Commission Duration | Collection Risk | Potential Revenue Loss |

These numbers are for illustrative purposes only, to aid discussion

[Kunnal]

APL-EG_10674709; APL-EG_10677570
APL-EG_10680730

CX-0505.24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570
APL-EG_10680731



[Kunnal]

CX-0505.25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Launch timeline

**6/30**
Production Ready
- All code changes ready
- All supporting materials ready

**7/6**
Go Live
- StoreKit APIs enabled
- System sheet enabled
- 'Learn More' story
- Entitlement requests open
- Developer agreement
- Developer support page
- Legal filing (Statement of Compliance and Declaration)

**7/12**
Entitlements Approved
- Earliest entitlement approvals
- App submissions (with entitlement) accepted

**8/1**
Developer Reports
- Developer reports submitted (i.e. month of July)
- Begin sending invoices to developers

**9/15**
Collection
- Developer due date for collection

Attorney Client Privileged - Prepared at the Direction of Counsel

[TANYA]
This Friday 6/30 - all code changes and supporting materials will be ready

Go live on July 5 (9-10am):
- Engineering will enable StoreKit APIs and the system disclosure sheet
- Open up entitlement agreement, new Guidelines, developer support pages
- Legal is going to file the 'Statement of Compliance and Declaration'

7/12: About a week later is when the earliest entitlements will be approved, and we'll begin to accept app submissions with entitlements
- entitlements will be manually reviewed

8/1-8/15: We'll see Developer reports submitted, and we'll begin to send invoices to developers during this timeframe
[15 days to report after July]

9/15: is the due date for developers to pay us via electronic funds transfer
- Due date aligned with when we'll pay them for commission for Month of July
- Electronics funds transfer

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_10674709; APL-EG_10677570
APL-EG_10680732

CX-0505.26

APL-EG_10674709; APL-EG_10677570
APL-EG_10680733



CX-0505.27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

U.S. District Court - NDCAL
4:20-cv-05640-YGR-TSH
Epic Games, Inc. v Apple Inc
Ex. No. **CX-0520**
Date Entered
By_____

APL-EG_11473351



# App Store
## Michigan (IAP Links)

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 1 of 44

CX-0520.1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 2 of 44

Overview

1. **Allow developers to link out to a website featuring alternate payment methods**

2. **Allow developers to communicate the benefits of buying on the web**

3. **The link must be detached from purchase buttons, and placed elsewhere in their experience**

Is this accurate?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473352

CX-0520.2

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 3 of 44



APL-EG_11473353

CX-0520.3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR          Document 1542-57          Filed 05/07/25          Page 4 of 44



App Examples

APL-EG_11473354

CX-0520.4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473355



CX-0520.5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473356



**Roblox** Link Placement Options

CX-0520.6

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR   Document 1542-57   Filed 05/07/25   Page 7 of 44



APL-EG_11473357

CX-0520.7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473358



CX-0520.8

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473359

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 9 of 44



CX-0520.9

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473360



CX-0520.10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR     Document 1542-57     Filed 05/07/25     Page 11 of 44

APL-EG_11473361



CX-0520.11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473362



CX-0520.12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473363



CX-0520.13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473364



CX-0520.14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 15 of 44

**Roblox Link Placement Options**



APL-EG_11473365

CX-0520.15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR     Document 1542-57     Filed 05/07/25     Page 16 of 44

APL_EG_11473366



CX-0520.16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473367



CX-0520.17

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Sheet Style 01 Text Alts
9:41
App Store
Continue to the Developer's Website
By continuing on the web, you will leave the app and be taken to an external website.
Any purchases made externally will be managed by the developer "Hulu Inc."
Continue
Cancel
A1
9:41
App Store
Continue to the Developer's Website
By continuing on the web, you will leave the app and be taken to an external website.
Any purchases made externally will be managed by the developer "Hulu Inc." App Store payment features like subscription management, fast and safe payments, and Report a Problem will not be available.
Continue
Cancel
A2
9:41
App Store
Open External Website
"Hulu" wants to open "https://signup.hulu.com".
By continuing, you will leave the app and open your web browser. Any purchases made externally will be managed by the developer "Hulu Inc."
Continue
Cancel
B1
9:41
App Store
Open External Website
"Hulu" wants to open "https://signup.hulu.com".
By continuing, you will leave the app and open your web browser. Any purchases made externally will be managed by the developer "Hulu Inc."
If you make purchases in your web browser, App Store payment features like subscription management, fast and safe payments, and Report a Problem will not be available.
Learn more
Continue
Cancel
B2

Sheet Style 01 Text Alts – Equal Buttons
App Store
Continue to the Developer's Website
By continuing on the web, you will leave the app and be taken to an external website.
Any purchases made externally will be managed by the developer "Hulu Inc."
Continue
Cancel
A1
App Store
Continue to the Developer's Website
By continuing on the web, you will leave the app and be taken to an external website.
Any purchases made externally will be managed by the developer "Hulu Inc." App Store payment features like subscription management, fast and safe payments, and Report a Problem will not be available.
Learn more
Continue
Cancel
A2
App Store
Open External Website
"Hulu" wants to open "https://signup.hulu.com".
By continuing, you will leave the app and open your web browser. Any purchases made externally will be managed by the developer "Hulu Inc."
Continue
Cancel
B1
App Store
Open External Website
"Hulu" wants to open "https://signup.hulu.com".
By continuing, you will leave the app and open your web browser. Any purchases made externally will be managed by the developer "Hulu Inc."
If you make purchases in your web browser, App Store payment features like subscription management, fast and safe payments, and Report a Problem will not be available.
Learn more
Continue
Cancel
B2

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 20 of 44



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473370

CX-0520.20

APL-EG_11473371



CX-0520.21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Sheet Style 02 Text Alts – Equal Buttons
9:41
App Store
Continue to the Developer's Website
By continuing on the web, you will leave the app and be taken to an external website.
Paying on a Developer's Website
Purchases will be managed by the developer "Hulu Inc". App Store payment features will not be available.
Paying in the App With Apple
Purchases will be managed by Apple and eligible for fast and safe payments, Report a Problem, and easy subscription management in one place.
Learn more about paying with Apple
Continue
Cancel
A1
9:41
App Store
Continue to the Developer's Website
By continuing on the web, you will leave the app and be taken to an external website.
Paying on a Developer's Website
Purchases will be managed by the developer "Hulu Inc". App Store payment features will not be available.
Paying in the App With Apple
Purchases will be managed by Apple and eligible for:
• Fast and safe payments
• Report a Problem
• Subscription management in one place
Learn more about paying with Apple
Continue
Cancel
A2
9:41
App Store
Open External Website
"Hulu" wants to open "https://signup.hulu.com". By continuing, you will leave the app and open your web browser.
Paying on an External Website
Purchases will be managed by the developer "Hulu Inc". App Store payment features will not be available.
Paying in the App With Apple
Purchases will be managed by Apple and eligible for fast and safe payments, Report a Problem, and easy subscription management in one place.
Learn more about paying with Apple
Continue
Cancel
B

APL-EG_11473373



CX-0520.23

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473374



Section about branding and app store badge

CX-0520.24

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473375

Case 4:20-cv-05640-YGR          Document 1542-57          Filed 05/07/25          Page 25 of 44



CX-0520.25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Options
9:41
App Store
Open External Website
"Hulu" wants to open "https://signup.hulu.com".
By continuing, you will leave the app and open your web browser. Any purchases made externally will be managed by the developer "Hulu Inc."
If you make purchases in your web browser, App Store payment features including subscription management, fast and safe payments, and Report a Problem, will not be available.
Continue
Cancel
Text Only
9:41
App Store
Open External Website
"Hulu" wants to open "https://signup.hulu.com". By continuing, you will leave the app and open your web browser.
Paying on an External Website
Purchases will be managed by the developer "Hulu Inc". App Store payment features will not be available.
Paying in the App With Apple
Purchases will be managed by Apple and eligible for fast and safe payments, Report a Problem, and easy subscription management in one place.
Continue
Cancel
Blocks

APL-EG_11473377



**System Dialog**

Last time we met, you shared some great feedback for Charts

CX-0520.27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473378



CX-0520.28

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473379

Case 4:20-cv-05640-YGR Document 1542-57 Filed 05/07/25 Page 29 of 44



CX-0520.29

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473380



# Button Placement Options

Last time we met, you shared some great feedback for Charts

CX-0520.30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473381



**Payment Flow**
Hulu

CX-0520.31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473382



CX-0520.32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473383



CX-0520.33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473384

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 34 of 44



CX-0520.34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR  Document 1542-57  Filed 05/07/25  Page 35 of 44



APL-EG_11473385

CX-0520.35

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473386



**Beginning of the Journey**
End of the Journey

Last time we met, you shared some great feedback for Charts

CX-0520.36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR          Document 1542-57          Filed 05/07/25          Page 37 of 44



APL-EG_11473387

CX-0520.37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473388



**Developer Button** Text Variations

CX-0520.38

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR          Document 1542-57          Filed 05/07/25          Page 39 of 44



**Beginning of Journey** Warning Options

APL-EG_11473389

CX-0520.39

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473390



Beginning of the Journey
**End of the Journey**

Last time we met, you shared some great feedback for Charts

CX-0520.40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473391



**End of Journey** Link

CX-0520.41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473392

CX-0520.42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR     Document 1542-57     Filed 05/07/25     Page 42 of 44



APL-EG_11473393



**Developer Button** Text Variations

CX-0520.43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

APL-EG_11473394

Case 4:20-cv-05640-YGR    Document 1542-57    Filed 05/07/25    Page 44 of 44



Beginning of *Journey* Warning Options

CX-0520.44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



[Heather to set-up topic]

PLAINTIFF
U.S. District Court NDCAL
4:20-cv-05640-YGR-TSH
Epic Games, Inc. v Apple Inc.
Ex. No. CX-0859
Date Entered
By

PRIV-APL-EG_00162520

CX-0859.1

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

3-ER-489

Attorney-Client Privilege

PRIV-APL-EG_00162521

CX-0859.2

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Attorney-Client Privilege

PRIV-APL-EG_00162522

CX-0859.3

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 4 of 87

Attorney-Client Privilege

PRIV-APL-EG_00162523

CX-0859.4

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Attorney-Client Privilege

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 5 of 87

PRIV-APL-EG_00162524

CX-0859.5

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Attorney-Client Privilege

PRIV-APL-EG_00162525

CX-0859.6

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162526

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 7 of 87

# Attorney-Client Privilege

CX-0859.7

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162527

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 8 of 87

# Attorney-Client Privilege

CX-0859.8

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Attorney-Client Privilege

PRIV-APL-EG_00162528

CX-0859.9

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 10 of 87



PRIV-APL-EG_00162529

CX-0859.10

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Solution Based on Reader App Entitlement



- Apple will set up an entitlement program for links out of the app to purchases on a developer's web site
- Clicking on a link will launch an interstitial
- Link must go to a web site owned or controlled by developer
- Link must open a new window in default browser, not in-app web view
- Link cannot pass additional parameters, must be statically defined

For discussion only

PRIV-APL-EG_00162530

CX-0859.11

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Solution Based on Reader App Entitlement
I think we can remove the parenthetical copy on the 2nd bullet since we have a screen of it on the next slide
• Apple will set up an entitlemen of the app to purchases on a developer's web site
• Clicking on a link will launch a warning screen (user will leave the app and go to the web; transaction will not be supported by Apple)
• Link must go to a web site owned or controlled by developer
• Link must open a new window in default browser, not in-app web view
• Link cannot pass additional parameters, must be statically defined
For discussion only

CX-0859.12

Link-out Interstitial
9:41
App Store
You're about to leave the app and go to an external website. You will no longer be transacting with Apple.
For discussion only

CX-0859.13

## Option 1 & 2: Proposed Templates – Styling

| | |
|---|---|
| Link | www.hulu.com/welcome |
| Link + | Lorem ipsum dolor sit amet www.hulu.com/ |
| Button | www.hulu.com/welcome↗ |
| Button + | Lorem ipsum dolor sit amet www.hulu.com/ ↗ |

For discussion only

[Sean]
Let's take a look at our proposed policies around language for both options.

Developers would be able to choose from a range...

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.14          PRIV-APL-EG_00162533

Option 1 & 2: Proposed Templates – Styling

| | |
|---|---|
| Link | www.hulu.com/welcome |
| Link + | Lorem ipsum dolor sit amet www.hulu.com/ |
| Button | www.hulu.com/ |
| Button + | Lorem ipsum dolor sit amet www.hulu.com/ |

For discussion only

[Sean]
Let's take a look at our proposed policies around language for both options.

Developers would be able to choose from a range...

PRIV-APL-EG_00162534

CX-0859.15

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Option 1 & 2: Proposed Templates – Styling

| | |
|---|---|
| Link | www.hulu.com/welcome |
| Link + | Lorem ipsum dolor sit amet www.hulu.com/ |
| Button | www.hulu.com/ |
| Button + | Lorem ipsum dolor sit amet www.hulu.com/ |

For discussion only

[Sean]
Let's take a look at our proposed policies around language for both options.

Developers would be able to choose from a range...

**3-ER-504**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.16          PRIV-APL-EG_00162535



[Sean] Developers would be able to choose from a range…

PRIV-APL-EG_00162536

CX-0859.17

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Option 1 & 2: Proposed Templates – Language



- ⊗ Special Offer Template — For special offers go to www.hulu.com/welcome§
- ⊗ Lowest Price Template — Lowest price offered on www.hulu.com/welcome†
- ⊗ % Off Template — To get 50% off, go to www.hulu.com/welcome‡
- ⊗ Specific Price — Buy/ for $4.99 at www.hulu.com/welcome†*

For discussion only

[Sean] Developers would be able to choose from a range...

These templates are advisory. We will approve language that follows these templates. Developers can submit their own language, which will be evaluated by App Review.

PRIV-APL-EG_00162537

CX-0859.18

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Option 1 & 2: Proposed Templates – Language

| | | |
|---|---|---|
| ⊘ Special Offer Template | | For special offers go to www.hulu.com/welcome8 |
| ⊘ Lowest Price Template | | Lowest price offered on www.hulu.com/welcome4 |
| ⊘ % Off Template | | To get 50% off, go to www.hulu.com/welcome@ |
| ⊘ Specific Price | | Buy for $4.99 at www.hulu.com/welcome2¹ |
| ● Any Other Arbitrary Language | | Get $15 off all purchases on www.hulu.com/welcome8 |

**For discussion only**

[Sean] Developers would be able to choose from a range...

PRIV-APL-EG_00162538

CX-0859.19

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 20 of 87



[Sean] Here's the range of language developers could use…

PRIV-APL-EG_00162539

CX-0859.20

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



[Sean] Developers would be able to choose from a range...

PRIV-APL-EG_00162540

CX-0859.21

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



PRIV-APL-EG_00162541

CX-0859.22

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Option 1: Standard Developer Economics**
30% Apple IAP | 0% Linking Out Commission | 10% Adoption with 10% Breakage

[Nate]
As a basic illustration, here is a view of the impact on revenue and cost for developers with linking-out now existing as an option. This scenarios shows a developer who pays 30% commission for Apple IAP, sees 10% link-out adoption, with then 10% of those customers dropping out during the buy flow process.

In this example, [click]

90% of billings go through Apple IAP and 10% linkout, but only 9% of purchases complete successfully due to a 10% breakage assumption. This results in 99% of status-quo billings being retained.

From a cost perspective, this developer pays the 30% commission on Apple IAP, while there is no Apple commission for linking-out; however, we're assuming a cost of 5.5% on the developer side to account for cost of payments and other servicing and infrastructure costs. The net developer cost here would be 27% vs. the 30% standard commission, which results in developers earning 72% of billings proceeds vs. the standard 70% they have typically earned.

In this case, the developer would adopt linking out.

Next, we'll get into the numbers...

[click]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.23          PRIV-APL-EG_00162542

## Option 1: Developers Opting for Link-out
0% Commission for Linking Out

**Linkout Billings Share**

| Breakage | 10% | 20% | 30% | 40% | 50% |
|---|---|---|---|---|---|
| 0% | 46,202 | 54,548 | 56,728 | 62,617 | 65,063 |
| 5% | 21,969 | 26,995 | 29,776 | 32,152 | 33,292 |
| 10% | 18,087 | 24,645 | 26,607 | 27,898 | 29,554 |
| 15% | 12,918 | 16,320 | 18,473 | 20,155 | 21,406 |
| 20% | 4,566 | 6,432 | 7,226 | 7,681 | 8,450 |
| 25% | 60 | 64 | 65 | 67 | 68 |

These numbers are for illustrative purposes only, to aid discussion

Removes Threshold of 100K indifference and Small developer ($1m billings annually)

PRIV-APL-EG_00162543

CX-0859.24

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 25 of 87



PRIV-APL-EG_00162544

CX-0859.25

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Option 1: Considerations
0% Commission on Linking Out

**Benefits**

Attorney-Client Privilege

- Avoids new challenge on applying commission to web sales
- Avoids challenges of collecting commission on web sales
- Maintains integrity of in-app purchase option

**Risks**

- Meaningful financial risk due to new in-app channel for developers without commission
- Increases volume and complexity of enforcement by App Review

Attorney-Client Privilege

- Diverges from alt payments approach to date; could spread to other markets

**For discussion only**

[Sean]

PRIV-APL-EG_00162545

CX-0859.26

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Option 1: US Revenue Impact
0% Commission on Linking Out

[Note]
Tim – these are the slides Alex and I presented to you last time we met on this topic. This was a general sensitivity chart that showed what the revenue impact would be simply based on count of developers adopting link-out and % of revenue shifting to linking-out.

We know it's very likely that when a link-out happens, there will be some breakage, meaning customer dropping off during the buy-flow process due to a less seamless experience compared to Apple's iAP, and so we wanted to show you another view that takes this factor into account.

**Click**

PRIV-APL-EG_00162546

PRIV WITHHOLD

CX-0859.27

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**Option 1: US Revenue Impact with Breakage**
0% Commission on Linking Out

These numbers are for illustrative purposes only, to aid discussion

[Nate]
We have run various sensitivities through our developer economic decisioning model to forecast whether or not a developer will adopt linking out.

On the rows, this accounts for the revenue impact if breakage is 0% and all the way up to 25%. Beyond 25%, developers reach a tipping point where they lose more on linking out than they would make sticking with Apple iAP and the higher commission.

For the share of billings linking-out, we are showing sensitivities from 10% to 50%, which will depend where is the text and the language developers are allowed to use. We don't have great data points on what this will end up being, but we have a situations we've encountered to point to.

**NetEase** – has offered discounted pricing offered outside the App Store and has been targeting specific marketing to their high spend customers. Based on the analysis we did with Analytics, we believe about ▇ of our billings have shifted to their webstore.

**Disney+** – has offered a discounted bundle outside the App Store, with no App Store purchase option for bundle. We believe this has driven about ▇ of Disney+ billings outside of the App Store.

And in the case for **Epic**, we saw about ▇ of billings shift for the few weeks when they offered their own payment option and had discounted pricing.

The range of impact on the low end with 25% breakage and 10% billings shift (bottom left corner) is more negligible at ▇. However on the other end with 0% breakage and 50% billings shift (top right corner), it's closer to ▇ of U.S. revenue that Apple would lose. A more middle ground scenario of 10% breakage and 30% billings shift would result in ▇ of revenue loss, nearly ▇ of our U.S. App Store revenue.

Next, XX will recap the pros and cons of Option 1 with not charging a commission.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          PRIV-APL-EG_00162547

CX-0859.28

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 29 of 87

PRIV-APL-EG_00162548

CX-0859.29

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162549

CX-0859.30

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 30 of 87



## Option 2: Revenue Impact
Commission for linking out with cost of payments discount (3%)

These numbers are for illustrative purposes only, to aid discussion



**Option 2: US Revenue Impact**
Commission on Linking Out with Cost of Payments Discount (-3%)

[Nate]
If we decided and had the ability to charge a commission, we believe there would be very little developer adoption of link-out, assuming a scenario where we would give a cost of payments discount at 3%.

We ran the commission option through our developer decisioning model as well but this will likely not make economic sense for the vast majority of developers with the 3% discount. However we know that the model is economic in nature and does not capture softer elements like customer relationship and developers ability to monetize in others way they don't today with a transaction going through linking-out, hence we did a sensitivity.....

We believe based on low developer count adoption and low billings share (top left corner), the revenue impact would be closer to zero, whereas if all developers adopted and there was 50% billings shift (bottom right), the revenue impact would be closer to ▮. Of course this all assumes we can actually collect the billings going through linking out, which as you can see in yellow, ranges from ▮ in the top left to ▮ in the bottom right. Any amount that we cannot collect will have a further impact on Apple's Revenue / Profitability.

From a margin perspective, the impact is essentially negligible since we don't have cost of payments

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          PRIV-APL-EG_00162550

CX-0859.31



PRIV-APL-EG_00162551

CX-0859.32

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Option 2: US Revenue Impact
*Commission for linking out with discount for cost of payments (-3%)*

| Developer Count | Total Revenue | Linkout Billings Share | | | | | |
|---|---|---|---|---|---|---|---|
| | | 10% | 20% | 30% | 40% | 50% | 60% |
| 10 | | | | | | | |
| 50 | | | | | | | |
| 200 | | | | | | | |
| All Developers | | | | | | | |

These numbers are for illustrative purposes only, to aid discussion

If we decided and had the ability to charge a commission, we believe there would be very little developer adoption of link-out, assuming a scenario where we would give a cost of payments discount at 3%.

PRIV-APL-EG_00162552

CX-0859.33

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



[Sean or Jennifer]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.34          PRIV-APL-EG_00162553

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 35 of 87



PRIV-APL-EG_00162554

CX-0859.35

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Option 2A: Discounted Commission

Commission for Linking Out with Cost of Payments Discount (~3%)

### Proposed Justification

- Developers still benefit from materially all of Apple's tools, technologies, and services, minus cost of payments
- Our 30% commission is fair and defensible:
  - Standard commission rate for mobile App Stores is generally 30%, including Google Play
  - Game stores on console are generally charge 30%, including Xbox and Playstation
  - Steam commission is 20-30%, with no technology platform or services
  - Epic Games Stores commission is below cost at 12%, without tech platform or services

C

- Simplest ap Netherland
- No "tipping business model changes
- Significant compliance risk because of the proximity to 30% commission
- Developers will claim that a small discount does not allow for price competition i.e. difficulties with Netherlands approach

I think it's also worth mentioning that unlike in KR/NL/EU we are still planning to require IAP (not even just to allow it). That has an effect on adoption rate for any of these options and could also affect our strategic considerations here.

Attorney-Client Privilege

iscussion only

CX-0859.36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY PRIV WITHHOLD PRIV-APL-EG_00162555

## Option 2A: US Revenue Impact

Commission for Linking Out with Cost of Payments Discount (.3%) + 10% Breakage on Link Out



These numbers are for illustrative purposes only, to aid discussion

PRIV-APL-EG_00162556

CX-0859.37

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Option 2B: Discounted Commission with Time Limit

Commission for Linking Out with Cost of Payments Discount (~3% for first year, 0% commission in Y2+

### Proposed Justification

- Developers who retain customers through direct channels after linking out will eventually keep 100% of customer billings

- Our commission for 1 year is fair and deferrable.

- Developers are still benefitting from the vast majority of Apple's tools, technologies, and services, minus cost of payments

- This effort also benefiting from the platform itself, users on...

  How would we measure Y1 vs Y2 — across all developer, on a per-developer basis?

  It would have to be per customer, hence the piracy / data sharing issues

### Considerations

- Provides more margin opportunity for developers, which may mitigate compliance risk

- Retains many of the challenges and complications of Option 2A, with less financial upside

  Questions to think about:
  a) What ongoing commission rate is a revenue neutral tie to this proposal?
  b) Would we be better off - in terms of optics - simply charging the equivalent commission rate on an ongoing basis.

  I don't think so because I think an unstated goal of the decision is for there to be pricing dispersion. A single lower commission rate generally wouldn't necessarily accomplish that.

PRIV-APL-EG_00162557

CX-0859.38

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Option 2B: US Revenue Impact Y1 Impact
Commission for Linking Out with Cost of Payments Discount (-3%) + 10% Breakage on Link Out
Linkout Share
Developer Count
Total Revenue
10%
20%
30%
40%
50%
10
50
200
All Developers
[redacted]
These numbers are for illustrative purposes only, to aid discussion
Note: Non IAP commission will have a further impact on Apple's revenue depending on the collection rate

PRIV-APL-EG_00162559



CX-0859.40

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Option C: Flat Affilia

Flat fee per Customer Tap-Throug

Why is/isn't it grounded specifically in IP/proprietary technology? We could argue that the app benefited from tech in acquiring the customers.

I think it's also worth mentioning that unlike in KR/NL/EU are still planning to require IAP (not even just to allow it).

Justifications for any sort of affiliate or referrals fees are g couched in the value of demand generation / demand cap and not in specific claims to IP.

Another way of thinking about it is that online advertising platforms market and frame their fees as fair value for the placement and performance of the advertising, and the compensation for the underlying IUP and technology is ve much implicit

### Proposed Justifica

- In allowing linking out, the App Store is functioning as an affiliate channel that facilitates customer app discovery while resolving to out-of-app direct payment options

Attorney-Client Privilege

sible:

Apple's
s

lly
e

ansion

- No calculation risk with fees; Apple has full visibility into tap-through data
- No need for data sharing or audit rights between developers and Apple
- Pricing framework is not grounded specifically in IP or proprietary technology
- Significant divergence from other approaches in Korea, Netherlands and Europe
- Significant pricing risk and complexity (i.e. single fee for all apps, apps vs games, or app-specific)
- Significant optics risk as the flat fee may be larger than the value of the first customer transaction

**For discussion only**

CX-0859.41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY PRIV WITHHOLD PRIV-APL-EG_00162560

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 42 of 87



PRIV-APL-EG_00162561

CX-0859.42

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162562



CX-0859.43

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162563



CX-0859.44

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**3-ER-532**

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 45 of 87



PRIV-APL-EG_00162564

CX-0859.45

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 46 of 87



PRIV-APL-EG_00162565

CX-0859.46

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



PRIV-APL-EG_00162566

CX-0859.47

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



PRIV-APL-EG_00162567

CX-0859.48

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Appendix

PRIV-APL-EG_00162568

CX-0859.49

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162569

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 50 of 87

CX-0859.50

PRIV WITHHOLD



Option 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Attorney-Client Privilege

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 51 of 87

PRIV-APL-EG_00162570

CX-0859.51

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



## Option 3: Proposed Placement Policy
Commission on Linking Out + 0% Commission on In-App Text Communications

[Sean] Here's are examples where links may be placed if we go with option 2.

Again, we are only showing possible placements for the links. We are not showing the links in situation.

Since we are charging a commission, the link could be placed once per page, including alongside IAP.

[pause]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.52          PRIV-APL-EG_00162571



## Option 3: Proposed Placement Policy
*Commission on Linking Out + 0% Commission on In-App Text Communications*

[Sean]
And here's the Two Dots game example.

Now let's turn to financials for option 2.
[Handoff to Nate]

PRIV-APL-EG_00162572

CX-0859.53

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

[Nate]
The table on the left is the same as Option 2.  What Option 3 introduces is the additional information allowed to be presented but without a link to customers as mentioned where we would not charge a commission.

On the right side, this shows the incremental impact that may happen as more customers might migrate to the web with this additional information being presented to them.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY        PRIV WITHHOLD        CX-0859.54        PRIV-APL-EG_00162573



[Nate]

If we decided and had the ability to charge a commission, we believe there would be very little developer adoption of link-out, assuming a scenario where we would give a cost of payments discount at 3%.

We ran the commission option through our developer decisioning model as well but this will likely not make economic sense for the vast majority of developers with the 3% discount. However we know that the model is economic in nature and does not capture softer elements like customer relationship and developers ability to monetize in others way they don't today with a transaction going through linking-out, hence we did a sensitivity......

We believe based on low developer count adoption and low billings share (top left corner), the revenue impact would be closer to zero, whereas if all developers adopted and there was 50% billings shift (bottom right), the revenue impact would be closer to [redacted]. Of course this all assumes we can actually collect the billings going through linking out, which as you can see in yellow, ranges from $[redacted] in the top left to $[redacted] in the bottom right. Any amount that we cannot collect will have a further impact on Apple's Revenue / Profitability.

From a margin perspective, the impact is essentially negligible since we don't have cost of payments

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          PRIV-APL-EG_00162574

CX-0859.55

PRIV-APL-EG_00162575

CX-0859.56

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY





[Sean or Jennifer]

PRIV-APL-EG_00162576

CX-0859.57

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 58 of 87



Designs

PRIV-APL-EG_00162577

CX-0859.58

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



[Sean] Let's take a look at our proposed policies around UI styling for both options.

Developers would be able to choose from a range of templates governed by these rules...

PRIV-APL-EG_00162578

CX-0859.59

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162579

CX-0859.60

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 60 of 87



## Option 1 & 2: Proposed Sheet

## Option 1: Proposed Placement Policy
0% Commission on Linking Out – Current Experience in Hulu

FPO | For discussion only



[Sean] Here are examples of where links may be placed if we go with option 1.

Here we are only showing possible placements for the links. We are not showing the links in situation.

If we don't charge a commission, a developer could display one link per page, excluding the page that presents Apple IAP, like the second screen.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY        PRIV WITHHOLD        CX-0859.61        PRIV-APL-EG_00162580



[Sean]
Here's a game example where there is an upsell flow before the in-app shop. Developers would not be able to display the URL on these screens.

Now let's turn to financials.
[Handoff to Nate]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY   PRIV WITHHOLD   CX-0859.62   PRIV-APL-EG_00162581



[Sean] Here are examples of how option 1 would look to a user.

If we don't charge a commission, a developer could display one link per page, excluding the page that presents Apple IAP, like the second screen.

PRIV-APL-EG_00162582

CX-0859.63

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Option 1: Proposed Placement Policy**
0% Commission on Linking Out – Plain Icon Button

[Sean] Here are examples of how option 1 would look to a user.

If we don't charge a commission, a developer could display one link per page, excluding the page that presents Apple IAP, like the second screen.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY       PRIV WITHHOLD       CX-0859.64       PRIV-APL-EG_00162583



[Sean] Here are examples of how option 1 would look to a user.

If we don't charge a commission, a developer could display one link per page, excluding the page that presents Apple IAP, like the second screen.

PRIV-APL-EG_00162584

CX-0859.65

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



[Sean] Here are examples of how option 1 would look to a user.

If we don't charge a commission, a developer could display one link per page, excluding the page that presents Apple IAP, like the second screen.

PRIV-APL-EG_00162585

CX-0859.66

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Option 1: Proposed Placement Policy
0% Commission on Linking Out – Current Experience

[Sean]
Here's a game example where there is an upsell flow before the in-app shop. Developers would not be able to display the URL on these screens.

Now let's turn to financials.
[Handoff to Nate]

PRIV-APL-EG_00162586

CX-0859.67

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 68 of 87



## Option 1: Proposed Placement Policy
0% Commission on Linking Out – Plain Icon Button

[Sean]
Here's a game example where there is an upsell flow before the in-app shop. Developers would not be able to display the URL on these screens.

Now let's turn to financials.
[Handoff to Nate]

PRIV-APL-EG_00162587

CX-0859.68

PRIV WITHHOLD

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



## Option 1: Proposed Placement Policy
0% Commission on Linking Out – Icon Button

[Sean]
Here's a game example where there is an upsell flow before the in-app shop. Developers would not be able to display the URL on these screens.

Now let's turn to financials.
[Handoff to Nate]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.69          PRIV-APL-EG_00162588

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 70 of 87



## Option 1: Proposed Placement Policy
0% Commission on Linking Out – Full Button

[Sean]
Here's a game example where there is an upsell flow before the in-app shop. Developers would not be able to display the URL on these screens.

Now let's turn to financials.
[Handoff to Nate]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY    PRIV WITHHOLD    CX-0859.70    PRIV-APL-EG_00162589

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 71 of 87



PRIV-APL-EG_00162590

CX-0859.71

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Option 2: Proposed Placement Policy
Commission on Linking Out with Cost of Payments Discount (~3%) – Current Experience in Hulu

[Sean] Here's are examples where links may be placed if we go with option 2.

Again, we are only showing possible placements for the links. We are not showing the links in situation.

Since we are charging a commission, the link could be placed once per page, including alongside IAP.

[pause]

PRIV-APL-EG_00162591

CX-0859.72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD

**3-ER-560**

## Option 2: Proposed Placement Policy

Commission on Linking Out with Cost of Payments Discount (-3%) - Current Experience in Two Dots

FPO | For discussion only



[Sean]
And here's the Two Dots game example.

Now let's turn to financials for option 2.
[Handoff to Nate]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.73          PRIV-APL-EG_00162592

PRIV-APL-EG_00162593

CX-0859.74

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 74 of 87



Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 75 of 87



PRIV-APL-EG_00162594

CX-0859.75

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 76 of 87



## Current Developer Web Presence Landscape

| App Rank | Count of Apps with web | % with web | % of Total US Billings |
|---|---|---|---|
| Top 10 (5x Billings) | 10 | 100% | |
| Top 20 | 18 | | |
| Top 50 | 33 | | |
| Top 100 | 67 | | |
| Top 150 | 76 | | |
| Top 200 | 98 | | |

These numbers are for illustrative purposes only, to aid discussion.

Privileged and Confidential – Prepared at the Request of Counsel

PRIV-APL-EG_00162595

CX-0859.76

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 77 of 87



PRIV-APL-EG_00162596

CX-0859.77

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



PRIV-APL-EG_00162597

CX-0859.78

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



PRIV-APL-EG_00162598

CX-0859.79

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Option 1 & 2: Proposed Language Templates

- Go to <<developer website URL>> to get <<XXX>>% off
- Buy at <<developer website URL>> for <<price>>
- Go to <<developer website URL>> for special offers
- Lowest price offered on <<developer website URL>>

[Sean]

Let's take a look at our proposed policies around language for both options.

Developers would be able to choose from a range...

PRIV-APL-EG_00162599

CX-0859.80

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Case 4:20-cv-05640-YGR    Document 1542-64    Filed 05/07/25    Page 81 of 87



PRIV-APL-EG_00162600

CX-0859.81

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PRIV-APL-EG_00162601

Case 4:20-cv-05640-YGR   Document 1542-64   Filed 05/07/25   Page 82 of 87



CX-0859.82

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



We have run various sensitivities through our developer decisioning model to forecast whether or not a developer will adopt linking out.

On the rows, this accounts for the revenue impact if breakage is 0% and all the way up to 25%. Beyond 25%, developers reach a tipping point where they lose more on linking out than they would make sticking with Apple IAP and the higher commission.

For the share of billings linking-out, we are showing sensitivities from 10% to 50%. We don't have great data points on what this will end up being, but we have a situations we've encountered to point to.

**NetEase** – has offered discounted pricing offered outside the App Store and has been targeting specific marketing to their high spend customers. Based on the analysis we did with Analytics, we believe about ▉ of our billings have shifted to their webstore.

**Disney+** – has offered a discounted bundle outside the App Store, with no App Store purchase option for bundle. We believe this has driven about ▉ of Disney+ billings outside of the App Store.

And in the case for **Epic**, we saw about ▉ of billings shift for the few weeks when they offered their own payment option and had discounted pricing.

The range of impact on the low end with 25% breakage and 10% billings shift (bottom left corner) is more negligible at ▉ however on the other end with 0% breakage and 50% billings shift (top right corner), it's closer to ▉ of U.S. revenue that Apple would lose. A more middle ground scenario of 10% breakage and 30% billings shift would result in ▉ of revenue loss, nearly ▉ of our U.S. App Store revenue.

Next, XX will recap the pros and cons of Option 1 with not charging a commission.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY      PRIV WITHHOLD      CX-0859.83      PRIV-APL-EG_00162602



## Program Developer Economics
15% Apple IAP | 0% Link Out Commission | 10% Adoption with 10% Breakage

|  | Apple IAP | Apple IAP | Linkout | Mixed Strategy | Net Developer Impact |
|---|---|---|---|---|---|
| Billings | ~100% | 15% | Coupon Value | 99% | -1% |
| Cost | 15% | 3% | 5.4% | 14% | +1% |
| Proceeds | 85% | 17% | 85% | 85% | 0% |

These numbers are for illustrative purposes only, to aid of discussion

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY          PRIV WITHHOLD          CX-0859.84          PRIV-APL-EG_00162603

PRIV-APL-EG_00162604

CX-0859.85

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Attorney-Client Privilege

PRIV-APL-EG_00162605

CX-0859.86

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Attorney-Client Privilege

PRIV-APL-EG_00162606

CX-0859.87

PRIV WITHHOLD

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  CYNTHIA E. RICHMAN (D.C. Bar No.     MARK A. PERRY, SBN 212532
2  492089; *pro hac vice*)                    mark.perry@weil.com
     crichman@gibsondunn.com           JOSHUA M. WESNESKI (D.C. Bar No.
3  GIBSON, DUNN & CRUTCHER LLP    1500231; *pro hac vice*)
   1700 M Street, N.W.                     joshua.wesneski@weil.com
4  Washington, D.C. 20036-4504       WEIL, GOTSHAL & MANGES LLP
   Telephone: 202.955.8500            2001 M Street NW, Suite 600
5  Facsimile: 202.467.0539             Washington, DC 20036
                                     Telephone: 202.682.7000
6                                      Facsimile: 202.857.0940

7  Attorneys for Defendant APPLE INC.

8  **UNITED STATES DISTRICT COURT**

9  **NORTHERN DISTRICT OF CALIFORNIA**

10  **OAKLAND DIVISION**

11  EPIC GAMES, INC.                  Case No. 4:20-cv-05640-YGR

12        Plaintiff, Counter-defendant    **APPLE INC.'S POST-HEARING BRIEF**

13  v.

14  APPLE INC.,                   The Honorable Yvonne Gonzalez Rogers
                                 Courtroom 1, 4th Floor

15        Defendant, Counterclaimant

16

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 2

LEGAL STANDARD ................................................................................................. 7

ARGUMENT ............................................................................................................... 8

I.   Apple complied with the Injunction ..................................................................... 9

    A.   Apple followed an objectively reasonable process to reach an objectively reasonable conclusion .................................................................................. 10

    B.   Apple no longer prohibits developers from including buttons, external links, or other calls to action ............................................................................ 15

    C.   Context confirms that Apple's rules comply with the Injunction's plain terms ................... 18

II.  Epic failed to prove non-compliance by clear and convincing evidence ........................ 20

    A.   Epic's textual positions are wrong as a matter of fact and law ............................... 20

    B.   Epic's atextual "spirit" arguments are both factually flawed and legally irrelevant ............ 24

        1.   Epic did not prove that the technical requirements violate the Injunction ................... 24

        2.   Epic failed to prove that the commission violates the "spirit" of the Injunction .......... 29

        3.   Epic's atextual contentions about "spirit" cannot support contempt ...................... 33

III. Any additional remedy must be circumscribed and prospective ................................. 37

CONCLUSION ......................................................................................................... 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armstrong v. Brown*,
  768 F.3d 975 (9th Cir. 2014) ................................................................. 40

*Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*,
  928 F.3d 670 (7th Cir. 2019) ................................................................. 28

*Beasley v. Wells Fargo Bank, N.A.*,
  235 Cal. App. 3d 1383 (1991) ................................................................ 30

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
  1978 WL 1379 (W.D.N.Y. July 28, 1978) ............................................. 34

*Cal. Grocers Ass'n v. Bank of Am.*,
  22 Cal. App. 4th 205 (1994) ................................................................... 30

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987) ................................................................................ 17

*Cameron v. Apple Inc.*,
  No. 4:19-cv-3074-YGR (N.D. Cal. 2021) ................................................ 4

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ................................................................................ 31

*City of Las Vegas v. Clark County*,
  755 F.2d 697 (9th Cir. 1984) ........................................................... 18, 29

*Clark v. Coye*,
  60 F.3d 600 (9th Cir. 1995) .............................................................. 8, 19

*Doe, 1–13 ex rel. Doe Sr. 1–13 v. Bush*,
  261 F.3d 1037 (11th Cir. 2001) ............................................................. 40

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) ..................................................................... 7

*In re Dyer*,
  322 F.3d 1178 (9th Cir. 2003) ............................................................... 38

*eBay Domestic Holdings, Inc. v. Newmark*,
  16 A.3d 1 (Del. Ch. 2010) ...................................................................... 18

*ECM BioFilms, Inc. v. FTC*,
  851 F.3d 599 (6th Cir. 2017) ................................................................. 21

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ................................................................. *passim*

*Epona, LLC v. County of Ventura*,
  2019 WL 4187393 (C.D. Cal. Apr. 12, 2019) ...................................... 35

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ............................................................... 18

*Fortyune v. Am. Multi-Cinema, Inc.*,
  364 F.3d 1075 (9th Cir. 2004) ....................................................... 32, 36

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................................... 32

*Gates v. Rowland*,
  39 F.3d 1439 (9th Cir. 1994) ............................................................... 23

*Gates v. Shinn*,
  98 F.3d 463 (9th Cir. 1996) .............................................. 7, 25, 34, 36

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................................ 40

*In re Grand Jury*,
  23 F.4th 1088 (9th Cir. 2021) ............................................................... 9

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) ............................................................ 40

*Horne v. Dep't of Agriculture*,
  576 U.S. 350 (2015) .............................................................................. 31

*Horne v. Flores*,
  557 U.S. 433 (2009) ................................................................................ 8

*ILA, Loc. 1291 v. Phila. Marine Trade Ass'n*,
  389 U.S. 64 (1967) ................................................................................ 39

*Itel Containers Int'l Corp. v. Huddleston*,
  507 U.S. 60 (1993) ................................................................................ 28

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018) .............................................................................. 24

*In re Kellogg Brown & Root, Inc.*,
  756 F.3d 754 (D.C. Cir. 2014) ............................................................... 9

*Kokesh v. SEC*,
  581 U.S. 455 (2017) .............................................................................. 38

*Lasar v. Ford Motor Co.*,
    399 F.3d 1101 (9th Cir. 2005) ................................................................ 39

*Lazzareschi Inv. Co. v. S.F. Fed. Sav. & Loan Ass'n.*,
    22 Cal. App. 3d 303 (1971) .................................................................... 30

*Levitt v. Yelp! Inc.*,
    765 F.3d 1123 (9th Cir. 2014) ................................................................ 40

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................................ 40

*McKell v. Wash. Mut., Inc.*,
    142 Cal. App. 4th 1457 (2006) ............................................................... 40

*Moltan Co. v. Eagle–Picher Indus.*,
    55 F.3d 1171 (6th Cir. 1995) .................................................................. 41

*Moody v. Netchoice, LLC*,
    603 U.S. 707 (2024) ................................................................................ 26

*N.C. State Conf. of the NAACP v. McCrory*,
    214 F. Supp. 3d 466 (M.D.N.C. 2016) .................................................... 34

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ................................................................................ 27

*Navellier v. Sletten*,
    262 F.3d 923 (9th Cir. 2001) .................................................................. 37

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ............................................................... 26

*New.Net, Inc. v. Lavasoft*,
    356 F. Supp. 2d 1071 (C.D. Cal. 2003) .................................................. 26

*Ahearn, ex rel. NLRB v. Int'l Longshore & Warehouse Union, Locals 21 & 4*,
    721 F.3d 1122 (9th Cir. 2013) ................................................................ 38

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018) ................................................................................ 25

*Oracle USA, Inc. v. Rimini St., Inc.*,
    81 F.4th 843 (9th Cir. 2023) ................................................................... 38

*Overton v. Bazzetta*,
    539 U.S. 126 (2003) ................................................................................ 21

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986) .................................................................................... 27

*Pennsylvania v. Wheeling & Belmont Bridge Co.*,
   59 U.S. 421 (1855)..........................................................................................8

*PruneYard Shopping Ctr. v. Robins*,
   447 U.S. 74 (1980)..........................................................................................17

*Pulsifer v. United States*,
   601 U.S. 124 (2024)........................................................................................22

*Reno Air Racing Ass'n, Inc. v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) .......................................................................8

*S. Hospitality, Inc. v. Zurich Am. Ins.*,
   393 F.3d 1137 (10th Cir. 2004) ...................................................... 18, 28, 31

*S. Or. Barter Fair v. Jackson County*,
   372 F.3d 1128 (9th Cir. 2004) .......................................................................17

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)...........................................................................8, 36, 37

*Shell Offshore Inc. v. Greenpeace, Inc.*,
   815 F.3d 623 (9th Cir. 2016) .................................................................38, 39

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019)...............................................................................*passim*

*Terminal R.R. Ass'n. v. United States*,
   266 U.S. 17 (1924)....................................................................................34, 35

*Theme Promotions, Inc. v. News Am. Mktg FSI*,
   546 F.3d 991 (9th Cir. 2008) .......................................................................39

*Town of Islip v. E. Air Lines, Inc.*,
   793 F.2d 79 (2d Cir. 1986)......................................................................8, 34

*United States v. Armour & Co.*,
   402 U.S. 673 (1971)................................................................................33, 34

*United States v. Google LLC*,
   747 F. Supp. 3d 1 (D.D.C. Aug. 5, 2024) .................................................25

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .......................................................................40

*United States v. Morales*,
   122 F.4th 590 (5th Cir. 2024) ...............................................................21, 22

*United States v. United Mine Workers of Am.*,
   330 U.S. 258 (1947)..................................................................................8, 38

*Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004).................................................................................................. 25, 32

*Vlasak v. Super. Ct. of Cal. ex rel. County of Los Angeles*,
   329 F.3d 683 (9th Cir. 2003) ...................................................................................... 23

*Willard v. AT&T Commc'ns. of Cal., Inc.*,
   204 Cal. App. 4th 53 (2012) ....................................................................................... 30

*Wilson v. USI Ins. Serv. LLC*,
   57 F.4th 131 (3d Cir. 2023) ........................................................................................ 28

*Young v. United States ex rel. Vuitton et Fils S.A.*,
   481 U.S. 787 (1987)................................................................................................... 2, 37

**Federal Rules**

Fed. R. Civ. P. 60......................................................................................................... 8

Fed. R. Civ. P. 65...................................................................................................*passim*

**Other Authorities**

American Heritage Dictionary (5th ed. 2011) ............................................................ 23

Daniel Markovits, *Transactions Benefits*, 38 Yale J. on Regul. 633 (2021) ............. 27

New Oxford American Dictionary (2001) .................................................................... 16

Oxford Dictionary of Computer Science (7th ed. 2016)............................................. 23

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*
   (2012)........................................................................................................................ 21

Webster's Third New International Dictionary (2002)................................................. 16

**INTRODUCTION**

1

2    The Ninth Circuit upheld the App Store's fundamental business model as "clearly lawful." *Epic*

3    *Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023).  That includes Apple's "requirement" that

4    developers "buy [their] in-app-purchase-processing requirements from Apple." *Id.* at 996 n.20.  On a

5    "record [that] was less fulsome," Dkt. 812 ("Rule 52 Order") at 163, the Court found two anti-steering

6    Guidelines unfair under the UCL, and (as relevant) enjoined Apple from "prohibiting developers from

7    including in their apps buttons, external links, or other calls to action" directing users to alternative pur-

8    chase mechanisms outside of the app.  Dkt. 813 ¶ 1.  As the Court explained, this remedy required Apple

9    to "sever[]" the enjoined restriction "without any impact on the integrity of the ecosystem."  Rule 52

10   Order at 164.

11   Nine days of testimony and scores of documents demonstrate the extensive efforts Apple took to

12   develop a framework that complies with the Injunction while preserving the fundamental features of

13   Apple's business model and safeguarding consumers.  In Mr. Schiller's words, "there were meetings

14   every week"—with work over "nights [and] weekends"—to wrestle with a "very complex" decision.

15   TT 1295:10–25 (Schiller).  In determining an appropriate commission rate for the tools, technology, and

16   services developers would continue to benefit from, Apple engaged external experts to assist in identi-

17   fying benchmarks.  TT 548:7–12 (Oliver).  The finance team spent "dozens [or] hundreds of hours com-

18   ing up" with the assumptions that underlay Apple's competitive and financial analyses.  TT 502:2–3

19   (Oliver); 1749:1–3 (Vij).  After "very full discussion" of many options, TT 1277:17–23 (Schiller), Apple

20   adopted a framework under which a developer "may" "include a link to the developer's website . . . that

21   informs users of other ways to purchase digital goods or services," CX-0013 § 3.1.1(a), when that link

22   is "accompanied by language and a button."  CX-0002 § 3.3.  In-app content must comply with certain

23   technical requirements, and transactions effected using the new link entitlement would be subject to a

24   reduced commission commensurate with the value Apple provided to developers.  This framework com-

25   plied with the Injunction as written, as the Court contemporaneously explained it, and as Apple reason-

26   ably understood it.

27   Like any decision in a "dynamic, innovative" marketplace, Rule 52 Order at 71, Apple did not

28   know *ex ante* exactly how the new framework would work in practice.  But Apple knew its actions would

APPLE'S POST-HEARING BRIEF                         1                    CASE NO. 4:20-cv-05640-YGR

be scrutinized. Apple came to the Court affirmatively, filing a Notice of Compliance the day the Injunction took effect to provide the Court with the primary source materials that demonstrate its compliance. Epic disagreed, accusing Apple of civil contempt. This Court has never found that any specific act by Apple violated any specific term of the Injunction, finding only preliminarily that, "viewed holistically, Apple's practice changes undermine the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice." Dkt. 925, at 3.

In challenging Apple's injunction compliance, Epic has run roughshod over the procedural protections Apple was due. It invaded Apple's attorney-client privilege and hampered Apple's ability to put on a defense. Epic introduced no evidence that Apple's new framework causes it any harm. Instead, Epic has acted more as a private attorney general, in violation of core due process protections against private prosecution for contempt. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801–14 (1987). But even so, Epic was unable to prove, by clear and convincing evidence, that Apple violated the Injunction, much less that Apple had "no objectively reasonable basis for concluding that [its] conduct might be lawful," as required for civil contempt. *Taggart v. Lorenzen*, 587 U.S. 554, 560–61 (2019). Quite the contrary: Apple's witnesses cogently and consistently explained that the new framework was designed to comply with the Injunction, and the documentary record supports their testimony and the reasonableness of their conclusions.

The Court recognized from the outset that it must apply the law "cautiously" because Apple operates in "a technology context where lawyers and economists can merely hypothesize about the future of the digital frontier." Dkt. 118, at 1. Apple took extraordinary steps to comply with a directive that it, too, recognized was "not an easy problem to solve." TT 1282:12 (Schiller). Apple has and will continue to abide by the Court's orders, subject only to its lawful right to appeal. The Court should conclude that Apple has complied with the Injunction and deny Epic's motion to enforce.

## FACTUAL BACKGROUND

On September 10, 2021, after a bench trial, the Court rejected Epic's antitrust claims (which, among other things, challenged Apple's requirement that developers use IAP for in-app purchases of digital content) but found two categorical anti-steering provisions in Apple's App Review Guidelines to be "unfair" under the UCL: Guideline 3.1.1, which categorically prohibited developers from including

in their apps "buttons, external links, or other calls to action that direct customers to purchasing mecha-nisms other than" IAP; and Guideline 3.1.3, which categorically prohibited developers from communi-cating with users through "points of contact obtained from account registration within the app (like email or text)" to "encourage users to use a purchasing method other than" IAP.  Rule 52 Order at 31–32, 163–64.  The Court found that those anti-steering provisions "prevent[ed] developers from communicating about lower prices on other platforms." *Id.* at 93.  The Court issued the following Injunction:

> Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ("Apple"), are hereby permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

Dkt. 813 ¶ 1.  The first clause (i) draws nearly verbatim from the language of Guideline 3.1.1(a) in effect at the time of trial.  CX-0001 § 3.1.1(a).  The second clause (ii) draws nearly verbatim from the language of Guideline 3.1.3 in effect at the time of trial.  *Id.* § 3.1.3.

The Court explained that "[a] remedy to eliminate those provisions is appropriate."  Rule 52 Order at 179; *see id.* at 2 (requiring Apple "to eliminate those provisions").  The Court further explained that the "measured remedy" of eliminating those twin categorical prohibitions would "increase compe-tition, increase transparency, [and] increase consumer choice and information," while "preserving Ap-ple's iOS ecosystem which has procompetitive justifications" and without "micromanag[ing] [Apple's] business operations, which courts are not well-suited to do as the Supreme Court has appropriately rec-ognized."  *Id.* at 179.  At the same time, the Court recognized that Apple was entitled to collect compen-sation from developers for use of its platform, including its intellectual property, as well as access to the iOS userbase.  *Id.* at 1, 14, 65–67, 117, 150 & n.617, 169.

Apple moved to stay the Injunction pending appeal.  *See* Dkt. 821.  This Court denied the motion, reiterating that it would not "micromanage" Apple's business and stating it could "envision numerous avenues for Apple to comply."  Dkt. 830, at 3–4.  The Court recognized that Apple would "perhaps, need[] time to establish Guidelines" and noted that "[l]inks can be tested by App Review."  *Id.*

The Ninth Circuit stayed the Injunction pending appeal.  *See* Order, C.A. Dkt. 27.  On April 24, 2023, the Ninth Circuit affirmed in part and reversed in part.  *See Epic Games, Inc. v. Apple, Inc.*, 67

1  F.4th 946 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 & 682 (2024).  As relevant, the Ninth Circuit

2  affirmed this Court's findings that Apple had not violated the antitrust laws, confirming Apple's right to

3  require that developers use IAP for in app purchases of digital goods and services.  *Id.* at 981–99.  The

4  Ninth Circuit also affirmed the UCL judgment and Injunction.  *Id.* at 1002–04.  After the Supreme Court

5  denied review, the mandate issued on January 17, 2024, terminating the stay.  C.A. Dkt. 258.

6       The day before the mandate issued, Apple filed a Notice of Compliance summarizing the changes

7  it had made to comply with the Injunction.  Dkt. No. 871.  The new framework is set forth in revised

8  Guidelines, a new StoreKit External Purchase Link Entitlement ("Entitlement"), and certain Apple Ma-

9  terials referenced therein.   Apple had previously come into compliance with the second clause of the

10  Injunction, involving external communications, by revising the relevant Guideline pursuant to a court-

11  approved settlement in another case.  *See* Stipulation of Settlement, *Cameron v. Apple Inc.*, No. 4:19-

12  cv-3074-YGR (N.D. Cal. Nov. 5, 2021), ECF No. 451-1.  To comply with the first clause of the Injunc-

13  tion, Apple deleted Guideline 3.1.1, which had prohibited developers from including any "buttons, ex-

14  ternal links, or other calls to action" to alternatives to IAP.  Apple replaced that provision with new

15  Guideline 3.1.1(a), which now provides that developers may apply for the new Entitlement, permitting

16  them to include in their apps "a link to the developer's website that informs users of other ways to

17  purchase digital goods or services."  CX-0013 § 3.1.1(a).  The link must be "accompanied by language

18  and a button adhering to the requirements provided in the Apple Materials."  CX-0002 § 3.3.  There is

19  no cost or fee for including buttons, links, or other calls to action within an app.  If a user completes a

20  transaction within 7 days of tapping through a link within an iOS app, Apple collects a commission of

21  12% or 27% of the purchase price, depending on the size of the developer.  *Id.* §§ 1, 5.14.

22       Hours after Apple filed its Notice of Compliance, Epic's CEO Tim Sweeney publicly announced

23  Epic's intent to contest Apple's "bad-faith compliance."  Dkt. 916-9.  On January 30, 2024, Epic filed a

24  Notice of Non-Compliance.  Dkt. 883.  On March 13, 2024, Epic filed a motion to enforce the Injunction

25  and to hold Apple in civil contempt.  Dkt. 897.  Acknowledging that the Injunction did not "explicitly

26  prohibit" Apple's new Entitlement framework, Epic contended that Apple's conduct was contrary to the

27  "purpose" and "spirit" of the Injunction.  *Id.* at 17–18.  Epic did not seek any discovery.

28

On April 23, 2024, this Court set an evidentiary hearing on Epic's motion. Dkt. 925. The Court did not find that Apple had violated any specific command in the Injunction. Rather, the Court found that Epic had made a preliminary showing that, "viewed holistically, Apple's practice changes undermine the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice." *Id.* at 3.

The initial phase of the hearing took place over six days in May 2024. Epic called four Apple witnesses, and cross-examined them before Apple examined them: Matt Fischer (then-Vice President of the Worldwide App Store), Alex Roman (Vice President of Finance), Carson Oliver (Senior Director of Business Management for the App Store), and Phil Schiller (Apple Fellow). TT 11:18–12:1 (Fischer), 267:21–23 (Roman), 437:4–438:12 (Oliver), 669:17–671:9 (Schiller). After all the witnesses had testified, and even though Epic had not requested any discovery, the Court directed Apple to produce "*all* Apple's documents relative to the decision-making process leading to the link entitlement program and associated commission rates." Dkt. 974 (emphasis added). The evidentiary hearing was adjourned until those materials had been collected, reviewed, and produced. Dkt. 985, 996. In the interim months, Apple was not permitted to discuss the case, the newly produced documents, or any historical decision making with any of the four testifying witnesses, including its corporate representative. TT 668:24–669:14 (Oliver), 710:2–6 (Schiller).

Apple collected documents from 52 custodians and applied expansive search terms proposed by Epic, resulting in a total review population of approximately 1.3 million documents. Dkt. 1198-1 ¶ 36. Apple completed substantial production by the deadline of September 30, 2024. *Id.* ¶ 62. In October 2024, Epic sent Apple a letter raising objections to certain privilege assertions Apple had made in its privilege logs served in June. Dkt. 1198-1 ¶¶ 63–64. After this Court affirmed Judge Hixson's ruling rejecting many of the privilege assertions in 11 exemplar documents, Dkt. 1095; *see also* Dkt. 1056, Epic demanded that Apple re-review all documents over which it had asserted privilege and submit those documents to independent Special Masters. Dkt. 1092, at 2. Apple did so by January 17, 2025. *See* Dkt. 1198-1 ¶ 81. Apple has consistently maintained its privilege objections. The Special Masters have upheld Apple's privilege assertions at a rate of approximately 92%. Apple also downgraded a number

1  of documents over which it had previously asserted privilege, in part based on the Court's intervening

2  discovery orders, and produced those to Epic by January 21, 2025.  *See* Dkt. 1198-1 ¶¶ 77, 84.

3       The evidentiary hearing resumed on February 24, 2025 and lasted through February 26, 2025.

4  Dkt. 1071.  Epic re-called Mr. Schiller and Mr. Oliver, as well as three additional witnesses from Apple:

5  Rafael Onak (a User Experience writer), Kunal Vij (a Senior Manager of Finance), and Marni Goldberg

6  (a Corporate Communications Director).  Epic requested the attendance of these additional witnesses

7  just 10 days before the hearing resumed.  Dkt. 1241.  Once again, Epic cross-examined Apple's witnesses

8  before Apple examined them.  At the hearing, Epic introduced approximately 30 exhibits that were pro-

9  duced during the privilege re-review.  *See* Dkt. 1287.

10       As requested by the Court, TT 1914:2–14, a summary chronology of Apple's injunction compli-

11  ance efforts, focusing on significant meeting and events, follows:

| Date | Event | Citation |
|---|---|---|
| September 2021 | Apple begins work to respond to and comply with Injunction (Project Michigan). | TT 1138:22–25 (Schiller) |
| December 8, 2021 | Ninth Circuit grants stay pending appeal, and Injunction compliance is temporarily paused. | CX-0486.1; C.A. Dkt. 27 |
| April 24, 2023 | Ninth Circuit affirms judgment in relevant part but mandate does not yet issue. | C.A. Dkts. 215, 222 |
| April 2023 | Apple reengages work to comply with Injunction (Project Wisconsin). | TT 1295:5–25 (Schiller) |
| May 18, 2023 | Cross-functional team meets to discuss proposals for complying with Injunction. | CX-0488; CX-0272; TT 1433:13–1433:15 (Oliver) |
| May 25, 2023 | Cross-functional team meets to discuss design elements, including system disclosure sheet. | CX-0490; TT 1258:8–1259:6 (Schiller) |
| June 1, 2023 | Cross-functional team meets to discuss proposals for complying with Injunction. | CX-0485; CX-1104; CX-0859; TT 1168:11–1169:3 (Schiller) |
| June 20, 2023 | Cross-functional team meets to further discuss proposals for complying with Injunction. | CX-0223; CX-0224; CX-0489; TT 1173:10–24 (Schiller) |

APPLE'S POST-HEARING BRIEF                6                CASE NO. 4:20-CV-05640-YGR

| Date | Event | Citation |
|------|-------|----------|
| June 28, 2023 | Cross-functional team meets to further discuss proposals for complying with Injunction. | CX-0291; CX-0532; TT 1227:24–1229:2, 1267:15–23 (Schiller) |
| July 5, 2023 | Price Committee makes preliminary decisions regarding pricing and other requirements. | CX-0227; TT 1245:1–1246:1, 1254:5–18 (Schiller) |
| July 17, 2023 | Ninth Circuit issues stay of the mandate. | C.A. Dkt. 250 |
| January 11, 2024 | Price Committee meets to discuss pricing and other requirements. | TT 679:20–23 (Schiller) |
| January 16, 2024 | Supreme Court denies certiorari, ending stay. | 144 S. Ct. 681 & 682 (2024) |
| January 16, 2024 | Price Committee approves final compliance structure. | CX-0009A at 3; TT 1257:9–15 (Schiller) |

## LEGAL STANDARD

Civil contempt is a "severe remedy" that is unavailable where there is "*fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Taggart*, 587 U.S. at 561 (emphasis in original and quotation marks omitted). Epic had the burden of proving, by clear and convincing evidence, that (1) Apple violated "a specific and definite" order; (2) the violation was "beyond substantial compliance"; and (3) its conduct was not "based on a good faith and reasonable interpretation" of the order. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). The "standard is generally an objective one," asking whether there is "no objectively reasonable basis for concluding that the [defendant's] conduct might be lawful." *Taggart*, 587 U.S. at 560–61.

"Every order granting an injunction … must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). The operative terms of an injunction must appear "'within its four corners,' and not by reference to the court's purpose or the purpose of the party seeking to hold the other in contempt." *Gates v. Shinn,* 98 F.3d 463, 468 (9th Cir.

1   1996); *see Town of Islip v. E. Air Lines, Inc.*, 793 F.2d 79, 83 (2d Cir. 1986).  "[T]he specificity provi-

2   sions of Rule 65(d) are no mere technical requirements"; "basic fairness requires that those enjoined

3   receive explicit notice of precisely what conduct is outlawed."  *Schmidt v. Lessard*, 414 U.S. 473, 476

4   (1974).  The recipient "should not be left guessing as to what conduct is enjoined."  *Reno Air Racing*

5   *Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1134 (9th Cir. 2006).  "[A]ll ambiguities are resolved in favor of

6   the person subject to the injunction."  *Clark v. Coye*, 60 F.3d 600, 604 (9th Cir. 1995) (citation omitted).

7                                          **ARGUMENT**

8        As explained below, (I) Apple complied with the Injunction by eliminating the categorical pro-

9   hibitions on steering from its Guidelines; (II) Epic did not carry its burden of proving non-compliance

10  by clear and convincing evidence; and (III) if the Court were to find non-compliance, any remedy must

11  be both circumscribed and prospective.  Those points are all subject to two threshold considerations:

12       *First*, Apple's pending Rule 60(b) motion (Dkt. 1018) must be decided before Epic's motion to

13  enforce, because granting the former would render the latter moot.  "[T]he right to remedial relief falls

14  with an injunction which events prove was erroneously issued."  *United States v. United Mine Workers*

15  *of Am. ("UMWA")*, 330 U.S. 258, 295 (1947); *see also Horne v. Flores*, 557 U.S. 433, 448 (2009);

16  *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 431–32 (1855).  Because prospective

17  enforcement of the Injunction is now inequitable, this Court should vacate the Injunction and terminate

18  these proceedings.

19       *Second*, the orders requiring Apple to produce privileged documents, and Epic's use of those

20  documents at the resumed evidentiary hearing, are improper and cannot support contempt.  The entire

21  injunction compliance process was a legal project with business inputs, TT 1275:21:1276:4 (Schiller),

22  and many documents associated with that project—including the interim presentation decks—are privi-

23  leged and not discoverable.  The Court required Apple to show that legal advice was "*the* primary pur-

24  pose" of the documents, and demanded that the privilege claim be apparent on the face of each document.

25  Dkt. 1095, at 2 (emphasis added).   The Court granted Apple a standing objection to Epic's use of "Dis-

26  puted Documents" over which Apple maintains privilege.  TT 1129:25–1130:5; *see also* Dkt. 1198, at

27  4.  Fourteen of the documents Epic introduced are in this category.  CX-0223, CX-0224, CX-0225, CX-

28  0272, CX-0274, CX-0477, CX-0478, CX-0479, CX-0520, CX-0529, CX-0540, CX-0859, CX-1104, and

APPLE'S POST-HEARING BRIEF            8            CASE NO. 4:20-CV-05640-YGR

CX-1208.  Apple contends they are privileged under the Ninth Circuit standard, *see In re Grand Jury*, 23 F.4th 1088, 1094–95 (9th Cir. 2021), and preserves the argument that the "primary purpose" standard should be abandoned or modified, *see In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759–60 (D.C. Cir. 2014).

## I.    APPLE COMPLIED WITH THE INJUNCTION

Compliance with an injunction is primarily an "objective" inquiry. *Taggart*, 587 U.S. at 561.  At most, a party's subjective good or bad faith "may help to determine an appropriate sanction" for any non-compliance, *id.* at 562, but it cannot form the basis for a finding of contempt in the first place.  A party cannot be held in contempt "where there is [a] fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* at 561.

In response to the Injunction, Apple adopted rules that expressly allow developers to include buttons, links, and calls to action within their apps.  The primary source materials Apple submitted with its Notice of Compliance (the new Guideline, Entitlement, and Apple Materials) establish that point, and Epic has introduced no contrary evidence.  The evidentiary record confirms that the new framework complies with the Injunction and, at a minimum, that Apple reasonably concluded that its framework complies after working at all times toward compliance with—not defiance or disregard of—the Injunction.  TT 1292:16–23 (Schiller).  There is a robust record of meetings, presentations, analyses, and workstreams in which Apple developed and refined numerous options for compliance.  TT 444:4–12, 452:7–17 (Oliver); 802:4–8 (Schiller).  Apple's business teams worked hand-in-glove with in-house and outside counsel throughout the exercise, because Apple directed its entire compliance project toward finding and choosing a solution to a *legal* problem (*i.e.*, the prohibition the Injunction imposed).  TT 785:17–20, 1275:11–20 (Schiller).  The final Price Committee deck—the formal corporate approval mechanism for the compliance framework—includes the full text of the Injunction.  CX-0009A, at 3.  Apple reasonably concluded that this framework complied with the Injunction in the context of the

Court's contemporaneous orders.  TT 1280:1–17, 1282:1–12 (Schiller).[1]

### A.  Apple followed an objectively reasonable process to reach an objectively reasonable conclusion

**1.**  As Mr. Schiller explained, Apple "began immediately working on a compliance plan in 2021 . . . understanding the ruling, reading it, discussing it with legal counsel to understand what it means. We began having conversations in '21 working up through '23. . . We added people throughout the process to work on [] compliance in a cross-functional way across teams at Apple, eventually culminating in the final plan and implementation."  TT 1274:25–1275:10 (Schiller); *see also* TT 174:4–7 (Fischer); 303:24–304:3 (Roman); 444:17–19 (Oliver).  Extensive evidence showed that Apple engaged numerous people, inside and outside the company, considered many options, and expended significant resources to develop a solution that met the Injunction's terms and purpose while safeguarding user security and privacy, protecting IAP, and providing Apple a return for the extensive services Apple provides to developers.  Over a period of several years, Apple spent thousands of hours working toward a solution that balanced the interests of consumers, developers, and the platform itself.

*First*, the technical requirements were the result of a cross-functional team's effort to develop and implement measures to help consumers make informed decisions and protect them from fraud and scams by developers while still preserving the iOS ecosystem and experience.  TT 803:23–804:6, 805:9–16, 813:6–14, 829:15–830:5, 830:10–25 (Schiller).  For example, Apple decided to require developers to use the "Plain Button" style—which predates the Entitlement and in fact predates iOS—to make it clear to users they were being presented with a web link and not an alternative in-app purchase mechanism.  TT 840:13–24, 1286:20–1288:13 (Schiller); *see also* CX-1103.  Additionally, Apple decided to require developers to interpose a system disclosure sheet, and drafted the language, in order to objectively "explain[] to the user that they'll be leaving the app and going to an external website to make a purchase through a source other than Apple."  CX-0003; *see also* TT 46:5–12 (Fischer).  This Court found that, under IAP, "[c]onsumers do not understand that developers have effectively no control over

---

[1] The injunction compliance framework is a duly authorized act of Apple, the corporation, and Epic has sought sanctions only against Apple and not any individual officer or employee.  This Court, likewise, has indicated only that "*Apple's* practice changes" warrant further scrutiny, Dkt. 925, at 3 (emphasis added), and has put no individual on notice.  This submission therefore focuses exclusively on Apple.

payment issues and even access to consumers' information. Consequently, it can be frustrating for both sides when issues arise relating to the inability to issue and manage the legitimacy of requests for re-funds." Rule 52 Order at 40. That is the precise issue Apple seeks to address, but in the other direction. Finally, Apple's system disclosure sheet is consistent with industry practice. The Federal Trade Com-mission, for example, surfaces a similar system disclosure sheet whenever a visitor to its website clicks on a link to a social media website. CX-1001.003; *see also* TT 853:7–854:13 (Schiller).

The requirements were also the result of Apple's desire to design a framework that was scalable, that is, able to be applied across all types of developers without having to create individual rules and exceptions. TT 137:7–17 (Fischer). For example, regarding the template requirement, Apple determined that, by using a "defined set of examples," the App Review process "has a better chance of being able to check them all" and ensure that developers are communicating truthfully to users. TT 834:21–835:2 (Schiller). Likewise, the link requirements allow Apple to check the destination URL against the actual landing page to ensure they sync up and removes the potential for friction that may arise if a redirect does not work or a user is otherwise not directed to the desired destination. TT 825:1–3, 827:14–22 (Schiller). These requirements do not limit a developer's ability to direct a user to a customized webpage tailored to his individual interests or shopping habits. TT 827:10–13 (Schiller).

Finally, the link placement requirements preserve Apple's right to offer IAP as the exclusive in-app purchase mechanism, as well as a user's decision to use IAP. TT 859:9–861:19 (Schiller). Just as a store is not obliged to advertise its competitor's prices in the checkout aisle, the Injunction did not require Apple to allow developers to replace or displace IAP for in-app purchases. TT 861:7–19 (Schil-ler). As a matter of business judgment, Apple does not want to distribute a product (an iOS app) that discourages use of Apple's products or services, or creates consumer confusion about whether a pur-chasing option is an Apple system. TT 856:25–857:4 (Schiller). The Ninth Circuit recognized this right.

*Second*, Apple's decisions to impose a commission and the applicable rate and window were the result of an extensive process involving significant analysis, which began shortly after the Court issued its Injunction in 2021. TT 674:13–18, 681:6–25 (Schiller); TT 1400:8-1401:2 (Oliver). Apple's work accelerated in early to mid-2023, around the time of the Ninth Circuit's decision. TT 1142:2–19 (Schil-ler). Apple held discussions throughout 2023 among its executive team and the cross-functional team

regarding whether to charge a commission on linked transactions at all.  TT 471:2–18 (Oliver).  Apple considered charging no commission on linked transactions, TT 544:13–15 (Oliver), and there were some who raised questions about Apple charging a commission, TT 1294:19–1295:4 (Schiller).  Apple also considered alternatives to a commission structure.  TT 1400:8–11 (Oliver).  Ultimately, after rigorous analysis and discussion, Apple determined that access to Apple's intellectual property, services, userbase and platform justify a commission.  TT 543:20–544:24, 545:1–10, 1558:10–23 (Oliver).

Apple engaged an outside, independent firm (Analysis Group) to evaluate the value of services Apple provides to developers that choose to link out, including Apple's platform and app discovery services, and to explore commission rates and windows other platforms employ.  TT 550:8–551:16, 558:2–6 (Oliver); *see also* CX-0014.3.  Analysis Group's task was to determine how Apple could "fairly charge for the value that it provides to developers . . . while implementing a linkout to allow [users] to purchase from the web."  TT 550:5–11 (Oliver).  To answer that, Analysis Group produced a detailed slide deck setting forth its conclusions and analyses.  CX-0014; CX-0015; *see also* TT 441:7–9 (Oliver). Analysis Group estimated the cost to developers of the various services Apple provides through its plat-form, and concluded that (1) Apple's platform technology is worth up to ~30% of developer revenue (depending on the other services offered), (2) Apple's developer tools and services are worth ~3–16%, (3) Apple's distribution services are worth ~4%–14%, and (4) Apple's discovery services are worth ~5%–14%.  CX-0014.7.  Analysis Group also assessed different frameworks for assessing a fee on linked transactions, *i.e.*, "how to charge a commission or fee for a purchase that happens after the user clicks a link that goes out of the app," CX-0014.39, identified affiliate programs and developer ad campaigns as benchmarks for situations where a fee is paid for referrals, and observed that tracking windows in such programs range from 24 hours to 90 days after a user taps on a link.  TT 589:8–13, 591:25–592:1, 596:12–16 (Oliver); CX-0014.39; CX-0014.40; CX-0014.41.

After considering a wide range of rates, Apple's finance and business teams narrowed the com-mission percentage to between 20% and 30% based on Analysis Group's benchmarking data, TT 282:21–283:2 (Roman), before recommending a commission at the higher end of the range given Ap-ple's unique services (including user trust, safety, and privacy) and demand generation.  TT 559:18–25

1  (Oliver); *see also* Dkt. 916-5.  Apple's finance and business teams recommended selecting a 7-day win-

2  dow for a commission, relying on data showing that the effective commission rate remained relatively

3  stable at 18% for windows of 24 hours, 72 hours, and 7 days, but jumped materially if the window was

4  extended to 30 days.  TT 608:4–18 (Oliver); *see also* TT 623:3–15 (Oliver).  These teams projected that

5  the Entitlement would make transactions less expensive for developers overall and that Apple would

6  lose hundreds of millions of dollars in revenue after a ramp up period.  TT 624:2–15 (Oliver); TT 365:5–

7  366:25 (Roman); CX-0009.13.  The teams based those projections on data regarding past developer and

8  user behavior, including developers' success at using direct marketing to divert game and subscription

9  transactions outside the App Store; while not perfect, the projections represented Apple's best effort at

10  predicting developer behavior in response to the new Entitlement.  TT 761:20–23 (Schiller); 1570:2–16,

11  1578:10–1582:5, 1590:2–1591:24 (Oliver); 1687:13–19 (Vij); *see also* CX-1303; CX-1304; CX-

12  0054.39.

13          Apple convened a Price Committee to make a final decision—based on the recommendations of

14  the working group, as well as the Analysis Group report—on how much to charge for a commission and

15  what the framework should be.  TT 209:16–211:14, 442:11–16 (Oliver).  The final decision-makers were

16  Tim Cook (Apple's Chief Executive Officer), Luca Maestri (Apple's Chief Financial Officer), and Mr.

17  Schiller.  TT 198:20–24 (Roman).  Apple employees across the various relevant segments contributed

18  collectively hundreds of hours to the financial analysis and assumptions presented within the deck pre-

19  sented to the Price Committee.  TT 304:4–8, 305:4 (Roman); 501:17–502:3 (Oliver); 1749:1–3 (Vij).

20  As Apple's authorized decision-maker, the Price Committee concluded that a 12%/27% commission

21  structure with a 7-day window was an appropriate amount to charge developers for use of Apple's plat-

22  form, tools, and services while providing a discount to IAP that would incentivize developers to adopt

23  the Entitlement.  TT 622:25–623:15 (Oliver).

24          **2.**  The testimonial and documentary record makes clear that Apple reasonably concluded that its

25  framework complied with the Injunction.  During the first phase of the evidentiary hearing, each of Ap-

26  ple's witnesses testified that Apple's framework complies and testified about the specific steps Apple

27  took to comply within their respective area of responsibility.  Mr. Fischer explained that Apple "deleted

28  [its] [prior] guideline and created a new guideline to specifically address the injunction."  TT 144:11–16

---

(Fischer); *see also* TT 143:7–144:10 (demonstrative containing side-by-side comparison). Mr. Roman explained that his financial modeling team spent "several months" and ran "thousands of calculations [to] support" the new framework while accounting for "assumptions and [] projections . . . to determine that developers would be incentivized to proceed with [] linkout entitlements." TT 303:24–304:3, 306:15–17 (Roman). Mr. Oliver explained how Apple "incorporated the data points provide by [Analysis Group] and their bottoms-up value comparables analysis" to reflect the "costs of replacement for developers of the . . . value that Apple provides to developers." TT 602:25–603:4 (Oliver); *see also* CX-0009A. And Mr. Schiller explained that Apple's technical requirements were "created to help ensure the developer makes a link that's safe and easy for the user to use" while protecting "the integrity of the app experience." TT 820:19–22 (Schiller).

At the conclusion of the first phase, Epic had not carried its burden of proving that Apple violated the Injunction, and Epic did not seek any discovery in connection with its motion. TT 924:1–7. Rather than simply denying the motion, this Court ordered Apple to produce "all" documents related to injunction compliance. Dkt. 974. Apple reviewed 1.3 million documents, producing more than 100,000 documents to Epic (of which Epic only introduced 49 at the resumed evidentiary hearing). As the Court explained, the aim of the resumed evidentiary hearing was to determine whether these documents were consistent with the prior testimony of Apple's witnesses. Dkt. 1050, at 4 ("Look, your folks came in here and they told me how and why they did what they did, and I expect, from your perspective, the documents will be consistent with that testimony.").

The resumed evidentiary hearing made clear that the testimony of Apple's witnesses was consistent with and supported by the documentary record—further establishing the objective reasonableness of Apple's process and conclusions. Epic recalled only two witnesses: Mr. Oliver and Mr. Schiller. Dkt. 1235. Just as they had previously testified, the relevant documents included or referenced multiple analyses and meeting decks that established that Apple took numerous steps to comply with the Injunction. *See, e.g.*, CX-0009A; CX-0014; CX-224; *see also* TT 1274:23–1275:10 (Schiller). The evidence also showed that Apple affirmatively considered the Injunction, the Court's Rule 52 Order, and even the "spirit" of the decision while considering the available compliance options. *See, e.g.*, TT 870:11– 874:3 (Schiller); CX-0013; CX-1104. This was a compliance program.

Epic repeatedly challenged the witnesses on whether various aspects of the new framework were consistent with the Injunction. Each of Apple's witnesses pushed back and testified that Apple had complied with the Injunction:

- "**Q.** And so this slide is telling Mr. Cook in no uncertain terms that the 27 percent will avoid financial risk but will frustrate the goal of the injunction, correct? **A.** That's not true." TT 1538:17–23 (Oliver).

- "**Q.** All right. But you had concerns about doing it and effectively got overruled or outvoted by others? **A.** No, I wouldn't describe it that way." TT 1203:4–6 (Schiller).

- "**Q.** And the idea was that you were trying to choose words that would deter users from proceeding, right? **A.** That's incorrect." TT 1340:19–20 (Onak).

- "**Q.** So links can compete with IAP as long as they do it with both hands strapped behind their back. **A.** I do not agree." TT 1685:21–23 (Vij).

- "**Q.** So what this is communicating is that the injunction didn't spell out the contours of exactly how Apple had to comply with it, right? **A.** This is communicating that the injunction compliance followed what was contained in the injunction itself." TT 1850:12–17 (Goldberg).

Not a single Apple witness testified that the new framework is non-compliant, and no document establishes non-compliance. Epic's *arguments* are refuted by the *evidence*.

Mr. Schiller, Mr. Oliver, and the rest of Apple's witnesses candidly explained the injunction compliance process. Apple spent months grappling with how best to comply with the Injunction from a legal-business perspective. Mr. Oliver explained how Apple "debated [options]" but ultimately "believed . . . [they] were going to be in compliance with the injunction." *See* TT 1531:23–25 (Oliver). Mr. Schiller testified to similar effect. TT 1274:23–1275:10, 1295:5–1296:6 (Schiller). The only conclusion to be drawn from this record is that Apple followed an objectively reasonable process and reached an objectively reasonable conclusion. Epic's motion must be denied.

### B. Apple no longer prohibits developers from including buttons, external links, or other calls to action

The Court enjoined Apple from "prohibiting developers from … including in their apps and their metadata buttons, external links, or other calls to action" directing customers to out-of-app purchasing

mechanisms. Dkt. 813 ¶ 1. To "prohibit" primarily means "to forbid by authority or command." Webster's Third New International Dictionary (2002); *see also Prohibit*, New Oxford American Dictionary (2001); *Prohibit*, American Heritage Dictionary (5th ed. 2011). It secondarily means to "prevent" or "make impossible." *Prohibit*, Webster's Third; *see also Prohibit*, New Oxford American Dictionary; *Prohibit*, American Heritage Dictionary. The Injunction's prohibitory command therefore is that Apple must not (1) forbid developers, by authority or rule, from including buttons, external links, or other calls to action to alternatives to IAP; or (2) prevent or otherwise make it impossible for developers to include such buttons, links, or other calls to action. The Injunction includes no other mandates or prohibitions and describes no other "act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).

Apple complied with the Injunction. Apple eliminated its prior categorical prohibition against in-app steering, former Guideline 3.1.1. The replacement Guideline expressly allows developers "to include a link to the developer's website that informs users of other ways to purchase digital goods or services," and "the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price." CX-0013 § 3.1.1(a). The Entitlement further provides that the link must be "accompanied by language and a button adhering to the requirements provided in the Apple Materials." CX-0002 § 3.3. Those materials provide templates for language to call the user to click the button and thereby activate the link. CX-0003.5 (*e.g.*, "To get XX% off, go to www.example.com"). Apple's new templates comprise a button, link, and a call to action. *See* TT 1286:10–12 (Schiller) (template includes a button, link, and a call to action, and thus would "have been rejected under any" of the three provisions of former Guideline 3.1.3); *see also id.* at 1286:14–16 (Schiller) (template is permitted under new Guideline 3.1.3 and Entitlement). Put simply, before the Injunction, developers could not include buttons, links, or other calls to action within their app. Now they can.

The rules that Apple developed to regulate such developer communication, such as Apple's accompaniment requirement, button rules, technical requirements, and the commission, comply with the Injunction because they do not prohibit developers from engaging in such communications. Rather, each of those rules allow developers to include such content, subject to rules and regulations that developers can readily follow, without any significant added cost or burden.

The Supreme Court recently juxtaposed prohibitions with regulations, explaining that "regulating" something—"fix[ing] the time, amount, degree, or rate of an activity according to rule"—does not "prohibit" it. *Ysleta Del Sur Pueblo*, 596 U.S. at 697 (cleaned up); *see also California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 209 (1987) (cleaned up) (a law does not "prohibit" conduct if it "generally permits the conduct at issue, subject to regulation"). The Court explained that, unlike a prohibition, "to *regulate* something is usually understood to mean to 'fix the time, amount, degree, or rate' of an activity 'according to rule[s].'  Frequently, then, the two words are 'not synonymous.'" *Ysleta Del Sur Pueblo*, 596 U.S. at 687 (citations omitted) (quoting dictionary definitions). The Ninth Circuit has long recognized the same point, upholding regulations as not "prohibiting" or even "effectively prohibiting" the underlying communications or conduct.  For example, in *Sprint Technology PCS, L.P. v. County of San Diego*, the court held that the Telecommunications Act of 1996, which preempts local laws that "prohibit" or "have the effect of prohibiting" the provision of telecommunications services, did not preempt a local ordinance that "impose[d] restrictions and permit requirements on the construction and location of wireless telecommunications facilities." 543 F.3d 571, 573–74 (9th Cir. 2008) (en banc). The Ninth Circuit explained that conduct that "'creates a substantial … barrier' to the provision of services" is not an "actual or effective prohibition." *Id.* at 577–78 (cleaned up); *see also S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1139 (9th Cir. 2004). And this same distinction—between prohibitions versus rules that allow subject to regulation—applies between private parties as well.  *See Prune-Yard Shopping Ctr. v. Robins*, 447 U.S. 74, 83–84 (1980) (private mall owner that is barred from prohibiting certain speech on mall property can still establish rules for engaging in such speech).

Apple's rules and commission on linked transactions do not prohibit developers from including buttons, links, or other calls to action.  Apple expressly allows such communications, subject to rules and a commission that the Injunction does not address and that the Court has never adjudicated.  Developers can readily comply with those rules: the application for the Entitlement is short, applying is free, and approval is automatic and has never been denied.  TT 33:5–7 (Fischer).  Including links in an app is similarly easy and free: there is no change for including links and the requirements do not make including the links any more difficult or burdensome.  TT 808:8–9 (Schiller). There is accordingly no prohibition in name *or* effect—developers can now include buttons, links, and calls to action.  Apple has complied.

1    Epic has suggested that Apple set the commission and the related requirements to discourage

2    developer adoption and minimize the financial impact on Apple. *See, e.g.*, TT 1221:8–9 (Schiller);

3    1664:21–25 (Vij); 1790:3–4 (Goldberg). But the Injunction does not require Apple to ignore the finan-

4    cial consequences of available compliance mechanisms. To the contrary, it is legitimate for a business

5    to "promote the value of the corporation for the benefit of its stockholders" when choosing among legally

6    available options for compliance. *E.g.*, *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 34 (Del.

7    Ch. 2010). Apple adopted a framework that has a lower commission on linked transactions, and, at the

8    time of final approval by the Price Committee, Apple projected that the new Entitlement would result in

9    hundreds of millions of dollars of lost revenue annually. TT 365:5–366:25 (Roman); CX-0009.13. That

10   projection depends on an assumption regarding developer adoption that has not yet been achieved, but

11   that is attributable at least in part to the very pendency of this proceeding. TT 366:21–25 (Roman).

12   Epic, which has the burden of proof by clear and convincing evidence, failed to prove why other

13   developers have not yet implemented the Entitlement. Indeed, Epic did not call as a witness any devel-

14   oper that had even applied for the Entitlement, much less a developer that was unable to comply with its

15   requirements. Evidence of third-party inactivity is insufficient to prove that Apple's new rules (whether

16   viewed in isolation or in combination) prohibit that activity. *See, e.g.*, *S. Hospitality, Inc. v. Zurich Am.*

17   *Ins.*, 393 F.3d 1137, 1140 (10th Cir. 2004). Nor can contempt turn on the independent decision-making

18   of third parties. *See Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 (9th Cir. 1983)

19   ("The power to impose coercive sanctions to compel obedience to an order in a civil contempt is limited

20   by the *individual's* ability to comply with the court's order.") (emphasis added). Epic also has no apps

21   on the App Store and therefore cannot benefit from the Injunction, which is reason enough to deny its

22   motion.

23   **C.    Context confirms that Apple's rules comply with the Injunction's plain terms**

24   The context of the Injunction confirms that Apple's rules comply with the Injunction. *See City*

25   *of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1984) (stating that a court's order "must be

26   discerned within its four corners," but that "a court may consider surrounding circumstances as aids in

27   construing" the order) (citation omitted). The Injunction tracks nearly verbatim Apple's previous Guide-

28   line 3.1.1, which effected a complete prohibition against in-app buttons, links, or other calls to action

APPLE'S POST-HEARING BRIEF                    18                    CASE NO. 4:20-cv-05640-YGR

directing users to purchase mechanisms other than IAP. Rule 52 Order at 31–32, 163–64. The Court emphasized that the Injunction was a "measured remedy" requiring Apple to "eliminate" its prior categorical anti-steering prohibitions. *Id.* at 179. And in the order denying Apple's motion to stay the Injunction, the Court stated that it "can envision numerous avenues for Apple to comply with the injunction and yet take steps to protect users," including by implementing "engineering or guidelines" similar to the "reader-rule, cross-play, and cross-wallet." Dkt. 830, at 3.

The Injunction does not address, one way or the other, Apple's ability to set more detailed terms and conditions for engaging in such steering communications and the contemporaneous Rule 52 Order indicates that Apple could adopt such requirements. Rule 52 Order at 142–43. Moreover, during the merits stage of this proceeding, Epic never sought an injunction prohibiting Apple's in-app steering— let alone an injunction addressing the technical requirements for how such communications could be made. *See* Dkt. 821 at 1. The Court in fact recognized there was a "less fulsome" record on the anti-steering provisions as compared to other aspects of the challenged rules. Rule 52 Order at 163. Judicial imposition of such detailed technical requirements would involve the very "micromanage[ment]" this Court has properly disavowed. *Id.* at 179. Doing so is especially inappropriate here, where "all ambiguities are resolved in favor of the person subject to the injunction." *Clark*, 60 F.3d at 604.

The context of the Court's and the Ninth Circuit's determinations about the lawfulness of Apple's requirement that developers use IAP for in-app purchase further supports Apple's conclusion. The Court indicated that Apple was entitled to charge a commission for access to the iOS platform and userbase. *See* Rule 52 Order at 150 ("Even in the absence of IAP, Apple could still charge a commission on developers."). It was objectively reasonable for Apple to conclude that a commission on linked transactions is not prohibited by the Injunction. TT 1274:23–1275:10, 1295:5–1296:6 (Schiller). And the Ninth Circuit held that Apple's app distribution and IAP requirements are "clearly lawful." *See Epic Games*, 67 F.4th at 998. That is, the requirement that developers pay Apple a commission in order to sell in-app goods as a condition of app distribution is a lawful form of competition. The Injunction does not require that Apple provide developers a way to circumvent that lawful business model and any associated commission. To now read into the Injunction unwritten limitations on the same thing—through technical requirements and/or a commission—would undermine Apple's victory on Epic's antitrust claims.

\*   \*   \*

Apple respects this Court's orders and has endeavored at all times to comply with them fully. The Apple witnesses with decision-making authority uniformly testified that they had read the Injunction. TT 12:21–23 (Fischer); 1273:1–2 (Schiller). Mr. Schiller read the entire 185-page Rule 52 order, as did Mr. Oliver. TT 1273:3–7, 1274:23–1275:10 (Schiller); TT 453:2–7 (Oliver). No witness with any level of authority testified that they disregarded or ignored the Injunction. No document even suggests as much. Instead, the record is replete with references to the Injunction, this Court's orders, and even its "spirit." To be sure, Apple recognized that Epic would likely challenge any compliance plan: As Epic's own counsel put it, "everyone knew that this … may need to go before a court." TT 1734:24–1734:25 (Vij). But the recognition of a likely challenge by an adversary does not suggest that Apple acted in defiance of the Injunction. The evidence establishes that Apple weighed a number of compliance options based on informed and careful analyses, with the Injunction front-and-center. Apple used a reasonable process to make a reasonable conclusion that it complied.

## II. EPIC FAILED TO PROVE NON-COMPLIANCE BY CLEAR AND CONVINCING EVIDENCE

Epic advances two sets of challenges to Apple's compliance framework. *First*, Epic contends that Apple did not comply with the plain text of the Injunction. While that is the proper mode of analysis, Epic's textual positions are simply incorrect. *Second*, Epic contends that Apple did not comply with the atextual "spirit" or "purpose" of the Injunction. But Apple fulfilled the purpose of the Injunction by eliminating the kinds of categorical prohibitions against steering that this Court found unlawful and enjoined. Such categorical restrictions are gone. In any event, Epic's argument also fails on the law because its contentions are unambiguously outside the text of the Injunction and therefore cannot support a finding of a violation, much less contempt.

### A. Epic's textual positions are wrong as a matter of fact and law

On the actual terms of the Injunction, Epic raises only three arguments. Epic asserts that Apple violated the Injunction's text by: (1) requiring that the link "be accompanied by language and a button"; (2) by requiring a "Plain Button" style; and (3) by requiring that some developers of subscription apps choose between participating in the Entitlement or the VPP/NPP programs. Each of them fails as a

matter of law and fact because none of these rules prohibit developers from including buttons, links, or other calls to action. Moreover, even if the Court were to agree with Epic on any or all of these, the proper way to address such issues is by modifying the injunction to clarify its scope, after which Apple could seek to restrike the appropriate balance on its platform.[2]

**1.** The "accompaniment" requirement does not prohibit developers from including buttons, links, or other calls to action; it allows developers to include all three items, subject to a requirement that they must appear together on the same screen at the same time. *See* CX-0013 § 3.1.1(a). A requirement that some speech or conduct must be accompanied by other speech or conduct is not a prohibition on the speech. For example, the Sixth Circuit upheld an agency rule that required the term "biodegradable" on a product label to be accompanied by a disclaimer. *See ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 615–16 (6th Cir. 2017). The court explained that the "restriction is not a prohibition on speech; it does not ban [manufacturers] from using the word 'biodegradable'" even if it prevented them from "speaking in a certain manner." *Id.* at 616; *cf. Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) (upholding rule that required minors to be accompanied by adults during inmate visits in order to protect minors' safety). So too for Apple's accompaniment rule: developers may include all three elements, subject to a requirement governing the time, place, and manner for including those elements.

Contrary to Epic's arguments, *see* Dkt. 897, at 20; Dkt. 923, at 8, the "accompaniment" requirement is fully consistent with the disjunctive "or" in the phrase "buttons, external links, *or* other calls to action." The disjunctive "or" does not require Apple to allow developers to mix and match these in-app actions. Rather, in ordinary English, the disjunctive command "'not A, B, *or* C' means 'not A, not B, *and* not C.'" Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 119 (2012); *see also United States v. Morales*, 122 F.4th 590, 596 (5th Cir. 2024) ("Simply put, a requirement that a defendant 'must not do *X* or *Y*' has the same results as a requirement that a defendant 'must not do *X* and must not do *Y*.'"). This Court has recognized as much. Dkt. 830, at 4 ("The Court … enjoined the prohibition to communicate external alternatives *and* to allow links to those external sites.") (emphasis added). The Injunction thus creates a checklist, forbidding Apple from prohibiting any of the listed

---

[2] Indeed, Epic previously argued that Apple had improperly excluded "multiplatform" apps from the Entitlement. *See* Dkt. 897, at 9–11. The evidence establishes that Apple does *not* exclude such apps, TT 114:5–24 (Fischer), and Apple published guidance to developers to confirm as much, CX-0031.

items. *See Morales*, 122 F.4th at 596. Apple has complied because it now permits developers to include all three things. *See* CX-002 § 3.3 (allowing developers to include a link "accompanied by language and a button.").

Apple's accompaniment requirement also does not change "or" to "and." Had the Injunction used "and" to bar Apple from prohibiting "buttons, links, *and* other calls to action," then Apple arguably would comply by allowing *only one* of the three elements (rather than allowing all three, as Apple currently does). *See Pulsifer v. United States*, 601 U.S. 124, 134–36 (2024) (discussing the possible "check-list" and "combination" readings of a prohibitory list separated by "and"). The word "other" is similarly inapposite: It requires that the call to action be "other" ("not the same: different") from the button and link. *See Other*, Webster's Third. Apple has complied because the accompanying language is different from the button and the external link. TT 1285:9–1286:16 (Schiller). The Injunction is a legal text, and principles of legal construction confirm that Apple has complied with its terms.

**2.** The requirement that the "button" appear in "Plain Button" style likewise complies because the "Plain Button" is a "button." The Injunction mirrors Apple's former Guideline 3.1.1, which prohibited developers from including certain "buttons." The term "button," as used by Apple, has a defined meaning that predates the Entitlement. Specifically, Apple's Human Interface Guidelines provide several different "buttons" for developers to use. CX-0016; TT 840:13–16 (Schiller). Mr. Schiller confirmed in his testimony that the "Plain Button" is a "button" as that term is used in Apple's developer materials, because "it can be clicked on and it will take an action." TT 1881:11–21 (Schiller); *see also* TT 1286:3–9 (Schiller). Indeed, Mr. Schiller agreed that, before the Injunction, if a developer had attempted to include a "Plain Button" directing a user to a non-IAP purchasing mechanism, Apple would have rejected that app for violating Guideline 3.1.1. TT 1285:5–1286:16 (Schiller). The Injunction's reference to a "button" thus plainly includes Apple's "Plain Button."

Epic offered no evidence to contradict Mr. Schiller's testimony that the "Plain Button" is a "button." Industry usage confirms that understanding. *See Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994) ("technical words" in a court's order "are interpreted as usually understood by persons in the profession or business to which they relate"). As that term is used in the context of software applications, a button is "[a]n area on a screen that when activated … causes an action to be initiated," and which "can

be any shape or size and need not be visible." *Button*, Oxford Dictionary of Computer Science (7th ed. 2016); *see Button*, American Heritage Dictionary ("[A] well-defined area within the interface that is clicked to select a command."). When a user presses the plain button—an area on the screen—it "acti-vate[s]" the link, causing "an action to be initiated" (i.e., opening the disclosure sheet linked to the de-veloper's website). This is the exact explanation Mr. Schiller gave at trial. The design features that Epic challenges thus do not mean that the "Plain Button" ceases to be a button. Apple's button rule complies.

    **3.** Epic suggested at the hearing that Apple is violating the Injunction by requiring developers of certain subscription apps to choose between participating in the News Partner Program ("NPP") or Video Partner Program ("VPP"), on one hand, and the Entitlement, on the other. TT 475:14–478:5 (Oliver). Not so. Apple permits *any* developer to include buttons, links, or other calls to action, subject to the limitation that developers cannot *also* participate in the NPP/VPP programs at the same time. Rules that two things must occur at different times do not prohibit either activity; they regulate the time and manner for engaging in those activities. *E.g.*, *Vlasak v. Super. Ct. of Cal. ex rel. County of Los Angeles*, 329 F.3d 683, 686 (9th Cir. 2003) (upholding rule against carrying oversized equipment while participating in a demonstration). Apple made the decision to require developers to choose between these programs based, as the contemporaneous evidence shows, on the special requirements developers must satisfy in order to receive the NPP and VPP discounts, including integration with Apple's commer-cial services such as IAP. TT 1593:8–1594:24 (Oliver); CX-1310.

    The Injunction does not address the NPP or VPP programs, much less require Apple to allow developers to extend those programs to developers at the same time they include external links. All participants in the VPP and NPP programs are subscription apps—yet the Rule 52 Order made clear that subscriptions are not part of this case and that the Court was not even addressing the separate steering provisions applicable to subscription apps. Rule 52 Order at 32 n.194, 33 n.198, 123. (Epic also is not a VPP/NPP participant, highlighting the problems in allowing Epic to litigate issues in which it has no cognizable interest.) Notably, the Injunction requires Apple to allow links "in addition to" IAP, but it does not impose a similar requirement that Apple must allow links "in addition to" the NPP and VPP programs. Dkt. 813 ¶ 1. The only plausible inference is that no such requirement exists. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018) ("The expression of one thing implies the exclusion of

1    others (*expressio unius est exclusio alterius*)" (citation omitted)).

2    **B. Epic's atextual "spirit" arguments are both factually flawed and legally irrelevant**

3    Epic failed to prove that (1) the technical requirements or (2) the commission structure contra-

4    vene the "spirit" of the Injunction; and in any event, (3) Epic's invocation of an atextual "spirit" cannot

5    support contempt liability or sanctions.

6    **1. Epic did not prove that the technical requirements violate the Injunction**

7    Epic has focused much of its attention on certain technical requirements that Apple imposes on

8    external links, including where in the app they can (and cannot) be located, as well as the system disclo-

9    sure sheet surfaced after a user taps an external purchase link. Epic has *conceded* that "the Court did not

10    explicitly prohibit" these requirements, but nonetheless argues that they violate the "spirit" or "purpose"

11    of the Injunction. *See* Dkt. 897, at 18. That concession is all but dispositive, because contempt is avail-

12    able only if a party has violated the clear and definite terms of the Injunction. *See* Fed. R. Civ. P. 65(d);

13    *see also Taggart*, 587 U.S. at 560–61. If the Court were to conclude that Apple's new rules do not

14    comport with the "spirit" of the Injunction, the only remedy would be a new (or modified) injunction;

15    Apple cannot be found in contempt of the extant Injunction or sanctioned as a result.

16    As set forth above, Apple's technical requirements comply because they do not "prohibit[] de-

17    velopers from … including in their apps and their metadata buttons, external links, or other calls to

18    action." Dkt. 813 ¶ 1. Each of Apple's rules allows developers to engage in such in-app steering, subject

19    to rules that are clear, easy to follow, and impose little to no additional cost on the developer. None of

20    these regulations prohibits—or even make it hard for developers to include—the in-app communications

21    described in the Injunction.

22    Epic complains that the requirements are less attractive for large developers, but Epic ignores the

23    many benefits to other developers and consumers. Determining the technical and design requirements

24    for a feature or function for the App Store is an obligation of the platform operator, balancing the interests

25    of participants on both sides of the two-sided platform. *See* Rule 52 Order at 127; *see also Ohio v. Am.*

26    *Express Co.*, 585 U.S. 529, 546–47 (2018). Apple cannot consider the interests of only (large) develop-

27    ers; it also endeavors to protect, to the extent possible, user security and privacy. TT 829:15–21;

28    1283:13–16 (Schiller). The Injunction does not address such decisions, which were never examined or

adjudicated as unlawful by this Court in the merits proceeding.

**a**. Epic asserts there is not adequate "justification" for Apple's technical requirements. Dkt. 897, at 16. But as set forth above, after a careful and thorough process, Apple determined that each technical requirement was justified by legitimate concerns about user safety, avoiding consumer confusion, and protecting the iOS ecosystem—all of which are recognized as legitimate in this Court's Rule 52 Order. *Supra* pp. 13–15. The Injunction does not prohibit Apple from imposing such requirements. Moreover, Rule 65(d)'s specificity requirement would bar any requirement that Apple affirmatively create "mechanisms to *competitively constrain*" Apple's IAP commission. Dkt. 897, at 17 (emphasis added). "The practical effect of such a vague standard" would be that Apple's policies would improperly "remain under the continuing and largely unfettered supervision of the district court." *Gates*, 98 F.3d at 471. For example, the Ninth Circuit has held that an injunction requiring a prison to set an "appropriate level of psychiatric evaluation and treatment" could not be invoked as the basis for contempt. *Id.* at 465, 471–72; *see also United States v. Google LLC*, 747 F. Supp. 3d 1, 183 (D.D.C. Aug. 5, 2024) (observing that any standard seeking to regulate "otherwise rational business conduct" would be "highly subjective"). The Supreme Court has likewise cautioned federal courts against becoming "central planners," responsible for setting a party's "terms of dealing" with others. *Verizon Commc'ns Inc. v. L. Offs. Of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Courts construe injunctions to "preserve [their] validity," a maxim that Epic's expansive interpretation contravenes. *DAS*, 18 F.4th at 1042.

That principle also forecloses Epic's arguments that the Injunction precludes Apple from surfacing a system disclosure sheet or preventing developers from placing steering content within the IAP payment flow. Those arguments are not only divorced from the text but also, if accepted, would violate the First Amendment—which "offers protection when an entity engaging in expressive activity … is directed to accommodate messages it would prefer to exclude." *Moody v. Netchoice, LLC*, 603 U.S. 707, 731 (2024). Forcing Apple "to carry speech with which it disagree[s]" would thus "alter its own message," triggering First Amendment scrutiny. *Id.* at 729 (quoting *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 13–14 (1986) ("*PG&E*")). An injunction burdening speech before "an adequate determination that it is unprotected by the First Amendment" constitutes a presumptively unconstitutional prior restraint. *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1071, 1084 (C.D. Cal. 2003)

(quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973)).

The system disclosure sheet contains truthful and non-misleading information that informs users about commercial services they will not obtain if they leave Apple's platform for a third-party website. TT 1289:7–23 (Schiller). Epic's suggestion that the system disclosure sheet is misleading is simply wrong—every sentence is objectively truthful, and none suggests anything about the developer's alternative purchase mechanisms other than the fact that *Apple* is not responsible for the privacy or security of those mechanisms. TT 52:2–7 (Fischer); TT 1266:13–18 (Schiller); TT 1367:9–12 (Onak).[3] But even were it the case that the system disclosure sheet might "scare" users, Apple is permitted to advise users (or even *advocate* to users) on *its own platform* about the shortcomings or risks of competitor products. *See New.Net*, 356 F. Supp. 2d. at 1084 (refusing to enjoin the defendant from displaying a warning about the dangers of the plaintiff's software). The Injunction does not prohibit Apple from speaking to users on its own platform, nor could it.

Similarly, requiring Apple to host third-party speech inside the IAP payment flow, directing users to external purchase options, would not survive even intermediate scrutiny. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024) (intermediate scrutiny ordinarily applies to commercial speech). Requiring Apple to host such directly competitive messaging at the point of sale cannot be justified on the ground that this would "better balance[] the marketplace of ideas," because that is true of any compelled speech promoting competitor products. *Moody*, 603 U.S. at 732. Indeed, the Ninth Circuit has already held that Apple's tie between app distribution and IAP is "clearly lawful." *See Epic Games*, 67 F.4th at 998. Moreover, developers already have ample less-restrictive opportunities to inform consumers about alternatives to IAP, including in their apps outside of the IAP payment flow, "without burdening [Apple] with unwanted speech" inside its own checkout aisle. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 585 U.S. 755, 775 (2018). Requiring Apple to host competitor speech in the IAP buy-flow would be analogous to *PG&E*, where the Supreme Court held unconstitutional an order requiring a utility to include a third party's newsletter containing "hostile views" in the

---

[3] During the evidentiary hearing, Epic showed three instances in which lower-level employees working on the system disclosure sheet used the word "scary" or its variants to describe a particular word or aspect of the proposed sheet. In two out of those three instances, Apple did not adopt the purportedly "scary" language. TT 1375:16–18, 1378:14–17 (Onak).

1  company's billing statements. *PG&E*, 475 U.S. at 13–14. Apple similarly cannot be compelled to pro-
2  mote its competitors' products. *See NIFLA*, 585 U.S. at 767; *PG&E*, 475 U.S. at 13–14. That is partic-
3  ularly so because this Court (and the Ninth Circuit) previously sustained Apple's IAP requirement
4  against Epic's challenge.

5  **b**. Epic's arguments about so-called transaction "friction" for users to complete a linked trans-
6  action do not establish contempt. The evidence showed, at most, users might need to take several addi-
7  tional steps between pressing a link and completing a transaction, such as pressing "continue" on the
8  disclosure sheet and potentially logging into the developer's website if account information is not already
9  saved. *E.g.*, TT 58:17–24 (Fischer); TT 814:11–25 (Schiller). The evidence showed that Apple found
10  each of those steps to be amply justified by concerns about avoiding consumer confusion and protecting
11  against social engineering and other user-safety risks. *Supra* pp. 12–13. The Injunction did not bar
12  Apple from making those determinations.

13  In any event, Epic's arguments about transaction friction fail as a matter of law. In the words of
14  Epic's counsel, "friction" is "the phenomenon that increasing the number of steps in a flow … increases
15  the likelihood that users will become frustrated and give up." TT 70:25–71:4 (Fischer). Every transac-
16  tion involves some friction—a transactional cost beyond the value of the good or service being offered.
17  *See* Daniel Markovits, *Transactions Benefits*, 38 Yale J. on Regul. 633, 634–37 (2021). Friction is thus
18  inevitable—but it also can be valuable, because friction can help make a transaction more secure or
19  legitimate. *See id.* at 635–37. Indeed, Apple's witnesses explained that the "friction" associated with
20  the technical requirements is helpful to users, because it helps users understand the new service the
21  developer is offering and helps prevent developers from misleading users. *See, e.g.*, TT 102:8–13
22  (Fischer); TT 1289:19–25 (Schiller); TT 1387:2–6 (Onak).

23  Epic failed to prove by clear and convincing evidence that any friction is so great as to be tanta-
24  mount to a prohibition even on linked transactions. The very fact that Epic speaks in terms of "fric-
25  tion"—rather than "prohibition"—shows that Apple is not in violation of the Injunction. TT 538:12–15
26  (Oliver) ("[Y]ou understand that the Court's goal was that the injunction would lower the friction of
27  making purchases outside the app . . . correct?"). The Injunction itself says nothing about friction. *See*
28  *Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*, 928 F.3d 670, 676 (7th Cir.

2019) (the "four corners" of an injunction must "spell[] out … exactly what the enjoined parties must or must not do").  None of the terms of the Injunction can fairly be construed as regulating transaction "friction," much less defining how much transaction friction is too much.

Epic does not even contend that there is significant "friction" to including buttons, links, and calls to action in an app—the subject of the Injunction.  The uncontroverted evidence is that including this content is both free and straightforward.  A few additional steps for a user to complete a transaction, *after* following a link a developer previously added, does not indirectly prohibit developers from adding links or in-app communications in the first place.  Numerous cases hold that an act is not "prohibited" simply because a *different* but related act is subject to an economic or other burden.  *See, e.g.*, *S. Hosp.*, 393 F.3d at 1140 (government grounding of flights on September 11, 2001 did not "prohibit" access to airport hotels, even though the order had "the indirect effect of restricting or hampering access to the business premises" by impeding the travel that brought guests to the hotel); *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 147 (3d Cir. 2023) (similar for COVID-19 closure orders not prohibiting access to the businesses' properties); *Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 77–78 (1993).  That principle forecloses Epic's argument that downstream transaction "friction" after a user follows a link somehow indirectly prohibits the inclusion of links in the first place.

**c**.  Epic's challenge to the technical requirements implicitly assumes that once Apple complied with the Court's directive to "eliminate" the former anti-steering Guideline, it was required to leave a vacuum in its place.  But the Injunction's text and the context provided by the contemporaneous orders establishes otherwise.  The Rule 52 Order recognized Apple's right to require IAP for in-app purchases of digital content.  Rule 52 Order at 150.  The stay order recognized that Apple could adopt replacement Guidelines to (among other things) protect users.  Dkt. 830, at 3.  Both orders recognized that the Court was not in a position to micromanage Apple's affairs.  Rule 52 Order at 179; Dkt. 830, at 3.  Yet that is what Epic's challenge to the technical requirements boils down to.

Apple's rules advance the goal of "preserving Apple's iOS ecosystem," and allowing Apple (rather than a court) to set those rules advances the goal of avoiding micromanagement of its business operations.  Rule 52 Order at 179.  For example, the "accompaniment" rule centralizes information about the out-of-app purchase option in one place, instead of—as Epic would have it—telling users in one

place that they can get discounts on a developer's website but then making them search for the standalone URL or standalone button elsewhere within an app. Conversely, mandating standalone textual calls to action would impede Apple's ability to preserve the iOS ecosystem, because it would facilitate freeriding on access to Apple's platform and intellectual property without paying any commission. *See id.* at 118, 150 & n.617. Epic has admitted that desire to evade any commission is the primary reason a developer would prefer to use standalone text. TT 1883:3–7 (Schiller). Apple's requirement that the links be placed outside of the IAP purchase flow similarly reflects the Court's balance between informing users and maintaining a cohesive iOS ecosystem, recognizing that Apple can continue to require IAP to be the exclusive *in-app* purchase mechanism for the sale of digital goods or services. *See id.* at 150.

### 2. Epic failed to prove that the commission violates the "spirit" of the Injunction

Much of the testimony at the evidentiary hearing focused on Apple's decision to levy a commission—of either 12% or 27%—on purchases made on a developer's website within 7 days after a user taps on an external purchase link and continues to the developer's website. But once again, Epic failed to prove that this aspect of the compliance program violates either the letter or spirit of the Injunction, particularly in context of the contemporaneous orders.

**a.** The Injunction does not address commissions, much less forbid Apple from charging a commission or dictating either the rate or the window. Epic has admitted that the Injunction does "not prevent [Apple] from … introducing a new fee … on linked out-of-app transactions." Dkt. 871–4, at 561. And context confirms that the Injunction does not preclude Apple from charging a commission. *See City of Las Vegas*, 755 F.2d at 702. This Court's Rule 52 Order recognizes that, "*[e]ven in the absence of IAP*, Apple could still charge a commission on developers," even if doing so "would seemingly impose both increased monetary and time costs to both Apple and the developers." Rule 52 Order at 150 & n.617 (emphasis added). The Court explained that "the developer's use of the App Store platform … and access to Apple's user base … justifies a commission." *Id.* at 118. That is no less true for developers who link out from an iOS app. Analysis Group's extensive work validated that conclusion by analyzing the services Apple provides to developers *beyond IAP* and estimating a range of value based on comparable services from other providers. *See supra* pp. 12–14. Epic has criticized the *value* Apple and Analysis Group assigned to those services, but it never refuted that developers benefit from them.

Further supporting the reasonableness of Apple's conclusion, this Court could *not* have restricted Apple's ability to charge a commission for purchases made through in-app links. The sole basis for the Injunction was the UCL, but California courts have rejected efforts to use the UCL as a ratemaking tool. For instance, in a suit challenging bank fees, a state appellate court held that ordering a lower fee would be "an inappropriate exercise of judicial authority" given the "general preference for legislative or administrative regulation in the field of price control." *Cal. Grocers Ass'n v. Bank of Am.*, 22 Cal. App. 4th 205, 217–18 (1994); *see also Lazzareschi Inv. Co. v. S.F. Fed. Sav. & Loan Ass'n.*, 22 Cal. App. 3d 303, 311 (1971) (holding that "the control of charges . . . is better accomplished by statute or by regulation authorized by statute than by ad hoc decisions of the courts"). Another UCL appellate decision affirmed a trial court's decision to abstain from engaging in judicial review of a company's fees, because the claim "implicate[d] a question of economic policy: whether service fees charged by banks are too high and should be regulated." *Willard v. AT&T Commc'ns. of Cal., Inc.*, 204 Cal. App. 4th 53, 59–61 (2012); *see also Beasley v. Wells Fargo Bank*, *N.A.*, 235 Cal. App. 3d 1383, 1391 (1991) (courts are not "well suited to regulat[e] retail . . . pricing via injunction on an ongoing basis"). Courts are "compelled to construe" injunctions "in order to preserve [their] validity," *DAS*, 18 F.4th at 1042, yet Epic's effort to add an unwritten cap on Apple's commission would render the Injunction invalid under the UCL.

Additionally, requiring Apple to set a commission of zero—requiring Apple to permanently provide access to its services and technologies for free—would constitute an unconstitutional taking. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021). Such a restriction would "appropriat[e] for the enjoyment of third parties [Apple's] right to exclude." *Id.* at 149; *see also Horne v. Dep't of Agriculture*, 576 U.S. 350, 359–60 (2015) (Takings Clause protects intellectual property).

**b.** Nor has Epic proven that the commission indirectly or effectively prohibits the inclusion of buttons, links, or other calls to action. The commission is not levied on the inclusion of steering content within an app. Apple does not charge developers any fee for applying for the Entitlement or including buttons, links, or calls to action—which is the conduct the Injunction forbids Apple from prohibiting. Developers may include such content completely free of charge. Apple does not charge a commission or fee when a user taps a link, or when the user continues through the link to the developers' website. Apple charges nothing for the communications covered by the Injunction: Including buttons, links, or

other calls to action is free. As set forth above, a burden—or even an outright prohibition—on one transaction does not indirectly prohibit a different transaction. *See, e.g.*, *S. Hosp.*, 393 F.3d at 1140.

**c.** Epic has advanced policy arguments about whether Apple has "justified" the amount of its commission or whether the commission will facilitate, in Epic's eyes, sufficient competitive pressure on IAP from external purchase options. *See, e.g.*, TT 203:20–204:2 (Roman); TT 453:8–21, TT 1536:8–24 (Oliver); TT 1331:19–1332:2 (Onak). But Apple studied this issue extensively and found that a commission, the rate, and the structure were all adequately justified. *See* CX-0014 (Analysis Group report analyzing the value of Apple's ecosystem and services to developers). The stated rate of 12% and 27% is lower than the standard 15%/30% commission for IAP transactions, reasonably reflecting that Apple provided fewer services. CX-0002 § 4. The window only lasted for 7 days (shorter than longer periods that Apple considered), after which the rate was zero. *Id.* Apple reasonably calculated, using actual purchase data and reasonable assumptions based on developer behavior, that the effective commission rate on transactions following a link would be 18%, representing a significant reduction from the Apple's IAP commission. *Supra* pp. 13; *see also* TT 623:16–624:15, 1590:15–1591:18, 1607:19–1608:2 (Oliver). Developers of course remain free to steer users to transactions on their websites without clicking a link, or outside the 7-day window, for which there is no commission at all. TT 1575:4–14, 1578:19–1579:3, 1584:1–1585:17 (Oliver). Most digital goods and services have only a marginal cost, meaning developers will still make a significant profit on each sale under the 12%/27% commission. *See* Rule 52 Order at 11; *see also* Merits Trial Tr. 2410:3–4 (Evans).

The Injunction provides no basis to hold Apple in contempt for making those determinations. As set forth above, Apple was under no obligation to justify its commission in any particular way—the Injunction contains no such requirement, and the Court could not have imposed one. *Supra* pp. 30. Requiring Apple to adequately justify its commission would not provide "fair and precisely drawn notice of what the injunction actually prohibits." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086–87 (9th Cir. 2004). Such a requirement would invite endless questions, such as which services or products Apple may charge for, the value of those services or products, whether certain developers should pay more or less than other developers, and the profit margin Apple may earn. None of those questions are issues that courts are empowered to answer under the UCL (or, for that matter, the antitrust laws).

1    *See Trinko*, 540 U.S. at 408 (federal courts should not dictate the "proper price" for a product).

2       The Court asked whether Apple had conducted a complete valuation of its intellectual property.

3   TT 1893:11–15 (Schiller). As Mr. Schiller explained, the purpose of the Price Committee and Analysis

4   Group process was to perform both a top-down and a bottom-up assessment of the value of Apple's

5   services. *See id.* The question of whether Apple's commission precisely reflects the value of its intel-

6   lectual property is not an issue for injunction compliance. *Cf. FTC v. Qualcomm Inc.*, 969 F.3d 974, 999

7   (9th Cir. 2020) (rejecting argument that royalties charged for a patented product are "'anticompetitive'—

8   in the antitrust sense—unless they precisely reflect a patent's current, intrinsic value and are in line with

9   the rates other companies charge for their own patent portfolios"). Moreover, the value that Apple pro-

10   vides to developers is not limited to its intellectual property. *See supra* pp. 12.

11       Ultimately, the compliance analysis should be straightforward: the commission rate is *lower* than

12   the standard IAP commission, which obviously does not prohibit in-app transactions. And the commis-

13   sion is not even levied on the inclusion of links—the subject of the Injunction. It is levied on a subse-

14   quent transaction. Nothing in the Injunction obliges Apple to make external purchase options more

15   economically attractive for developers than Apple's own services. It would be a radical departure from

16   the law to hold that the UCL (or any competition statute, for that matter) requires a party to set prices in

17   such a way as to guarantee that its competitors' products will be cheaper than its own. *Cf. Qualcomm*

18   *Inc.*, 969 F.3d at 999. There has been no evidence that the commission—3% *lower* than what Apple

19   charges for purchases made through IAP, before even accounting for the 7-day window—forbids, pre-

20   vents, or makes it impossible for developers to include links within their apps, or even that doing so

21   would be unprofitable. Moreover, developers are free to charge lower prices for their own digital content

22   outside the iOS App Store, regardless of commission rates. And in any event, the Ninth Circuit noted

23   on appeal that developers may select alternative payment processors for reasons *other* than price. *See*

24   *Epic Games*, 67 F.4th at 996.

25       The context thus confirms that it was objectively reasonable for Apple to conclude that its com-

26   mission is consistent with the Injunction. In fact, Epic asks in contempt proceedings for the very relief

27   this Court rejected on the merits in denying Epic antitrust claims: to benefit from Apple's platform free

28   of charge. *See* Rule 52 Order at 158–59.

APPLE'S POST-HEARING BRIEF       32       CASE NO. 4:20-CV-05640-YGR

### 3. Epic's atextual contentions about "spirit" cannot support contempt

Even if, *arguendo*, the arguments Epic now advances might have been considered in formulating the original injunction, or even in modifying the extant injunction upon proper request, they are "out of place" in determining whether Apple complied with the injunction actually entered by the Court. *United States v. Armour & Co.*, 402 U.S. 673, 681–82 (1971) (so explaining in the context of consent decrees). As a matter of law, a contempt finding cannot be based on an atextual "spirit" of the Injunction. In any event, Apple has complied with the purpose of the Injunction per the contemporaneous orders.

**a.** On the facts, Apple *has* complied with the Injunction's purpose enshrined in its text and confirmed by the context of this Court's orders that speak directly to the Injunction: The purpose is to "eliminate" the categorical prohibition on in-app steering. Rule 52 Order at 2; *see id.* at 179 ("Apple's conduct in enforcing anti-steering restrictions is anticompetitive. *A remedy to eliminate those provisions is appropriate.*" (emphasis added)). Specifically, the Court found that "Apple contractually enforce[d] silence, in the form of anti-steering provisions." *Id.* at 166. The Court found that the injury "can best be remedied by invalidating the offending provisions." *Id.* Apple fulfilled that purpose by eliminating the Guidelines that were the subject of the Injunction, thereby removing the categorical prohibition against steering that the Court enjoined.

In issuing the Injunction, the Court also observed that the "measured remedy" of eliminating the categorical restrictions on speech would strike a balance between competing goals: it would "increase competition, increase transparency, increase consumer choice and information" while at the same time it would be "preserving Apple's iOS ecosystem which has procompetitive justifications," and would avoid any need "to micromanage business operations which courts are not well-suited to do as the Supreme Court has appropriately recognized." Rule 52 Order at 179; *see also id.* at 166 ("this limited measure balances the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace."). To the extent this language articulates secondary purposes, Apple's conduct advances those purposes as well. For example, the system disclosure sheet advances legitimate interests in informing consumers and avoiding confusion; the templates and appearance requirements maintain cohesiveness and facilitate app review; the link requirements protect user safety; the link placement requirements

1  advance Apple's interest in maintaining the tie that this Court upheld; and the commission protects the

2  iOS ecosystem from freeriding. *Supra* pp. 10–11.

3      **b**. Epic's contrary arguments fail as a matter of law. The command of an injunction is defined

4  by its "'four corners,' and not by reference to the court's purpose or the purpose of the party seeking to

5  hold the other in contempt." *Gates*, 98 F.3d at 468 (citing *Armour & Co.*, 402 U.S. at 682); *see also*

6  *Town of Islip*, 793 F.2d at 83 (similar). Although an accompanying order or opinion may provide context

7  for *interpreting* the terms of an injunction, courts have long rejected efforts to rely on atextual "spirit"

8  arguments to *add* new enjoined acts that are unambiguously outside an injunction's terms: "In contempt

9  proceedings for its enforcement, a decree will not be expanded by implication or intendment beyond the

10  meaning of its terms when read in light of the issues and the purpose for which the suit was brought."

11  *Terminal R.R. Ass'n. v. United States*, 266 U.S. 17, 29 (1924); *see also, e.g.*, *Armour & Co.*, 402 U.S. at

12  683 (rejecting atextual "purpose" as the basis for contempt); *N.C. State Conf. of the NAACP v. McCrory*,

13  214 F. Supp. 3d 466 (M.D.N.C. 2016) (rejecting atextual "spirit" as a basis for contempt); *Buffalo Cou-*

14  *rier-Express, Inc. v. Buffalo Evening News, Inc.*, 1978 WL 1379 (W.D.N.Y. July 28, 1978) ("[T]he spirit

15  of the injunction cannot be used to expand the language [of the injunction] beyond what was clearly

16  intended or implied."); *see also* Scalia & Garner at 57 ("Purpose sheds light only on deciding which of

17  various *textually permissible meanings* should be adopted.").

18      That rule forecloses most of Epic's arguments. The additional acts Epic complains of are beyond

19  the text of the Injunction—for the commission to be too high to impose a "competitive[] constrain[t]"

20  on Apple's IAP commission, or to unduly limit competition, impede information flow, or constrain user

21  choice. Epic's arguments are not an exercise in interpretation—they would rewrite the text wholesale,

22  radically expanding the Injunction's scope. That is not permitted. *Terminal R.R. Ass'n*, 266 U.S. at 29.

23      To support its "spirit" argument, Epic takes language out of context from *Institute of Cetacean*

24  *Research v. Sea Shepherd Conversation Society*, which involved an injunction that barred the defendants

25  "and any party acting in concert with them" from attacking whaling vessels. 774 F.3d 935, 941 (9th Cir.

26  2014) (citation omitted). The defendants aided and abetted third parties to perpetrate the very enjoined

27  attacks, "flagrantly and materially assisting others to do what they themselves are forbidden to do." *Id.*

28  at 952. The defendants then contended that they could not be held in contempt because the injunction

1   did not specifically bar the means they used to perpetrate the attacks.  The Ninth Circuit invoked the

2   "object" and "spirit" in rejecting that unduly narrow reading of the "strict letter" of the injunction.  *Id.*

3   at 949 (citation omitted).  The court observed that its "objective in issuing the injunction was to stop

4   [defendants] from attacking the Plaintiffs' vessels," but the defendants had nonetheless circumvented

5   the injunction by giving third parties the means to perpetrate the enjoined attack.  *Id.*

6        As another district court has explained, "*Sea Shepherd* did not conclude that a party may be held

7   in contempt for refusing to engage in affirmative conduct that is not required by the terms of a prohibitory

8   injunction, or for engaging in conduct that is not specifically and definitely prohibited therein." *Epona,*

9   *LLC v. County of Ventura*, 2019 WL 4187393, at *14 (C.D. Cal. Apr. 12, 2019).  Rather, *Sea Shepherd*

10   "held that a party may be held in contempt for 'giving a non-party the means to violate an injunction, if

11   the party knows it is [] likely the non-party will use those means to violate the injunction.'" *Id.* (quoting

12   *Sea Shepherd*, 774 F.3d at 950).  The conduct prohibited—and any associated "spirit"—is still only the

13   conduct actually identified in the injunction itself.  *Sea Shepherd* thus simply makes clear that an en-

14   joined party may not circumvent an injunction by outsourcing its non-compliance to a third party.  None

15   of the circumstances from *Sea Shepherd* are present here.  *Taggart* controls, *Sea Shepherd* is inapposite,

16   and contempt is unavailable as a matter of law.

17        **c.**  Epic's contrary position raises grave due process problems, which alone bar the entry of con-

18   tempt sanctions.  "[B]asic fairness requires that those enjoined receive explicit notice of precisely what

19   conduct is outlawed."  *Schmidt*, 414 U.S. at 476.  To implement that requirement, Rule 65(d) requires

20   every injunction to "state its terms specifically" and "describe in reasonable detail—and not by referring

21   to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  As

22   applicable here, the Court entered a discrete, prohibitory injunction comprising a single sentence.  Dkt.

23   813.  The Injunction puts Apple on specific notice that it may not "prohibit developers from including

24   buttons, links, or calls to action."  Dkt. 813 ¶ 1.  Apple has complied:  Acting in reliance on the text of

25   the Injunction, Apple deleted the enjoined Guideline and adopted a replacement framework.

26        The Injunction does not put Apple on specific notice of precisely what Epic's grievances would

27   require it to do.  Indeed, Epic still has not identified specifically what acts Apple must do (or not do) to

28   comply, and the "spirits" Epic divines are ill-defined and amorphous.  For example, even if it were in

the text, requiring Apple to effect a "competitive constraint" would not provide "fair and precisely drawn notice of what the injunction actually prohibits," *Fortune*, 364 F.3d at 1086–87, and would impermissibly invite "continuing and largely unfettered supervision of the district court," *Gates*, 98 F.3d at 471. The lack of notice is particularly glaring because Epic's perspective on the supposed "spirit" is both unspecific and has continually shifted throughout the proceeding:

- "[Y]ou understand that the Court's goal was that the injunction would lower the friction of making purchases outside the app by allowing steering, correct?" TT 538:12–14 (Oliver).

- "You didn't have an understanding that the whole idea was that developers were supposed to be able to offer users incentives to have competition among the various payment options?" TT 1331:22–25 (Onak).

- "Now, you understand that creating a leakage risk was a goal at least, if not the goal, of the injunction, right?" TT 1456:5–6 (Oliver).

- "[Y]ou understood that posing a meaningful competitive threat to IAP was the goal of the injunction, correct?" TT 1536:8–24 (Oliver).

In contrast, Apple fairly read the Injunction and the Rule 52 Order to have a different, specific, and unchanging goal: to eliminate Apple's categorical prohibitions against steering while preserving the integrity of the iOS ecosystem. To nonetheless hold Apple in contempt for failing to comply with Epic's ill-defined "spirits" would thus create the very notice problems Rule 65(d) was enacted to prevent. *See DAS*, 18 F.4th at 1040–41 (construing injunction to avoid similar problems).

These issues have combined to deprive Apple of fundamental protections that ensure basic fairness, *see Schmidt*, 414 U.S. at 476, and they are compounded by the procedural shortcomings in the proceeding. Apple's attorney-client privilege has been pervasively invaded, which irreparably tainted the entire proceeding. Apple was prevented from talking to its own witnesses for nearly a year to formulate its case, including on the documents that the Court *sua sponte* ordered produced. *Supra* pp. 5. It has been subjected to extraordinary burdens, including making witnesses available on short notice and with no exhibits disclosed in advance. Dkt. 1235; *see also* TT 1445:3–8, 1446:6–7. And Epic has made itself a private prosecutor prosecuting an inquiry into Apple's subjective decision-making process without any claim it harms Epic. *See Young*, 481 U.S. at 801–14. Those procedural deficiencies, standing

alone, violate Apple's due-process rights. Taken together with Epic's open-ended reading of the Injunction, they leave no doubt that any contempt finding or sanction imposed on Apple would be incompatible with due process. The Injunction put Apple on notice that it may not prohibit developers from including buttons, links or other calls to action—period. It did not put Apple on notice that it would need to satisfy all of Epic's grievances. A contempt action requires more procedural protections than ordinary civil litigation, but here Apple received less process than it was due.

The Court's contemporaneous orders recognized Apple's right to regulate and charge for access to the iOS App Store. The Injunction required Apple to delete the anti-steering Guidelines, but did not specify their replacement or preclude an alternative commission. All of Epic's arguments ultimately founder on those realities.

## III.    ANY ADDITIONAL REMEDY MUST BE CIRCUMSCRIBED AND PROSPECTIVE

This Court never made a finding that *any* specific act or conduct by Apple violated *any* term of the Injunction—as required by the show-cause procedure applicable to civil contempt proceedings. *See Navellier v. Sletten*, 262 F.3d 923, 943 (9th Cir. 2001). As Epic explains in its motion, however, "the [C]ourt need not find the defendant in civil contempt in order to find that the defendant has violated the injunction and to enter appropriate relief." Dkt. 897, at 14 (citing *ADT Security Servs., Inc. v. Security One Int'l, Inc.*, Case No. 11-cv-05149-YGR (N.D. Cal.), ECF No. 185 (order denying motion for civil contempt but modifying preliminary injunction)). If the Court were to conclude that Apple has not complied with one or more specific aspects of the Injunction, it can order Apple to comply without contempt findings or sanctions. If, however, the Court were to hold Apple in contempt—and, again, Apple submits that there is no basis for such a finding—then the available sanctions would be limited.

*First*, the Court cannot punish Apple for any alleged noncompliance because this is a civil contempt proceeding. *See Oracle USA, Inc. v. Rimini St., Inc.*, 81 F.4th 843, 858 (9th Cir. 2023) (citing *Int'l Union, UMWA v. Bagwell*, 512 U.S. 821, 826–27 (1994)). "A court may wield its civil contempt powers for two separate and independent purposes: (1) 'to coerce the defendant into compliance with the court's order'; and (2) 'to compensate the complainant for losses sustained.'" *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) (quoting *UMWA*, 330 U.S. at 303–04). "Because civil compensatory sanctions are remedial, they typically take the form of unconditional monetary sanctions; whereas

1   coercive civil sanctions, intended to deter, generally take the form of conditional fines." *Id.*

2       Civil compensatory sanctions "must of course be based upon evidence of complainant's actual

3   loss[.]" *UMWA*, 330 U.S. at 304; *see also Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union,*

4   *Locals 21 & 4*, 721 F.3d 1122, 1130 (9th Cir. 2013). Here, Epic has not even attempted to prove any

5   losses. Epic has no apps on the App Store and has proven no cognizable injury from the new Guideline

6   and Entitlement framework. Although the Court stated before the resumption of the evidentiary hearing

7   that "should Apple be found to be in violation of the injunction, every day presents further injury to

8   Epic," Dkt. 1171, at 2, Epic failed to adduce any evidence of such injury (and there is no such evidence

9   in the entire record of this case). Thus, the Court cannot award any money to Epic (save, perhaps, its

10   attorneys' fees). *See In re Dyer*, 322 F.3d 1178, 1195 (9th Cir. 2003).

11       Contrary to a suggestion Epic appeared to be making during the hearing, disgorgement is not

12   available as a compensatory sanction for civil contempt. Nonrestitutionary disgorgement is a penalty,

13   and penalties are not permissible sanctions in a civil contempt proceeding. *See Kokesh v. SEC*, 581 U.S.

14   455, 465–67 (2017) (holding that disgorgement is a penalty because it "is imposed as a consequence of

15   violating a public law and it is intended to deter, not to compensate"). To the extent disgorgement

16   intended to act as restitution for an aggrieved party could be a permissible remedy for civil contempt,

17   Epic introduced no evidence that it sustained any actual losses nor any evidence seeking to quantify such

18   losses, much less evidence that any losses were a result of Apple's violation of the Injunction. Moreover,

19   the UCL does not permit disgorgement, *see Theme Promotions, Inc. v. News Am. Mktg FSI*, 546 F.3d

20   991, 1009 (9th Cir. 2008), so the Court could not modify the judgment to impose such a requirement.

21       At most, therefore, the Court could levy a prospective sanction to coerce Apple to come into

22   compliance within a reasonable period of time. *See Shell Offshore*, 815 F.3d at 629. In other words, if

23   the Court were to find that specific conduct by Apple violated a specific term of the Injunction, and

24   required Apple to come into compliance within a reasonable time, it could ensure timely compliance by

25   levying a coercive sanction. Any such sanction would have to be prospective only, and Apple must be

26   given the opportunity to avoid (or "purge") it by coming into compliance. *Lasar v. Ford Motor Co.*, 399

27   F.3d 1101, 1110 (9th Cir. 2005) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 442

28   (1911)) ("A civil contemnor 'carries the keys of his prison in his own pocket' because civil contempt is

1  'intended to be remedial by coercing the defendant to do what he had refused to do.'").

2      These limitations are especially appropriate given that this proceeding has deviated far from the

3  accepted procedures for injunction compliance.  Coercive sanctions are a "potent weapon" designed to

4  address "violation of a court order by one who fully understands its meaning but chooses to ignore its

5  mandate." *ILA, Loc. 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).  While Epic has chal-

6  lenged aspects of Apple's compliance efforts, the Court has yet to specify what conduct (if any) violates

7  what aspect (if any) of the Injunction.  The proper course at this point is for the Court to determine

8  whether Apple's conduct complied with the terms of the Injunction and, if not, to instruct Apple what

9  further steps would be required to comply on pain of civil sanctions for future non-compliance.  Apple

10  would have the opportunity within a reasonable time to comply with such an instruction, if within the

11  Court's lawful authority under the UCL, with no sanctions required.

12      *Second*, contempt sanctions are entirely unwarranted to the extent Epic is now seeking a new,

13  prescriptive decree that would include conduct never analyzed at trial under the UCL standards.  Epic

14  never moved to modify the Injunction and cannot belatedly do so now.  Had it done so, Epic would have

15  had to identify the specific practices it seeks to enjoin and explain why the modifications are consistent

16  with and warranted by the underlying UCL judgment.  *See Armstrong v. Brown*, 768 F.3d 975, 979–80

17  (9th Cir. 2014).  As the Supreme Court has explained, "[t]he scope of injunctive relief is dictated by the

18  extent of the violation established[.]"  *Lewis v. Casey*, 518 U.S. 343, 360 (1996) (quoting *Califano v.

19  Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("[A] 'remedy

20  must ... be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'").

21  But Epic never challenged under the UCL—and this Court never adjudicated—the practices Epic attacks

22  in this post-judgment proceeding.  *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1137 (9th Cir. 2014) (when

23  evaluating UCL claim courts must determine whether the defendant's conduct "amounts to a violation

24  of antitrust laws or otherwise significantly threatens or harms competition" (quotation marks omitted)).

25  And absent such a merits determination, the Court cannot enjoin such conduct.

26      An equitable remedy must be tied to the underlying substantive violation.  *See Hecox v. Little*,

27  104 F.4th 1061, 1089 (9th Cir. 2024) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970,

28  974 (9th Cir. 1991) ("[I]njunctive relief 'must be tailored to remedy the specific harm alleged,' and '[a]n

overbroad injunction is an abuse of discretion.'")).  The Court never considered (because they did not exist) the rules and commission that Apple imposes under the new framework.  The Court cannot base a contempt finding on Apple's new and materially different conduct.  *See Doe, 1–13 ex rel. Doe Sr. 1–13 v. Bush*, 261 F.3d 1037, 1063–64 (11th Cir. 2001) (conduct that has "not been addressed in the final judgment … cannot serve as a valid basis for holding defendants in contempt").

The UCL does not permit a court to dictate the terms of business along the lines Epic now urges.  As discussed above, the UCL is not a rate-setting statute, and Epic therefore cannot use the UCL to limit (or eliminate) Apple's ability to charge for its products or services.  Likewise, California courts in UCL cases abstain from issuing equitable relief under the UCL that would require the court to intervene in "matters of complex economic policy."  *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1473 (2006).  The appropriate rules to ensure consistency and inform users of their options are matters of difficult economic policy in an area of fast-moving technological innovation.

Finally, structural injunctive relief is complex and typically requires a "remedies-specific evidentiary hearing" before an injunction goes into effect, in which the parties and the Court evaluate the scope and implementation of the relief.  *United States v. Microsoft Corp.*, 253 F.3d 34, 101, 103 (D.C. Cir. 2001); *see Moltan Co. v. Eagle–Picher Indus.*, 55 F.3d 1171, 1174–75 (6th Cir. 1995).  The Court did not hold such a hearing before issuing the extant Injunction.  The contempt hearing held over the past year—which focused principally on Apple's subjective intent or motivations—is no substitute for *ex ante* evaluation and consideration of appropriate structural remedies.  Epic cannot now use contempt proceedings as a *post hoc* mechanism to import new requirements into the UCL Injunction that Epic itself never requested, and the Court issued *sua sponte*.

## CONCLUSION

Epic's Motion to Enforce should be denied.

Dated: March 7, 2025

Respectfully submitted,

By: /s/ *Mark A. Perry*
Mark A. Perry
WEIL, GOTSHAL & MANGES LLP

Attorney for Apple Inc.

1   DANIEL G. SWANSON, SBN 116556
    dswanson@gibsondunn.com
2   **GIBSON, DUNN & CRUTCHER LLP**
    333 South Grand Avenue
3   Los Angeles, CA 90071-3197
    Telephone: 213.229.7000
4   Facsimile: 213.229.7520

5   CYNTHIA E. RICHMAN (D.C. Bar No.
    492089; *pro hac vice*)
6   crichman@gibsondunn.com
    **GIBSON, DUNN & CRUTCHER LLP**
7   1050 Connecticut Avenue, N.W.
    Washington, DC 20036-5306
8   Telephone: 202.955.8500
    Facsimile: 202.467.0539
9
    JULIAN W. KLEINBRODT, SBN 302085
10  jkleinbrodt@gibsondunn.com
    **GIBSON, DUNN & CRUTCHER LLP**
11  One Embarcadero Center, Suite 2600
    San Francisco, CA 94111
12  Telephone: 415.393.8200
    Facsimile: 415.393.8306

    MARK A. PERRY, SBN 212532
    mark.perry@weil.com
    JOSHUA M. WESNESKI (D.C. Bar
    No. 1500231; *pro hac vice*)
    joshua.wesneski@weil.com
    **WEIL, GOTSHAL & MANGES LLP**
    2001 M Street NW, Suite 600
    Washington, DC 20036
    Telephone: 202.682.7000
    Facsimile: 202.857.0940

    MORGAN D. MACBRIDE, SBN 301248
    morgan.macbride@weil.com
    **WEIL, GOTSHAL & MANGES LLP**
    Redwood Shores Pkwy, 4th Floor
    Redwood Shores, CA 94065
    Telephone: 650.802.3044
    Facsimile: 650.802.3100

    Attorneys for Defendant APPLE INC.

13

14                    **UNITED STATES DISTRICT COURT**

15                **NORTHERN DISTRICT OF CALIFORNIA**

16                        **OAKLAND DIVISION**

17   EPIC GAMES, INC.                          Case No. 4:20-cv-05640-YGR

18          Plaintiff, Counter-defendant       **DECLARATION OF MARK A. PERRY IN**
                                                **SUPPORT OF APPLE INC.'S MOTION**
19   v.                                         **FOR ENTRY OF A RULE 502(d) ORDER**

20   APPLE INC.,                                The Honorable Yvonne Gonzalez Rogers

21          Defendant, Counterclaimant

22

23

24

25

26

27

28

I, Mark A. Perry, hereby declare as follows:

1.     I am an attorney licensed to practice in the State of California, and a member of the Bar of this Court. I am a partner at the law firm Weil, Gotshal & Manges LLP ("Weil"), counsel of record for Apple Inc. ("Apple") in this case. I have personal knowledge of the facts stated below and, if called as a witness, would testify competently thereto.

2.     I have represented Apple in this litigation since shortly after it was filed in August 2020. At that time, I was a partner at Gibson, Dunn & Crutcher LLP ("Gibson"). In May 2022, I left Gibson and joined Weil as a partner. Since then, I and my team at Weil have worked collaboratively with the Gibson team (and other law firms) to represent Apple in this litigation, including with respect to the motion to enforce the injunction filed by Epic Games, Inc. ("Epic").

3.     In response to this Court's order requiring Apple to produce all documents related to injunction compliance, Apple reviewed more than 1.3 million documents, many of which implicated complex issues of attorney-client privilege and work-product doctrine. Apple retained numerous law firms and outside consultants to complete this extensive collection, review, production, and re-review.

4.     Below, I provide an overview of Apple's discovery efforts to provide context and support for the Rule 502(d) order Apple is requesting in connection with the resumption of the evidentiary hearing scheduled for February 24, 2025. I intend to submit a more detailed declaration regarding the discovery process once the Special Masters' review is completed, and the evidentiary hearing has concluded, in order to provide a more complete record for the Court's assessment of any discovery-related sanctions pursuant to the order dated February 4, 2025. *See* Dkt. 1171.

## I.    <u>The Permanent Injunction</u>

5.     On August 13, 2020, Epic filed a complaint against Apple, challenging Apple's app distribution and IAP requirements under Sections 1 and 2 of the Sherman Act and analogous provisions of the Cartwright Act, as well as under California's Unfair Competition Law ("UCL"). Dkt. 1.

6.     After a bench trial, this Court issued findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, ruling in favor of Apple on Epic's antitrust claims. *See* Dkt. 812 ("Rule 52 Order"). The Court held that Apple did not have a monopoly in any relevant market, that procompetitive

---

DECLARATION OF MARK A. PERRY IN SUPPORT    1     CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
RULE 502(D) ORDER

justifications supported the challenged restrictions on app distribution and in-app payment, and that Epic had not proposed a viable less restrictive alternative. The Court rejected Epic's contentions that the two requirements challenged in the complaint—app distribution and IAP—were unlawful.

7. The Court held, however, that two of Apple's unilateral restrictions on "steering"—Guideline 3.1.1 prohibiting in-app steering, and Guideline 3.1.3 prohibiting certain out-of-app communications—were "unfair" under the UCL. *See id.* at 179. Epic did not bring a standalone challenge to Apple's anti-steering provisions; nor did it seek to enjoin those provisions. *See id.* at 47–61. Nevertheless, the Court concluded that those provisions cause a "lack of information transparency about policies which affect consumers' ability to find cheaper prices, increased customer service, and options regarding their purchases." *Id.* at 118. The Court enjoined Apple from enforcing those two Guidelines to "balance[] the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace." *Id.* at 166.

8. On September 10, 2021, this Court entered its Permanent Injunction, which provides in operative part:

> Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ("Apple"), are hereby permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

9. The first clause (i) tracks the language of Guideline 3.1.1(a) in effect at the time of trial. CX-0001 § 3.1.1(a). The second clause (ii) tracks the language of Guideline 3.1.3 in effect at the time of trial. CX-0001 § 3.1.3.

10. The Court denied Apple's motion for a stay pending appeal. Dkt. No. 830. The Court noted that it could "envision numerous avenues for Apple to comply with the injunction and yet take steps to protect users." *Id.* at 3. The Court explained that it did not intend to "micromanage" Apple's implementation of the Injunction. *Id.* at 3.

11. The Ninth Circuit stayed the Injunction pending appeal. *See* C.A. Dkt. 27.

12. On April 24, 2023, the Ninth Circuit affirmed in part and reversed in part. *See* C.A. Dkt. 222. As relevant here, the Ninth Circuit affirmed dismissal of Epic's Sherman Act claims, confirming Apple's right to require that developers use IAP for in-app purchases of digital goods and services. *Id.* at 67, 76–77, 87. The Ninth Circuit also affirmed the UCL judgment and Injunction. *Id.* at 80. It held that Epic's failure to prove its claims under the Sherman Act did not preclude a finding that the conduct was "unfair" under the UCL. *Id.* at 81.

13. Following further appellate proceedings, the Ninth Circuit mandate issued on January 16, 2024, thus ending the stay pending appeal. C.A. Dkt. 258.

## II.    The Parties' Competing Submissions Regarding Injunction Compliance

14. On the day the Ninth Circuit mandate issued, Apple filed a Notice of Compliance in this Court, explaining the steps that it had taken to comply with the Injunction. Dkt. 871. In brief, Apple deleted the prior Guidelines that contained the enjoined prohibitions, replaced them with new Guidelines that allowed the relevant communications, created an External Purchase Link Entitlement ("Entitlement") with rules regarding the time, place, and manner for including links, buttons, and calls to action, and established a new commission structure for transactions completed within 7 days of a user tapping a link within an iOS app.

15. Hours after Apple filed its Notice, Epic CEO Tim Sweeney tweeted that "Epic will contest Apple's bad-faith compliance plan in District Court." Dkt. 916-9.

16. On January 30, 2024, Epic filed a Notice of Non-Compliance, disputing Apple's compliance and indicating its intent to file a motion setting forth the bases of non-compliance. Dkt. 883. Epic did not seek any discovery. Dkt. 915, at 14 n.2.

17. On March 13, 2024, Epic filed a Motion to Enforce Injunction. Dkt. 897. Acknowledging that the Injunction did not "explicitly prohibit" Apple's new Entitlement framework, Epic contended that Apple's conduct was contrary to the "purpose" and "spirit" of the Injunction. *Id.* at 17. Epic sought an order (i) holding Apple in civil contempt for violating the Injunction; (ii) requiring Apple to promptly bring its policies into compliance; and (iii) requiring Apple to revise Section 3.1.3 of the Guidelines. *Id.* at 23.

DECLARATION OF MARK A. PERRY IN SUPPORT     3     CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

18.    On April 23, 2024, this Court set an evidentiary hearing on Epic's Motion to Enforce. Dkt. 925.  The Court found that Epic had "made a sufficient preliminary showing that, viewed holistically, Apple's practice changes undermine the spirit of the injunction." *Id.* at 3.  Epic again did not seek any discovery.  The initial phase of the evidentiary hearing took place over the course of 6 non-consecutive days, from May 8, 2024 to May 31, 2024.

19.    Among other things, the testimony and other evidence established that Apple has deleted the two Guidelines enjoined in the Injunction and replaced them with new Guidelines.

20.    *First*, Apple deleted Guideline 3.1.1 and replaced it with 3.1.1(a).  That ended Apple's prior prohibition on developers including links, buttons, or other calls to action within their apps directing users to other purchase mechanisms in addition to IAP.  New Guideline 3.1.1(a) provides:

> StoreKit External Purchase Link Entitlements: apps on the App Store in specific regions *may* offer in-app purchases and *also use a StoreKit External Purchase Link Entitlement to include a link to the developer's website that informs users of other ways to purchase digital goods or services*.  Learn more about these entitlements.  In accordance with the entitlement agreements, *the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price*.  The entitlements are limited to use only in the iOS or iPadOS App Store in specific storefronts.  In all other storefronts, apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase.

CX-0013 § 3.1.1(a) (emphases added).

21.    Under Guideline 3.1.1(a), Apple enabled developers to apply for a new External Purchase Link Entitlement ("Entitlement").  CX-0013 § 3.1.1(a).  Developers may use the Entitlement to include links and other information in their apps that direct users to non-IAP purchasing mechanisms, so long as they adhere to certain requirements regarding the time, place, and manner for including such content. CX-0002 § 3.  Apple charges a 12% or 27% commission on purchases users make on a developer's website within 7 days after following an external link in an iOS app and continuing to the developer's website.  CX-0002 § 4.

22.    *Second*, Apple deleted the prior prohibition on out-of-app communications that used information obtained during account registration.  Apple amended Guideline 3.1.3 to provide that "[d]evelopers can send communications outside of the app to their user base about purchasing methods

other than in-app purchase." CX-0013 § 3.1.3.  Apple also added Guideline 5.1.1(x) to provide that "[a]pps may request basic contact information (such as name and email address) so long as the request is optional for the user." CX-0013 § 5.1.1(x).

**III.    Document Discovery**

23.    At various points during the first phase of the evidentiary hearing, the Court directed Apple to produce particular documents in connection with the testimony of individual witnesses.  In each instance, Apple produced the specified documents promptly and to the best of its ability, in view of the limitations on its ability to speak with witnesses and the compressed timeframe.  *See* TT 33:1–11 (Fischer) (number of apps offering in-app purchases for digital goods and services; produced to Epic on May 8 and to the Court on May 9); TT 34:14–36:4 (Fischer) (list of developers who applied for the External Link Entitlement; produced to Epic on May 8 and to the Court on May 9); TT 337:24–338:23 (Roman) (list of top 200 developers on the App Store by revenue; produced to Epic on May 13 and to the Court on May 16); TT 342:2–344:5 (Roman) (summary report of data regarding the time windows in which users make successive purchases; produced to Epic on May 13 and May 15, and to the Court on May 16); TT 446:7–447:18 (Oliver) (Price Committee Deck presented on January 11, 2024; produced to Epic on May 16 and introduced as an exhibit at the hearing on May 17); TT 458:1–14 (Oliver) (electronic notes on computer related to Entitlement; produced to Epic and the Court on May 24); TT 460:20–24 (Oliver) (email, iMessage, and Slack communications regarding analysis of the commission for the Entitlement; produced to Epic and the Court on May 24); TT 502:16–17 (Oliver) (case studies Apple relied on in forming the assumptions it used for financial analysis; produced to Epic and the Court on May 24).

24.    On May 31, 2024, after all the witnesses called by both parties had testified, the Court directed Apple to produce "all Apple's documents relative to the decision-making process leading to the link entitlement program and associated commission rates." Dkt. 974.  The evidentiary hearing was adjourned until those materials had been collected, reviewed, and produced.

25.    The evidentiary hearing-related discovery directed by the Court on May 31, 2024 proceeded in two phases. *See* Dkt. 983.

DECLARATION OF MARK A. PERRY IN SUPPORT      5      CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

26.     In the first phase, Apple identified and produced certain documents relevant to the testimony of Carson Oliver, one of Apple's testifying witnesses at the evidentiary hearing.  Those documents included "Quip" documents—essentially shared workspaces—to which Mr. Oliver had access and that concerned Project Michigan and/or Project Wisconsin (the codenames for the U.S. Link Entitlement program at issue in this hearing).

27.     Apple completed the first phase of discovery on June 14, 2024, producing several hundred documents to Epic and providing a privilege log for documents withheld or redacted on privilege grounds.

28.     In the second phase, the Court ordered Apple to identify and produce all other documents "relative to the company's decision-making process concerning the link entitlement program and associated commission rate."  Dkt. 983.  On June 18, 2024, the Court referred all discovery matters related to this second phase to Magistrate Judge Hixson.  Dkt. 985.

### A.  *Document Identification and Collection*

29.     Apple and Epic spent significant time negotiating the scope of the collection and review via multiple meet-and-confers and exchanges of written proposals in June and July 2024.  After reaching an impasse on certain items, the parties took the open issues to Magistrate Judge Hixson to resolve.  *See* Dkts. 1000, 1002, and 1003.  Judge Hixson ruled on those issues on August 8, 2024.  *See* Dkt. 1008.

30.     Apple had initially proposed 17 custodians for the second phase of discovery.  Epic countered with 54 custodians.  Apple ultimately agreed to produce documents from 52 custodians.  During the merits phase of the litigation, by contrast, Apple produced documents from 11 custodians.

31.     For Apple's 52 custodians, Epic requested over 100 unique search terms be applied.

32.     Apple reported to the Court on July 17, 2024 that applying Epic's requested search terms to the 52 custodians would result in "at least 642,000 documents and attachments from server side emails alone."  Dkt. 1000, at 5.  As Apple explained, however, that estimate did not include documents that would have to be retrieved from each of the 52 custodians' computers and network drives.  *Id.*  In order to collect those documents, Apple had to conduct extensive custodial interviews and collections with each of the 52 custodians.

DECLARATION OF MARK A. PERRY IN SUPPORT     6     CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

33.     Apple conducted more than 100 custodial interviews and collections on a rolling basis in June, July, and August 2024 in order to exhaust all available data sources for relevant documents.

34.     Each of those interviews involved at least one Apple in-house counsel, at least two outside counsel (from Weil and/or Gibson), and at least two Apple discovery specialists.  The interviews often lasted several hours and required the attorneys and discovery specialists to comb through every possible file location on a custodian's computer or network drives.  Some custodians required three or four interviews to get through the significant volume of documents on their computer and network drives.

35.     Altogether, Apple estimates hundreds of outside counsel hours were spent on the custodial interview process.

36.     Ultimately, after completion of all collections from the 52 custodians, there were approximately 1.3 million documents in the total review population.

### B.     Document Review

37.     In tandem with the collection process, Apple also engaged outside vendors to conduct the document review itself.

38.     The document review platform Apple used is maintained by a company called OpenText.  OpenText provides support for operating and managing the document review platform, including with respect to uploading collected documents, distributing documents for review, and processing documents for production.   OpenText and its staff do not provide substantive input on issues regarding responsiveness or privilege.

39.     To conduct the initial document review, Apple engaged Deloitte Transaction and Business Analytics ("Deloitte") in July 2024.  Apple later added Consilio in September 2024 as a second vendor to assist with the review given the volume of documents and truncated timeline for review.  The bulk of the review was conducted by third-party contract attorneys at Deloitte and Consilio in August and September 2024.

40.     The document review proceeded in two stages, or "passes."

41.     In the "first-pass review," conducted entirely by Deloitte attorneys, the reviewers tagged documents in all scope fields, including for relevance, privilege, personally identifiable information,

DECLARATION OF MARK A. PERRY IN SUPPORT        7        CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

1  confidentiality, and more.

2      42.    In the "second-pass review," conducted by both Deloitte and Consilio attorneys, the

3  reviewers evaluated the documents more closely for privilege specifically, applied redactions as

4  necessary, and completed information for logging documents.

5      43.    Documents proceeded through the first and second-pass reviews depending on their

6  coding.  Documents tagged not responsive did not require second-pass review and instead went directly

7  to the outside counsel team (made up of Gibson and Weil attorneys) for quality control through a

8  sampling review.  Documents tagged as responsive and potentially privileged by Deloitte during the

9  first-pass review were escalated to a second-pass review by Deloitte and Consilio.

10     44.    Apple's outside counsel provided training to the second-pass reviewers responsible for

11 making privilege determinations.  Outside counsel provided written document review protocols to

12 Deloitte on August 7, 2024, including a privilege-specific protocol and a general review protocol.  Those

13 written protocols directed the second-pass reviewers to review for privilege under the governing Ninth

14 Circuit standards, including identifying material that should be redacted and drafting privilege log entries

15 for each privileged document.[1]

16     45.    In addition to the written protocol, Gibson and Weil conducted a live privilege training

17 with Deloitte attorneys on August 12, 2024 in anticipation of ramping up the second-pass review given

18 Deloitte's progress on the first-pass review up to that point.  Consilio received similar training when it

19 was added to the review.

20     46.    Deloitte maintained a running decision log and query tracker that tracked daily reviewer

21 privilege questions, which the outside counsel team reviewed and responded to weekly, and at times

22 daily.

23     47.    Once the second-pass review was complete, a subset of documents was then released to

24 outside counsel (led by Weil and Gibson) for quality control checks and sampling.

25     48.    Given the nuances and complexities of this privilege review, on top of Deloitte's and

26 Consilio's work in the second-pass review, this review included a more robust quality control process

27 _____

28 [1] Apple is prepared to submit the privilege review protocols to the Court for *in camera* review.

DECLARATION OF MARK A. PERRY IN SUPPORT       8       CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

(conducted by a team of more senior outside attorneys) than typically employed in Apple document reviews.

49.     Specifically, the privilege quality control process involved a third-level of review by the outside counsel team of certain categories of documents, including those with in-house attorneys on them as well as a 10% sample of all documents withheld for privilege, among other conditions.

50.     The outside counsel quality control team included 30 reviewers to start (in August 2024), but Apple increased those reviewers weekly as the substantial completion deadline neared, with up to 80 reviewers engaged in the quality control process at the height of the review (who were all outside counsel with two or more years of practice at large firms). The outside counsel quality control team also received written and live training.

51.     Weil and Gibson worked closely with the outside counsel quality control team week by week, providing iterative substantive privilege guidance and answering numerous questions raised by reviewers daily. Weil and Gibson emphasized repeatedly to the outside counsel quality control team that they should critically assess the first and second-pass review calls, and downgrade any documents withheld or redacted as privileged that should not have been coded that way in the first place. Indeed, Weil and Gibson continued to downgrade documents up to the finalization of each privilege log at issue where documents were found not to be privileged.

### C.     *Privilege Determinations*

52.     There were several aspects of the discovery that presented special challenges for Apple's discovery process.

53.     *First*, most of the responsive documents concerned Apple's compliance with a Court-ordered injunction and with emerging regulatory requirements from around the world. Those changing regulatory requirements and related projects include (but are not limited to):

- In 2022, the European Union enacted the Digital Markets Act (frequently abbreviated to "DMA"), which went effective in substantial part in 2023. The DMA required Apple and other technology companies to make a number of changes regarding the design of use of their platforms. As part of its compliance with the DMA, Apple made changes in the European

Union regarding developers' ability to include links within their apps (similar to what is required under the Injunction) or alternatives to IAP in their apps, third parties' ability to offer alternatives to the App Store for distribution on iOS, and other App Store features permitting alternative payment and distribution options for iOS apps.

- In 2019, the Netherlands competition authority initiated an action against Apple relating to the App Store's rules for dating apps. The Netherlands competition authority eventually required Apple to make changes to the rules for dating apps in the Netherlands storefront similar to that required by the Injunction.

- In 2022, Apple changed its App Store rules worldwide to allow certain types of apps ("reader apps") to include links to websites where the user could create or manage an account with the developer. The changes were made in response to a regulatory investigation by the Japan Fair Trade Commission.

- In 2022, Apple changed its App Store rules for apps in South Korea to allow iOS apps to include a payment system other than IAP within their apps.

- From 2019 to the present, Apple has been engaged in a regulatory matter involving Spotify (a music-streaming app developer) in Europe regarding issues similar to that under the Injunction.

- From 2020 to the present, Apple has been engaged in litigation with Epic in Australia over substantially the same issues litigated in this case.

54.    Lawyers (both in-house and outside counsel) were involved in all of Apple's projects around the globe to comply with these requirements. Apple instructs its employees that adding a lawyer to a communication does not automatically make the communication privileged, and that documents should be labeled as "Privileged Confidential" only for communications with lawyers with the primary purpose of seeking legal advice or when working at the direction of a lawyer.[2] Even under that guidance, many documents in the review were labeled as "Privileged" at the time of their creation. As a result, a significant number of the documents reviewed are of the kind that contract or outside counsel document

---

[2] Apple is prepared to submit its internal privilege training materials to the Court for *in camera* review.

1   reviewers are likely to flag as potentially implicating attorney-client privilege.

2       55.    Although outside counsel provided detailed training to document reviewers—including

3   instructions that the presence of a lawyer does not render a document privileged and that documents

4   labeled "Privilege" by the sender are not presumptively privileged—the presence of (and often active

5   participation by) lawyers on so many documents is the kind of signal document reviewers are frequently

6   trained to look for when evaluating documents for privilege.

7       56.    Many of the documents most directly at issue—those concerning Apple's efforts to

8   comply with the Injunction—raise these challenges.  Every document concerning the Entitlement was

9   created as a direct result of the Injunction—there was no preexisting business motivation for Apple to

10  develop the Entitlement.  None of the analyses produced in discovery would have been undertaken but

11  for the Injunction.  And consequently, drafts of documents were sent to legal for review or were drafted

12  in part (sometimes substantial part) by lawyers.  While final versions of these documents sometimes

13  ended up being made public (through Apple's website) or were produced to Epic, the *drafts* of those

14  documents frequently reflected iterative feedback from counsel.

15      57.    *Second*, the subject matter of the documents likewise made privilege determinations more

16  complicated.  Even for documents on which no lawyer appears, the content frequently relates to Apple's

17  response to new *legal* requirements in various jurisdictions.  The documents thus often contain references

18  to orders from regulatory or judicial bodies, newly passed laws, and discussions with regulators.  And

19  again, for those documents at issue here, these challenges are even more acute—virtually every slide

20  deck prepared in connection with Apple's Injunction compliance efforts included some discussion of the

21  terms and scope of the Injunction, content that a reviewer would reasonably understand to have been

22  prepared or informed by counsel.

23      58.    Although document reviewers received training to help them understand the business

24  context for these documents, it is not surprising that many reviewers considered these documents to have

25  been created for the primary purpose of seeking, obtaining, or implementing legal advice.

26      59.    *Third*, Apple had to work on a highly truncated timeline.  Judge Hixson directed Apple

27  to substantially complete its review and production by September 30, 2024. Dkt. 1008. Beginning with

28

DECLARATION OF MARK A. PERRY IN SUPPORT    11    CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

the Court's order of May 31, that timeframe gave Apple four months to collect, review, log, and produce responsive documents. Apple ultimately collected and reviewed ~1.3 million documents, which even assuming a highly aggressive rate of 100 documents per reviewer per hour, requires approximately 13,000 attorney hours to review on the *first* pass. That time does not include the additional second-pass review, quality control reviews, privilege log refinements, or production logistics. Even for a company with Apple's resources, this was a substantial task.

60. Apple continuously added resources to the Deloitte and Consilio teams, and also its outside counsel quality control team, in an effort to meet its deadlines. Each incremental addition of reviewers, however, required additional onboarding and training, adding logistical burdens throughout the process. And it is a basic principle of modern discovery that the more reviewers that are added, the greater variance there will be among privilege determinations.

61. Given that Apple's original estimate of documents (based on server-side emails alone) more than doubled following the collection efforts, and in recognition that the review ramp-up took time, on September 26, Apple requested a two-week extension of its time to substantially complete its review and production. *See* Dkt. 1016, at 5–6. Judge Hixson denied that request on September 27, 2024. *See* Dkt. 1017.

62. Apple thereafter substantially completed its document production by September 30, 2024.

### IV.    Privilege Re-Review

63. Shortly after the substantial completion date of September 30, Epic sent Apple a letter raising objections to certain privilege assertions Apple had made in its privilege logs served in June. This letter was the first time Epic had raised any specific privilege objection.

64. The parties thereafter met and conferred regarding Epic's privilege objections. At the same time, Apple was finalizing its privilege logs, during which Apple removed several thousand documents from its privilege logs as a result of quality control checks.

65. The parties ultimately briefed their privilege dispute through a joint discovery submission to Judge Hixson on October 27, 2024, principally focused on Epic's identification of four categories of documents, under which Epic identified eleven exemplar documents. *See* Dkt. 1039.

DECLARATION OF MARK A. PERRY IN SUPPORT        12        CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

66.    On December 2, 2024, Judge Hixson issued a discovery order ruling that the eleven exemplar documents were, for the most part, not privileged or otherwise protected from discovery. *See* Dkt. 1056.

67.    Following Judge Hixson's discovery order of December 2, Epic requested that Apple conduct a re-review of all documents over which it had asserted privilege and that all such privilege assertions be reviewed by one or more special masters. *See* Hr'g Tr. 8:23–9:14 (Dec. 3, 2024). Although Apple disagreed that Judge Hixson's ruling regarding eleven exemplar documents justified such measures, it agreed to undertake the re-review in order to reach resolution as soon as possible.

68.    The parties thereafter negotiated a protocol for that re-review (the "Special Master Protocol"), and on December 23, 2024, this Court approved a joint stipulation "govern[ing] the re-review process directed by Judge Hixson." Dkt. 1092, at 2. The Special Master Protocol requires Apple to re-review all documents previously withheld or redacted as privileged or otherwise protected and provides for three Special Masters to review Apple's privilege assertions, with either party retaining the ability to seek judicial review of the Special Masters' determinations. *Id.* at 2, 5.

**A.    *Category Two Documents and Apple's Reservation of Rights***

69.    The Special Master Protocol divides the re-reviewed documents into three categories:

- Category One: "Documents that Apple continues to maintain are privileged or otherwise protected in whole or in part (including for the avoidance of doubt any documents downgraded from withheld to redacted and/or as to which the redactions have changed), including under the December 2 Order." Dkt. 1092 ¶ 1(b)(i);

- Category Two: "Documents that Apple maintains are privileged or otherwise protected in whole or in part, but that Apple acknowledges are not privileged or otherwise protected under Judge Hixson's order of December 2, 2024 (Dkt. 1056)." *Id.* ¶ 1(b)(ii);

- Category Three: "Documents that Apple no longer maintains are privileged or otherwise protected." *Id.* ¶ 1 (b)(iii).

70.    These categories—and in particular, Category Two—served two purposes. First, at the time Apple began its privilege re-review, it had pending before this Court an objection to Judge Hixson's

December 2 Order. *See* Dkt. 1079. As Judge Hixson recognized, Apple should not be ordered to produce documents affected by his discovery order until Apple had exhausted its right of review in this Court. Hr'g Tr. 22:4–10 (Dec. 3, 2024). Documents sorted into Category Two were therefore initially withheld from both the Special Masters and Epic, and released only after this Court ruled on (and denied) Apple's appeal. *See* Dkt. 1095. Second, the identification of documents in Category Two, both before and after resolution of Apple's appeal from Judge Hixson's discovery order, allows Apple to track those documents it maintains are privileged and preserve for appeal its contentions that those documents are protected from discovery under the attorney-client privilege and/or work-product doctrine.

71.  Pursuant to the protocol, Apple began producing Category Two documents to Epic five court days after this Court denied Apple's appeal. *See* Dkt. 1092 ¶ 1(h). In conjunction with those productions, on January 8, I wrote to counsel for Epic advising, in relevant part:

- "It remains Apple's position that many or all of the 'Category Two' documents are protected from discovery or disclosure under the attorney-client privilege and/or work product doctrine, in whole or in part." Ex. A, at 1.

- "The 'Category Two' documents are accordingly being produced to Epic at this time pursuant to Court order, over Apple's objections, and subject to a forthcoming appeal." *Id.*

- Apple's current "production and any prior or future productions of 'Category Two' documents—and any use of the documents in district court proceedings—do not constitute a waiver of any applicable privilege or other protection." *Id.*

- "To avoid possible prejudice to Apple until the privilege issue has been finally resolved on appeal, Epic shall not take any actions with respect to the 'Category Two' documents, including but not limited to further dissemination, that could constitute (or be deemed to constitute) a waiver or invasion of any applicable privilege or other protection, as to particular documents or their subject matter." *Id.* at 1–2.

- "So that there is no ambiguity in the record, Apple will create an index identifying all 'Category Two' documents at the conclusion of the re-review process. Such documents should be treated as 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' pursuant

DECLARATION OF MARK A. PERRY IN SUPPORT        14        CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

to the Amended Protective Order in effect for this litigation (Dkt. 274)."

72. Epic did not respond to the January 8 letter until February 7, 2025, as discussed below.

73. Since January 8, the parties have briefed to Judge Hixson several rounds of objections to rulings of the Special Masters on certain of Apple's privilege assertions. Judge Hixson has ruled on some, but not all, of those objections. *See* Dkts. 1139, 1150, 1157. For those documents Judge Hixson has ruled are not privileged, Apple was required to (and did) produce those documents to Epic within three court days of Judge Hixson's rulings. *See* Dkt. 1092 ¶ 4(c). A list of all documents upheld by the Special Masters but ordered produced by Judge Hixson as of the date of this declaration is attached as Ex. B.

74. On February 5, 2025—after Apple had re-reviewed all of the documents over which it had originally maintained privilege—I wrote a second letter to counsel for Epic following up on my prior letter, stating, in relevant part:

- "We are currently finalizing the index that we stated we would provide that identifies all 'Category Two' documents now that Apple's re-review has concluded." Ex. C, at 1.

- "In light of Apple's express reservation of rights, Apple has not waived its privilege assertions over any documents produced pursuant to the orders of the Court, including all 'Category Two' documents." *Id.*

- "Nevertheless, in an abundance of caution and to avoid any dispute about this issue in the future, in this or in any other forum, we request that Epic enter into the attached stipulation under the Federal Rule of Evidence 502(d) providing that Epic's or Apple's use of any of the Category Two documents at the hearing, as well as any use of documents that the Court has ordered produced notwithstanding objections to the Special Master rulings, does not constitute a waiver of any applicable privilege or other protection." *Id.*

75. Counsel for Epic responded on February 7, 2025, stating: "Epic treats and will continue to treat as 'HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY' (pursuant to the Amended Protective Order, Dkt. 274 (the 'PO')) any document appropriately designated as such under Section 5.2 of the PO. Epic does not agree to Apple's other demands reflected in your letters and reserves all rights."

DECLARATION OF MARK A. PERRY IN SUPPORT    15    CASE NO. 4:20-CV-05640-YGR
OF APPLE INC.'S MOTION FOR ENTRY OF A
502(D) ORDER

Ex. D.

76.    On February 11, 2025, I responded to counsel for Epic, providing the appendix of Category Two documents. Ex. E. That appendix is attached as Ex. F.

**B.    The Re-Review Process**

77.    Apple re-reviewed approximately 54,000 documents over which it had originally asserted a claim of privilege or work product in whole or in part. For those documents over which Apple maintained its assertion of privilege or work product, Apple began sending those documents on a rolling basis to the Special Masters on December 23. Apple completed its final production to the Special Masters on January 21.

78.    During that same time period, Apple produced to Epic the documents over which it is no longer asserting privilege.

79.    At the outset of the re-review project, Apple identified approximately 40 reviewers—all attorneys at law firms—to conduct the re-review. Based on the target rate of 15,000 documents per week, Apple reasonably believed that 40 reviewers was sufficient to meet that target, requiring reviewers to review approximately 375 documents per week.

80.    In the initial weeks of the re-review, Apple believed it could reach and maintain the desired pace with the 40 reviewers retained. Over the winter holidays, however, as some reviewers began to fall short of their weekly targets, Apple determined that additional reviewers would be needed. Beginning on December 28, Apple added more attorneys from the firms involved in the privilege re-review. As a result of those efforts, the re-review team grew to approximately 100 reviewers.

81.    At a hearing on January 3, Judge Hixson directed that Apple should aim to finish its review of the documents by January 17. Hr'g Tr. 16:17–20 (Jan. 3, 2025). With the help of the larger group of reviewers and significant effort by all involved, Apple was able to meet that deadline.

82.    Epic has raised questions during and after the privilege re-review about the percentage of downgrades from week to week. *See* Hr'g Tr. 4:16–5:6 (Jan. 14, 2025); *see also* Dkts. 1149, 1151. The reviewers added later in the process received the same re-review training as those added at the

1  beginning.[3]  At no point were reviewers instructed to alter their general standards for evaluating privilege
2  or to assert privilege over a great proportion of reviewed documents.

3      **C.**    *Final Results of the Privilege Re-Review*

4      83.    On January 31, 2025, Apple provided the metrics of its re-review to this Court (Dkt.
5  1151).

6      **Total documents re-reviewed:** 53,820
7      **Categories**
8          **Category 1:** 22,658
9          **Category 2:** 7,059
10         **Category 3:** 24,103
11     **Privilege assertions**
12         **Documents tagged "Not Privileged":** 30,104
13         **Documents tagged "Privileged":** 23,716

14     84.    Out of the 53,820 documents reviewed, Apple downgraded approximately 55.9%.
15 Excluding the Category Two documents—over which Apple maintains its assertion of privilege—the
16 downgrade percentage is approximately 42.1%.

17     85.    The Special Masters' review of Apple's documents remains underway.  The following
18 metrics represent the Special Masters' progress as of January 31, as previously reported to the Court:

19     **Documents Ruled On:** 5,506
20         **Privilege Upheld in Full:** 4,906 (89.1%)
21         **Privilege Upheld in Part, Overruled in Part:** 46 (0.8%)
22         **Privilege Overruled in Full:** 554 (10.1%)
23     **Requests for Additional Information:** 89

24     86.    Judge Hixson has overruled Apple's privilege assertions with respect to an additional 9
25 documents sustained by the Special Masters but objected to by Epic.  *See* Dkts. 1139, 1157.

26     87.    Between the 7,059 Category Two documents, the 600 documents overruled by the Special

27

28    [3] Apple is prepared to submit the re-review training materials to the Court for *in camera* review.

Declaration of Mark A. Perry in Support     17     Case No. 4:20-cv-05640-YGR
of Apple Inc.'s Motion for Entry of a
502(d) Order

Masters in whole or in part, as of January 31, and the 9 additional documents overruled by Judge Hixson, Apple has produced approximately 7,668 documents over which it maintains its privilege assertions but that were ordered produced to Epic, on direction from either the Court or the Special Masters pursuant to the re-review protocol. We anticipate that there will be additional such documents as the Special Masters complete their determinations, and will include the final numbers in a further submission following completion of the document production. *See* ¶ 4, *supra*.

88.     As the Court has already recognized, the privilege rulings are not immediately appealable to the Ninth Circuit. Hr'g Tr. 12:12–15 (Dec. 18, 2024). Accordingly, Apple has produced these documents to Epic pursuant to Court orders. As expressed in its letters to Epic, however, Apple reserves its rights to challenge the adverse rulings as to the documents once an appealable order is entered in this Court.

89.     Apple therefore seeks, prior to the resumption of the evidentiary hearing, an order pursuant to Rule 502(d) to clarify and eliminate any dispute that its production and/or use of (1) Category One documents that Apple has been required (or may be required in the future) to produce given privilege rulings from the Special Masters or Judge Hixson and (2) all Category Two documents has produced or will produce to Epic does not effect a waiver of any claim of attorney-client privilege or work product protection.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of February 2025, in Cupertino, California.

Dated: February 12, 2025                                 Respectfully submitted,


By: */s/ Mark A. Perry*

Mark A. Perry