## No. 25-2935

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**EPIC GAMES, INC.,**

*Plaintiff-ctr-defendant - Appellee*,

v.

**APPLE INC.,**

*Defendant-ctr-claimant - Appellant.*

Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR (Yvonne Gonzalez Rogers, District Judge)

## EXCERPTS OF RECORD FOR APPLE INC.

## VOLUME 4 OF 7 (4-ER-642 to 4-ER-796)

Mark A. Perry
Zachary D. Tripp
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
(202) 682-7511

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

June 23, 2025

Gregory G. Garre
Roman Martinez
Peter E. Davis
Soren J. Schmidt
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Ben Harris
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Apple Inc*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **EPIC GAMES, INC.,** | Case No. 4:20-cv-05640-YGR |
| Plaintiff and Counter-Defendant, | **ORDER DENYING APPLE INC.'S MOTION FOR RELIEF FROM A NONDISPOSITIVE PRE-TRIAL ORDER OF A MAGISTRATE JUDGE** |
| v. | |
| **APPLE INC.,** | Re: Dkt. No. 1079 |
| Defendant and Counterclaimant. | |

Apple Inc. moves this Court to reverse in part Magistrate Judge Thomas S. Hixson's December 2, 2024 order (Dkt. No. 1056 (the "Order")) which largely rejected Apple's claims of attorney-client privilege and work-product protections as to eleven exemplar documents. Apple challenges the Order's holdings as to nine of those documents (Dkt. No. 1079), and Epic Games, Inc. ("Epic") opposes (Dkt. No. 1091).

As part of the ongoing evidentiary hearing regarding Apple's compliance with this Court's injunction, the Court ordered Apple to produce all injunction-compliance related documents (Dkt. No. 974), and referred all discovery matters to Judge Hixson (Dkt. No. 985). Of the documents reviewed, Judge Hixson estimates that Apple is asserting privilege over more than one third of the responsive documents.[1] (Order at 1.) The instant motion concerns, as Judge Hixson explained, "11 examples of documents that [Epic] says exemplify Apple's overreaching claims on privilege," which he reviewed in camera. (*Id.* at 1.)

A motion for relief from a non-dispositive order should only be granted when the moving party establishes that the non-dispositive order by the magistrate judge is clearly erroneous or contrary to law. Fed. R. Civ. P. 72; *see Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1414 (9th Cir. 1991) ("[T]he magistrate's decision on a nondispositive issue will be reviewed by the district judge under the clearly erroneous standard."). "In finding that the magistrate judge's decision is

---

[1] Apple has to-date asserted privilege over some 55,000 (by Apple's count) to 57,000 (by Epic's count) documents. (*See* Dkt. No. 1073 at 2, 4.)

United States District Court
Northern District of California

1    'clearly erroneous,' the Court must arrive at a definite and firm conviction that a mistake has been

2    committed." *Barnes & Noble, Inc. v. LSI Corp.*, 2013 WL 841334, at *1 (N.D. Cal. Mar. 6, 2013)

3    (quoting *Wi-Lan, Inc. v. LG Elecs., Inc.*, 2011 WL 841271, at *1 (N.D. Cal. Mar. 8, 2011)).  This

4    standard of review is extremely deferential.  *Id.*

5         The core of Apple's assertion of privilege rests on claims of "dual-purpose

6    communications," *i.e.*, communications with counsel that "involve both legal and non-legal

7    analyses."  *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021) (citation omitted).  For these

8    "dual-purpose communications," the Ninth Circuit has directed courts to apply the "primary

9    purpose test" for claims of attorney-client privilege and consider "whether the primary purpose of

10    the communication is to give or receive legal advice, as opposed to business" advice.  *Id.*

11    Additionally, the work product doctrine protects "dual purpose" documents from disclosure where

12    those documents were created "because of" the prospect of litigation, if "in light of the nature of

13    the document and the factual situation in the particular case, the document can be fairly said to

14    have been prepared or obtained because of the prospect of litigation."  *See In re Grand Jury*

15    *Subpoena (Mark Torf/Torf Env't Mgmt.)*, 357 F.3d 900, 908 (9th Cir. 2004) (quoting Charles Alan

16    Wright, Arthur R. Miller & Richard L. Marcus, 8 Fed. Prac. & Proc. Civ. § 2024 (2d ed. 1994)).

17    Further, Apple urges that Judge Hixson "failed to consider the documents' context."

18    (Dkt. No. 1079 at 3.)

19         With the relevant legal standard in mind, the Court has reviewed each of the documents

20    over which Apple claims attorney-client privilege or work product protections.  The Court affirms

21    Judge Hixson's findings and finds that none of rulings reflect clear error.  Each is appropriately

22    supported by the Ninth Circuit standards provided above.  The Order reflects a careful

23    consideration of the arguments presented by the parties, which includes the context that prompted

24    the creation of each of these documents.  That Judge Hixson approved of certain redactions for

25    privilege in particular documents while rejecting others underscores his nuanced assessment.  (*See*

26    Order at 3–4.)

27         Moreover, the Court finds that many of Apple's claims do not even rise to the level of

28    "dual purpose."  Companies have been repeatedly advised that merely attaching a lawyer's name

United States District Court
Northern District of California

2

to a document does not suffice for invoking the privilege.  Substance, not form, matters.  In fact, there are precisely the kinds of documents the Court ordered produced as they reflect the business rationale at issue.

The Court further rejects Apple's claim that Judge Hixson denied it the opportunity to be heard fully on the factual context.  Apple strains credulity by arguing that it does not know how the expedited discovery-dispute protocol works in the Northern District of California.  These arguments were waived as they were not presented to Judge Hixson.[2]  Notwithstanding Apple's knowledge of these processes, the Court has reviewed the Declaration of Jennifer Brown and is not convinced otherwise.  The declaration is too generic to overcome the facial substance of the document.  That a lawyer may review a document or has an "understanding" that a lawyer reviewed a document does not create a privilege.  There is no showing of how any legal advice or work product was provided or what other lawyers, not the declarant, actually did that constituted legal advice or work product.  Lawyers frequently revise documents.  That does not create a privilege.  Further, the choosing of a non-privileged document to review for testimony does not create a privilege.  In short, Apple's business decisions cannot be shielded because they were prompted by a Court order.  A line exists.  Judge Hixson appropriately heeded the distinction.

Accordingly, Apple's motion for relief is **DENIED**.  Judge Hixson's determinations with respect to the eleven exemplar documents are upheld in full.

This terminates Dkt. No. 1079.

**IT IS SO ORDERED.**

Dated: December 31, 2024

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

---

[2] Similarly, the majority of the authority upon which Apple relies in its reply brief was not cited in either Apple's motion or Epic's opposition.  (*See* Dkt. No. 1094.)  As Apple is well aware, it should not be citing, and the Court need not consider, new law in a reply where it should have been cited in the motion.

3

United States District Court
Northern District of California

# Exhibit A

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically RECEIVED on 6/18/2024 2:20:03 PM

Case 4:20-cv-05640-YGR    Document 1049-2    Filed 11/07/24    Page 2 of 20

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 6/18/2024 by Dianna Urzua, Deputy Clerk

# S285154

# IN THE
# SUPREME COURT OF CALIFORNIA

---

### MICHELLE BEVERAGE, ET AL.,
*Plaintiffs and Appellants,*

*v.*

### APPLE INC.,
*Defendant and Respondent.*

---

AFTER A DECISION BY THE COURT OF APPEAL
SIXTH APPELLATE DISTRICT
CASE NO. H050526

APPEAL FROM THE SUPERIOR COURT FOR SANTA CLARA COUNTY
HON. SUNIL KULKARNI, JUDGE
CASE NO. 20CV370535

---

## ANSWER TO PETITION FOR REVIEW

---

**COMPLEX APPELLATE LITIGATION GROUP LLP**
**\*Anna-Rose Mathieson** (No. 231770)
**Charles M. Kagay** (No. 73377)
**Melanie Gold** (No. 116613)
96 Jessie Street
San Francisco, CA 94105
(415) 649-6700 • Fax: (415) 726-2527
annarose.mathieson@calg.com
charles.kagay@calg.com
melanie.gold@calg.com

**GIBSON DUNN & CRUTCHER LLP**
**\*Julian W. Kleinbrodt** (No. 302085)
**Viola Li** (No. 327783)
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200 • Fax: (415) 393-8306
jkleinbrodt@gibsondunn.com
vhli@gibsondunn.com

ATTORNEYS FOR DEFENDANT AND RESPONDENT
**APPLE INC.**

## Table of Contents

Table of Authorities ........................................................................3

Introduction ...................................................................................5

Background ....................................................................................8

Argument........................................................................................8

    I.    The petition misreads the Court of Appeal
decision ...........................................................................8

    II.   The petition concedes that California decisions
are already uniform on the issue actually decided
below ..............................................................................10

    III.  The petition does not establish any need to settle
an important question of law ......................................13

Conclusion ....................................................................................16

Certificate of Word Count.............................................................18

## Table of Authorities

### *Cases*

*Adolph v. Uber Technologies, Inc.*
(2023) 14 Cal.5th 1104...........................................................12

*Belton v. Comcast Cable Holdings, LLC*
(2007) 151 Cal.App.4th 1224................................................10

*Campbell v. Superior Court*
(1996) 44 Cal.App.4th 1308...................................................12

*Cel-Tech Communications, Inc. v. Los Angeles*
*Cellular Telephone Company*
(1999) 20 Cal.4th 163.....................................................*passim*

*Chavez v. Whirlpool Corp.*
(2001) 93 Cal.App.4th 363.............................................*passim*

*Davis v. HSBC Bank Nevada, N.A.*
(9th Cir. 2012) 691 F.3d 1152...............................................12

*De La Torre v. CashCall, Inc.*
(2018) 5 Cal.5th 966.............................................................15

*Drum v. San Fernando Valley Bar Assn.*
(2010) 182 Cal.App.4th 247...................................................10

*Epic Games, Inc. v. Apple Inc.*
(9th Cir. 2023) 67 F.4th 946..................................................12

*Epic Games, Inc. v. Apple Inc.*
(N.D.Cal. 2021) 559 F.Supp.3d 898 ...............................11, 12

*Kolling v. Dow Jones & Co.*
(1982) 137 Cal.App.3d 709 .....................................................6

*Leegin Creative Leather Products, Inc. v. PSKS,*
*Inc.*
(2007) 551 U.S. 877...............................................................10

*Loeffler v. Target Corp.*
(2014) 58 Cal.4th 1081..........................................................15

*Novell, Inc. v. Microsoft Corp.*
(10th Cir. 2013) 731 F.3d 1064..............................................11

*Olszewski v. Scripps Health*
(2003) 30 Cal.4th 798............................................................15

**4-ER-649**

*People's Choice Wireless, Inc. v. Verizon Wireless*
(2005) 131 Cal.App.4th 656 ................................................ 10

*SC Manufactured Homes, Inc. v. Liebert*
(2008) 162 Cal.App.4th 68 .................................................. 10

*Schnall v. Hertz Corp.*
(2000) 78 Cal.App.4th 1144 ................................................ 15

*Shvarts v. Budget Group, Inc.*
(2000) 81 Cal.App.4th 1153 ................................................ 15

*State of California ex rel. Van de Kamp v. Texaco, Inc.*
(1988) 46 Cal.3d 1147 ........................................................ 14

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*
(1998) 17 Cal.4th 553 ......................................................... 14

*The Jeanery, Inc. v. James Jeans, Inc.*
(9th Cir. 1988) 849 F.2d 1148 ............................................. 10

*United States v. Colgate Co.*
(1919) 250 U.S. 300 ....................................................... *passim*

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*
(2004) 540 U.S. 398 ....................................................... 6, 11

*Zhang v. Superior Court*
(2013) 57 Cal.4th 364 .................................................... 15, 16

### Statutes

Bus. & Prof. Code, § 16700 et seq. ................................................ 8

Bus. & Prof. Code, § 17200 ............................................................. 5

Bus. & Prof. Code, § 17200 et seq. ................................................ 8

### Rules

Cal. Rules of Court, rule 8.500 ....................................................... 7

# S285154

# IN THE
# SUPREME COURT OF CALIFORNIA

---

**MICHELLE BEVERAGE, ET AL.,**
*Plaintiffs and Appellants,*

*v.*

**APPLE INC.,**
*Defendant and Respondent.*

---

## ANSWER TO PETITION FOR REVIEW

---

### Introduction

Plaintiffs ask this court to decide whether, under *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company* (1999) 20 Cal.4th 163, if conduct "is not 'unlawful' under California's Unfair Competition Law ["UCL"] because it is not barred by a prohibitory statute, is it also automatically not 'unfair' under that Law"?  (Petn. 5.)  But this case does not present that issue.

The Court of Appeal did not hold that conduct must be "unlawful" to be considered "unfair" under the UCL.  To the contrary, the Court of Appeal recognized that the " 'UCL operates as a three-pronged statute' " that separately prohibits " 'any unlawful, unfair or fraudulent business act.' "  (Opn. 7; Bus. & Prof. Code, § 17200.)  The court repeatedly made clear that

5

conduct is *not* automatically shielded from the "unfair" prong of the UCL simply because it does not violate other laws. (Opn. 7 [" 'a practice may be deemed unfair even if not specifically proscribed by some other law' "], 17-18.)

Instead, the Court of Appeal affirmed because plaintiffs did not dispute that the conduct they challenged as "unfair" was protected by the *Colgate* doctrine. (Opn. 17; see *United States v. Colgate Co.* (1919) 250 U.S. 300.) That doctrine is a " 'firmly entrenched' " rule of both state and federal antitrust law (Opn. 11) that provides immunity for "the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal" – including the right to "announce in advance the circumstances under which he will refuse to sell." (*Colgate*, at p. 307; see also *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP* (2004) 540 U.S. 398, 408; *Kolling v. Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 720.)

*Cel-Tech* instructs courts faced with a UCL "unfair" claim to determine whether a "safe harbor" protects the conduct. (*Cel-Tech*, *supra*, 20 Cal.4th at pp. 187, 182-184.) As *Cel-Tech* held, "[i]f the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination." (*Id*. at p. 182.) In applying that framework, the Court of Appeal explained that a UCL "unfair" claim falls within a safe harbor when the allegations sound in antitrust yet focus on solely unilateral conduct that has "been

6

historically accepted as procompetitive and categorically shielded from antitrust liability by the *Colgate* doctrine." (Opn. 18.)

Plaintiffs do not suggest that review is necessary to secure uniformity of California decisions or settle an important question of law. Nor could they. The decision below followed a decision of the Second Appellate District that reached the same result more than 20 years ago, *Chavez v. Whirlpool Corp.* (2001) 93 Cal.App.4th 363, 375. As *Chavez* concluded, unilateral "conduct that the courts have determined to be permissible under the *Colgate* doctrine cannot be deemed 'unfair' under the [UCL]." (*Ibid.*) California courts have followed *Chavez* for more than two decades, and no California appellate court has questioned or departed from its holding.

In the Court of Appeal, plaintiffs conceded that the *Chavez* decision would bar their "unfair" claim under the UCL. (Opn. 13-14.) But plaintiffs urged the Court of Appeal to disagree with *Chavez* and adopt a different rule. In declining to do so, the Court of Appeal relied on settled principles and emphasized the "narrow" nature of its holding, stressing that its "decision is limited to" situations "where the same conduct found immune from antitrust liability by the *Colgate* doctrine is also alleged to violate the 'unfair' prong of the UCL." (Opn. 17-18.)

Rather than focusing on the factors governing review in rule 8.500 of the California Rules of Court, the petition focuses on the merits, and argues the Court of Appeal misapplied *Cel-Tech*'s "unfair" prong standard. These assertions are not appropriate grounds for review, and they are also wrong. The decisions

7

holding that the *Colgate* doctrine provides a "safe harbor" to UCL liability are uniform and correct. There is no reason for this court's review.

## Background

The trial court in this case sustained a demurrer to plaintiffs' complaint alleging violations of the antitrust provisions of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) and unlawful and unfair conduct under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) At the Court of Appeal, plaintiffs abandoned any challenge to the trial court's dismissal of their antitrust and UCL "unlawful" claims, effectively conceding that the conduct they challenged was a lawful refusal to deal under federal and state antitrust law and was protected by the long-established *Colgate* doctrine. (Opn. 13). Plaintiffs instead challenged only the dismissal of their claims under the UCL's "unfair" prong.

In a careful decision, the Court of Appeal rejected plaintiffs' argument, following the decisions of other Courts of Appeal in finding a safe harbor for allegedly "unfair" conduct protected by the *Colgate* doctrine.

## Argument

### I.    The petition misreads the Court of Appeal decision

The petition seeks review of a question not at issue in this case. Plaintiffs repeatedly assert that the Court of Appeal held that any activity that is not prohibited by the antitrust laws can never be deemed "unfair" under the UCL. (Petn. 7, 16, 24-25.)

Plaintiffs frame their entire petition around this contention, identifying the sole issue for review as: "where the defendant's conduct is not 'unlawful' under California's Unfair Competition Law because it is not barred by a prohibitory statute, is it also *automatically* not 'unfair' under that Law – even though no separate 'safe harbor' statute immunizes that conduct?" (Petn. 5, italics added.)

But the Court of Appeal did not issue the ruling that plaintiffs try to challenge. To the contrary, the Court of Appeal repeatedly stated that conduct is *not* automatically shielded from the "unfair" prong of the UCL simply because it does not violate antitrust law: "[A]n 'unfair' business act or practice need not violate an antitrust law to be actionable under the UCL." (Opn. 18; see also Opn. 7 [" 'a practice may be deemed unfair even if not specifically proscribed by some other law' "], quoting *Cel-Tech*, *supra*, 20 Cal.4th at p. 180.) And *Chavez* said the same. (*Chavez*, *supra*, 93 Cal.App.4th at p. 375.)

Rather than announcing a broad rule, the Court of Appeal made clear that its decision was "a narrow one" that turned on plaintiffs' failure to challenge the trial court's finding that Apple's conduct was protected by the *Colgate* doctrine. (Opn. 17, 13-14.) This court should not grant review to decide a question not presented by this case.

## II.    The petition concedes that California decisions are already uniform on the issue actually decided below

Plaintiffs do not argue that review is needed to resolve conflicting California authority.  Indeed, they concede the opposite.  They complain that the Sixth Appellate District followed the Second Appellate District's earlier *Chavez* decision, and acknowledge that at least three other published Court of Appeal decisions have followed or cited *Chavez* with approval.  (Petn. 25-26, citing *Drum v. San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247; *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 93; and *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1240.)  An entire subsection of the petition is captioned:  "The Opinion Relies on Other Court of Appeal Decisions."  (Petn. 25-26.)

Plaintiffs cite no California decision that has so much as questioned *Chavez* in the 20-plus years since it was issued.  And for good reason.  As California courts have long recognized, the *Colgate* doctrine's protection of unilateral conduct does not represent a mere failure to act by the Legislature, but rather recognizes a "right" that is "sacrosanct" because of its procompetitive effects.  (*People's Choice Wireless, Inc. v. Verizon Wireless* (2005) 131 Cal.App.4th 656, 667; *Chavez, supra*, 93 Cal.App.4th at p. 370; see also *Leegin Creative Leather Products, Inc. v. PSKS, Inc.* (2007) 551 U.S. 877, 902; *The Jeanery, Inc. v. James Jeans, Inc.* (9th Cir. 1988) 849 F.2d 1148, 1154.)  Plaintiffs should not be allowed to " 'plead around' " this safe harbor.  (*Cel-Tech, supra*, 20 Cal.4th at p. 184.)

The conclusion that conduct protected by the *Colgate* doctrine cannot form the basis of a UCL action also accords with *Cel-Tech*'s requirement that, in applying the "unfair" prong, "[c]ourts must be careful not to make economic decisions or prevent rigorous, but fair, competitive strategies that all companies are free to meet or counter with their own strategies." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 185.)  As *Chavez* recognized, allowing plaintiffs to plead around the *Colgate* doctrine in a UCL action "could lead to the enjoining of procompetitive conduct." (*Chavez*, *supra*, 93 Cal.App.4th at p. 375, citing *Cel-Tech*, at p. 185; see also, e.g., *Trinko*, *supra*, 540 U.S. at pp. 408, 414-415 [explaining how the *Colgate* doctrine is procompetitive and benefits consumers].) That is consistent with federal precedent recognizing that judicial intervention into conduct protected under *Colgate* not only raises "[a]dministrability concerns" as courts would have "to become 'central planners' " but also would "paradoxically risk encouraging collusion between rivals and dampen[ing] price competition – themselves paradigmatic antitrust wrongs, injuries to consumers and the competitive process alike." (*Novell, Inc. v. Microsoft Corp.* (10th Cir. 2013) 731 F.3d 1064, 1073.)

The absence of any conflict among California appellate courts is alone reason for this court to deny the petition.  While conceding the lack of a conflict among California decisions, plaintiffs argue that *Chavez* and the decision below are inconsistent with decisions in a federal court lawsuit involving Epic Games, the developer of Fortnite.  (See *Epic Games, Inc. v.*

11

*Apple Inc.* (N.D.Cal. 2021) 559 F.Supp.3d 898, affd. in part and revd. in part (9th Cir. 2023) 67 F.4th 946.)[1]

But they are wrong. In *Epic Games*, the Ninth Circuit gave several examples of a "categorical" legal bar that would preclude a UCL claim, *including the Chavez decision.* (*Epic Games*, *supra*, 67 F.4th at p. 1001.) That is, the Ninth Circuit cited *Chavez* as holding "that the *Colgate* doctrine – that it is lawful for a company to unilaterally announce the terms on which it will deal – precluded a UCL action." (*Ibid.*) The Ninth Circuit did not disagree with *Chavez*, nor did it address the applicability of the *Colgate* doctrine to the conduct challenged in that case, and therefore did not resolve the issue presented in this case.

In any event, "federal opinions are not controlling authority in interpreting state law." (*Campbell v. Superior Court* (1996) 44 Cal.App.4th 1308, 1317; accord, *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1119.) Even if there were some inconsistency between the Court of Appeal's opinion and *Epic Games*, there would be no basis for this court to reconsider legal principles that California courts have interpreted uniformly for decades. That is particularly true here because, as the court below explained, neither of the federal *Epic Games* decisions "engaged [in] a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims." (Opn. 18, fn. 6.)

---

[1] Plaintiffs also cite *Davis v. HSBC Bank Nevada, N.A.* (9th Cir. 2012) 691 F.3d 1152 (Petn. 29), but that court did not address the *Chavez/Colgate* unilateral conduct issue.

12

### III.  The petition does not establish any need to settle an important question of law

Rather than addressing the factors that govern review, plaintiffs focus on the merits and argue that the court below (and the *Chavez* court, and the other courts that have reached the same result) misinterpreted *Cel-Tech*.  Plaintiffs suggest that only express statutory language can create a "safe harbor," so the 100-year-old *Colgate* doctrine does not qualify.

But in addition to agreeing with the analysis set out in *Chavez*, the Court of Appeal went further by explaining how this result followed from *Cel-Tech*'s holding that a UCL safe harbor may arise when the Legislature " 'considered a situation and concluded no action should lie.' "  (Opn. 14-17, italics omitted.) Viewing this language from *Cel-Tech*, together with the Cartwright Act's history of prohibiting only coordinated conduct, the *Colgate* doctrine's longstanding and prominent role in state and federal antitrust jurisprudence, and the Legislature's nonintervention against this background, the Court of Appeal found the *Colgate* doctrine provides a " 'safe harbor' against Plaintiffs' UCL claim under the 'unfair' prong."  (Opn. 17.)  As the Court of Appeal explained, "we find sufficient indication from the text and history of the Cartwright Act that the Legislature has determined that 'no action should lie' for unilateral refusals to deal that are permissible under the *Colgate* doctrine."  (Opn. 15.)[2]

---

[2] The petition criticizes the decision below because "the Court of Appeal looked to the legislative history of the prohibitory statute – almost always an iffy project, where one can only rarely

*(footnote continues on following page)*

Plaintiffs do not even try to identify an unsettled question of law or any inconsistent authority pertaining to this careful analysis.

Instead, plaintiffs argue that this court should retroactively reject a portion of its own decision in *Cel-Tech* and hold the following italicized phrase has no independent meaning: " 'If the Legislature has permitted certain conduct *or considered a situation and concluded no action should lie*, courts may not override that determination.' " (Petn. 6-7, 15-24; *Cel-Tech*, *supra*, 20 Cal.4th at p. 182.) The petition describes this phrase as "less-than-clear" and "awkward" (Petn. 20) – a polite way of saying that this court supposedly misspoke.

But this phrase is no offhand remark – it is integral to *Cel-Tech*'s reasoning and holding. Shortly after that quoted language, *Cel-Tech* explained in detail that the Legislature's failure to outlaw an activity amounts to a safe harbor against the UCL's "unfair" prong if and only if it considered the activity in enacting legislation:

---

be sure of what the Legislature intended." (Petn. 40-41.) But the Court of Appeal relied on *this court's* explanation of the legislative history of the Cartwright Act, and *this court's* analysis of the significance of legislative inaction in the face of decisions finding the Cartwright Act does not extend to unilateral conduct. (Opn. 15-16, quoting and citing *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1154-1163, superseded by statute on another ground as stated in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 570.) Unless plaintiffs want to ask this court to disavow its own prior discussion of the Cartwright Act's legislative history, along with portions of *Cel-Tech*, this is not a fair criticism of the Court of Appeal's opinion.

14

> *If*, in [a provision of law], *the Legislature considered certain activity in certain circumstances and determined it to be lawful*, courts may not override that determination under the guise of the unfair competition law. However, *if the Legislature did not consider that activity in those circumstances*, the failure to proscribe it in a specific provision does not prevent a judicial determination that it is unfair under the unfair competition law.

(*Cel-Tech*, *supra*, 20 Cal.4th at p. 183, italics added.) And later in the *Cel-Tech* decision, the court directly applied this holding to the case before it. (*Id.* at p. 188.)

This court has repeatedly reiterated that a safe harbor should be found when the Legislature " 'considered a situation and concluded no action should lie.' " (*De La Torre v. CashCall, Inc.* (2018) 5 Cal.5th 966, 986; *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1125; *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 377, 379, fn. 8; *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 828.) The Courts of Appeal have followed and applied this test. (See, e.g., *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1154, 1162-1163 [finding one UCL "unfair" claim fell within a safe harbor based on express statutory language, one fell within a safe harbor because the Legislature considered the situation and determined no action should lie, and one did not fall within a safe harbor]; *Shvarts v. Budget Group, Inc.* (2000) 81 Cal.App.4th 1153, 1157-1159.)

Plaintiffs argue that this court has already "read *Cel-Tech*" to reject any reliance on the "considered a situation" language (Petn. 20, 22-24, citing *Zhang*, *supra*, 57 Cal.4th 364). But in *Zhang*, this court recognized a safe harbor even in the absence of

express statutory language because the Legislature had
" 'considered [the] situation and concluded no action should lie.' "
(*Zhang*, *supra*, 57 Cal.4th 364 at p. 379, fn. 8.)  The Court of
Appeal cited this specific portion of *Zhang* in rejecting plaintiffs'
arguments below (Opn. 14-15), but plaintiffs continue to ignore it,
focusing instead on other quotes that are entirely consistent with
the Court of Appeal's analysis.  (Compare, e.g., Petn. 23
[stressing that *Zhang* held that " 'a practice may violate the UCL
even if it is not prohibited by another statute' "] with Opn. 7 [" 'a
practice may be deemed unfair even if not specifically proscribed
by some other law' "].)

     In sum, plaintiffs do not establish any disagreement among
the California courts, and indeed they concede the California
courts have reached uniform decisions on the issue actually
decided in this case.  The petition focuses solely on the merits but
does not show any need for this court's review.

## Conclusion

     The petition establishes no grounds for Supreme Court
review and identifies no error in the Court of Appeal's decision.
This court should deny review.

Respectfully submitted,

June 18, 2024          **Complex Appellate Litigation Group LLP**
                      Anna-Rose Mathieson
                      Charles M. Kagay
                      Melanie Gold

                      **Gibson Dunn & Crutcher LLP**
                      Julian W. Kleinbrodt
                      Viola Li


                      By /s/ Anna-Rose Mathieson
                      Anna-Rose Mathieson

                      *Attorneys for Respondent Apple Inc.*

17

**4-ER-663**

## Certificate of Word Count

(Cal. Rules of Court, rule 8.504(d)(1).)


The text of this answer consists of 2,865 words as counted

by the Microsoft Word program used to generate this answer.


Dated: June 18, 2024

/s/ Anna-Rose Mathieson
Anna-Rose Mathieson

## Proof of Service

I, Stacey Schiager, declare as follows:

I am employed in the County of San Francisco, State of California, am over the age of eighteen years, and am not a party to this action. My business address is 96 Jessie Street, San Francisco, CA 94105. On June 18, 2024, I mailed the following document:

### Answer to Petition for Review

I enclosed a copy of the document identified above in an envelope and deposited the sealed envelope with the U.S. Postal Service, with the postage fully prepaid. The envelope was addressed as follows:

> The Honorable Sunil Kulkarni, Dept. 1
> Santa Clara County Superior Court
> 191 North First Street
> San Jose, CA 95113
> *Trial Judge*

Additionally, on June 18, 2024, I caused the above-identified document to be electronically served on all parties and the California Court of Appeal via TrueFiling, which will submit a separate proof of service.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on June 18, 2024.

/s/ Stacey Schiager
Stacey Schiager

DANIEL G. SWANSON, SBN 116556
 dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
 crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

JULIAN W. KLEINBRODT, SBN 302085
 jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: 415.393.8200
Facsimile: 415.393.8306

MARK A. PERRY, SBN 212532
 mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice*)
 joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000
Facsimile: 202.857.0940

Attorneys for Defendant APPLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC.,<br><br>        Plaintiff, Counter-defendant<br><br>v.<br><br>APPLE INC.,<br><br>        Defendant, Counterclaimant | Case No. 4:20-cv-05640-YGR<br><br>**APPLE INC.'S MOTION FOR RELIEF FROM THE JUDGMENT UNDER FEDERAL RULE 60(B)**<br><br>The Honorable Yvonne Gonzalez Rogers<br>Hearing Date: November 12, 2024 (noticed date)<br>Hearing Time: 2:00pm PST<br>Courtroom 1, 4th Floor |

# NOTICE OF MOTION

## TO ALL PARTIES HEREIN AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE THAT on Tuesday, November 12, 2024 at 2:00pm PST, or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable Yvonne Gonzalez Rogers, Courtroom 1 – 4th Floor, United States District Court, 1301 Clay Street, Oakland, California, Apple Inc. ("Apple") will and hereby does move that this Court provide relief under Federal Rule of Civil Procedure 60(b)(5) from the judgment, and enter an order vacating or narrowing the injunction entered on September 10, 2021 ("Injunction"). *See* Dkt. No. 813.

This motion is based on this notice and supporting memorandum, the trial record, the appellate record, intervening decisions from the California Sixth District Court of Appeal and U.S. Supreme Court, and other information of which the Court may take judicial notice. The parties met and conferred, and were not able to resolve the issues without motion practice.

Dated: September 30, 2024

Respectfully submitted,

By: */s/ Mark A. Perry*
Mark A. Perry
WEIL, GOTSHAL & MANGES LLP

Attorney for Apple Inc.

APPLE'S MOTION FOR RELIEF FROM JUDGMENT      i      CASE NO. 4:20-cv-05640-YGR

## TABLE OF CONTENTS

Page

Introduction ................................................................................................................ 1

Background ................................................................................................................. 2

    A.   *Epic v. Apple* ................................................................................................. 2

    B.   *Beverage v. Apple* ......................................................................................... 4

    C.   *Murthy v. Missouri* ....................................................................................... 6

Legal Standard ........................................................................................................... 6

Argument .................................................................................................................... 8

  I.   *Beverage* and *Murthy* establish that the Injunction is unlawful ...................... 8

    A.   *Beverage* establishes that the UCL ruling is incorrect as a matter of state law ................. 8

    B.   *Murthy* clarifies that Epic lacks Article III standing to seek nationwide injunctive relief running to third-party developers ........... 11

        1.   *Murthy* clarifies the "tall order" of establishing a future injury that depends on the conduct of independent third parties ............. 12

        2.   *Murthy*'s demands are not satisfied as to the Injunction of Apple's conduct toward third-party developers ............. 13

  II.  In light of *Beverage* and *Murthy*, it is no longer equitable to continue enjoining Apple from imposing anti-steering rules ............. 15

    A.   The *Beverage* decisions warrant vacating the Injunction ............................... 16

    B.   At a minimum, *Beverage* and *Murthy* together warrant narrowing the Injunction to apply solely to Epic and its affiliates ............. 18

        1.   Article III, comity, and federalism concerns strongly support narrowing the Injunction ............. 18

        2.   The equities favor narrowing the Injunction ......................................... 22

Conclusion ............................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*245 Park Member LLC v. HNA Grp. (Int'l)*,
674 F. Supp. 3d 28 (S.D.N.Y. 2023) ...............................................................23

*Agostini v. Felton*,
521 U.S. 203 (1997) ..................................................................... 6, 7, 15, 20

*Allergan, Inc. v. Athena Cosms., Inc.*,
738 F.3d 1350 (Fed. Cir. 2013) ......................................................................19

*Artec Grp. v. Klimov*,
No. 15-cv-03449-EMC, 2017 WL 5625934 (N.D. Cal. Nov. 22, 2017) ...........7

*Asencio v. Miller Brewing Co.*,
283 F. App'x 559 (9th Cir. 2008) ................................................................ 8, 9

*Associated Builders & Contractors v. Michigan Dep't of Lab. & Econ. Growth*,
543 F.3d 275 (6th Cir. 2008) ................................................................... 13, 23

*Bellevue Manor Assocs. v. United States*,
165 F.3d 1249 (9th Cir. 1999) ................................................................... 6, 22

*Beverage v. Apple Inc.*,
101 Cal. App. 5th 736 (2024) ................................................................*passim*

*Beverage v. Apple Inc.*,
No. S285154 (Cal. May 29, 2024) ....................................................................5

*Burnthorne-Martinez v. Sephora USA, Inc.*,
No. 16-cv-02843-YGR, 2016 WL 6892721 (N.D. Cal. Nov. 23, 2016) ..........21

*Bynoe v. Baca*,
966 F.3d 972 (9th Cir. 2020) .................................................................... 15, 18

*California ex rel. Becerra v. EPA*,
978 F.3d 708 (9th Cir. 2020) ........................................................1, 7, 15, 16, 18

*Cameron v. Apple Inc.*,
No. 19-cv-3074-YGR (N.D. Cal. Nov. 16, 2021) ...................................... 3, 15

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) .................................................................*passim*

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................12

*Doe v. Briley*,
562 F.3d 777 (6th Cir. 2009) ............................................................................7

*Flores v. Huppenthal,*
   789 F.3d 994 (9th Cir. 2015)...................................................................21

*Georgia v. President of the U.S.,*
   46 F.4th 1283 (11th Cir. 2022)...............................................................19

*Gibson v. Berryhill,*
   411 U.S. 564 (1973) ..............................................................................16

*Gill v. Whitford,*
   585 U.S. 48 (2018) ................................................................................18

*Gondeck v. Pan Am. World Airways, Inc.,*
   382 U.S. 25 (1965) ................................................................................17

*Growe v. Emison,*
   507 U.S. 25 (1993) ................................................................................16

*Guillen v. Bank of Am. Corp.,*
   No. 5:10-cv-05825-EJD, 2011 WL 4071996 (N.D. Cal. Aug. 31, 2011).......................21

*Hawaii v. Office of Hawaiian Affs.,*
   556 U.S. 163 (2009) ..............................................................................19

*Hegler v. Borg,*
   50 F.3d 1472 (9th Cir. 1995)...................................................................12

*Henson v. Fid. Nat'l Fin., Inc.,*
   943 F.3d 434 (9th Cir. 2019)...................................................................17

*Herrera v. Zumiez, Inc.,*
   953 F.3d 1063 (9th Cir. 2020).................................................................9

*Horne v. Flores,*
   557 U.S. 433 (2009) .........................................................................7, 22

*Keegan v. Grant Cnty. Pub. Util. Dist. No. 2,*
   661 P.2d 146 (Wash. Ct. App. 1983).......................................................9

*Keith v. Volpe,*
   118 F.3d 1386 (9th Cir. 1997).................................................................16

*Killgore v. SpecPro Pro. Servs., LLC,*
   51 F.4th 973 (9th Cir. 2022) ...................................................................8

*L.A. Haven Hospice, Inc. v. Sebelius,*
   638 F.3d 644 (9th Cir. 2011)...................................................................21

*Levin v. Com. Energy, Inc.,*
   560 U.S. 413 (2010) ..................................................................18, 19, 20

APPLE'S MOTION FOR RELIEF FROM JUDGMENT          ii          CASE NO. 4:20-cv-05640-YGR

*Marroquin v. City of Los Angeles*,
  112 F.4th 1204 (9th Cir. 2024) ........................................................................6

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ........................................................................11

*Missouri v. Biden*,
  83 F.4th 350 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1972 (2024) ........................13

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024) ........................................................................*passim*

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) ........................................................................3, 23

*Pierce v. Cook & Co.*,
  518 F.2d 720 (10th Cir. 1975) ........................................................................17

*Poublon v. C.H. Robinson Co.*,
  846 F.3d 1251 (9th Cir. 2017) ........................................................................9

*Pyramid Lake Paiute Tribe of Indians v. Hodel*,
  882 F.2d 364 (9th Cir. 1989) ........................................................................20

*Richardson v. United States*,
  841 F.2d 993 (9th Cir. 1988) ........................................................................1, 8, 9, 21

*Rogers v. Lyft, Inc.*,
  452 F. Supp. 3d 904 (N.D. Cal. 2020) ........................................................................21, 22

*Royal Crown Ins. Corp. v. Northern Mariana Islands*,
  447 F. App'x 760 (9th Cir. 2011) ........................................................................10

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992) ........................................................................7, 16

*Ryman v. Sears, Roebuck & Co.*,
  505 F.3d 993 (9th Cir. 2007) ........................................................................9

*S. Or. Barter Fair v. Jackson County*,
  372 F.3d 1128 (9th Cir. 2004) ........................................................................1, 13

*State Farm Fire & Cas. Co. v. Abraio*,
  874 F.2d 619 (9th Cir. 1989) ........................................................................9

*Stephan v. Dowdle*,
  733 F.2d 642 (9th Cir. 1984) ........................................................................9

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................2, 18, 22

*Sweeton v. Brown*,
   27 F.3d 1162 (6th Cir. 1994).................................................................................7

*Syst. Fed'n No. 91, Ry. Emps. Dep't v. Wright*,
   364 U.S. 642 (1961) ..........................................................................................7

*In re Terrorist Attacks on Sept. 11, 2001*,
   741 F.3d 353 (2d Cir. 2013)........................................................................ 17, 20

*The Jeanery, Inc. v. James Jeans, Inc.*,
   849 F. 2d 1148 (9th Cir 1988)..........................................................................11

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ........................................................................................18

*United States v. AMC Ent., Inc.*,
   549 F.3d 760 (9th Cir. 2008)..................................................................... 19, 21

*United States v. Harris*,
   531 F.3d 507 (7th Cir. 2008).............................................................................7

*United States v. Holtzman*,
   762 F.2d 720 (9th Cir. 1985)...........................................................................23

*United States v. Sineneng-Smith*,
   590 U.S. 371(2020) .........................................................................................14

*United States v. Texas*,
   599 U.S. 670 (2023) ........................................................................................19

*Venoco, LLC v. Plains Pipeline, L.P.*,
   No. 21-55193, 2022 WL 1090947 (9th Cir. Apr. 12, 2022)......................... 2, 16, 17, 19

*Verde Media Corp. v. Levi*,
   No. 14-cv-00891-YGR, 2015 WL 2379564 (N.D. Cal. May 18, 2015)..................19

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ................................................................................... 3, 23

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................................20

*York v. Starbucks Corp.*,
   No. 08-cv-07919 GAF PJWX, 2011 WL 4597489 (C.D. Cal. Aug. 5, 2011)..................8

*Zogenix, Inc. v. Fed. Ins. Co.*,
   No. 4:20-CV-06578-YGR, 2022 WL 3908529 (N.D. Cal. May 26, 2022)..................9

**Constitution & Statutes**

15 U.S.C. § 1................................................................................................2

28 U.S.C. 1738 ................................................................................................. 16

U.S. Const. Art. III, § 2, cl. 1 ......................................................................... 12

U.S. Const. Amend. X ...................................................................................... 16

Cal. Bus. & Prof. Code § 16700 *et seq.* .......................................................... 2

Cal. Bus. & Prof. Code § 17200 *et seq.* ................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 60(b)(5) ............................................................................ *passim*

Fed. R. Civ. P. 60(b)(6) ............................................................ 1, 15, 16, 17, 19

Restatement (Second) of Judgments § 28 (1982). ......................................... 20

Restatement (Second) of Judgments § 29 (1982). ......................................... 20

**INTRODUCTION**

Federal Rule of Civil Procedure 60(b)(5) authorizes a court to relieve a party from a judgment when "applying it prospectively is no longer equitable." Apple respectfully submits that two recent developments make it no longer equitable to continue applying the Injunction prospectively. At a minimum, they warrant narrowing the Injunction so that it applies solely to Epic and its corporate affiliates. First, the California courts have held that Apple's enjoined anti-steering rules are not "unfair" under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. *Beverage v. Apple Inc*., 101 Cal. App. 5th 736 (2024), *review denied* (July 10, 2024). Second, the U.S. Supreme Court has emphasized the need for "specific causation findings" based on "specific evidence" to prove Article III standing for injunctive relief where the plaintiff's injury depends on the future conduct of independent third parties. *Murthy v. Missouri*, 144 S. Ct. 1972, 1987, 1991 n.7 (2024).

*Beverage* and *Murthy* were not available to this Court when it entered the Injunction or to the Ninth Circuit when it affirmed, but they show that the Injunction rests on two errors. First, under *Beverage*, Apple's anti-steering rules do not violate California's UCL. "In a case governed by state law, a federal court is not free to disregard an intervening decision of a state appellate court, even if it requires a reexamination of the law of the case" following appellate review. *Richardson v. United States*, 841 F.2d 993, 1000 (9th Cir. 1988). Second, under the standing analysis set forth in *Murthy*, there is no basis under Article III to enjoin Apple's conduct towards third-party developers. This Court must follow *Murthy* because it is an intervening decision of the Supreme Court that provides "clarifi[cation]" and "important guidance" on a threshold constitutional issue. *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1136, 1137 (9th Cir. 2004).

*Beverage* warrants vacating this Court's Injunction because it directly contravenes the UCL rulings made by this Court and the Ninth Circuit. "[W]hen a district court reviews an injunction based solely on law that has since been altered to permit what was previously forbidden, it is an abuse of discretion to refuse to modify the injunction in the light of the changed law." *California ex rel. Becerra v. EPA*, 978 F.3d 708, 718–19 (9th Cir. 2020). For example, the Ninth Circuit has held that a district court abused its discretion in declining to grant relief under Rule 60(b)(6)—even after a prior Ninth Circuit affirmance—when a California appellate court disagreed and reached the opposite conclusion in

an intervening decision applying the same "doctrine to the same defendant on the basis of virtually identical facts." *Venoco, LLC v. Plains Pipeline, L.P.*, No. 21-55193, 2022 WL 1090947, at *3 (9th Cir. Apr. 12, 2022). That is what happened here.

At a minimum, *Beverage* and *Murthy* together establish that this Court should narrow the Injunction to apply solely to Epic and its affiliates. Enforcing an injunction that runs to others without the requisite showings of traceability and redressability exceeds the "proper—and properly limited—role of the courts in a democratic society." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (citation omitted). The Injunction also raises acute comity and federalism concerns: It indefinitely enjoins conduct that the California courts have now held is lawful, it exports that incorrect legal ruling nationwide, and it effectively overrides *Beverage* by providing non-party developers with state-law relief that *Beverage* would foreclose if those same developers brought their own actions against Apple, even though Epic never sought to certify a class. Narrowing the Injunction to Epic and its affiliates would significantly ease those concerns.

Apple respectfully submits that the intervening decisions in *Beverage* and *Murthy* warrant relief from the UCL judgment, and an order vacating or, in the alternative, narrowing the Injunction.

## BACKGROUND

### A.   *Epic v. Apple*

Epic filed this lawsuit in August 2020. After a bench trial, the Court entered judgment rejecting Epic's claims under the federal Sherman Act, 15 U.S.C. § 1, and the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*. The Court also exercised its supplemental jurisdiction to hold that Apple's anti-steering rules were "unfair" under the California UCL. Dkt. No. 812 ("Rule 52 Order"), at 161–66. The Court rejected Apple's argument that the legality of its rules under the antitrust laws precluded analogous UCL "unfairness" claims. *See id.* at 162 n.631 (discussing *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001)); Dkt. No. 779-1 ¶¶ 609–12 (relying on *Chavez*).

Although Epic never sought class certification and opted out of a then-pending developer class action, the Court enjoined Apple from applying its then-existing anti-steering rules to any developer nationwide. *See* Dkt. No. 813 ¶ 1. Specifically, the Court enjoined Apple from "prohibiting developers from … including in their apps and their metadata buttons, external links, or other calls to action that

direct customers to purchasing mechanisms" other than Apple's own In-App Purchase System ("IAP"). *Id.* ¶ 1(i).[1]

Apple moved for a stay of the Injunction arguing, among other things, that Epic lacked Article III standing. *See* Dkt. No. 821, at 14. Epic opposed, contending that Apple's anti-steering rules maintained supracompetitive commissions, which indirectly reduced Epic's royalties earned for its *Unreal Engine* software that it licenses to developers. *See* Dkt. No 824, at 13; Dkt. No. 835, at 7:2–13. Relying on that representation about *Unreal Engine* royalties, this Court denied the motion. *See* Dkt. No. 830, at 2. The Ninth Circuit stayed the Injunction pending appeal. C.A. Dkt. No. 27.

The Ninth Circuit affirmed this Court's rejection of Epic's claims under the Sherman Act. *See Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 966 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024). Epic did not appeal the rejection of its Cartwright Act claims.

Apple cross-appealed the UCL Injunction. Apple argued that this Court's Article III holding was premised on misrepresentations by Epic about its *Unreal Engine* royalties. The evidence established that those royalties depend on gross sales, not net profits after commission, so Apple's commission did not affect them. C.A. Dkt. No. 93, at 103–04. On the merits, Apple argued, among other things, that the UCL claim failed as a matter of law under *Chavez* because the same conduct had been held not to violate the antitrust laws. *Id.* at 105. And Apple argued, among other things, that its anti-steering rules were unilateral conduct protected under established antitrust principles. *See* C.A. Dkt. 183, at 10–11 (citing *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 n.2, 457 (2009), and *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415–16 (2004)).

Epic did not defend its prior representations regarding the *Unreal Engine* license structure. Epic instead argued for the first time that "marketplace dynamics" supported standing, contending that, "[i]f *Unreal Engine* developers could inform their customers that out-of-app purchases are available at lower rates than in-app purchases through IAP, consumers would have the choice to seek the better deal." C.A. Dkt. No. 163, at 90.

---

[1] This Court also enjoined Apple from prohibiting certain out-of-app steering communications. Dkt. No. 813 ¶ 1(ii). Apple ceased prohibiting those communications as part of the developer class-action settlement in *Cameron v. Apple Inc.*, No. 19-cv-3074-YGR (N.D. Cal. Nov. 16, 2021), Dkt. 453.

The Ninth Circuit affirmed. First, the Court held that Epic had Article III standing, albeit on different grounds from this Court. The Ninth Circuit found that Epic has subsidiaries on the App Store and that any loss of profits by those subsidiaries indirectly harms Epic. 67 F.4th at 1000. The Ninth Circuit next found that Apple's anti-steering rules indirectly injured Epic in its capacity as "a competing game distributor through the Epic Games Store." *Id.* The Court reasoned that, "[i]f consumers can learn about lower app prices, which are made possible by developers' lower costs, and have the ability to substitute to the platform with those lower prices, they will do so—increasing the revenue that the Epic Games Store generates." *Id.* Epic had never mentioned harm via the Epic Games Store as a basis for standing. Neither Epic nor the Ninth Circuit cited specific evidence or findings showing that developers would in fact face lower costs because of the Injunction, would pass on those lower costs to users, or would direct users to the Epic Games Store specifically (instead of to their own websites or another platform). *See* C.A. Dkt. No. 163, at 87–91; *Epic Games*, 67 F.4th at 1003. The Ninth Circuit held that the nationwide remedy was appropriate because it was tied to Epic's alleged injuries. *Epic Games*, 67 F.4th at 1003.

Second, the Ninth Circuit affirmed this Court's determination that Apple's anti-steering rules violate the UCL as "unfair." The Ninth Circuit held that Epic's failure to prove its antitrust claims did not involve a "categorical legal bar" that would provide a "safe harbor" under *Chavez*. *Id.* at 1001 (emphasis omitted).

The Ninth Circuit denied the parties' petitions for rehearing, and the Supreme Court denied their petitions for certiorari. The Injunction took effect on January 16, 2024. Apple removed the anti-steering rules from its App Store Review Guidelines applicable to apps on the U.S. storefronts of the iOS and iPadOS App Stores. *See* Dkt. No. 871.

### B.  *Beverage v. Apple*

In *Beverage*, consumers of Epic's *Fortnite* game filed a putative class action against Apple in California state court. They alleged that Apple's rules—including the same anti-steering rules enjoined here—violated the Cartwright Act as well as the UCL. After this Court entered its Injunction but before the Ninth Circuit decision, the California trial court dismissed the *Beverage* complaint for failure to state a claim. It ruled that (1) Apple's anti-steering rules were protected under *Colgate* as a unilateral refusal

---

APPLE'S MOTION FOR RELIEF FROM JUDGMENT        4        CASE NO. 4:20-CV-05640-YGR

to deal; and (2) under *Chavez*, such unilateral conduct is not actionable under the UCL as "unfair." *See Beverage*, 101 Cal. App. 5th at 746. On appeal, the *Beverage* plaintiffs challenged that second ruling, contending that *Chavez* was wrongly decided and that the Sixth District Court of Appeal should follow the UCL "fairness" decisions of this Court and the Ninth Circuit. *Id.* at 753–756 & n.6.

The Sixth District Court of Appeal affirmed, squarely rejecting that argument. *Id.* The Court of Appeal held that "the *Colgate* doctrine provides Apple with a 'safe harbor' against Plaintiffs' UCL claim under the 'unfair' prong." *Id.* at 755. The court explained that the Cartwright Act is narrower than the Sherman Act: The Cartwright Act does not reach every "contract"; instead, it "prohibit[s] only anticompetitive conduct by two or more entities in conspiracy or in combination." *Id.* at 754. Accordingly, the court explained, the California legislature affirmatively decided to preclude liability for "a claim describing only a unilateral refusal to deal without alleging a corresponding illegal conspiracy or combination." *Id.* at 749–50. The *Beverage* court further observed that the legislature had amended the Cartwright Act since *Chavez* and since the California courts had adopted *Colgate*, but had not overruled those decisions. *Id.* at 754. Accordingly, the court concluded, the California legislature intended to protect unilateral refusals to deal: It had "considered [the] situation and concluded no action should lie." *Id.* at 753–54 (emphasis omitted) (citation omitted).

Notably, the *Beverage* trial and appellate courts expressly declined to follow the determinations in this case that Apple's anti-steering rules are unfair. *See id.* at 756 n.6; Perry Decl., Ex. 1 ("*Beverage* First Trial Court Order"), at 14 n.7. The Court of Appeal found the *Epic* decisions not "persuasive on the precise issue presented by this appeal" because they mentioned *Chavez* "only in passing" and did not "engage[ ] a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims." *Beverage*, 101 Cal. App. 5th at 756 n.6.

The plaintiffs timely sought California Supreme Court review, arguing that the California Supreme Court should instead follow the *Epic* decisions. *See* Petition for Review, *Beverage v. Apple Inc.*, No. S285154, at 8 (Cal. May 29, 2024) (emphasizing that the Court of Appeal "decline[d] to follow recent federal decisions involving *exactly the same facts* as the current case"). On July 10, 2024, the California Supreme Court denied the petition for review. Perry Decl., Ex. 4. The Court of Appeal entered remittitur on August 26, 2024, ending the case. Perry Decl., Ex. 5.

---

APPLE'S MOTION FOR RELIEF FROM JUDGMENT        5        CASE NO. 4:20-CV-05640-YGR

### C.  *Murthy v. Missouri*

On June 26, 2024, the U.S. Supreme Court decided *Murthy*. In *Murthy*, plaintiffs sued members of the Biden Administration, claiming they unlawfully pressured social media platforms to suppress "misinformation." 144 S. Ct. at 1981. The district court issued a nationwide preliminary injunction, restricting the government officials from communicating with platforms to suppress protected content. *Id.* at 1984. The Fifth Circuit affirmed in relevant part. *See id*.

The Supreme Court vacated for lack of Article III standing. The Supreme Court emphasized that the plaintiffs' claims of injury depended on how independent third parties (social media platforms) would respond to future pressure by government officials. That "one-step-removed, anticipatory nature of [their] alleged injuries" made proving standing a "tall order." *Id.* at 1986. To avoid "guesswork as to how independent decisionmakers will exercise their judgment," the plaintiffs in *Murthy* were required to establish "a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* (citation omitted).

The Court faulted the Fifth Circuit for "approach[ing] standing at a high level of generality." *Id.* at 1987. It then methodically addressed the standing of each plaintiff, finding a "lack of specific causation findings" and a lack of "specific facts" to connect each step of the causal chain on traceability and redressability. *Id*. at 1987, 1989–96 & n.7.

### LEGAL STANDARD

Under Rule 60(b)(5), a district court may relieve a party from a judgment when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). That Rule "codifies the courts' traditional authority, inherent in the jurisdiction of the chancery, to modify or vacate the prospective effect of their decrees." *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1252 (9th Cir. 1999) (internal quotation marks omitted). "'Rule 60(b)(5) is routinely used to challenge the continued validity of consent decrees' and 'injunction[s].'" *Marroquin v. City of Los Angeles*, 112 F.4th 1204, 1217 (9th Cir. 2024) (quoting *Bellevue Manor*, 165 F.3d at 1253).

Rule 60(b)(5) relief is warranted when "the party seeking relief from an injunction or consent decree can show 'a significant change either in factual conditions or in law.'" *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (citation omitted). "[T]he passage of time frequently brings about changed

circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of [an] original judgment." *Horne v. Flores*, 557 U.S. 433, 447 (2009); *see also Syt. Fed'n No. 91, Ry. Emps. Dep' v. Wright*, 364 U.S. 642, 650 n.6 (1961) ("There are many cases where a mere change in decisional law has been held to justify modification of an outstanding injunction.").

A change in decisional law qualifies as "significant" when it "undermine[s] the assumptions" or "erode[s]" the basis for the original order, even when it leaves the legal framework "largely unchanged." *Agostini*, 521 U.S. at 218, 222–23. Courts have likewise relieved a party from a judgment under Rule 60(b)(5) based on legal developments, "clarifications" of the law, and "continuing trends" in Supreme Court cases. *See Doe v. Briley*, 562 F.3d 777, 779 (6th Cir. 2009) (affirming vacatur of consent decree when "subsequent caselaw has swept away the decree's constitutional foundation"); *United States v. Harris*, 531 F.3d 507, 513 (7th Cir. 2008) (relief warranted if there is "change in, or clarification of, law that makes clear that the earlier ruling was erroneous"); *Sweeton v. Brown*, 27 F.3d 1162, 1166–67 (6th Cir. 1994) ("Ongoing injunctions should be dissolved when they no longer meet the requirements of equity. The law changes and clarifies itself over time. Neither the doctrines of *res judicata* or waiver nor a proper respect for previously entered judgments requires that old injunctions remain in effect when the old law on which they were based has changed."); *cf. Artec Grp. Inc. v. Klimov*, No. 15-cv-03449-EMC, 2017 WL 5625934, at *3 (N.D. Cal. Nov. 22, 2017) (reconsidering order on motion to dismiss for lack of personal jurisdiction based on "a continuing trend in Supreme Court authority"). Even for a consent decree, modification may be warranted "when … decisional law has changed to make legal what the decree was designed to prevent." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). And when no consent decree is involved, a court must modify the injunction "in light … of the changed law" when the injunction is "based solely on law that has since been altered to permit what was previously forbidden." *EPA*, 978 F.3d at 718–19.

## ARGUMENT

### I.   *BEVERAGE* AND *MURTHY* ESTABLISH THAT THE INJUNCTION IS UNLAWFUL

#### A.   *Beverage* establishes that the UCL ruling is incorrect as a matter of state law

This Court addressed whether Apple's anti-steering rules were "unfair" under the UCL without the benefit of any state court decision addressing that issue. It therefore was required to "predict how the highest state court would decide the state law issue." *Killgore v. SpecPro Pro. Servs., LLC*, 51 F.4th 973, 982 (9th Cir. 2022). This Court found that Apple's rules were "unfair" and that *Chavez* "does not counsel otherwise," and it enjoined Apple from enforcing those rules against any developer nationwide. Rule 52 Order 162 n.631, 168.

The *Beverage* decisions now settle the same question of California law underlying the Injunction, and they reach the opposite conclusion: Under *Beverage*, the conclusive determination of the California courts is that Apple's anti-steering rules are not "unfair" under the UCL. *Beverage*, 101 Cal. App. 5th at 755–56. This is not simply an intervening development or clarification on a general point of law—it is state-law precedent evaluating the *same* conduct by the *same* defendant under the *same* state law. *Beverage* is now the authoritative state-law pronouncement on the exact UCL issue in this case.

"In a case governed by state law, a federal court is not free to disregard an intervening decision of a state appellate court, even if it requires a reexamination of the law of the case"—including when the Ninth Circuit has previously affirmed. *Richardson*, 841 F.2d at 1000; *see also Asencio v. Miller Brewing Co.*, 283 F. App'x 559, 561 (9th Cir. 2008) ("An exception to the law of the case doctrine allows the district court sitting in diversity to reexamine the previously decided issue when 'there has been a dispositive intervening decision of an intermediate appellate state court.'" (quoting *Richardson*, 841 F.2d at 996)); *York v. Starbucks Corp.*, No. 08-cv-07919 GAF PJWX, 2011 WL 4597489, at *2 (C.D. Cal. Aug. 5, 2011) (similar). For example, in *Richardson*, the district court applied the state-law legal standard articulated by the Ninth Circuit in a prior published decision in the case rather than following the intervening decision of an intermediate state appellate court coming out the other way. 841 F.2d at 994–95. The Ninth Circuit reversed, holding that the state court's disagreement "with the Ninth Circuit's analysis" on the same state-law issue required the district court to depart from the law of the case. *Richardson*, 841 F.2d at 996–97. Notably, the Ninth Circuit found the intervening decision sufficient to

depart from law of the case even though the state appellate court applied a state-law standard that had been "consistently followed by [Washington] courts," *Keegan v. Grant Cnty. Pub. Util. Dist. No. 2*, 661 P.2d 146, 150 (Wash. Ct. App. 1983), without changing the legal standard. *See Richardson*, 841 F.2d at 997; *see also Stephan v. Dowdle*, 733 F.2d 642, 642 (9th Cir. 1984) (district court was required to follow intermediate state appellate court that reached "opposite conclusion" of Ninth Circuit on state law); *Asencio*, 283 F. App'x at 561 (affirming district court decision that followed intervening California intermediate appellate decision rather than prior Ninth Circuit decision).

Consistent with *Richardson* and other precedent, the law of the case doctrine is no barrier to revisiting the Injunction in light of *Beverage*. As in *Richardson*, the *Beverage* appellate court followed a longstanding doctrine of state law (*Chavez*), but expressly departed from the Ninth Circuit's state-law analysis. Accordingly, this Court must follow the *Beverage* appellate decision unless there is "convincing evidence that the state's supreme court likely would not follow it." *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007). No such evidence exists. To the contrary, the California Supreme Court denied a petition for review in *Beverage*, and "the importance of relying on a state appellate court's ruling is heightened when 'the highest court has refused to review the lower court's decision.'" *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1266–67 (9th Cir. 2017) (citation omitted); *see also Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1069–70 (9th Cir. 2020) (similar); *State Farm Fire & Cas. Co. v. Abraio*, 874 F.2d 619, 622 (9th Cir. 1989) (similar); *Zogenix, Inc. v. Fed. Ins. Co.*, No. 4:20-CV-06578-YGR, 2022 WL 3908529, at *7 n.4 (N.D. Cal. May 26, 2022) (state intermediate appellate decision was "binding" where facts were "analogous," the decision was the "only California state law decision to decide this issue," and the California Supreme Court denied the petition for review).

The *Beverage* appellate decision also identified a critical missing link in the UCL analysis in *Epic*, warranting reexamination of the Injunction. As noted, the California Court of Appeal declined to follow the *Epic* decisions because the federal courts mentioned *Chavez* "only in passing" and did not "engage[ ] a rigorous analysis of the *Colgate* doctrine and its effect on UCL claims." *Beverage*, 101 Cal. App. 5th at 756 n.6. The *Beverage* appellate decision thus clarifies that Apple's anti-steering rules cannot be enjoined under the UCL without a "rigorous analysis" of whether those rules are protected as unilateral conduct under *Colgate*. *Id.*

The previous *Epic* decisions did not address whether Apple's anti-steering rules were such unilateral conduct. As the *Beverage* trial and appellate courts noted, that dispositive legal question has never explicitly been resolved in this litigation. *See* 101 Cal. App. 5th at 756 n.6; *Beverage* First Trial Court Order 14 n.7. Epic specifically challenged only two provisions in the Apple Developer Program License Agreement (DPLA): one requiring developers to distribute iOS apps only through the App Store and the other requiring developers to use IAP for in-app purchases of digital goods and services. *See* Rule 52 Order 3, 141–42. In its Sherman Act ruling, this Court concluded that the DPLA was unilateral conduct outside the scope of Section 1. *See id.* at 141–43. The Ninth Circuit disagreed on that narrow issue, explaining that Section 1 reaches "[e]very contract" and that the DPLA is a "contract" even if it is a contract of adhesion. *See* 67 F.4th at 982; *cf.* Rule 52 Order 157 n.624 (suggesting that the DPLA may include terms that are bilateral restraints of trade). But the conclusion that the DPLA is a "contract" does not address or establish whether Apple's separate anti-steering Guidelines are unilateral conduct under *Colgate*, as adopted by the California courts, much less whether they are condemnable under the narrower Cartwright Act. Apple set forth its anti-steering rules through its App Store Review Guidelines, which the DPLA incorporates but which Apple imposes and can alter unilaterally. *See* Rule 52 Order 31; *id.* at 36–41 (describing Apple's exclusive management of the Guidelines). There is accordingly no law of the case on that critical point.

There is now, however, state law authority directly on point as to the lawfulness of Apple's anti-steering provisions under *Colgate* and the Cartwright Act. Under *Erie*, the state trial court's judgment is persuasive on matters of state law. *See, e.g.*, *Royal Crown Ins. Corp. v. Northern Mariana Islands*, 447 F. App'x 760, 762 n.1 (9th Cir. 2011). And the *Beverage* trial court decision is persuasive and indeed correct on this point.

First, as the *Beverage* trial court explained, Apple's anti-steering Guidelines are "open, unilateral conduct by Apple, essentially a 'take it or leave it' deal—not threats, boycotts or other such 'affirmative action' to coerce developers into a conspiracy with Apple against others." Perry Decl., Ex. 2 ("*Beverage* Second Trial Court Order"), at 7. "[A] claim describing only a unilateral refusal to deal without alleging a corresponding illegal conspiracy or combination does not state an actionable antitrust claim" under the Cartwright Act. *Beverage*, 101 Cal. App. 5th at 749–50. The Court's factual finding that "a developer

---

APPLE'S MOTION FOR RELIEF FROM JUDGMENT         10         CASE NO. 4:20-CV-05640-YGR

must accept [Apple's] provisions (including the challenged restrictions) to distribute games on iOS," Rule 52 Order 142, leads to the same conclusion as the *Beverage* trial court: Apple unilaterally imposes the Guidelines as a "take it or leave it" deal, which generally is not actionable under the Cartwright Act. *Beverage* Second Trial Court Order 7.

Second, as the *Beverage* trial court further explained, there is no coercion that would take Apple's Guidelines outside of *Colgate*'s protection. Under *Colgate*, as applied by the California courts, "coercion does not include the mere 'announcement' of a policy and refusal to deal with those who do not comply, even when coupled with 'measures to monitor compliance that do not interfere with … freedom of choice.'" *Beverage* Second Trial Court Decision 6 (citation omitted); *see also The Jeanery, Inc. v. James Jeans, Inc.*, 849 F. 2d 1148, 1158-59 (9th Cir 1988) ("[T]he privilege of independent action … under *Colgate*" extends to "exposition, persuasion, argument, or pressure." (citation omitted)). Apple unilaterally established its App Review terms as a condition of dealing with Epic and every other developer. It never forced Epic to accept its terms by threats or coercion: Epic voluntarily became an iOS app developer, profiting substantially. *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Under *Colgate*, the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply."). That is unilateral conduct without coercion.

Again, this Court's findings further support that conclusion. This Court found that Apple is not required to grant Epic access to its iOS platform because it is Apple's property and not an "essential facility." Rule 52 Order 158–59. Apple therefore does not coerce developers when it simply sets the terms of dealing. And this Court found that Apple was permitted to enforce its policy by removing Epic from the App Store. *Id.* at 178–79 (Apple merely "enforced [its] rights as plaintiff's own internal documents show Epic Games expected."). Apple's anti-steering Guidelines therefore are unilateral conduct and are not actionable as "unfair," as clarified in *Beverage*.

### B. *Murthy* clarifies that Epic lacks Article III standing to seek nationwide injunctive relief running to third-party developers

The Supreme Court's intervening decision in *Murthy*—decided after the Ninth Circuit's decision—further undercuts the current Injunction by clarifying that Epic lacks standing to enjoin Apple's conduct toward third-party developers.

### 1. *Murthy* clarifies the "tall order" of establishing a future injury that depends on the conduct of independent third parties

To establish Article III standing, a plaintiff must show that it has suffered, or will suffer, an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see* U.S. Const. Art. III, § 2, cl. 1. The Court in *Murthy* did not set a "new and elevated standard for redressability" or traceability, but it did clarify their applicability to a case like this one. 144 S. Ct. at 1996 n.11.

The Court in *Murthy* explained that it is a "tall order" to establish standing for an injunction when the plaintiff's theory of future injury depends on anticipated conduct of "independent decisionmakers." *Id.* at 1986. In such a case, the plaintiff must "show a substantial risk that, in the near future, at least one" of those third parties will act in the way that contributes to the injury. *Id.*; *see also id.* (describing "challenges" of proving standing based on "one-step-removed, anticipatory" injuries). The Court held that, in such a case, courts cannot "approach[] standing at a high level of generality." *Id.* at 1987. Rather, "specific causation findings" must link together each step of the causal chain on traceability and redressability. *Id.* And the Court clarified that the plaintiff, not a court, must devise and support the theory of standing. *See id.* at 1991 n.7. The Court found it "especially important to hold the plaintiffs to their burden in a case like this one, where the record spans over 26,000 pages and the lower courts did not make any specific causation findings." *Id.* Indeed, the Court rejected a theory of standing articulated for the first time by the dissenting Justices because "the *plaintiffs*" had not carried their burden. *Id.*

The Court's application of the specificity requirement is further illuminating. Over the course of seven pages, the Court reviewed the evidence in detail, plaintiff-by-plaintiff, and concluded that the record evidence was insufficiently specific to support each link in the causal chain on traceability and redressability. *E.g.*, *id.* at 1989 (finding that with respect to COVID-19 viewpoint suppression, "neither the timing nor the platforms line up"); *id.* at 1990–92 (concluding that the inferences from evidence were "weak[]"); *id.* at 1992 (noting that even the strongest evidence for standing was based on a "weak record" and gave that plaintiff "little momentum"); *id.* at 1995 (noting a "redressability problem" because evidence showed that the administration "wound down" its pandemic response measures "[a]round the

APPLE'S MOTION FOR RELIEF FROM JUDGMENT        12        CASE NO. 4:20-cv-05640-YGR

same time" plaintiff Hines last reported that Facebook had restricted her posts, making it "unlikely" an injunction would benefit her going forward).

### 2. *Murthy*'s demands are not satisfied as to the Injunction of Apple's conduct toward third-party developers

A Supreme Court decision that "provide[s] important guidance in [the] case" warrants departure from law of the case, even when the Ninth Circuit has previously affirmed. *S. Or. Barter Fair*, 372 F.3d at 1136; *see also Hegler v. Borg*, 50 F.3d 1472, 1478 (9th Cir. 1995) (recognizing "an exception to the law of the case doctrine" in that the Ninth Circuit "must apply intervening Supreme Court authority to a subsequent appeal"); *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 277–79 (6th Cir. 2008) (dissolving injunction after intervening Supreme Court ERISA decision clarified that previously enjoined state law was not preempted). Under *Murthy*, Epic lacks standing to enjoin Apple's application of its anti-steering rules toward third-party developers.

Under *Murthy*, it is a "tall order" for Epic to obtain standing to enjoin Apple's conduct towards third-party developers, who are "independent decisionmakers." 144 S. Ct. at 1986.[2] To support such a theory, Epic had the burden of proving that (1) third-party developers would imminently react to a change in Apple's policies by steering iOS users to the Epic Games Store as a place for purchasing in-app digital goods or services; (2) such steering by third-party developers would imminently cause their customers to make purchases on the Epic Games Store through external links; and (3) enjoining Apple's restrictions on such steering would cause an indirect increase in Epic's profits. *See Epic Games*, 67 F.4th at 1000.

Without the benefit of *Murthy*, however, the Ninth Circuit addressed standing at a "high level of generality." 144 S. Ct. at 1987. The Ninth Circuit's analysis of the Epic Games Store standing theory consists of two short sentences, *see* 67 F.4th at 1000, with no "specific causation findings" or "specific facts" to support the many steps in the causal chain on traceability and redressability, *Murthy*, 144 S. Ct. at 1987, 1991 n.7. That is similar to the level of generality in the Fifth Circuit's three-paragraph discussion of standing, which the Supreme Court reversed in *Murthy* as insufficiently specific. *See Missouri v. Biden*, 83 F.4th 350, 370–71 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1972 (2024).

---

[2] Epic's subsidiaries are not "independent decisionmakers" under the Ninth Circuit's ruling. *See* 67 F.4th at 1000–01. They accordingly fall outside the scope of *Murthy*.

APPLE'S MOTION FOR RELIEF FROM JUDGMENT       13       CASE NO. 4:20-CV-05640-YGR

The absence of specific factual findings is especially problematic because findings and record evidence contradict the theory of standing the Ninth Circuit announced *sua sponte*. Apple's in-app steering Guidelines prohibited developers from steering users to alternative mechanisms for purchasing in-app digital content and services available *on iOS apps*. Rule 52 Order 31. But the Epic Games Store is not a mechanism for directly purchasing iOS content in the United States. As this Court found, "the Epic Games Store serves as a platform to sell gaming apps which operated on PC and Mac computers." *Id.* at 15; *see also id.* at 15–16. The Epic Games Store thus does not distribute apps or in-app content on the iOS platform in the United States. And notably, this Court further found that PC and Mac distribution were a different market, outside the market of digital mobile gaming transactions. *Id.* at 84–85 ("[T]he relevant product market does not appear to be so wide as to include all platforms at this time"); *id.* at 133, 151. That is a fundamental disconnect between Apple's in-app steering rules and any claimed indirect impact on the future profitability of the Epic Games Store.

The Ninth Circuit also adopted a theory of standing that Epic did not advance in this Court or on appeal, a practice that *Murthy* forecloses, particularly in a "case like this one" with a long and complex record. *See* 144 S. Ct. at 1991 n.7. There is good reason for that rule: The Ninth Circuit lacked specific evidence or findings to support its theory of third-party standing in part because Epic had never advanced or supported that theory. *Cf. United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("in the first instance and on appeal," courts "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (citation omitted)).

To be sure, Judge Smith's concurrence in the order staying the mandate stated that record is "filled with support" for Epic's standing to enjoin Apple's conduct towards third-party developers. *See Epic Games, Inc. v. Apple, Inc.*, 73 F.4th 785, 786 (9th Cir. 2023) (Smith, J., concurring). That single-judge opinion was written without the benefit of *Murthy*, however, and the cited evidence does not satisfy *Murthy*'s requirements.

Judge Smith pointed to record evidence about cross-platform games, *see id.* at 787, but that evidence does not close the *Murthy* gap. Among other things, the record lacks specific findings or evidence that ending Apple's anti-steering rules would cause developers of cross-platform games to steer users *to the Epic Games Store specifically*. *See* Rule 52 Order 83–85. Instead of steering users to the

Epic Games Store, developers could continue using IAP, or could steer users to their own websites or a competing platform. *See id.* (discussing Sony PlayStation, Nintendo Switch, Microsoft Xbox, and Nvidia GeForce Now). There are no specific findings or record evidence on that point.

The concurrence also focused on Apple's out-of-app steering rule prohibiting developers from using information "obtained from account registration" to "encourage[] users to use a purchasing method other than [IAP]." *Id.* at 31–32; *see also Epic* Games, 73 F.4th at 787. But there are no specific findings or evidence on whether ending this anti-steering rule would cause third-party developers to try and steer users to the Epic Games Store to distribute iOS in-app digital content (or content available on iOS via a cross-platform game). In any event, Apple removed its out-of-app steering rule as part of the *Cameron* class action settlement. *See* Stipulation of Settlement § 5.1.3, *Cameron v. Apple Inc.*, No. 19-cv-3074-YGR (Aug. 26, 2021), Dkt. No. 396-1, Ex. A. Accordingly, even if that rule had indirectly injured Epic in the past, it no longer does so prospectively for reasons that are independent of the Injunction. *See* p.3 n.1, *supra*. That prior rule thus provides no basis to continue a nationwide injunction, nor can it justify enjoining Apple prospectively from imposing a separate prohibition against in-app links, buttons, and other calls to action.

Under *Murthy*, Epic therefore failed to carry its burden and lacks Article III standing to enjoin Apple's conduct towards developers other than Epic and its affiliates. To the extent the Injunction is not vacated outright under *Beverage*, it should be narrowed to Epic and its affiliates under *Murthy*.

## II. IN LIGHT OF *BEVERAGE* AND *MURTHY*, IT IS NO LONGER EQUITABLE TO CONTINUE ENJOINING APPLE FROM IMPOSING ANTI-STEERING RULES

Rule 60(b)(5) relief is warranted when an intervening decision "undermine[s] the assumptions" or "erode[s]" the basis for the original order, even when it leaves the legal framework "largely unchanged." *Agostini*, 521 U.S. at 218, 222–23 (citation omitted). And "when a district court reviews an injunction based solely on law that has since been altered to permit what was previously forbidden, it is an abuse of discretion to refuse to modify the injunction in the light of the changed law." *EPA*, 978 F.3d at 718–19; *see Bynoe v. Baca*, 966 F.3d 972, 984 (9th Cir. 2020) (relief from judgment appropriate even under Rule 60(b)(6) when intervening decision "resolve[s] an unanswered question of law"). Here, there are two intervening decisions that require either vacatur or at least modification of the Injunction.

**A.   The *Beverage* decisions warrant vacating the Injunction**

The intervening *Beverage* decisions warrant vacating the Injunction under Rule 60(b)(5). This Court entered a nationwide injunction based on its resolution of an unanswered question of state law, holding that Apple's prior anti-steering rules violate the UCL. The California courts have since answered that precise question, holding that those same Apple anti-steering rules comply with the UCL and are lawful. The California courts therefore "permit what was previously forbidden" by the Injunction in this case. *EPA*, 978 F.3d at 718–19; *see also Rufo*, 502 U.S. at 388 ("[D]ecisional law has changed to make legal what the decree was designed to prevent.").

A direct and irreconcilable conflict now exists between *Beverage* and the Injunction: If Apple were to engage prospectively in the very conduct that the *Beverage* decisions held was lawful under California law, Apple would violate this Court's Injunction issued under the same state law. The Injunction thus renders the *Beverage* decisions largely ineffective. But "elementary principles of federalism and comity embodied in the full faith and credit statute" means that federal courts must "give [state court] judgment[s] *legal effect*." *Growe v. Emison*, 507 U.S. 25, 35–36 (1993); *see also Gibson v. Berryhill*, 411 U.S. 564, 581 (1973) (relying on "considerations of equity, comity, and federalism" to vacate a judgment for reconsideration in light of an intervening decision of state law); 28 U.S.C. § 1738 (the judicial proceedings of any state "shall have the same full faith and credit in every court within the United States"); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997) (a federal consent decree cannot override valid state law, when the court does not identify a federal law justifying the decree; and "policy concerns" do not suffice) (citing U.S. Const. Amend. X).

The Ninth Circuit has recognized that such a direct conflict between a state appellate court decision and a federal decision requires relief even from a *retrospective* judgment under Rule 60(b)(6). In *Venoco*, as here, (1) the district court ruled in favor of the plaintiff under California law; (2) the Ninth Circuit affirmed; and (3) a California Court of Appeal later issued a decision that expressly departed from the Ninth Circuit in a case applying the same state-law "doctrine to the same defendant on the basis of virtually identical facts." 2022 WL 1090947, at *2–3; *see also id.* (the case involved "the same oil spill, the same legal doctrine, and the same defendant"). The district court denied a Rule 60(b)(6) motion, but the Ninth Circuit reversed in a summary order, holding that the district court abused its discretion by

---

APPLE'S MOTION FOR RELIEF FROM JUDGMENT          16          CASE NO. 4:20-CV-05640-YGR

declining to follow the intervening state court decision. The Ninth Circuit found the "direct relationship between the original judgment and the change in law" to be "especially important" and to "tip[] the scales heavily toward" relief. *Id.* at *2. The Court emphasized that declining to grant relief "would only injure comity interests." *Id.* at *3. Because the case "hinge[d]" on California law, it went "to the heart of comity's concern with tensions 'between the independently sovereign state and federal judiciaries.'" *Id.* at *3 (citation omitted). That was "especially" true, the Ninth Circuit observed, because the case applied the same "doctrine to the same defendant on the basis of virtually identical facts." *Id.*; *see also Gondeck v. Pan Am. World Airways, Inc.*, 382 U.S. 25, 26–27 (1965) (granting relief out of time in the "interests of justice" to avoid "unfair" results when other victims of the same accident had subsequently obtained relief); *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 357 (2d Cir. 2013) (abuse of discretion to deny Rule 60(b)(6) relief following intervening federal appellate decision to avoid "inconsistent results between two sets of plaintiffs suing for damages based on the same incident"); *Pierce v. Cook & Co.*, 518 F.2d 720, 723 (10th Cir. 1975) (Rule 60(b)(6) relief warranted when the "federal courts in which [the movants] were forced to litigate have given them substantially different treatment than that received in state court by another injured in the same accident").

Rule 60(b)(5) relief is even more clearly warranted here. First, as in *Venoco*, this case involves application of the same doctrine "to the same defendant on the basis of virtually identical facts." 2022 WL 1090947, at *2–3. Leaving the Injunction in place thus "would only injure comity interests" and would go "to the heart" of comity's concerns. *Id.* Second, as in *Venoco*, the California Court of Appeal expressly departed from the *Epic* decisions. The Court of Appeal stated that the decisions were not "persuasive," mentioned *Chavez* "only in passing," and failed to engage in a "rigorous analysis of the *Colgate* doctrine and its effect on UCL claims." *Beverage*, 101 Cal. App. 5th at 756 n.6. Third, the legal standard here is more easily satisfied than in *Venoco*. For retrospective relief, Rule 60(b)(6) imposes a higher standard, limiting relief to "extraordinary circumstances." *Henson v. Fid. Nat'l Fin., Inc.*, 943 F.3d 434, 443, 446–53 (9th Cir. 2019). For prospective relief, by contrast, Rule 60(b)(5) requires merely that it no longer be "equitable" to continue applying the injunction. Fed. R. Civ. P. 60(b)(5). Indeed, the Ninth Circuit has made clear that district courts *must* grant prospective relief under Rule 60(b)(5) when an injunction's legal underpinnings are subsequently removed and no consent decree is involved. *See*

---

APPLE'S MOTION FOR RELIEF FROM JUDGMENT        17        CASE NO. 4:20-CV-05640-YGR

*EPA*, 978 F.3d at 718–19; *Bynoe*, 966 F.3d at 984. It is thus no longer equitable to continue enjoining Apple from engaging in the very conduct that the *Beverage* decisions hold is lawful.

### B.   At a minimum, *Beverage* and *Murthy* together warrant narrowing the Injunction to apply solely to Epic and its affiliates

At a minimum, this Court should narrow the Injunction to apply only to Epic and its affiliates. Under *Beverage* and *Murthy*, the portion of the Injunction that enjoins Apple's conduct towards third-party developers oversteps the Court's authority under Article III and gives rise to acute comity and federalism problems. The balance of the equities also powerfully supports narrowing the Injunction.

#### 1.   Article III, comity, and federalism concerns strongly support narrowing the Injunction

Under *Murthy*, Epic has failed to adduce sufficient evidence to establish Article III standing to obtain injunctive relief against Apple with respect to third parties. In light of that decision, the nationwide Injunction raises serious concerns about overstepping the "proper—and properly limited—role of the courts in a democratic society." *Summers*, 555 U.S. at 492–93. Article III's limitations are "fundamental to the judiciary's proper role in our system of government." *Murthy*, 144 S. Ct. at 1985 (citation omitted). A court's "constitutionally prescribed role" is to "vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 585 U.S. 48, 72 (2018). "Federal courts do not possess a roving commission to publicly opine on every legal question. Federal courts do not exercise general legal oversight of the Legislative and Executive Branches, *or of private entities*." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021) (emphasis added). Any "remedy must … be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill*, 585 U.S. at 68 (citation omitted). Otherwise, an uninjured plaintiff is, "by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's 'compliance with regulatory law.'" *TransUnion*, 594 U.S. at 427 (citation omitted). Those Article III considerations weigh heavily in favor of narrowing the Injunction.

Comity and federalism concerns also strongly support narrowing the Injunction. The Ninth Circuit affords great weight to comity and federalism concerns in the Rule 60(b) context. *See* pp.16–18, *supra*. Comity is grounded in "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their

---

separate functions in separate ways." *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 421 (2010) (citation omitted); *see also Verde Media Corp. v. Levi*, No. 14-cv-00891-YGR, 2015 WL 2379564, at *4 (N.D. Cal. May 18, 2015) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). When a state intermediate court decision applies the same doctrine "to the same defendant on the basis of virtually identical facts," comity concerns are sufficient to justify even Rule 60(b)(6) relief from a retrospective judgment applicable only to the named private parties in a case. *See Venoco*, 2022 WL 1090947, at *3.

Those concerns are far more pronounced when a federal court has relied on state law to prospectively enjoin conduct nationwide that the state courts have since held is lawful under state law. Unlike a retrospective judgment, the injury to comity from a prospective injunction in contravention of state law is ongoing. Even worse, the injury extends nationwide. "[T]he issuance of an injunction under state law prohibiting otherwise lawful conduct in another state raises serious concerns." *United States v. AMC Ent., Inc.*, 549 F.3d 760, 772 (9th Cir. 2008) (quoting *Herman Miller, Inc. v. Palazzeti Imps. & Exps., Inc.*, 270 F.3d 298, 327 (6th Cir. 2001)). As the Eleventh Circuit has explained, "nationwide injunctions frustrate foundational principles of the federal court system" and "disturb comity by hindering other courts from evaluating legal issues for themselves." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1305 (11th Cir. 2022); *see also United States v. Texas*, 599 U.S. 670, 694 (2023) (Gorsuch, J., concurring) (noting problems with decrees that "purport to define the rights and duties of sometimes millions of people who are not parties before them"); *Allergan, Inc. v. Athena Cosms., Inc.*, 738 F.3d 1350, 1358 (Fed. Cir. 2013) ("The injunction impermissibly imposes the UCL on entirely extraterritorial conduct regardless of whether the conduct in other states causes harm to California."). The Supreme Court has invalidated a statewide injunction on the ground that it "improperly prevent[ed] the citizens of the State from addressing the issue [of statewide relief] through the processes provided by the State's constitution." *Hawaii v. Office of Hawaiian Affs.*, 556 U.S. 163, 176–77 (2009).

Here, California's process for resolving questions about the scope of the UCL has run its course "through the processes provided by the State's constitution." *Id.* at 177. The California courts have concluded that Apple's anti-steering rules are lawful. The nationwide Injunction, however, makes it

1   illegal for Apple to apply those same rules to any developer in California or in the nation. The Injunction

2   thus subverts comity by overriding the determination of the California courts, rather than leaving them

3   "free to perform their separate functions in separate ways." *Levin*, 560 U.S. at 421 (citation omitted).

4   　　The conflict with *Beverage* and *Murthy* also greatly exacerbates the Rule 23 and preclusion

5   problems that arise from the nationwide Injunction. Under ordinary principles of finality, even though

6   the Injunction is based on a determination of state law that the state courts have since rejected as

7   incorrect, Epic could potentially still be entitled to its win as a party. Principles of finality can sometimes

8   outweigh the interest of correcting an erroneous and inequitable decision. *Cf. Pyramid Lake Paiute Tribe*

9   *of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989); *but see Agostini*, 521 U.S. at 218, 222, 223

10  (a change in decisional law warrants relief from a prospective order when the change "undermine[s] the

11  assumptions" or "erode[s]" the basis for the original order, even when it leaves the legal framework

12  "largely unchanged"); *In re Terrorist Attacks*, 741 F.3d at 358 ("[T]he interest in finality must yield to

13  the interests of justice" to avoid "treat[ing] cases arising from the same incident differently"). Third-

14  party developers are not parties to this litigation, however. Epic did not seek to represent or certify a

15  nationwide developer class, and it opted out of a parallel developer class action. *See* Rule 52 Order 23–

16  24; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360–61 (2011) (describing stringent

17  requirements for class certification). And as non-parties, third-party developers could not rely on this

18  Court's judgment and instead would have to independently establish that Apple's anti-steering rules are

19  "unfair."[3] They could not do so under *Beverage*.

20  　　Prospective application of the nationwide Injunction subverts those bedrock principles of law.

21  Enjoining Apple's conduct nationwide gives third-party developers the benefit of a legal determination

22  that they never sought and, post-*Beverage*, could not obtain if they sued Apple themselves. That

23  effectively converts Epic's single-plaintiff suit into a nationwide Rule 23(b)(2) class action, even though

24  Epic did not invoke (or make the requisite showings under) Rule 23, and the resulting class-wide

25  injunction contravenes California law. Prospective application of the nationwide Injunction thus

26  

---

27  [3] In a separate suit against Apple, developers could not rely on the issue-preclusive effect of the *Epic* judgment. Issue preclusion is unavailable when there has been an "intervening change in the applicable legal context." Restatement (Second) of Judgments § 28 (1982). Non-mutual preclusion is additionally

28  unavailable when "[t]he determination relied on as preclusive [i]s itself inconsistent with another determination of the same issue." *Id.* § 29.

APPLE'S MOTION FOR RELIEF FROM JUDGMENT　　　20　　　CASE NO. 4:20-CV-05640-YGR

deprives the California courts of the ability to determine important questions of California law. Federal courts ordinarily must follow the decisions of the state intermediate courts as to state law, not the other way around. *See Richardson*, 841 F.2d at 1000; *see also, e.g.*, *Burnthorne-Martinez v. Sephora USA, Inc.*, No. 16-cv-02843-YGR, 2016 WL 6892721, at *7 (N.D. Cal. Nov. 23, 2016); *Guillen v. Bank of Am. Corp.*, No. 5:10-cv-05825-EJD, 2011 WL 4071996, at *4 (N.D. Cal. Aug. 31, 2011).

Narrowing the Injunction to Epic and its subsidiaries would significantly mitigate the conflict with the *Beverage* decisions, eliminate the *Murthy* problem, and ease the Rule 23 and preclusion problems. If the Injunction applied only to Epic and its subsidiaries—like a typical non-class action—the Injunction and the *Beverage* decisions could coexist without significantly interfering with one another. Apple would have won one case against one set of plaintiffs, and lost another case against a different plaintiff. Each judgment would be limited to its own parties, and the *Beverage* decisions would carry their usual precedential and persuasive force in future litigation with others.

The Ninth Circuit has narrowed nationwide injunctions out of comity to other courts. For example, in *AMC Entertainment*, the Ninth Circuit relied on comity concerns to hold that a district court abused its discretion in entering a nationwide injunction after another circuit had "judicially repudiated" the underlying legal position. 549 F.3d at 772–73; *see id.* at 770 ("Courts ordinarily should not award injunctive relief that would cause substantial interference with another court's sovereignty."). The Ninth Circuit has further held that a district court "abused its discretion by entering a nationwide injunction" when, among other things, "several other courts of appeals [we]re currently reviewing" the same question. *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 661, 665 (9th Cir. 2011); *see also Flores v. Huppenthal*, 789 F.3d 994, 1008 (9th Cir. 2015) (vacating statewide injunction when plaintiffs did not allege statewide injury). Here, the California courts in *Beverage* have "review[ed]" and "judicially repudiated" the UCL determination, and *Murthy* further undermines Epic's standing to pursue nationwide relief. In light of those developments, this Court should similarly narrow the Injunction.

Other district courts have also refused to grant nationwide relief on the basis of California law. In *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904 (N.D. Cal. 2020), *aff'd*, 2022 WL 474166 (9th Cir. Feb. 16, 2022), for example, three individual Lyft drivers did not seek a class action, but nonetheless sought a nationwide injunction to benefit all Lyft drivers based on alleged violations California law. *Id.* at 919.

APPLE'S MOTION FOR RELIEF FROM JUDGMENT     21     CASE NO. 4:20-CV-05640-YGR

1  The district court held that Article III foreclosed the court from issuing class-wide injunctive relief in a

2  non-class action. *Id.* at 919–20. The court emphasized that federal courts cannot "adjudicate a standalone

3  'abstract' request for an injunction 'apart from any concrete application' of the challenged policy 'that

4  threatens imminent harm' to the plaintiffs." *Id.* at 920 (quoting *Summers*, 555 U.S. at 494). In light of

5  *Murthy* and *Beverage*, this Court similarly should cease enjoining Apple's conduct towards developers

6  other than Epic and its affiliates. That would return this case to the familiar posture of individual non-

7  class litigation between private parties.

8  **2. The equities favor narrowing the Injunction**

9  For the reasons set forth above, it is not equitable to continue enjoining Apple from imposing

10  anti-steering rules prospectively, particularly as to developers other than Epic and its subsidiaries. The

11  intervening decisions in *Beverage* and *Murthy* establish both that Apple's prior rules do not violate

12  California law, and that Epic lacks standing to seek a nationwide injunction running to non-parties.

13  There is nothing on Epic's side of the equitable ledger. Epic no longer has any apps of its own

14  on the App Store. Epic's indirect interest in Apple's treatment of Epic's subsidiaries, *see Epic Games*,

15  67 F.4th at 1000–01, provides no basis to justify the nationwide Injunction, *see* p.13 n.2, *supra*. Epic has

16  no cognizable interest in Apple's treatment of third-party developers (*i.e.*, developers other than its

17  affiliates) because Epic has never attempted to prove, and lacks specific findings or evidence, that

18  Apple's anti-steering rules will imminently harm Epic in its capacity as the proprietor of the Epic Games

19  Store. *See* pp.13–15, *supra*. The relief Apple seeks is purely prospective, and any finality interests that

20  Epic might assert are further weakened with respect to a "sweeping public-litigation-type injunction"

21  like this one. *Bellevue*, 165 F.3d at 1257; *cf. Horne*, 557 U.S. at 447 ("Rule 60(b)(5) serves a particularly

22  important function in … 'institutional reform litigation.'").

23  Apple has been diligent bringing this motion to the Court's attention. The U.S. Supreme Court

24  decided *Murthy* on June 26, 2024, and issued its judgment on July 29, 2024. *See Murthy*, 144 S. Ct. at

25  1972; Perry Decl., Ex. 7. The California Supreme Court denied the *Beverage* petition on July 11, 2024,

26  and the Court of Appeal issued its remittitur on August 26, 2024. Perry Decl., Exs. 4, 5. The parties met

27  and conferred on August 28, 2024, consistent with the Court's Standing Order in Civil Cases requiring

28  parties to meet and confer "before the filing of any motion" to determine whether the motion can be

avoided or deferred until after this Court's multi-defendant criminal trial. The parties agreed that Epic would not raise any claim of undue delay based on Apple deferring its filing from August 28, 2024, until one business day after the last calendared date for that trial. Apple filed on September 30, 2024, the first business day after the last calendared date of that trial. *See United States v. Holtzman*, 762 F.2d 720, 725 (9th Cir. 1985) (reversing district court finding a five-year period unreasonable, emphasizing "the prospective nature of the injunction calls for leniency in interpreting the reasonable time requirement"); *Associated Builders,* 543 F.3d at 279 (6th Cir. 2008) (rejecting "unduly strict reading of the reasonable-time requirement" because it would "tend to force premature Rule 60(b)(5) motions"); *see also 245 Park Member LLC v. HNA Grp. (Int'l) Co.*, 674 F. Supp. 3d 28, 36 n.5 (S.D.N.Y. 2023) (collecting cases finding Rule 60(b)(6) motions timely within 5 to 18 months), *aff'd*, 2024 WL 1506798 (2d Cir. Apr. 8, 2024).

More broadly, Apple has diligently protected its rights throughout this litigation. Apple has consistently argued that *Chavez* foreclosed Epic's UCL "unfairness" claim. *See* Dkt. No. 779-1 ¶ 610; C.A. Dkt No. 93, at 105; C.A. Dkt. No. 183, at 9–12. Apple additionally argued in this Court that Apple's unilateral conduct was protected under the *Colgate* line of authority. *See* Dkt. No. 779-1 ¶ 375; *see also id.* ¶¶ 263–83 (Apple cannot be held liable for "a refusal to deal with Epic on its preferred terms"); *id.* ¶ 493 (similar). And Apple argued on appeal that its anti-steering Guidelines were unilateral conduct protected by multiple judicially created antitrust doctrines and protected by *Chavez* because of Epic's failure to prove its antitrust claims. *See* C.A. Dkt. No. 93, at 62–66, 105; C.A. Dkt. No. 183, at 10–11 (giving as examples *linkLine*, 555 U.S. at 448 n.2, 457, and *Trinko*, 540 U.S. at 415–16). Apple has similarly been diligent in raising its Article III objection. This issue first arose when this Court entered the UCL injunction with nationwide scope. Apple responded by filing post-trial stay papers challenging Epic's standing to pursue nationwide relief. *See* Dkt. No. 821, at 14–15. Apple reiterated that argument on appeal, *see* C.A. Dkt. No. 93, at 102–04; C.A. Dkt. No. 183, at 1–5, and in a petition for a writ of certiorari, *see* Petition for Writ of Certiorari, *Apple Inc. v. Epic Games, Inc.*, 144 S. Ct. 681 (2024) (No. 23-344).

Vacating the Injunction entirely would obviate the ongoing Injunction enforcement proceedings, whereas narrowing the Injunction would simplify those proceedings by focusing the inquiry specifically

APPLE'S MOTION FOR RELIEF FROM JUDGMENT          23          CASE NO. 4:20-CV-05640-YGR

on Apple's conduct towards Epic and its subsidiaries. Either way, the burden on the parties and the judicial system would be alleviated. If anything, those proceedings make it more important for this Court to reexamine the antecedent question of whether it is equitable to continue applying the underlying Injunction prospectively.

* * * * *

This Court entered its Injunction, and the Ninth Circuit affirmed, without the benefit of *Beverage* or *Murthy*. The California courts had not resolved the legality of Apple's anti-steering rules under the UCL's "unfairness" prong. The Supreme Court had not addressed the level of evidentiary specificity needed to establish standing to seek an injunction where injury depends on the future conduct of independent actors. The California courts have now resolved the UCL question in *Beverage*, and the U.S. Supreme Court has provided an important clarification of the Article III issue in *Murthy*.

The *Beverage* decisions alone justify vacating the Injunction. At a minimum, *Beverage* and *Murthy* together establish that it is no longer equitable to continue enjoining Apple from applying its anti-steering rules to third-party developers nationwide. An injunction based on state law—when the state courts have held that the enjoined conduct is lawful—is inequitable, at least if applied nationwide beyond the plaintiff in the particular case.

## CONCLUSION

For the foregoing reasons, Apple respectfully requests the Court relieve Apple from the judgment and either vacate the Injunction or, at a minimum, narrow it so that it applies only to Epic and its corporate affiliates.

Dated: September 30, 2024

Respectfully submitted,

By: */s/ Mark A. Perry*
Mark A. Perry
WEIL, GOTSHAL & MANGES LLP

Attorney for Apple Inc.

Case 4:20-cv-05640-YGR   Document 1018-2   Filed 09/30/24   Page 1 of 16

# EXHIBIT 1

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 2/4/2022 9:31 AM
Reviewed By: R. Walker
Case #20CV370535
Envelope: 8216559**

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

| | |
|---|---|
| MICHELLE BEVERAGE, et al.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>APPLE INC., et al.,<br><br>        Defendants. | Case No.: 20CV370535<br><br>**ORDER CONCERNING DEFENDANT APPLE INC.'S DEMURRER TO PLAINTIFFS' COMPLAINT** |

Plaintiffs bring this action against Defendant Apple Inc. on behalf of a putative class of California consumers. They challenge Apple's removal of the social and gaming software application "Fortnite" from its application marketplace (the "App Store") and Apple's related alleged abuse of monopolistic power.

Following a pause on merits-related proceedings to allow the parties to address the post-trial decision in a related federal case, *Epic Games Inc. v. Apple Inc.* (N.D. Cal., No. 4:20-CV-05640) ("*Epic*"), Plaintiffs filed the operative First Amended Class Action Complaint ("FAC"). Apple now demurs to each cause of action in the FAC for failure to state a claim. (Code Civ. Proc., § 430.10, subd. (e).) Plaintiffs oppose the demurrer in its entirety.

1

The Court issued a tentative ruling on February 2, 2022, and no one appeared at the hearing on February 3 to contest it.  The Court now issues its final order, which SUSTAINS the demurrer with 60 days' leave to amend.

## I.      BACKGROUND

### A.      Factual

Fortnite is a social and gaming application or "app" created by Epic Games, Inc. ("Epic").  Using the app, dozens of participants compete individually or in teams to be the last one standing at the end of a game.  (FAC, ¶ 47.)  Spectators are a major part of the experience, with sometimes hundreds of thousands watching either in the app or on websites like twitch.tv. (*Ibid.*)  A feature called "CrossPlay" allows users to interact with others using Fortnite on different platforms, such as PC, Mac, XboxOne, and PlayStation 4.  (*Id.*, ¶ 49.)  A significant part of Fortnite's fun and appeal comes from grouping up with friends or random teammates, which also lets users show off their characters and the unique ways they have customized them. (*Id.*, ¶ 48.)  Users may purchase digital currency ("V-Bucks") to buy digital goods including costumes for playable characters.  (*Id.*, ¶¶ 50–51.)  For users of Apple's mobile operating system, iOS, these transactions have occurred through Apple's in-app purchase system (IAP). (*Id.*, ¶ 50.)  Apple takes a thirty percent cut, as it typically does for all in-app purchases on iOS devices.  (*Ibid.*)

Fortnite was released for iOS in April 2018, and was advertised as being the same as Fortnite on PC, Mac, and console platforms, with the "same gameplay, same map, same content, same weekly updates."  (FAC, ¶¶ 52–53.)  The app became immensely popular: by May 2020, it reached $1 billion in revenue from mobile (mostly iOS) and attracted a cumulative total of 350 million users—roughly three percent of the world's population.  (*Id.*, ¶¶ 54–55.)

Plaintiffs allege that Apple has a total monopoly on the legal distribution of apps to iOS devices and considerable market power in the mobile device market as a whole, and has abused its dominance through its actions towards Fortnite and its related policies and practices.  (*Id.*, ¶¶ 62–114.)

2

1    Citing to filings in *Epic*, Plaintiffs allege that on June 30, 2020, Epic's CEO contacted

2  Apple's leadership to propose new features related to Fortnight, including an Epic payment

3  processing system and Epic's own app store within the iOS ecosystem.  (FAC, ¶ 115.)  Apple

4  swiftly and completely rejected these ideas via its legal team.  (*Id.*, ¶ 116.)  Epic informed Apple

5  that it would nonetheless proceed to launch a direct payment system via Fortnite on iOS devices.

6  (*Id.*, ¶ 118.)  Apple responded by unilaterally removing Fortnite from the App Store, preventing

7  users from downloading the app or updating it as updates are released.  (*Id.*, ¶ 119.)  Epic filed

8  suit against Apple in the Northern District of California.  (*Id.*, ¶ 122.)

9    Despite the issuance of what Plaintiffs characterize an adverse opinion in *Epic*, Apple

10  refuses to reinstate Fortnite on the App Store.  (FAC, ¶ 125.)  It has stated it will refuse to even

11  consider reinstating Fortnite until the complete resolution of the appeals process, and has applied

12  for a stay of the "baseline" injunctive relief provided by the federal court.[1]  (*Id.*, ¶¶ 127–128.)

13    Based on these allegations, Plaintiffs bring this action on behalf of a putative class of

14  "[a]ll California citizens that (a) possess, own, or have access to an iOS Device manufactured by

15  Apple; (b) have downloaded the Fortnite application onto their iOS Device; and (c) have

16  purchased digital currency or goods within the Fortnite application utilizing Apple's in-app

17  purchase system."  (FAC, ¶ 131.)  Plaintiffs "seek[] to obtain, in one proceeding, before one trier

18  of fact, a ruling on Apple's unjust and unfair use of power to raise prices for consumers on the

19  App Store in the mobile gaming market."  (*Id.*, ¶ 134.)

20    The complaint asserts the following causes of action: (1) violation of the Cartwright Act,

21  Business & Professions Code section 16700 et seq.; (2) violation of the Unfair Competition Law

22  ("UCL"), Business & Professions Code section 17200 et seq., "unlawful" prong; (3) violation of

23  the UCL, "unfair" prong; and (4) breach of the implied covenant of good faith and fair dealing.

24

25

26

27

28  _____

[1] That stay was granted as to one portion of the permanent injunction.  (See *Epic Games, Inc. v. Apple, Inc.* (9th Cir. Dec. 8, 2021, Nos. 21-16506, 21-16695) 2021 U.S. App. LEXIS 36191, at *1–2.)

3

**B.     Procedural**

Plaintiffs filed this action on September 17, 2020.  The initial discovery stay was lifted on February 18, 2021, and the parties began to meet and confer about discovery.  Apple filed a demurrer, which was scheduled to be heard in July 2021.

The related action in *Epic* was filed by Epic on August 13, 2020.  In that case, Epic alleged violations of federal and state antitrust laws and the UCL based upon Apple's operation of its App Store.  (*Epic Games, Inc. v. Apple Inc*. (N.D.Cal. Sep. 10, 2021, No. 4:20-cv-05640-YGR) 2021 U.S.Dist.LEXIS 172303, at *10 ("*Epic* Trial Decision").)

The Court denied Apple's motion to stay this entire action in favor of *Epic* in an order filed on May 5, 2021.  But it suggested that it would be beneficial for the parties and the Court to review the decision in *Epic* before conducting any merits-related proceedings in this case—including on Apple's demurrer.  The parties agreed to delay full briefing and hearing of the demurrer until after the decision in *Epic* issued.

The *Epic* Trial Decision issued on September 10, 2021.[2]  Plaintiffs filed the FAC on October 12, addressing that decision as they deemed appropriate.  Apple has again demurred.

## II.     REQUESTS FOR JUDICIAL NOTICE

Both Apple and Plaintiffs request judicial notice of agreements, guidelines, and other materials published to Apple's website, the contents of which are undisputed.  The parties do not oppose one another's requests, and the Court GRANTS them.  (See Evid. Code, § 452, subd. (h); *Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1285, fn. 3 ["Since the contents of the letter and media release form the basis of the allegations in the complaint, it is essential that we evaluate the complaint by reference to these documents."].)

## III.     LEGAL STANDARD

A demurrer tests the legal sufficiency of the complaint.  (*Chen v. PayPal, Inc*. (2021) 61 Cal.App.5th 559, 568.)  Consequently, it "reaches only to the contents of the pleading and such matters as may be considered under the doctrine of judicial notice."  (*Weil v. Barthel* (1955) 45

---

[2] Apple appealed the *Epic* Trial Decision, and its appeal remains pending.

4

1   Cal.2d 835, 837; see also Code Civ. Proc., § 430.30, subd. (a.).)  "It is not the ordinary function

2   of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he

3   describes the defendant's conduct. … [T]he facts alleged in the pleading are deemed to be true,

4   however improbable they may be."  (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949,

5   958, internal citations and quotations omitted.)

6        In ruling on a demurrer, the Court must liberally construe the allegations of the

7   complaint, with a view to substantial justice between the parties.  (*Glennen v. Allergan, Inc.*

8   (2016) 247 Cal.App.4th 1, 6.)  Nevertheless, while "[a] demurrer admits all facts properly

9   pleaded, [it does] not [admit] contentions, deductions or conclusions of law or fact."  (*George v.*

10   *Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1120.)  A demurrer will

11   succeed where the allegations and matters subject to judicial notice clearly disclose a defense or

12   bar to recovery.  (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183.)

13   **IV.   THE *EPIC* TRIAL DECISION**

14        The *Epic* Trial Decision is too long to be addressed in detail here, but the Court will

15   summarize its key findings.  As to the antitrust claims in that case, the federal court defined the

16   relevant market as "digital mobile gaming transactions," and found that the record at trial did not

17   ultimately support the conclusion "that Apple is a monopolist under either federal or state

18   antitrust laws."  (*Epic* Trial Decision at *12.)

19        While the Court finds that Apple enjoys considerable market share of over 55%

20        and extraordinarily high profit margins, these factors alone do not show antitrust

21        conduct. … The final trial record did not include evidence of other critical factors,

22        such as barriers to entry and conduct decreasing output or decreasing innovation

23        in the relevant market. The Court does not find that it is impossible; only that Epic

24        Games failed in its burden to demonstrate Apple is an illegal monopolist.

25   (*Epic* Trial Decision at *12–13.)

26        But as to the claim under the "unfair" prong of the UCL, the trial court held "that Apple's

27   anti-steering provisions hide critical information from consumers and illegally stifle consumer

28   choice. When coupled with Apple's incipient antitrust violations, these anti-steering provisions

<center>5</center>

are anticompetitive and a nationwide remedy to eliminate those provisions is warranted." (*Epic Trial Decision* at \*13.)  The court accordingly held that

> a nationwide injunction shall issue enjoining Apple from prohibiting developers to include in their:
>
> > Apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to IAP.
>
> Nor may Apple prohibit developers from:
>
> > Communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

(*Epic* Trial Decision at \*303.)

## IV.   DISCUSSION

Apple demurs to the FAC on the following grounds: (1) Plaintiffs are not entitled to an injunction forcing Fortnite back onto the App Store because such relief is foreclosed by federal law; (2) the Cartwright Act cause of action fails to plead a relevant market, concerted action, cognizable anticompetitive conduct, or separate products under a tying theory; (3) the UCL claims fail with the Cartwright Act claim and "because Plaintiffs have not satisfied basic pleading standards"; and (4) the claim for breach of the implied covenant of good faith and fair dealing fails to identify the contractual terms at issue, and is foreclosed by the express terms and limitations of liability in the Media Services Terms and Conditions between Plaintiffs and Apple, the only contract that could be at issue.

Before addressing the issue of relief, the Court will address whether the FAC otherwise states a cause of action.

### A.   The First Cause of Action Under the Cartwright Act and the Second Cause of Action Under the UCL "Unlawful" Prong

The Cartwright Act, contained in Business and Professions Code section 16700, et seq., generally codifies the common law prohibition against restraint of trade.  (*G.H.I.I. v. MTS,*

6

*Inc.* (1983) 147 Cal.App.3d 256, 264 (*G.H.I.I.*).)[3]  Recovery is provided where the activities of a combination of capital, skill, or acts by two or more persons result in a restraint of trade.  (*Id.* at pp. 264–265, citing Bus. & Prof. Code, §§ 16720 [defining a "trust" for purposes of the Act] & 16750 [establishing a private right of action].)  "In order to maintain a cause of action for such combination in restraint of trade, the complaint must allege: The formation and operation of the conspiracy; the illegal acts done pursuant thereto; a purpose to restrain trade; and the damage caused by such acts."  (*Id.* at p. 265; see also *Marsh v. Anesthesia Services Medical Group, Inc.* (2011) 200 Cal.App.4th 480, 492–493 (*Marsh*).)

> Our high court demands a "high degree of particularity in the pleading of Cartwright Act violations. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 326–328 [(*Chicago Title*)].)"  Consequently, generalized allegations of civil antitrust violations are usually insufficient and the unlawful combination or conspiracy must be alleged with specificity. …  [G]eneral allegations of a conspiracy unaccompanied by a statement of facts constituting the conspiracy and explaining its objectives and impact in restraint of trade will not suffice.  …
>
> At the same time, as with any demurrer, the material allegations of an antitrust cause of action are deemed admitted and assumed to be true, while the general rule of pleading that a complaint must be given liberal construction in order to achieve substantial justice between the parties is applicable.

---

[3] "The Cartwright Act is patterned after the federal Sherman Antitrust Act (15 U.S.C. § 1 et seq.) and decisions under the latter act are applicable to the former."  (*G.H.I.I., supra,* 147 Cal.App.3d at p. 265 [citing cases].)  But notably, "the Cartwright Act contains no provision parallel to the Sherman Act's prohibition against monopolization (15 U.S.C. § 2)," and it thus "applies only to a 'combination' involving 'two or more persons' (§ 16720), not to unilateral conduct."  (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2011) 198 Cal.App.4th 1366, 1386.)  Notably, *Apple Inc. v. Pepper* (2019) ___ U.S.___ [139 S.Ct. 1514, 1520, 203 L.Ed.2d 802, 808], which is cited in the FAC, was alleged under Section 2 of the Sherman Act.

7

1   (*G.H.I.I., supra*, 147 Cal.App.3d at pp. 265–266, citations omitted.)

2   Ultimately (unless a per se framework applies),[4] an antitrust plaintiff "must prove that the

3   defendant's conduct harmed competition in the relevant market and that any procompetitive

4   justifications for the conduct did not outweigh that harm," applying the "rule of reason."

5   (*Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.* (2020) 55 Cal.App.5th 381,

6   396, citing *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672 (*Exxon*).)  In analyzing

7   the pleadings, "the identification of the relevant market should be treated as a matter of law…."

8   (*Marsh, supra*, 200 Cal.App.4th at p. 499.)

9   Here, Plaintiffs allege that Apple has violated the Cartwright Act "by maintaining

10  complete control of the approval of all software and/or applications listed in the App Store

11  marketplace, maintaining an unreasonably high 30% fee for all purchases of apps on the App

12  Store and digital purchases within said apps, and … barring creation of separate app store fronts

13  on iOS Devices," as well as by "disallow[ing] developers and firms from maintaining their own

14  payment system within apps …."   (FAC, ¶¶ 145–146.)

15  ### 1.    *Failure to Plead a Relevant Market*

16  Apple first contends that Plaintiffs fail to allege a relevant market, complaining that the

17  FAC refers to ten different markets.[5]  Plaintiffs respond that many of these references, for

18  example, those that address the mobile phone or mobile phone operating system markets, are

19  merely for background purposes.  This is a fair reading of the FAC.  However, even where

20  Plaintiffs expressly allege the relevant market for antitrust purposes, their framing of it is not

21

22  _____

23  [4] "Historically, some combinations, such as agreements to fix prices, divide markets, or tie the
24  purchase of one product or service to another, as well as certain boycotts, have been considered
    unreasonable per se and, therefore, illegal."  (*Ben-E-Lect v. Anthem Blue Cross Life & Health*
25  *Ins. Co*. (2020) 51 Cal.App.5th 867, 872–873.)

26  [5] Apple notes that "[t]he FAC references: a 'mobile operating system market,' (FAC ¶ 65); a
    'mobile gaming purchases market,' (*id*); a 'mobile phone market,' (*id*. ¶ 72); a 'mobile device
27  market,' (*id*.); an 'App Store market,' (*id*. ¶ 79); an 'app distribution market,' (*id*. ¶ 81); a
    'purchasing market on iOS,' (*id*. ¶ 93); an 'iOS device market,' (*id*. ¶ 98); the 'App Store
28  marketplace,' (*id*. ¶ 145); 'the mobile gaming market,' (*id*.); and 'the market for in-app
    purchases,' (*id*. ¶ 162)."

8

1    consistent.  (See, e.g., FAC, ¶¶ 145 ["mobile gaming market"], 149 ["the App Store marketplace,

2    a valid antitrust market"].)

3          In opposition to Apple's motion, Plaintiffs state that the relevant market is "digital mobile

4    gaming transactions," consistent with the marketplace defined in the *Epic* Trial Decision.  This

5    phrase is found nowhere in the FAC, but it is close to the "mobile gaming market" to which the

6    FAC does repeatedly refer.  It is fair to read the FAC to allege that this is the relevant market,

7    and the Court will focus its analysis on this market rather than the "App Store market" to which

8    many of Apple's arguments on demurrer are addressed (since Plaintiffs do not defend an "App

9    Store market" theory on opposition).

10         While Apple contends that any "mobile gaming market" is not described in sufficient

11   detail in the FAC, the Court does not read *Marsh* and *Chicago Title* to require the level of detail

12   demanded by Apple at the pleading stage in every case.  Like those authorities, the Court will

13   read the FAC liberally to assess whether it states a claim.  (See *Chicago Title, supra*, 69 Cal.2d at

14   pp. 325–326 [while noting that market was not specifically defined in the complaint, going on to

15   analyze why a theory based on defendants' control of the "title insurance market" failed based on

16   the allegations and facts subject to judicial notice]; *Marsh, supra*, 200 Cal.App.4th at p. 499

17   [similarly analyzing the merits of the claim with reference to the relevant market; "the

18   circumstances described in the pleadings show that Appellant has been able to retain privileges

19   to practice at other outpatient facilities … [and] do not support her claim she has been wholly

20   excluded from practice in the relevant market area (since it is undisputed that San Diego … has a

21   number of hospital facilities within the immediate area)"].)

22               2.    *Failure to Allege Bilateral Conduct*

23         "It is well settled that the antitrust laws do not preclude a trader from unilaterally

24   determining the parties with whom it will deal and the terms on which it will transact business.

25   An antitrust case must be based upon conspiratorial rather than unilateral conduct."  (*G.H.I.I.,*

26   *supra*, 147 Cal.App.3d at pp. 267–268, citations omitted.)  "It is also established, however, that a

27   necessary 'conspiracy' or 'combination' cognizable as an antitrust action is formed where a

28   trader uses coercive tactics to impose restraints upon otherwise uncooperative businesses.  If a

9

1   'single trader' pressures customers or dealers into pricing arrangements, an unlawful

2   combination is established, irrespective of any monopoly or conspiracy, and despite the

3   recognized right of a trader to determine with whom it will deal." (*Id.* at p. 268.)

4         Here, Plaintiffs contend that they allege bilateral conduct based on the theory that Apple

5   coerces developers to pay its 30 percent fee and abide by other terms described in the FAC.  But

6   "coercion" in this context requires something more than a simple policy that business partners

7   agree to certain terms.  "[A]n illegal combination may be found where a supplier secures

8   compliance with announced policies in restraint of trade by means which go beyond mere

9   announcement of policy and the refusal to deal," for example, by "tak[ing] 'affirmative action' to

10  bring about the involuntary acquiescence of its dealers…." (*Kolling v. Dow Jones & Co.* (1982)

11  137 Cal.App.3d 709, 721.)  This might include "threatening commands" aimed at price-fixing.

12  (*Id.* at pp. 721–722.)  Or it could include a "boycott" to extract price concessions. (*G.H.I.I.,*

13  *supra,* 147 Cal.App.3d at pp. 263, fn. 3, 269 [contrasting adequate allegations of one record

14  store's boycott of distributors accompanied by threats with inadequate allegations as to other

15  stores that apparently obtained favorable terms from distributors "in an atmosphere of free

16  competition"].)

17        Coercion must be alleged with specificity.  (See *Freeman v. San Diego Assn. of*

18  *Realtors* (1999) 77 Cal.App.4th 171, 196 (*Freeman*).)  And critically, under the so-called

19  *Colgate* doctrine, coercion does not include the mere "announcement" of a policy and refusal to

20  deal with those who do not comply, even when coupled with "measures to monitor compliance

21  that do not interfere with … freedom of choice." (*Chavez v. Whirlpool Corp.* (2001) 93

22  Cal.App.4th 363, 373 (*Chavez*).)  Accordingly, in *Chavez*, allegations "that Whirlpool

23  announced [a] price policy prescribing minimum resale prices … and informed retailers that it

24  would refuse to sell products to any retailer who did not comply," and "would monitor the

25  retailers' compliance with the policy by reviewing their advertising, collecting sales receipts, and

26  sending 'mystery shoppers' to retail stores," were deemed "insufficient to establish a coerced

27  agreement in violation of the Cartwright Act…." (*Ibid.*)

28

10

**4-ER-708**

The theory urged by Plaintiffs here is indistinguishable from the announcement plus monitoring theory alleged in *Chavez*:

> As put forth in the FAC, Plaintiffs alleged that Apple entered into agreements with both consumers and developers, forcing them to abide by Apple's terms and conditions in order to have access to the Mobile Gaming Purchases Marketplace. (FAC ¶ 152.)  Any violation of these rules would lead to the removal of an app or the voiding of a consumer's warranty. (FAC ¶¶ 79, 81.)

(Opp'n, at p. 7.)  This amounts to open, unilateral conduct by Apple, essentially a "take it or leave it" deal—not threats, boycotts or other such "affirmative action" to coerce developers into a conspiracy with Apple against others.  (See *Epic* Trial Decision at *251–252 [finding Apple's agreements with developers demonstrated only unilateral conduct]; see also *Freeman, supra,* 77 Cal.App.4th at p. 200 ["[t]he law is clear that unilateral pricing decisions do not violate section 1 of the Sherman Act"].)

In arguing to the contrary, Plaintiffs rely heavily on a preliminary trial court ruling in federal antitrust litigation against Qualcomm.  But there, the agreements at issue barred manufacturers (OEMs, including Apple) from sourcing modem chips from other suppliers by imposing excessive penalties, which "led to exclusivity and effectively shut Qualcomm's competitors out of the market."  (*In re Qualcomm Antitrust Litig.* (N.D.Cal. 2017) 292 F. Supp. 3d 948, 974–975.)  And critically, the opinion distinguished *Chavez* based on allegations "that Qualcomm employed its superior market power *and threatened to withhold chips* if OEMs did not agree to Qualcomm's licensing terms."  (*Id.* at pp. 976–977.)  Nothing like that is alleged here.[6]

### 3.  *Conclusion*

Plaintiffs fail to state a claim under the Cartwright Act because the conduct they allege in restraint of trade is Apple's unilateral conduct.  So the Court does not need to address Apple's remaining arguments about this claim.

---

[6] Apple notes that the district court's eventual ruling against Qualcomm in this case was reversed on appeal.  (See *FTC v. Qualcomm Inc.* (9th Cir. 2020) 969 F.3d 974.)

11

Plaintiffs' second cause of action for violation of the UCL's "unlawful" prong is based on their Cartwright Act claim, and fails for the same reason.

Apple's demurrer to both of these claims is SUSTAINED with 60 days' leave to amend.

**B.    The Third of Action Under the UCL "Unfair" Prong**

In their third cause of action under the UCL's "unfair" prong, Plaintiffs allege that Apple's practices were unfair because (1) they caused consumers to pay unfairly inflated prices for goods sold inside Fortnight and (2) "Anti-steering provisions by Apple prevented consumers from receiving information, … preventing them from being fully educated about options, including purchase options" and preventing them "from attributing the cost to the platform versus the developer." (FAC, ¶¶ 178–183.)  Apple's unfair practices caused Plaintiffs and the putative class "to pay supra-competitive and artificially-inflated prices for digital goods and currency within the Fortnite app."  (FAC, ¶ 176.)

Apple contends that this claim must fail because "the predicate acts are not actionable," Plaintiffs have an adequate remedy at law, and Plaintiffs have no available remedy under the UCL.

### 1.    *Actionable Conduct*

Apple's first argument regarding "actionable conduct" is that because Plaintiffs fail to state a claim under the Cartwright Act, they cannot state a UCL "unfair prong" claim, either.

As noted by Plaintiffs, there are varying standards in the appellate courts as to what constitutes an "unfair" act or practice under the UCL in the consumer context.  (See *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 303, fn. 10 [describing, but not resolving, split of authority].)  One line of appellate decisions has adopted a "balancing" test, which requires a court to examine the challenged practice's "impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer."  (*Smith v. State Farm Mutual Automobile Ins. Co*. (2001) 93 Cal.App.4th 700, 718, internal quotation marks omitted.)  Another line of decisions has adopted a "tethering test," requiring that "the public policy which is a predicate to [a consumer unfair competition action under the 'unfair' prong of the UCL] must be 'tethered' to specific constitutional, statutory or regulatory

12

1   provisions." (*Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854.)  A final line of

2   decisions has adopted a "section 5 test," namely that: "(1) The consumer injury must be

3   substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or

4   competition; and (3) it must be an injury that consumers themselves could not reasonably have

5   avoided." (*Camacho v. Automobile Club of Southern California* (2006) 142 Ca1.App.4th 1394,

6   1403.)

7          But *Chavez* held that regardless of which test applies in the consumer context, "we

8   conclude as a matter of law that conduct that the courts have determined to be permissible under

9   the *Colgate* doctrine cannot be deemed 'unfair' under the unfair competition law." (*Chavez,*

10  *supra*, 93 Cal.App.4th at p. 375.)  Subsequent California authorities are in accord.  (See *Drum v.*

11  *San Fernando Valley Bar Assn.* (2010) 182 Cal.App.4th 247, 255 [citing *Chavez* for the

12  proposition that the fact "that a unilateral resale price policy is 'not an unreasonable restraint of

13  trade necessarily implies that the conduct is not "unfair" toward consumers' under the UCL,"

14  affirming judgment for defendant on  demurrer emphasizing its unilateral conduct]; *SC*

15  *Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 93 (*SC*) [citing *Chavez* for the

16  proposition that " '[i]f the same conduct is alleged to be both an antitrust violation and an

17  "unfair" business act or practice for the same reason—because it unreasonably restrains

18  competition and harms consumers—the determination that the conduct is not an unreasonable

19  restraint of trade necessarily implies that the conduct is not "unfair" toward consumers' ";

20  sustaining judgment for defendant on demurrer]; *Belton v. Comcast Cable Holdings, LLC* (2007)

21  151 Cal.App.4th 1224, 1240 [citing *Chavez* for the same proposition as *SC* and sustaining

22  judgment for defendant on summary adjudication].)

23         Here, Plaintiffs' theories both depend on unilateral conduct by Apple that is protected by

24  the *Colgate* doctrine.  This includes the "anti-steering" theory.  (See, e.g., FAC, ¶ 69

25  ["Developers are forced into non-negotiable contracts if they wish to do business on the App

26  Store — these developers are required to use Apple's In-App Purchase system and may not

27  include [any] alternative payment solutions in the app whatsoever.  They cannot steer users to

28  alternative payment methods outside the app, as apps and their metadata may not include

                                              13

1  buttons, external links, or other calls to action that direct customers to purchasing methods other
2  than Apple's In-App Purchase system."].)[7]

3  Per *Chavez* and the other authorities cites above, Plaintiffs' UCL "unfair" prong claim
4  must also fail.

5       2.   *Conclusion*

6  The Court SUSTAINS Apple's demurrer to the third cause of action under the UCL's
7  "unfair" prong, also with 60 days' leave to amend.

8  **C.    The Fourth Cause of Action for Breach of the Implied Covenant of Good**
9  **       Faith and Fair Dealing**

10  Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing arises
11  from Apple's "terms and conditions," which they allege that they and other putative class
12  members agreed to in order to use the App Store.  (FAC, ¶ 188.)  Plaintiffs allege that they
13  performed their duties under the terms and conditions, but Apple unfairly and in bad faith
14  (1) "restrict[ed] payment options for in-app purchases, resulting in Plaintiffs and the Class
15  paying an inflated price for purchases within Fortnite" and (2) "refus[es] to reinstate Fortnite
16  onto the App Store, and is thus acting in bad faith by deliberately acting to deprive Plaintiffs and
17  the Class of the use of Fortnite and any digital goods found within, and further by interfering
18  with Plaintiffs and the Class use of the Fortnite application downloaded through the App Store."
19  (*Id.* at ¶¶ 191–194.)

20  Apple contends that Plaintiffs fail to specify the "terms and conditions" upon which this
21  claim is based, and the only terms upon which it could be based expressly permit the conduct at
22  issue.  On opposition, Plaintiffs are non-committal about what "terms and conditions" this claim
23  is based on.  But Plaintiffs' own authority emphasizes that "[t]he implied covenant of good faith
24  and fair dealing rests upon the existence of some specific contractual obligation."  (*Avidity*
25  *Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1204 (*Avidity*), citing *Foley v.*
26  *Interactive Data Corp.* (1988) 47 Cal.3d 654 (*Foley*).)  "[T]he scope of conduct prohibited by the

---

27
28  [7] While the *Epic* Trial Decision found a UCL "unfair prong" violation based on the "anti-steering" theory, its discussion of *Chavez* was cursory, and it did not address *Chavez*'s application of the other California authorities cited above.

14

**4-ER-712**

covenant of good faith is circumscribed by the purposes and express terms of the contract."
(*Avidity, supra,* 221 Cal.App.4th at p. 1204, quoting *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373.)  "[S]ince the covenant is an implied term in the contract," the contract is a prerequisite.  (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49.)  And to state a claim for breach of contract, the terms of the contract must be alleged in some manner.  (See *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 270, fn. 1 [taking judicial notice of terms of operative contract that were not pleaded as required].)

In the Court's view, applying these authorities, Plaintiffs must at least allege what "terms and conditions" their claim for breach of the implied covenant arises from.  Apple's demurrer to this claim is therefore SUSTAINED, but the Court will give Plaintiffs 60 days' leave to amend.

**V.  CONCLUSION**

As discussed above, each cause of action in the FAC fails to state a claim.  On this basis, Apple's demurrer is SUSTAINED with 60 days' leave to amend.  The Court therefore does not need to address Apple's arguments regarding permissible remedies in this case.

**IT IS SO ORDERED.**

Date:        February 4, 2022

_____

The Honorable Sunil R. Kulkarni
Judge of the Superior Court

15

**4-ER-713**

Case 4:20-cv-05640-YGR   Document 1018-5   Filed 09/30/24   Page 1 of 3

# EXHIBIT 4

SUPREME COURT
**FILED**

JUL 1 0 2024

Jorge Navarrete Clerk

Court of Appeal, Sixth Appellate District - No. H050526

S285154

Deputy

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

MICHELLE BEVERAGE et al., Plaintiffs and Appellants,

v.

APPLE, INC., Defendant and Respondent.

The petition for review is denied.

Kruger, J., was absent and did not participate.

GUERRERO

*Chief Justice*

**4-ER-715**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **EPIC GAMES, INC.,** | Case No.  4:20-cv-05640-YGR |
| Plaintiff, | **ORDER SETTING EVIDENTIARY HEARING** |
| vs. | Re: Dkt. No. 897 |
| **APPLE INC.,** | |
| Defendant. | |

Pending before the Court is plaintiff Epic Games, Inc.'s request to find defendant Apple, Inc. in civil contempt for failing to abide by this Court's injunction, which requires it to implement certain practice changes relative to in- and out-of-app purchases. Having carefully considered the briefing and for the reasons articulated below, the Court **FINDS** an evidentiary hearing is necessary to explore the factual bases for plaintiff's motion and **SETS** such a hearing, subject to the parameters specified herein.  Given the Court's schedule, including a five-defendant three-month trial to begin this June, the hearing shall be held on **Wednesday, May 8, 2024 at 8:30 a.m.**  To the extent proceedings have not concluded, they shall resume on **Friday, May 10, 2024 at 12:00 p.m.** and again on **Friday, May 17, 2024 at 8:30 a.m.**

The Court begins by briefly summarizing the procedural history. On September 10, 2021, after a bench trial, the Court ruled that certain anti-steering provisions, such as those in Apple's App Store Review Guidelines (the "Guidelines"), violate the unfairness prong of California Unfair Competition Law ("UCL"), Cal. Civ. Code § 17200, *et seq*., because they "hide critical information from consumers" relative to alternate payment methods, thereby "illegally stif[ling] consumer choice." (Dkt. No. 812 at 3, 162–67.) The Court subsequently crafted and entered a permanent, nationwide injunction requiring Apple to implement practice changes. The injunction survived appeal and remains in force.

On January 16, 2024, Apple filed a notice identifying steps taken to comply with the injunction. (*See generally* Dkt. No. 871.) On March 13, 2024, Epic Games filed the pending motion

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

1   to enforce the injunction, asserting that, contrary to Apple's representations, the company's "new

2   App Store policies continue to impose prohibitions on developers that this Court found unlawful and

3   enjoined." (Dkt. No. 897, Motion to Enforce the Injunction ("Mot.") at 6:2–3.) Plaintiff seeks as relief

4   a Court order: (i) holding Apple in civil contempt for violating the injunction; (ii) requiring Apple to

5   promptly bring its policies into compliance; and (ii) requiring Apple to remove all anti-steering

6   provisions in Section 3.1.3 of the Guidelines. Thus, Epic Games requests that this Court invoke its

7   "inherent authority to enforce compliance with its order[] through a civil contempt proceeding."

8   *Craters & Freighters v. Daisychain Enterprise*, 2014 WL 2153924, at *1 (N.D. Cal. May 22, 2014).

9        To succeed on such a motion, Epic Games must show, by clear and convincing evidence, that

10   (1) Apple violated the injunction, (2) its violation was "beyond substantial compliance," and (3) its

11   conduct was "not based on any good faith and reasonable interpretation of the injunction." *United*

12   *States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010) (cleaned up). "[T]he proper practice," when a

13   party is alleged, as here, to be in contempt of court, is "to require the [purported] offender to appear

14   and show cause why he should not be punished." *Cooke v. United States*, 267 U.S. 517, 535 (1925);

15   *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) ("[C]ivil

16   contempt sanctions . . . may be imposed in an ordinary civil proceeding upon notice and an

17   opportunity to be heard.").

18        Here, Epic Games makes three primary arguments regarding Apple's alleged non-

19   compliance with the injunction. One, "the web of technical requirements, economic hurdles, and

20   user frictions imposed through Apple's new policies" serve as "a *de facto* prohibition on [e]xternal

21   [l]inks" in violation of the injunction. (Mot. at 19:26–27; 20:2–3.) Two, Apple's new commission

22   structure for out-of-app purchases made after a user clicks an external link "alone frustrate[s] the

23   purpose of the [i]njunction." (Mot. at 19:25–26.) Three, the plain text of Section 3.1.3 of the

24   Guidelines, as further revised by Apple, violates the injunction by prohibiting covered apps from,

25   "within the app, encourag[ing] users to use a purchasing method other than in-app purchase." (Dkt.

26   No. 874, Notice of Compliance, Corrected Ex. 1, Guidelines § 3.1.3.) Epic Games supports these

27   arguments with screenshots of Apple's required system disclosure sheet and developer-oriented web

28   pages, as well as by reference to the Guidelines and related addenda, as well as other materials.

<div style="text-align: center">2</div>

Having reviewed these arguments and the supporting documentation relevant thereto, the Court **FINDS** that Epic Games has made a sufficient preliminary showing that, viewed holistically, Apple's practice changes undermine the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice. The Court **SETS** an evidentiary hearing to further assess Epic Games' arguments as well as Apple's defenses.

Parties are advised that parameters shall apply to the topics raised at the hearing. Namely, the parties shall provide evidence concerning the following: (i) the external link entitlement program and related requirements, technical or otherwise; (ii) the decision-making process relative to Apple's commission structure for out-of-app purchases and impact of such structure, especially given the payment structure which exists for physical items or other items outside of the app; (iii) Section 3.1.3 of the Guidelines; and (iv) out-of-app communications between developers and users.

The Court anticipates discussion of this process will touch on the Analysis Group report referenced in Alex Roman's sealed declaration. Thus, Apple is **ORDERED** to lodge the report under seal and provide it to opposing counsel by **Friday, April 26, 2024**. Further, Roman **SHALL** attend in person. If for whatever reason Roman is unavailable, the Court will accept a designee in his stead, although such designee must have also been involved in the process of designing the revised commission structure, including the presentation of such structure to the Price Committee, and be familiar with Apple's engagement with the Analysis Group. Ned S. Barnes, who submitted a declaration to which Epic Games refers in their reply, **SHALL** also attend.

The parties shall each file a witness list by noon on **Tuesday, April 30, 2024** with a short description of the anticipated evidence and an exhibit list by **Friday, May 3, 2024**. Electronic copies of exhibits shall be exchanged no later than noon on **Saturday, May 4, 2024**.

**IT IS SO ORDERED.**

Dated: April 23, 2024

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

United States District Court
Northern District of California

3

GARY A. BORNSTEIN (*pro hac vice*)
gbornstein@cravath.com
YONATAN EVEN (*pro hac vice*)
yeven@cravath.com
LAUREN A. MOSKOWITZ (*pro hac vice*)
lmoskowitz@cravath.com
JUSTIN C. CLARKE (*pro hac vice*)
jcclarke@cravath.com
MICHAEL J. ZAKEN (*pro hac vice*)
mzaken@cravath.com
M. BRENT BYARS (*pro hac vice*)
mbyars@cravath.com
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

PAUL J. RIEHLE (SBN 115199)
paul.riehle@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

*Attorneys for Plaintiff and Counter-defendant*
*Epic Games, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| EPIC GAMES, INC., | Case No. 4:20-CV-05640-YGR-TSH |
| Plaintiff, Counter-defendant, | **PLAINTIFF EPIC GAMES, INC.'S NOTICE OF MOTION AND MOTION TO ENFORCE INJUNCTION** |
| v. | Date:  April 30, 2024 (noticed date) |
| APPLE INC., | Courtroom:  1, 4th Floor |
| Defendant, Counterclaimant. | Judge:  Hon. Yvonne Gonzalez Rogers |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on April 30, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court for the Northern District of California, before the Honorable Yvonne Gonzalez Rogers, Plaintiff and Counter-Defendant Epic Games, Inc. will move this Court for an Order Granting Epic's Motion to Enforce Injunction.

This Motion is made on the grounds that Defendant and Counterclaimant Apple Inc. is in violation of this Court's order permanently restraining and enjoining it from "prohibiting developers from . . . including in their apps and their metadata buttons, external links, or other calls to action that direct customers to alternative purchasing methods, in addition to In-App Purchase".  (Dkt. 813.)

This motion is based upon the pleadings in this action, this Notice of Motion, the Memorandum of Points and Authorities filed herewith, the Declaration of Benjamin Simon ("Simon Decl."), the Declaration of Christian Bailey Owens ("Owens Decl."), the Declaration of Yonatan Even ("Even Decl.") along with its accompanying exhibits, all matters with respect to which this Court may take judicial notice, and such oral and documentary evidence as may be presented to the Court.

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND...........................................................................................4

      A.     The Court's Rule 52 Order and UCL Injunction .................................4

      B.     Subsequent Procedural History...........................................................5

      C.     Apple's "Notice of Compliance" ........................................................5

      D.     Industry and Third-Party Reactions to the Notice of Compliance........11

LEGAL STANDARDS .................................................................................................13

ARGUMENT ..............................................................................................................14

I.     Apple's Updated Policies with Respect to External Links Violate the Injunction ...........14

II.     Apple's General Prohibition on Buttons and Calls to Action Other than External Links Violates the Injunction ............................................................20

III.     Apple's Updated Guideline 3.1.3 Impermissibly Prohibits Steering.................................21

CONCLUSION............................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ADT Security Servs., Inc. v. Security One Int'l, Inc.*,
  Case No. 11-cv-05149-YGR (N.D. Cal.), ECF No. 185 ...................................... 14

*Alter Domus, LLC v. Winget*,
  2023 WL 4865590 (E.D. Mich. July 31, 2023) ................................................ 17

*Buono v. Norton*,
  364 F. Supp. 2d 1175 (C.D. Cal. 2005) ........................................................ 14

*C.F.T.C. v. Saffron*,
  2020 WL 495557 (D. Nev. Jan. 30, 2020) ...................................................... 22

*Craters & Freighters v. Daisychain Enters.*,
  2014 WL 2153924 (N.D. Cal. May 22, 2014) ................................................. 13

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) ....................................................................... 13

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ......................................................................... 5

*F.V. v. Jeppesen*,
  466 F. Supp. 3d 1110 (D. Idaho 2020) ......................................................... 17

*Facebook, Inc. v. Power Ventures, Inc.*,
  2017 WL 3394754 (N.D. Cal. Aug. 8, 2017) ................................................. 13

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ..................................................................... 13

*Gen. Signal Corp. v. Donallco, Inc.*,
  787 F.2d 1376 (9th Cir. 1986) ................................................................... 14

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014) .......................................................... 14, 17, 18

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994) ................................................................................ 22

*John B. Stetson Co. v. Stephen L. Stetson Co.*,
  128 F.2d 981 (2d Cir. 1942) ...................................................................... 17

*Mendoza v. Hyundai Motor Co., Ltd.*,
  2024 WL 189014 (N.D. Cal. Jan. 17, 2024) .................................................. 22

**4-ER-723**

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,
    2017 WL 3021024 (N.D. Cal. July 17, 2017)...........................................................21

*OmniGen Rsch., LLC v. Yongqiang Wang*,
    2017 WL 5505041 (D. Or. Nov. 16, 2017)............................................................22

*S.E.C. v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ................................................................................22

*United States v. Bright*,
    596 F.3d 683 (9th Cir. 2010) ................................................................................13

*United States v. Rescino*,
    2021 WL 4685385 (N.D. Cal. Oct. 7, 2021)........................................................22

*Zest Anchors, LLC v. Geryon Ventures, LLC*,
    2022 WL 16838806 (S.D. Cal. Nov. 9, 2022) ......................................................18

## PRELIMINARY STATEMENT

Apple is in blatant violation of this Court's injunction.  Its new App Store policies continue to impose prohibitions on developers that this Court found unlawful and enjoined.  Moreover, Apple's new policies introduce new restrictions and burdens that frustrate and effectively nullify the relief the Court ordered.

In its September 21, 2021 order finding that Apple violated the California Unfair Competition Law (the "UCL"), this Court found that Apple insulated itself from competition by preventing developers from "communicat[ing] lower prices on other platforms either within iOS or to users obtained from the iOS platform" and that Apple's conduct "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform".  (Dkt. 812 at 163-64 (the "Rule 52 Order").)  The Court reasoned that "[i]n the context of technology markets, the open flow of information becomes even more critical . . . [because] information costs may create 'lock-in' for platforms", and that "the ability of developers to provide cross-platform information is crucial" to facilitate competition.  (*Id.* at 164.)  As a result of Apple's anti-steering provisions and other restrictive policies, Apple had "excessive operating margins under any normative measure", "the commission rate driving the excessive margins has not been justified" and "the costs to developers are higher because competition is not driving the commission rate".  (*Id.* at 163.)  To remedy Apple's violations of the UCL, the Court enjoined Apple from prohibiting developers from including in their iOS apps "buttons, external links, or other calls to action" that direct customers to alternative purchasing methods outside of the app.  (Dkt. 813 ¶ 1 (the "Injunction").)

Compliance with the Injunction should have been simple; all Apple needed to do was to remove the illegal anti-steering language from its App Store Review Guidelines (the "Guidelines") so that developers could provide truthful information to users and enable them to act on it.  But Apple chose a markedly different path.  On January 16, 2024—after its challenges to the Injunction were exhausted—Apple filed a notice contending that it had updated its policies to comply with this Court's mandate.  (Dkt. 871 (the "Notice of Compliance" or "Notice").)  In fact, Apple's Notice is one of *non*-compliance.  As explained in the Notice, Apple replaced its

1    blanket prohibition on steering with an elaborate new scheme that is guaranteed to continue

2    extracting excessive commissions from developers and prevent developers from

3    "communicat[ing] lower prices on other platforms".  (Dkt. 812 at 163-64.)  Apple's new scheme

4    so pervasively taxes, regulates, restricts and burdens in-app links directing users to alternative

5    purchasing mechanisms on a developer's website ("External Links" or "Links") as to make them

6    entirely useless.  Moreover, Apple continues to completely prohibit the use of "buttons . . . or

7    other calls to action" in direct contravention of this Court's Injunction.  (*See* Dkt. 813 ¶ 1.)

8            Apple violates the Injunction in three ways.  *First*, with respect to External Links,

9    Apple has imposed a new fee and enacted a slew of new rules that work together to make the

10   links commercially unusable.  This new fee and accompanying web of restrictions subvert the

11   purpose of the Injunction, allowing Apple to continue extracting its excessive commissions and

12   making it effectively impossible for a developer to inform users about, and direct users toward, an

13   alternative platform for making a purchase.  Apple now requires a developer to:

14   - pay Apple a new fee of 27% on any purchases users make **outside** the app up to one week
15     after clicking a Link;

16   - apply for and receive Apple's permission ("Link Entitlement") for the inclusion of any
     Link;

17   - abide by Apple's mandates concerning the language, look and location of any Link—
18     Links may not be prominently displayed, may not pop up and may not be placed within
     any purchase flow (*i.e.*, in any context relevant to steering users to alternative purchasing
19     mechanisms);

20   - present users with a "scare screen" intended to deter users from making purchases outside
     the app; and

21   - link users to a single static URL (*i.e.*, to a general landing page where users are neither
22     logged in to their accounts nor presented with any specific product they were seeking to
     purchase).

23           Notably, Apple's new fee on purchases made outside the app, in and of itself, is

24   enough to frustrate the very purpose of the Injunction; if Apple is allowed to tax out-of-app

25   purchases, those purchases could never constrain Apple's pricing of IAP, and developers and

26   consumers would not have any reason to use these alternative transacting options.  The fact that,

27   on top of this new fee, Apple has designed External Links to be so riddled with additional

28   economic disincentives, technical requirements and user frictions further negates any incentives

EPIC'S MOTION TO ENFORCE       2       CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

1    developers could have to use such Links, as well as the benefits to consumers the Court sought to

2    achieve by allowing developers to inform users of competitive options.  These policies

3    collectively operate as a *de facto* prohibition on External Links, and violate the Injunction.

4         *Second*, Apple continues to categorically prohibit any steering using "buttons" or

5    "other calls to action".  Specifically, Apple does not allow External Links that resemble a

6    "button" in any way.  And developers are likewise prohibited from including in their apps simple

7    statements—without any attendant link—stating truthfully that items or subscriptions may be

8    purchased directly on the web at a lower price.  Apple's ban on "buttons" or "other calls to

9    action" is a brazen violation of the Court's Injunction, which explicitly requires Apple to allow

10    developers to use "*buttons*, external links, *or other calls to action*" that direct customers to

11    purchasing mechanisms other than IAP.  (Dkt. 813 ¶ 1 (emphases added).)

12         *Third*, Apple's Guideline 3.1.3 still prohibits certain apps, including all

13    multiplatform services (*i.e.*, apps that operate across multiple platforms and allow users to access

14    the same content across these platforms, including popular games such as Minecraft), from

15    "within the app, encourag[ing] users to use a purchasing method other than in-app purchase".

16    (Dkt. 874 Ex. 1 § 3.1.3.)  This language expressly contravenes the Injunction by prohibiting any

17    steering to alternative purchasing methods.  Apple has now stated in a separate website post that

18    multiplatform services may obtain an External Link entitlement notwithstanding the express

19    prohibition in Guideline 3.1.3.  But Apple has refused repeated requests from Epic to amend the

20    Guidelines themselves to remove the general prohibition on steering or to otherwise clarify that

21    apps covered by Guideline 3.1.3 can still qualify for External Links.

22         With these new policies, Apple continues to charge unjustified fees and

23    intentionally prevent the "open flow of information".  Apple's goal is clear:  to prevent

24    purchasing alternatives from constraining the supracompetitive fees it collects on purchases of

25    digital goods and services.  Apple's so-called compliance is a sham.  Epic therefore seeks an

26    order (i) finding Apple in civil contempt, (ii) requiring Apple to promptly bring its policies into

27    compliance with the Injunction and (iii) requiring Apple to remove all anti-steering provisions in

28    Guideline 3.1.3.

EPIC'S MOTION TO ENFORCE     3     CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

## FACTUAL BACKGROUND

### A.    The Court's Rule 52 Order and UCL Injunction

Epic brought suit under both federal and state competition statutes, including the UCL, seeking an injunction against Apple. (Dkt. 1.) Epic's UCL claim challenged (among other things) Apple's anti-steering provisions, which stifled the ability of iOS app developers to communicate to their users the existence of alternative—and potentially cheaper—purchasing options outside of an app. (*Id.* ¶¶ 130, 131; *see also* Dkt. 407 ¶ 27.)

On September 10, 2021, this Court found that "Apple's anti-steering provisions hide critical information from consumers and illegally stifle consumer choice". (Dkt. 812 at 2.) The Court reasoned that the free flow of price information is a necessary competitive constraint on what it characterized as Apple's "excessive operating margins under any normative measure" and that "[t]he costs to developer[s] are higher because competition is not driving the commission rate". (*Id.* at 163.) The Court noted that "where consumers have the benefit of price advertising, retail prices often are dramatically lower than they would be without advertising". (*Id.* at 164 (quotation omitted).) However, Apple's anti-steering rules "enforced silence to control information and actively impede users from obtaining the knowledge to obtain digital goods on other platforms". (*Id.* at 165.)

Accordingly, this Court issued an injunction striking Apple's Guideline prohibiting the inclusion within iOS apps of "buttons, external links or other calls to action that direct customers to purchasing mechanisms other than in-app purchase".[1] (*Id.* at 163-64.) In issuing the Injunction, the Court stated that its intent was to further the "public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace". (*Id.* at 166.)

---

[1] Specifically, the Court enjoined Apple from "prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app." (Dkt. 813 ¶ 1.)

EPIC'S MOTION TO ENFORCE INJUNCTION                4                CASE NO. 4:20-CV-05640-YGR-TSH

### B. Subsequent Procedural History

Apple moved this Court to stay the Injunction pending its appeal to the Ninth Circuit, which this Court denied. (Dkt. 830.) In its order denying the stay, this Court emphasized that "it should be [consumers'] choice" whether to use IAP or an external alternative, because "[c]onsumer information, transparency and consumer choice is in the interest of the public". (*Id.* at 4.) The Court further clarified that, while it did not limit the fee that Apple charges for IAP and did not enjoin Apple from requiring IAP to be used to process in-app purchases of digital goods and services, IAP had to "compete on pricing" with external alternatives. (*Id.*)

On December 8, 2021, the Ninth Circuit granted Apple's motion to stay the Injunction pending appeal. (C.A.9. No. 21-16695, Dkt. 14 at 2.) On April 24, 2023, the Ninth Circuit affirmed the Injunction in all respects. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002-03 (9th Cir. 2023). Apple then filed a petition for writ of certiorari with the U.S. Supreme Court on September 23, 2023. (Petition for Writ of Certiorari, *Apple Inc. v. Epic Games, Inc.*, No. 23-344 (Sept. 23, 2023).) That petition was denied on January 16, 2024. (*See* Dkt. 871-4 Ex. 20.) The Injunction then came into effect. (*Id.* Exs. 8, 19.)

### C. Apple's "Notice of Compliance"

On January 16, 2024, following the Supreme Court's denial of Apple's petition for a writ of certiorari, Apple filed a purported "Notice of Compliance" with this Court. (Dkt. 871.) The Notice of Compliance introduced updated Guidelines (*see* Dkt. 874 Ex. 1), a new StoreKit External Purchase Link Entitlement Addendum for US Apps (*see* Dkt. 874 Ex. 2 (the "Addendum")) and a printout of the Apple website's StoreKit External Purchase Link Entitlement (US) Support Page (*see* Dkt. 874 Ex. 3), which set forth Apple's updated policies regarding External Links. These policies make clear that Apple continues to engage in enjoined conduct.

#### 1. Apple's New Policies Regarding External Links

The new policies nominally permit External Links, but only under a strict set of terms and conditions that make them unusable. These include:

***New Commission.*** Developers are required to pay Apple a new percentage-based fee of up to 27% on all transactions for digital goods and services that take place *outside the app*

EPIC'S MOTION TO ENFORCE
INJUNCTION

5

CASE NO. 4:20-CV-05640-YGR-TSH

within seven days after the user clicks an External Link ("Linked Purchases").[2]  (Dkt. 871 at 12.)
This new fee on purchases made outside the app is set at a rate that is 3% lower than the
corresponding fee that Apple would charge on in-app sales utilizing Apple's In-App Purchase—
27% for purchases on apps not participating in any special programs (as compared to 30% for in-
app purchases), and 12% for subscription payments in the second year of the subscription or for
developers participating in the Small Business Program (as compared to 15% for in-app
purchases).  (*Id.* at 12-13.)  This is essentially the same fee that this Court found Apple has never
justified and is not driven by competition, only now it is being charged—for the first time—on
purchases that take place *outside* of an iOS app.  The amount of this fee removes the economic
incentive to incorporate an External Link into an app, because developers will have to pay more
than 3% just to process Linked Purchases.  (*See, e.g.*, Simon Decl. ¶ 32; Owens Decl. ¶¶ 9, 18, 26,
32, 33.)  As a result, developers would not be able to offer consumers lower prices on Linked
Purchases than they offer on in-app purchases processed through IAP.  (Simon Decl. ¶ 32.)

   ***Entitlement Requirement.***  Under Section 3.1.1(a) of the Guidelines, a developer
cannot include an External Link within its app unless it applies for, and is granted, a Link
Entitlement.  (*See* Dkt. 874 Ex. 1 § 3.1.1(a).)  Applying for the Link Entitlement is a separate
application process that a developer must complete in addition to the ordinary process for
submitting an app for review by Apple.  (*See* Dkt. 874 Ex. 3.)  Apple reserves the right, in its
"sole discretion", to deny developers' requests for Link Entitlements.  (Dkt. 874 Ex. 2 § 2.3.)

   ***Link Placement, Messaging and Appearance.***  Apple dictates every aspect of the
placement, messaging and appearance of External Links.  Specifically:

---

   [2] Note that Linked Purchases need not be causally linked to the use of an External Link.
Instead, Apple collects its new 27% fee on any purchase made on the developer's website within
seven days of an External Link being clicked, even if such purchase was completed days later, in
a different browser window than was opened by the External Link, or even on a different device.
(*See* Dkt. 874 Ex. 2 § 1 (defining "Transaction" as *any* "sale of digital goods or services . . . on a
website You own or have responsibility for ('Your website'), provided that the sale was initiated
within seven (7) calendar days after a link out . . . from your [app]"); *id.* § 5.1 (stating that "Apple
shall be entitled to a commission equal to [up to] twenty-seven percent (27%) of all Transaction
proceeds made on Your website").)

EPIC'S MOTION TO ENFORCE                    6              CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

- Placement:  Developers may **not** place a Link anywhere near a purchase flow, where steering is most relevant.  (*See* Dkt. 874 Ex. 2 § 3.3.)

- Messaging:  Developers may only convey to users one of the following five Apple-curated messages:[3]

---

**Templates**

Use the templates that best fits your use case. Aside from the price, percentage off, and your website URL, the language used in your app must match the template language. Don't modify or use the template in a manner that misleads customers.

Purchase template:
Purchase from the website at www.example.com ⤢

Special offer template:
For special offers, go to www.example.com ⤢
For a special offer, go to www.example.com ⤢

Lower price template:
Lower prices offered on www.example.com ⤢
Lower price offered on www.example.com ⤢

Percent off template:
To get XX% off, go to www.example.com ⤢

Specific price template:
Buy for $X.XX at www.example.com ⤢

---

- Appearance:  Developers may only include an External Link that follows Apple's "Plain Button Style"—**which is not a button at all**—as depicted below (permitted style in green enclosure):[4]



---

[3] Dkt. 874 Ex. 3 (Apple-permitted "Templates").  While Apple describes these templates as having seven different messages, there are in reality only five templates, two of which have alternate wording for the singular and the plural, depending on how many offers or products are available on the developer's website.

[4] *Buttons*, Apple Developer Blog (last visited Mar. 12, 2023), https://developer.apple.com/design/human-interface-guidelines/buttons#Platform-considerations (Apple's "button styles").

1  Collectively, these requirements prevent developers from designing their External Links in a way

2  that is effective in directing customers to cheaper, convenient purchasing alternatives.  (Simon

3  Decl. ¶¶ 28, 29.)

4           ***Scare Screen.***  Developers are required to display a scare screen to every user that

5  clicks on an External Link, warning the user against the use of non-Apple purchasing

6  alternatives:[5]



In-app system disclosure sheet

Each time your app calls the StoreKit External Purchase Link API, it will surface a system disclosure sheet provided by the system (iOS 15.4 and/or iPadOS 15.4 or later) that explains to the user that they'll be leaving the app and going to an external website to make a purchase through a source other than Apple. When a user taps the Continue button, they will be directed to your website within a web browser.

20  This scare screen is intended to dissuade users from completing purchases on the web, and is

21  required even if the alternative payment processor on the linked website is just as secure, or even

22  more secure, than Apple's IAP.  (Simon Decl. ¶ 30; Owens Decl. ¶ 31.)

23           ***URL Restrictions.***  External Links must link to a single website URL, with no

24  query parameters.  This means that the Link may not (a) transfer the user's login credentials or

25  (b) land the user on the page of the product they were browsing in the app.  Users who follow the

26  Link must navigate anew on the web page to find the purchase they want to make, and may also

27  _____

28  [5] Dkt. 874 Ex. 3 (Apple's "In-app system disclosure sheet").

Epic's Motion to Enforce Injunction       8       Case No. 4:20-CV-05640-YGR-TSH

need to sign in again to make the purchase.  This will result in a frustrating experience that users may abandon before completing a purchase (Owens Decl. ¶ 29) or may lead to users purchasing products for the wrong accounts (Simon Decl. ¶ 31).  Furthermore, developers can only list a single website URL, and that URL cannot be changed without resubmitting the External Link to Apple.  (Dkt. 874 Ex. 2 § 3.3; Dkt. 874 Ex. 3.)  Accordingly, developers cannot engage in the hallmarks of price competition—promotions, frequent changes to prices, etc.

### 2. Apple's Continued Prohibition on Calls to Action Other than External Links

Apple's Notice of Compliance states that Apple now permits steering through "buttons".  (Dkt. 871 at 1, 4, 5, 13.)  But as noted above and as depicted in the above figure, the new Guidelines do not actually allow buttons, such as the buttons that fitness app developer Down Dog previously included—with great success—in the Android versions of its apps.  (*See* Simon Decl. ¶¶ 15-27.)

Further, Apple continues to prohibit developers from simply telling users, without a Link, that other purchasing options are available.  In other words, simple truthful statements like "Items available on our website at a discount" or "Go to [www.website.com] for lower prices" remain prohibited.  The Notice states that Apple now permits "links *__with__* calls to action".  (Dkt. 871 at 1, 4, 5, 13 (emphasis added).)  But the Court's Injunction enjoins Apple from prohibiting steering through "links[] *__or other calls to action__*".  (Dkt. 813 ¶ 1 (emphasis added).)  As Apple has confirmed in meet and confers with Epic, Apple still does not allow any "other calls to action" that are untethered to an External Link.  (Even Decl. Ex. 3 at 3.)

### 3. Apple's Continued Prohibition on Encouraging Users To Use Purchasing Methods Other than IAP

New Guideline 3.1.3 still prohibits developers of certain types of apps from, within the app, "encourag[ing] users to use a purchasing method other than in-app purchase".[6]  (Dkt. 874

---

[6] This prohibition in Guideline 3.1.3 covers purchase methods for Multiplatform Services, Enterprise Services, Person-to-Person Services, Goods and Services Outside of the App, Free Stand-alone Apps and Advertising Management Apps.  The Guideline recognizes a single exception, stating that "encouragement" of the use of other purchasing alternatives is allowed "as

Ex. 1 at 21.)  This language suggests that the apps covered in Guideline 3.1.3 are prohibited from using an External Link because doing so would "encourage" users to use a purchasing method other than IAP.  Among the apps covered by Guideline 3.1.3 are "Multiplatform Services", broadly defined by Apple as all "[a]pps that operate across multiple platforms [and] allow users to access content, subscriptions or features they have acquired . . . on other platforms or [the developer's] website, **including consumable items in multi-platform games**".  (Dkt. 874 Ex. 1 § 3.1.3(b) (emphasis added).)  This definition covers many of the most popular game apps on iOS, such as Minecraft, Candy Crush, Hearthstone, Roblox, PUBG Mobile and Call of Duty: Mobile.  (*See* Dkt. 779-1 ¶¶ 165, 514.)[7]

Epic raised this issue with Apple during meet and confers, and Apple stated that Multiplatform Services *may*, in fact, obtain an entitlement for External Links (so long as they meet all of the other requirements).  (Even Decl. Ex. A at 2, 3.)  Epic asked Apple to amend its Guidelines consistent with this representation.  (*Id.* Ex. A at 3.)  On March 5, 2024, Apple published amended Guidelines (the "Amended Guidelines").  (*See id.* Ex. B.)  However, the Amended Guidelines do not modify Section 3.1.3.  The only relevant change was to hyperlink the language "in-app purchases within the app" in Section 3.1.3(b) to Section 3.1.1.  (*Compare* Dkt. 874 Ex. 1 § 3.1.3(b) (the phrase "in-app purchases within the app" appears as plain text) *with* Even Decl. Ex. B § 3.1.3(b) (the phrase "in-app purchases within the app" appears as an internal

---

set forth in 3.1.3(a)".  Guideline 3.1.3(a) covers only Reader Apps, which are expressly allowed to use External Links (though not buttons or other calls to action).

[7] The Fortnite iOS app would also fall into this category if it were allowed on the Apple App Store.

EPIC'S MOTION TO ENFORCE
INJUNCTION

10

CASE NO. 4:20-CV-05640-YGR-TSH

1    link, which takes the user back to Section 3.1.1).)  The changed text is highlighted in the below

2    depiction of Section 3.1.3(b) of the Amended Guidelines:[8]

3
4    **3.1.3(b) Multiplatform Services:** Apps that operate across multiple platforms may allow users to access content, subscriptions, or features they have acquired in your app on other platforms or your web site, including consumable items in multi-platform games, provided those items are also available as in-app purchases within the app.

5

6            The Amended Guidelines retain the language in Section 3.1.3 prohibiting

7    developers of covered apps from "encourag[ing] users to use a purchasing method other than

8    in-app purchase" and, aside from the hyperlink, otherwise leave Section 3.1.3(b) unchanged.  The

9    Amended Guidelines also make no changes to the other subsections of Section 3.1.3 to clarify

10   whether apps covered in those subsections can also qualify for an External Link.[9]  Apple has not

11   otherwise explained during meet and confers how the availability of the External Link entitlement

12   for apps covered by Guideline 3.1.3(b) is consistent with the prohibition on encouraging the use

13   of purchasing methods other than IAP.  (Even Decl. Ex. A.)[10]

14           **D.    Industry and Third-Party Reactions to the Notice of Compliance**

15           Since Apple filed its Notice of Compliance, other developers and industry

16   participants have decried the onerous restrictions in Apple's compliance plan and its effect on the

17   free exchange of price information.  App developer Spotify stated that Apple's response to the

18

19       [8] Even Decl. Ex. B § 3.1.3(b) (Section 3.1.3(b) of the Amended Guidelines, with highlighting added to language appearing as a link instead of plain text).

20

21       [9] While certain of the app types covered in Section 3.1.3 may not need to use an External Link because they are not required to use IAP to process in-app purchases (*e.g.*, apps selling physical goods and services, covered in Section 3.1.3(e)), other app types likely would benefit from External Links because they are still required to use IAP for in-app purchases (*e.g.*, Enterprise Services, covered in Section 3.1.3(c)).

22

23

24       [10] A March 5, 2024 post on Apple's website provides the following description of the change to Section 3.1.3(b) in the Amended Guidelines:  "3.1.3(b):  Added a link to 3.1.1 to make clear that 3.1.1(a) applies, and multiplatform services apps can use the 3.1.1(a) entitlement."  *Updated App Review Guidelines now available*, APPLE.COM (March 5, 2024), https://developer.apple.com/news/?id=flmb6ri3.  However, this note is not included in the Guidelines themselves, such that a developer would not receive this clarification if they reviewed only the Guidelines to understand their rights and obligations.  Developers cannot be expected to scroll back through old news posts to find this statement, which is inconsistent with the plain meaning of the Guidelines themselves.

25

26

27

28

EPIC'S MOTION TO ENFORCE             11             CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

Injunction "is outrageous and flies in the face of the court's efforts to enable greater competition and user choice"[11] and that "[o]nce again, Apple has demonstrated that they will stop at nothing to protect the profits they exact on the backs of developers and consumers under their app store monopoly".[12]  App developer Paul Haddad, founder of Tapbots, which develops apps such as Tweetbot, Pastebot and Calcbot, called Apple's new policies "downright insulting".[13]  App developer Nick Farina, co-founder of payment app Kuto, described Apple's new commission on linked purchases as a "farce" and that Apple's new policies regarding External Links "will be used by no one" because "[p]rocessing your own payments will cost you at least 3 percent (as Apple well knows), so you're back to giving them 30 percent, plus doing a bunch of dev work and special recordkeeping, then reporting to them on your own dime".[14]  Developer David Heinemeier Hansson, the creator of Ruby on Rails, similarly commented that Apple's new steering commission is going to "poison the one victory Epic secured in their lawsuit so bad nobody would ever think to use it".[15]

Other developers' and industry participants' perspectives are likewise that Apple's policies will not allow for effective steering to payment mechanisms other than IAP.  Benjamin Simon, President and CEO of fitness app developer Down Dog, explains that Apple's policies will not allow the use of in-app buttons similar to those Down Dog previously included in the Android versions of its apps.  (Simon Decl. ¶¶ 15-33.)  These buttons were highly effective in enabling users to save money by purchasing subscriptions on Down Dog's website rather than

---

[11] Sarah E. Needleman and Aaron Tilley, *Apple Changes Its App Store Policy: Critics Call the Moves 'Outrageous'*, WALL STREET J. (Jan. 17, 2024), https://www.wsj.com/tech/apple-changes-its-app-store-policy-critics-call-the-moves-outrageous-7c023e0c.

[12] Tom Gerken, *Spotify attacks Apple's 'outrageous' 27% commission*, BBC NEWS (Jan. 18, 2024), https://www.bbc.com/news/technology-68018618.

[13] Christopher Mins, *The Main Driver of Apple's Success Has Become Its Biggest Liability*, WALL STREET J. (Jan. 26, 2024), https://www.wsj.com/tech/personal-tech/apple-vision-pro-walled-garden-mac-iphone-app-store-c4838278.

[14] Emma Roth, *Apple thought it dealt with Epic v. Apple—has it really?*, THE VERGE (Jan. 24, 2024), https://www.theverge.com/24049014/apple-epic-court-ruling-developer-tax.

[15] *Id.*

EPIC'S MOTION TO ENFORCE INJUNCTION    12    CASE NO. 4:20-CV-05640-YGR-TSH

through Google's in-app billing solution.  (*Id.* ¶¶ 21-24.)  Mr. Simon explains that Apple's new fee on Linked Purchases is prohibitive to implementing External Links, because the 3% difference between the fees Apple charges for IAP and those it now imposes on Linked Purchases will not cover the cost of a payment solution on Down Dog's website, which ranges from approximately 3.5% to 6.5% of the transaction price.  (*Id.* ¶ 32.)  Christian Owens, founder and executive chairman of payment solution provider Paddle, explains why developers will be unlikely to use External Links because of the added friction they introduce.  (Owens Decl. ¶¶ 27-31, 34, 35.)  And, even if users were willing to overcome the frictions associated with Linked Purchases, they still would not benefit from lower prices.  Paddle's own costs for its services exceed the 3% differential between Apple's existing IAP fee and its new fee for Linked Purchases, meaning that Paddle would have to charge developers more than 3%—and as a result developers would have to pay *more* in fees for a Linked Purchase completed through Paddle's payment solution than they would for a purchase made within their app using IAP.  (*Id.* ¶¶ 32-35.)

## LEGAL STANDARDS

This Court retains jurisdiction to enforce the Injunction.  Specifically, the Court has broad powers to hold Apple in contempt, enforce the Injunction and clarify its application. *Craters & Freighters v. Daisychain Enters.*, 2014 WL 2153924, at *1 (N.D. Cal. May 22, 2014) (the Court "has the inherent authority to enforce compliance with its orders through a civil contempt proceeding").

"[T]he party alleging civil contempt must demonstrate by clear and convincing evidence that (1) the contemnor violated a court order, (2) the noncompliance was more than technical or de minimis, and (3) the contemnor's conduct was not the product of a good faith or reasonable interpretation of the violated order." *Facebook, Inc. v. Power Ventures, Inc.*, 2017 WL 3394754, at *8 (N.D. Cal. Aug. 8, 2017) (citing *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010)).  The contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order".  *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993) (quotation omitted).  In determining what sanction to impose for civil contempt, a court "should weigh all the evidence properly before it determines

EPIC'S MOTION TO ENFORCE INJUNCTION                  13                  CASE NO. 4:20-CV-05640-YGR-TSH

1   whether or not there is actually a present ability to obey and whether failure to do so constitutes

2   deliberate defiance or willful disobedience which a coercive sanction will break". *Falstaff*

3   *Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 n.6 (9th Cir. 1983).  The court must

4   "consider the character and magnitude of the harm threatened by continued contumacy, and the

5   probable effectiveness of any suggested sanction" in bringing about the result desired.  *Gen.*

6   *Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986) (quotation omitted).

7   Separately from civil contempt, courts may also find that a defendant is violating

8   an injunction when the plaintiff brings the defendant's conduct to the court's attention through a

9   motion to enforce.  In so doing, the court need not find the defendant in civil contempt in order to

10   find that the defendant has violated the injunction and to enter appropriate relief.  *See ADT*

11   *Security Servs., Inc. v. Security One Int'l, Inc.*, Case No. 11-cv-05149-YGR (N.D. Cal.), ECF

12   No. 185 (order denying motion for civil contempt but modifying preliminary injunction); *Buono*

13   *v. Norton*, 364 F. Supp. 2d 1175 (C.D. Cal. 2005) (granting "motion to enforce" after finding

14   defendant's conduct violated injunction, without finding defendant in civil contempt).

15   "In deciding whether an injunction has been violated it is proper to observe the

16   objects for which the relief was granted and to find a breach of the decree in a violation of the

17   spirit of the injunction, even though its strict letter may not have been disregarded."  *Inst. of*

18   *Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 949 (9th Cir. 2014).

19   **ARGUMENT**

20   **I.    Apple's Updated Policies with Respect to External Links Violate the Injunction**

21   Apple's policies negate price competition between in-app purchases and out-of-

22   app purchases by burdening out-of-app Linked Purchases with the same exorbitant fees it imposes

23   on in-app purchases—fees that this Court identified as "supracompetitive" and "untethered to

24   [Apple's] intellectual property".  (Dkt. 830 at 2.)  Those fees—which are up to 27% on purchases

25   made within seven days of users clicking an External Link—alone frustrate the purpose of the

26   Injunction.  Further, the web of technical requirements, economic hurdles and user frictions

27   imposed through Apple's new policies mean that the External Links Apple now allows can never

28   be an effective tool to disseminate competitive pricing information as contemplated by the

EPIC'S MOTION TO ENFORCE                    14              CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

Injunction.  Because Apple's fees and restrictions eliminate developers' ability to use External Links to offer lower prices to users, Apple's new policies are a *de facto* prohibition on External Links.

This Court found that Apple's fee on purchases processed by IAP has never been justified and is not restrained by competition.  (Dkt. 812 at 163.)  This Court's Injunction required Apple to allow developers to steer consumers from IAP, which was encumbered by Apple's tax of up to 30%, to alternative platforms where purchases were unencumbered by Apple's tax.  While this Court allowed Apple to continue requiring IAP for in-app purchases, it entered the Injunction so that competition from unencumbered web purchases could "driv[e] the commission rate" (*id.*) and require Apple to compete on the merits with outside payment options (Dkt. 830 at 4).  Allowing Apple to charge *any* fee for these alternative purchasing mechanisms interferes with those goals because it gives Apple complete control over the price of the competitive alternative to IAP.  By imposing high fees that are not materially different from the fees it charges through IAP, Apple increases the cost of out-of-app purchases and negates the competitive pressure on IAP that the Injunction is intended to introduce.

As noted above, the new fee is only 3% lower than the fee Apple charges developers for in-app purchases using IAP, and the cost to developers of an alternative payment solution would typically meaningfully exceed 3%, resulting in Linked Purchases being more costly to the developer, and in turn, consumers, than in-app purchases using IAP.[16]  Further, acquiring and maintaining a Link Entitlement adds costs to developers, including that developers must maintain various specified data on Linked Purchases, report that data to Apple and possibly submit to an audit by Apple.  Simply put, instead of the Injunction resulting in competitive pressure that would force Apple to make IAP *cheaper*, Apple is using the Court-mandated links to

---

[16] For example, Paddle charges developers a fee of up to 10% for its payment solution (Owens Decl. ¶ 18, 26), and in Epic's lawsuit against Google, internal Google documents and trial testimony established that the average cost for processing payments is between 4%-6% (*see* Trial Exhibit 360, *Epic Games, Inc. v. Google LLC*, No. 21-md-2981-JD (N.D. Cal.), ECF No. 886-30 at 24; Trial Tr. at 726:19-22, *Epic Games, Inc. v. Google LLC*, No. 21-md-2981-JD (N.D. Cal.)), ECF No. 837.

make alternative purchasing avenues *more expensive*.  Make no mistake:  this is intentional.

Apple knows that under this scheme developers have no real incentive to, and will not, make use

of External Links.  And as noted above, this financial impact is exacerbated by Apple's decision

to impose the fee on all purchases made within seven days of a user clicking a Link—***even if the***

***purchase was made in a different browser window, or even on a different device, and for***

***reasons unrelated to the External Link***.

In addition to the new fees, Apple has imposed further restrictions on External

Links that ensure they will not be effective (and will not be used).  Together with the fees, these

restrictions operate as a *de facto* prohibition on steering that this Court ordered Apple to permit.

*First*, Apple's Link Entitlement review process puts a developer's ability to make price

competition available to users squarely within Apple's discretion and control.

*Second*, Apple's design restrictions completely defang External Links as an

effective marketing tool for alternative purchasing options.  Apple designed External Links to be

bland, inconspicuous and removed from the purchase flow in which the link would be meaningful

to users.  Apple's design of External Links is not intended to *promote* price competition; it is

intended to *stifle* it.

*Third*, if users do somehow locate and click an External Link, Apple's mandatory

scare screen will deter them from following through on their chosen out-of-app purchase.  Apple

claims the scare screen is necessary to make clear to users that their purchase will not be handled

by Apple.  But that excuse rings hollow in light of the lack of any similar warning when a user

utilizes an iOS app to purchase *physical* goods or services—a purchase handled by entities other

than Apple.  Indeed, Apple does not present users with *any* warning before they make purchases

in the iOS Amazon or Uber app, even though none of these purchases are handled by Apple.  In

fact, this Court already considered and largely rejected Apple's arguments at trial that mandating

the use of IAP for in-app purchases of digital goods and services increased security.  (*See*

Dkt. 812 at 116-17 (finding Apple's security justifications "cut both ways" and noting in

particular that Apple itself did not verify digital goods transactions, and thus "Apple ha[d] not

1  shown how [its] process is any different than other payment processors, and any potential for

2  fraud prevention [wa]s not put into practice").)

3       *Fourth*, any user that makes it past the scare screen will be linked to a generic page

4  of the developer's website.  To complete a purchase, the user would need to again (a) log into

5  their account (even though they already logged into their account in the app), and (b) search

6  for the product they wanted to purchase.  These frictions will further deter users from completing

7  a purchase on the developer's website if they even make it this far into the purchase flow.

8       Apple's *de facto* prohibition on External Links is a violation of the Injunction

9  because it is clearly intended to subvert the purpose of the Injunction:  enabling external

10 purchasing mechanisms to competitively constrain Apple's excessive IAP commission.  This sort

11 of textbook circumvention of an injunction is plainly sufficient grounds for finding Apple in

12 contempt.  *See Inst. of Cetacean Rsch.*, 774 F.3d at 949 (finding conduct violated an injunction

13 where it was against "the spirit of the Injunction, even though its strict letter may not have been

14 disregarded" (quoting *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir.

15 1942)); *see generally Alter Domus, LLC v. Winget*, 2023 WL 4865590, at *6 (E.D. Mich. July 31,

16 2023) (collecting cases and noting that "[i]t has been said that a defendant that hews to the narrow

17 letter of the injunction while simultaneously ignoring its spirit charts such a course at its own

18 peril" (quotation marks, citations and alterations omitted)); *F.V. v. Jeppesen*, 466 F. Supp. 3d

19 1110, 1116 (D. Idaho 2020) (noting that "[t]he scope of an injunction is discerned from the

20 language of the injunction itself, as well as from the objective of the relief granted therein" and

21 that "[p]arties are expected to comply with both the letter and the spirit of a court's order").

22      *Cetacean* is illustrative.  There, a conservation group defendant was enjoined from

23 "physically attacking any vessel engaged by [p]laintiffs", an operator of whaling ships.  The

24 defendant transferred certain assets to a foreign entity it knew was likely to use those assets to

25 attack the plaintiffs' vessels.  774 F.3d at 941.  The Ninth Circuit held that this conduct violated

26 the injunction by "giving others [the defendant] knew were highly likely to violate the injunction

27 the means to do so".  *Id.* at 949.  The court further found that a finding of contempt was

28 appropriate because, despite ample opportunity, the defendants "did not seek clarification of their

EPIC'S MOTION TO ENFORCE        17      CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

1    obligations" under the injunction before acting.  *Id.* at 954.  The court also warned that "[t]he

2    schemes available to those determined to evade injunctions are many and varied, and no

3    injunction can explicitly prohibit every conceivable plan designed to defeat it".  *Id.* (citations

4    omitted).

5              Similarly, in *Zest Anchors, LLC v. Geryon Ventures, LLC*, the district court issued

6    a preliminary injunction prohibiting the defendant from selling certain products, among other

7    actions.  2022 WL 16838806, at *1 (S.D. Cal. Nov. 9, 2022).  After the injunction was issued, the

8    defendants stopped selling one of the finished products at issue but continued to sell components

9    used to make that product.  *Id.*  The court found that the defendants' behavior constituted a

10   violation of the injunction and held the defendants in civil contempt, noting that the

11   "[d]efendants' reading of the Preliminary Injunction and continued sales of their [individual

12   component parts] constitutes an impermissible end-run around the Preliminary Injunction because

13   even though [the d]efendants sell non-infringing, individual components to foreign distributors,

14   they know that these parts will be combined into an infringing whole for sale to customers in the

15   United States".  *Id.* at *2.

16             As with the defendants in *Cetacean* and *Zest Anchors*, Apple is determined to

17   circumvent the Injunction.  Its conduct violates the Injunction by introducing a new fee on

18   purchases made outside the app set at effectively the same supracompetitive price that the

19   Injunction was designed to constrain.  As a result, Linked Purchases will not be any cheaper than

20   IAP.  While the Court did not explicitly prohibit this scheme, it goes against the purpose of the

21   Injunction, which was to open up Apple's service fees to competition.  Similarly, Apple's conduct

22   violates the Injunction by creating a *de facto* prohibition on one of the three steering mechanisms

23   that this Court explicitly required Apple to permit.  As discussed in Section A above, the Court

24   was clear that the purpose of the Injunction was to allow competition to finally restrain the fee

25   Apple charges for purchases processed through IAP by increasing the free exchange of "pricing

26   information on mobile devices and bringing transparency to the marketplace".  (Dkt. 812 at 166.)

27   Far from complying with the Injunction in good faith, Apple has introduced effectively the same

28   fee for External Links and otherwise erected so many barriers and imposed so many costs on

EPIC'S MOTION TO ENFORCE                       18            CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

1  developers who seek to use External Links that no developer actually will.  That is a violation of

2  the Injunction.[17]

3          Apple's restrictions cannot be justified by security, privacy or any rationale other

4  than the anti-competitive objectives this Court found unlawful in its Rule 52 Order.  Indeed, the

5  Court already weighed Apple's supposed privacy and security concerns against the negative

6  impacts of its anti-steering provisions in determining that those provisions violated the UCL,

7  concluding that "the harm from the anti-steering provisions outweighs its benefits".  (Dkt. 812

8  at 165-66.)  Further, as noted above, Apple imposes none of the frictions discussed above on apps

9  selling physical goods or services, even though those sales are not handled or monitored by Apple

10  in any way.  (*See* Dkt. 871-4 Ex. 11 § 3.1.3(e) ("If your app enables people to purchase physical

11  goods or services that will be consumed outside of the app, you *must* use purchase methods other

12  than in-app purchase to collect those payments . . . ." (emphasis added)).)  And as Apple itself

13  admits, "developers are already permitted to (and do) include within their apps certain external

14  links, directing customers to websites for support and other services" (Dkt. 871 at 4), and this

15  Court has likewise recognized that "[c]onsumers are quite used to linking from an app to a web

16  browser" (*id.* (quoting Dkt. 830 at 3)).  If Apple had legitimate privacy and security concerns, it

17  would have similar restrictions apply to all apps, links and purchasing mechanisms—not just to

18  the type of links that could threaten Apple's "excessive operating margins".  (*See* Dkt. 812 at

19  163.)

20      ―――――――――――

[17] Apple's deliberate efforts to frustrate the purposes of laws and rulings intended to open up
21  the iOS ecosystem to competition do not end with its response to this Court's Injunction.  Apple
recently announced that, pursuant to the European Union's Digital Markets Act—a new law
22  intended to open up app distribution and payment solutions to competition in European markets—
it would allow competing app stores on iOS in Europe, but would impose new fees on any
23  download of such stores and on downloads of apps *from* such stores.  Moreover, a European Epic
subsidiary, Epic Games Sweden AB, applied and was approved for a developer account with the
24  stated intent of developing the Epic Games Store and Fortnite for iOS in European markets.  On
March 2, 2024, Apple terminated Epic Games Sweden's account, citing Epic's public statements
25  disagreeing with Apple's DMA compliance plan and the new fees Apple imposed.  Apple
reinstated the account only after the European Commission announced it was investigating
26  Apple's conduct.  *See UPDATE: Apple Reinstates Epic Developer Account After Public Backlash
for Retaliation*, Epic Games.com (Mar. 8, 2024), https://www.epicgames.com/site/en-
27  US/news/apple-terminated-epic-s-developer-account.

28

EPIC'S MOTION TO ENFORCE          19          CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

Moreover, Apple has not argued, and cannot argue, that some of its restrictions—such as its incredibly particular restrictions on the aesthetic and size of External Links—serve any legitimate purpose other than to hide and disadvantage External Links. This is especially true with respect to Apple's requirement that External Links not appear within the purchase flow of an app, which Apple's Notice does not even attempt to justify.

## II. Apple's General Prohibition on Buttons and Calls to Action Other than External Links Violates the Injunction

Apple's purported compliance plan also violates the letter of the Injunction, which requires Apple to allow developers to include in their apps not only external links, but also "buttons" and "other calls to action". (Dkt. 813 ¶ 1.) Apple's updated policies do not allow either. By continuing to prohibit such in-app steering mechanisms, Apple is in clear violation of the plain text of the Injunction.

As noted in Section C.2 above, Apple's updated policies do not allow in-app "buttons" to direct users to purchasing mechanisms other than IAP. Instead, Apple's Guidelines and other materials refer repeatedly only to a "Link Entitlement". The content, style and appearance limitations Apple places on these links mean that a developer cannot actually include a "button" in their app.

Apple's updated policies also continue to prohibit "calls to action" other than External Links. A developer is prohibited from informing users about the ability to purchase a digital good or service on the developer's website except by using one of Apple's "templates" in conjunction with an External Link. (*Supra* Section C.1.) In other words, a developer who otherwise qualifies for a Link Entitlement can include a link in their app that states "To get 30% off, go to [*link to website*]", but that same developer is prohibited from simply including in their app, without an accompanying link, a message such as: "To get 30% off, go to our website"; "In-App prices are 30% higher due to Apple's 30% fees"; or "We prefer that you purchase on our website". Indeed, Apple is continuing to prohibit these "other calls to action" even though Epic has, from the very beginning of this litigation, specifically focused on Apple's prohibition on "other calls to action" as distinct from buttons or external links. (*See* Dkt. 1 ¶ 130 (describing,

1  with emphasis in the original, Apple's policy that "Apps and their metadata may not include

2  buttons, external links, *or other calls to action that direct customers to purchasing mechanisms*

3  *other than in-app purchase*").)

4        The Injunction is crystal clear.  There is no reasonable, good-faith interpretation of

5  the Injunction that allows Apple to continue to ban two of the three in-app steering mechanisms

6  that were expressly identified by the Court.  Yet that is exactly what Apple has done, without any

7  justification or explanation.  Apple is therefore violating the express terms of the Injunction and

8  should be held in civil contempt for this reason as well.  *See Nat'l Abortion Fed'n v. Ctr. for Med.*

9  *Progress*, 2017 WL 3021024 (N.D. Cal. July 17, 2017), *aff'd*, 2022 WL 3572943 (9th Cir.

10  Aug. 19, 2022) (finding defendant in civil contempt where they violated the express terms of a

11  preliminary injunction and there was "no argument that the short, simple commands of the

12  Preliminary Injunction are vague or ambiguous").

13  **III.**  **Apple's Updated Guideline 3.1.3 Impermissibly Prohibits Steering**

14        As noted above, Section 3.1.3 of Apple's App Store Review Guidelines, as

15  reflected even in the March 5, 2024 Amended Guidelines, prohibits apps covered by that

16  Guideline (except Reader Apps, as noted above) from, "within the app, encourag[ing] users to use

17  a purchasing method other than in-app purchase".  (Even Decl. Ex. B § 3.1.3.)  This language

18  plainly and impermissibly prohibits all steering within apps covered by the Guideline.  (*See*

19  Section C.3.)  In fact, this Court's Rule 52 Order specifically identified Guideline 3.1.3 as an

20  illegal anti-steering rule, noting that Apple violated the UCL by "prohibiting apps from . . .

21  '*encourag[ing] users to use a purchasing method other than in-app purchase*'".  (Dkt. 812 at 163

22  & n.635 (emphasis added) (citing PX-2790 § 3.1.3).)

23        Apple has taken the position that multiplatform games and apps can still qualify

24  for External Links (subject to the myriad requirements discussed above).  (*See* Section C.3.)  But

25  this representation is inconsistent with the plain language of the Guidelines.

26        Apple's recent amendment to the Guidelines does nothing to cure the issue.  The

27  new link from Section 3.1.3(b) to Section 3.1.1 says nothing about the availability of External

28  Links for apps covered by Section 3.1.3(b) and does not change the fact that Section 3.1.3 plainly

EPIC'S MOTION TO ENFORCE         21         CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

1  prohibits developers of apps covered in that Section from encouraging users to use a purchasing

2  method other than IAP.  If anything, the fact that Apple issued the Amended Guidelines and

3  accompanying blog post describing the amendment to Section 3.1.3(b) is an admission that the

4  plain language of Section 3.1.3 contravenes the Injunction.  Apple's failure to make any change to

5  the text of that Section, despite this inconsistency between the language and its stated intent, only

6  highlights the problems with Apple's Guidelines.

7       Further, Apple's private assurance to Epic in a meet and confer between counsel

8  that Apple would not enforce the plain language of its own Guidelines does not alleviate the need

9  for enforcement of the Injunction.  *See C.F.T.C. v. Saffron*, 2020 WL 495557, at *2 (D. Nev.

10  Jan. 30, 2020) (finding defendants in civil contempt and ordering full compliance with

11  preliminary injunction where defendants had merely "offered excuses and promises" with respect

12  to their violations and future compliance efforts); *cf. S.E.C. v. Fehn*, 97 F.3d 1276, 1296 (9th Cir.

13  1996) ("[S]incere assurances of an intent to refrain from aiding and abetting future violations are

14  insufficient, without more, to militate against an injunction."); *OmniGen Rsch., LLC v. Yongqiang*

15  *Wang*, 2017 WL 5505041, at *20 (D. Or. Nov. 16, 2017) ("A defendant's voluntary cessation of

16  activity is not a ground for denial of a permanent injunction.").

17       Thus, this Court can and should order Apple to further amend its Guidelines to

18  remove this language or to explicitly state that the categories of apps in Guideline 3.1.3 have the

19  same right to use in-app steering mechanisms as do all other apps.[18]  Such an order is within the

20  Court's inherent authority to ensure compliance with its Injunction.  *See United States v. Rescino*,

21  2021 WL 4685385, at *3 (N.D. Cal. Oct. 7, 2021) ("A district court has the inherent authority to

22  enforce compliance with its orders through a civil contempt proceeding" (citing *Int'l Union,*

23  *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827-28 (1994))); *see also Mendoza v.*

24  _____

25  [18] The most straightforward manner of clarifying Apple's policies would be to modify Guideline 3.1.3 so that it simply follows the text of the Injunction.  Specifically, Guideline 3.1.3 could be modified to state as follows (with emphasis for modified language):  "The following

26  apps may use purchase methods other than in-app purchase.  ***Developers can include in their apps and metadata buttons, external links, or other calls to action that direct customers to***

27  ***purchasing mechanisms other than in-app purchase.***  Developers can ***also*** send communications outside of the app to their user base about purchasing methods other than in-app purchase."

28

EPIC'S MOTION TO ENFORCE                22          CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

1 *Hyundai Motor Co., Ltd.*, 2024 WL 189014, at *2 (N.D. Cal. Jan. 17, 2024) ("[A] federal court

2 administering a permanent injunction has discretion to clarify or modify an injunction if a party

3 enters upon transactions which raise doubts as to the applicability of the injunction." (quotation

4 omitted)).

5                                  <u>**CONCLUSION**</u>

6          For the foregoing reasons, Epic requests the Court enter an order (1) holding Apple

7 in contempt for violating the Court's Injunction; (2) requiring Apple to promptly bring its policies

8 into compliance with the Injunction; and (3) requiring Apple to remove all anti-steering

9 provisions in Guideline 3.1.3.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EPIC'S MOTION TO ENFORCE                    23              CASE NO. 4:20-CV-05640-YGR-TSH
INJUNCTION

Dated:  March 13, 2024

Respectfully submitted,

By:   /s/ *Gary A. Bornstein*

**FAEGRE DRINKER BIDDLE & REATH LLP**

Paul J. Riehle (SBN 115199)
paul.riehle@faegredrinker.com

Four Embarcadero Center
San Francisco, California 94111
Telephone:  (415) 591-7500
Facsimile:  (415) 591-7510

**CRAVATH, SWAINE & MOORE LLP**

Gary A. Bornstein (*pro hac vice*)
gbornstein@cravath.com
Yonatan Even (*pro hac vice*)
yeven@cravath.com
Lauren A. Moskowitz (*pro hac vice*)
lmoskowitz@cravath.com
Justin C. Clarke (*pro hac vice*)
jcclarke@cravath.com
Michael J. Zaken (*pro hac vice*)
mzaken@cravath.com
M. Brent Byars (*pro hac vice*)
mbyars@cravath.com

825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Plaintiff and Counter-defendant Epic Games, Inc.*

EPIC'S MOTION TO ENFORCE INJUNCTION

24

CASE NO. 4:20-CV-05640-YGR-TSH

**4-ER-748**

1  THEODORE J. BOUTROUS JR., SBN
   132099
2    tboutrous@gibsondunn.com
   DANIEL G. SWANSON, SBN 116556
3    dswanson@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
4  333 South Grand Avenue
   Los Angeles, CA 90071
5  Telephone: 213.229.7000
   Facsimile: 213.229.7520
6
   JULIAN W. KLEINBRODT, SBN 302085
7    JKleinbrodt@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
8  555 Mission Street
   San Francisco, CA 94105
9  Telephone: 415.393.8200
   Facsimile: 415.393.8306

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS (D.C. Bar No.
1617356; *pro hac vice*)
  hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

MARK A. PERRY, SBN 212532
  mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice pending*)
  joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: 202.682.7000
Facsimile: 202.857.0940

12  **Attorneys for Defendant APPLE INC.**

15               UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                     OAKLAND DIVISION

19  EPIC GAMES, INC.,

20          Plaintiff, Counter-defendant
    v.
21

22  APPLE INC.,

23          Defendant, Counterclaimant

Case No. 4:20-cv-05640-YGR

**NOTICE OF COMPLIANCE WITH UCL
INJUNCTION**

The Honorable Yvonne Gonzalez Rogers

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................1

DISCUSSION ..............................................................................................................................4

    I.      APPLE NOW PERMITS DEVELOPERS WITH APPS ON THE IOS OR
           IPADOS APP STORE U.S. STOREFRONTS TO COMMUNICATE
           WITHIN THE APP REGARDING ALTERNATIVE PURCHASING
           MECHANISMS.................................................................................................4

    II.    APPLE ALSO PERMITS DEVELOPERS TO COMMUNICATE OUTSIDE
           THE APP REGARDING ALTERNATIVE PURCHASING MECHANISMS........15

CONCLUSION............................................................................................................................16

**INTRODUCTION**

On September 10, 2021, the Court issued an Injunction enjoining Apple from prohibiting in the United States developers from "(i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchas[e] ['IAP'] and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."  Declaration of Mark A. Perry ("Perry Decl.") Ex. 6 ¶¶ 1–2.  The Ninth Circuit affirmed the Injunction on April 24, 2023 (Perry Decl. Ex. 9, at 77), and denied Apple's petition for rehearing on June 30, 2023 (Perry Decl. Ex. 10).  The Supreme Court denied Apple's petition for a writ of certiorari on January 16, 2024.  Perry Decl. Ex. 20.

As of January 16, 2024, Apple has fully complied with the Injunction:  It is striking the relevant parts of the App Store Review Guidelines applicable to apps on the U.S. storefronts of the iOS and iPadOS App Stores and implementing new rules that permit developers to (i) include in their apps buttons or links with calls to action that direct customers to purchasing mechanisms in addition to IAP and (ii) communicate with customers through points of contact obtained voluntarily from customers through account registration within the app.  As a result of these changes, developers have the option of informing consumers, both within and outside the app, about alternative purchase mechanisms in addition to IAP.  Apple respectfully makes this submission to summarize these changes for the Court.[1]

**BACKGROUND**

For over a decade, Apple has imposed certain requirements on developers that use Apple's proprietary tools and technologies protected by intellectual property to develop iOS and iPadOS apps.  Those requirements are memorialized in the Apple Developer Program License Agreement ("DPLA") and the App Store Review Guidelines.  Perry Decl. Ex. 5, at 31, 143.  Epic Games, Inc. initiated this lawsuit to challenge two contractual and technical restrictions:  Apple's requirement

---

[1] Apple incorporates by reference the definition of IAP used by the Court in its post-trial findings of fact and conclusions of law.  Perry Decl. Ex. 5, at 3 n.3.

that developers distribute iOS and iPadOS apps through the App Store, and Apple's requirement that iOS and iPadOS apps use IAP for in-app purchases of digital goods and services.  After a bench trial, the Court held that these requirements do not violate state and federal antitrust laws or the California Unfair Competition Law ("UCL").  *Id.* at 162, 179.  The Ninth Circuit affirmed.  Perry Decl. Ex. 9.

Epic also challenged two anti-steering rules in the App Store Review Guidelines, which at the time of trial provided that (i) "[a]pps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than [IAP]," and (ii) "[a]pps in this section cannot, either within the app or through communications sent to points of contact obtained from account registration within the app (like email or text) encourage users to use a purchasing method other than [IAP]."  Perry Decl. Ex. 11.[2]

The Court concluded that the quoted parts of these two Guidelines were unfair under the UCL because they impaired information transparency, noting that "[i]n the context of technology markets, the open flow of information becomes even more critical."  Perry Decl. Ex. 5, at 164.  The Court expressed particular concern that these two provisions prohibited developers from "letting users know that [other payment] options exist."  *Id.* at 165.  Accordingly, the Court entered a Permanent Injunction enjoining Apple from prohibiting app developers from (i) "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing," or (ii) "communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."  Perry Decl. Ex. 6 ¶¶ 1–2.

The Court described the Injunction as a "limited measure" that "balance[d] the justification for maintaining a cohesive ecosystem with the public interest in uncloaking the veil hiding pricing information on mobile devices and bringing transparency to the marketplace."  Perry Decl. Ex. 5, at 166.  The Court recognized, however, that while transparency and consumer choice are

---

[2] As the Court noted, Apple has other anti-steering rules that are not implicated by the Injunction. *See* Perry Decl. Ex. 5, at 32 n.194.

important, Apple and millions of iPhone users still have a substantial interest in the "integrity of the ecosystem." *Id.* at 164.  The Court expressly noted that Apple could continue to require the use of IAP for in-app transactions.  Perry Decl. Ex. 7, at 4.  Moreover, the Court clarified that Apple could still "take steps to protect users" from new threats created by the Injunction's mandate.  Perry Decl. Ex. 7, at 3.  The Court stated it would not "micromanage" the new framework.  *Id.*  The Ninth Circuit stayed the Injunction pending issuance of the appellate mandate.  *See* Perry Decl. Ex. 8.

Shortly before the Court issued the Injunction, Apple entered into a settlement in another case that resolved the antitrust and unfair competition law claims of 99% of U.S. app developers, who, like Epic, had asserted that Apple monopolized an alleged iOS app and in-app product distribution services market.   As part of the settlement, Apple agreed to revise Guideline 3.1.3 and thereby allow developers to "send communications outside of the app to their user base about purchasing methods other than in-app purchase," including through points of contact obtained through account registration.  *See* Perry Decl. Ex. 13.  Apple has made that revision.  Declaration of Matthew Fischer ("Fischer Decl.") ¶ 40.   In doing so, Apple came into compliance with Paragraph 1(ii) of the Injunction.  *See infra* § II.  This Court approved the settlement as fair, reasonable, and adequate.  *See* Perry Decl. Ex. 14.

Two additional developments have helped provide a framework for Apple's implementation of Paragraph 1(i) of the Injunction.  First, in response to a December 2021 decision by the Netherlands Authority for Consumers and Markets, which is currently on appeal, Apple created an "entitlement" framework to permit dating apps on the Netherlands iOS and iPadOS App Store storefronts to inform users of other purchase options (both within and outside of the app) while still protecting user security.  *See* Perry Decl. Ex. 15; *see also* note 4, *infra* (explaining "entitlement" in this context).  Second, in March 2022, Apple again used an entitlement and usage requirements to implement changes to the Guidelines for reader apps as part of its effort to resolve

a competition investigation by the Japan Fair Trade Commission.  *See* Perry Decl. Ex. 16.[3]

On April 24, 2023, the Ninth Circuit affirmed the Injunction in all respects.  Perry Decl. Ex. 9.  The Ninth Circuit stayed the mandate (and the Injunction) pending Apple's filing of a petition for a writ of certiorari with the U.S. Supreme Court. Perry Decl. Ex. 19.  The U.S. Supreme Court denied Apple's petition on January 16, 2024.  Perry Decl. Ex. 20.

Apple is publishing the amended Guidelines and supporting materials on January 16, 2024.

## DISCUSSION

### I.    APPLE NOW PERMITS DEVELOPERS WITH APPS ON THE iOS OR iPADOS APP STORE U.S. STOREFRONTS TO COMMUNICATE WITHIN THE APP REGARDING ALTERNATIVE PURCHASING MECHANISMS

Paragraph 1(i) of the Injunction enjoins Apple from prohibiting developers from including in their apps buttons, links, or other calls to action that direct customers to purchasing mechanisms in addition to IAP.  Apple is complying with this requirement by adopting a new Guideline that expressly permits developers with apps on the iOS or iPadOS App Store U.S. storefronts to include buttons or external links with calls to action within their apps that direct users to alternative, out-of-app purchasing mechanisms.

Apple has long required that all iOS and iPadOS apps developed using Apple's proprietary tools and technologies protected by intellectual property use IAP for in-app transactions for digital goods and services.  Fischer Decl. ¶ 7.  The Court rejected Epic's challenge to the IAP requirement and has made clear that its Injunction does not require Apple to change this requirement.  Perry Decl. Ex. 7, at 4.  In addition, developers are already permitted to (and do) include within their apps certain external links, directing customers to websites for support and other services.  Fischer Decl. ¶ 9.  This Court has previously noted that "[c]onsumers are quite used to linking from an app to a web browser."  Perry Decl. Ex. 7, at 3.  What Apple has heretofore precluded are external

---

[3] Reader apps are apps that provide digital content—i.e., magazines, newspapers, books, audio, music, or video—as the primary functionality of the app.  With reader apps, people can sign into their account created outside of the app, letting them view and enjoy previously purchased media content or content subscriptions on their Apple device.  This Guideline permits reader apps to link to a website that is owned or maintained by the developer for the purpose of account creation or management, subject to an entitlement and usage requirements.  *See* Fischer Decl. ¶ 21.

links that direct customers to alternative *purchasing* mechanisms.  In response to the Injunction, Apple is removing that prohibition with respect to apps on the U.S. storefronts of the iOS and iPadOS App Stores.

Section 3.1.1(a) of the Guidelines will now provide:

> 3.1.1(a) Link to Other Purchase Methods
>
> - Developers may apply for an entitlement to provide a link in their app to a website the developer owns or maintains responsibility for in order to purchase such items.  Learn more about the entitlement.  In accordance with the entitlement agreement, the link may inform users about where and how to purchase those in-app purchase items, and the fact that such items may be available for a comparatively lower price.  The entitlement is limited to use only in the iOS or iPadOS App Store on the United States storefront. In all other storefronts, apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase.
>
> If your app engages in misleading marketing practices, scams, or fraud in relation to the entitlement, your app will be removed from the App Store and you may be removed from the Apple Developer Program.

Fischer Decl. ¶ 13; *see also id.* Ex. 1.  Under Section 3.1.1(a), Developers may apply for the StoreKit External Purchase Link Entitlement (US) (the "Link Entitlement").[4]  Developers who are approved for the entitlement can include within their apps buttons or links with calls to action directing users to out-of-app purchasing mechanisms other than IAP.  Fischer Decl. ¶ 14.  For convenience, we refer to the in-app communications permitted by the Link Entitlement as "External Purchase Links."

As Apple has previously explained, and Epic has never disputed, unregulated external payment links will "harm users, developers, and the iOS platform more generally."  Perry Decl.

---

[4]  An "entitlement" is a right or privilege granted to a developer to activate certain features, capabilities, technologies, or functionalities for its app not otherwise available to developers. Fischer Decl. ¶ 15.  Apple requires entitlements for many features, particularly where privacy, safety, and security concerns are heightened or where a requested feature carries additional risk to users.  *Id.*

Ex. 12 ¶ 10.[5]  In order to minimize the considerable risks posed by external payment links, Apple will require developers to adhere to certain requirements to qualify for and use the Link Entitlement.  These requirements are necessary to protect user privacy and security, maintain the integrity of Apple's ecosystem, promote the flow of information, avoid user confusion, and enable efficient review of developers' apps by App Review.  They also guard against the uncompensated use of, among other things, Apple's platform, services (including but not limited to marketing and external advertising), and proprietary tools and technologies protected by intellectual property.  Fischer Decl. ¶¶ 22, 35.  The requirements are informed by Apple's substantial experience.  *Id.* ¶ 21; *see also* Perry Decl. Ex. 7, at 3 (noting that Apple could look to "alternatives outside the app" like the reader rule to promote security and maintain its ecosystem); Perry Decl. Ex. 5, at 37 (recognizing that privacy and security are not "static" issues, and require Apple to respond and react to new developments and technological advancements).

*Entitlement Application*.  A developer who wants to use the Link Entitlement must complete and submit a request form to Apple providing details about its app, the External Purchase Link it wishes to include, and the website domain to which the External Purchase Link will direct users.  *See* Fischer Decl. ¶ 16; *see also id.* Ex. 4.  Developers approved for the entitlement may "provide a link in their app to a web site the developer owns or maintains responsibility for in order to purchase" digital goods and services for use within the app.  *Id.* ¶ 13.

In order to qualify for the Link Entitlement, developers must certify that the third-party payment services provider(s) they have contracted with for out-of-app purchasing mechanisms meet certain industry standards for payment processors, that the digital goods and services users purchase on their websites can be used within the apps, and that they will provide users with processes for disputing unauthorized transactions, managing subscriptions, and requesting refunds.

---

[5] Since the Injunction was entered, Epic has entered into two settlements with the Federal Trade Commission that, based on publicly available information, appear to bolster Apple's concern that developers may take advantage of children and other users.  *See* Perry Decl. Exs. 17, 18.  Specifically, the FTC found that, among other things, Epic had deceptively saved users' payment information without their knowledge, thus enabling kids to make impulse purchases without their parents' knowledge or approval.  *Id.* Ex. 17.

*See* Fischer Decl. ¶¶ 17–18.  Apps participating in the Apple Video Partner Program or the News Partner Program are not eligible for the Link Entitlement.  *Id.* ¶ 19.  This application process provides notice to Apple that the developer intends to use the Link Entitlement and allows Apple to confirm whether a developer is adhering to the rules and requirements applicable to the Link Entitlement.  *Id.* ¶ 20.

**Technical Requirements.**  A developer who is approved for the Link Entitlement must abide by the requirements set forth in the StoreKit External Purchase Link Entitlement Addendum for US Apps.  Fischer Decl. ¶ 16; *see also* Fischer Decl. Ex. 2.  These requirements serve a variety of purposes, but they all arise largely from the fact that an External Purchase Link encourages users to leave the app and the Apple ecosystem, and undertake a transaction on the open Internet. *Id.* ¶ 22.  Apple has designed the App Store, iOS, and iPadOS so that it can use established and predictable mechanisms to review apps for a variety of purposes, including protecting user security and privacy and deterring fraud and scams.  Apple lacks similar capabilities with respect to transactions on the open Internet, as the Court has already recognized.  Perry Decl. Ex. 5, at 108–09.  Accordingly, the requirements of the Link Entitlement help to inform users of the benefits they may be losing and the risks they are assuming when they leave the Apple ecosystem, while still allowing developers to communicate with users regarding purchase alternatives.  Fischer Decl. ¶ 22.

These requirements include:

> **3.1**     Your StoreKit External Purchase Link App (US) must continue to offer in-app purchases in accordance with the Developer Agreement and the App Store Review Guidelines. Your StoreKit External Purchase Link App (US), including any link You provide under this Addendum, may not discourage end users from making in-app purchases.

This requirement ensures that IAP remains available for in-app transactions in digital goods and services.  Fischer Decl. ¶ 24.  As noted above, this Court has already ruled that Apple may continue to require developers to offer IAP for in-app transactions in digital goods and services.

> **3.2** Prior to each instance of linking from Your StoreKit External Purchase Link App (US) to an external website for purchases, You must:
>
> - Call the canMakePayments API and determine that the end user may authorize payments; and
> - Call the StoreKit External Purchase Link API and determine that the end user is a user of the United States App Store, and if so, surface to the end user the associated system disclosure.

These requirements help ensure that users are adequately informed about alternative purchasing options. The system disclosure sheet explains (1) that the user is leaving the app and going to the open Internet to make purchases through a mechanism other than IAP, and (2) that certain App Store protections and features will not be available. *See* Fischer Decl. ¶¶ 26–27. Apple requires that users tap a button that says "Continue" before being redirected to the developer's website. *See* Fischer Decl. ¶ 26. Apple has already implemented a similar requirement for reader apps. *See* Perry Decl. Ex. 16 (Reader Apps Addendum) § 3.3. Apple is implementing this requirement because users should, in the first instance, understand that they are tapping a link that will take them outside of the Apple ecosystem and that they are assuming risks by doing so. *See* Fischer Decl. ¶ 26. The requirement is thus consistent with the underlying purpose of the Injunction—that users be apprised of their choices. Perry Decl. Ex. 5, at 179; *see also id.* Ex. 9, at 85 (Injunction helps consumers "becom[e] would-be . . . consumers" of other platforms). Additionally, the system disclosure sheet advises users that certain App Store-specific features will not be available if they proceed, such as the ability of Apple to provide subscription management or process refund requests for digital goods and services. *See* Fischer Decl. ¶¶ 26–27.

Apple is concerned that some developers may provide information within their apps that does not accurately reflect what users can receive or are charged on a website. Apple will have less ability to prevent or address fraudulent or misleading statements made by developers in connection with linked transactions than it does (and its users are used to) with IAP. Accordingly, the system disclosure sheet may require adjustment to protect the user experience and mitigate any confusion.

---

**3.3** The link You provide in Your StoreKit External Purchase Link App (US) under this Addendum must:

- Go directly to Your website without any redirect or intermediate links or landing page;
- Open a new window in the default browser on the device, and may not open a web view;

---

- Not pass additional parameters in the URL, to protect the end user (for example, their privacy);

- Be statically-defined in the <<SKExternalPurchaseLink>> in Your app's info.plist before submission to the App Store;

- Be submitted with Your StoreKit External Purchase Link App (US) to the App Store, and shall be resubmitted if the URL changes;

- Be accompanied by language and a button adhering to the requirements provided in the Apple Materials;

- Not mimic Apple's in-app purchase system, nor discourage end users from using it;

- Be displayed in Your StoreKit External Purchase Link App (US) on no more than one app page the end user navigates to (not an interstitial, modal, or pop-up), in a single, dedicated location on such page, and may not persist beyond that page;

- Not be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase; and

- Comply with any additional requirements provided in the Apple Materials.

These requirements are designed to minimize fraud, scams, and confusion. Developers must take responsibility for the linked website, send users only to that website, and inform Apple of that website so that Apple can review the app (including the destination of the proposed External Purchase Link). Fischer Decl. ¶ 28.

These requirements give developers a meaningful opportunity to "entice users to other platforms" (Perry Decl. Ex. 5, at 93), while also enabling users to make an informed choice between "the convenience of IAP" and out-of-app payment systems (Perry Decl. Ex. 7, at 4).[6] The requirements regarding placement of the External Purchase Links serve multiple purposes, including preventing users from being overloaded with duplicative information that might interrupt their app experience, ensuring a consistent user experience, minimizing confusion between options, and reducing the risk of users inadvertently leaving the app. *See* Fischer Decl. ¶ 28; *see also* Perry Decl. Ex. 5, at 164 (describing Injunction's purpose of facilitating the flow of

---

[6] Because the Court upheld Apple's IAP requirement and the Ninth Circuit affirmed (Perry Decl. Ex. 5, at 150; Perry Decl. Ex. 9), the Guidelines will still require that developers use IAP as the exclusive purchasing mechanism for in-app purchases.

information).  They also prevent developers from free-riding on Apple's reputation for creating a "seamless" purchasing mechanism and protect Apple's right to require IAP for all in-app purchases, which the Court did not enjoin.  Fischer Decl. ¶ 28; Perry Decl. Ex. 7, at 4; *see also* Perry Decl. Ex. 5, at 66 ("Creating a seamless system to manage all its e-commerce was not an insignificant feat. Further, expanding it to address the scale of the growth required a substantial investment.").

The "Apple Materials" referred to in Section 3.3 include several templates that Apple is providing to developers to include as part of their External Purchase Links.  Fischer Decl. ¶ 29. These templates allow developers to advertise prices to users, but use curated language to avoid misleading or confusing offers.  *Id.* ¶ 30.  For example, developers may insert language stating: "To get [X]% off, go to [link to developer's website]," or "Lower price offered at [link to developer's website]."  *Id.* ¶ 29.  Users will therefore be able to price-compare across platforms, consistent with the Injunction's purpose.  *See* Perry Decl. Ex. 5, at 164 (noting "the benefit of price advertising" and the desirability of "cross-platform information" in technology markets).  These templates also make it more efficient for Apple to review developers' apps for compliance with Link Entitlement requirements and App Review Guidelines, while still preserving developers' ability to convey information to their users.  *See* Perry Decl. Ex. 7, at 4 ("Links can be tested by App Review"); Perry Decl. Ex. 5, at 179 (Injunction should "increase competition, increase transparency, [and] increase consumer choice and information while preserving Apple's iOS ecosystem which has procompetitive justifications").

These templates do not allow developers to make subjective claims within the app about competing purchasing mechanisms.  Fischer Decl. ¶ 30.  Developers will still be able to communicate information to users, in-app, such that users can make informed decisions whether to leave the app for other options.  *See* Perry Decl. Ex. 5, at 165 (noting that the main objection to the prior anti-steering provisions was that they prohibited developers from "letting users know that [other payment] options exist").  And importantly, as described below, Apple places no limitations on developers' *out-of-app* communications with users.  Fischer Decl. ¶ 30.

---

> **3.5**    You may not include information about purchasing on Your website or a link to Your website for purchasing on the product page of Your StoreKit External Purchase Link App (US).

This requirement limits the External Purchase Link to the app itself rather than the product page in the App Store on which the app appears.  Fischer Decl. ¶ 31.

> **3.6**    Digital purchases sold on Your website to end users after link out that are marketed as being for use in an Application must be available for use in that Application.

This requirement helps ensure that users are able to use the digital goods and services that they purchase from the developer's external website within an app.  Fischer Decl. ¶ 32.

*Commission.*  The Court did not enjoin Apple's core business model of monetizing the App Store by charging a percentage commission rate on sales of digital goods and services facilitated by its platform.  Instead, it found that "under all models, Apple would be entitled to a commission or licensing fee, even if IAP was optional."  Perry Decl. Ex. 5, at 67; *see also id.* at 150 ("Even in the absence of IAP, Apple could still charge a commission on developers.").  Accordingly, in view of the substantial value Apple provides to developers, Apple will charge a commission on certain out-of-app purchases of digital goods and services.  Fischer Decl. ¶ 33.  Epic has already recognized that this approach is consistent with the injunction entered in this case:  In a publicly available letter regarding parallel litigation against Google, Epic (represented by the same counsel as in this case) acknowledged that an "injunction such as the one ordered in *Epic v. Apple*" would "not prevent Google from . . . introducing a new fee . . . on linked out-of-app transactions."  Perry Decl. Ex. 21, at 3–4.

Apple will apply a 27% commission to transactions for digital goods and services that take place on a developer's website within seven days after a user taps through an External Purchase Link from the system disclosure sheet to an external website.  Fischer Decl. ¶ 33.  Developers eligible for and participating in the App Store Small Business Program will be charged a 12% commission on purchases made within seven days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external website.  *Id.* ¶ 34.  Auto-renewals in

1    the second year or later of an auto-renewing subscription that was purchased within seven days

2    after a user taps through an External Purchase Link from the system disclosure sheet will be

3    charged a 12% commission. *Id.* Apple's commission policies regarding purchases made through

4    External Purchase Links are set forth in the StoreKit External Purchase Link Entitlement

5    Addendum for US Apps. *See* Fischer Decl. Ex. 2.

6          Charging a commission on transactions facilitated by External Purchase Links not only

7    complies with the Injunction's plain terms (*see* Perry Decl. Ex. 21, at 3–4), but is also consistent

8    with the Court's rationale for upholding Apple's other App Store policies. All App Store

9    developers—including those who place buttons or links with calls to action in their apps—benefit

10   from (among other things) Apple's platform integrity, proprietary tools and technologies protected

11   by intellectual property, developer services and support, services that help developers acquire,

12   retain, and reengage users, marketing and external advertising, and a safe environment for users to

13   download and purchase apps and in-app content. Fischer Decl. ¶ 35. Developers benefit from

14   Apple's "enormous" investment in "tools and features for iOS" (Perry Decl. Ex. 5, at 113–14),

15   including the "thousands of developer tools, SDKs, and APIs" and Apple's "constant upgrading

16   of . . . cellphones to allow for more sophisticated apps." (*id.* at 67; *see id.* at 150 ("Apple is entitled

17   to some compensation for use of its intellectual property.")). Developers also benefit from "access

18   to Apple's vast consumer base" (Perry Decl. Ex. 9, at 14), as well as "the safe environment created

19   by the App Store," which encourages users to "download apps freely and without care" (Perry

20   Decl. Ex. 5, at 111; *see also id.* at 145 ("Apple provides a safe and trusted user experience on iOS,

21   which encourages users and developers to transact freely and is mutually beneficial."); Perry Decl.

22   Ex. 9, at 58 (Apple's provision of a "safe and trusted user experience . . . "increas[es] the per-user

23   average number of app transactions")). "[T]he developer's use of the App Store platform . . . and

24   access to Apple's user base . . . justifies a commission." Perry Decl. Ex. 5, at 118; *see also id.* at

25   150 n.617 (developers should not be allowed to "avoid the commission while benefitting from

26   Apple's innovation and intellectual property free of charge").

27         Apple is limiting the commission to those transactions taking place on the developer's

28

---

NOTICE OF INJUNCTION COMPLIANCE      13      CASE NO. 4:20-CV-05640-YGR

1    website within seven days after a user taps on an External Purchase Link and continues from the

2    system disclosure sheet to an external website, consistent with how other platforms address similar

3    kinds of transactions.   Fischer Decl. ¶ 36.   Undoubtedly, this window will not capture all

4    transactions that Apple has facilitated through the App Store, but it balances (1) Apple's

5    entitlement to a commission for purchases facilitated through the App Store, even if the user waits

6    a small amount of time after leaving the App Store to actually finalize the purchase, with (2) the

7    fact that the longer the time between the link out and the purchase, the more attenuated the

8    connection between the purchase and Apple's facilitation of the purchase.   Through out-of-app

9    communications (*see infra*), developers can encourage users to go directly to the website, without

10   the use of an External Purchase Link and without incurring a commission.   At all times, users

11   remain free to select whichever purchasing method they prefer.

12            To help ensure collection of Apple's commission, developers are required to provide a

13   periodic accounting of qualifying out-of-app purchases, and Apple has a right to audit developers'

14   accounting to ensure compliance with their commission obligations and to charge interest and

15   offset payments.   Fischer Decl. Ex. 2 § 7.   As both this Court and the Ninth Circuit recognized,

16   collecting a commission in this way will impose additional costs on Apple and the developers.   *See*

17   Perry Decl. Ex. 5, at 150 n. 617 (contractual auditing "would seemingly impose both increased

18   monetary and time costs to both Apple and the developers"); Perry Decl. Ex. 9, at 64.   It also

19   carries considerable risk to Apple:   Although developers are contractually obligated to pay the

20   commission, as a practical matter, with hundreds of thousands of developers with apps on the U.S.

21   storefronts for the iOS and iPadOS App Stores, collection and enforcement will be exceedingly

22   difficult and, in many cases, impossible.

23            ***Non-Compliance***.   Apple may terminate the Link Entitlement of any developer who

24   violates the terms of the StoreKit External Purchase Link Entitlement Addendum for US Apps,

25   and may, in its discretion, remove the offending app, terminate the developer's account with

26   Apple, or take any other appropriate action to stop the violation of the App Store rules.   *See* Fischer

27   Decl. ¶¶ 38–39.   In Apple's view, these measures are necessary to enforce the above guardrails

28

---

1  and protect users.  *Id.*  Apple will be monitoring the use of External Purchase Links and may

2  modify the requirements for the Link Entitlement if issues arise that are not adequately addressed

3  in the current requirements.  *Id.* ¶ 37.

4  **II.    APPLE ALSO PERMITS DEVELOPERS TO COMMUNICATE OUTSIDE THE**
   **APP REGARDING ALTERNATIVE PURCHASING MECHANISMS**

5

6          Paragraph 1(ii) of the Injunction enjoins Apple from prohibiting developers from

7  communicating with customers using contact information obtained within the app.  Apple came

8  into compliance with this provision as part of the *Cameron* settlement, which has already been

9  approved by this Court.  *See* Perry Decl. Ex. 14.  Guideline 3.1.3 now provides, in relevant part:

10 | Developers can send communications outside of the app to their user base about purchasing methods other than in app purchase |
   | --- |

11

12 Fischer Decl. ¶ 40.  Separately, Guideline 5.1.1(x) provides:

13 | Apps may request basic contact information (such as name and email address) so long as the request is optional for the user, features and services are not conditional on providing the information, and it complies with all other provisions of these guidelines, including imitations on collecting information from kids. |
   | --- |

14

15

16 *Id.* ¶ 42.  Accordingly, Apple does not limit developers' ability to send out-of-app communications

17 to users regarding alternative purchasing methods.  *Id.* ¶ 41.  These Guidelines comply with the

18 plain terms of the Injunction because developers now can "[c]ommunicat[e] with customers

19 through points of contact obtained voluntarily from customers through account registration within

20 the app."  Perry Decl. Ex. 6 ¶ 2.

21

22

23

24

25

26

27

28

---

NOTICE OF INJUNCTION COMPLIANCE                15                CASE NO. 4:20-cv-05640-YGR

## <u>CONCLUSION</u>

For the foregoing reasons, Apple has timely complied with the Court's Injunction.

Dated: January 16, 2024                         Respectfully submitted,

                                            WEIL, GOTSHAL & MANGES LLP

                                            By:  _/s/ Mark A. Perry_
                                            WEL, GOTSHAL & MANGES LLP

                                            Attorney for Apple Inc.

THEODORE J. BOUTROUS JR.,
SBN 132099
  tboutrous@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

JULIAN W. KLEINBRODT,
SBN 302085
  jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone:  415.393.8200
Facsimile:  415.393.8306

CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
HARRY R. S. PHILLIPS (D.C. Bar No.
1617356; *pro hac vice*)
  hphillips2@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:  202.955.8500
Facsimile:  202.467.0539

MARK A. PERRY, SBN 212532
  mark.perry@weil.com
JOSHUA M. WESNESKI (D.C. Bar No.
1500231; *pro hac vice pending*)
  joshua.wesneski@weil.com
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone:  202.682.7000
Facsimile:  202.857.0940

**Attorneys for Defendant APPLE INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

EPIC GAMES, INC.

      Plaintiff, Counter-defendant

v.

APPLE INC.,

      Defendant, Counterclaimant

Case No. 4:20-cv-05640-YGR

**DECLARATION OF MATTHEW FISCHER REGARDING COMPLIANCE WITH UCL INJUNCTION**

The Honorable Yvonne Gonzalez Rogers

I, Matthew Fischer, hereby declare as follows:

1.      I am the Vice President, Head of Worldwide App Store at Apple Inc. and am responsible for, among other things, overseeing Apple's App Store business.  Prior to my current position, I was the Director, Marketing and Partnerships, for iTunes.  Over my 20 years at Apple, I have helped guide the growth and development of Apple's key products and services, including the App Store.  In my current role, I work extensively on all matters related to the App Store and have a deep knowledge and understanding of the design and operation of the App Store.  I have personal knowledge of the facts testified to herein.

**APPLE HAS COMPLIED WITH THE INJUNCTION**

2.      On September 10, 2021, this Court entered an injunction against Apple, enjoining Apple from "prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchas[e] ['IAP'] and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app."

3.      Apple has complied with the injunction as set forth herein.

4.      With respect to part (i) of the injunction, Apple has modified the App Store Review Guidelines to permit developers to include in their apps buttons or external links with calls to action that direct customers to purchasing methods in addition to IAP.  Specifically, Apple has created a new "StoreKit External Purchase Link Entitlement (US)" (the "Link Entitlement"), which permits any developer to include in apps on the U.S. storefronts of the iOS and iPadOS App Stores information about alternative purchase options and a link to the developer's external website.

5.      With respect to part (ii) of the injunction, Apple has revised its Guidelines to permit developers to communicate with users outside of the app about purchasing methods other than IAP, including through points of contact obtained through account registration within the app and with the user's consent.

6.      Below, I have provided a more detailed explanation of these changes as well as

DECLARATION OF MATTHEW FISCHER
REGARDING INJUNCTION COMPLIANCE

CASE NO. 4:20-CV-05640-YGR

certain requirements that Apple has implemented to protect users and the integrity of iOS and iPadOS.

**GUIDELINES 3.1.1 AND 3.1.3 IN CONTEXT**

7.      Apple has long required that all iOS and iPadOS apps developed using Apple's proprietary tools and technologies protected by intellectual property use IAP for in-app transactions for digital goods and services.

8.      Developers are permitted to offer digital goods and services outside an app that can be consumed within the app.  For example, a game developer may sell tokens on its website that can be redeemed during game play in its app.

9.      Developers are permitted to include in their apps external links to websites for certain non-transaction purposes, such as customer support or account management.

10.     Developers are permitted to communicate with customers outside the app on any subject, including alternative purchase mechanisms.

11.     The App Review Guidelines at issue here prohibited developers from (i) including an external link (or button, or call to action) within an app directing customers to alternative purchase mechanisms outside the app (former Guideline 3.1.1), and (ii) using contact information obtained within the app (such as during registration) to facilitate communications outside the app (former Guideline 3.1.3).

12.     The Court prohibited Apple from enforcing in the United States the two provisions just described.  Accordingly, Apple is amending the Guidelines applicable to apps on the U.S. storefronts of the iOS and iPadOS App Stores as set forth below.

**PART (i) – THE LINK ENTITLEMENT**

13.     Apple is adopting new Guideline 3.1.1(a):

---

3.1.1(a) Link to Other Purchase Methods

- Developers may apply for an entitlement to provide a link in their app to a website the developer owns or maintains responsibility for in order to purchase such items.  Learn more about the entitlement.  In accordance with the entitlement agreement, the link may inform users about where and how to purchase those in-app purchase items, and

---

> the fact that such items may be available for a comparatively lower price. The entitlement is limited to use only in the iOS or iPadOS App Store on the United States storefront. In all other storefronts, apps and their metadata may not include buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than in-app purchase.
>
> If your app engages in misleading marketing practices, scams, or fraud in relation to the entitlement, your app will be removed from the App Store and you may be removed from the Apple Developer Program.

14.    The Link Entitlement allows developers to include in their apps buttons or links with calls to action directing users to out-of-app purchasing mechanisms, other than IAP, for transactions for digital goods and services ("External Purchase Links"). The Link Entitlement is available only for apps on the iOS and iPadOS App Stores, in the U.S. storefronts.

15.    An "entitlement" is a right or privilege granted to a developer to activate certain features, capabilities, technologies, or functionalities for its app not otherwise available to developers. Entitlements are offered only for limited uses, and developers must make a specific request that details the intended use of the entitlement. Apple requires entitlements where privacy, safety, and security concerns are heightened or where a requested feature carries additional risk to users. This is in order to understand that a developer is intending to utilize an entitlement for a specific app, and to confirm that apps do not include features that have not been approved.

16.    To take advantage of the Link Entitlement, developers must provide Apple with details about their app, the proposed External Purchase Link, and the website to which users will be directed. Developers must also agree to the terms and conditions of the Link Entitlement, which are set forth in an addendum to the DPLA titled the "StoreKit External Purchase Link Entitlement Addendum for US Apps."

17.    Developers applying for the Link Entitlement must certify that the third-party payment services provider(s) they have contracted with for the execution of out-of-app purchases meets Level 1 Payment Card Industry compliance. These are well-established standards, promulgated by a council of representatives from companies with global payment networks, such

3

1   as American Express, MasterCard, Visa, Discover, and JCB.

2       18.     Developers must further certify to Apple that the digital goods and services users

3   purchase on their website marketed for use in an app can be used within the app, and that they will

4   provide users with processes for disputing unauthorized transactions, managing subscriptions, and

5   requesting refunds for purchases made through the External Purchase Link.

6       19.     Apps participating in the Apple Video Partner Program or the News Partner

7   Program are not eligible for the Link Entitlement.

8       20.     This application process notifies Apple that a developer is attempting to include an

9   External Purchase Link within its app, and allows Apple to confirm whether a developer is

10  adhering to the rules and requirements applicable to the Link Entitlement and to understand the

11  services and features the developer intends to offer through the Link Entitlement.   Apple will

12  approve developers for the Link Entitlement if they satisfy the eligibility requirements outlined

13  here and in the StoreKit External Purchase Link Entitlement Addendum for US Apps.

14      21.     The Link Entitlement includes requirements drawn from other entitlements Apple

15  has created, namely the StoreKit External Purchase Link Entitlement (NL) and the External Link

16  Account Entitlement.  The StoreKit External Link Entitlement (NL) allows dating app developers

17  in the Netherlands App Store storefront to include links to external websites for purchasing digital

18  goods and services.  The External Link Account Entitlement allows developers of reader apps to

19  include links in their apps to external websites for account creation or management.

20      22.     These requirements serve a variety of purposes, but they all arise largely from the

21  fact that an External Purchase Link encourages users to leave the app and the App Store ecosystem,

22  and undertake a transaction on the open Internet.  Apple has designed the App Store, iOS, and

23  iPadOS so that it can use established and predictable mechanisms to review apps for a variety of

24  purposes, including protecting user security and privacy, and deterring fraud and scams related to

25  the sale of digital goods and services.  Apple lacks similar capabilities with respect to transactions

26  on the open Internet.  Accordingly, the requirements of the Link Entitlement help to inform users

27  of the benefits they may be losing and the risks they are assuming when they leave the App Store

28

*DECLARATION OF MATTHEW FISCHER*                    4                    CASE NO. 4:20-cv-05640-YGR
*REGARDING INJUNCTION COMPLIANCE*

ecosystem, while still allowing developers to communicate with users regarding purchase alternatives.

23.     The Link Entitlement technical requirements are listed in the StoreKit External Purchase Link Entitlement Addendum for US Apps and include the following:

> **3.1**     Your StoreKit External Purchase Link App (US) must continue to offer in-app purchases in accordance with the Developer Agreement and the App Store Review Guidelines. Your StoreKit External Purchase Link App (US), including any link You provide under this Addendum, may not discourage end users from making in-app purchases.

24.     The requirement in **3.1** ensures that IAP remains available for in-app transactions for digital goods and services.  As the Link Entitlement makes clear, developers must continue to offer IAP for such transactions.

> **3.2**     Prior to each instance of linking from Your StoreKit External Purchase Link App (US) to an external website for purchases, You must:
> - Call the canMakePayments API and determine that the end user may authorize payments; and
> - Call the StoreKit External Purchase Link API and determine that the end user is a user of the United States App Store, and if so, surface to the end user the associated system disclosure.

25.     The requirements in **3.2** help ensure that users are adequately informed about alternative purchase options, including through the "system disclosure" sheet described below.

26.     The system disclosure sheet referred to explains to users that they are leaving the app and going to an external website to make purchases through a source other than IAP.  Apple requires that users tap a button that says "Continue" before being redirected out of the app.  The purpose of this disclosure is to ensure users understand they are leaving the App Store ecosystem and accepting the risks presented by an external website on the open Internet.

27.     The system disclosure sheet also advises users that certain App Store-specific features will not be available if they proceed.  For example, once a user leaves the App Store ecosystem, Apple can no longer provide subscription management or process refund requests for digital goods and services.

> **3.3**     The link You provide in Your StoreKit External Purchase Link App (US) under this Addendum must:
>
> - Go directly to Your website without any redirect or intermediate links or landing page;
> - Open a new window in the default browser on the device, and may not open a web view;
> - Not pass additional parameters in the URL, to protect the end user (for example, their privacy);
> - Be statically-defined in the <<SKExternalPurchaseLink>> in Your app's info.plist

before submission to the App Store;

- Be submitted with Your StoreKit External Purchase Link App (US) to the App Store, and shall be resubmitted if the URL changes;

- Be accompanied by language and a button adhering to the requirements provided in the Apple Materials;

- Not mimic Apple's in-app purchase system, nor discourage end users from using it;

- Be displayed in Your StoreKit External Purchase Link App (US) on no more than one app page the end user navigates to (not an interstitial, modal, or pop-up) in a single, dedicated location on such page, and may not persist beyond that page;

- Not be displayed on any page that is part of an in-app flow to merchandise or initiate a purchase using in-app purchase; and

- Comply with any additional requirements provided in the Apple Materials.

28. The requirements in **3.3** are designed to minimize fraud, scams, and confusion. Developers must take responsibility for the linked website, send users only to that website, and inform Apple of that website so that Apple can review the app (including the External Purchase Link). These requirements also help ensure that users are not overloaded with duplicative information that may diminish the app experience, and are not confused about purchase options. They also protect Apple's continued investment in its commerce and payment services, including the IAP option—which Apple will continue to require developers to use for in-app transactions for digital goods and services.

29. The "Apple Materials" referred to in **3.3** include several templates—with specified language and formatting—that developers may use for External Purchase Links, including: "For special offers go to [X]"; "Lower prices offered at [X]"; "To get [X%] off, go to [X]"; and "Buy for [$X.XX] at [X]." Apple also specifies the style of the links on the developer support page for the Link Entitlement.

30. These templates and other requirements allow developers to communicate pricing information to users using standardized language to avoid misleading or confusing offers, and protect against false statements by developers. These templates also enable Apple to more efficiently review apps. These limitations apply only to External Purchase Links; Apple does not

limit the content of developers' out-of-app communications to users, as detailed below.

> **3.5** You may not include information about purchasing on Your website or a link to Your website for purchasing on the product page of Your StoreKit External Purchase Link App (US).

31. The requirement in **3.5** limits the External Purchase Link to the app itself rather than the product page (which appears on the App Store itself).

> **3.6** Digital purchases sold on Your website to end users after link out that are marketed as being for use in an Application must be available for use in that Application.

32. The requirement in **3.6** helps ensure that users are able to use the digital goods and services that they purchase from the developer's external website within an app.

33. Apple will charge developers a 27% commission on digital goods and services transactions that take place on a developer's website within seven days after a user taps through an External Purchase Link from the system disclosure sheet to an external website.

34. Developers eligible for and participating in the App Store Small Business Program will be charged a 12% commission on purchases made within seven days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external website. Auto-renewals in the second year or later of an auto-renewing subscription that was purchased within seven days after a user taps through an External Purchase Link will be charged a 12% commission.

35. All App Store developers—including those who choose to use the Link Entitlement—benefit from (among other things) Apple's platform integrity, proprietary tools and technologies protected by intellectual property, developer services and support, services that help developers acquire, retain, and reengage users, marketing and external advertising, and a safe environment for users to download and purchase apps and in-app content. Apple monetizes its significant investments in its ecosystem by charging a commission on specified transactions.

36. Apple will charge a commission on purchases made within seven days after a user taps on an External Purchase Link and continues from the system disclosure sheet to an external

website. Many platforms charge a commission or other fee for similar transactions, with windows ranging from 24 hours to 30 days, or even longer. The App Store affords many more tools to developers than most platforms, and seven days also appropriately credits Apple for facilitating linked transactions.

37. Apple will be monitoring the use of External Purchase Links and may modify the requirements for the Link Entitlement if issues arise that are not adequately addressed in the current guidance.

38. Developers that breach their obligation to timely pay Apple a commission on specified transactions or otherwise violate the requirements of the Link Entitlement may lose access to the Link Entitlement, may have their app(s) removed from the App Store, and/or may have their developer account with Apple terminated, among other remedies and/or penalties.

39. More generally, 8.4 of the StoreKit External Purchase Link Entitlement Addendum for US Apps informs developers that misleading practices, scams, or fraud will not be tolerated:

> If Your StoreKit External Purchase Link App (US) engages in misleading, fraudulent, improper, unlawful or dishonest acts or practices such as bait and switch, scams, or payment fraud, it will be removed from the App Store and You may be removed from the Apple Developer Program.

**PART (ii) – OUT-OF-APP COMMUNICATIONS**

40. Apple has complied with part (ii) of the injunction by revising Guideline 3.1.3 so that it now reads, in relevant part:

> Developers can send communications outside of the app to their user base about purchasing methods other than in-app purchase.

41. Pursuant to this new Guideline, Apple does not limit developers' ability to send out-of-app communications to users regarding alternative purchasing methods, regardless of how developers obtain that contact information. Apple also does not limit the content of developers' out-of-app communications to users.

42. Separately, Apple added Guideline 5.1.1(x), which provides:

1
2
3

> Apps may request basic contact information (such as name and email address) so long as the request is optional for the user, features and services are not conditional on providing the information, and it complies with all other provisions of these guidelines, including imitations on collecting information from kids.

4
5
6
7

43.     This provision helps ensure that developers only collect information from users with their full consent.  Once they have done so, however, Apple does not limit the content of out-of-app marketing materials or other communications developers may send to users.

**EXHIBITS**

8
9
10

44.     Attached to this Declaration are copies of the amended Guidelines, the StoreKit External Purchase Link Entitlement Addendum for US Apps, the developer support page regarding the StoreKit External Purchase Link Entitlement (US), and the Entitlement Request Form.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 16, 2024

By: _____
Matthew Fischer

# CRAVATH

Yonatan Even
yeven@cravath.com
T+1-212-474-1958
New York

July 19, 2023

Re:     *In re: Google Play Store Antitrust Litigation*, No. 3:21-md-02981-JD (N.D. Cal.);
        *Epic Games, Inc. v. Google LLC*, No. 3:20-cv-05671-JD (N.D. Cal.);
        *State of Utah, et al. v. Google LLC, et al.*, No. 3:21-cv-05227-JD (N.D. Cal.)

Dear Elinor, Melissa, Paula, Sarah:

Further to our recent discussions, I write on behalf of Epic Games, Inc. ("Epic"), to lay out the key principles that Epic believes should guide any potential settlement of the claims brought by the State Attorneys General Plaintiffs ("State Plaintiffs") against Google in this MDL.  As set forth in their complaint, the State Plaintiffs' goals in their litigation against Google are to "end Google's anticompetitive conduct", "restore competition" and "prevent Google from engaging in similar conduct in the future"[1]—goals Epic emphatically agrees with.

The only way for a settlement to accomplish these goals is for it to address three fundamental issues affected by Google's anticompetitive conduct:

- *Pillar 1 -* **Open the Android App Distribution Market.**  Google must be prohibited from using its control over Android OS to impede new entry and meaningful competition in the Android app distribution market.  Importantly, and as further explained below, this requires leveling the playing field for competing app stores *and* enabling secure direct downloading of apps, as direct downloading is the quickest and most effective way to introduce a viable alternative to the Play Store (as demonstrated by distribution models adopted on Windows and Mac systems).

- *Pillar 2 -* **Open the Android In-App Payment Solution Market.**  Google must be prohibited from using its control over Android OS and Android app distribution to foreclose competition in the Android in-app payment solution market and charge supracompetitive monopoly rents.

---

[1] MDL Dkt. 188, State Plaintiffs' First Am. Compl. ¶ 26.

NEW YORK
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

LONDON
CityPoint
One Ropemaker Street
London EC2Y 9HR

WASHINGTON, D.C.
1601 K Street NW
Washington, D.C. 20006-1682
T+1-202-869-7700

CRAVATH, SWAINE & MOORE LLP

- ***Pillar 3* - Prevent Circumvention of the Above Remedies.** Given Google's entrenched dominance in multiple markets, Google must be prohibited from circumventing the terms and purpose of any settlement or the law by simply shifting its anticompetitive behavior and collecting monopoly rents in other adjacent markets, such as imposing fees on transactions that do not go through Google Play Billing ("GPB").

Achieving all three of these pillars is the only way to ensure that Google's anticompetitive conduct is ended, markets that Google has tipped in its favor are opened up, meaningful competition is established and the ongoing harms to consumers through inflated prices for, and reduced innovation in, apps and in-app digital content will end.

The importance of a State Plaintiffs' settlement cannot be overstated: any settlement that falls short of addressing all three pillars stated above will rubber stamp conduct that is illegal under federal and state law, and that will harm innovation and impose excessive prices on consumers for years to come. The States' role is particularly important as private plaintiffs (other than Epic) may be paid off by Google to settle their claims. It will thus be up to the State Plaintiffs to insist on an injunction that addresses all three pillars. Moreover, how the State Plaintiffs choose to resolve this litigation will have cascading effects on other jurisdictions, which are closely watching how this MDL proceeds. As such, any settlement must include injunctive relief that opens both markets for competition and prevents Google from circumventing the terms and purpose of the relief obtained. Such an injunction is the only way to enable competition to determine the pricing of distribution and payment services, and to reverse the consumer harm (high prices, lack of innovation and lack of consumer choice) caused by Google's anticompetitive scheme.

Recent experience in other jurisdictions demonstrates that any settlement that fails to address any one of these pillars will inevitably fail to ameliorate the harms caused by Google's conduct—supracompetitive prices, lack of innovation and diminished consumer choice. Legislatures and regulators in South Korea, the Netherlands and India have adopted measures aimed at requiring Google to allow developers to utilize alternative payment solutions to GPB in apps distributed through Google Play.[2] But because these measures did not address competition in distribution (Pillar 1) or prohibit Google from taking steps to circumvent the new measures (Pillar 3), the new measures failed to open up any market to competition, instead entrenching Google's monopolies and raising rates for developers, all under the guise of compliance with the new regulations. Specifically, in response to the new measures, Google introduced a brand new "service fee" of 26-27% of all in-app sales of digital goods, which Google imposes on transactions processed through payment solutions *other than* GPB—*i.e.,* transactions Google is not involved with in any way. The result is that sellers of in-app digital goods in these jurisdictions are given an option: they can continue paying Google its typical 30% fee if they utilize GPB, or they can

---

[2] The UK Competition and Markets Authority (CMA) is currently considering accepting commitments by Google to permit developers to use alternative payment solutions to resolve its investigation into Google's practices. *See* "App developers on Google Play store offered payment choices following CMA probe", Competition and Markets Authority (Apr. 19, 2023), available at https://www.gov.uk/government/news/app-developers-on-google-play-store-offered-payment-choices-following-cma-probe.

elect to pay Google "only" 27% (in the Netherlands)[3] or 26% (in Korea and India)[4] and then on top of that pay an additional fee to another payment solution—one that invariably brings the developer's total fees to 30% **or more**.

        The newly-introduced 26-27% "service fee" in these jurisdictions is set by fiat, not competition; it is simply an exercise in rate setting—by Google, and by any enforcer accepting that rate as satisfactory. Google is able to impose this new fee and unilaterally set its rate because the new measures do nothing to address its monopoly over app distribution, and Google is able to leverage that monopoly power to set rates that far exceed competitive pricing. Google has set the new rate at this particular level because it is well aware that, on average, it costs *more* than 3-4% to process in-app payments and support ancillary related services (such as customer returns and refunds)[5]—meaning that developers are deterred from leaving GPB for an alternative payment solution by the prospect of facing overall fees that, in the aggregate, are even *higher* than the 30% fee Google charges for the use of GPB. Indeed, this "service fee" penalizes developers for opting for a competing payment solution. In short, by addressing only Pillar 2, regulators abroad allowed Google to replace its historic contractual tie between distribution and payment solutions with an equally effective and equally illegal economic tie.[6]

        In a similar vein, an injunction such as the one ordered in *Epic v. Apple*, which would require Google only to allow developers to incorporate in their Android apps buttons or "external links" offering users the option to complete their purchases of digital goods in an inconvenient manner outside the app (*e.g.*, in a web browser), would fail to ameliorate the harm

---

[3] *See* "Offering an alternative billing system for users in the European Economic Area (EEA)", Play Console Help, available at https://support.google.com/googleplay/android-developer/answer/12348241?hl=en&ref_topic=3452890&sjid=4231795017615233004-NA. Notably, in Europe, game developers are still subject to the tie and have no choice but to pay Google's 30% tax. *Id.* ("In order to be eligible [to use an alternative billing system in the European Economic Area] [y]our app may not be a gaming app.").

[4] *See* "Changes to Google Play's billing requirements for developers serving users in South Korea", Play Console Help, available at https://support.google.com/googleplay/android-developer/answer/11222040?hl=en; "Changes to Google Play's billing requirements for developers serving users in India", Play Console Help, available at https://support.google.com/googleplay/android-developer/answer/13306652?hl=en. In the UK, Google is also planning to charge developers 26-27% for in-app purchases made using alternative payment solutions. *See* Oliver Bethell, "An update on Google Play billing in the UK" (Apr. 19, 2023), available at https://blog.google/around-the-globe/google-europe/an-update-on-google-play-billing-in-the-uk/amp/.

[5] In internal Google documents, Google estimated that its own break-even cost for payment processing alone (excluding attendant services and any profit margin) was roughly 6%. *See* GOOG-PLAY-000565541.R at -5553.R.

[6] *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016) (recognizing that "tying conditions need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions" and that "implied" or "de facto" tying claims can occur "when a seller 'adopts a policy that makes it unreasonably difficult or costly to buy the tying product . . . without buying the tied product'" (citation omitted)); *see also Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 903 (9th Cir. 2008) (recognizing that antitrust liability can occur where a firm offers "two or more goods or services that could be sold separately . . . for a lower price than the seller charges for the goods or services purchased individually" and uses this "bundled discount to exclude an equally or more efficient competitor and thereby reduce consumer welfare in the long run").

3

caused by Google's conduct.[7]  Again, such an injunction addresses only Pillar 2; it would do nothing to open up app distribution, and absent a strong anti-circumvention measure, it would not prevent Google from again introducing a new fee, this time on linked out-of-app transactions, which would replicate the economic tie Google has implemented in Korea and other jurisdictions, as explained above.

In light of the above, we lay out below the principles that we believe ought to be included in a settlement aiming to address the three pillars described above.  **Attachment A** then provides a proposed draft injunction implementing these principles.  In addition to the specific relief set out in **Attachment A**, the State Plaintiffs should also consider implementing compliance and monitoring provisions in any settlement order.

A. ***Principle One:***  Prohibit Google From Leveraging Its Control over Android OS to Self-Preference Play and GPB.

A developer should be able to choose to use Google Play and GPB based on the merits of those products and not be coerced by Google's monopoly power over Android ecosystem participants.  Prohibiting Google from leveraging its control over Android OS to self-preference Google Play and GPB—such as by tying Google Play and GPB to any other of its other products or services—will prevent Google from using its dominance over Android, its GMS apps, or any of its other products or services to secure preferential treatment for Google Play, and will permit new entrants to compete freely and fairly in the market.

B. ***Principle Two:***  Prohibit Google From Discriminating Against Any App, App Developer, Competing App Store or Alternative Payment Solution.

Similar to Principle One above, Google should be prevented from using its power over the Android ecosystem to unfairly discriminate against (i) developers who operate competing app stores or alternative payment solutions; and (ii) developers who distribute their apps directly or through competing app stores, or that implement alternative payment solutions in their own apps.  Such discriminatory treatment would foreclose fair and open competition.

Any settlement must prohibit Google from unfairly disadvantaging any third-party app store, or app downloaded through a non-Google Play source, through technical, financial or contractual means.  Importantly, given the current dominance of Google Play as compared to other stores, this non-discrimination principle should extend to direct downloading, and not only to distribution through alternative stores.  Indeed, the most immediate and effective competitive threat to Google Play may come not from other stores, but from major developers seeking to offer their apps for direct download—a distribution channel often used by major developers (*e.g.*, Activision, Microsoft, Adobe, and Google itself) on Windows and Mac systems.  Thus, Google must not be allowed to indiscriminately impose additional downloading frictions such as warning screens for alternative app distribution channels, including direct downloading.  Such warnings provide Google Play and GPB with an unfair advantage over competing distribution channels and actively dissuade users from directly downloading apps and app stores, even from sources the user trusts and that Google often recognizes as trustworthy.

---

[7] *Epic Games, Inc. v. Apple, Inc.*, 559 F. Supp. 3d 898, 1056-58 (N.D. Cal. 2021), *aff'd in part and rev'd in part on other grounds*, 67 F.4th 946 (9th Cir. 2023).

4

This prohibition need not undermine the security of the Android ecosystem; it simply means that Google should be able to impose warning screens or other frictions on alternative app distribution channels only when it has a well-founded, good faith basis to believe they are necessary to prevent malware or malicious actors from causing harm to users. For example, Google could institute a "whitelisting" or "notarization" process that removes all downloading frictions for apps that have been vetted and pre-approved by Google and/or other trusted third parties that specialize in reviewing and vetting the safety of apps. Such procedure could be similar to that followed by Apple on macOS, where developers can upload their apps to Apple for vetting; Apple scans the app and issues developers a "notarization token" or "notarization ticket", which is digitally "stapled" to the app; the developer may then distribute the app through any distribution channel, and MacOS distinguishes between notarized and un-notarized apps, regardless of their source, warning users against installation of the latter but not the former.[8] This vetting process can be undertaken by Google itself or by trusted third parties and must be made generally available to all developers seeking to distribute Android apps. This process would provide a viable pathway for developers to seamlessly distribute their apps on Android outside of Google Play, enabling competition in app distribution to flourish, while allowing Google to maintain its security warnings against installation of apps that did not undergo the security vetting procedure prior to distribution.

Finally, under this principle, the injunction should also prohibit Google from using distribution channel or choice of payment solution to withhold access to, or charge in a discriminatory manner for access to, Google's APIs, SDKs, software features or other tools needed to develop Android apps.

C. **_Principle Three:_** Prohibit Google From Entering Into Exclusivity Agreements or Other "Agreements Referencing Rivals" with Carriers, OEMs or Developers.

Given the importance of pre-installation and securing exclusive content in making an app store competitive, Google should be prohibited from entering into exclusivity agreements or similar contracts that reference competing app stores and payment solution providers and require carriers, OEMs or developers to deal with such rivals on no more favorable terms than with Google. This principle would prevent Google from entering into contracts that prohibit OEMs from pre-installing competing app stores, or require OEMs to place Google Play on mobile devices in at least as prominent a location as competing app stores. It would also prevent Google from securing exclusivity or sim-ship requirements for Android apps from developers.

D. **_Principle Four:_** Prohibit Google From Imposing Any New Fees that Increase the Cost of Distributing Apps or App Stores on Android

In order to remedy the anticompetitive effects of its conduct, Google should be prohibited for at least a period of time from imposing on developers or users new fees for access to any Android technology or functionality necessary to develop and distribute apps on Android. In addition, Google must be prohibited from imposing financial penalties or costs that deter developers from integrating alternative in-app payment solutions alongside or instead of GPB. Google must also be prohibited from imposing a financial penalty or cost to access the Android OS on apps and app stores that use alternative in-app payment solutions.

---

[8] ████████████████████████████████████████████

5

**4-ER-783**

Finally, any settlement must also include broad anticircumvention language that prohibits Google from taking steps that violate the settlement's purpose even if not expressly set out in its terms, including imposing disincentives and providing incentives that prevent entry and meaningful competition in the Android app distribution and in-app payment solutions markets.

\*        \*        \*

I enclose herewith as **Attachment A** a draft injunction that aims to operationalize the above principles.  The principles above are consistent with and would not preclude Google from competing on the merits of its product and service offerings, and earning a fair return.  For example, under an injunction consistent with these principles, Google could compete with other app developers, distributors and payment processing solution providers by making quality improvements to Android, Google Play and GPB; promoting its Google Play and GPB service offerings; and competing on price.  However, such competition must occur on a level playing field, or the platform will remain closed and Google will be able to maintain its monopoly rents.  Epic believes that such competition can and must exist, and believes that the above principles set forth a roadmap for bringing truly free and fair competition to the platform.

Very truly yours,

Yonatan Even

Elinor Hoffman
    Chief of the Antitrust Bureau
        Office of the New York Attorney General
        elinor.hoffmann@ag.ny.gov

Melissa A. Holyoak
    Utah Solicitor General
        Office of Utah Attorney General
        melissaholyoak@agutah.gov

Paula L. Blizzard
    Deputy Attorney General
        California Attorney General's Office
        Paula.Blizzard@doj.ca.gov

Sarah G. Boyce
    Deputy Attorney General & General Counsel
        North Carolina Department of Justice
        sboyce@ncdoj.gov

BY EMAIL

ENCL.

6

**Attachment A:  Proposed Remedies– Specific Relief**

The following draft injunctive language is organized with reference to the three pillars Epic believes any settlement must address in order to accomplish the goals of the Google MDL:  Part I below includes remedies necessary to open the Android app distribution market, Part II includes remedies necessary to open the Android in-app payment solutions market and Part III includes remedies that would prevent Google from circumventing the terms and purpose of Parts I and II. All three Parts are essential to addressing Google's anticompetitive behavior, and it is critical that all three Parts be considered and implemented together.

**I.      Remedies to Open the Android App Distribution Market**

Google is enjoined from enforcing contractual provisions, guidelines or policies, or imposing technical restrictions, usage frictions or financial penalties that (i) restrict, prohibit, impede, disincentivize or deter the distribution of Android apps[1] through an Android app distribution channel other than Google Play (an "Alternative Android App Distribution Channel"); (ii) have the effect of impeding or deterring competition among Android app distributors (including competition between third-party Android app distributors and Google Play); and/or (iii) otherwise discriminate against or disadvantage Android app distribution through any Alternative Android App Distribution Channel.

To effectuate the above injunctive relief, the Court orders the following specific remedies addressing Google's conduct with respect to original equipment manufacturers ("OEMs"), mobile network carriers ("Carriers"), developers of Android apps ("Developers"), users of Android mobile devices ("Consumers") and developers or would-be developers of any Alternative Android App Distribution Channel ("Competing Distributors"), as well as with respect to its own Android platform.

---

[1]  Distribution includes both supply of apps by Developers and acquisition of apps by Consumers unless otherwise specified.

A.      Remedies Concerning OEMs and Carriers

With respect to OEMs and Carriers, Google is enjoined from:

1.    Prohibiting or disincentivizing the preinstallation of any Android app based on its availability or non-availability on Google Play;

2.    Requiring or incentivizing Google Play to be (i) the exclusive app store preinstalled on Android mobile devices; (ii) the exclusive app store placed on the default home screen of Android mobile devices; (iii) the most prominently or preferentially placed app store on Android mobile devices; and/or (iv) equal to or on par with the placement of any other app store on Android mobile devices, including, but not limited to, enforcing the priority placement requirements for Google's apps in its Mobile Application Distribution Agreements ("MADAs") and enforcing the exclusive preloading requirements of the Premier Tier Terms of its RSA 3.0;

3.    Conditioning or impeding access to, restricting the use of, or conditioning the terms of access to any of Google's products or services, including Android or any of its proprietary apps or APIs, on the placement of Google Play on Android mobile devices, including, but not limited to, enforcing the priority placement requirement for Google Play in its MADAs as a condition of obtaining access to Google Mobile Services ("GMS") core Google apps and APIs; and/or

4.    Prohibiting or disincentivizing the preinstallation or promotion of any Alternative Android App Distribution Channel.

B.      Remedies Concerning Developers

With respect to Developers, Google is enjoined from:

1.    Requiring or incentivizing the distribution of any Android app exclusively on Google Play;

2.    Requiring or incentivizing the distribution of any Android app on Google Play before, or at the same time as, the app's release on an Alternative Android App Distribution Channel, including, but not limited to, enforcing the app release parity requirement in certain of its Project Hug agreements;

3.    Prohibiting or disincentivizing the distribution of any Android app that has different or exclusive app content and/or features when distributed through an Alternative Android App Distribution Channel, as compared to when distributed through Google Play, including, but not limited to, enforcing the in-app content release parity requirement in certain of its Project Hug agreements;

4.    Prohibiting or disincentivizing the distribution of any Android app that has different prices for the app, its content and/or any app features when distributed through an Alternative Android App Distribution Channel, as compared to when distributed through Google Play, including, but not limited to, enforcing the price parity requirement in certain of its Project Hug agreements;

5.    Prohibiting the withdrawal of any Android app from Google Play without Google's consent, including, but not limited to, enforcing the non-removal requirement in certain of its Project Hug agreements;

2

6. Conditioning or impeding access to, restricting the use of, or conditioning the terms of access to any of Google's products or services (other than its Android app distribution services) on the basis of a Developer's actual or intended use of any Alternative Android App Distribution Channel. For the avoidance of doubt, prohibiting or disincentivizing the inclusion of a link to download or install an Android app through any Alternative Android App Distribution Channel in an advertisement for such an app would be deemed a violation of this Clause 6, including, but not limited to, enforcing the prohibition against linking to Alternative Android App Distribution Channels in Google Ads as part of its App Campaigns program; and/or

7. Prohibiting or disincentivizing the distribution or promotion of a Developer's app through any Alternative Android App Distribution Channel, including, but not limited to, enforcing its promotion parity requirement in certain of its Project Hug agreements that requires Developers to promote apps listed on Google Play in the same or equivalent manner as equivalent apps listed on an Alternative Android App Distribution Channel.

To remedy Google's past misconduct, its unlawfully maintained monopoly power and the anticompetitive effects it has imposed, the Court further orders that from the date of this Order and **for a period of five (5) years**, Google is enjoined from enforcing contractual provisions, guidelines or policies, or imposing technical restrictions, that restrict, prohibit, impede, disincentivize or deter distribution of any Alternative Android App Distribution Channel through Google Play, including, but not limited to, enforcing current Section 4.5 of its Developer Distribution Agreements ("DDAs") against any developer.

C. <u>Remedies Concerning Consumers</u>

With respect to Consumers, Google is enjoined from:

1. Prohibiting or disincentivizing, through any technical, contractual, financial, or other means, the downloading, installation and/or updating of any Android app through any Alternative Android App Distribution Channel, including, but not limited to, requiring users to go through the "Unknown Sources Flow" on Alternative Android App Distribution Channels when users download third-party apps or app stores that have been vetted by generally available review processes; and/or

2. Prohibiting or disincentivizing, through any technical, contractual, financial, or other means, the execution or use of any Android app that was downloaded, installed and/or updated through any Alternative Android App Distribution Channel.

3

**4-ER-787**

D.    <u>Remedies Concerning Competing Distributors</u>

With respect to Competing Distributors, Google is enjoined from:

1.    Requiring or incentivizing, including through the provision of any pecuniary or in-kind benefits, or through the imposition of any financial penalty or economic loss, any Competing Distributor to scale back, slow down or abandon its distribution of Android apps or its entry into the distribution of Android apps, including, but not limited to, using its monopoly profits to incentivize Developers and OEMs not to invest in Alternative Android App Distribution Channels through the revenue share terms of its Project Hug agreements and RSA 3.0.  For the avoidance of doubt, any benefit offered to a Developer to distribute any Android app through Google Play in lieu of, or in parallel with, self-distribution of the same Android app, is prohibited by this Clause 1;

2.    Denying or impeding any Alternative Android App Distribution Channel from having equivalent access to Android functionality that Google Play has, including, for example, the same functionality as Google Play for facilitating the downloading, installation and/or updating of apps, including, but not limited to, by requiring users to go through the "Unknown Sources Flow" on Alternative Android App Distribution Channels when users download third-party apps or app stores that have been vetted by generally available review processes; and/or

3.    Prohibiting or disincentivizing the preinstallation, downloading, distribution, or promotion of any Alternative Android App Distribution Channel, including, but not limited to, using the "sim-ship" parity requirements in its Project Hug Agreements to restrict Competing Distributors' opportunities to differentiate their Alternative Android App Distribution Channels by offering exclusive content or early access to content.

E.    <u>Remedies Concerning the Android Platform</u>

With respect to the Android platform, Google is enjoined from:

1.    Denying or impeding any Alternative Android App Distribution Channel, or any Android app that was downloaded through any Alternative Android App Distribution Channel, from having equivalent access to Android functionality and/or features that any Android app downloaded through Google Play has access to, including, for example, the same functionality as Google Play for facilitating the downloading, installation and/or updating of apps, including, but not limited to, by enforcing the prohibition against OEMs preloading apps that contain INSTALL-PACKAGES permissions in the Premier Tier Terms of its RSA 3.0; and/or

2.    Denying or impeding the downloading, installation and/or updating of any Android app from or through any Alternative Android App Distribution Channel, including by imposing "warning" screens or other obstructions or deterrents on any Android app distributed through any Alternative Android App Distribution Channel that are not present for apps distributed through Google Play and are not based on a risk assessment of the app itself based on factors other than whether it is sourced from Google Play or an Alternative Android App Distribution Channel, including, but not limited to, requiring users to go through the "Unknown Sources Flow" on Alternative Android App Distribution Channels when users download third-party apps or app stores that have been vetted by generally available review processes.

4

1                                    *      *      *

2          Notwithstanding the preceding prohibitions, nothing in this Part I shall prohibit Google

3   from engaging in bona fide competition on the merits with respect to the distribution of apps on

4   Android, such as:

5          1.      Making quality improvements to Google Play to differentiate it from Alternative
                   Android App Distribution Channels;
6
           2.      Communicating to OEMs, Carriers, Developers or Consumers regarding any
7                  purported quality or price advantages of Google Play over Alternative Android App
                   Distribution Channels, or otherwise publicly promoting Google Play; and/or
8
           3.      Competing on price with respect to the distribution of apps on Android, such as
9                  through loyalty programs or promotional discounts.

10         For the avoidance of doubt, nothing herein shall prohibit Google from preventing or

11  warning consumers against the installation of an Android app or app store that has not been

12  submitted to a generally available[2] vetting (through scanning or review processes) offered by

13  Google itself, by an Alternative Android App Distribution Channel preinstalled on the Android

14  device, or by a third party Google designates for the purpose of reviewing the safety and security

15  of Android apps.

16  **II.      Remedies to Open the Android In-App Payment Solutions Market**

17         Google is enjoined from (i) restricting, prohibiting, impeding, disincentivizing or deterring

18  the use of Android in-app payment solutions other than Google Play Billing ("GPB") ("Alternative

19  In-App Payment Solutions"), and/or (ii) otherwise discriminating against Alternative In-App

20  Payment Solutions, Developers that use Alternative In-App Payment Solutions or any Android

21  app or app store that uses Alternative In-App Payment Solutions.

22         To effectuate the above injunctive relief, the Court orders the following specific remedies

23  as it relates to Google's conduct with respect to Developers, Users and to its own Android

24  platform:

25  _____

26         [2] For the avoidance of doubt, "Generally available" means Google may not deny or limit, or
    attempt to deny or limit, any Developer's access to a scanning or review process offered by Google,
27  an Alternative Android App Distribution Channel, or a third party Google designates for the
    purpose of reviewing the safety and security of Android apps, unless Google receives express
28  permission from the Court or the Compliance Monitor (if applicable) to do so based on a good-
    faith belief that the developer poses a security threat.

                                                5

A.    <u>Remedies Concerning Developers</u>

With respect to Developers, Google is enjoined from:

1.    Requiring the implementation of GPB in any Android app, including, but not limited to, enforcing Sections 1 and/or 2 of its Google Play Payments Policy.

2.    Rejecting for distribution, or otherwise disadvantaging, any Android app distributed through Google Play on the basis of the app's actual or intended integration of one or more Alternative In-App Payment Solution, whether alongside GPB or to the exclusion of GPB;

3.    Retaliating or threatening to retaliate against any Developer on the basis of such Developer's app's actual or intended integration of one or more Alternative In-App Payment Solutions, whether alongside GPB or to the exclusion of GPB;

4.    Enforcing contractual provisions, guidelines or policies, or imposing technical restrictions or financial penalties, that (i) restrict, prohibit, impede, disincentivize or deter Developers from integrating any Alternative In-App Payment Solution, whether alongside GPB or to the exclusion of GPB, including, but not limited to, charging any fee for in-app purchases of digital content using an Alternative In-App Payment Solution; or (ii) restrict, prohibit, impede, disincentivize or deter Developers from directing or informing users of the existence of payment methods outside of any Android app, including, but not limited to, enforcing the anti-steering clause in Section 4 of its Google Play Payments Policy; and/or

5.    Giving preferential treatment in search to any Android app that uses GPB as an Android in-app payment solution, whether alongside any Alternative In-App Payment Solutions or to the exclusion of any Alternative In-App Payment Solutions.

B.    <u>Remedies Concerning Users</u>

With respect to Users, Google is enjoined from:

1.    Enforcing contractual provisions, guidelines or policies, or imposing technical restrictions or financial penalties, that restrict, prohibit, impede, disincentivize or deter Users from selecting any Alternative In-App Payment Solution for processing in-app purchases of digital content in any Android app.

C.    <u>Remedies Concerning the Android Platform</u>

With respect to the Android platform, Google is enjoined from:

1.    Denying or impeding any Android app or app store that uses any Alternative In-App Payment Solution, whether alongside GPB or to the exclusion of GPB, from having equivalent access to the same Android functionality and/or features as any Android app that uses only GPB for in-app purchases of digital content; and/or

2.    Imposing a financial penalty, technical limitation or otherwise restricting, prohibiting or impeding access to the Android platform for any Android app (including any Android app store) on the basis that such app or app store uses any Alternative In-App Payment Solution, whether alongside GPB or to the exclusion of GPB.

\*        \*        \*

6

1    Notwithstanding the preceding prohibitions, nothing in this Section II shall prohibit Google

2 from engaging in bona fide competition on the merits with respect to in-app payment solutions for

3 Android apps, such as:

4    1.    Making quality improvements to GPB to differentiate it from Alternative In-App
            Payment Solutions;

5

6    2.    Charging different fees for transactions processed through GPB on different apps;
            and/or

7    3.    Communicating to OEMs, Carriers, Developers or Consumers regarding any
            purported quality or price advantages of processing in-app purchases of digital

8           content through GPB over Alternative In-App Payment Solutions, or otherwise
            publicly promoting GPB, advertising GPB, or incentivizing OEMs, Carriers or

9           Developers to communicate the purported benefits to Consumers of GPB through
            Android apps or Alternative Android App Distribution Channels.

10
     Further, nothing in this Section II shall prohibit Google from seeking a modification of the

11 Court's Order regarding the Android In-App Payment Solutions Market on the basis of changed

12 circumstances (*i.e.*, Google's loss of monopoly power in the Android App Distribution Market).

13 **III.    Remedies to Prevent Circumvention**

14   For a period of ten (10) years, Google is enjoined from circumventing this Order by taking

15 steps that violate the purpose, even if not expressly the terms, of this Order, including by imposing

16 disincentives or providing incentives that are designed to, or have the effect of, making competitive

17 entry or expansion in the Android App Distribution Market and/or the Android In-App Payment

18 Solutions Market more expensive, slower, harder or otherwise impracticable for Competing

19 Distributors and/or actual or potential providers of Android in-app payment solutions.  For the

20 avoidance of doubt,  the remedies in this Part III prohibit conduct including, but not limited to, the

21 imposition by Google of fees tied to or calculated on the basis of a Developer's revenues or profits

22 derived from the sales of content, goods, services or subscriptions, whether such sales occur in-

23 app or outside the Developer's Android app, where the developer uses an Alternative In-App

24 Payment Solution  to service such sales.

25   Nothing in this Part III shall prohibit Google from competing on the merits, such as by

26 making quality improvements to its Google Play and GPB services.

27

28

7

**4-ER-791**

1

2

3

4    **UNITED STATES DISTRICT COURT**

5    **NORTHERN DISTRICT OF CALIFORNIA**

6

7    **EPIC GAMES, INC.,**

8             Plaintiff, Counter-defendant

9        v.

10    **APPLE INC.,**

11             Defendant, Counterclaimant.

Case No.  4:20-cv-05640-YGR

**ORDER DENYING APPLE'S MOTION TO STAY INJUNCTION PENDING APPEAL**

Dkt. No. 821

12         The Court is in receipt of Apple Inc.'s Motion to Stay part of the Court's injunction

13    pending resolution of all appeals, specifically that portion prohibiting developers from including

14    "in their apps and their metabuttons, external links, or other calls to action that direct customers to

15    purchasing mechanisms, in addition to In-App Purchasing ["IAP"]."  (*See* Dkt. No. 821.)

16         Having considered all the filings, and oral argument, the Court finds Apple has failed to

17    satisfy its burden, and the request as framed is **DENIED**.  In short, Apple's motion is based on a

18    selective reading of this Court's findings and ignores all of the findings which supported the

19    injunction, namely incipient antitrust conduct including supercompetitive commission rates

20    resulting in extraordinarily high operating margins and which have not been correlated to the value

21    of its intellectual property.  This incipient antitrust conduct is the result, in part, of the antisteering

22    policies which Apple has enforced to harm competition.  As a consequence, the motion is

23    fundamentally flawed.  Further, even if additional time was warranted to comply with the limited

24    injunction, Apple did not request additional time other than ten days to appeal this ruling.  Thus,

25    the Court does not consider the option of additional time, other than the requested ten days.

26         The Court analyzes the motion using a four-factor test to determine whether a stay is

27    appropriate, namely whether (i) the movant demonstrates a strong showing of likelihood of

28    success on the merits; (ii) the movant would be irreparably injured absent a stay; (iii) issuance of

United States District Court
Northern District of California

United States District Court
Northern District of California

the stay will substantially injure the other parties interested in the proceeding; and (iv) an

evaluation of where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009). Apple

bears the burden of demonstrating that the Court should exercise its discretion to stay the

injunction. *Id*. at 433-34.

In considering Apple's likelihood of success on the merits, Apple notes that it will argue

on appeal that the Court applied the wrong test in its analysis of California's Unfair Competition

Law ("UCL"), plaintiff lacked standing, and the injunction was not within the Court's authority.

Contrary to Apple's assertions, the Court evaluated the UCL claims using two tests, not one. *See*

Order at Law Sections VI.C.1 and 2. Furthermore, the Court's Order analyzed the basis for Epic

Game's standing under the UCL. *See* Order at Law Section Law, VI. A. Moreover, Apple's

citations to Epic Games' alleged loss of standing does not persuade.[1]

Here, as noted, the antisteering provisions are one of the key provisions upon which Apple

has been able to successfully charge supracompetitive commissions untethered to its intellectual

property. *See* Order at Fact Sections IV and V. Evidence admitted at trial demonstrate that Epic

Games and its related companies receive royalties from numerous companies who use the Unreal

Engine for apps. *See e.g.* DX-4022. Apple's commission rates depress those royalties and

suppress competition in the industry generally, and in which Epic Games operates. This is

sufficient to establish Article III standing. *See Franchise Tax. Bd. of California v. Alcan*

*Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (finding that parent company had Article III standing to

---

[1] Indeed, Apple relies on a handful of distinguishable cases that deal with whether the party initially had standing, not the loss of standing (mootness), in support of its proposition that Epic Games lacks standing to enforce the injunction. *See Lujuan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (finding that environmental groups did not have standing to challenge regulation of the Secretary of the Interior which interpretated Section 7 of the Endangered Species Act, finding that plaintiff did not meet the imminent injury requirement for Article III because plaintiffs intent to "return to the places they had visited before" was not actual or imminent); *Davis v. FEC*, 554 U.S. 734-35 (2008) (finding that self-financed candidate had standing to challenge the constitutionality of the Millionaires' Amendment of the Bipartisan Campaign Reform Act, noting that "the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed"); *Hangarter v. Provident Life & Accident Ins. Co*., 373 F.3d 998, 1021 (9th Cir. 2004) (finding that plaintiff did not have standing to seek injunction where plaintiff no longer had contractual relationship with defendant at the time of lawsuit).

2

challenge the taxes that their wholly owned subsidiaries were required to pay). Thus, this argument fails.

Next, the Court addresses Apple's claim of irreparable injury. Again, the evidence does not support Apple's position. Apple focuses part of its irreparable harm argument on harm that could occur in the form of loss of trust and integrity in the iOS ecosystem by way of allowing developers to include their links and metabuttons in their apps. Apple's arguments are exaggerated. The reader rule, cross-play, and cross-wallet all reflect trial examples that alternatives outside the app can be accommodated. Mr. Kosmynka's declaration does not change the result. In most ways, he merely repeats arguments that the Court considered as part of its Order. That the injunction may require additional engineering or guidelines is not evidence of irreparable injury. Rather, at best, it only suggests that more time is needed to comply. Apple, though, did not request additional time to comply. It wants an open-ended stay with no requirement that it make any effort to comply. Time is not irreparable injury.

The third and fourth elements overlap so the Court addresses them collectively: injury to other parties and public interest. The evidence from the trial revealed that the party who would benefit primarily from a stay *pending all resolution of all appeals* is Apple. The Court can envision numerous avenues for Apple to comply with the injunction and yet take steps to protect users, to the extent that Apple genuinely believes that external links would create issues. The Court is not convinced, but nor is it here to micromanage. Consumers are quite used to linking from an app to a web browser. Other than, perhaps, needing time to establish Guidelines, Apple has provided no credible reason for the Court to believe that the injunction would cause the professed devastation. Links can be tested by App Review. Users can open browsers and retype links to the same effect; it is merely inconvenient, which then, only works to the advantage of Apple.[2]

_____

[2] The Court also notes that while Mr. Kosmynka claims that Apple verifies purchases. Apple's Head of Pricing, Mr. Grey, testified at trial that Apple simply asks the developer to confirm delivery and then it issues a receipt. Order, p. 117.

3

United States District Court
Northern District of California

With respect to the alleged need for clarification because, anecdotally, some developers may not understand the scope of the injunction, the parties themselves have not indicated any confusion. The Developer Agreement prohibits third party in-app purchasing systems other than Apple's IAP. The Court did not enjoin that provision but rather enjoined the prohibition to communicate external alternatives and to allow links to those external sites. Apple still maintains the convenience of IAP and, if it can compete on pricing, developers may opt to capitalize on that convenience, including any reassure that Apple provides to consumers that it may provide a safer or better choice. The fact remains: it should be their choice. Consumer information, transparency, and consumer choice is in the interest of the public.

The request for a ten-day extension to file an appeal to the Ninth Circuit is **DENIED**. Given the promptness of this decision, more time remains before the injunction takes place than at least two of those authorities upon which Apple relies for requesting such relief. *See Campbell v. National Passenger Railroad Corp.*, No. 05-CV-5434, 2009 WL 4546673, at *2 (N.D. Cal. Nov. 30, 2009) (ordering that defendant comply with the injunction within 10 days from the date of the Court's order on the motion to stay pending appeal); *see also Conservation Cong. v. U.S. Forest Serv.*, No. CIV. S-11-2605 LKK, 2012 WL 3150307, at *2 (E.D. Cal. Aug. 1, 2012) (providing twenty-one day extension to seek appeal). Here, the Court afforded Apple 90 days to comply and it still has approximately 30 days before the injunction goes into effect. Thus, the Court sees no need for an additional 10 days for Apple to file its appeal of this ruling. Granting this extension would extend the deadline to the end of December just before the December holidays which itself is inconvenient.

For the foregoing reasons, the Court **DENIES** Apple's motion to stay the injunction pending appeal. The Court also **DENIES** Apple's request for a temporary stay of an additional 10 days.

This order terminates docket No. 821.

**IT IS SO ORDERED.**

Dated: November 9, 2021

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

United States District Court
Northern District of California

4

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **EPIC GAMES, INC.,**<br><br>                Plaintiff,<br><br>        vs.<br><br>**APPLE INC.,**<br><br>                Defendant.<br><br>**AND RELATED COUNTERCLAIM** | Case No.  4:20-cv-05640-YGR<br><br>**PERMANENT INJUNCTION** |

The Court, having considered the evidence presented at the bench trial in this matter and consistent with its findings of fact and conclusions of law, **HEREBY ORDERS** as follows:

1. Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ("Apple"), are hereby permanently restrained and enjoined from prohibiting developers from (i) including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing and (ii) communicating with customers through points of contact obtained voluntarily from customers through account registration within the app.

2. Any party may seek modification of this Order, at any time, by written motion and for good cause based on changed circumstances or otherwise.

3. The Court will retain jurisdiction over the enforcement and amendment of the injunction. If any part of this Order is violated by any party named herein or any other person, plaintiff may, by motion with notice to the attorneys for defendant, apply for sanctions or other relief that may be appropriate.

4. This injunction will take effect in ninety (90) days.

**IT IS SO ORDERED.**

Dated: September 10, 2021

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**