**No. 25-2935**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**EPIC GAMES, INC.,**

*Plaintiff-ctr-defendant - Appellee*,

v.

**APPLE INC.,**

*Defendant-ctr-claimant - Appellant.*

Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR (Yvonne Gonzalez Rogers, District Judge)

## EXCERPTS OF RECORD FOR APPLE INC.

## VOLUME 6 OF 7 (6-ER-1067 to 6-ER-1279)

Mark A. Perry
Zachary D. Tripp
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
(202) 682-7511

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

June 23, 2025

Gregory G. Garre
Roman Martinez
Peter E. Davis
Soren J. Schmidt
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Ben Harris
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Apple Inc.*

UNITED STATES DISTRICT COURT

<span style="color:red">**ORIGINAL**</span>

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 3** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 408 - 561 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, May 16, 2024 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                   BY:  GARY A. BORNSTEIN,
                        M. BRENT BYARS,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        BENJAMIN WYLLY,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                  A P P E A R A N C E S (CONT'D.)

 2

 3      For Defendant:          Weil, Gotshal & Manges LLP
                                2001 M Street NW, Suite 600
 4                              Washington, D.C.  20036
                          BY:  MARK A. PERRY,
 5                             JOSHUA M. WESNESKI, ATTORNEYS AT LAW

 6                              Weil Gotshal & Manges LLP
                                1395 Brickell Avenue, Suite 1200
 7                              Miami, Florida  33131
                          BY:  MARK PINKERT, ATTORNEY AT LAW

 8

 9                              Gibson, Dunn & Crutcher LLP
                                333 South Grand Avenue
10                              Los Angeles, California  90071
                          BY:  RICHARD J. DOREN,
11                             JASON C. LO, ATTORNEYS AT LAW

12

13                              Gibson, Dunn & Crutcher LLP
                                1050 Connecticut Avenue, N.W.
14                              Washington, DC  20036-5306
                          BY:  HARRY PHILLIPS,
15                             CYNTHIA E. RICHMAN, ATTORNEY AT LAW

16

17

18

19

20                              --o0o--

21

22

23

24

25
```

**I N D E X**

THURSDAY, MAY 16, 2024 - VOLUME 3

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| BARNES, NED | | |
| CROSS-EXAM (CONT'D.) BY MR. PERRY | 414 | 3 |
| REDIRECT EXAMINATION BY MR. BYARS | 431 | 3 |
| | | |
| OLIVER, CARSON | | |
| (SWORN) | 437 | 3 |
| DIRECT EXAMINATION BY MR. EVEN | 438 | 3 |
| CROSS-EXAMINATION BY MS. RICHMAN | 541 | 3 |

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| CX-0014 | | | 505 | 3 |

| DEFENDANT'S  EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| CX-0015.1 | | | 549 | 3 |

--o0o--

OLIVER - DIRECT / EVEN

1    **A.**  I would not say that.

2         **THE COURT:**  It's not 3 percent less?

3         **THE WITNESS:**  It is 3 percent less for that duration

4    of the first seven days.  But that is not consistent with what

5    would happen if that purchase were made in the app.

6    **BY MR. EVEN:**

7    **Q.**  Sir, we already -- I already defined linked purchases as

8    purchases occurring within the seven-day period, and you

9    agreed to that definition, right?

10   **A.**  Yes.

11   **Q.**  And so I'm asking about linked purchases, the fee on

12   linked purchases, purchases occurring within the seven-day

13   window is 3 percent less than the fee Apple would impose on

14   the same purchase if it were completed within the app on IAP,

15   correct?

16   **A.**  Yes.

17   **Q.**  Thank you.

18        Now the price committee was convened to determine the

19   commission structure for Apple's link entitlement program,

20   right?

21   **A.**  That's correct, yes.

22   **Q.**  And you assisted in preparing a presentation for the price

23   committee that was given on January 16, 2024, correct?

24   **A.**  I did, yes.

25   **Q.**  And if I refer to that presentation as the price committee

OLIVER - DIRECT / EVEN

1    deck, you will understand what I'm referring to?

2    A.   Yes.

3    Q.   The price committee deck reflected certain information for

4    a report compiled by a consulting firm known as Analysis

5    Group, correct?

6    A.   Yes.

7    Q.   And you led a group at Apple that worked with Analysis

8    Group on this report, correct?

9    A.   Yes.

10   Q.   Now you understand that Apple designated you to testify

11   about the commission structure of the external purchase link

12   entitlement including the Analysis Group report and the deck

13   presented to the price committee, correct?

14   A.   Yes.

15   Q.   You did not put in a declaration in support of Apple's

16   notice of compliance, correct?

17   A.   That's correct.

18   Q.   And you also did not put in a declaration in support of

19   Apple's opposition to Epic's motion, correct?

20   A.   That's correct.

21   Q.   Now, the person who did put in a declaration is Mr. Roman

22   who put in both a declaration and attached the analysis in the

23   price committee deck, correct?

24   A.   That's correct.

25   Q.   And Mr. Roman is a vice president, right?

OLIVER - DIRECT / EVEN

1    **A.**  That's correct.

2    **Q.**  And I take it that at least formally, that is a more

3    senior than you, correct?

4    **A.**  Yes.

5    **Q.**  And Mr. Roman was the person in charge of creating the

6    financial analysis that is reflected in the pricing committee

7    deck, correct?

8    **A.**  Mr. Roman's team, yes.

9    **Q.**  Mr. Roman's team led by Mr. Roman, correct?

10   **A.**  Correct.

11   **Q.**  And Mr. Roman presented the price committee deck to

12   Mr. Cook, Mr. Maestri, and Mr. Schiller on January 16 of this

13   year, correct?

14   **A.**  Yes.  That's when it was emailed to them.

15   **Q.**  You said that was when it was emailed to them?

16   **A.**  That's correct.

17   **Q.**  Do you understand that Mr. -- well, do you have an

18   understanding about whether Mr. Roman personally presented the

19   deck to them?

20   **A.**  I believe the meeting related to it was a few days earlier

21   than that.

22   **Q.**  When was the meeting, do you believe?

23   **A.**  I believe it was in mid-January where we discussed the --

24   the price committee and we emailed the deck on the 16th.

25   **Q.**  So January 16, I think for me at least, would be

OLIVER - DIRECT / EVEN

1    mid-January.  So how many days prior to January 16 do you

2    believe the meeting occurred?

3    **A.**  A few days earlier, four or five days, I believe.

4    **Q.**  Is it your testimony that the recommendations in the deck

5    were presented four or five days prior to January 16th?

6    **A.**  They were discussed four or five days earlier, yes.

7    **Q.**  And they were discussed in person four or five days

8    earlier?

9    **A.**  That's correct, yes.

10   **Q.**  And did the pricing committee actually adopt the

11   recommendations four or five days earlier?

12   **A.**  No.

13   **Q.**  When did the price committee adopt the recommendations?

14   **A.**  On the 16th.

15   **Q.**  So I'm trying to understand the timeline.  So there was a

16   meeting --

17   **A.**  Yes.

18   **Q.**  -- four or five days prior to January 16, correct?

19   **A.**  Correct.

20   **Q.**  Who attended that meeting?

21   **A.**  That meeting would have been attended by our legal team

22   including Kate Adams or Heather, our senior legal team.  It

23   would have included Tim Cook, Luca Maestri, our CFO, as well

24   as Phil Schiller.  It would have included me, a member of my

25   team, Tim O'Kim [phonetic].  It would have included Matt

OLIVER - DIRECT / EVEN

```
 1    Fischer.  It would have included Alex Roman and two members of
 2    his team.
 3    Q.   And that was the only meeting about this deck?
 4    A.   They were prior meetings about the implementation which
 5    covered elements of the factors that were covered in the final
 6    deck.
 7    Q.   How many meetings were there altogether?
 8    A.   Numerous meetings.  I don't think I could count.
 9    Q.   More than ten?
10    A.   Yes.
11    Q.   More than 20?
12    A.   Not all with that same group, to be clear, but yes.
13    Q.   How many meetings were there with Mr. Cooke, Mr. Maestri,
14    and Mr. Schiller?
15    A.   A handful.
16    Q.   So around five; is that a handful?
17    A.   It sounds roughly right.  But there were many meetings
18    that happened over the course of, you know, more than six
19    months.
20    Q.   When did the first meeting with the full price committee
21    occur?
22    A.   Well, I wouldn't call those price committee meetings.
23    Those were discussions of elements of the implementation for
24    this.
25    Q.   Okay.  When did the first discussion of certain elements
```

1   with Mr. Cook, Maestri, and Schiller occur?

2   A.   As early as April or May of 2023.

3   Q.   And this meeting on January 11th or 12th was the last

4   meeting, correct?

5   A.   To my memory, yes.

6   Q.   And you mentioned that Ms. Adams, Ms. Grenier were there.

7   And you then mentioned senior legal team.  Is that in addition

8   to Ms. Adams and Ms. Grenier?

9   A.   There -- there may be some -- there may have been other

10  members of the litigation team that were also there and as

11  well as our product counsel.

12  Q.   Who is that?

13  A.   Sean Cameron.  Potentially Lou on his team would have also

14  been there.  Maybe other members of Heather's team including

15  Jenny Brown.

16  Q.   Okay.  In the five or so meetings, the handful of meetings

17  that actually included Mr. Cook, Mr. Maestri, and

18  Mr. Schiller, was the makeup of the meeting similar in terms

19  of legal being there, you being there, Mr. Roman and his team

20  being there, et cetera?

21  A.   Yes.  Many of those were largely driven and organized by

22  the legal team.

23  Q.   What happened between January 11th or 12th and the 16th

24  that led to an actual decision by the pricing committee?

25  A.   We finalized the details based on the discussion in the

OLIVER - DIRECT / EVEN

1   price committee meeting and then presented the final proposal

2   over email.

3   **Q.**  So the final proposal, as we see in the deck that was

4   submitted to the Court, was only provided over email, not in

5   person?

6   **A.**  The final one, yes.

7   **Q.**  Was there a material difference between recommendations

8   in -- at any stage in the recommendations that were ultimately

9   adopted on May 16th?

10          **MS. RICHMAN:**  Objection, Your Honor.  I think that

11  calls for privileged communications.

12          **THE COURT:**  I would need -- I would need more from

13  you on -- on that to sustain the objection.

14      What I am concerned about is the data.  And regardless if

15  you have an attorney sitting there, when you're talking about

16  financial information, that's not legal advice.

17          **MS. RICHMAN:**  Understood, Your Honor.  I think the

18  question was, was there a material difference between

19  recommendations between the meeting on January 16th and in the

20  discussions earlier.  And this is about compliance with a

21  legal injunction.  And so that inevitably would reflect legal

22  advice.

23      I have no problem with Mr. --

24          **THE COURT:**  I'm going to ask you to rephrase.  Let's

25  see if you can put it in the context that would not have --

OLIVER - DIRECT / EVEN

 1    well, let's try a new question, see where we go.

 2    **BY MR. EVEN:**

 3    **Q.**  The ultimate decision was to land on one ultimate --

 4         **THE COURT:**  Well, here's a question.

 5         Do I have the deck from January 11th?  Let me see the deck

 6    from January 11th, and perhaps I can figure out, and Mr. Even

 7    can figure out, to what extent there's an appropriate

 8    attorney-client objection being made.

 9         So do you have it with you right now?

10         **MS. RICHMAN:**  No, I don't, Your Honor.

11         **THE COURT:**  Well, then get it.  So before his

12    testimony finishes, somebody email and figure out where it is

13    and get that deck.

14         **MS. RICHMAN:**  Yes, Your Honor.

15         **THE COURT:**  Proceed.

16         **MR. EVEN:**  Thank you, Your Honor.  If I may, just one

17    point on that.  Unless the decks actually include the legal --

18         **THE COURT:**  I agree.  But let's see it.

19         **MR. EVEN:**  Yeah, all I'm saying is it sounds like

20    there have been multiple iterations of the deck in at least a

21    handful of meetings, and so I don't know that the 11th alone

22    would suffice it.

23         **THE COURT:**  It may not.

24         **MR. EVEN:**  Okay.  I will proceed.

25    **Q.**  At the meeting on January 11th or 12th, Mr. Roman was the

OLIVER - DIRECT / EVEN

```
 1    one who presented the deck to the pricing committee?

 2    A.   I believe I presented a couple of slides, but Alex

 3    presented most of the slides.

 4       (Clarification by the Certified Stenographic Reporter.)

 5            THE WITNESS:   Alex presented most of the slides, but

 6    I think I presented a couple of them.

 7    BY MR. EVEN:

 8    Q.   So if you turn to CX-0009 in your binder, that's already

 9    in evidence, and that is the deck that we do have which bears

10    the date January 16.

11       Do you see that?

12    A.   Sorry.   I think I have the wrong binder.

13       (Reviewing document.)

14       That's correct, yes.

15                       (Exhibit published.)

16    BY MR. EVEN:

17    Q.   If you can go through the slides and tell me which slides

18    did you present to Mr. Cook, Maestri, and Schiller at that

19    meeting on January 11th or 12th.

20    A.   It would have been Slide 5.

21            THE COURT:   Hold on.   Let me get it.

22       Okay.   And when you're -- do you see that tiny little

23    number that you can barely read on the document in the middle

24    on the bottom of the page.   So --

25            THE WITNESS:   I do, yes.
```

OLIVER - DIRECT / EVEN

```
 1              THE COURT:  So if you can use that reference.

 2              THE WITNESS:  I will.  Thank you.

 3              THE COURT:  Thank you.

 4         Go ahead.

 5              THE WITNESS:  So it would be 9.6 -- oh, sorry.  The

 6    one on my binder is different.

 7         Do you want me to use the one on the screen?

 8         Okay.  It's 9.6.

 9              THE COURT:  So you presented this one?

10              THE WITNESS:  That's correct.

11    BY MR. EVEN:

12    Q.   Okay.  Any other slides that you presented?

13    A.   Yes.  9.7.

14    Q.   Okay.

15    A.   9.8.

16    Q.   All right.

17    A.   9.9.

18    Q.   Okay.

19    A.   I believe that's it.

20    Q.   Okay.  We'll get there, but all these slides that you've

21    just pointed out are slides reflecting information developed

22    by Analysis Group, correct?

23    A.   No.

24    Q.   Which of these slides that you just mentioned, in your

25    view, does not present information from Analysis Group?
```

OLIVER - DIRECT / EVEN

```
 1    A.   There are parts of Analysis Group's analysis that are

 2    incorporated into 9.7 and 9.8, but those also incorporated

 3    work that was done internally at Apple.

 4    Q.   I understand.  That's not what I asked.

 5    A.   Okay.

 6    Q.   Mr. Oliver, my question was each of the slides that you

 7    presented included information from the Analysis Group,

 8    correct?

 9    A.   And again on those two slides, and I'm not meaning to be

10    difficult, but we -- there is information that AG includes in

11    their report that mirrors information that was shown in these

12    two slides, but it was substantively prepared by my team, not

13    by the Analysis Group.  Just --

14                     (Simultaneous colloquy.)

15    BY MR. EVEN:

16    Q.   So what you're saying is that actually your team was the

17    source for some of this information and the Analysis Group

18    report, which we'll speak to later, actually got that

19    information from your team?

20    A.   No.  It was mirrored.  It was mirrored data that they had

21    also collected, but it didn't necessarily -- wasn't from that

22    source.

23    Q.   Okay.  Are those the only four slides that you presented?

24    A.   I believe so, yes.

25    Q.   Other than yourself and Mr. Roman, did anyone else present
```

OLIVER - DIRECT / EVEN

```
1    any portion of the deck to the price committee on January 11th

2    or 12th?

3    A.   I don't believe so.

4            THE COURT:   Okay.  Hold on.  Hold on just a moment.

5        So who's having a problem hearing?

6            THE CLERK:   The audio.

7                (Off-the-record discussion.)

8            THE COURT:   Okay.  We're just going to take a short

9    break here so that they can reset the system.

10       We'll stand in recess for just a few minutes.  Don't go

11   too far.

12       (Recess taken at 10:23 A.M.; proceedings resumed at 10:41

13   A.M.)

14           THE COURT:   All right.  We're back on the record.

15   The record will reflect that the parties are present.  I hope

16   everybody enjoyed the break.  That was your first one.

17       Let's go.

18           MR. EVEN:   Thank you, Your Honor.

19   Q.  Mr. Oliver, I just want to make sure I understand your

20   testimony so far.

21       So somewhere in April or May of 2023, there was a group

22   assembled to work on the -- on the pricing committee

23   materials, correct?

24   A.  I would say we started working on the understanding how to

25   respond to the injunction.  And so that that was beyond just
```

1    pricing, it was considering a bunch of different factors of

2    how we would respond to it.

3                **MR. EVEN:**  Okay.

4                **THE COURT:**  In April or May of 2023?

5                **THE WITNESS:**  Correct.

6    **BY MR. EVEN:**

7    **Q.**  Now, in terms of the pricing committee deck which you're

8    here to testify about, Mr. Roman led a finance team doing work

9    on that deck, correct?

10   **A.**  That's correct.

11   **Q.**  You led a business team, I guess?

12   **A.**  That's correct.

13   **Q.**  Am I missing any other team that worked on that deck?

14   **A.**  There were other teams that were involved in additional

15   elements that went into the deck.  So product and others.  The

16   legal team of course was -- was actively involved in terms of

17   understanding how we would comply.

18       But we -- the -- that small working group between business

19   and finance was the primary group beyond those others.

20   **Q.**  Okay.  At the time you began working on this back in

21   spring of 2023, you were aware that the Court entered the

22   injunction after conducting a full trial, hearing evidence and

23   issuing findings of facts, correct?

24   **A.**  Yes.

25   **Q.**  In fact, you were deposed in that case, I believe, right?

OLIVER - DIRECT / EVEN

1    **A.**  That's correct.

2    **Q.**  Now, have you read the Court's full post trial order

3    including all findings of fact and conclusions of law in

4    connection with your work on the external link entitlement

5    program?

6    **A.**  I read it before I started actively working on this, but

7    yes.

8    **Q.**  Do you understand that a fundamental problem this Court

9    had identified with Apple's anti-steering rules was that they

10   resulted in higher costs to developers because competition was

11   not driving commission rates?

12   **A.**  I understood it slightly differently.

13   **Q.**  You did not understand that a fundamental problem this

14   Court had identified with Apple's anti-steering rules was that

15   they resulted in higher costs to developers because

16   competition was not driving commission rates?

17   **A.**  I think that was one of -- one of multiple elements.

18   **Q.**  I'm only asking whether you understood that element to be

19   something that this Court had found as a fundamental problem

20   with the anti-steering rules?

21   **A.**  Amongst others, but yes.

22   **Q.**  Did you understand that a fundamental problem this Court

23   had identified with Apple's anti-steering rules was that by

24   preventing steering, Apple prevented developers from

25   communicating to their users the lower prices that the

OLIVER - DIRECT / EVEN

```
 1    commissioned by Apple?

 2    A.   Yes.

 3    Q.   Have you worked on a July 2020 Analysis Group report that

 4    tried to suggest that Apple's rates are in alignment with

 5    other stores?

 6    A.   I was only lightly involved in that report.

 7    Q.   Now, the reports that Analysis Group prepares for Apple

 8    are then published in -- on Analysis Group's website, Apple's

 9    website sometimes, correct?

10    A.   Yes.

11    Q.   And those are essentially kind of public relations pieces,

12    correct?

13    A.   It depends.  Sometimes they are amplified by our public

14    relations team.

15    Q.   Well, the reports invariably are commissioned by and paid

16    for entirely by Apple, correct?

17    A.   I believe so, yes.

18    Q.   And that's true for the report that's now on the screen as

19    well, correct?

20    A.   Yes.

21    Q.   And the report invariably support Apple's policy and

22    litigation positions, correct?

23    A.   I can't say one way or the other.

24    Q.   You don't know?

25    A.   I -- I -- again, I don't know what specific points and
```

OLIVER - DIRECT / EVEN

1    litigation positions you're talking about.

2    **Q.**  Well, let me ask it in reverse.  Have you ever seen

3    Analysis Group come out with one of these reports and say we

4    think Apple is wrong about the following five things?

5    **A.**  No.

6    **Q.**  You understand that Apple uses the reports for lobbying

7    and PR purposes?

8    **A.**  Yes.

9    **Q.**  And Apple employees work with Analysis Group and review

10   and comment on the various reports before they're published,

11   correct?

12   **A.**  Yes.

13   **Q.**  And Apple employees worked with Analysis Group under your

14   guidance and supervision and reviewed and commented on this

15   report, correct?

16   **A.**  Yes.  We had feedback.

17   **Q.**  And Apple never suggested that the Analysis Group's

18   continued retention by Apple depends -- does not depend --

19   sorry -- on the reports being favorable to Apple, correct?

20   **A.**  No.

21   **Q.**  No, not correct?  Or yes, this is correct?  Apple has

22   never suggested that it will continue to retain Analysis Group

23   even if Analysis Group's conclusions are bad for Apple?

24   **A.**  We have never had any discussion about Analysis Group's

25   conclusions being unfavorable or favorable to Apple.

OLIVER - DIRECT / EVEN

1   **Q.**  The reports are not peer-reviewed in any way, right?

2   **A.**  I don't know.  Not that I'm aware.

3   **Q.**  Certainly this report was not peer-reviewed by anyone,

4   right?

5   **A.**  That's correct.

6   **Q.**  And the reports do not purpose to meet any kind of

7   scientific standard, right?

8   **A.**  They're prepared by the economists at the Analysis Group.

9   I don't know what standard you're discussing.

10          **THE COURT:**  Have you ever worked with consultants?

11   Management consultants?

12          **THE WITNESS:**  No.

13          **THE COURT:**  We should take a ten-minute break for the

14   court reporter.  So we'll go back on the record at 12:15 and

15   then we'll have that be the last session.

16          **MR. EVEN:**  Thank you, Your Honor.

17          **THE CLERK:**  Court is in recess.

18      (Recess taken at 12:05 P.M.; proceedings resumed at

19   12:18 P.M.)

20          **THE COURT:**  Okay.  We're back on the record.

21      You may be seated.

22      The record will reflect that all the parties are present.

23      Proceed.

24          **MR. EVEN:**  Thank you, Your Honor.

25   **Q.**  Mr. Oliver, we saw that the Analysis Group report is dated

OLIVER - DIRECT / EVEN

```
 1    January 2024.  How long did you work on this report with
 2    Analysis Group?
 3    A.  We started in the spring of 2023.
 4                        (Exhibit published.)
 5    BY MR. EVEN:
 6    Q.  Who at Apple reviewed and commented on the report?
 7    A.  It was largely me and my team, though we worked in
 8    conjunction with the legal team as well.
 9    Q.  Did Mr. Roman review the report and comment on it?
10    A.  I believe he was -- had some involvement, but it was
11    primarily led by my team.
12    Q.  Did Mr. Fischer review the report and comment on it?
13    A.  I don't believe so.
14            THE COURT:  So you edited their report?
15            THE WITNESS:  I did not edit the report.
16            THE COURT:  You -- you and legal gave them feedback
17    with respect to the content of their report?
18            THE WITNESS:  It was largely questions and clarify --
19    clarifications.
20            THE COURT:  Proceed.
21    BY MR. BORNSTEIN:
22    Q.  Did Mr. Schiller review and comment on the report?
23    A.  Not to my knowledge.
24    Q.  Please turn to slide number 2 on the report.
25                        (Exhibit published.)
```

OLIVER - DIRECT / EVEN

BY MR. EVEN:

Q.  The third subbullet under the heading "A Post Epic

Injunction World" has a number of questions, right?

A.  Yes.

Q.  One of those question is what pricing could make linking

out an actual option for developers to comply with the

injunction?  Do you see that?

A.  I do, yes.

Q.  So at least Analysis Group understood, and presumably you

understood, that in a post injunction world, linked purchases

have to be an actual option for developers in order to comply,

correct?

A.  That's correct, yes.

Q.  Despite posing that question on Slide 2, there's no

assessment by Analysis Group of whether Apple's external link

program makes purchase links an actual option for developers,

correct?

A.  That's correct.

Q.  That's another thing that you did not ask Analysis Group

to perform, correct?

A.  That's correct.

Q.  Let's talk briefly about the third goal of the report to

provide an economic framework for considering alternative

pricing options.

        So by the time Analysis Group was retained, you agree with

OLIVER - DIRECT / EVEN

1    me that Apple has already decided that it's going to impose a

2    fee at whatever rate on linked purchases, correct?

3    **A.**   I don't believe that's the case.

4    **Q.**   You think that Analysis Group was retained when Apple was

5    still considering whether to impose a fee?

6    **A.**   Yes.

7    **Q.**   That's nowhere in the deck, correct?

8    **A.**   Correct.

9    **Q.**   Let's turn to Slide 44.

10                        (Exhibit published.)

11   **BY MR. EVEN:**

12   **Q.**   That slide is titled "Leakage Risk," correct?

13   **A.**   That's correct, yes.

14   **Q.**   Now in the second bullet, Analysis Group defines leakage

15   as what happens when participants meet on a platform but take

16   their transactions off platform to avoid paying the

17   commission, right?

18   **A.**   Correct.

19   **Q.**   And historically, Apple certainly viewed diversion of

20   transactions from within the app to the web as a form of

21   leakage, right?

22   **A.**   Correct.

23   **Q.**   And the goal of Apple's anti-steering provision was in

24   fact to prevent this leakage, correct?

25   **A.**   Correct.

OLIVER – DIRECT / EVEN

1    Q.  Now, if you turn further below on the slide, Analysis

2    Group provides some guidance on what factors determine the

3    potential magnitude of leakage as relevant to the App Store,

4    correct?

5    A.  Correct.

6    Q.  In the first bullet below, Analysis Group warns that, in

7    the second sentence, quote, high fees incentivize parties to

8    transact off platform, end quote, right?

9    A.  Correct.

10   Q.  High fees incentivize leakage because they create a large

11   disparity between the cost of on-platform transactions and

12   off-platform transactions, correct?

13   A.  Correct.

14   Q.  Now, to avoid that disparity and the resulting leakage, a

15   platform may want to lower its own platform fees, correct?

16   A.  Sir, is that reference to the slide?  Or is that a

17   separate question?

18   Q.  It's just a question, sir.  In order to avoid that

19   disparity between the price of on-platform and off-platform

20   transactions, a platform may want to lower its on-platform

21   fees, correct?

22   A.  It depends.  They may.  They may not as well.

23   Q.  So, yes, they may want to lower their own fees?

24   A.  It depends.

25   Q.  But lowering their own fees would minimize that disparity,

OLIVER - CROSS / RICHMAN

1    and technologies in a way that allows them to build great apps

2    and deliver those apps to users all over the world.  And we

3    charge a commission only when developers begin building a

4    digital goods and services business.

5    **Q.**  Does Apple charge a commission on the sale of physical

6    goods that take place through the app?

7    **A.**  We do not.

8    **Q.**  And Apple has -- does Apple have other exceptions to the

9    commission that's levied on digital goods and services?

10   **A.**  I don't believe so.

11   **Q.**  I apologize.  My question was not clear.

12        What percentage of apps on the App Store are free?  If you

13   know?

14   **A.**  The vast majority, roughly 85 percent.

15   **Q.**  Okay.  And do you know what percentage of apps on the App

16   Store monetize using IAP and selling digital goods and

17   services?

18   **A.**  It's roughly 15 percent.

19   **Q.**  Okay.  Thank you.

20        Mr. Oliver, how do the changes that Apple was required to

21   make by the Court's injunction affect its historic business

22   model?

23   **A.**  Yes.  Historically, as we discussed earlier, we only

24   commissioned the sale of digital goods and services that were

25   sold directly within apps that were distributed through the

OLIVER - CROSS / RICHMAN

1   App Store.

2       For all other digital goods and services sold outside the

3   App Store, there was no commission.  And the basic principle

4   there was that if we provided a user to a developer, that we

5   were commissioned on those users that purchased within --

6   within the app, and where the developer was able to guide a

7   user outside of the store to a sale of the digital goods or

8   service, they were welcome to use that within their own app.

9   Q.  When transactions that may be facilitated through the link

10  entitlement, were those transactions that Apple previously

11  monetized?

12  A.  They were, yes.

13  Q.  Okay.  Did Apple, in crafting its injunction compliance

14  plan, consider charging no commission on linked transactions?

15  A.  We did, yes.

16  Q.  And why did Apple decide to charge a commission on linked

17  transactions?

18  A.  We determined that we -- the value of the services that we

19  provide, independent of payments and commerce, were

20  substantive and ongoing for developers.  And we felt like it

21  was a reasonable approach to provide a commission on

22  linked-out transactions as long as that -- those linked-out

23  transactions ended -- the commission ended at a certain period

24  of time.

25  Q.  And what was your understanding as to whether the Court's

OLIVER - CROSS / RICHMAN

1    injunction allowed Apple to charge a commission for the

2    services it provides to developers?

3    **A.**  It was our understanding that we -- the Court found that

4    we would be able to charge a fee for our tools, technologies

5    and intellectual property even if we weren't offering in-app

6    purchase.

7    **Q.**  Did you understand that in its post trial order, the Court

8    found that even in the absence of IAP, Apple could still

9    charge a commission on developers?

10   **A.**  Yes.

11   **Q.**  And did that understanding inform your recommendation --

12            **THE COURT:**  Well, I don't recall seeing any slide so

13   far that identifies the value to a single developer.

14            **THE WITNESS:**  The value to a single developer of...?

15            **THE COURT:**  Of whatever it is the value is.

16            **THE WITNESS:**  So that --

17            **THE COURT:**  Your model has one group of developers

18   subsidizing everyone else.  Right?  Because you don't charge

19   many developers anything other than the application fee or the

20   developer fee.

21            **THE WITNESS:**  That's correct.

22            **THE COURT:**  So is there any -- there was no analysis

23   done about the value given to an independent developer, right?

24            **THE WITNESS:**  I would point to the Analysis Group's

25   report where they looked at the different --

OLIVER - CROSS / RICHMAN

1            THE COURT:  For an individual developer?

2            THE WITNESS:  Well --

3            THE COURT:  Not for all developers.  For an

4     individual developer.

5            THE WITNESS:  We were trying to represent what

6     individual developers received from that value analysis.

7            THE COURT:  What page?

8            THE WITNESS:  If you go to Slide 6 of the Analysis

9     Group report, that looks at the different components of value

10    in terms of distribution discovery.

11       I'm also happy to provide more clarity as to what those

12    buckets represent.

13            THE COURT:  I don't see any numbers on that slide.

14            THE WITNESS:  14.7?

15            THE COURT:  I don't see any reference to IP or

16    anything.

17            THE WITNESS:  Platform technology developer tools and

18    services distribution --

19            THE COURT:  The 30 percent number came out of thin

20    air.  That was the testimony from the -- from Apple.  So that

21    number is meaningless.

22            THE WITNESS:  Okay.

23            THE COURT:  You read -- you read that, right?  That's

24    what people testified to from Apple.

25            THE WITNESS:  Yes, I read that.

OLIVER - CROSS / RICHMAN

1          THE COURT:  So where is the analysis?

2          THE WITNESS:  So the ranges that are shown below the

3    30 percent number represent the Analysis Group's understanding

4    of what it would cost to go out and acquire comparable

5    services across discovery, distribution, and other tools and

6    services, and then looked at that across both large and small

7    developers and game and nongame developers to try to

8    understand what was the value of the services that Apple

9    provides.

10          THE COURT:  Where is the value of the IP?

11          THE WITNESS:  The way that IP is charged for -- and

12    I'm not -- not an intellectual property expert -- is through a

13    variety of different models, business models.  And that could

14    include SaaS models that charge for a per-seat model as many

15    developer tools do.  It could be a commission model as many

16    kind of marketplaces or payments in commerce service providers

17    use.

18       But it could also be on a per -- per-user model as -- or

19    per-call model as certain API libraries use.

20          THE COURT:  Go ahead.

21    BY MS. RICHMAN:

22    Q.  Well, why don't we step back and talk about the process

23    that Apple went through with respect to setting a commission

24    on linked transactions.

25       You were part of that process, correct?

OLIVER - CROSS / RICHMAN

1    **A.**  I was, yes.

2    **Q.**  And you -- I think you mentioned earlier, but who did you

3    work with on that process?

4            **THE COURT:**  He's already said.  Let's move on.  We

5    have 15 minutes today.  That's it.

6            **MS. RICHMAN:**  Thank you, Your Honor.

7    **Q.**  Mr. Oliver, can you explain why Apple decided to engage

8    Analysis Group as an outside consultant here?

9    **A.**  Yes.  It was clear that we needed to do more work to

10   justify the fees that we were charging, and so we wanted to

11   make sure that we had additional perspectives on different

12   ways to approach the pricing of the commission for linkout.

13   **Q.**  And I think you said this, but just to be clear, are you

14   aware that in its post trial order the Court found that Apple

15   had not adequately justified its 30 percent rate?

16   **A.**  Yes, I am.

17   **Q.**  And did that inform your decision to retain AG?

18   **A.**  It did, yes.

19   **Q.**  And there was extensive discussion of your prior work with

20   AG.  Do you remember that?

21   **A.**  I do.

22   **Q.**  Why did you choose to retain Analysis Group for this

23   project specifically?

24   **A.**  Yes.  Analysis Group had specific expertise in terms of

25   their understanding of the app ecosystem, as well as the

OLIVER - CROSS / RICHMAN

```
 1    specific components of value that Apple provided to

 2    developers, based on their prior work.  And so we felt like

 3    they were in the best position to go deeper in some of those

 4    areas for this analysis.

 5  Q.  Okay.  Mr. Oliver, I'm going to hand up a binder of

 6    documents -- oh, you have it already.  I think it's the

 7    smaller version.  It has the same documents as Mr. Even's but

 8    it's a little bit more manageable because it's not as

 9    voluminous.

10      Okay.  We're going to talk about the documents at tab 1

11    and 2.

12      I believe the report at tab 1 has already been entered

13    into evidence and that you spoke to Mr. Even about that.

14      Could you just turn to tab 2 for a moment?

15  A.  Yes.

16  Q.  And do you recognize this document?

17  A.  I do, yes.

18  Q.  And what is this document?

19  A.  This document is the short form of the report provided by

20    Analysis Group.

21          MS. RICHMAN:  And, Your Honor, I'm not sure that this

22    one has been entered into evidence so I would offer it.  It's

23    CX-0015.1.

24          THE COURT:  It's admitted.

25      (Defense Exhibit CX-0015.1 received in evidence.)
```

OLIVER - CROSS / RICHMAN

1   BY MS. RICHMAN:

2   Q.  Okay.  Let's look at Slide 2 of the long deck which you

3   spoke to Mr. Even about.

4   A.  Yes.

5   Q.  And can you summarize what the key question was that you

6   asked AG to explore here?

7                   (Exhibit published.)

8           THE WITNESS:  Yeah, the key question was how can

9   Apple fairly charge for the value that it provides to

10  developers through a -- while implementing a linkout to allow

11  them to purchase from the web.

12  BY MS. RICHMAN:

13  Q.  Okay.  And I'm going to just walk through the goals so you

14  can provide explanation to the Court as to why you set these

15  three goals.

16      So, number one, if you can just read that aloud.

17  A.  Yes.  The first goal was to estimate the value of services

18  provided by the Apple ecosystem to developers, focusing on

19  digital goods and services.

20  Q.  And why did you ask AG to do that?

21  A.  Again we wanted to take a more robust approach to

22  justifying the rate that we were going to charge for linking

23  out.  And so we decided that we wanted to take both a

24  bottoms-up approach that looked at the subcomponents of value

25  as well as taking another look at the comparisons that other

OLIVER - CROSS / RICHMAN

1    marketplaces would demonstrate.

2    Q.   And what about the -- the second goal?

3    A.   The second is to compare Apple's commission with those of

4    other app marketplaces and digital marketplaces.  Sorry.  App

5    stores and digital marketplaces.

6    Q.   And why did you ask AG to examine on that issue?

7    A.   While this is work that they had done previously, we

8    wanted to make sure that we had all the latest relevant

9    information from the market.

10   Q.   And then the third goal, the economic framework, can you

11   explain what that was intended to do?

12   A.   Yes.  Again, I mentioned that there was a novel element to

13   this in terms of basically driving users from within an app to

14   outside of an app for the purposes of making up a transaction.

15   And so we wanted to understand if other markets or other

16   parties had dealt with similar problems.

17   Q.   Okay.  Thank you.

18        Let's go ahead and walk through the -- the short deck that

19   Analysis Group prepared.  So could you please turn to tab 2.

20   A.   Yes.

21   Q.   And if you go to Slide 1.

22                     (Exhibit published.)

23   BY MS. RICHMAN:

24   Q.   What does this slide show?

25   A.   Slide 1 shows a summary of the valuation for the different

OLIVER - CROSS / RICHMAN

1    subcomponent buckets that Analysis Group defined.

2    Q.  And what are those buckets?

3    A.  Platform technology, developer tools and services,

4    distribution, discovery, care and support.

5    Q.  And are -- these are the value buckets that you asked AG

6    to analyze?

7    A.  Yes.  We worked with them to define the specific buckets,

8    but they had already done prior work here that helped to

9    articulate these buckets.

10   Q.  And I think you tried to explain this earlier, but

11   could -- is there some degree of overlap among these buckets?

12   A.  Yes.

13   Q.  And can you elaborate on that?

14   A.  So some of these buckets and the business models

15   associated with them end up crossing over into buckets.  For

16   example, most providers of platform technology also provide

17   tools and services to allow developers or other parties to

18   interoperate with that platform technology.  So oftentimes the

19   AG team found that there was overlap in the way that -- that

20   those service providers charged.

21   Q.  Did Analysis Group reach any conclusions about the cost to

22   developers of substituting these services that are provided by

23   Apple?

24   A.  They did, yes.

25   Q.  And what were their findings, broadly speaking?

OLIVER - CROSS / RICHMAN

1    **A.**  Broadly speaking they found that the reasonable cost of

2    replacing these or paying for them from other service

3    providers was between 3 percent -- or actually .3 percent and

4    25 percent, depending on the bucket.

5    **Q.**  And do you have an understanding as to why these findings

6    are reported as ranges?

7    **A.**  Yes.  So the methodology that the Analysis Group team used

8    converted a variety of other business models into a comparable

9    fee per developer revenue.  And so that allowed -- or

10   percentage of developer revenue -- to allow us to more easily

11   compare the fees to the commission that we charge

12   traditionally for sales of in-app goods and purchases -- or

13   digital goods and purchases.

14       And so they -- using that methodology, they looked at

15   different cohorts of developers including small and large

16   developers and game and nongame developers, which led to the

17   ranges that you see here.

18   **Q.**  Do these ranges reflect costs to individual developers?

19   **A.**  This is a cost that a developer would assume based on

20   their revenue.

21   **Q.**  Okay.  Are there any -- well, you spoke about this

22   earlier.  You did not ask Analysis Group to evaluate the value

23   of IAP and the commerce stack, correct?

24   **A.**  We did not.

25   **Q.**  And why was that?

OLIVER - CROSS / RICHMAN

1    A.   That was because we knew that as part of this linkout

2    transaction that was occurring, we would not be providing

3    payment and commerce services for those sales.

4    Q.   And did you -- do you have any understanding as to what

5    developers would have to pay to replace the commerce services

6    that Apple provides to developers through IAP?

7    A.   Yes, we do.

8    Q.   And where does that information come from?

9    A.   A variety of different data points.  I talked earlier

10   about one datapoint available to us which was provided as part

11   of this report where AG found that the reasonable range of

12   offer or using a service provider as payment options was

13   between one and four percent.  But we also looked at other

14   analysis and data points that had been gathered in other

15   instances.

16   Q.   And you did not estimate -- ask AG to estimate the cost of

17   value for care and support; is that correct?

18   A.   That's correct.

19   Q.   And why was that?

20   A.   Well, actually AG determined that it was too hard to

21   independently quantify the value of care and support.  And

22   they instead suggested that we consider that as part of the

23   elements that would guide us within a range of the other

24   buckets.

25   Q.   Okay.  Why don't we walk through each of the value buckets

OLIVER - CROSS / RICHMAN

1    that AG did identify and attempt to value.

2        The first one is platform technology.  Do you see that

3    on -- on Slide 2?

4                        (Exhibit published.)

5        **THE WITNESS:**  I do, yes.

6    **BY MS. RICHMAN:**

7    **Q.**  Can -- can you explain to the Court what AG means by

8    platform technology here?

9    **A.**  Sure.  So AG's definition of platform technology is common

10   technology infrastructure that both consumers and merchants,

11   in this case, developers, can use to expand the capabilities

12   that developers can offer, and that in certain cases actually

13   create specific demand for the goods and services being sold

14   by those merchants or developers.

15   **Q.**  Do you have a understanding as to why AG focused on these

16   three examples of platform technology on -- on Slide 2?

17   **A.**  Yes.  We wanted them to take as broad a view of market

18   comparables as possible, again in -- with the goal of

19   providing as much justification about how our fee that we were

20   approaching would be considered reasonable.

21   **Q.**  And does -- is this an exhaustive list of all the possible

22   benchmarks for platform technology?

23   **A.**  These were three that they found and were able to

24   specifically value.  They note a couple of other examples

25   including cloud services that they were not able to

OLIVER - CROSS / RICHMAN

1    independently value in this way.

2    Q.  And Mr. Even asked you about operating systems, macOS,

3    Microsoft.  Did you consider those as potential benchmarks for

4    valuing platform technology?

5    A.  Those were considered, but they were largely captured in

6    other areas of the report.

7    Q.  Okay.  What does AG conclude about the value of platform

8    technology on this slide?

9    A.  They conclude that there is a significant value in

10   platform technology though it often overlaps with the business

11   models of the other value buckets and that that can range

12   anywhere from .3 percent to 6 percent of -- for platform

13   technology with no demand generation, in between 5 and

14   20 percent for those with demand generation.

15   Q.  What do you mean by no demand generation and demand

16   generation?

17   A.  Sure.  So one key element from AG's work was clarifying

18   that they believe there was different value if the common

19   infrastructure served to bring in customers for merchants.

20       So part of the reason, a key reason why developers began

21   purchasing iPhone were the capabilities that were completely

22   independent of the App Store and third-party developers.  In

23   fact, those didn't exist when we launched the iPhone.

24       It was things like the camera and access to Safari and

25   other first-party technologies that drove initial demand for

OLIVER - CROSS / RICHMAN

1    the iPhone.  And so they wanted to acknowledge that there was

2    value associated with that demand generation.

3    **Q.**  Is there a relationship between the estimated value to

4    developers of platform technology and whether or not the

5    platform generates demand or not?

6    **A.**  Yeah.  Based on AG's findings, they saw an increase in the

7    amount paid by developers for platform technology where there

8    was demand generation.

9    **Q.**  Now, I think you said that the -- the range here was

10   between .3 and 20 percent; is that correct?

11   **A.**  That's correct, yes.

12   **Q.**  The first -- the first row, game consoles, includes a

13   percentage of revenues of 30 percent; is that right?

14   **A.**  That's correct, yes.

15   **Q.**  And why did you not include that in the range you

16   provided?

17   **A.**  Well, as I referenced earlier, that 30 percent is unique

18   in that it is something that cuts across every other value

19   bucket.  And so just in terms of refining the range relative

20   to just the elements of platform technology, I left it out.

21   **Q.**  That range, .3 to 20 percent, it's a very broad range.

22   How -- what is that informative of, if anything?

23   **A.**  It's informative of the fact that there is a variety of

24   different ways that platform technology providers can approach

25   the services that they offer, and there's a big disparity in

OLIVER - CROSS / RICHMAN

1    that -- in that potential value to developers.

2    Q.  And how did you use that range to gauge the value of the

3    platform technology that Apple provides to developers?

4    A.  This is just one of multiple data points -- data points

5    that we considered when trying to evaluate a reasonable

6    commission rate for the linkout entitlement.

7    Q.  Okay.  Could you please turn to the next slide, Slide 3.

8                    (Exhibit published.)

9              THE WITNESS:  Yes.

10   BY MS. RICHMAN:

11   Q.  Which is 15.4.

12             THE COURT:  Can you give me an example of a developer

13   for whom the .3 applies versus 20?

14             THE WITNESS:  So -- so the .3 example is from Shopify

15   and Adobe Commerce, and so those are examples where there was

16   no demand generation.  So there is a variety of tools and

17   technologies provided to developers as part of this platform

18   technology.  In this case, those are e-commerce capabilities

19   that allow them to build and operate specific e-commerce

20   stores.

21      However, they are not actually bringing in customers to

22   those websites.  That's not part of what a developer is paying

23   for when they're paying for Shopify or Adobe Commerce.  So

24   they will independently pay for that demand generation from

25   other -- from other sources.

OLIVER - CROSS / RICHMAN

1           THE COURT:  20 percent?

2           THE WITNESS:  So 20 percent in this case comes from

3    physical retail environments where actually the creation of a

4    high-end mall, for example, with a number of attractions like

5    a movie theater and -- and, you know, and nice facilities,

6    actually attracts users to that shared environment as a

7    meeting place and as a place to -- to buy goods.  And that

8    attracts, that makes it more compelling for merchants to be a

9    part of that environment because there's demand generation

10   that the foot traffic provides.

11          THE COURT:  So why not treat them differently?

12          THE WITNESS:  Why not treat what differently?

13          THE COURT:  Well, you don't charge a different

14   commission.

15          THE WITNESS:  So the comparison for us with the

16   platform technology provided by Apple would be the iPhone and

17   the operating system.

18       As I discussed previously, we -- we believe and the

19   evidence is that customers come to Apple's phone and

20   technology because of a variety of the offerings that we

21   provide in addition to the value that third parties provide

22   that are distributed through the store.

23       And so we would -- we believe that there is demand

24   generation as part of the offering that Apple provides to

25   users.  So that would put us at a higher end of this range.

OLIVER - CROSS / RICHMAN

1          THE COURT:  Proceed.

2          MS. RICHMAN:  Thank you.

3   Q.  Mr. Oliver, just one quick question back on platform

4   technology.  Did you agree with AG that shopping malls and

5   airports were relevant benchmarks?

6   A.  Again, we asked them to take a very wide view of potential

7   benchmarks, recognizing that some of these were further afield

8   to kind of Apple's core offering.

9   Q.  Okay.  Thank you.

10         Can we please turn to the next slide.

11         Unless, Your Honor, we're at time.  I don't know if --

12         THE COURT:  If you're going to shift, I think we

13  probably should.  All right.

14         We'll stand in recess until 1:00 o'clock tomorrow.  I've

15  got my MDL in the morning and I'll deal with you all in the

16  afternoon.

17         MS. RICHMAN:  Your Honor, may I make one request?

18  Mr. Oliver, of course, is admonished not to talk to counsel

19  while he's under oath.  May we speak with him about

20  identifying the folders that you asked us to produce so that

21  we can expeditiously provide them to Epic and to Your Honor?

22         THE COURT:  You may.  Thank you for asking.

23         MS. RICHMAN:  Thank you.

24         THE COURT:  All right.  We'll see you tomorrow.

25         THE CLERK:  Court is in recess.

UNITED STATES DISTRICT COURT

**ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 4** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 562 - 710 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, May 17, 2024 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                   BY:  GARY A. BORNSTEIN,
                        M. BRENT BYARS,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        BENJAMIN WYLLY,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
1                    A P P E A R A N C E S (CONT'D.)

2


3    For Defendant:           Weil, Gotshal & Manges LLP
                              2001 M Street NW, Suite 600
4                             Washington, D.C.  20036
                        BY:  MARK A. PERRY,
5                            JOSHUA M. WESNESKI, ATTORNEYS AT LAW

6                             Weil Gotshal & Manges LLP
                              1395 Brickell Avenue, Suite 1200
7                             Miami, Florida  33131
                        BY:  MARK PINKERT, ATTORNEY AT LAW
8

9                             Gibson, Dunn & Crutcher LLP
                              333 South Grand Avenue
10                            Los Angeles, California  90071
                        BY:  RICHARD J. DOREN,
11                           JASON C. LO, ATTORNEYS AT LAW

12


13                            Gibson, Dunn & Crutcher LLP
                              1050 Connecticut Avenue, N.W.
14                            Washington, DC  20036-5306
                        BY:  HARRY PHILLIPS,
15                           CYNTHIA E. RICHMAN, ATTORNEY AT LAW

16

17

18

19

20                                --oOo--

21

22

23

24

25
```

```
1                          I N D E X

2

3

4       FRIDAY, MAY 17, 2024 - VOLUME 4

5
        PLAINTIFF'S WITNESSES                    PAGE    VOL.
6

7       OLIVER, CARSON

8       CROSS-EXAMINATION (CONTINUED) BY MS. RICHMAN  571     4

9       REDIRECT EXAMINATION BY MR. EVEN          625     4

10      RECROSS-EXAMINATION BY MS. RICHMAN        659     4

11

12      SCHILLER, PHILIP

13      (SWORN)                                   670     4

14      DIRECT EXAMINATION BY MR. BORNSTEIN       670     4

15

16

17                       E X H I B I T S

18
        PLAINTIFF'S EXHIBITS    W/DRAWN    IDEN    EVID    VOL.
19

20      CX-54                                     636     4

21

22

23                          --o0o--

24

25
```

OLIVER - CROSS (Continued)/ RICHMAN

```
 1              THE COURT:  Okay.  All right.  Let's get started.
 2          MR. PERRY:  Thank you, Your Honor.
 3              THE COURT:  Do we have a witness?
 4                    (Pause in the proceedings.)
 5
 6                         CARSON OLIVER,
 7     called as a witness by the plaintiff, having been previously
 8     duly sworn, testified as follows:
 9              THE COURT:  Mr. Oliver, good afternoon.
10          THE WITNESS:  Good afternoon.
11              THE COURT:  I'll remind you, sir, you're still under
12     oath.  Do you understand that?
13          THE WITNESS:  I do.  Thank you.
14              THE COURT:  All right.  You may proceed, Ms. Richman.
15          MS. RICHMAN:  Thank you, Your Honor.
16                    CROSS-EXAMINATION (Continued)
17     BY MS. RICHMAN:
18     Q.  Good afternoon, Mr. Oliver.
19     A.  Good afternoon.
20     Q.  When we left off yesterday, we were talking about the
21     analysis that AG performed for -- at your direction.  Do you
22     remember that?
23     A.  I do, yes.
24     Q.  And we were talking about the different value buckets that
25     AG identified.  Do you recall?
```

OLIVER - CROSS (Continued)/ RICHMAN

1    A.  I do.

2    Q.  We had just talked about the platform technology bucket,

3    and I just want to return to that briefly before we move on.

4         First, would developers who sell digital goods and

5    services through the entitlement link use Apple's platform

6    technology?

7    A.  Yes.

8    Q.  And how would they do that?

9    A.  Developers who sell through the entitlement link would

10   continue to use Apple's platform technology, including the

11   operating system and the hardware technology as part of their

12   delivery of the app and the continued use of the app on those

13   devices.

14   Q.  And so is that a one-time service provided by Apple or an

15   ongoing service?

16   A.  It's an ongoing service.

17   Q.  Okay.  Can you please turn to the short AG deck in your

18   binder that is tab 2, Slide 3.

19                      (Exhibit published.)

20            THE WITNESS:  Yes.

21   BY MS. RICHMAN:

22   Q.  Okay.  What does this slide reflect?

23   A.  This slide reflects a summary of the developer tools and

24   services analysis that AG performed.

25   Q.  And what are some examples of developer tools and services

OLIVER - CROSS (Continued)/ RICHMAN

1    that Apple provides to developers?

2    **A.**  They provide everything from an integrated development

3    environment and programming languages which help developers to

4    build their apps for Apple's devices.

5        They also provide a variety of frameworks and API's which

6    are used by developers to interoperate with Apple's devices.

7        And then they also provide things like testing and

8    analytics that help developers to optimize the performance of

9    their apps for users.

10   **Q.**  Would developers who implement the link entitlement

11   continue to use Apple's developers' tools and services?

12   **A.**  Yes, they would.

13           **THE COURT:**  Do you have any evidence that the top 200

14   that are generating -- the top 200 developers that are

15   generating the income actually use these tools?

16           **THE WITNESS:**  Yes, we do.

17           **THE COURT:**  Okay.  Where is that data?

18           **THE WITNESS:**  There is some data that is in the long

19   form report that looks at a summary of the use of the tools

20   and technologies.

21           **THE COURT:**  What page?

22           **THE WITNESS:**  Let's see.

23                   (Reviewing document.)

24   BY MS. RICHMAN:

25   **Q.**  Is that on page 59, Mr. Oliver, 58 and 59?

OLIVER - CROSS (Continued)/ RICHMAN

1    **A.**   Hold on a second.

2    **Q.**   Slide number 57 and 58, I should say.

3    **A.**   Fifty-seven and 58.

4                         (Exhibit published.)

5           **THE WITNESS:**  Give me one second.

6      I was thinking of Slide 14.

7    **BY MS. RICHMAN:**

8    **Q.**   Okay.

9           **THE COURT:**  So CX-14-14?

10          **THE WITNESS:**  I'm sorry.  CX-14.15.

11     But 14. -- 14 also includes kind of an overview of all the

12   tools that are relevant from Apple and then comparable

13   services.

14     And then what the AG did as part of their analysis was

15   estimate, based on information from experts at Apple, the

16   typical data use of tools and services.

17     So they split it out into three buckets, including basic

18   or common tools.  Those are things like the use of X code

19   which is used to help build apps.  And then also looks at

20   advanced and specialized features likes ARKit and CoreML, and

21   then testing and analytics features including TestFlight and

22   App Analytics.

23   **BY MS. RICHMAN:**

24   **Q.**   And, Mr. Oliver, if you could turn to the backup

25   Slides 57, 58, 59, and 60, are those -- contain additional

1   as developers who are selling digital goods and services as

2   those who do not sell digital goods and services.

3              **THE COURT:**  What is that assumption based on?

4              **THE WITNESS:**  It's based on our knowledge of the

5   ecosystem.

6              **THE COURT:**  So the answer to my question is no,

7   there's no slide that gives me that information.

8              **THE WITNESS:**  Not specifically.

9              **THE COURT:**  Keep going.

10             **MS. RICHMAN:**  Thank you, Your Honor.

11  **Q.**  Mr. Oliver, can you explain what's encompassed in Apple's

12  discovery services?

13  **A.**  Yes.  Discovery services incorporate a number of different

14  things.  They incorporate --

15             **THE COURT:**  Which slide are we on?

16             **MS. RICHMAN:**  Can we turn to Slide 15.6, please.

17                     (Exhibit published.)

18             **THE WITNESS:**  Yes, so they incorporate the app page

19  or product page which is effectively the home page of an app

20  on the App Store, and all the associated services like ratings

21  and reviews that are available to customers on that product

22  page.

23       There is also the curation and personalization that Apple

24  provides through the App Store largely through its browse tabs

25  including the today tabs, apps tab, and games tab.  In

OLIVER - CROSS (Continued)/ RICHMAN

1      addition to that, includes the optimization and measurement

2      tools that are provided to developers to help them optimize

3      their discovery.

4          And then even beyond the App Store, there are additional

5      discovery tools provided in the OS, things like Spotlight

6      search.

7                  THE COURT:  Do you understand there was substantial

8      amount of testimony that said that Apple -- that indicated --

9      suggested that Apple because, of the lack of competition, was

10     favoring its own apps over those of third parties?

11                 THE WITNESS:  I'm aware of that.

12                 THE COURT:  So how is that helpful at all to these

13     other apps, to these other developers?

14                 THE WITNESS:  The evidence that we have is that there

15     is a significant amount of discovery value that is provided to

16     third parties.

17                 THE COURT:  What evidence and where is it?

18                 THE WITNESS:  So if we want to go into the appendix

19     for discovery, I think that would help to -- on the long deck.

20                 THE COURT:  Since the trial, what steps has Apple

21     taken to increase discovery of third-party apps over their own

22     given the problems that were disclosed?

23                 THE WITNESS:  We have made a number of different

24     investments for discovery on the App Store since the trial.

25          A -- a few to call out, we've continued to improve our

OLIVER - CROSS (Continued)/ RICHMAN

1    search results by updating the algorithm with more signals to

2    make it more efficient in terms of helping users to discover

3    the apps and games that they want.

4        We've continued to update the browse tabs of the App Store

5    with additional personalization.  And we've continued to

6    provide more tools for developers like custom product pages

7    and product page optimization which allows them to better

8    understand and optimize their browse and discovery performance

9    on the App Store.

10            THE COURT:  But because you've not done any survey of

11    any of the developers, there's no evidence then it's been

12    successful in any way.

13            THE WITNESS:  We have quantitative evidence that

14    those -- all the things that I just listed have continued to

15    improve the browse performance on the store in terms of

16    driving better conversion for developers when customers find

17    their apps on the store and then also continue to drive more

18    overall actions and downloads from the store.

19            THE COURT:  And where is that evidence?

20            THE WITNESS:  It's not in this binder.

21            THE COURT:  Yeah.  Okay.

22    BY MS. RICHMAN:

23    Q.   Mr. Oliver, would developers who implement the link

24    entitlement to make transactions continue to benefit from

25    Apple's discovery services?

OLIVER - CROSS (Continued)/ RICHMAN

1    A.   Yes, they would.

2    Q.   How -- how would they do so?

3    A.   We actually see that the majority of actions that are

4    taken on the App Store are not for initial downloads.  They're

5    actually for ongoing reengagement and engagement with apps

6    that a user may have downloaded previously but uninstalled or

7    actions that allow them to open up and rediscover content or

8    features that are in apps that they already have on their

9    device.

10   Q.   Do large developers who are well-known benefit from

11   Apple's discovery services?

12   A.   Yes, they do.

13   Q.   And how?

14   A.   They are provided with the features and functionality that

15   I just talked about, including a significant amount of

16   exposure to customers through the browse tabs, which benefits

17   from both personalization as well as the developer tools and

18   services that help to optimize that discovery.

19   Q.   Okay.  Switch gears a bit.

20        Could you please turn to Slide 15.7.  That's tab 2.

21   A.   Yes.

22   Q.   Did you ask AG to undertake benchmarking analysis of

23   comparable market places?

24   A.   We did, yes.

25   Q.   And why did you ask them to do that in addition to the

OLIVER - CROSS (Continued)/ RICHMAN

1    valuation analysis?

2    **A.**  We wanted to take multiple approaches to understanding the

3    value provided to developers.  So the first section really

4    looks at a bottoms-up approach by valuing each subcomponent of

5    value that Apple provides.

6         And this approach helped us to triangulate with what other

7    marketplaces, and obviously there are some that are closer

8    comparables like Google Play, but also for those that are

9    further afield like other digital marketplaces.

10   **Q.**  And do you recall that Mr. Even asked you why you didn't

11   use effective commission rates in conducting the benchmarking

12   exercise?

13   **A.**  I do, yes.

14   **Q.**  Are effective commission rates of your competitors

15   something that's publicly available?

16   **A.**  No.

17   **Q.**  Okay.

18        Let's --

19             **THE COURT:**  -- important and relevant?

20             **THE WITNESS:**  Yes.

21             **MS. RICHMAN:**  If we could go to or -- go to -- stick

22   with 15.7 for a minute.

23                         (Exhibit published.)

24   **BY MS. RICHMAN:**

25   **Q.**  And if you look at the third main bullet on the slide, so,

OLIVER - CROSS (Continued)/ RICHMAN

1    like, at the bottom.

2    **A.**   Yes.

3    **Q.**   Starts with "Some platforms."  Do you see that?

4    **A.**   I do.

5    **Q.**   And what is being conveyed there?

6    **A.**   One of the things that we asked the Analysis Group to look

7    into is to whether any of these other marketplaces had allowed

8    for developers to use their own payments and commerce services

9    versus their own.  And we found a few examples -- or Analysis

10   Group found a few examples.  And they estimated the value of

11   those options based on a share of customer -- of developer

12   revenue.

13   **Q.**   And can you please flip to 15.10, CX-15.10.

14   **A.**   Yes.

15   **Q.**   And what does this slide show?

16   **A.**   This slide shows five examples that Analysis Group found

17   that offer both their own payment processing and commerce

18   services to merchants as well as those that offer a direct

19   option.

20   **Q.**   And why was this information relevant to the work that you

21   asked AG to perform?

22   **A.**   It was relevant as a data point in understanding for

23   developers that would use a linkout with the entitlement, what

24   the market rate for those similar services would be,

25   independent of payment processing and commerce.

OLIVER - CROSS (Continued)/ RICHMAN

1   Q.  And do you remember when Mr. Even asked you why services

2   like Stripe and PayPal were omitted from this slide?

3   A.  Yes.

4   Q.  And what's the reason for that?

5   A.  The reason is because we were looking at examples of

6   marketplaces that offer this option and what the pricing they

7   used around that option was.

8   Q.  Okay.  And what did AG find about the fee structures of

9   these platforms?

10  A.  Sorry.  Are we talking about the --

11  Q.  I'm sorry.  Going back to the -- on Slide 15.10.

12  A.  They found that the fee structures were between one and

13  four percent of developer revenue.

14  Q.  Okay.  Let's go to 15.11, next slide.

15  A.  Yes.

16                  (Exhibit published.)

17  BY MS. RICHMAN:

18  Q.  Does this slide address the third goal of AG's study that

19  we discussed yesterday, the economic framework for entitlement

20  transactions?

21  A.  It does, yes.

22  Q.  And do you see the first bullet there, how to charge a

23  commission or fee for a purchase that happens after the user

24  clicks out of the app?

25  A.  I do.

OLIVER - CROSS (Continued)/ RICHMAN

1    Q.  How does that relate to AG's analysis here?

2    A.  What we asked AG to look into was how other comparable

3    industries and groups had solved for a similar -- a problem

4    that we were looking to solve for with a linkout entitlement,

5    which was to provide a reasonable way to associate a link from

6    one source to a reasonable fee structure associated with that

7    referral.

8    Q.  Did AG identify any benchmarks for out-of-app

9    transactions?

10   A.  They did, yes.

11   Q.  And what are those?

12   A.  They found affiliate programs and ad campaigns run by

13   developers use -- were useful comparables.

14   Q.  Can you please explain what an affiliate program is?

15   A.  Sure.  An affiliate program is a program that a service

16   provider or marketplace would use to encourage marketing

17   partners, often called affiliate partners, to bring traffic or

18   purchases back to those service providers.

19   Q.  And why was that a relevant benchmark for Apple's

20   entitlement program?

21   A.  Because affiliate programs were also dealing with the fact

22   that they had to find a reasonable way to compensate their

23   marketing partners for driving discovery of the services back

24   to the service provider.

25   Q.  Could you provide the Court with an example of an

OLIVER - CROSS (Continued)/ RICHMAN

1    affiliate program?

2    **A.**  Sure.  One example might be a newspaper service that sells

3    a subscription for a physical and digital newspaper.  They

4    might allow blogs or other affiliate partners to basically

5    link to a subscription page for that -- for that newspaper.

6    And then any purchase that happens within a period of time

7    from that affiliate partner would be -- would be paid back --

8    there would be a fee paid back to the affiliate partner.

9    **Q.**  If you look down to the third bullet, tracking windows is

10   bolded.  Do you see that?

11   **A.**  I do, yes.

12   **Q.**  It says tracking windows or cookie durations determine the

13   time period within which affiliates can earn a commission.

14   Correct?  Do you see that?

15   **A.**  I do, yes.

16   **Q.**  And can you explain what a tracking window is in this

17   context?

18   **A.**  Sure.  So a tracking window is the period of time from the

19   moment a user clicks on an affiliate link that a -- any

20   subsequent purchase would be paid a fee to the affiliate

21   partner.

22   **Q.**  And why do affiliate programs have a tracking window?

23   **A.**  Because the affiliate partner needs to know when the

24   action or discovery that they provided to a customer can be

25   tied back to that service that they provided.

OLIVER - CROSS (Continued)/ RICHMAN

1    Q.   The second benchmark you mentioned was developer ad

2    campaigns; is that right?

3    A.   That's correct.

4    Q.   And what are those?

5    A.   An ad campaign is most commonly when a developer pays for

6    an ad and an install occurs based on that ad.

7    Q.   And do ad campaigns also rely on tracking windows?

8    A.   They do, yes.

9    Q.   Okay.

10        Let's look at the next slide, CX-15.12.

11                    (Exhibit published.)

12            THE WITNESS:  Yes.

13   BY MS. RICHMAN:

14   Q.   Are you there?

15   A.   Yes.

16   Q.   What does this slide show?

17   A.   This slide shows comparables that Analysis Group found of

18   first-party affiliate programs.

19   Q.   And what's a first-party affiliate program?

20   A.   A first-party affiliate program is when the service

21   provider themselves are operating an affiliate program, so

22   like the newspaper that we talked about earlier.

23   Q.   And what did AG find about the tracking window for

24   first-party affiliate programs?

25   A.   They found that the tracking window for first-party

OLIVER - CROSS (Continued)/ RICHMAN

1    you're charging 27 percent, right?

2              **THE WITNESS:**  For the first seven days.

3              **THE COURT:**  Okay.  So where is the delta between the

4    27 percent and the 12.3 percent?  How did you justify the

5    other 15 percent that you're charging them?  Where is that?

6              **THE WITNESS:**  So there are a variety of different

7    factors.  Some of them are included in the notes here that

8    guide us within the range that is provided here.

9        I would argue that the 5, 4, and 3 percent numbers that

10   you're referencing are not reflective of some key unique

11   attributes to Apple's ecosystem and tools and technologies.

12   Our focus on user trust and privacy and those elements are not

13   valued in the comparables, as AG notes here.

14   **BY MS. RICHMAN:**

15   **Q.**  Mr. Oliver, under the category of platform technology,

16   there are a couple of ranges there.  Do you see that?

17   **A.**  I do, yes.

18   **Q.**  And one is 5 to 20 percent?

19   **A.**  Yes.

20   **Q.**  And the other is .3 to 6 percent?

21   **A.**  That's correct.

22   **Q.**  And what do those different ranges reflect?

23   **A.**  As we discussed yesterday, that reflects the different

24   ranges for platform technology with and without demand

25   generation.

OLIVER - CROSS (Continued)/ RICHMAN

1    **Q.**  And does the App Store provide demand generation?

2    **A.**  I would clarify it's not the App Store but Apple's

3    platform technology provides demand generation, yes.

4    **Q.**  So is .3 the correct lower bound to incorporate into the

5    calculation?  Or is it 5 percent?

6    **A.**  No.  We thought the -- the appropriate range was 5 to

7    20 percent when we were looking at this.

8    **Q.**  Okay.  Thank you.

9         And if you add up 5 percent plus 3 percent plus 4 percent

10   plus 5 percent, what does that equal?

11   **A.**  That's 17 percent.

12   **Q.**  Where else --

13           **THE COURT:**  You're charging 27.

14           **THE WITNESS:**  Yes, Your Honor.

15           **THE COURT:**  Yeah, so you're still charging an extra

16   third.

17           **THE WITNESS:**  I would argue that the effective rate

18   is 18 percent.

19           **THE COURT:**  Well, that's a big assumption.  The

20   actual price that they're paying on every sale within a

21   seven-day period is 27 percent.  Right?

22           **THE WITNESS:**  That's correct.

23           **THE COURT:**  And your assumptions are just that,

24   they're assumptions.  There's actually no data for it.

25           **THE WITNESS:**  That's not true.

                    OLIVER - CROSS (Continued)/ RICHMAN

1     BY MS. RICHMAN:

2     Q.   Why don't we jump to that.

3          Can you please go to Slide 9.12.

4     A.   Yes.

5     Q.   And what does this slide reflect, Mr. Oliver?

6     A.   This slide reflects the view of the effective commission

7     rate for different commissions and time durations.

8     Q.   And how did the effective commission rate analysis inform

9     your recommendation of a 27 percent commission rate during a

10    seven-day window?

11            THE COURT:  I can't see that number.  I need the

12    CX number.

13            MS. RICHMAN:  CX-9.12, Your Honor.

14            THE COURT:  Thank you.

15            THE WITNESS:  Can you repeat the question?

16    BY MS. RICHMAN:

17    Q.   Yes.

18         I asked how, if at all, did the effective commission rate

19    analysis affect your selection and your recommendation of the

20    27 percent commission rate over a seven-day window?

21    A.   So based on our analysis using internal data and other

22    sources, we thought we had a good view of the amount of

23    transactions that would flow through the linkout entitlements

24    and would be subject to a commission relative to all billings

25    that were -- or a customer spend that was flowing from the

OLIVER - CROSS (Continued)/ RICHMAN

1    linkout entitlement, and we were able to calculate an

2    effective rate which gave us a sense of what developers would

3    actually be paying in commission to Apple.

4        THE COURT:  So why not do 24 hours or 72 hours?  Why

5    extend it to seven days?

6        THE WITNESS:  That's a great question.  We looked at

7    actually all of the time windows shown here, and we had a few

8    different data points that guided us to seven days.

9        We thought that, one, there was a big jump up in terms of

10   the amount of customer spend subject to the commission after

11   seven days.  So we wanted -- we knew that we wanted to guide

12   below seven days.

13       And then we also saw that there -- or we believe that

14   there was a reasonable risk of developer fraud and abuse below

15   seven days which --

16       THE COURT:  What was the data for that?

17       THE WITNESS:  That data was based on our internal

18   expertise.

19       THE COURT:  Okay.  Any documents in front of me to

20   support that?

21       THE WITNESS:  No.

22   BY MS. RICHMAN:

23   Q.  Mr. Oliver, can you please turn to CX-9.13.

24   A.  Yes.

25   Q.  And do you see the small font at the bottom of this page?

OLIVER - CROSS (Continued)/ RICHMAN

1    **A.**  I do, yes.

2    **Q.**  Are these the assumptions that underlie the effective

3    commission rate analysis?

4    **A.**  Yes, they are.

5    **Q.**  Okay.  And what was your role in coming up with the

6    assumptions?

7    **A.**  My role in coming up with the assumptions was to help

8    guide the analysis using internal and public data sources to

9    help understand how we could come up with the most reasonable

10   and conservative assumptions.

11   **Q.**  What kind of data did you use to ground these assumptions?

12   **A.**  A variety of different -- we have public and internal data

13   points that were available to us.

14   **Q.**  Let's start with the -- the first one on the right.

15   Please don't say the number out loud.  But it's for the

16   percentage of billings entitlement implementation.

17        Do you see that?

18   **A.**  I do, yes.

19   **Q.**  Can you describe the analysis you undertook to arrive at

20   this assumption?

21   **A.**  Yes.  There were a couple of key data points that guided

22   us here.  The first one was a review that the team had done of

23   the number of top games that had leveraged web stores or

24   direct-to-consumer payments and commerce capabilities over a

25   recent time period.

OLIVER - CROSS (Continued)/ RICHMAN

1    And that helped and we found that that number was very

2    much in line with the number that is shown here, which gave us

3    confidence that many of the largest developers had the

4    capabilities already existing to take advantage of these

5    new -- these new options under the link entitlement.

6         THE COURT:  Do I have that data?

7         THE WITNESS:  I think it is being --

8         THE COURT:  Produced?

9         THE WITNESS:  -- produced.

10        MS. RICHMAN:  If not, Your Honor, we'll make sure it

11   is.

12        THE COURT:  Let me be clear.  If I don't have the

13   data, I'm not considering it.

14        MS. RICHMAN:  Understood, Your Honor.

15        THE WITNESS:  The second thing that we considered was

16   the -- we looked at a variety of different features that had

17   been launched for developers to understand what a steady state

18   adoption might be from a percentage of billings perspective.

19   And so some of those were existing case studies.  And in

20   other places, we used kind of data boards and data tools

21   available to us to understand the ramp-up.  And that --

22   those -- those data points also were in line with the numbers

23   shown here.

24   BY MS. RICHMAN:

25   Q.  And do you remember when Mr. Even was asking you about the

OLIVER - CROSS (Continued)/ RICHMAN

1    has a meaningful overlap with tenured subscriptions.  And that

2    means that the participants in the video partner program and

3    news partner program often have great retention.  And so they

4    have a significant percentage of their customer base that is

5    already at the reduced commission due to the fact that they

6    are year two subscribers or beyond.

7    Q.  Do you recall the questions that you were asked yesterday

8    about the interaction between auto renewing subscriptions and

9    link entitlement?

10   A.  I believe so, but you might need to remind me.

11   Q.  Sure thing.

12        Do you recall that Mr. Even characterized the commission

13   on auto-renewing subscriptions as lasting in perpetuity?

14   A.  Yes.

15   Q.  And do you agree with that characterization?

16   A.  I don't, no.

17   Q.  And can you explain why not?

18   A.  There are a few different reasons.  The first is that any

19   customer action including an unsubscribe to a subscription,

20   what we call churn, a price change or a -- an action like a

21   plan change would actually stop the commissioning of a

22   auto-renewing subscription.

23        And specifically for churn, we know that a meaningful

24   percentage of customers churn out after only a few months.

25   Q.  Okay.  Thank you, Mr. Oliver.

OLIVER - CROSS (Continued)/ RICHMAN

1        On -- could you just go to Slide 9.12 again.  Sorry to be

2   doing jumping with you.

3   A.   Yes.

4                        (Exhibit published.)

5   BY MS. RICHMAN:

6   Q.   Can you explain how the commission rate range reflected

7   here was determined?

8   A.   Yes.  So when we looked at the bottoms-up analysis that we

9   discussed earlier provided by AG, as well as the subjective

10  factors that we believe guided us within that range, that got

11  us comfortable being above 20 percent in the range.

12       Though we -- we obviously knew that there were market

13  comparables from other stores and marketplaces that were

14  relevant to us which cap the range at 30 percent.

15  Q.   And then on the time duration column, from current session

16  to 30 days, did you select that range for consideration by the

17  price committee?

18  A.   Yes, we did.

19  Q.   And how was that determined?

20  A.   Again, we relied heavily on the AG's data for that.  Their

21  comparables, both for affiliate programs and for advertising,

22  showed that a reasonable range could be between 24 hours and

23  90 days.  And so we actually took a -- a reduction in the top

24  end of that range to 30 days.

25  Q.   And can you explain for the Court why you recommended --

OLIVER - CROSS (Continued)/ RICHMAN

1    ultimately recommended that the link entitlement bear a

2    commission rate of 27 percent over a seven-day time period?

3    **A.**   Yes.  So we looked at a variety of different factors to

4    help triangulate here.  Looking both at kind of what the

5    services provided that were unique to Apple which guided us to

6    the higher end of the commission range, things like the trust

7    and safety, the privacy elements, the things that were not

8    available in any of the other commission comparables that we

9    looked at.

10       And then we looked at kind of what the effective rate

11   would be based on our knowledge of customer spend that was

12   happening within the app.

13       And that gave us confidence that developers would have an

14   opportunity to capture significant amount of value from the

15   out-of-app transactions occurring after the seven-day window.

16   **Q.**   And what does the effective commission rate tell you about

17   whether linking out is a viable option for developers?

18   **A.**   This gave us certainty or confidence that the commission

19   rate that developers were going to be paying to Apple was a

20   significant reduction from the commission rate that they would

21   be paying for in-app transactions.  And that gave us

22   confidence that they would have the ability to take advantage

23   of those capabilities.

24   **Q.**   And what is your understanding as to whether Apple's

25   charging a fee on off-app transactions makes the transactions

OLIVER - CROSS (Continued)/ RICHMAN

```
 1    more expensive for developers?

 2    A.   My view is it makes it cheaper for developers.

 3    Q.   And can you explain why?

 4    A.   Previously any customer that was in the app would have

 5    been required to transact within the app to -- to buy a

 6    digital good and service.  A digital good and service.

 7         In this new scenario, customers are starting within an app

 8    but are being guided to purchase outside of an app.  And so

 9    because we are only charging for the first seven days, that

10    allows developers to capture significant amount of value with

11    no commission paid to Apple after those first seven days.

12         And we believe that that significantly reduced the

13    commission that they would be paying versus the in-app

14    transactions that would normally be commissioned at the

15    standard rate.

16              MS. RICHMAN:  Thank you, Mr. Oliver.

17         Pass the witness.

18              THE COURT:  Mr. Even.

19                   (Pause in the proceedings.)

20              THE COURT:  You know, why don't we go ahead and --

21    since -- so that we don't break up your flow, why don't we go

22    ahead and take our break.

23         We'll stand in recess for 15 minutes.

24              THE CLERK:  Court is in recess.

25         (Recess taken at 2:21 P.M.; proceedings resumed at
```

OLIVER – REDIRECT / EVEN

1    2:37 P.M.)

2            THE COURT:  You may be seated.

3        We're back on the record.  The record will reflect that

4    all the parties are present.

5        Mr. Even, you may proceed.

6            MR. EVEN:  Thank you, Your Honor.

7        May we approach and provide one more exhibit to the

8    witness?

9            THE COURT:  You may.  Thank you.

10           MR. EVEN:  Thank you, Your Honor.

11                    REDIRECT EXAMINATION

12   BY MR. EVEN:

13   Q.  Good afternoon, Mr. Oliver.

14   A.  Good afternoon.

15   Q.  You covered a lot.  I will try and jump around as little

16   as I can, but I'm going to have to do some jumping so try and

17   bear with me, please.

18       And I see you have the additional document that we placed

19   before you.  You also have the binders before you.  Correct?

20   A.  I do, yes.

21   Q.  Okay.  So I actually want to start where you ended your

22   testimony, if I may.  And that is in your analysis of the

23   costs to Apple and the effective rate to developers.  Do you

24   remember that you discussed that with Ms. Richman?

25   A.  Yes.

OLIVER - REDIRECT / EVEN

1  Q.  Now, you agree with me that Apple's total cost of handling

2  payment services for in-app transactions is roughly 3 percent?

3  A.  I believe it's below 3 percent.

4  Q.  Okay.  It's close to 3 percent?

5  A.  I believe it's below 3 percent.  I don't know exactly the

6  cost.

7  Q.  Well, if you look at CX-54.38 that's before you.

8  A.  Thirty-eight.

9                      (Exhibit published.)

10  BY MR. EVEN:

11  Q.  And you see some numbers there that I can't repeat, but --

12  A.  Yes.

13  Q.  -- do you see that if I add card fee blended to total

14  support cost of all issues, I get to roughly 3 percent, almost

15  3 percent?

16  A.  (Reviewing document.)

17       So you're adding the card fee plus the support costs?

18  Q.  Correct.  That is about 3 percent?

19  A.  No.  It's below 3 percent.

20  Q.  It's just below.  Very close?

21  A.  Well, within 3 percent, it's a significant percentage

22  below that.

23  Q.  Okay.  Sir, I understand that I can't say the number.  Do

24  you understand that that number is within 5 percent of

25  3 percent?

OLIVER - REDIRECT / EVEN

1    **A.**  In absolute points or as a percentage relative to

2    3 percent?

3    **Q.**  Never mind.  The Court has the document.  The Court will

4    see the number.

5    **A.**  Yes.

6    **Q.**  Is it your testimony that Apple -- Apple's cost is far

7    below 3 percent?

8    **A.**  I didn't say far below.

9    **Q.**  Okay.

10   **A.**  It's below 3 percent.

11   **Q.**  All right.  So and you understand that roughly speaking,

12   for instance, in the Netherlands Apple said we're going to

13   charge 27 percent because the 3 percent delta reflects more or

14   less our cost of providing payment services; are you aware of

15   that?

16   **A.**  It was payment services plus a reasonable margin, if I

17   remember the approach.

18   **Q.**  Okay.  But you understand that that's what Apple said

19   about how it got to 27 percent in the Netherlands?

20   **A.**  It was -- it was the cost of payments, the support costs

21   and margin on top of that.

22   **Q.**  Okay.

23   **A.**  That's my recollection.

24   **Q.**  That's not what Apple told the world, right?  What Apple

25   told the world was we're reducing 3 percent to reflect the

OLIVER - REDIRECT / EVEN

```
 1        cost of payment services, correct?
 2   A.   I think that's the simplified version.  I think what we --
 3   Q.   Yes, sir, that's the simplified version.  I understand.
 4        Is that a yes, that's what Apple told the world at the
 5   time?
 6   A.   I don't remember what the specific public statement was.
 7   Q.   You understand that at 27 percent, Apple makes roughly the
 8   same money on a linked purchase within the seven days as it
 9   does on an IAP purchase, correct?
10   A.   Yes, roughly.
11   Q.   And you understand that for a developer, transactions
12   within the seven days are going to cost roughly the same or
13   more on linked transactions as compared to IAP, correct?
14   A.   Yes.
15   Q.   And the reduction in Apple's revenue and margins that you
16   calculated in the price committee deck come primarily from the
17   assumption that in fact many, many linked-out transactions
18   would occur outside of the seven-day window and therefore
19   would not be subject to any commission, right?
20   A.   Correct.
21   Q.   And that same assumption is also the driver behind the
22   18 percent effective commission calculated in the price
23   committee deck, correct?
24   A.   Correct.
25   Q.   So I want to understand the scenario that's envisioned
```

OLIVER - REDIRECT / EVEN

1    here.  I play *Boom Beach*.  Nobody knows.  It's a confession

2    here.  I play *Boom Beach* regularly.  You know the game?

3    A.  Yes.

4    Q.  Okay.  In *Boom Beach*, you understand that I can purchase a

5    diamond package to upgrade my base, my weapons, et cetera,

6    correct?

7    A.  Yes, that sounds right.

8    Q.  And if the developer Supercell adopted purchase links and

9    I found that link, I could do so -- I could purchase that by

10   clicking on the link and going to a web store, correct?

11   A.  Correct.

12   Q.  I would then spend those diamonds over time, correct?

13   A.  Correct.

14   Q.  Now, the next time I would actually need diamonds would

15   occur while I am playing *Boom Beach* again, correct?

16   A.  It depends, but, yes, usually.

17   Q.  I don't need the diamonds for *Boom Beach* anywhere outside

18   of *Boom Beach*, do I?

19   A.  I don't think so.

20   Q.  And in the scenario that you envision is that instead of

21   me going back to the link that took me to the store the first

22   time, I would get out of *Boom Beach*, open Safari, manually

23   type in www.supercell.com/BoomBeach, or whatever is the

24   relevant URL, and go to the store that way?

25   A.  Correct.  Or through other communication channels driven

OLIVER - REDIRECT / EVEN

1    by --

2    Q.    And --

3    A.    -- the developer.

4    Q.    And you think that roughly 50 percent of people would do

5    that.

6    A.    No.

7    Q.    I apologize.  You think roughly 50 percent of transactions

8    would be made that way.

9    A.    No.

10    Q.    Okay.  Let me try again.

11        Your assumption is that 50 percent of revenues are going

12    to come from people who followed the manual process I just

13    described or get to the store through some other way but not

14    by simply following the link within *Boom Beach*, correct?

15    A.    I -- I just want to clarify that --

16    Q.    Sir, it's a yes or no question.  That's your assumption,

17    that 50 percent of people would click again, the other

18    50 percent will not click, correct?

19    A.    The clarification is the 50 percent would click again only

20    of the percentage of customers that have already gone through

21    the linkout for the first time.

22    Q.    I understand.

23    A.    But it's --

24                    (Simultaneous colloquy.)

25                    THE COURT:    Hey.

SCHILLER - DIRECT / BORNSTEIN

1    about the timeline.

2        So there's a 27 percent standard fee for the external

3    purchase link which was approved by the price committee,

4    correct?

5    **A.**   Yes.

6    **Q.**   And that's you, Mr. Cook, and Mr. Maestri?

7    **A.**   Well, the price committee is the whole group of people

8    meeting, but we were the decision-makers in that committee.

9    **Q.**   Okay.  And so who else constitutes the price committee

10   besides the three of you?

11   **A.**   Well, it -- it -- it varies from product to product.

12   **Q.**   I apologize.  Who else constituted the price committee

13   beside the three of you for this matter?

14   **A.**   Well, in addition to the three of us, there were Kate

15   Adams, our legal -- chief legal counsel was there.

16   Mr. Federighi, Mr. Cue, Mr. Joswiak.  Let's see.  Ms. Grenier.

17   Let's see.

18       Those are the names that come to mind.  There were

19   approximately just under 20 people in that committee meeting.

20   Of course Mr. Roman and Mr. Oliver as well as you're heard

21   from.

22   **Q.**   Okay.

23   **A.**   And Mr. Fischer.

24   **Q.**   And all those people constitute the price committee, as

25   you understand?

SCHILLER - DIRECT / BORNSTEIN

1    **A.**  I always refer to the price committee as the full

2    committee even though there are a smaller subset making the

3    final approval.

4    **Q.**  All right.  Now you've -- you've been sitting here

5    throughout these proceedings, correct?

6    **A.**  Yes.

7    **Q.**  All right.  So you heard some differing testimony from

8    Mr. Roman and Mr. Oliver about when the last price committee

9    meeting happened.

10        Do you recall Mr. Roman said he woke up on the morning of

11   the 16th and finalized the deck and presented and explained

12   everything in an in-person meeting on that day.

13        And Mr. Oliver said, no, no, no, it was four or five days

14   earlier and what happened on the 16th was just an email

15   exchange.

16        Do you recall all that?

17   **A.**  Yes, I do.

18   **Q.**  Okay.  Can you set it straight, Mr. Schiller?  When was

19   the last price committee meeting in person?

20   **A.**  The in-person meeting was on January 11th.  The deck was

21   presented there and we discussed it.  We did not finalize it.

22   There was still open questions about what we would decide.

23   And the final decision was handled via an email on the 16th.

24   **Q.**  Okay.  So you met on January 11 with the understanding

25   that the decision from the Supreme Court was likely to be

SCHILLER - DIRECT / BORNSTEIN

1    coming soon, correct?

2    **A.**  I believe that was known, yes.

3    **Q.**  Okay.  And at the time that you met on January 11, you had

4    already had a tentative plan of record for what this pricing

5    structure would look like, correct?

6    **A.**  Well, we had had a number of elements --

7    **Q.**  Did you or did you not have a tentative plan of record as

8    of January 11 when the price committee met for the last time?

9    **A.**  I would call it a likely plan of record.  It wasn't a plan

10   of record.  It was likely.  We --

11   **Q.**  Right.

12   **A.**  We knew we might likely --

13   **Q.**  You had a likely plan of record.

14   **A.**  Yes.

15   **Q.**  Okay.  And the likely plan of record on January 11 was a

16   27 percent standard fee with a 12 percent program fee just

17   like you ultimately landed on, correct?

18   **A.**  Yes.

19   **Q.**  And the tentative plan of record on January 11 was a

20   seven-day tracking window, correct?

21   **A.**  Yes.

22   **Q.**  Just like you ultimately landed on?

23   **A.**  Correct.

24   **Q.**  And it was the tentative plan of record on January 11 that

25   apps in the news partner program and the video partner program

SCHILLER - DIRECT / BORNSTEIN

1    would not be eligible for participation in the purchase link

2    entitlement, correct?

3    **A.**    Correct.

4    **Q.**    Okay.  And that's where you ultimately landed as well?

5    **A.**    That was the final decision.

6    **Q.**    All right.  Now you've made very clear, including your

7    testimony just now, about working back -- starting work back

8    in 2021, that Apple has put a lot of time and effort into

9    responding to the Court's injunction, correct?

10   **A.**    We try to, yes.

11   **Q.**    There have been significant resources in the effort,

12   correct?

13   **A.**    I believe so.

14   **Q.**    And Apple has carefully analyzed how it intended to

15   proceed; is that right?

16   **A.**    Yes.

17   **Q.**    Okay.  And this effort, as you said, involved really the

18   most senior people at Apple, including yourself, including the

19   CEO, correct?

20   **A.**    As all our pricing committee processes do.

21   **Q.**    And this one did?

22   **A.**    Yes.

23   **Q.**    Okay.  And it involved legal advice, correct?  I don't

24   want to know the content, but you got legal advice, right?

25   **A.**    Yes, sir.

SCHILLER - DIRECT / BORNSTEIN

1    Q.  And you got legal advice from inside counsel and outside

2    counsel on this?

3    A.  I primarily dealt with inside counsel.  I'm sure there was

4    outside counsel involved for the process.

5    Q.  So there was a very thoroughly vetted plan, right?

6    A.  I'm not sure compared to what you're using that reference.

7    It's -- there was a lot of work and a lot of people involved

8    in it.

9    Q.  But, Mr. Schiller, it's fair to say that this got

10   extensive review and attention at the company, correct?

11   A.  Yes.

12   Q.  Every piece of this plan was thought through, it's

13   purposeful, it's deliberate, there's no accidents in here,

14   right?

15   A.  In the major elements we're talking about, there was a lot

16   of time and thought on, and we worked very hard to make them

17   accurate and correct.

18   Q.  So if the Court ultimately concludes that there are

19   aspects of this plan or the entirety of this plan that don't

20   comply with the injunction, that's because of some deliberate

21   choice that Apple made, not because of carelessness or

22   inattention to the process, right?

23   A.  We certainly worked deliberately on these items.  We

24   didn't set out to be deliberately doing anything that would be

25   in disagreement with the Court.

UNITED STATES DISTRICT COURT    *CERTIFIED COPY*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 5** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 711 - 903 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, May 22, 2024 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                   BY:  GARY A. BORNSTEIN,
                        ANISSA BADEA,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        BENJAMIN WYLLY,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:      Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                  A P P E A R A N C E S  (CONT'D.)

 2

 3    For Defendant:          Weil, Gotshal & Manges LLP
                              2001 M Street NW, Suite 600
 4                            Washington, D.C.  20036
                         BY:  MARK A. PERRY, ATTORNEY AT LAW
 5

 6                            Gibson, Dunn & Crutcher LLP
                              333 South Grand Avenue
 7                            Los Angeles, California  90071
                         BY:  RICHARD J. DOREN,
 8                            JASON C. LO,
                              JACQUELINE L. SESIA, ATTORNEYS AT LAW
 9
                              Gibson, Dunn & Crutcher LLP
10                            One Embarcadero Center, Suite 2600
                              San Francisco, California  94111-3715
11                       BY:  ANTHONY D. BEDEL, ATTORNEY AT LAW

12

13

14

15                            --o0o--

16

17

18

19

20

21

22

23

24

25
```

```
 1                           I N D E X

 2

 3

 4    WEDNESDAY, MAY 22, 2024 - VOLUME 5

 5

       PLAINTIFF'S WITNESSES                   PAGE     VOL.
 6

 7    SCHILLER, PHILIP

 8    DIRECT EXAM (CONT'D.) BY MR. BORNSTEIN    715      5

 9    CROSS-EXAMINATION BY MR. DOREN            801      5

10    REDIRECT EXAMINATION BY MR. BORNSTEIN     874      5

11

12

13

                             E X H I B I T S
14

15    PLAINTIFF'S EXHIBITS    W/DRAWN    IDEN    EVID    VOL.

16    CX-0004                                    808      5

17    CX-38                                      719      5

18

19

20                          --o0o--

21

22

23

24

25
```

SCHILLER – CROSS / DOREN

1    A.  That's right.

2    Q.  And we've now created through this injunction a new option

3    which is the linked purchase, correct?

4    A.  Yes.

5    Q.  If the linked purchase carries no commission, it's more

6    likely to be used by developers and developers are more likely

7    to be able to charge lower prices than if that linked purchase

8    carries a commission payable to Apple.  Correct?

9    A.  Yes.

10   Q.  Okay.  Thank you.

11        MR. BORNSTEIN:  I have no more questions, Your Honor.

12   Pass the witness for now.

13        THE COURT:  Mr. Doren.

14        MR. DOREN:  Thank you, Your Honor.

15   We have a binder of our own that we're distributing.

16        THE COURT:  Thank you.

17        MR. DOREN:  May I proceed, Your Honor?

18        THE COURT:  You may.

19                      CROSS-EXAMINATION

20   BY MR. DOREN:

21   Q.  Good morning, Mr. Schiller.

22   A.  Good morning.

23   Q.  Last week you testified that since 2021, you have been

24   leading a cross-functional team to perform the work necessary

25   to comply with the injunction.  Do you recall that?

SCHILLER - CROSS / DOREN

1    **A.**  Yes, I do.

2    **Q.**  What areas of the company have been involved in that

3    cross-functional team?

4    **A.**  The App Store business team, the App Store engineering

5    team, the software engineering team, two different human

6    interface teams, the finance team, the App Store commerce

7    team, the legal team.  I -- those are all I can think of right

8    now.

9    **Q.**  And back in September 2021, you testified again last week

10   that you gave the team instructions when it began its work.

11   Do you recall that?

12   **A.**  Yes, I do.

13   **Q.**  What instructions did you give the team?

14   **A.**  I recall telling them that this injunction is the -- now

15   the law.  This is what we're going to do.  And our job now is

16   not to question why we're doing it or whether you like it,

17   we're doing it, and it's going -- we have to consider how to

18   best do it.  And there were four constituencies to keep in

19   mind as we do this, the Court, users, our developers, and of

20   course Apple and our shareholders.

21   **Q.**  And who came first in that list?

22   **A.**  The Court.

23   **Q.**  Let's pull up, please, if we can docket -- document Docket

24   number 813.  This is the injunction.  And it's also behind

25   tab 1 in your binder.

SCHILLER - CROSS / DOREN

```
 1                     (Exhibit published.)

 2      BY MR. DOREN:

 3      Q.   And specifically let's look at paragraph 1 in which the

 4      Court states that Apple is permanently restrained and enjoined

 5      from prohibiting developers from, romanette one, including in

 6      their apps and their metadata button -- and their metadata,

 7      buttons, external links, or other calls to action that direct

 8      customers to purchasing mechanisms in addition to in-app

 9      purchasing.

10           Now do you see that language, sir?

11      A.   Yes, I do.

12      Q.   Do you recognize that language?

13      A.   I do.

14      Q.   What is it from?

15      A.   It was in our guidelines in section 3.1.1.

16      Q.   Prior to the trial?

17      A.   Prior, yes.

18      Q.   And did Apple take any action specific to this language

19      after the issuance of this injunction?

20      A.   We did.

21      Q.   And what is that?

22      A.   We removed that for developers in the U.S.

23      Q.   Now, we've heard testimony and we'll discuss some of the

24      other steps that Apple took.  But why didn't Apple simply

25      leave it at that, eliminate the language and see how things
```

SCHILLER - CROSS / DOREN

1    worked out?

2    **A.**  Because we had concerns that without appropriate

3    guidelines and terms, the risk to our users would be severe,

4    that the opportunity for frauds and scams would be significant

5    and that the ability to maintain the ecosystem of IAP would

6    really go away.

7    **Q.**  Now, you talked about fraud and scams and these risks at a

8    very high level, and we'll talk about some line items, but can

9    you give the Court a little bit more about --

10              **THE COURT:**  Hold on.  Hold on.

11              **MR. DOREN:**  I apologize.

12              **THE COURT:**  You said the ecosystem of IAP would

13   really go away.  You mean that you're concerned that no one

14   would use IAP?

15              **THE WITNESS:**  No.  I think --

16              **THE COURT:**  Is that what you meant?

17              **THE WITNESS:**  No, Your Honor.  Well, yes, I'm

18   concerned that users might be tricked into thinking that they

19   were making in-app purchases if it wasn't clear the difference

20   between going out to the web to get a great deal versus paying

21   for it in the app, and that if that distinction wasn't clear

22   and obvious to users, they would be tricked.

23              **THE COURT:**  You said it would go away.

24              **THE WITNESS:**  Yes, I think if developers could have

25   no guidelines around how they could create their own links and

SCHILLER - CROSS / DOREN

1    methods of payment in the app, that it would make in-app --

2    the ecosystem fundamentally useless.

3            THE COURT:  That is, that people would choose not to

4    use IAP?

5            THE WITNESS:  Or be duped into using something that

6    they thought they were doing an in-app purchase and they're

7    not.

8    BY MR. DOREN:

9    Q.  And Mr. Schiller, when you speak of users being duped and

10   you speak of fraud concerns, can you expand on that a bit?

11   A.  Yes.  That without guidelines to make it obvious to users

12   what's a linkout, without guidelines to keep developers from

13   using web views that look like native applications within the

14   app, it would be trivial to recreate the equivalent of an

15   in-app purchase without knowing that you're not actually

16   making an in-app purchase.

17   Q.  And did you take steps to address those concerns?

18   A.  We did.

19   Q.  And is the purchase link entitlement one of those steps?

20   A.  It is.

21   Q.  Is the purchase link entitlement intended to stifle

22   competition?

23   A.  It is not.

24   Q.  What's the purpose of the purchase link entitlement?

25   A.  To create a way for developers to communicate their offers

SCHILLER - CROSS / DOREN

```
1    to users, offers that are on the web, from within the app.

2    Q.  And if you could take a look, please -- and if we could

3    please turn to document number 830 in the court docket, which

4    is the order denying Apple's motion to stay injunction pending

5    appeal.  And this is tab 2 in your binder.  And specifically

6    if we could look at page 3, line 22.

7                        (Exhibit published.)

8    BY MR. DOREN:

9    Q.  And the Court states here that links can be tested by app

10   review.  Do you see that?

11   A.  Yes, I do.

12   Q.  Did Apple intend to test links, external links, under

13   these entitlements through app review?

14   A.  We do.

15   Q.  For what purpose, to what end?

16   A.  We simply want to make sure as best we can that the site

17   the user is going to isn't fraudulent and that the offers that

18   the user sees in the app are reflected by what's available in

19   that link.

20   Q.  Will entitlements facilitate that app review?

21   A.  It does.

22   Q.  How?

23   A.  It enables a method for the app review team to know where

24   the website is that the user is being sent so they can go and

25   verify that it is the website that the user is expecting to
```

SCHILLER - CROSS / DOREN

1    be.

2    Q.  In other words, are you telling us that they know to look

3    at web -- at apps for developers that have these entitlements?

4    A.  Well, the entitlement is two things.  It's technology and

5    it's also a process.  And so through this technology, we can

6    be sure that when the developer tells us here's the website

7    the user is going to be sent to, it's actually where they're

8    being sent to.

9        It also becomes a method for the app review team to know,

10   when they are reviewing an app, oh, this is an app that has

11   this entitlement which means it has the link.  We should go

12   look for that link, and the developer has told us where to

13   find it.

14       So all of those things come through this process.

15           THE COURT:  Have you ever had any fraud issues with

16   your 200 biggest developers?

17           THE WITNESS:  I believe so, but -- but sitting here,

18   I'm not going to come up with an example off the top of my

19   head.  I'd have to think for a few minutes about it, Your

20   Honor.

21   BY MR. DOREN:

22   Q.  Will Apple app review eliminate all risks related to those

23   external links?

24   A.  No.  We -- we cannot.

25   Q.  Why not?

SCHILLER – CROSS / DOREN

1    **A.**   Because it's the web.  Things will dynamically change

2    after we review it.  And we'll go back and do spot checks when

3    we can.  And when users raise issues to us, we do this all the

4    time.  Every week we get users complaining about things, and

5    we go and look and investigate them.

6        So we can go back and look, but in the interim, in real

7    time, we don't know what's happening on those websites.

8    **Q.**   Is it difficult to apply for an entitlement?

9    **A.**   It is not.

10   **Q.**   Can you please turn the Exhibit CX-0004 in your binder?

11   **A.**   All right.

12   **Q.**   Do you have that in front of you?

13   **A.**   Yes, I do.

14   **Q.**   What is this document?

15   **A.**   This is the site on the developer website for them to

16   apply for a link entitlement.

17        **MR. DOREN:**   And, Your Honor, I would move this

18   document into evidence.

19        **THE COURT:**   It's admitted.

20      (Plaintiff's Exhibit CX-0004 received in evidence.)

21   **BY MR. DOREN:**

22   **Q.**   And is this document, Exhibit 4, the entire application?

23   **A.**   It looks to be, yes.

24   **Q.**   Let's look then at the fields.  And first of all, on

25   page 4.2, can you tell us what information is required here?

SCHILLER – CROSS / DOREN

1    A.   We ask the developer to fill in the name of their team.

2    They have departments or teams.  The I.D. that's used on the

3    App Store for this developer.  And then the contact of the

4    person responsible for that developer account.

5    Q.   And then on page 4.3, what information is requested?

6    A.   We ask them for the name of the app that they want to

7    create the link in.  And the app has an I.D.  It's called a

8    bundle I.D.  That's how we identify and verify the app.  And

9    then a brief description of what that app is.

10   Q.   And if you could turn, please, to page 4.4, what

11   information is sought on this page?

12   A.   We ask them for a finance contact, the name and phone

13   number and email of that person since it is a transactional

14   item and there is a commission.  So we have the finance

15   contact.

16   Q.   Are the fields that we just reviewed all of the

17   information that's requested from a developer in applying for

18   this entitlement?

19   A.   Yes.

20   Q.   What's the approval process for an external purchase link

21   entitlement?

22   A.   It's automatic.

23   Q.   All they need to do is submit a completed and accurate

24   application, that's it?

25             THE COURT:   Where does it say that?

SCHILLER - CROSS / DOREN

1          **THE WITNESS:**  It doesn't say it, Your Honor.  It just

2    happens once you hit "Send."  It just generates the

3    entitlement.

4          **THE COURT:**  And how have you communicated that?

5          **THE WITNESS:**  On the -- on developer's site that

6    lists all the entitlements, I believe it notices whether ones

7    are automatic or manual.  But --

8          **THE COURT:**  I'm sorry.  Where do you say it's

9    automatic?

10          **THE WITNESS:**  We have a developer site that lists all

11    of the entitlements they can apply for, and I believe there's

12    information there about it.

13          **THE COURT:**  And does it say "automatic" is my

14    question?

15          **THE WITNESS:**  I don't recall, Your Honor.

16          **THE COURT:**  Proceed.

17          **MR. DOREN:**  Thank you, Your Honor.

18    **Q.**  And, Mr. Schiller, if you could please turn to Exhibit 2

19    in your binder, CX-2 which is already in evidence, and

20    specifically to paragraph 2.3.

21          And in the middle of that, Mr. Fischer was shown the

22    statement that Apple will review your request and reserves the

23    right to not provide you with the entitlement profile in its

24    solely discretion.

25          Now I believe there was a suggestion that that language

SCHILLER - CROSS / DOREN

1    over there is a trap for Apple to use with developers.  Do you

2    agree with that?

3    **A.**  No, I don't.

4    **Q.**  What is this language for?

5    **A.**  This is boilerplate language we have in our agreements.

6    Sometimes conditions arise that were never thought of that are

7    concerning and serious, and we need some way to say this is

8    something really bad, we can't approve it.  And so there's

9    usually some term like this that gives us the right to deny

10   something if there's a serious issue.

11   **Q.**  Thank you, sir.

12        Let's -- let's turn to URLs.  We've heard a lot about URLs

13   and static URLs in particular.  And can we start, please, with

14   just defining what a static URL is?

15   **A.**  Yeah.  It's simply something that I think we're all

16   familiar with whenever you type in the name in your browser to

17   go somewhere.  That's a static URL.  It simply is a specific

18   place that the user is going to be sent to.

19   **Q.**  And is the alternative called a dynamic URL?

20   **A.**  Yes, it is.

21   **Q.**  And what's the difference between the two?

22   **A.**  A couple things.  First a dynamic URL, as the name

23   implies, can change.  So you can send a user to different

24   places.  But even if it doesn't, I think more of interest to

25   us is that a dynamic URL can attach parameters, data, to the

SCHILLER – CROSS / DOREN

1    URL.

2        I think most users aren't aware of this.  A URL can

3    actually be extremely long.  There's no limit to a URL.

4    Typically most systems recommend between 2,000 and 8,000

5    characters.  So I think that would be surprising to most

6    people.  A URL can have up to 8,000 characters in it.

7        And the parameters are actually data that can be stuck and

8    appended to a URL to be passed along.  So that's of great

9    concern to us.

10   **Q.**  And what do you mean by parameters?  What sort of data?

11   **A.**  The types of parameters vary greatly, but the -- the type

12   that concern us most are parameters that are used for user

13   tracking and profiling.  So a -- a frequent use on the

14   internet of -- of -- of parameters in URLs are things like

15   user identity, geolocation can be appended to a -- a

16   parameter.  Session information about what the user's been

17   doing, to pass that along to a website.

18       **THE COURT:**  So you would disagree with Google, then,

19   that URLs have personally identifying data?

20       **THE WITNESS:**  Oh, they certainly do.  This isn't an

21   Apple idea.  If anyone searches on the web "URL parameters for

22   tracking users," you'll see a tremendous resource of

23   information about how that's being done.

24       **THE COURT:**  Glad to know you think I was right in

25   that case.

SCHILLER - CROSS / DOREN

1           Go ahead.

2                 **MR. DOREN:**   Thank you, Your Honor.

3     **Q.**   And does Apple require static URLs to be used for

4     linkouts?

5     **A.**   We do.

6     **Q.**   Does the use of static URLs help to protect the privacy of

7     consumers?

8     **A.**   Yes, it does.

9     **Q.**   How does it do that?

10    **A.**   It keeps the URL from being used to pass along information

11    about the user without their knowledge from the app out to the

12    website.  It has nothing to do with sending them to a page to

13    find pricing.  It's about passing along parameters like their

14    demographics.

15    **Q.**   And that information is not included in the static URL?

16    **A.**   It is not.

17    **Q.**   It's been suggested that when a person or a user taps a

18    static URL to reach a website, once they get to the website

19    they have to then manually type in their user I.D. and their

20    password speech every time they go there.  Is that true?

21    **A.**   No, that's not true.

22    **Q.**   How does it actually work?

23    **A.**   Well, when you click a link, any link from an app to a

24    website, the first time you go to that website, if you've

25    never been it to before, the website, if it has a user

1    identity log-on, it will ask you and the browser, whether it's

2    our Safari or Chrome or something else, will use the key chain

3    or password management tool so that the user automatically

4    filled that in once, click enter, and now you're logged in.

5    Every subsequent visit, it will remember that and you will be

6    logged in.

7         THE COURT:  Well, don't you have to authorize it to

8    remember it?

9         THE WITNESS:  Yes.  As long as you use those tools.

10   BY MR. DOREN:

11   Q.  It's also been suggested that when a user taps on a static

12   URL or types a static URL into a browser, that on a return

13   visit, they can only be directed to the website's generic home

14   page, they can't be sent to a page specific to them.  Is that

15   accurate?

16   A.  No, that's not true.

17   Q.  How does it actually work?

18   A.  Well, when you visit a website -- and I think we've all

19   experienced this, and Your Honor used the Amazon example, I

20   think was very appropriate to this idea -- when a user goes to

21   a site from a link without logging in or an identity, it can

22   be still a dynamic site that's showing the offer of the day or

23   whatever.  But if the user's identity was remembered, it can

24   customize that site for whatever the developer wants to

25   present the user with.

SCHILLER - CROSS / DOREN

1    Q.   And if we can, I'd like to show you a series of

2    demonstratives that -- that focus on the Court's example of

3    Amazon.com.

4                    (Demonstrative published.)

5            **MR. DOREN:**  If we could please to CDX-1003.

6    Q.   And you just tell us what we're looking at here.

7    A.   We're looking at the home screen of an iPhone.

8    Q.   And by the way, if we were to look for Amazon.com, is that

9    a static URL?

10   A.   Yes.  If the user went to www.amazon.com, that's certainly

11   a static URL.

12   Q.   Let's start first, if we can, by simply getting there

13   through the browser, through Safari.  We see that on the

14   bottom row, if you will, second from the left.  Do you see

15   that?

16   A.   That's right.  The compass icon is the Safari button.

17   Q.   All right.  And what's the first thing that the user does?

18   A.   Well, you would tap on that on your phone to launch

19   Safari.

20   Q.   Okay.  Let's go to Slide 2.

21                    (Demonstrative published.)

22           **THE WITNESS:**  And then you would start to type in

23   Amazon, and you can see here it does auto-completion.  That's

24   a feature of most browsers so you don't even have to type the

25   full name to go there.

SCHILLER - CROSS / DOREN

1   Q.  Now before we look at those specifically, there have been

2   questions and testimony over the last several days about app

3   transactions involving physical goods and services.

4       Do you recall that topic generally?

5   A.  Yes.

6   Q.  And, Mr. Schiller, do app transactions for physical goods

7   and services involve linkouts to external websites?

8   A.  No.

9   Q.  Do they involve URLs of any type?

10  A.  No.

11  Q.  How do they work?

12  A.  Well, because developers of physical goods apps can use

13  their own payment method, they provide those payments in the

14  app.  They don't want the user to leave the app because they

15  can transact with the user in the app.

16  Q.  So where do those transactions take place then?

17  A.  All on device in the app.

18  Q.  Is that where the payment processing take place -- takes

19  place as well?

20  A.  Yes.

21  Q.  Is the user's payment information ever transmitted to an

22  external website?

23  A.  Well, it's transmitted through the log-on ID to the

24  developer's servers but not sent out via link to a website.

25  Q.  So in your evaluation of the risks of purchase links or

1     purchase linkouts under this new program from apps to websites

2     for the purchase of digital goods and currency, did you

3     consider transactions involving the sale of physical goods to

4     be relevant to that assessment?

5     **A.**  We did not think of that comparison in designing this.

6     **Q.**  And -- and why not?

7     **A.**  Again, because typically physical goods are doing

8     transactions within the app, and we don't -- I can't recall

9     ever seeing a physical goods app that required you to linkout

10    to then transact versus in the app.  It's not saying it's

11    impossible to occur.  I just haven't heard of that.

12    **Q.**  There have also been questions and testimony about

13    developers including external links in their apps for

14    nonfinancial transactions.  Do you recall that topic

15    generally?

16    **A.**  Yes.

17    **Q.**  And does Apple, in fact, permit those sorts of links?

18    **A.**  Yes.

19    **Q.**  What sorts of examples are there?

20    **A.**  Well, the simplest and biggest example is that we have

21    third-party browsers in the App Store.  Everything in that app

22    is a link.  So we have to allow linkouts.

23         And then we've used other examples.  We have talked in

24    here about links to privacy policies, links to support, yes.

25    **Q.**  And were those links relevant to your risk assessment, if

SCHILLER - CROSS / DOREN

1   you will, related to external links to websites for the

2   purchase of digital currency and goods?

3   **A.**  We did not consider those relevant to trying to solve for

4   this new -- new capability.

5   **Q.**  Why not?

6   **A.**  Well, first, because we can't try to protect users from

7   every link in every app.  It's just -- that's too big a

8   surface area of issues to take on.  We haven't tried to do

9   that.

10      And this is a unique specific limited method for specific

11   case which is helping developers to communicate their offers

12   and link users to them for the purpose of making a purchase.

13   And we thought that was a targeted, focused enough situation

14   that could be weaponized against users, that we wanted to try

15   to make it safe for them.

16   **Q.**  And what's unique about those particular types of

17   interactions, if you will, between the user and the websites,

18   the internet?

19   **A.**  Well, this is -- as we've talked about before, this is a

20   new thing.  I think for the kinds of apps that have digital

21   content within them for purchase within app, to date there

22   haven't been linkouts and offers to take the user out of the

23   app.  And so it's just a new experience we're all going to

24   enter into.  And we were worried about the risks that that

25   might create on users.

SCHILLER - CROSS / DOREN

1  **Q.**  Let's turn back, if we can, to 3.3.  And I'd like to talk

2  about the specific bullet points that address URL issues.

3  (Exhibit published.)

4  **BY MR. DOREN:**

5  **Q.**  The first one states that the link must go directly to

6  your website without any redirect or intermediate links or

7  landing pages.

8  Can you explain to the Court what that means?

9  **A.**  Well, two things.  First we just want to make sure, to

10  state the obvious, that it's going to the website.  So where

11  the user thinks it's going and where app review can check it's

12  going is where it's going.  That's the obvious part.

13  The intermediary link is actually another form of

14  fraudulent activity on the web that you have an intermediary

15  page between where the user is going and where they end up

16  that can redirect.

17  And again people can look this up on the web too.  But

18  it's not an Apple idea.  There have been a number of

19  fraudulent cases perpetrated on users where intermediary links

20  are used to send users to fishing sites, to malware sites, to

21  financial scams.

22  And so the intermediary link is something to be concerned

23  about and want to protect users from being tricked through.

24  **Q.**  Was this requirement included to stifle competition?

25  **A.**  It was not.

SCHILLER - CROSS / DOREN

1    Q.  Did this requirement add friction for the user experience?

2    A.  No.  It should make it easier because they go straight

3    where you want them to go.

4    Q.  And does this --

5         THE COURT:  Yet they can't go to the landing page.

6    That creates friction, doesn't it?  Doesn't it?

7         THE WITNESS:  A landing page is -- sorry.  We mean

8    that here as an in-between page, not the final destination.

9    That's what we intended from that language.  Sort of a

10   waypoint before wherever you're going.

11       So for example, on our own website, apple.com, when you

12   want to go check out the new MacBook Pro, we have a landing

13   page in front of it that says "All MacBooks."  And then you go

14   to another page that's the MacBook Pro page.

15       So the intermediary page is a landing page.  That's what

16   we mean by that language, Your Honor.

17   BY MR. DOREN:

18   Q.  So the Court may be focused on the last few words of this

19   bullet point which says go directly to your website without

20   any redirect or intermediate links or landing page.

21       Is that a reference to the developer's landing page?

22   A.  Or anything in the middle that -- that --

23        THE COURT:  Yes?  Did you -- can you answer his

24   question?

25        THE WITNESS:  I'm sorry.

SCHILLER – CROSS / DOREN

BY MR. DOREN:

**Q.** The question is the reference to a landing page in that first bullet point, is that a reference to the website that the user is intending to link to?

**A.** No. The landing page in this sentence does not mean the page the user is intending to go to.

**Q.** What does it mean?

**A.** It means a page in the middle before they get there.

**Q.** And what's wrong with having those?

**A.** Because again it works as an intermediate page that anything can happen on, and then they can redirect the user to different pages that they end up on and app review can't check it.

**Q.** And we just went through a series of examples involving navigating to the amazon.com landing page. Is navigating to a amazon.com landing in any way prohibitive or limited or restrained by this bullet point?

**A.** No. What we intended with this language was something in between where the user is going, not where they're going.

       **THE COURT:** So "intermediate" refers to links and landing page?

       **THE WITNESS:** Yes. That's exactly right, Your Honor.

       **THE COURT:** Not the landing page of the website?

       **THE WITNESS:** No.

       **THE COURT:** Go ahead.

SCHILLER - CROSS / DOREN

1          **MR. DOREN:**  Thank you, Your Honor.

2          **THE WITNESS:**  I'm sorry.  And just one more because I

3     think this is exactly what you just said, Your Honor.  It

4     depends how you apply the "or."  We meant intermediate link or

5     landing page.  So the intermediate was meant to apply to both

6     the link and the landing page, an intermediate landing page.

7          And if it helps us later to make clearer language, we

8     should -- we should be happy to do that.

9     **BY MR. DOREN:**

10    **Q.**  Does this requirement limit a developer's ability to

11    direct a user to a customized page, customized for that

12    individual on their website?

13    **A.**  It does not.

14    **Q.**  And does this requirement facilitate a meaningful app

15    review?

16    **A.**  It does.

17    **Q.**  How does it do that?

18    **A.**  Because the web can send people anywhere.  But at least if

19    we have the intention of where they're -- the page the user's

20    supposed to go to through this process of the entitlement, we

21    have something to check versus a waypoint that can go anywhere

22    and then we just don't know what to check.

23    **Q.**  And by a waypoint, you mean some sort of intermediate link

24    or redirect.

25    **A.**  That's right.

SCHILLER - CROSS / DOREN

1  **Q.**  The second bullet point under 3.3 states that the link

2  must open a new window in the default browser on the device

3  and may not open a web view.

4      First of all, what's a web view?

5  **A.**  A web view is a method for developers to use HTML and web

6  technology inside their native app in a seamless way to create

7  one experience between what's native and what's seamless --

8  excuse me -- and what's web in such a way that you never

9  actually leave that app page, you're in the app and on the web

10  at the same time.

11  **Q.**  What's wrong with that, from Apple's perspective?

12  **A.**  Two things.  One, we want to -- the user to at least

13  understand that they're out on the web.  And if it's embedded

14  inside the app, we think it's less likely that they would know

15  that they're on the web.  If they were taken to their browser,

16  much higher likelihood that they understand that.

17      And secondly, with the ability to create web views within

18  the app, you, for all intents, are able to then, as a

19  developer, create an in-app purchase system.

20  **Q.**  And does this second requirement impede a developer's

21  ability to direct users to its website through a link in the

22  app?

23  **A.**  No.

24  **Q.**  Does it impede the developer's ability to send the user to

25  a page that is customized to that user?

SCHILLER – CROSS / DOREN

1    **A.**   No.

2    **Q.**   The third bullet point under 3.3 states that the link must

3    not pass additional parameters in the URL to protect the end

4    user, paren, for example their privacy, close paren.

5          What does that mean?

6    **A.**   This is what we spoke about earlier that URLs can attach

7    additional parameters and data about the user that they send

8    out of the app to the website, often without the user's

9    knowledge.

10   **Q.**   And how extensive can that information be?

11   **A.**   As I said, it can be thousands of characters and any

12   amount of information the developer is able to track about the

13   user and store about the user in the app can go along with the

14   URL.

15   **Q.**   And how does the passing of additional parameters about

16   individual users in the URL put their privacy at risk?

17   **A.**   Again in multiple ways.  First, for that data to be sent

18   along in the URL, if the developer isn't careful in how they

19   do their encryption, it's susceptible to hacking on the web.

20   There have been examples of this before.  That's not a new

21   thing.

22         But assuming that developers are very careful with it,

23   still the user then may not know it, but the developers could

24   be tracking what they do in the app and taking personal

25   information that they don't think is being sent out to the

SCHILLER - CROSS / DOREN

1    website, they're not aware of it, and it goes with that click.

2    Q.   And can it go beyond that website?

3    A.   Well, once it's passed out in a URL, depending on the

4    developer's terms, it can be used for many different purposes

5    and shared with others.

6    Q.   Now, once a user has decided to tap out of the app, one

7    thing that seems pretty well established here is that most

8    people know that when they tap on a link, that they're going

9    out to the internet.

10        Why does Apple care if their personal data is spread

11   around the internet -- if their users' personal data is spread

12   around the internet?

13   A.   We care.  They're our users, and we don't want to take

14   part in a -- in a scheme that hurts their privacy and the

15   trust of the app that they got on our store.  We're giving

16   them this app.  Whatever happens on the internet happens on

17   the internet.  That's not our business.  But the app we give

18   the user, seeing the button in it, knowing what could be done,

19   I think it's partly our responsibility as well to try to make

20   that a safe experience for the user.

21   Q.   But shouldn't everyone know once they tap on that link

22   they're on their own?

23   A.   They should, but I don't think many users understand what

24   parameters are and the extent of the data that can be packed

25   in parameters and sent out with their clicks.

SCHILLER - CROSS / DOREN

1    **Q.**  And does this requirement stop a developer from delivering

2    the user to a personalized page on their website?

3    **A.**  No, it doesn't.

4    **Q.**  Or does it impair the developers' ability to send users to

5    pages containing special offers?

6    **A.**  It does not.

7    **Q.**  Does it create friction in a user's ability to reach a

8    developer's website?

9    **A.**  It does not.

10   **Q.**  Or conduct business with that developer?

11   **A.**  It does not.

12   **Q.**  Does this third requirement facilitate an effective app

13   review?

14   **A.**  Yes, because with a static URL without parameters and

15   dynamic changing of the URL, the app review team at least has

16   a chance now to see where the user is going with fair

17   certainly that that -- until the developer chooses to change

18   it, that's where they're going to send the user.

19   **Q.**  The fourth bullet point under section 3.3 says that the

20   URL must be statically defined in your app's info.plist before

21   submission to the App Store.  What does that mean?

22   **A.**  This is just part of the -- the entitlement process.

23   Plists are normal property lists that the developers submit

24   for many different purposes when they submit their app to the

25   App Store.  It's Apple's way of -- of developers giving us

SCHILLER - CROSS / DOREN

1      data that's needed for features.

2          And so this just is the way the developer says here's my

3      website that I'm sending the user to, and now that's what gets

4      submitted and included for app review to check.

5      Q.  And what does statically defined mean?

6      A.  What we've already talked about, that it's a specific

7      website location that they're going to send users to.  It

8      could be anywhere on their website.  It does not have to be

9      the home page.  It could be ten layers deep.  But they're

10     being specific about where they want to send users.

11     Q.  And does it impact the ability of a user to tap out to a

12     developer's website?

13     A.  No, it does not.

14     Q.  Does it impact in any sort of negative way the user's

15     experience once they reach that website?

16     A.  It does not.

17     Q.  Does it impair the developers' ability to direct that user

18     to a web page that is customized to that user?

19     A.  No, it does not.

20     Q.  Does it create any friction for the user?

21     A.  It does not.

22     Q.  Does this requirement facilitate an effective app review?

23     A.  Again it does help because now with a statically defined

24     link shared through the plist as the way to communicate it to

25     Apple gives us the location to check.

1    **Q.**  And the fifth bullet point which I believe is the last

2    URL-specific one says that the link shall be resubmitted if

3    the URL changes.  I think I understand that, but what does it

4    mean?

5    **A.**  Yes, I hope it's -- it's as obvious as it seems.  It's --

6    the developer can change it whenever they want.  They just

7    need to go through the process to submit it so app review can

8    check it as part of the app submission.  They can change it

9    with every app update they want, but we need to check it to

10   approve it.

11   **Q.**  And does this impact the interactions between the user and

12   the developer in any way?

13   **A.**  It does not.

14   **Q.**  Does this requirement facilitate an effective app review?

15   **A.**  It does.

16   **Q.**  How does it do that?

17   **A.**  Again when the developer wants to change the site or their

18   site they want to send users to, app review will be able to

19   check it when they submit their app.

20   **Q.**  Thank you, Mr. Schiller.

21       Let's move on to the sixth bullet point in 3.3 which

22   states that the link must be accompanied by language and a

23   button adhering to the requirements provided in the Apple

24   materials.

25       And if I could ask you, sir, to please turn to Exhibit 3

SCHILLER – CROSS / DOREN

```
 1        which is already in evidence.
 2                        (Exhibit published.)
 3        BY MR. DOREN:
 4        Q.   First of all, can you identify for us what this document
 5        is?
 6        A.   This is a support document for developers on our website
 7        that describes the external purchase link entitlement and how
 8        to implement it.
 9        Q.   And is this part of the Apple materials referred to in the
10        bullet point?
11        A.   It is.
12        Q.   Let's turn to page 5, 3.5, again a page that we've all
13        grown familiar with.  And specifically the section entitled
14        "Templates."  Now do you see that?
15        A.   I do.
16        Q.   What are these?
17        A.   These are the words that we've authorized for developers
18        to use as ways to communicate offers to users within the app.
19        Q.   Why didn't Apple leave the choice of words to the
20        developers?
21        A.   Simply because we're trying to build a system where
22        hopefully lots of developers will take advantage of this and
23        then app review knows what to check.  And if we there's a
24        defined set of examples for the developer to use, then app
25        review has a better chance of being able to check them all and
```

SCHILLER - CROSS / DOREN

1    understanding what they're looking for and make sure they're

2    truthful.

3    **Q.**   And how did Apple decide on these options?

4    **A.**   We asked the design and business team to go look at all

5    different ways developers try to build in links in their apps

6    and what they want to try to communicate, and pick the most

7    popular ones and base the templates on what we were seeing as

8    most popular attempts to create links and communications in

9    apps.

10   **Q.**   And obviously we can all read them for ourselves, but can

11   you just quickly review for us the categories that Apple has

12   selected?

13   **A.**   Sure.  The first one simply is a catch-all, go purchase on

14   the developer's website.

15       The second template talks about special offers.  So we

16   wanted something open-ended that a developer, if they didn't

17   want to be specific, could have a more generic enticement to

18   go to their website.

19       The third one is based on being specific about that the

20   prices are lower.

21       The fourth talks about actual percent off on the website,

22   X percent, whatever the developer wants to communicate.

23       And last one is specific prices.  Here's an exact price

24   that the developer may want to use to communicate to the user

25   about.

1    Q.   Now, in -- in Apple's documentation, it states that

2    developers cannot discourage users from using IAP.  That is,

3    within the app, they can't discourage users.  And clearly --

4         **THE COURT:**  I thought they said that they couldn't

5    discourage them, period, both in the app and on the website.

6         **MR. DOREN:**  Thank you, Your Honor.  I appreciate the

7    point.  Let's address this.

8    Q.  Mr. Schiller, you've heard the Court's concern.  Is -- is

9    criticism or discouragement of the use of IAP permitted

10   outside of the app?

11   A.   Yes, it is.

12   Q.   Can you explain that, please?

13   A.   We didn't want to distribute an app from us that says what

14   we do isn't good, don't use us.  That's -- we thought was fair

15   that we shouldn't be forced to distribute something that says

16   don't do business with us.

17        What happens outside the app on the website that the user

18   gets sent to, on any other website, on any communication our

19   intention was to be very clear developers can do or say

20   whatever they want.

21   Q.  So if a user clicks -- taps, I guess is the term I'm

22   supposed to use.  If a user taps on a lower price link using

23   one of these templates within the app, and they're directed to

24   a web page, can that web page, can the first thing on it be a

25   critique of Apple, its commissions, and its IAP?

SCHILLER - CROSS / DOREN

1    **A.**  Yes, it can.

2    **Q.**  Can developers campaign with users or solicit users to

3    help them avoid that commission out on their web page?

4    **A.**  Yes.

5    **Q.**  And while Apple says the use of IAP cannot be discouraged

6    within the -- the app itself, that clearly doesn't foreclose

7    the statement that lower prices are available elsewhere, just

8    click here, correct?

9    **A.**  Correct.

10   **Q.**  And to be clear, is there any limitation, any limitation

11   at all, on what developers can say about Apple, the App Store,

12   commissions, IAP, or any other Apple-related topic out on

13   their website?

14   **A.**  No.

15   **Q.**  What about in the text messages they can now send users?

16   **A.**  No limitation.

17   **Q.**  What about in the emails they can send users?

18   **A.**  No limitation.

19   **Q.**  Only in the app; is that right?

20   **A.**  Correct.

21   **Q.**  So staying on page 3.5, and let's look at the three screen

22   images above the templates.  And you've been shown these a

23   couple of times or they've come up a couple of times in our

24   time here.  But can you please tell us what we're looking at.

25   **A.**  These are design examples to give the developers ideas of

SCHILLER - CROSS / DOREN

```
 1    kinds of places that it may be advantageous to place this link
 2    and offer.
 3    Q.  And one option is a sign-in screen.  And again, I don't
 4    mean to be somewhere between pedantic and ignorant, but can
 5    tell us what the sign-in screen is specifically?
 6    A.  Well, in theory many apps will have a sign-in screen.
 7    Some make users sign in frequently.  Some not.  And it could
 8    be placed right there at that starting points.
 9    Q.  And the second example declares itself an account screen.
10    What's that?
11    A.  Again a developer may have the user log in or update or
12    make changes to their account or manage their account, and
13    that might be another frequent page that the user visits that
14    may make sense for a developer to place it there.
15    Q.  And the third example is simply app page.  What is that?
16    A.  That means pretty much anywhere in the app that doesn't
17    obviously interfere with IAP, but anywhere they want on the
18    app.
19    Q.  Does it need to be something that people have to search
20    for to find?
21    A.  No.
22    Q.  Does Apple impose any limitations on the size of the font
23    developers can use for their links?
24    A.  No.
25    Q.  Do they impose any limitation on the style of the font?
```

SCHILLER – CROSS / DOREN

1      A.  No.

2      Q.  Does Apple impose any restriction on the colors developers

3      can use for their templates?

4      A.  No.

5      Q.  Let's look, please, at demonstrative CDX-1001.002.

6                      (Demonstrative published.)

7      BY MR. DOREN:

8      Q.  Mr. Schiller, can you tell us what we're looking at here?

9      A.  Well, we thought that since the previous document had some

10     pretty simple design styles, we wanted to make sure it was

11     very clear that those are not the limitations of what a

12     developer can do with the guidelines for the link.  And so we

13     created three more examples to show you what would be approved

14     as examples of links in an app.

15     Q.  And are each of these examples on CDX-1001.002 permissible

16     under Apple's guidelines?

17     A.  Yes.

18     Q.  And would each of these examples be permitted for a --

19     under the entitlement?

20     A.  Yes.

21     Q.  And again, other than where they are in, on -- or excuse

22     me -- on the same screen as an IAP button or in the stream of

23     purchase, are they permitted anywhere on the app?

24     A.  Yes.

25     Q.  And who makes the decision as to where they will go?

SCHILLER - CROSS / DOREN

1   A.   The developer.

2   Q.   Let's talk about buttons.  And if we can please turn to

3   Exhibit 16 in your binder, which is also in evidence.

4        And let's look if we can, please, at page 16.3.

5   A.   (Reviewing document.)

6   Q.   And at the bottom, we see different button styles,

7   correct?

8   A.   Yes.

9   Q.   Now there's been a lot of discussion about the selection

10  by Apple of plain buttons for use of external links.  You're

11  familiar with that discussion, correct?

12  A.   Yes.

13  Q.   Well, first of all, how long have plain buttons been in

14  use at Apple?

15  A.   Well, they predate iOS, but for as long as there's been

16  iPhone and iOS.

17  Q.   And why did Apple choose the plain button style to link to

18  external websites?

19  A.   Because we wanted a style that would be likely to be clear

20  that this is a web link and not an in-app purchase.  Web

21  links, I think we're all used to as text links that have more

22  like the plain style than any of the other styles here for

23  button.  And so we're trying to create a consistent user

24  experience where they understand this is a link to go out.

25  Q.   And in terms of again we've heard repeatedly about robust,

SCHILLER – CROSS / DOREN

1    back-shadowed, contrasting IAP buttons in apps.  Who designs

2    the IAP button to be included in an app?

3    **A.**  The developers do.

4    **Q.**  Could the developer select a plain IAP button if they

5    wished?

6    **A.**  Sure.  I've seen many.

7    **Q.**  Could they have a plain IAP button in small font and a

8    large bright red linkout for their own website elsewhere in

9    the app?

10   **A.**  Yes, they can.

11   **Q.**  Now, Mr. Fischer was asked by the Court whether there was

12   any reason other than to stifle competition for the

13   requirement that a plain button be used.

14       Do you recall that question?

15   **A.**  I do.

16   **Q.**  My question to you, sir, is, was the plain button selected

17   to stifle competition?

18   **A.**  It was not.

19   **Q.**  Why does Apple require that the plain button be used?

20   **A.**  We simply wanted to be clear to the user that this is a

21   link that will take them out of the app to go make that

22   purchase.

23   **Q.**  And how does this make that clear?

24   **A.**  Because it more closely matches the style of hyperlinks

25   and other internet links that we're used to seeing.

SCHILLER - CROSS / DOREN

1    Q.   And in fact, we've heard counsel reference the fact that

2    most everyone in the world understands that if you click on

3    something that says www.example.com, people know they're going

4    to the internet.  Do you recall that?

5    A.   Yes, I do.

6    Q.   Let's talk about the disclosure screen, and we'll look at

7    that back in Exhibit 3, page 5, at the bottom of the page

8    there.

9                          (Exhibit published.)

10              THE WITNESS:  Yes, I see that.

11   BY MR. DOREN:

12   Q.   And I think we've established this, but I'm going to ask

13   anyway.  Are you familiar with this screen?

14   A.   I am.

15   Q.   And did you have input in its design?

16   A.   Well, I was in the design meetings and was one of the ones

17   who approved it.

18   Q.   What's the purpose of this screen?

19   A.   We believe it's important that a user who taps on a

20   linkout have one notice that they're about to leave and go

21   someplace else, and that they are made aware of some of the

22   things they would previously assume would be the case with an

23   in-app purchase aren't the case here.  We thought those items

24   were important to communicate.

25   Q.   Well, we just explained why the plain button was used to

SCHILLER - CROSS / DOREN

1    make obvious that it's an external link.  So why this screen

2    as well?

3    **A.**  Two things.  Well, first -- well, I hope everybody

4    understands that that's what that text means.  I don't believe

5    that's universally true.  I think people won't always

6    understand.

7        And, for example, I might think the offer is coming from

8    the site but it's still in the app.  I don't realize I'm going

9    to -- and with over a billion users, we have to try our best

10   to predict what even a few percent, means millions of people

11   are going to have issues.  So we -- we worry about those

12   things.

13       But secondly, this is a touch screen.  People touch things

14   on them all the time -- I do, too, but I didn't mean to.

15   Ideally you don't want to accidentally touch this button and

16   be thrown out -- we call it do-si-do.  Do-si-do out to the web

17   and you don't know why that just happened.

18       And so I think for both those reasons, making sure it's

19   transparent to the user about what's going to occur and also

20   to give the user a confirmation before they leave the app and

21   go onto the internet are both good reasons for wanting to have

22   a sheet like this.

23   **Q.**  Now, are any of the statements on this screen untrue?

24   **A.**  Not to my knowledge, no.

25   **Q.**  And do you consider the statement that you are about to go

SCHILLER - CROSS / DOREN

```
1    to an external website to be redundant of tapping on an

2    external website link?

3    A.   Not entirely, no.  Because, again, I think there are

4    examples where people will tap and not realize they're leaving

5    the app, and so this will hopefully make it clear.

6    Q.   In examination by Epic, you were shown Exhibit 38, CX-38,

7    which is now evidence.  It's not in the binder I handed you,

8    but let's put it up on the screen and see if we can handle it

9    that way.

10   A.   Okay.

11                       (Exhibit published.)

12   BY MR. DOREN:

13   Q.   And specifically let's go to the second paragraph.  And

14   counsel pointed out the first sentence here, that we believe

15   Apple's in-app purchase system is the most convenient, safe,

16   and secure way for users to purchase digital goods and

17   services.  Do you see that?

18   A.   I do.

19   Q.   And he declared that a data-free presentation.  Do you

20   recall that?

21   A.   Yes.

22   Q.   Does Apple, in fact, have data in its possession that

23   shows that it is a convenient, safe and secure way for users

24   to purchase digital goods and services?

25   A.   We do.
```

SCHILLER - CROSS / DOREN

1   Q.  Let's look, please, at Exhibit CX-1005 which is in your

2   binder.

3                    (Exhibit published.)

4   BY MR. DOREN:

5   Q.  And this is already in evidence.

6       Can you please tell us what this is.

7   A.  This is a report on fraudulent transactions from the App

8   Store from May 16th of 2023.

9   Q.  And who -- who makes these reports and how often?

10  A.  This is an annual report that Apple produces.

11  Q.  And let's turn, if we can, please -- we aren't going to go

12  into a lot of detail on this, but let's look at a couple of

13  highlights.  And specifically page 2, there's a blue table in

14  the middle.  Do you see that?

15  A.  I do.

16  Q.  And what is this -- what information does this table

17  reflect?

18  A.  So this callout talks to three data points specifically

19  that occurred during 2022 where we helped protect App Store

20  users from these three different types of fraudulent

21  activities.

22  Q.  And let's look, please, at the table on page 3.

23                    (Exhibit published.)

24  BY MR. DOREN:

25  Q.  And can you please tell us what this -- information this

SCHILLER - CROSS / DOREN

1     table communicates?

2     **A.**  This is an accounting of, again in 2022, 1.7 million app

3     submissions that were rejected for different concerning

4     reasons.

5     **Q.**  Are these data some of the reasons that Apple believes its

6     in-app purchase system is the most convenient, safe and secure

7     way for users to purchase digital goods and services?

8     **A.**  It is.

9     **Q.**  And --

10          **THE COURT:**  Any of these apps include apps from your

11    200 large developers from which most of the activity comes?

12          **THE WITNESS:**  I -- I can't say.  But I think it's

13    reasonable for me to assume that most of these do not involve

14    the top 200 apps.

15          **THE COURT:**  So these are the smaller players?

16          **THE WITNESS:**  Many are the smaller players, certainly

17    the largest number of them.  But we have had fraudulent

18    activity in larger apps too.  It's not only smaller apps.

19          **THE COURT:**  Okay.

20    **BY MR. DOREN:**

21    **Q.**  Mr. Schiller --

22          **MR. BORNSTEIN:**  I'm sorry, Your Honor.  While we

23    paused in the examination I just wanted to know --

24          **THE COURT:**  I can't hear you.

25          **MR. BORNSTEIN:**  Sorry.  Can you hear me, Your Honor?

SCHILLER – CROSS / DOREN

1    **Q.**  And are Apple and the FTC the only two entities that use

2    these disclosure pages?

3    **A.**  No, I don't believe so.

4    **Q.**  Have you seen them on other occasions over the course of

5    your career?

6    **A.**  Yes.

7    **Q.**  Let's look too, please, if we can, at CDX-3.  And this was

8    a document or a demonstrative, rather, that was used with

9    Mr. Fischer.

10                        (Demonstrative published.)

11   **BY MR. DOREN:**

12   **Q.**  And it was pointed out to Mr. Fischer that the screen on

13   the right is smaller than the screen on the left.

14        Now do you recall that generally?

15   **A.**  Yes.

16   **Q.**  And, sir, do you know why the screen on the right is

17   different than the screen on the left?

18   **A.**  Yes.

19   **Q.**  Why?

20   **A.**  The screen on the right is asking the user if they wanted

21   to let the developer track them or not.  But they're not

22   leaving their app.  They're staying exactly where they were on

23   the same page.

24   **Q.**  So are those two different scenarios?

25   **A.**  Very different.

SCHILLER – CROSS / DOREN

```
 1                THE COURT:  So if the FTC's half page is good enough
 2       for the FTC, why is it not good enough for Apple?
 3                THE WITNESS:  Both are good methods, Your Honor.  We
 4       use the technology --
 5                THE COURT:  So you don't have any objection to making
 6       that half a page?
 7                THE WITNESS:  Only that, yeah, it will be more work,
 8       but no objection to it conceptually.
 9       BY MR. DOREN:
10       Q.  And let's take a look if we can back at that page, sir.
11       And we see that the language takes up what it takes up.  And
12       what happens to the rest of the page behind it?
13                     (Demonstrative published.)
14                THE WITNESS:  It gets shaded over in blue.
15       BY MR. DOREN:
16       Q.  Thank you.
17            So let's go back to Exhibit 2 and section 3.3.
18                         (Exhibit published.)
19       BY MR. DOREN:
20       Q.  And now I'd like to go to the next bullet point in order.
21       It is the fourth bullet point from the bottom, which states
22       that a link must not mimic Apple's in-app purchasing system
23       nor discourage end users from using it.  Do you see that?
24       A.  Yes.
25       Q.  Why is this bullet point included?
```

SCHILLER - CROSS / DOREN

1    **A.**  Again, the concept here was that in the app that Apple

2    distributes for the developer, it's not specifically asking

3    Apple to distribute something that within it says not to use

4    Apple for in-app purchase in our business.

5    **Q.**  And does this phrase, "nor discourage end users from using

6    it," does that have any application at all to communications

7    outside of the app?

8    **A.**  No.  This is simply a section about the link itself in the

9    app.

10   **Q.**  And when you say that it cannot discourage end users from

11   using IAP, does that have any impact on the users' ability --

12   excuse me -- the developers' ability to use the templates to

13   tell users that there are cheaper prices elsewhere?

14   **A.**  No.

15        **THE COURT:**  So we're now at the seventh bullet point,

16   not the fourth.

17        **MR. DOREN:**  Correct, Your Honor.  That's right.

18   Fourth from the bottom.  I'm sorry.  I changed order on you,

19   and I apologize for that.

20        **THE COURT:**  So we skipped over 6.

21        **MR. DOREN:**  We'll get there.  I'll cover them all for

22   you.

23   **Q.**  So continuing in order so we're all literally on the same

24   page, the next bullet point says that the link must be

25   displayed in your store kit external purchaser link app on no

SCHILLER - CROSS / DOREN

```
 1   more than one app page the end user navigates to, not an
 2   interstitial, modal, or pop-up in a single dedicated location
 3   on such page --
 4           THE COURT:  Mr. Doren.
 5           MR. DOREN:  Yes, ma'am.
 6           THE COURT:  Can we go back?
 7           MR. DOREN:  Yes.
 8           THE COURT:  So here, you go to the seventh bullet,
 9   fourth from the bottom, that's where Apple says you cannot
10   discourage end users from using it, it being the in-app
11   purchase system.
12           THE WITNESS:  Yes, Your Honor.  And what we mean and
13   intend by this is this is a bullet under the link you provide
14   must..., and so we are only talking about the link as it
15   appears in the app, not anything outside of the app.
16           THE COURT:  All right.  Now you can move on.  Thanks.
17           MR. DOREN:  Thank you, Your Honor.
18   Q.  And, sir, you spoke about it briefly with counsel, but can
19   you please remind us what an interstitial is?
20   A.  Interstitial would be a -- call it an in-between page, a
21   page before you get to the page you're intending to take the
22   user to.
23   Q.  And what is a modal?
24   A.  A modal is a window that you open up on your app above
25   whatever the user is doing that the user then must interact
```

SCHILLER - CROSS / DOREN

1    with to make it go away.

2    **Q.** And what is a pop-up? That one I think I know, but you'll

3    have to define it for us anyway.

4    **A.** Again another window that may come up, and this one you

5    don't have to interact with it, it can stay up or go away.

6    **Q.** And you testified earlier that each of these could be used

7    in various contexts in apps, correct?

8    **A.** Yes.

9    **Q.** And yet here, this bullet point states that they cannot be

10   used in relation to the developer's link. Why treat them

11   differently?

12   **A.** Our -- our only intention with these three examples were

13   they're tools that can be used to interfere with in-app

14   purchase. I could -- if a developer -- the user is trying to

15   go to a purchase and instead have an interstitial page that

16   gets in the middle of that and says, wait, before you go we

17   want to interrupt what you're about to do.

18       Or a modal or pop-up are two things that could happen on

19   top of whatever user experience is underneath. And again that

20   experience might be the in-app purchase experience.

21       So our intention in writing these three things were simply

22   to not have techniques that could interfere with in-app

23   purchase.

24   **Q.** Any other reason?

25   **A.** That was the only reason we had in mind when we created

SCHILLER - CROSS / DOREN

1    those.

2    **Q.**  And why is it required that the link app appear on no more

3    than one app page?

4    **A.**  Well, our thought on that was simply can we scale to check

5    these across many apps through app review, and if it was

6    open-ended and there were an unknown number or a lot of them,

7    if we're hopefully to get thousands and thousands of apps

8    doing this, that scale would become difficult to manage and

9    difficult to try to make safe for users.

10    **Q.**  And in that same bullet point, there's the phrase "the

11    page the end user navigates to."  Is that intended to limit

12    the location of the purchase link in any way?

13    **A.**  No.  In fact our hope was the opposite, that developers,

14    other than not getting in the way of in-app purchase, could

15    put it anywhere they wanted in their app.

16    **Q.**  And, sir, in the seventh bullet point from the top, we

17    have the not mimic.  And then in the eighth, what we just

18    discussed.  And then in the ninth, must not be displayed on

19    any page that is part of an in-app flow to merchandise or

20    initiate a purchase using in-app purchase.

21        And again, can you explain to the Court why that

22    requirement is there?

23    **A.**  We were trying to make sure that we have a system here

24    where developers can communicate clearly with users about

25    great offers on their website without also trying to undermine

SCHILLER - CROSS / DOREN

```
 1    and keep IAP from working appropriately for users and
 2    confusing them about how that works.
 3         So that was what we were trying to separate.  Show it
 4    wherever you want, but once they're starting the buying
 5    process with in-app purchase, don't -- don't ruin how that
 6    process works.
 7    Q.  And you were asked some questions about comparison
 8    shopping with -- with jeans out on the -- on the display floor
 9    and jeans back in the storeroom.
10         How about comparison shopping if you're looking for
11    ladders at Lowes and ladders at Home Depot, what do you do
12    then?
13    A.  Well, then you're going to two different places.
14    Q.  And which is the better comparison to what we're talking
15    about here?
16    A.  Well, I believe the latter -- no pun intended.  Well, I
17    didn't mean to do that, the latter.  But, again, I thought the
18    intention here was not to replace in-app purchase with a
19    completely different in-app purchase process.
20    Q.  And, Mr. Schiller, you were asked questions about -- about
21    the interstitial, modal, or pop-up.  And you were asked
22    whether that hides information from users.  And I wrote down
23    your answer.  It was possibly sometimes, not always.  And I
24    was -- I was confused about that so I wanted to ask you what
25    you meant.
```

SCHILLER - CROSS / DOREN

1    **A.**   Again, I think the -- there's the possibility here with

2    some of these techniques, if there aren't some of these

3    guidelines, to create confusion for the user intentionally

4    where they don't know what's in-app purchase and they don't

5    know is intended to drive into a linkout, and then that will

6    create mistrust in the whole in-app purchase system.

7        And that's the general concern I and others have had about

8    how to implement this in a way that both stay true that it's

9    clear communication to all users and it is that in-app

10   purchases still works and protects users as it did before.

11   **Q.**   You also testified earlier today that having the two

12   payment options on the same page may create a trust issue and

13   therefore a fraud issue.

14       Do you recall that generally?

15   **A.**   Yes.

16   **Q.**   Can you describe what you meant, please.

17   **A.**   If -- if -- if developers are able to create confusion,

18   intentionally or unintentionally, around how in-app purchase

19   works or what is in-app purchase versus something else, and

20   ultimately, not the good developers, but some of the bad

21   actors out there, take advantage of that and drive users to

22   purchase models that are not safe, then that can undermine the

23   ecosystem and ultimately hurt the trust users have because

24   they may not understand or always trust that what they got

25   from Apple is a safe purchase and has all the purchase

SCHILLER - CROSS / DOREN

1    features we provide.

2        Again, I don't think that's always the intention of a good

3    developer, but we're trying to make rules here that protect

4    users not only from unintentional things but from true

5    intentional bad actors.

6            THE COURT:  So you're creating a system for the

7    lowest common denominator, which harms --

8            THE WITNESS:  Certainly not.  I didn't --

9                    (Simultaneous colloquy.)

10           THE COURT:  -- which harms those who do it properly,

11   right?  To your benefit.

12           THE WITNESS:  It -- I'm not trying to do this to our

13   benefit, Your Honor.  I'm trying to find that balance of the

14   two systems that can work together for everybody.

15           THE COURT:  The problem is that, as you've indicated,

16   all that this does is maintain the noncompetitive environment

17   that exists.

18           THE WITNESS:  I think we've done more than that, but

19   I understand the questions and the concerns.

20           THE COURT:  Was there any discussion given to having

21   a certification, for instance, where those not lowest common

22   denominator bad actors, like Netflix, obviously you -- Amazon,

23   you trust those folks, where they would be given more latitude

24   than you're allowing because of these supposed bad actors?

25   Any discussion?

UNITED STATES DISTRICT COURT

**ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 6** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 904 - 1118 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, May 31, 2024 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        825 Eighth Avenue
                        New York, New York  10019
                   BY:  GARY A. BORNSTEIN,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        BENJAMIN WYLLY,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
1                    A P P E A R A N C E S  (CONT'D.)

2

3    For Defendant:          Weil, Gotshal & Manges LLP
                             2001 M Street NW, Suite 600
4                            Washington, D.C.  20036
                        BY:  MARK A. PERRY, ATTORNEY AT LAW
5

6                            Gibson, Dunn & Crutcher LLP
                             333 South Grand Avenue
7                            Los Angeles, California  90071
                        BY:  RICHARD J. DOREN,
8                            JASON C. LO,
                             JACQUELINE L. SESIA, ATTORNEYS AT LAW
9
                             Gibson, Dunn & Crutcher LLP
10                           One Embarcadero Center, Suite 2600
                             San Francisco, California  94111-3715
11                      BY:  ANTHONY D. BEDEL, ATTORNEY AT LAW

12                           Gibson, Dunn & Crutcher LLP
                             1050 Connecticut Avenue, N.W.
13                           Washington, DC  20036-5306
                        BY:  HARRY PHILLIPS,
14                           CYNTHIA E. RICHMAN, ATTORNEY AT LAW

15

16

17

18                           --o0o--

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3

4     FRIDAY, MAY 31, 2024 - VOLUME 6

5

6     PLAINTIFF'S WITNESSES              PAGE    VOL.

7     SIMON, BENJAMIN

8     (SWORN)                            933      6

9     DIRECT EXAMINATION BY MR. BORNSTEIN    933      6

10    CROSS-EXAMINATION BY MR. LO        963      6

11    REDIRECT EXAMINATION BY MR. BORNSTEIN  1028     6

12

13    SHOBIN, ALEC

14    (SWORN)                            1039     6

15    DIRECT EXAMINATION BY MS. MOSKOWITZ    1039     6

16    CROSS-EXAMINATION BY MR. LO        1060     6

17    REDIRECT EXAMINATION BY MS. MOSKOWITZ  1113     6

18

19

20                      --o0o--

21

22

23

24

25
```

```
 1        gone for two weeks from then.
 2            And I apologize, I don't have a calendar in front of me.
 3        It was the day before he testified the last time -- or the
 4        last time.
 5                THE COURT:  He testified --
 6            Ms. Richman, good morning.
 7                MS. RICHMAN:  Good morning, Your Honor.
 8                THE COURT:  He testified on 5/16 and 5/17 according
 9        to my notes.  Two weeks from that time is May 30th or
10        May 31st, and now you're saying it's June 10th?
11                MR. PERRY:  Yes, Your Honor.
12                THE COURT:  Well, he may have to fly back, wherever
13        he is.  That's on you.
14                MR. EVEN:  So before we question him, Your Honor, we
15        have some serious concerns about the documents that were
16        produced.
17                THE COURT:  All right.
18                MR. EVEN:  Which we have raised with Apple.  I have a
19        binder, if I may give Your Honor, of some examples.
20                THE COURT:  Sure.
21                    (Pause in the proceedings.)
22                MR. EVEN:  So the first thing, Your Honor, and the
23        most concerning perhaps is that after all the back and forth
24        between Your Honor and -- and Mr. Oliver, Your Honor told
25        Mr. Oliver -- Mr. Oliver to go back, review his notes, and any
```

```
 1      notes that relate to this issue to produce.  We understand
 2      that's not been done.
 3                  THE COURT:  You understand that it's not been done?
 4              MR. EVEN:  Correct, Your Honor.  Because a lot of
 5      these documents -- and Your Honor can begin looking at tab F
 6      in the binder.  And behind that, Your Honor, you can see that
 7      most of this is redacted, and I'll talk to that in a bit, but
 8      the last page is an email from Mr. Jeff Guebert where he
 9      writes "Meeting notes from today's discussion have been
10      captured in Quip," Q-U-I-P, "and are part of our folder that
11      we will be using for this project."  And then there are
12      references to some other documents in Quip.
13          And behind tab G, there's an email from Tanya Washburn
14      saying, "Hi everyone, Here with a link --"
15                  THE COURT:  What is Quip?
16              MR. EVEN:  Quip, we understand is some product
17      management repository.  We've asked Apple to produce documents
18      from it.  All of these emails say that notes, drafts, all of
19      these things, this entire project was apparently handled on
20      this platform.  Apple informed us that they did not, quote,
21      unquote, chase the links and did not produce anything from
22      Quip.  We don't have any notes from any meeting in what was
23      produced.
24          Now we don't understand this to be a chase --
25                  THE COURT:  First of all, I -- just to make sure that
```

```
 1     the record is clear.  The code name for this was Wisconsin.  I
 2     recall the testimony being that there were other code names.
 3     What were the other code names?
 4              MR. PERRY:  Your Honor, the previous code name was
 5     Michigan.  The final version was Wisconsin, is my
 6     understanding from the testimony.
 7              THE COURT:  And so why -- well, your response.
 8              MR. PERRY:  Your Honor, the Court asked Mr. Oliver to
 9     search his emails, iMessages and Slacks for communications
10     regarding the project.  Mr. Oliver did that the day after he
11     testified -- or the day of his testimony and the day after,
12     and found approximately 800 of those communications, all of
13     which we have produced both to the Court and to Epic.  We have
14     made redactions for confidentiality and privilege in keeping
15     with the other documents produced during the hearing.
16          We did not as -- "chase" is the word I gather the
17     e-discovery folks used, the links in those communications.  We
18     understand the request to be for the communications
19     themselves.  The parties in this proceeding have not routinely
20     chased links in e-discovery.  We did include attachments,
21     and -- and that is the production that was made is the actual
22     communications.
23          There's a second set of documents.  To be clear, the Court
24     also asked for some case studies and other backup for certain
25     assumptions, and there's approximately 40 documents that refer
```

```
 1   to that as well.  So that was two -- two components of the
 2   Mr. Oliver production.
 3              THE COURT:  Do you have what my instruction was?  I
 4   don't recall using the word Slack iMessage.
 5              MR. EVEN:  I have what was exchanged.  I'm sure we
 6   have the order somewhere if somebody can get it for me.
 7        But in the exchange in court, you asked Mr. Oliver where
 8   he's keeping his stuff.  He said it's on his computer in some
 9   note-keeping thing.  And you said today you'll go back, you'll
10   review your notes.  Any notes that -- and any notes that
11   relate to this issue I want produced.  So --
12              THE COURT:  "Any" is pretty broad.
13              MR. PERRY:  Yes, Your Honor is --
14              THE COURT:  So and does he have access to Quip?
15              MR. PERRY:  Well, he has access to Quip.  Quip is a
16   sort of white board that is an ongoing thing.  It's not frozen
17   in time at the time that communication was made.  In other
18   words, there is access to Quip.  It is a -- it is a
19   collaborative --
20              THE COURT:  The whole point, Mr. Perry, was to get
21   the documents relative to the decision-making with respect to
22   the issues in front of the Court.  That was the point.
23              MR. PERRY:  Yes, Your Honor.
24              THE COURT:  And you didn't do it.
25              MR. PERRY:  Well, Your Honor, with respect, the
```

```
 1   Court -- as we understood, the order was to produce the notes,
 2   emails, Slack, iMessages.
 3            THE COURT:  Where do I say Slack, email, and
 4   iMessage?
 5            MR. PERRY:  Well, Your Honor, it was in the
 6   discussion with Mr. Oliver.  You asked -- the Court asked what
 7   basis of communications, and then the -- the direction was --
 8            THE COURT:  Okay --
 9            MR. PERRY:  You're going to --
10            THE COURT:  -- so let me make it clear then if you
11   obviously didn't understand.
12       I want all of Apple's documents relative to its
13   decision-making process with respect to the issues in front of
14   the Court.  All of them.  All.  If there is a concern, then be
15   overly broad.
16            MR. PERRY:  Your Honor, may I ask time parameter for
17   the Court's request.
18            THE COURT:  All.
19            MR. PERRY:  Thank you, Your Honor.
20            THE COURT:  So let's say from the day that my
21   decision came out until the present.
22            MR. PERRY:  Yes, Your Honor.  That is not what is in
23   this production, to be clear.  That is not what we attempted
24   in this production.  This production was Mr. Oliver's
25   documents.  I just want to make that --
```

```
 1              THE COURT:  So the proceedings here are whether or

 2    not to hold you in contempt, that -- not you obviously

 3    personally, but Apple -- for failure to comply with my order.

 4         I have been told in this proceeding that much of the

 5    decision-making was not written, there were lots of

 6    communications and lots of meetings, which is not entirely

 7    beyond the pale given that Apple has been held to account many

 8    times, and part of the reason for the accounting is because

 9    there are things in emails.  So now you all don't write things

10    down anymore.

11         I need to understand what it was people were thinking and

12    how you got to a 27 percent charge from a 30 percent charge

13    that had been found to be anti-competitive.

14         So am I now clear?

15              MR. PERRY:  It's very clear, Your Honor.

16              THE COURT:  Mr. Even.

17              MR. EVEN:  Yeah, and so -- so one correction on that,

18    Your Honor, is that to be clear, the emails in tabs F and G

19    and H with the links to the notes in Quip are emails to

20    Mr. Oliver.  So he has the emails.  That's why they were

21    produced, I assume, with the links and he had the access.

22         We also have an issue, Your Honor, with the documents that

23    were produced because a lot of them were redacted, some

24    documents were withheld.  We never got a priv log.  Some of

25    them were redacted on the basis of confidentiality which we're
```

```
 1        not sure about the reason for.
 2            But to give Your Honor some examples, one is behind tab D
 3        where, for instance --
 4                THE COURT:  Well, let's take a look at tab D.
 5                MR. EVEN:  So we have a --
 6                THE COURT:  So I'm going to ask some questions.
 7            There are three people who are redacted in terms of chat
 8        participants.  What is the basis for the redaction?
 9                MR. PERRY:  Your Honor, I don't have the unredacted
10        version of this with me.  I apologize.
11                THE COURT:  Well, who is -- who redacted it then?
12                MR. PERRY:  May I have a moment, Your Honor?
13                THE COURT:  You may.
14                    (Pause in the proceedings.)
15                UNIDENTIFIED SPEAKER:  Those redactions --
16                THE COURT:  Who are you?
17                MR. PERRY:  Apologize.  This is Dana Craig, Your
18        Honor, also from Gibson Dunn, representing Apple, who assisted
19        with the document production.
20                THE COURT:  And are you a lawyer?
21                MS. CRAIG:  Yes, I am, Your Honor.
22                THE COURT:  All right.
23                MS. CRAIG:  Those redactions are phone numbers, Your
24        Honor.
25                THE COURT:  All right.  On the next page, what is the
```

```
 1    basis for the redaction that says "Confidential"?

 2            MS. CRAIG:  I would have to see the document.  My

 3    guess is that -- yeah, I would have to see the document, Your

 4    Honor.

 5            THE COURT:  Okay.  Go find it.

 6            MS. CRAIG:  Okay.

 7            THE COURT:  That would be now.

 8            MS. CRAIG:  Okay.

 9            MR. EVEN:  So the point, Your Honor, we wouldn't even

10    know this document is relevant because the only relevant

11    content of the document was fully redacted for

12    confidentiality.  All I have left is "Do you have a minute?"

13    and "Can I call you?"

14            THE COURT:  I agree.

15            MR. EVEN:  Another example is in tab A.  This one is

16    redacted for privilege.  This is an email from Tanya Washburn,

17    who we understand to not be a lawyer, to Matt Fischer.

18            THE COURT:  Tab which?

19            MR. EVEN:  A.

20            THE COURT:  H?

21            MR. EVEN:  A, as in apple.  Sorry, Your Honor.

22            THE COURT:  A, as in apple.

23            MR. EVEN:  Yes.

24         So it's an email to more than a dozen people including

25    Mr. Carson, including Mr. Fischer.
```

```
 1              THE COURT:  And who's Tanya?
 2         MR. EVEN:  The subject is Wisconsin prep.
 3         THE COURT:  And who's Tanya Washburn?
 4         MR. EVEN:  I understand she's a nonlawyer, Your
 5    Honor.  And this is about a meeting of this work group, and
 6    the entire substantive content is redacted.
 7              THE COURT:  Where is the lawyer?
 8         MR. EVEN:  So there are lawyers, I understand, and
 9    Mr. Perry may speak more to that, in the "To" line, but there
10    are many who are not lawyers.  And this is a big group as we
11    heard last week.  All the Wisconsin meetings included lawyers
12    and nonlawyers.
13              THE COURT:  So this is -- this is from June of 2023.
14         MR. EVEN:  Yes, Your Honor.
15         THE COURT:  All right.
16         MR. EVEN:  Another example is behind tab E,
17    Your Honor, where there's a PDF of what design we'll present
18    to Phil, who we understand to be Mr. Schiller, for Wisconsin
19    tomorrow.  This is written from Terry Liu, who I believe is
20    not a lawyer although I'm not sure.
21         I'm guessing this is another version of the deck that
22    we've all been discussing.  But the document itself was
23    withheld for privilege.  So I have something that says here's
24    the PDF, but I have no ability to question Mr. Oliver at all.
25              THE COURT:  So are you working on a privilege log?
```

```
 1              MR. PERRY:  Yes, Your Honor.

 2              THE COURT:  And when is it going to be done?

 3              MR. PERRY:  I believe it is done this week or early

 4    next week, I believe it is done.  We have been working on it

 5    since Mr. Even raised this issue.

 6         We also, just to be clear, offered to meet and confer on

 7    any particular documents.  This is the first time we're

 8    hearing specifics.  You know, we could explain these things,

 9    in other words, with them in front of us rather than here.

10    That conversation has not been had between the parties.

11         But, yes, we are working on the privilege log and we will

12    produce it.

13              MR. EVEN:  To be clear, that's not what was

14    represented to us, Your Honor.  What was represented to us is

15    that Your Honor did not ask for a priv log and therefore there

16    won't be one.

17              THE COURT:  Well, I'm assuming that you don't want to

18    produce everything, that you actually do want to withhold

19    stuff on grounds of privilege.  And if you are, then there

20    needs to be a log.

21              MR. PERRY:  Yes, Your Honor.

22              THE COURT:  That's standard protocol.  I shouldn't

23    have to tell you that.

24              MR. PERRY:  We -- we are -- as I just said, we are --

25    have been working on the log and it is almost completed for
```

1    this production.

2         THE COURT:  How long is it going to take you to get

3    the actual full production that I just ordered?

4         MR. PERRY:  Your Honor -- yes.  If I could make three

5    points about that, please.

6         First, we will check.  "I don't know" is the straight

7    answer to your question.  I don't know how long it will take,

8    but we will find out.

9         Second, you know, Epic didn't seek any of this, to be

10   clear, before the hearing began.  We made that point in the

11   papers.  They did not seek any discovery.

12        I understand the Court's order, but I wish to be clear

13   that this is coming from the Court, not from Epic.  And we

14   will find out the answer.

15        The third is when would the Court like to get back to

16   us -- us to get back to you with --

17        THE COURT:  You're going to talk about it now.  I'm

18   going to have a decision now.  So we'll stand in recess.  I'll

19   give you 45 minutes to figure it out.  I'll be back here at

20   10:00.

21        MR. PERRY:  Thank you, Your Honor.

22        (Recess taken at 9:20 A.M.; proceedings resumed at

23   10:02 A.M.)

24        THE COURT:  All right.  We are back on the record.

25   Please be seated.

1    The record will reflect that the parties are present.

2    Mr. Even, Mr. Perry, where do we stand?

3    **MR. PERRY:**  Your Honor, Mark Perry for Apple.

4    We have consulted the folks that are here in the courtroom

5    regarding the Court's request for all information related to

6    injunction compliance from September 10th, 2021, through

7    January 16th, 2024.  And our preliminary assessment -- and

8    we'd need to confirm some of this, Your Honor -- is that it

9    would involve potentially hundreds of custodians, particularly

10   if we include all the engineering work, which hasn't really

11   been the subject of the testimony here, but many, many

12   engineers were involved.

13   We estimate, Your Honor, that if we limited the search to

14   the commission issues that have been the focus of many of the

15   Court's questions, it would be up to 50 custodians.

16   As with any document production, we'd need to balance, you

17   know, the time to completion with -- with completeness.

18   If we could agree with a custodian list with Epic, I think

19   we all know who the principal players are from what we've done

20   so far, and search terms, as we did at the merits stage.  And

21   just reference, Your Honor, at the merits stage, we agreed on

22   24 custodians, and that took about four months on top of the

23   production that had already been done.

24   We think we could do this in approximately three months.

25   We could do some of it on the back end.  If we had a

1   custodian list and search terms, we can do automatic searches.

2   Some of it will require front-end searches.

3       This issue of the links, they take significantly more

4   time.  They cannot be automatically searched.  Judge Hixson

5   held in the *Pepper* case that they don't -- that Apple doesn't

6   produce all of them but the parties negotiate which ones to

7   chase, and we would propose something like that.

8       And then given the nature of the project, attorneys were

9   involved, as the Court is aware, throughout.  Many of these

10  documents are going to require an individualized privilege

11  review which was not the case in the previous production.  So

12  that's -- that's the time estimate.

13      Again, we -- we estimate we could do it in three months if

14  we had an agreed list of custodians and search terms.

15      I -- I -- I have to stress, Your Honor, this is

16  preliminary, in other words, we met on this, we know -- we

17  know the documents, but we have not pulled these.  They

18  don't -- there's no set that exists right now.  And we would

19  like to do a little more spade work frankly and submit

20  something next week with hard numbers if the Court would --

21  would appreciate that so that we can nail down, you know --

22  these are estimates, the best estimates we have today, but I

23  don't know -- you know, I'd like to do a little more work to

24  make sure we're right on the number of people involved in

25  particular.

```
 1            MR. EVEN:  So, Your Honor, we don't obviously have
 2     visibility into what Apple has and doesn't have.  What we do
 3     know is that there seems to be, at least as a preliminary
 4     issue, this Quip repository that has drafts, meeting notes,
 5     and all of those things that I don't know why that should take
 6     that long.  The emails with the links to that are there, and
 7     somebody ought to know what -- where that repository is.
 8         I think it needs to be very clear that Apple cannot redact
 9     things for confidentiality.  We have a protective order in the
10     case, and confidentiality is addressed through that.
11         I think we need some custodial information which Apple has
12     so far refused to provide us saying that the Court has not
13     asked for any metadata and therefore they're not obligated to
14     give that.  That's another issue that I haven't even gotten
15     to.
16         But we don't know, for instance, for PowerPoints, drafts,
17     et cetera, who -- who created, who modified, when they were
18     created, when they were modified, because everything was
19     produced as essentially paper documents or PDFs.
20         I think we can at least start there and then meet and
21     confer if there's more that's needed.  But those seem like
22     low-hanging fruit that don't need to take four months and that
23     we can start the process and figure out what's going on.
24            THE COURT:  I'm curious why you didn't ask for
25     discovery prior to a hearing.
```

```
 1            MR. EVEN:  Your Honor, we had -- at the time we
 2    thought we had enough information into what Apple has done
 3    based on the declaration and things of that nature.  We -- I
 4    think a lot of that came -- came out on cross where we thought
 5    it was pretty clear that what Apple has done was insufficient
 6    based on the results.  And we didn't think that much more was
 7    needed.
 8        It also wasn't clear to us that Your Honor meant for us to
 9    seek discovery on this particular issue, and so that -- that's
10    where we left it.
11            THE COURT:  You've been handed some notes.  Do you
12    want to say anything else?
13            MR. PERRY:  Your Honor, as to the confidentiality
14    redactions and metadata, we do have an ESI protocol in place.
15    We could, you know, follow that.  Much of those issues have
16    been resolved.
17        We have not been -- to be clear, the few documents that
18    have produced during the trial, we've been trying to get them
19    out quickly to the Court and to Epic because we're in the
20    ongoing proceeding.  If we're going to shift this into
21    discovery for the first time, you know, we do have a set of
22    protocols in place that would address the technical things
23    that Mr. Even mentioned that the parties already agreed on and
24    Judge Hixson has already ruled on.
25            MR. EVEN:  Your Honor, with respect, this is the
```

```
 1    second time now that this is happening that we're learning
 2    here that Apple is in fact working on a priv log and now
 3    they're suggesting that they'll use the ESI order.
 4        We've asked for all that the first time we got the
 5    documents immediately.  That was last weekend, I believe.  We
 6    said please provide us -- that was during the Memorial Day
 7    weekend -- please provide us the documents.  Based on the ESI
 8    order that you have agreed to, please provide us with the priv
 9    log.
10        I could have had a lot more information.  Apple told us
11    we're just not going to do that because we don't think this is
12    your discovery.  We think this is the Court, and the Court
13    didn't mention anything about an ESI order or metadata or priv
14    logs or anything of that nature.  And we're entitled to redact
15    things for confidentiality other than Northern District rules.
16    I'm not sure which rule that is.  It was never cited to me.
17        That -- those are the answers we got.  So this is not new
18    news for Apple.  They've known about it for at least since I
19    think it's Saturday night when I sent that email.
20            MR. PERRY:  Your Honor, may I address that, please?
21            THE COURT:  You may.
22            MR. PERRY:  We -- you just heard Mr. Even say they
23    sought no discovery before filing this motion.  They sought no
24    discovery before proceeding to this hearing.  They thought
25    they had enough.
```

```
 1          The Court has requested documents during the hearing.  And
 2   Apple has produced them within 24, 36, 72 hours for the Court.
 3   And we have produced them in paper copy for the Court.  And we
 4   have not been following the protocols, as I've told Mr. Even
 5   over and over again, because we've been trying to get them
 6   done during the hearing.  We were trying to finish today, as
 7   the Court noted this morning.  It takes longer to do things
 8   with all the bells and whistles.  Right?
 9          What I'm hearing the Court request this morning is a more
10   formalized discovery process.  I was simply pointing out that
11   that hasn't been done yet, that hasn't been requested by Epic.
12   And that if that is what we are going to embark on, then there
13   are protocols and procedures in place.
14          I was suggesting we don't need to reinvent the wheel.  We
15   can go back to the sort of 2021 period, 2020 period where we
16   had these protocols in place for this case and Judge Hixson's
17   rulings on various things that lay the groundwork for doing
18   it.  That was my point there.
19          MR. EVEN:  And our point was simply, Your Honor, that
20   it doesn't take less time to start stamping things
21   confidential and redact them.  It doesn't take less time to
22   scrape things from their metadata and produce them at PDF.
23   These things take more time, not less, and Apple took the more
24   time in order to provide a deficient production.
25          THE COURT:  Obviously we're not finishing today.  The
```

```
 1    question is how much time do you all need to get the documents
 2    that will be sufficient to show, which is always the term I
 3    used with discovery, I don't need every scrap of paper.  The
 4    problem is, is that if you are trying to hide something, I
 5    don't obviously want people to be able to use wiggle room to
 6    hide things.
 7        So if there is nothing, if there's no documentation, then
 8    it's pretty simple.  It sounds like that wasn't the case.
 9    Decisions were made, analysis was apparently done.  And it's
10    not just -- it's not just the commission that you're seeking.
11    It is all the other restrictions that have been added, that I
12    never authorized, to the protocols that are concerning.  All
13    of it is concerning.  All of it is concerning.
14        So at this point, it appears as if I need contemporary --
15    contemporaneous documents to indicate and to show me what was
16    actually going on.  There are issues of intent that need to be
17    addressed.  And documents can frequently circumstantially
18    address that.
19        So we are not done.
20        I need you all to meet and confer and figure out the most
21    efficient way to get me what I need for purposes of this
22    hearing.  You can meet today.  I can meet with you in the
23    afternoon.  You can meet over the weekend.  But I need some
24    kind of resolution of this issue.  And I need to get you back
25    on my calendar.
```

```
 1              MR. EVEN:  Understood.

 2              MR. PERRY:  Understood, Your Honor.  May I propose

 3    that, with the Court's instruction, if we go back to Apple and

 4    the custodians and figure out what the size of the box is, the

 5    meet-and-confer would be more useful so that we can discuss

 6    custodian names and titles and so forth, you know, which is

 7    not information we have in court with us today, but we can

 8    have by early next week for a meaningful meet-and-confer with

 9    Epic and get back to the Court with a proposal.

10              MR. EVEN:  We can meet and confer on Monday if -- if

11    that's helpful for them.  As I said, we -- our impression

12    based on the documents we already have is that there is a

13    central repository that should answer a lot of these questions

14    where people had all these documents and meeting notes that

15    are low-hanging fruit.  But --

16              THE COURT:  Well, the question is it may be

17    low-hanging fruit, but are we going to continue with the

18    low-hanging fruit, or are we just going to continue once you

19    have what you need?  I don't know the answer to that question.

20         Obviously, you know, I got two boxes of documents.  And I

21    certainly haven't looked at them.  I don't know that you have

22    had a chance.  You know, you gave some examples, but I don't

23    know that you've been able to digest them.

24         And, you know, I'm going to leave it to you, as the

25    plaintiff, to make decisions with respect to the record that
```

*ORIGINAL*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 7** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 1119 - 1424 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, February 24, 2025 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        375 Ninth Avenue
                        New York, New York  10001
                   BY:  GARY A. BORNSTEIN,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        CHARLOTTE ROTHSCHILD,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
         A P P E A R A N C E S  (CONT'D.)


 For Defendant:          Weil, Gotshal & Manges LLP
                         2001 M Street NW, Suite 600
                         Washington, D.C.  20036
                    BY:  ANNE CORBETT,
                         MARK A. PERRY,
                         JOSHUA M. WESNESKI, ATTORNEY AT LAW


                         Weil, Gotschal & Manges LLP
                         767 FIfth Avenue
                         New York, New York  10153-0119
                    BY:  CAMILLA BRANDFIELD-HARVEY,
                          ATTORNEY AT LAW


                         Gibson, Dunn & Crutcher LLP
                         One Embarcadero Center, Suite 2600
                         San Francisco, California  94111-3715
                    BY:  LAUREN DANSEY, ATTORNEY AT LAW

                         Gibson, Dunn & Crutcher LLP
                         1050 Connecticut Avenue, N.W.
                         Washington, DC  20036-5306
                    BY:  HARRY PHILLIPS,
                         CYNTHIA E. RICHMAN, ATTORNEY AT LAW




                         --o0o--
```

```
 1                          I N D E X

 2

 3     MONDAY, FEBRUARY 24, 2025 - VOLUME 7

 4
       PLAINTIFF'S WITNESSES                  PAGE    VOL.
 5

 6     SCHILLER, PHILIP

 7     (SWORN)                                1134      7

 8     DIRECT EXAMINATION BY MR. BORNSTEIN    1135      7

 9     CROSS-EXAMINATION BY MR. PERRY         1271      7

10     REDIRECT EXAMINATION BY MR. BORNSTEIN  1304      7

11

12     ONAK, RAFAEL

13     (SWORN)                                1316      7

14     DIRECT EXAMINATION BY MS. MOSKOWITZ    1317      7

15     CROSS-EXAMINATION BY MR. WESNESKI      1369      7

16     REDIRECT EXAMINATION BY MS. MOSKOWITZ  1388      7

17

18     OLIVER, CARSON

19     (SWORN)                                1393      7

20     DIRECT EXAMINATION BY MR. OLIVER       1394      7

21

22

23

24

25
```

# E X H I B I T S

| EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|----------|---------|------|------|------|
| 0202 | | | 1397 | 7 |
| 206 | | | 1336 | 7 |
| 223 | | | 1175 | 7 |
| 224 | | | 1200 | 7 |
| 225 | | | 1264 | 7 |
| 227 | | | 1243 | 7 |
| 229 | | | 1251 | 7 |
| 0246 | | | 1409 | 7 |
| 0266 | | | 1403 | 7 |
| 268 | | | 1346 | 7 |
| 272 | | | 1156 | 7 |
| 279 | | | 1230 | 7 |
| 281 | | | 1355 | 7 |
| 291 | | | 1239 | 7 |
| 484 | | | 1261 | 7 |
| 485 | | | 1169 | 7 |
| 486 | | | 1141 | 7 |
| 487 | | | 1363 | 7 |
| 488 | | | 1151 | 7 |
| 489 | | | 1174 | 7 |
| 490 | | | 1259 | 7 |
| 496 | | | 1353 | 7 |

| | **E X H I B I T S** | | | | |
|---|---|---|---|---|---|
| **EXHIBITS** | **W/DRAWN** | **IDEN** | | **EVID** | **VOL.** |
| 520 | | | | 1330 | 7 |
| 632 | | | | 1229 | 7 |
| 1103 | | | | 1287 | 7 |
| 1104 | | | | 1298 | 7 |
| 1208 | | | | 1380 | 7 |
| 1210 | | | | 1385 | 7 |
| 1211 | | | | 1382 | 7 |

--o0o--

SCHILLER - DIRECT / BORNSTEIN

1    A.   I don't know.  And I don't recall what was in the meeting

2    agendas during that time.

3    Q.   All right.  Is it fair to say, however, that the work that

4    was done for responding to orders and requirements in other

5    jurisdictions, like the Netherlands and Korea and Japan, was

6    then relied on for use in responding to this Court's

7    injunction?

8    A.   Not relied on.  I wouldn't use that word, no.

9    Q.   Okay.  That -- that work for those other jurisdictions was

10   taken into account and considered in the response to this

11   Court's injunction, correct?

12   A.   Again, that isn't quite how I'd describe it, no.

13   Q.   Well, I'll give you the opportunity, Mr. Schiller.  How

14   would you describe the way that the work that Apple did in

15   responding to these foreign orders was used in responding to

16   the U.S. injunction from this Court?

17   A.   I think throughout all this time, we've certainly given

18   consideration to trying to make the solutions we have for our

19   developers be -- make as much sense as we can around the

20   world, be consistent where they're allowed to be around the

21   world, and some of the engineering work and some of the

22   documentation work to be leveraged and consistent between them

23   where it makes sense.  So we have to think about some of those

24   elements as we're doing any one of these projects.

25   Q.   Okay.  Well, we'll -- we'll dive into some of that a bit

SCHILLER - DIRECT / BORNSTEIN

```
1      more in the course of today.
2          So when -- when Project Wisconsin started after the Ninth
3      Circuit decision in 2023, there were a range of implementation
4      issues in terms of responding to the Court's injunction that
5      had not yet been decided by Apple; is that correct?
6   A.  Yes.
7   Q.  For example, Apple had not yet decided after the Ninth
8      Circuit decision whether Apple would charge any commission at
9      all on external purchase links, correct?
10  A.  Correct.
11  Q.  And Apple had not formed a view, if it were going to
12     charge a commission, on what that commission would actually
13     be, correct?
14  A.  Correct.
15  Q.  And Apple had not made a determination on whether there
16     would be a tracking window or how long it would be, correct?
17  A.  Correct.
18  Q.  And Apple had not made a final decision on what the format
19     or text of any warning screen would be, correct?
20  A.  Correct.
21  Q.  And at that point after the Ninth Circuit decision, Apple
22     had not yet made any decision on whether the external purchase
23     link would be allowed to be in the buy flow or not?
24  A.  Correct.
25  Q.  And lastly, Apple had not made a decision after the Ninth
```

SCHILLER - DIRECT / BORNSTEIN

1   Circuit decision in April 2023 on what the restrictions would

2   be on the format and design of the link itself, correct?

3   A.   Correct.

4   Q.   All right.  So I want to talk about how it was that Apple

5   made some of those decisions over the course of 2023.  And

6   I'll start with the commission.

7        So when Project Wisconsin started after the Ninth Circuit

8   decision, your preference personally was for Apple not to

9   charge a commission, correct?

10  A.   Preference?  I don't think that's an appropriate word.  I

11  don't -- it's not about a preference.  I'm just trying to

12  understand what is required and what it takes to meet the

13  injunction.  And so we had many discussions about the

14  commission or not and what that means.  And so that was

15  certainly an area we talked a lot about.

16  Q.   My question, Mr. Schiller, was about your personal view.

17  Your personal view was that Apple should not charge a

18  commission for external purchase links in response to this

19  Court's injunction in the spring of 2023, correct?

20  A.   Again, I -- my view was not about what we should or

21  shouldn't do.  It's about what we can or can't do and what

22  meets the requirements of the injunction and what are all the

23  considerations therein.

24  Q.   Mr. Schiller, you have a business responsibility for the

25  App Store.  Is it your testimony that you didn't actually have

SCHILLER - DIRECT / BORNSTEIN

1    a business preference about how to comply with the injunction

2    and what would be preferable from a business perspective in

3    terms of charging a commission?

4    **A.**  I did not approach it -- my -- my input into the process

5    was not about a business preference.  It was about what is

6    required to meet the injunction and -- and what is allowed or

7    not allowed.  That was -- my thought process on it.

8    **Q.**  Okay.  Well, in the first half of May 2023, you gave

9    guidance to the team working on Project Wisconsin that Apple

10   would not charge a commission; isn't that right?

11   **A.**  Here, I'm -- in order to answer, I have to ask a question.

12   I'm sorry.

13       My discussions with the team about guidance and input on

14   what we can or cannot do was directly with lawyers about what

15   does the legal injunction mean.  And so I want to make sure as

16   I answer that I don't violate privilege that's not mine to

17   violate.

18       So I'm -- I'm concerned just -- I want to make sure I have

19   the right direction on what I'm allowed to and not allowed to

20   say --

21   **Q.**  Well --

22   **A.**  -- that would be violation of privilege.

23   **Q.**  Sure.  Fortunately we've had some guidance from the Court

24   in an order issued on New Year's Eve -- the Court was working

25   hard -- regarding the scope of the privilege that can be

SCHILLER - DIRECT / BORNSTEIN

1    thought maybe you would have to go live, correct?

2    **A.**  Yes.

3    **Q.**  All right.  Let's have you take a look then at

4    Exhibit 227.

5              **MR. BORNSTEIN:**  Oh, and, Your Honor, I don't know if

6    I moved Exhibit 291 -- oh, I did subject to --

7              **THE COURT:**  You did, subject to --

8              **MR. BORNSTEIN:**  Yeah.  I did.  I did.

9    **Q.**  So let's go to Exhibit 227, please.  And 227,

10   Mr. Schiller, this is the July 5th, 2023, App Store price

11   committee deck, correct?

12   **A.**  Yes, it looks to be that.

13   **Q.**  All right.

14             **MR. BORNSTEIN:**  I move the admission of Exhibit 227,

15   Your Honor.

16             **MR. PERRY:**  No objection, Your Honor.

17             **THE COURT:**  It's admitted.

18                  (Exhibit 227 received in evidence.)

19   **BY MR. BORNSTEIN:**

20   **Q.**  Now this deck, the App Store price committee deck, on the

21   day that you anticipated going live, this one is not labeled

22   privileged or confidential, is it?

23        Let me do it better.  This one is not labeled privileged

24   or confidential, correct?

25   **A.**  I believe it is labeled confidential.

SCHILLER - DIRECT / BORNSTEIN

1    **Q.**  Right.  It says Apple confidential for internal use only.

2    Right?

3    **A.**  Yes.

4    **Q.**  There's no privilege claim.  There's nothing that says

5    "prepared at the request of counsel" this time, right?

6    **A.**  I don't see that.

7    **Q.**  And this was the one that, at least at the time, you

8    thought might be the final deck because you didn't know yet

9    whether or not the stay -- a further stay would be granted of

10   the injunction, correct?

11   **A.**  I do not recall on July 5th what I thought about whether

12   this was final or not.  I don't recall.

13   **Q.**  Okay.  See if I can help on that.

14        So the page 227.3, Mr. Schiller, you'll see there's a

15   timeline.

16   **A.**  Yes.

17   **Q.**  And it's called a compliance timeline.  And you see in the

18   bottom left corner, it says the Court's ruling on the motion

19   to stay will dictate the date the mandate issues.

20        Right?

21   **A.**  I see that.

22   **Q.**  Okay.  And then there are several columns on the slide

23   that reflect items that are keyed and timing off of when the

24   mandate issues.  Do you see that?

25   **A.**  Yes.

SCHILLER - DIRECT / BORNSTEIN

1   **Q.**  So the mandate issues plus one day, the mandate issues

2   plus five days, and so forth.  Correct?

3   **A.**  Yes.

4   **Q.**  So at this point on July 5, what Apple is doing is it's

5   preparing for the imminent issuance of the mandate so that it

6   can be ready to put the injunction response plan into action.

7   Fair?

8   **A.**  I believe so, yes.

9   **Q.**  All right.  Now, look at the next slide .224.

10      On Exhibit 22 --

11      (Exhibit published to witness, counsel, and the Court.)

12  **BY MR. BORNSTEIN:**

13  **Q.**  No.  It's 227.4.

14  **A.**  Thank you.

15  **Q.**  This slide is titled "Link Entitlement Policies and User

16  Experience," right?

17  **A.**  Yes.

18  **Q.**  And now here if you look on the bottom right, now in the

19  final slide it reads that the link cannot be displayed on any

20  page that is part of an IAP flow to merchandise or initiate an

21  IAP, correct?

22  **A.**  Yes.

23  **Q.**  So by this point in time when you're preparing to go live,

24  Apple has decided that it would impose this restriction on the

25  placement of an external purchase link, correct?

SCHILLER - DIRECT / BORNSTEIN

1    though.

2              THE WITNESS:  You can make sure it's --

3              THE CLERK:  Do you want it on?

4              THE COURT:  For him.

5              MR. BORNSTEIN:  It might help if you tap it.  Maybe

6    that might make it go on.

7              THE COURT:  No.  She needs to make sure he has it.

8        Is it there now?

9              THE WITNESS:  Yes.  Thank you very much.

10   BY MR. BORNSTEIN:

11   Q.  Okay.  And so CX54, Mr. Schiller, the price committee deck

12   from the January 11 in-person meeting, 2024, in-person

13   meeting, this one is labeled "attorney client privileged,

14   prepared at the direction of counsel."  Correct?

15   A.  I see that, yes.

16   Q.  And then after this meeting, the decision was made to

17   finalize the determination of what would be in the injunction

18   response plan through an exchange of emails among members of

19   the price committee, correct?

20   A.  Yes.  It was more than exchange of emails.  It was -- we

21   call that an email price committee.  We've done it on other

22   occasions as well.  Where we haven't made the final decision

23   and we -- rather than have everyone meet in the room again, we

24   can handle it via email.  So it was an email approval of the

25   price committee.

SCHILLER - DIRECT / BORNSTEIN

1    Q.   Right.   And there was a deck associated with -- with that

2    email approval of the price committee as well.   Correct?

3    A.   Yes, correct.

4    Q.   All right.

5            MR. BORNSTEIN:   And this is also in evidence, Your

6    Honor, if we can put it on the screen.   It's CX9A.

7        (Exhibit published to witness, counsel, and the Court.)

8    BY MR. BORNSTEIN:

9    Q.   And Mr. Schiller, this is the final price committee deck

10   dated January 16, 2024, for the external purchase link

11   entitlement that you signed off on, correct?

12   A.   I believe so.

13   Q.   And for this final one, Apple again took off the privilege

14   stamp, correct?

15   A.   I see that, yes.

16   Q.   Yes.   And are you aware that Apple then submitted this one

17   to the Court in opposition to Epic's motion to enforce the

18   injunction as evidence of the decision-making process that

19   Apple went through to get to its injunction response plan?

20   A.   I'm not sure what was submitted or not.   Sorry.

21   Q.   Fine.   The docket will reflect what it reflects at docket

22   entry 916-07.

23           MR. BORNSTEIN:   Your Honor had mentioned a break.

24   I'm going to move to a different topic.   I'm happy to keep

25   going or take the break.   I just thought I'd raise the

SCHILLER - CROSS / PERRY

1    Q.  Did you read the injunction personally?

2    A.  Yes, I did.

3    Q.  And the order in this case which came out at the same

4    time, did you read that as well?

5    A.  Yes.

6    Q.  It was 185 pages long?

7    A.  Yes.

8    Q.  Do you recall discussing that order with a reporter

9    shortly after it came out?

10   A.  No, I don't recall.

11   Q.  Let me show you a document solely to refresh your

12   recollection, sir.  It's in your tab at CX1100.

13   A.  (Reviewing documents.)

14       I see that document.

15   Q.  Mr. Schiller, this is a September 12th email from PR

16   group -- within PR group.  What -- do you remember when the

17   Court's decision was in this case?

18   A.  In September of 2021.

19   Q.  And without reading the document out loud, if you just

20   read the first paragraph or the first sentence, does that

21   refresh your recollection, sir, that you spoke with a reporter

22   shortly after this decision was issued?

23   A.  It refreshes my recollection that I spoke with a reporter.

24   I don't remember the conversation at all.

25   Q.  You don't remember anything about it?

SCHILLER - CROSS / PERRY

```
 1    A.  I'm sorry, I do not.

 2    Q.  Okay.  Let me just ask you one -- one question about it

 3    that might refresh your recollection.

 4        If you look at the last page, which was 17411,

 5    Mr. Schiller.

 6    A.  I see that.

 7    Q.  Do you see your initials there toward the top, PS?

 8    A.  I do.

 9    Q.  And again without reading it out loud, could you just read

10    that to yourself, please?

11    A.  (Reviewing document.)

12        I've read that.

13    Q.  And does that refresh your recollection about what you

14    discussed with this reporter?

15    A.  I'm sorry, it does not.

16    Q.  Quite all right, Mr. Schiller.  It was a fair bit of time

17    ago.

18        Let's move on from there.

19        Mr. Bornstein asked you a number of questions today about

20    Apple's work in connection with developing a compliance plan.

21    Do you recall that?

22    A.  Yes.

23    Q.  And can you describe just in more general terms how that

24    work progressed with your role in it.

25    A.  As we stated previously when I was questioned, it began
```

SCHILLER - CROSS / PERRY

```
 1    immediately working on a compliance plan in 2021.  First
 2    understanding the ruling, reading it, discussing it with legal
 3    counsel to understand what it means for us.
 4        We began having conversations in '21 working up through
 5    '23.  And then as been discussed, there were a number of other
 6    activities in 2023 with appeals and things like that, that the
 7    team kept us updated.
 8        And we added people throughout the process to work on a
 9    compliance in a cross-functional way across teams at Apple,
10    eventually culminating in the final plan and implementation.
11 Q.  Now you've mentioned a couple times today the involvement
12    of legal counsel, Mr. Schiller.  And without discussing what
13    you addressed with legal counsel, is it usual in your position
14    at Apple to have legal counsel involved in a -- in a project
15    like this?
16 A.  Like this?  This is a fairly unique project, I would say.
17 Q.  Why is that?
18 A.  Because it is a injunction.  It's a legal order.  And so
19    the definition of it involves the legal team and legal
20    understanding.
21 Q.  And again without revealing the substance of
22    communications, from your perspective as a business leader at
23    Apple, why, in this unique project, were the lawyers involved?
24 A.  Well, in this case, a key element was trying to understand
25    what the requirements of the injunction were and what elements
```

SCHILLER - CROSS / PERRY

1    we would put in place to meet the requirements of the

2    injunction, and -- and that all involves legal interpretation

3    and understanding that others need to provide advice to myself

4    and the team about.

5    Q.   Now, you're not a lawyer, right, Mr. Schiller?

6    A.   I am not.

7    Q.   Are you an expert in the doctrine of attorney-client

8    privilege?

9    A.   I am not.

10   Q.   Mr. Bornstein asked you a number of questions about why

11   certain documents or whether certain documents were labeled

12   "privileged and confidential."

13       Did you -- did you personally make that decision to label

14   documents in that way?

15   A.   Most of the time, no.  A few times I've had to put them on

16   because I'm communicating something that already was

17   established or marked as privileged and confidential.  So I

18   try not to break whatever someone else has said, is how we do

19   it.

20       But I -- again I'm no expert on it.  And I always do that

21   assuming that the courts will decide what's right and what's

22   privileged, not me.

23   Q.   Now, Mr. Bornstein walked you through several decks today,

24   from May in 2023, that's Exhibit 272; three from June in '23,

25   that's 223, 224, and 291; from July of 2023 which is 227.

1  Q.  Mr. Bornstein asked you some questions about some changes

2  that were made to the system disclosure sheet during the

3  Wisconsin project.  Do you recall that?

4  A.  Yes.

5  Q.  Is it common for Apple to make changes along the way?

6  A.  Yes.

7  Q.  And can you describe a little bit about the changes that

8  were made here?  What do you recall?

9  A.  My recollection is in that price committee meeting we had

10  that summer, there was discussion about, as we read through

11  the disclosure sheet, the fact that that second bold sentence

12  that -- up on top was at the bottom of it in small text.  And

13  there was discussion about whether users would realize that

14  they weren't -- when they linked out, that now things that

15  they expected from an in-app purchase with Apple wasn't the

16  case.

17      So there was concern that what was in small text at the

18  bottom would not be understood and it should be bolded at top.

19  I believe that was the dialogue that went on in the meeting.

20  Q.  Thank you, Mr. Schiller.

21      If we can go back to CX2 which is the link entitlement.

22                  (Exhibit published.)

23  BY MR. PERRY:

24  Q.  And we were looking at the bullets in 3.3 which is on

25  CX2.4.

SCHILLER - CROSS / PERRY

```
 1        Mr. Bornstein asked you some questions, if you'll recall,

 2   about placement within the app of the new link.  Do you recall

 3   that?

 4   A.  Yes.

 5   Q.  And the last four bullets on this page basically, you

 6   know, describe that, correct?

 7   A.  Yes.

 8   Q.  That's the final decision Apple made.

 9   A.  I'm not sure what you mean "final decision."

10   Q.  In other words, we looked at a number of decks that had

11   iterations of possibilities.  This is what was actually

12   adopted?

13   A.  Yes.

14   Q.  Why were these requirements regarding the placement

15   adopted by Apple?

16   A.  We're trying to find a solution where developers can

17   communicate their offers and help users link out to get them

18   in a way that didn't also then interfere with in-app purchase

19   and the process that was established once a user was starting

20   to buy something in the app.

21   Q.  And you just drew a distinction between communication and

22   purchases.  Did I understand that correctly?  I'm sorry, I

23   just might not have caught your answer.

24   A.  I'm sorry.  Then maybe my answer was too complex.

25        We're trying to both have a solution for developers to
```

1    communicate their offers but not interfere or confuse users of

2    what is IAP and how that works.

3    **Q.**  And why is that, Mr. Schiller?

4    **A.**  Because I believe the ruling, as I understood it, allows

5    IAP to still be the only method of in-app purchase.  And so

6    we're trying to not have that be broken by this process.

7    **Q.**  And let me just pause on something you just said.  You

8    said the ruling, as you understood it.  Have you spent -- I

9    mean you said you read it.  But have you spent time with this

10   ruling, Mr. Schiller?

11   **A.**  I've read it multiple times.  We've certainly had many

12   discussions internally about it.  And so I'm not sure if that

13   meets the definition of spent time with it or not.  I don't

14   know.

15   **Q.**  Well, let me ask a more -- a better question, sir.

16        In developing these requirements, the various iterations

17   that Mr. Bornstein went through today, what effect, if any,

18   did you and the others at Apple give the language of the

19   injunction and the ruling that accompanied it?

20   **A.**  We've asked ourselves and -- and reread the language over

21   and over again throughout the process of trying to come up

22   with our compliance plan to understand how it mapped to that

23   and met the needs of it or not.  That happened frequently.

24   **Q.**  And again you're not a lawyer, Mr. Schiller.  Do you have

25   a view as to whether the requirements that Apple ultimately

SCHILLER - CROSS / PERRY

1    adopted for the link and so forth are consistent with the

2    injunction and the ruling?

3               MR. BORNSTEIN:  Objection, Your Honor, foundation.

4               THE COURT:  Well, I'll take it for his understanding.

5               THE WITNESS:  From the understanding I had and the --

6               THE COURT:  Well, let me --

7               THE WITNESS:  Sorry.

8               THE COURT:  Just say to be clear, I take it from your

9    understanding, but I don't think your attorney wants you to

10   violate attorney-client privilege.

11       So if your view is only based on lawyer involvement, then

12   you don't have one.

13               THE WITNESS:  I would prefer to say what you said,

14   Your Honor, which is my view is based on discussions with

15   attorneys and I would prefer not to say what my view is

16   independent of that.

17               MR. PERRY:  I appreciate the clarification, Your

18   Honor.

19   Q.  And I apologize, Mr. Schiller, again for asking an

20   inartful question.

21       Let's shift gears for a second and talk about the

22   commission structure; is that all right?

23   A.  Okay.

24   Q.  All right.  In May when we were here last, you

25   testified -- do you recall this -- that there were -- before

1    the injunction there were two categories of transactions?

2    **A.**  Yes.

3    **Q.**  And then you testified, and I'm quoting, there's now a

4    third class of transaction different from either the first or

5    second that's -- previously that starts in the app and links

6    out to pay on the website and come back to the app.

7        Am I --

8    **A.**  That is correct, I said that.

9    **Q.**  Okay.  Situate us where we were.

10       Did Apple change anything about the first two categories

11   of transactions, in your taxonomy --

12   **A.**  No.

13   **Q.**  -- as part of this --

14       And how does the third class of transactions then relate

15   to this injunction compliance program?

16   **A.**  Well, I think this program is all about that third class

17   of new transactions that start in the app and then go to a

18   website.

19   **Q.**  Now, Mr. Bornstein showed you several decks that had a

20   no-commission option, a commission option, three commission

21   options, different commission options.  How did -- can you

22   explain how that came about at Apple in the middle of 2023?

23   **A.**  There were many explorations of what a range of options of

24   providing a compliance plan for the injunction that involved

25   many variables, whether there was a commission or not a

SCHILLER - CROSS / PERRY

1    commission, whether the commission is any different, whether

2    there were rules around the links.  So all of that was -- we

3    spent all our time discussing and considering different

4    options.

5    Q.  So we are at a disadvantage, Mr. Schiller, doing

6    archeology with these decks.  How much time -- do you have an

7    estimate of how much time the meetings and the work and the

8    preparation and so forth went into this discussions of the

9    commission leading up to that July meeting?

10   A.  Typically, on most weeks, we had a weekly meeting where

11   the App Store team, with some of the finance team, some of the

12   legal team, would talk and work on just this or this and other

13   things.  The meetings would vary.  Some weeks we had more than

14   one meeting.

15        And, yes, there were some weeks with no meeting, but for

16   the most part there were meetings every week.

17        And the -- it began in 2021.  Mostly then with other --

18   other topics.  And then in '23, really became meetings all

19   about this.  There was much work on the team in between those

20   meetings, nights, weekends.  It was -- it was a -- to give you

21   one bit of flavor for it, very complex in the sense that we

22   would sit in a meeting, let's say it was on a Wednesday and

23   say, hey, do we consider this different way of calculating it,

24   did we consider this historical data to get a better model

25   here.

                         SCHILLER - CROSS / PERRY

1              And we want the team by the following week to have figured

2      that out and come back with an update to show us.  And so they

3      would spend all week and weekend trying to create that work

4      for us.

5          So that was a typical time.  I don't know how to add up

6      all those hours, but that's what we did.

7      Q.  And do you know whether those meetings, those periodic

8      meetings, were recorded in some way?

9      A.  I'm not -- I do not believe they were.

10     Q.  Not recorded.  Were notes taken?

11     A.  Some of those meetings had notes taken by some others, not

12     by me, but some others.  I can't be specific.  I don't know.

13     Q.  Well, let me just show you one document, Mr. Schiller.

14         If you look in your binder, it's CX1104.

15     A.  (Reviewing document.)

16             MR. PERRY:  And this can be published, Your Honor.

17             THE COURT:  You may.

18                     (Exhibit published.)

19     BY MR. PERRY:

20     Q.  Do you recognize this document, Mr. Schiller?

21     A.  I'm sorry, no, I don't.

22     Q.  Did you personally receive the notes of these meetings

23     that you just testified about?

24     A.  I -- I did.  I often didn't look at them.

25     Q.  Okay.

OLIVER - DIRECT / EVEN

1   A.  Yes, I have that.

2   Q.  And do you see that this is a regroup of a certain

3   project, the name of which we shall not name, that's dated

4   September 13, 2021?

5   A.  Yes, that looks like it's the title.

6   Q.  And do you see on the first page that there's a metadata

7   sheet that lists you as a custodian?

8   A.  (Reviewing document.)

9        Yes, that looks to be correct.

10            MR. EVEN:  Your Honor, I move to admit CX0202 into

11   evidence.

12            MS. RICHMAN:  No objection.

13            THE COURT:  It's admitted.

14                (Exhibit 0202 received in evidence.)

15            THE COURT:  Ms. Richman.

16            MS. RICHMAN:  Yes, I'm sorry.  And I've been joined

17   by Mr. Phillips and Ms. Dansey.  I apologize.

18            THE COURT:  Go ahead.

19   BY MR. EVEN:

20   Q.  Now, the date of this document, September 13, 2021, is

21   three days after the injunction in this case at issue,

22   correct?

23   A.  I believe that is correct, yes.

24   Q.  And the project this document talks about was intended to

25   consider a potential response to increased regulatory pressure

OLIVER - DIRECT / EVEN

```
 1    on Apple in several geographies to allow the use of
 2    alternative payment solutions, correct?
 3    A.   (Reviewing document.)
 4         I remember this specifically related to one geography.  I
 5    don't -- I don't know if this project was covering multiple
 6    geographies or just one.
 7    Q.   I've seen documents stating that this was a worldwide
 8    effort.  That's why I'm asking.  Do you remember it as being
 9    related to specific geography?
10    A.   I do, but I don't have a great memory of this project in
11    general.
12    Q.   Okay.  If you look up at the top of the page, do you see
13    that the notes say "three options"?
14    A.   I do, yes.
15    Q.   And these are all potential options Apple considered at
16    the time for responding to any requirement, either worldwide
17    or in a particular geography, to allow alternative payments,
18    correct?
19    A.   (Reviewing document.)
20         Again I remember this specifically for one geography.  But
21    within the context of that geography, that looks to be
22    correct.
23    Q.   Okay.  And the geography you remembered this for is which
24    geography?
25    A.   It was for Korea.
```

OLIVER - DIRECT / EVEN

```
 1    Q.   Okay.

 2         And in Korea, there were rules that required the

 3    introduction of alternative payments, correct?

 4    A.   That is correct, yes.

 5    Q.   Okay.  And the very first option is one, do nothing but

 6    allow the separate payment methods in.  Right?

 7    A.   (Reviewing document.)

 8         Yes, that is what the option says.

 9    Q.   And what this option would mean is that there would be the

10    removal of some guidelines that prohibit alternative payments

11    without imposing any new requirements, correct?

12    A.   (Reviewing document.)

13    Q.   That's what "do nothing" means?

14    A.   I don't remember specifically, but within the context of

15    the document that seems to be reasonable.

16    Q.   Okay.  The second option is charge an alternative

17    commission but audit developers, correct?

18    A.   That's what it says, yes.

19    Q.   And under this option, Apple would allow alternative

20    payments but seek a commission for the use of alternative

21    payments, correct?

22    A.   That seems to be the understanding I have of it, yes.

23    Q.   And this is essentially the option Apple chose in Korea,

24    correct?

25    A.   That's correct, yes.
```

OLIVER - DIRECT / EVEN

1    Q.   And this is the option that Apple chose in the

2    Netherlands, correct?

3    A.   That is correct, yes.

4    Q.   And this is option that Apple chose in this particular --

5    in response to this particular injunction in the U.S.,

6    correct?

7    A.   Probably, yes.

8    Q.   And so back in September '21, the option of responding to

9    requirements to allow alternate billing, one of the options on

10   the table were to just allow alternative billings without any

11   commission, correct?

12   A.   That's correct, yes.

13   Q.   Now, do you see about halfway down the page, a bullet that

14   reads, "YGR opinion needs to be taken into account."

15        Do you see that?

16   A.   Yes.

17   Q.   And the reference to the YGR opinion here, that's a

18   reference to this Court's injunction and opinion, correct?

19   A.   I believe so, yes.

20   Q.   And the notes then say, "Charging for commission, is it

21   fine to do?"  Correct?

22   A.   Yes.

23   Q.   And so three days after the injunction issued in September

24   '21, this working group at Apple raised the question of

25   whether imposing a commission on linked-out purchases is a

UNITED STATES DISTRICT COURT

**ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 8** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | **Pages 1425 - 1478 and** |
| | ) | **1491 - 1670** |
| Defendant. | ) | |
| _____ | ) | Oakland, California |
| | | Tuesday, February 25, 2025 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

**(Pages 1479 - 1491 UNDER SEAL)**

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        375 Ninth Avenue
                        New York, New York  10001
                  BY:   GARY A. BORNSTEIN,
                        M. BRENT BYARS
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:          Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                    A P P E A R A N C E S  (CONT'D.)

 2

 3    For Defendant:          Weil, Gotshal & Manges LLP
                              2001 M Street NW, Suite 600
 4                            Washington, D.C.  20036
                         BY:  ANNE CORBETT,
 5                            MARK A. PERRY,
                              JOSHUA M. WESNESKI, ATTORNEY AT LAW
 6

 7                            Gibson, Dunn & Crutcher LLP
                              One Embarcadero Center, Suite 2600
 8                            San Francisco, California  94111-3715
                         BY:  ANTHONY D. BEDEL,
 9                            LAUREN DANSEY, ATTORNEYS AT LAW

10

11                            Gibson, Dunn & Crutcher LLP
                              1050 Connecticut Avenue, N.W.
                              Washington, DC  20036-5306
12                       BY:  HARRY PHILLIPS,
                              CYNTHIA E. RICHMAN, ATTORNEY AT LAW
13

14

15

16                            --oOo--

17

18

19

20

21

22

23

24

25
```

1
2
3

4      TUESDAY, FEBRUARY 25, 2025 - VOLUME 8

5

**PLAINTIFF'S WITNESSES**                              **PAGE**     **VOL.**

6

7      OLIVER, CARSON

8      DIRECT EXAM (RESUMED) BY MR. EVEN          1432        8

9      CROSS-EXAMINATION BY MS. RICHMAN           1556        8

10     REDIRECT EXAMINATION BY MR. EVEN           1595        8

11     RECROSS-EXAMINATION BY MS. RICHMAN         1611        8

12

13     VIJ, KUNNAL

14     (SWORN)                                    1618        8

15     DIRECT EXAMINATION BY MR. EVEN             1619        8

16

17                          --oOo--

18
19
20
21
22
23
24
25

**E X H I B I T S**

| EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 216 | | | 1633 | 8 |
| 264 | | | 1647 | 8 |
| 0265 | | | 1622 | 8 |
| 274 (REDACTED) | | | 1501 | 8 |
| 384 | | | 1662 | 8 |
| 499 | | | 1472 | 8 |
| 503 | | | 1514 | 8 |
| 0506 (PROVISIONALLY) | | | 1541 | 8 |
| 509 | | | 1507 | 8 |
| 538 | | | 1546 | 8 |
| 0832 | | | 1598 | 8 |
| 859 | | | 1640 | 8 |
| 1303 | | | 1564 | 8 |
| 1304 | | | 1573 | 8 |
| 1310 | | | 1592 | 8 |

--o0o--

OLIVER - CROSS / RICHMAN

```
 1    will reflect that the parties are present.

 2         You may be seated.

 3         The witness is on the stand.

 4         Before we get restarted, is Jennifer Brown still with

 5    Apple?

 6              MS. RICHMAN:  Yes, she is, Your Honor.

 7              THE COURT:  Is she local?

 8              MS. RICHMAN:  Yes, she is.

 9              THE COURT:  She's ordered to appear here at 8:00 a.m.

10    tomorrow on an order to show cause as to why she wrote what

11    she did in Docket -- document 538, on order to show cause why

12    she should not be sanctioned or disciplined for suggesting to

13    her client to do something that was inaccurate solely for

14    purposes of asserting the attorney-client privilege.

15         Understood?

16              MS. RICHMAN:  Understood, Your Honor.

17              THE COURT:  Proceed.

18              MS. RICHMAN:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20    BY MS. RICHMAN:

21    Q.  Good afternoon, Mr. Oliver.

22    A.  Good afternoon.

23    Q.  Are you aware that after your prior testimony, the Court

24    admonished you to refrain from discussing the decision-making

25    process leading to the link entitlement program and associated
```

OLIVER - CROSS / RICHMAN

1    commission rates?

2    **A.**  I am, yes.

3    **Q.**  And are you also aware that the Court admonished you not

4    to discuss your prior testimony with anybody?

5    **A.**  Yes.

6    **Q.**  And do you understand that the Court indicated that if

7    there's any doubt, the witnesses are instructed to err on the

8    side of caution and nondisclosure?

9    **A.**  Yes.

10   **Q.**  And did you strictly comply with the Court's instruction?

11   **A.**  I did, yes.

12   **Q.**  And remind us, how long has it been in months since you

13   were last on the stand here?

14   **A.**  It was May of last year.

15   **Q.**  So about nine months?

16   **A.**  Yeah.

17   **Q.**  Are you aware that after your prior testimony, the Court

18   ordered Apple to produce documents about the decision-making

19   process related to the link entitlement program?

20   **A.**  I'm aware it happened, I think, while I was testifying.

21   **Q.**  And have you had the opportunity to review the documents

22   produced to Epic?

23   **A.**  No.

24   **Q.**  And have you had the opportunity to review any of those

25   documents with counsel?

OLIVER - CROSS / RICHMAN

 1    **A.**  No.

 2    **Q.**  Okay.

 3         **MS. RICHMAN:**  I think there's a binder.  Have those

 4    been handed out?

 5              (Pause in the proceedings.)

 6         **MS. RICHMAN:**  Your Honor, may we approach?

 7         **THE COURT:**  You may.

 8              (Pause in the proceedings.)

 9         **MS. RICHMAN:**  Okay.

10    **Q.**  Mr. Oliver, you testified about this last year and I think

11    today as well, but can you please provide an overview of the

12    bottoms-up valuation project that Apple commissioned in

13    connection with Wisconsin?

14    **A.**  Sure.  As part of our compliance plan for the injunction,

15    we wanted to make sure that we had different ways to help to

16    justify the value of the commission and the services provided

17    by Apple in the App Store specifically.

18         So as part of that, we worked with Analysis Group which is

19    an economic consulting firm that we'd worked with previously,

20    and they helped us to identify a framework and then a

21    different kind of buckets of value that they then proceeded to

22    evaluate and reflect as a share of commission.  Or sorry, a

23    commission or was a share of -- of revenue.

24    **Q.**  And what was the work product that came out of that

25    project?

OLIVER - CROSS / RICHMAN

1    **A.**  It was a report.

2    **Q.**  Was it a single document, or were there more than one

3    document prepared?

4    **A.**  I believe there were two.  There was a kind of a summary

5    report and then there was a more detailed report.

6    **Q.**  And do you remember testifying about those reports last

7    May?

8    **A.**  I do, yes.

9    **Q.**  Okay.  And did Analysis Group come back with a

10   recommendation to Apple as to which commission rate it should

11   charge?

12   **A.**  No, they did not.

13   **Q.**  What did they come back with?

14   **A.**  They came back with a -- a bunch of analysis, but the

15   bottoms-up analysis specifically looked at a reasonable range

16   of commission for each component bucket that they looked at.

17        **MS. RICHMAN:**  Okay.  Can we -- I'm sorry, let's see.

18   This is Epic's Exhibit CX0538.

19        Could Mr. Floyd [sic] pull that up?  We don't have it.

20        The second page.

21        **THE WITNESS:**  Sorry.  Is this in the new binder?

22   **BY MS. RICHMAN:**

23   **Q.**  It's in the old binder.  I'm sorry.  But they'll put it on

24   your screen in a second, Mr. Oliver.  I think we just need to

25   activate the screens.

OLIVER - CROSS / RICHMAN

```
 1              THE CLERK:  It's activated.

 2              MS. RICHMAN:  It's activated, okay.  Mine's not

 3    working.

 4              MR. BORNSTEIN:  Your Honor, I think control needs to

 5    be --

 6              THE COURT:  She's shifted control.

 7              MR. BORNSTEIN:  Thank you.

 8              MS. RICHMAN:  Can you go to the next page.

 9        (Exhibit published to witness, counsel, and the Court.)

10    BY MS. RICHMAN:

11    Q.  Do you remember Mr. Even asking you about this document?

12    A.  I'm sorry.  I don't see anything on my screen.

13    Q.  Okay.

14              THE COURT:  All right.  All right.

15        Publicize it to his screen.

16        Do you have it now?

17              THE WITNESS:  I do, yes.

18    BY MS. RICHMAN:

19    Q.  And I think you were trying to explain your interpretation

20    of Mr. Kim's email here.

21        Give you a second to read the whole thing.

22        But what do you -- what is your impression as to what he's

23    trying to convey in this message?

24    A.  My impression is that he was looking for a reasonable

25    comparable that we could use to draw the 20 percent commission
```

OLIVER - CROSS / RICHMAN

1    that had been proposed in that -- in that email and in the

2    presentation we reviewed for the purposes of helping to

3    justify it.  And for that purpose, he used a comparison with

4    another store.

5    Q.  And what was that store?

6    A.  That was Steam.

7    Q.  Okay.  And if you look at the bottom of that paragraph,

8    point 2, he says, "This approach is still not specifically

9    grounded in direct valuation of component services."

10       Do you see that?

11   A.  Yes.

12   Q.  And was the AG report intended to provide --

13           THE COURT:  Again, this is your witness.  Stop

14   leading.

15           MS. RICHMAN:  Okay.

16   Q.  And, Mr. Oliver, was the Analysis Group prepared to

17   provide direct valuation of Apple services?

18   A.  They were doing a kind of component valuation of those

19   services.

20   Q.  Okay.  Thank you.

21       Mr. Even asked you a number of questions about the

22   alternative payment model that was implemented in the

23   Netherlands.

24       Do you remember that?

25   A.  I do, yes.

OLIVER - CROSS / RICHMAN

1    Q.   And in the Netherlands, if -- for dating apps what is the

2    commission rate that applies if they choose to avail

3    themselves of that program?

4    A.   I believe it is 27 percent.

5    Q.   And is that the same as the 27 percent that was determined

6    to -- or selected to be the commission rate in connection with

7    Wisconsin?

8    A.   No.

9    Q.   What are the differences between the Netherlands

10   implementation and the Wisconsin implementation?

11   A.   One of the key differences is that in the Netherlands, you

12   are not able to offer IAP at the same time that you offer the

13   alternative options, which I believe include both alternative

14   in-app payments and linking out.

15       And the second notable option -- or difference is that the

16   commission applies in perpetuity rather than as a seven-day

17   from the linkout.

18   Q.   And is that what you were referring to when you kept

19   saying in perpetuity?

20   A.   Yes.

21   Q.   Okay, thank you.

22       Let's go to a new topic.

23       Last time you were here, you testified about a series of

24   assumptions that were the foundation for the effective

25   commission rate calculated --

OLIVER - CROSS / RICHMAN

1    A.   Yes.

2    Q.   -- by -- one of the assumptions you testified about was an

3    assumption that large developers representing a significant

4    portion of App Store billings would implement the link

5    entitlement.

6         Do you recall that?

7    A.   Yes, I do.

8    Q.   Okay.  And do large developers represent a substantial

9    majority of App Store billings?

10   A.   They do, yes.

11   Q.   Can you please turn to, I think it should be tab 4 in your

12   binder, CX1303.

13   A.   Yes.

14   Q.   What's the title of this document?

15   A.   Business Risks Update.

16   Q.   And what's the date?

17   A.   The date is May 2023.

18   Q.   And do you recognize this document?

19   A.   Can you give me a minute to look at it?

20   Q.   Yes.

21   A.   (Reviewing document.)

22        Yes, I do.

23   Q.   And what is this document?

24   A.   I believe this is a document that was prepared by members

25   of my team, most notably my games team, related to the -- an

OLIVER - CROSS / RICHMAN

1    update kind of on the state of the games business for the

2    App Store.

3            MS. RICHMAN:  Your Honor, I move CX1303 into

4    evidence.

5            MR. EVEN:  No objection, Your Honor.

6            THE COURT:  It's admitted.

7            (Exhibit 1303 received in evidence.)

8            MS. RICHMAN:  Thank you.

9    Q.  You may have touched on this, but can you expand on why

10   this document was created?

11   A.  The reason that this document was created is that we're

12   kind of constantly looking at the business to understand kind

13   of underlying trends in the market and how that affects the

14   customer experience on the App Store and developers' business

15   success.

16       And I believe that this deck was prepared as kind of an

17   update in that time frame to kind of share a fairly

18   comprehensive overview of some of the more recent trends that

19   had been showing up in the market.

20   Q.  And was this deck prepared in connection with Project

21   Wisconsin?

22   A.  It was not.

23   Q.  Okay.  Can you please turn --

24           MS. RICHMAN:  And this is a highly confidential

25   document, Your Honor.  It contains a lot of financial data and

UNITED STATES DISTRICT COURT          *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | **Evidentiary Hearing** |
| | ) | |
| Plaintiff, | ) | **Volume 9** |
| | ) | |
| vs. | ) | NO. C 20-05640 YGR |
| | ) | |
| APPLE, INC., | ) | Pages 1671 - 1916 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, February 26, 2025 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          Cravath, Swaine & Moore LLP
                        375 Ninth Avenue
                        New York, New York  10001
                  BY:   GARY A. BORNSTEIN,
                        YONATAN EVEN,
                        LAUREN A. MOSKOWITZ,
                        CHARLOTTE ROTHSCHILD,
                        CHRISTINA A. SEIDEMAN,
                        MICHAEL J. ZAKEN, ATTORNEYS AT LAW

(Appearances continued next page)

Reported By:       Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1                   A P P E A R A N C E S  (CONT'D.)

 2

 3      For Defendant:          Weil, Gotshal & Manges LLP
                                2001 M Street NW, Suite 600
 4                              Washington, D.C.  20036
                          BY:   MARK A. PERRY,
 5                              JOSHUA M. WESNESKI, ATTORNEY AT LAW

 6
                                Weil, Gotschal & Manges LLP
 7                              767 FIfth Avenue
                                New York, New York  10153-0119
 8                        BY:   CAMILLA BRANDFIELD-HARVEY,
                                 ATTORNEY AT LAW
 9

10                              Gibson, Dunn & Crutcher LLP
                                One Embarcadero Center, Suite 2600
11                              San Francisco, California  94111-3715
                          BY:   LAUREN DANSEY, ATTORNEY AT LAW
12
                                Gibson, Dunn & Crutcher LLP
13                              1050 Connecticut Avenue, N.W.
                                Washington, DC  20036-5306
14                        BY:   HARRY PHILLIPS,
                                CYNTHIA E. RICHMAN, ATTORNEY AT LAW
15

16

17

18                              --o0o--

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3

 4      WEDNESDAY, FEBRUARY 26, 2025 - VOLUME 9

 5

 6      PLAINTIFF'S WITNESSES                PAGE    VOL.

 7      VIJ, KUNAL                           1681      9

 8      DIRECT EXAMINATION BY MR. EVEN       1681      9

 9      CROSS-EXAMINATION BY MS. RICHMAN     1746      9

10      REDIRECT EXAMINATION BY MR. EVEN     1756      9

11

12      GOLDBERG, MARNI

13      (SWORN)                             1765      9

14      DIRECT EXAMINATION BY MS. MOSKOWITZ  1766      9

15      CROSS-EXAMINATION BY MR. PERRY       1859      9

16

17      SCHILLER, PHILIP

18      FURTHER REDIRECT EXAM BY MR. BORNSTEIN  1879   9

19      RECROSS-EXAMINATION BY MR. PERRY     1905      9

20      FURTHER REDIRECT EXAM BY MR. BORNSTEIN  1908   9

21

22

23

24

25
```

**E X H I B I T S**

| EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|----------|---------|------|------|------|
| 0231 | | | 1724 | 9 |
| 244 | | | 1814 | 9 |
| 257 | | | 1823 | 9 |
| 399 | | | 1794 | 9 |
| 435 | | | 1735 | 9 |
| 464 | | | 1831 | 9 |
| 477 | | | 1802 | 9 |
| 478 | | | 1800 | 9 |
| 479 | | | 1839 | 9 |
| 0505 | | | 1717 | 9 |
| 506 | | | 1737 | 9 |
| 529 | | | 1807 | 9 |
| 539 | | | 1697 | 9 |
| 540 | | | 1853 | 9 |
| 1504 | | | 1873 | 9 |
| 1505 | | | 1874 | 9 |
| 1506 | | | 1875 | 9 |
| 1507 | | | 1875 | 9 |

--o0o--

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1    believe that's what it is.

2    **Q.**  Okay.  And 5 percent is the most conservative of the

3    various sensitivities of revenue shift that is presented on

4    this slide, and the numbers go up quite a bit higher as the

5    revenue shift increases, correct?

6    **A.**  Yes.

7    **Q.**  And --

8           **THE COURT:**  Can I ask just a follow-up question on

9    that?

10          **MR. BORNSTEIN:**  Of course, Your Honor.

11          **THE COURT:**  I have seen no document in all of these

12   productions that shows that Apple did any analysis whatsoever

13   to justify that its intellectual property, at a minimum, cost

14   it hundreds of millions of dollars.  And I guess the question

15   is was there one and not produced?  Because it hasn't been

16   produced.

17          **THE WITNESS:**  The work on that, I believe, was the

18   work that was discussed under -- in testimony of Mr. Roman for

19   the -- the attempt to create a bottoms-up P&L analysis of what

20   the total costs are at Apple for the App Store.

21        And it was an analysis that's not our normal way of

22   looking at it, but there was, I believe, work done on that to

23   try to answer that very question of how to --

24          **THE COURT:**  But in terms of complying the

25   injunction --

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1          THE WITNESS:  Right.

2          THE COURT:  -- and in terms of trying to decide the

3   value of the IP, which could then be perhaps charged --

4          THE WITNESS:  Yes.

5          THE COURT:  -- I've seen zero analysis that

6   justifies, at a minimum, hundreds of millions of dollars and,

7   at a maximum, billions of dollars.

8          THE WITNESS:  The -- the -- the two things I'm aware

9   of that were done for that question was the Analysis Group's

10  study which have an external organization try to estimate the

11  value of what we've created.  And then the work from Mr. Roman

12  to bottoms-up try to estimate the costs of the work to create

13  it.  Those were the two attempts to try to do that.

14         THE COURT:  There was none of that discussion in the

15  business decision documents that we've been speaking about

16  over the last few days.  None of that was in here, correct?

17         THE WITNESS:  The -- both of those were included in

18  the price committee presentations.  There was data from the

19  Analysis Group that was used in the price committee

20  presentation.  And there was the pseudo P&L bottoms-up work

21  from Mr. Roman also in that price committee slide deck.

22      We did try to include that, Your Honor.

23         THE COURT:  Go ahead.

24  BY MR. BORNSTEIN:

25  Q.  I'll follow up just on one piece of that, Mr. Schiller.

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1    In the June, July -- May, June, July 2023 time frame,

2    we've seen a series of presentations that were used for the

3    basis of discussion among you and other senior executives at

4    Apple about how to respond to the Court's injunction, correct?

5    A.   Yes.

6    Q.   All right.  And the Court referenced those in some of the

7    Court's questions just now.

8        And you -- you saw a number of those decks were labeled

9    "privileged and confidential," correct?

10   A.   Yes.

11   Q.   All right.  And deck after deck after deck through May and

12   June, there's no discussion, no mention of Mr. Roman's work or

13   of the Analysis Group work to facilitate the discussions that

14   you and Mr. Cook and Mr. Maestri and your colleagues are

15   having in order to decide how to comply with the injunction.

16   It's just not there, correct?

17   A.   I don't recall seeing them in those decks either.  I

18   believe during --

19   Q.   Right.  It shows up for the first time in the July 5th

20   price committee deck, which is the one that for the first time

21   is not labeled "privileged and confidential," the one that was

22   intended for external consumption at some point in the future.

23   Those materials were finally layered in as a justification for

24   the decisions that you all took, correct?

25   A.   My -- my recollection --

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1  **Q.** Is that right, sir?

2  **A.** Not entirely, no. My -- my understanding was the work on

3  the Analysis Group was already going on at this time in June.

4  It took quite a while to compile and develop it with the

5  external groups. So it wasn't ready yet to be included.

6      I don't remember the date at which Mr. Roman's team was

7  tasked with also creating the bottoms-up analysis. And -- and

8  that was added in when that work was done. I believe that

9  started later.

10  **Q.** All right. But none of that fed into the discussions that

11  we've been talking about at some length over the course of the

12  past few days, and they appear for the first time in that

13  July 5 deck, which is the day that Apple at the time

14  anticipated it might need to go live with this program.

15  That's when it showed up, right?

16  **A.** I believe so.

17  **Q.** Okay.

18      **MR. BORNSTEIN:** If we can have back on the screen

19  Exhibit --

20      **THE COURT:** Just remind me. Remind me what the

21  exhibit number is for the July deck.

22      **MR. BORNSTEIN:** We do have it, Your Honor.

23  The July deck is Exhibit 227.

24      **THE COURT:** Okay.

25      And when we're done with this, if you all would meet and

SCHILLER - FURTHER REDIRECT / BORNSTEIN

1    confer and get me an index of everything that was admitted

2    with a short description, that would be helpful.

3              **MR. BORNSTEIN:**  I have a head start, Your Honor.

4              **THE COURT:**  Perfect.  Thank you.  I don't have that.

5    Go ahead.

6              **MR. BORNSTEIN:**  Thank you, Your Honor.

7    **Q.**  All right.  If we could turn back to the exhibit at 859

8    and I want to jump ahead to Slide .57 which is Bates 576.

9    And I'll just -- if we can get that on the screen.  There we

10   go.  Do we have that?

11                       (Exhibit published.)

12             **MR. BORNSTEIN:**  Great.

13       I'll just note for the record, Your Honor, and for Apple,

14   frankly, there was a bullet here that we think they likely

15   intended to redact that was not discussed with the Court the

16   other day.

17       Just for the sake of the presentation today, we've taken

18   the liberty of redacting the second bullet on the right side.

19             **THE COURT:**  Okay, thank you.

20             **MR. BORNSTEIN:**  But that was not discussed with Your

21   Honor.

22             **MR. PERRY:**  We appreciate that, Your Honor, and we

23   did send a note to Epic last night to that effect.  So we

24   appreciate the agreement.

25   / / /

VOLUME 1

Pages 1 – 214

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | | |
|---|---|---|
| EPIC GAMES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. C-20-5640 YGR |
| | ) | |
| vs. | ) | Monday, May 3, 2021 |
| | ) | |
| APPLE, INC., | ) | Oakland, California |
| | ) | |
| Defendant. | ) | BENCH TRIAL |
| _____ | ) | |
| APPLE, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| vs. | ) | |
| | ) | |
| EPIC GAMES, Inc., | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:              CRAVATH, SWAINE & MOORE, LLP
                           825 Eighth Avenue
                           New York, New York 10019
                      BY:  **KATHERINE B. FORREST, ESQUIRE**
                           **GARY A. BORNSTEIN, ESQUIRE**
                           **YONATAN EVEN, ESQUIRE**

                           (Appearances continued.)

Reported By:               Diane E. Skillman, CSR 4909, RPR, FCRR
                           Official Court Reporter

```
        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION


For Plaintiff:          CRAVATH, SWAINE & MOORE, LLP
                        825 Eighth Avenue
                        New York, New York 10019
                   BY:  LAUREN A. MOSKOWITZ, ESQUIRE
                        JUSTIN C. CLARKE, ESQUIRE
                        M. BRENT BYARS, ESQUIRE




For Defendant:          GIBSON, DUNN & CRUTCHER
                        333 South Grand Avenue
                        Los Angeles, California 90071
                   BY:  RICHARD J. DOREN, ESQUIRE
                        DAN SWANSON, ESQUIRE
                        CYNTHIA RICHMAN, ESQUIRE



                        GIBSON, DUNN & CRUTCHER, LLP
                        2001 Ross Avenue, Suite 1100
                        Dallas, Texas 75201
                   BY:  VERONICA S. MOYE, ESQUIRE

                        PAUL WEISS RIFKIND
                        WHARTON & GARRISON LLP
                        2001 K STREET, NW
                        Washington, DC 20006
                   BY:  KAREN DUNN, ESQUIRE
                        JESSICA E. PHILLIPS, ESQUIRE
```

```
 1                        I N D E X

 2                                      PAGE      VOL.

 3    Opening Statement by Ms. Forrest     11        1

 4    Opening Statement by Ms. Dunn        49        1

 5    PLAINTIFF'S WITNESS:

 6    Sweeney, Timothy

 7    Direct Examination by Ms. Forrest    87        1

 8    Cross-examination by Mr. Doren      159

 9

10    Plaintiff's Exhibits:              EVD.      VOL.

11        2455                            115        1

12        2456                            115        1

13        2463                            115        1

14        2776                            142        1

15        2777                            142        1

16        2778                            142        1

17    Defendant's Exhibits:

18        3620 (sealed)                   213        1

19        4457 (sealed)                   206        1

20        4477                            151        1

21        5535                            194        1

22

23

24

25
```

SWEENEY – CROSS / DOREN

| | | |
|---|---|---|
| 02:38:09 | 1 | **A.**  Bananas yes, sharks no.  Purchases made in *Fortnite* only |
| 02:38:14 | 2 | affect the appearance of your character and not their |
| 02:38:18 | 3 | capabilities in the game. |
| 02:38:20 | 4 | **Q.**  Thank you.  I appreciate that clarification. |
| 02:38:22 | 5 | So these V-Bucks, once purchased, are then used to |
| 02:38:26 | 6 | purchase skins and cosmetics and things within the *Fortnite* |
| 02:38:30 | 7 | environment? |
| 02:38:31 | 8 | **A.**  Yes. |
| 02:38:32 | 9 | **Q.**  So it's the sale of V-Bucks that generates the revenue for |
| 02:38:36 | 10 | Epic Games; correct? |
| 02:38:39 | 11 | **A.**  Yes. |
| 02:38:39 | 12 | **Q.**  And then it's the use of those V-Bucks on different skins |
| 02:38:43 | 13 | and cosmetics that bring the player back to spend more real |
| 02:38:47 | 14 | money purchasing more V-Bucks; correct? |
| 02:38:51 | 15 | **A.**  Yes.  If they like what they've gotten in the past, then |
| 02:38:51 | 16 | probably -- |
| 02:38:51 | 17 | **THE COURT REPORTER:**  I'm sorry? |
| 02:38:51 | 18 | **THE WITNESS:**  I'm sorry.  Yes. |
| 02:38:58 | 19 | **BY MR. DOREN:** |
| 02:39:02 | 20 | **Q.**  And just as a quick aside, we talked about -- you talked |
| 02:39:06 | 21 | about, I'm sorry, some different concerts that had been held |
| 02:39:10 | 22 | in the *Fortnite* environment over the last couple of years. |
| 02:39:13 | 23 | Do you recall that testimony? |
| 02:39:15 | 24 | **A.**  Yes. |
| 02:39:16 | 25 | **Q.**  And one of the ways that you monetize those experiences is |

SWEENEY – CROSS / DOREN

| | | |
|---|---|---|
| 02:39:19 | 1 | by selling kind of thematic cosmetics to go along with the |
| 02:39:26 | 2 | concerts; correct? |
| 02:39:27 | 3 | **A.**  Yes. |
| 02:39:31 | 4 | **Q.**  What is the price range in real money for items that can |
| 02:39:34 | 5 | be purchased with V-Bucks? |
| 02:39:38 | 6 | **A.**  My understanding is they will be between like $1 and $20 |
| 02:39:44 | 7 | for stand-alone items.  Then we have -- sometimes have bundles |
| 02:39:49 | 8 | of multiple items which can go up to, I believe, 30 or $40.  I |
| 02:39:59 | 9 | am not certain about all of the offers we've ever had. |
| 02:40:04 | 10 | **Q.**  Some may have been more? |
| 02:40:06 | 11 | **A.**  Possibly. |
| 02:40:06 | 12 | **Q.**  What does it cost to Epic to generate a V-Buck, minting a |
| 02:40:13 | 13 | V-Buck? |
| 02:40:14 | 14 | **A.**  There is no cost to a V-Buck.  There's cost in developing |
| 02:40:18 | 15 | the software, but the V-Bucks themselves don't have a marginal |
| 02:40:22 | 16 | cost. |
| 02:40:23 | 17 | **Q.**  And who sets the prices for the skins and cosmetics in |
| 02:40:28 | 18 | bundles? |
| 02:40:29 | 19 | **A.**  The *Fortnite* team in general. |
| 02:40:33 | 20 | **Q.**  In terms of roles, who's involved in that task? |
| 02:40:40 | 21 | **A.**  Nowadays it's under the general responsibility of Epic |
| 02:40:45 | 22 | President Adam Sussman.  And then we have a team of -- a |
| 02:40:51 | 23 | business team who works on individual pricing of individual |
| 02:40:58 | 24 | items. |
| 02:41:05 | 25 | **Q.**  So in your testimony, you discussed how prices had risen |

SWEENEY – CROSS / DOREN

| 02:41:11 | 1 | over the years as a result of this 30 percent commission. |
| 02:41:14 | 2 | Do you recall that topic generally? |
| 02:41:17 | 3 | **A.** Yes. |
| 02:41:19 | 4 | **Q.** The commission has remained the same over the years; |
| 02:41:21 | 5 | correct? |
| 02:41:27 | 6 | **A.** 30 percent is still 30 percent. |
| 02:41:28 | 7 | **Q.** 30 percent has been 30 percent as really the industry |
| 02:41:33 | 8 | standard from 2010 and before until today; correct? |
| 02:41:39 | 9 | **A.** 30 percent is most the prevalent rate charged by the |
| 02:41:44 | 10 | stores, and it was then and it is now. |
| 02:41:51 | 11 | **Q.** So when we talk about the costs of cosmetics and skins and |
| 02:41:56 | 12 | bundles rising, we are talking about pricing decisions made by |
| 02:42:00 | 13 | the Epic team; correct? |
| 02:42:03 | 14 | **A.** Yes. |
| 02:42:03 | 15 | **Q.** Not any rising commission pressure from any of the |
| 02:42:07 | 16 | platforms, much less iOS.  True? |
| 02:42:11 | 17 | **A.** Correct. |
| 02:42:17 | 18 | With respect to these 30 percent commissions. |
| 02:42:20 | 19 | **Q.** Now, there was some discussion about cross-progression |
| 02:42:26 | 20 | earlier.  And just to make sure we have all of our different |
| 02:42:29 | 21 | cross-disciplines well-defined here, cross-progression, as I |
| 02:42:32 | 22 | understand it, is when a player plays on, for example, an |
| 02:42:37 | 23 | iOS device and then later fires up *Fortnite* on their PC, and |
| 02:42:46 | 24 | there they will find that their game progression and their |
| 02:42:54 | 25 | identities and their purchases will all be there waiting for |