**No. 25-2935**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

Epic Games, Inc.

*Plaintiff-Appellee*,

v.

Apple, Inc.,

*Defendant-Appellant*.

———————

On Appeal from the United States District Court for the Northern District of California

No. 4:20-cv-05640-YGR • Hon. Yvonne Gonzalez Rogers

———————

**BRIEF OF THE PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES AS AMICUS CURIAE IN SUPPORT OF APPELLANT**

LAWRENCE J. SPIWAK
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
(202) 274-0235
Email: lspiwak@phoenix-center.org
Counsel for Phoenix Center

June 27, 2025

- i -

# **TABLE OF CONTENTS:**

**Page:**

CORPORATE DISCLOSURE STATEMENTS ........................................... iii

CERTIFICATE REGARDING AUTHORSHIP .......................................... iv

TABLE OF AUTHORITIES ............................................................ v

INTEREST OF AMICUS ............................................................... 1

SUMMARY OF ARGUMENT ......................................................... 2

ARGUMENT ............................................................................. 7

I.   By Permanently Prohibiting Apple from Charging a Commission or Fee for Linked Purchases, the District Court Has Improperly Engaged in Rate Regulation and Deprived Apple of its Fifth Amendment Rights ............. 7

    A.   The District Court Failed to Show its "Why's and Wherefores" in Setting a Regulated Rate of Zero ..................................................... 9

    B.   The District Court Failed to Give Apple Adequate Notice that Zero-Price Regulation was on the Table ................................................ 14

II.  Allowing the District Court's to Impose Zero-Price Regulation on Apple Will Set a Troubling Precedent ............................................... 16

CONCLUSION ........................................................................... 19

CERTIFICATE OF COMPLIANCE ..................................................... 20

CERTIFICATE OF SERVICE ............................................................ 21

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A) the Phoenix Center for Advanced Legal & Economic Public Policy Studies submits the following corporate disclosure statement. The Phoenix Center is a non-profit 501(c)(3) non-stock corporation organized under the laws of Maryland. As such, the Phoenix Center has no parent companies and no one holds an ownership interest in the Phoenix Center.

<u>s/ *Lawrence J. Spiwak*</u>

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and
Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email: lspiwak@phoenix-center.org

## CERTIFICATE REGARDING AUTHORSHIP

Pursuant to Federal Rule of Appellate Procedure 24(a)(4)(E), the Phoenix Center certifies that no party's counsel authored this brief, in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the Phoenix Center contributed money that was intended to fund preparing or submitting the brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and
Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org

- iv -

## TABLE OF AUTHORITIES:

**Page(s):**

## CASES:

*AT&T v. Iowa Utilities Board,* ..................................................................... 14
    525 U.S. 366 (1999).

*Cedar Point Nursery v. Hassid,* ....................................................................9
    594 U.S. 139 (2021).

*Christopher v. SmithKline Beecham Corp.,* ................................................. 15
    567 U.S. 142 (2012).

*Cooper v. Aaron*, ......................................................................................... 18
    358 U.S. 1 (1958).

*FCC v. Fox Television Stations, Inc.,* ......................................................... 15
    567 U.S. 239 (2012).

*Federal Power Comm'n. v. Conway Corp.,* ................................................. 10
    426 U.S. 271 (1976).

*Permian Basin Area Rate Cases,* ................................................................ 11
    390 U.S. 747 (1968).

*United States v. Armour & Co.,* .................................................................. 16
    402 U.S. 673 (1971).

*Verizon Commc'ns Inc. v FCC,* .................................................................. 14
    535 U.S. 467 (2002).

*Cellco Partnership v. FCC,* ........................................................................ 12
    700 F.3d 534 (2012).

*Century Commc'ns Corp. v. FCC,* .............................................................. 12
    835 F.2d 292 (D.C. Cir. 1987), *cert. denied,* 486 U.S. 1032 (1988).

- v -

*Cincinnati Bell Tel. Co. v. FCC,* ............................................................... 13
    69 F.3d 752 (6th Cir. 1995).

*Epic Games, Inc. v. Apple, Inc.,* ..................................... 7, 8, 9, 11, 12, 13, 16
    (N.D. California, April 30, 2025), 2025 U.S. Dist. LEXIS 82637
    ("*Contempt Order*").

*Farmers Union Central Exchange v. FERC,* ......................................... 10, 11
    734 F.2d 1486 (D.C. Cir.), *cert denied sub nom.,*
    469 U.S. 1034 (1984).

*FTC v. Qualcomm, Inc.,* .............................................................................. 14
    969 F.3d 974 (9th Cir. 2020).

*Southwestern Bell Telephone Co. v. FCC,* .................................................. 10
    168 F.3d 1344 (D.C. Cir. 1999).

*Time Warner Entm't Co. v. FCC,* ............................................................... 10
    56 F.3d 151 (D.C. Cir. 1995).

*United States v. Microsoft Corp.,* ............................................................... 16
    147 F.3d 935 (D.C. Cir. 1998).

*United States v. FCC,* ................................................................................. 10
    707 F.2d 610 (D.C. Cir. 1983).

*Verizon v. FCC,* .......................................................................................... 12
    740 F.3d 623 (D.C. Cir. 2014).

*WorldCom v. FCC,* ..................................................................................... 10
    238 F.3d 449 (D.C. Cir. 2001).

*California Grocers Ass'n v. Bank of Am.,* ................................................... 18
    27 Cal. Rptr. 2d 396 (Ct. App. 1994).

*Willard v. AT&T Commc'ns of Cal., Inc.,* ................................................... 18
    138 Cal. Rptr. 3d 636 (Ct. App. 2012).

## STATUTES:

U.S. CONSTITUTION, ARTICLE V ......................................................... 9, 15

Administrative Procedure Act, 5 U.S.C. §§ 553, 554 ................................. 15

Natural Gas Act, 15 U.S.C. § 717c ................................................. 10

Federal Power Act, 16 U.S.C. § 824d ............................................... 10

Communications Act, 47 U.S.C. § 201(b) ........................................... 10

## MISCELLANEOUS

Beard, T.R., Ford, G.S. and Spiwak, L.J., ........................................ 17
  *Market Definition and the Economic Effects of Special Access Price
  Regulation,* 22 COMMLAW CONSPECTUS 237 (2014).

Ford, G.S., ..................................................................... 17
  *Middle-Class Affordability of Broadband: An Empirical Look at the
  Threshold Question,* PHOENIX CENTER POLICY BULLETIN NO. 61 (October
  2022)      (available      at:      https://phoenix-
  center.org/PolicyBulletin/PCPB61Final.pdf).

Ford, G.S. and Spiwak, L.J., ..................................................... 17
  *Tariffing Internet Termination: Pricing Implications of Classifying
  Broadband as a Title II Telecommunications Service,* 67 FEDERAL
  COMMUNICATIONS LAW JOURNAL 1 (2015).

Spiwak, L.J., ................................................................... 17
  *USTelecom and its Aftermath,* 71 FEDERAL COMMUNICATIONS LAW
  JOURNAL 39 (2019).

Spiwak, L.J., ................................................................... 17
  *Ensuring Due Process at the Surface Transportation Board,* 21
  FEDERALIST SOCIETY REVIEW 136 (2020).

Spiwak, L.J.,.................................................................................... 17
    *A Poor Case for a "Digital Platform Agency,"* PHOENIX CENTER POLICY
    PERSPECTIVE NO. 21-02 (March 9, 2021) (available at:
    http://www.phoenix-center.org/perspectives/Perspective21-02Final.pdf).

Spiwak, L.J.,.................................................................................... 17
    *Regulatory Implications of Turning Internet Platforms into Common
    Carriers,* 76 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2023).

## <u>INTERESTS OF AMICUS CURIAE:</u>

The Phoenix Center is a non-profit 501(c)(3) research organization that studies the law and economics of the digital age. Over the past three decades, the Phoenix Center has authored numerous pieces of scholarly research—many of which have been published in leading academic journals—about why it is important for the government to respect the due process protections and takings prohibitions provided by the Fifth Amendment whenever it seeks to regulate the rates, terms and conditions of private entitles' businesses.[1] The Phoenix Center, therefore, has an established interest in the outcome of this proceeding and believes that its perspective on the issues will assist the Court in resolving this case.

---

[1] All of the Phoenix Center's scholarly research and academic publications are available on our webpage at www.phoenix-center.org.

- 1 -

## SUMMARY OF ARGUMENT:

While this case was brought under an assortment of federal and state antitrust laws, this proceeding has devolved into nothing more than an effort to impose price regulation on Apple's App Store. As Apple explains, there is no basis to engage in price regulation in the first place. The focus of this brief is to explain that, even if there were, the no-commission rule would still be unlawful. Price regulation may not occur in a legal vacuum—there are established rules, and these rules must be respected in order to make sure that the government does not trample upon the due process protections guaranteed by the Fifth Amendment to the Constitution. In this case, unfortunately, the District Court has completely ignored these rules and deprived Apple of its constitutional rights.

The facts of this case may be briefly summarized as follows: After trial, the District Court found in connection with Epic's antitrust claims that Apple's 30% commission on In-App Purchases ("IAP") "allowed it to reap supracompetitive operating margins" because the District Court believed that this commission rate was not tied to the value of Apple's intellectual property. But the District Court court declined to disturb the commission because Apple had established procompetitive benefits, and Epic failed to prove a less

- 2 -

restrictive alternative that would achieve those benefits. The District Court went on to hold that Apple's anti-steering rules—which limited the ability of developers to direct users to out-of-app purchasing mechanisms—violated the California UCL. The District Court then issued a narrow injunction limited to those anti-steering provisions. In response, Apple permitted developers to link out and imposed a 27% commission on such purchases.

However, believing that Apple "willfully disregard[ed]" its original order, the District Court took umbrage at Apple's response. According to the District Court, "Apple selected a 3% discount on its 30% IAP commission that it knew as anticompetitive. In so doing, Apple willfully set a commission rate that in practice made all alternatives to IAP economically non-viable." Moreover, the District Court believed that Apple's revised rate of 27% was "entirely manufactured."

Piqued at Apple, the District Court held Apple in contempt. Yet rather than issue a measured response to coerce Apple into compliance, the District Court chose to throw the book at them: the District Court *permanently restrained and enjoined* "Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them, from

- 3 -

[i]mposing any commission or any fee on purchases that consumers make outside an app….”

There is no legal logic to the District Court's punitive contempt sanction. The District Court conceded that it was Apple's prerogative in the first instance to set the price of its intellectual property.  As the District Court correctly noted, it is not the job of the judiciary "to select a rate"; rather, a court's only responsibility is to evaluate whether the commission Apple chose to charge third-party app providers caused anticompetitive harm in violation of California law.  But what did the District Court do nonetheless?  The District Court proceeded *to set a permanent, judicially-mandated rate of zero.* In other words, as a penalty for what the District Court viewed as contemptable behavior, the District Court presumed it had the authority to subject Apple to naked *price regulation*.

There are numerous problems with the district court's zero-commission injunction.  One core problem with the District Court's draconian penalty is that whenever the government decides to regulate the rates, terms and conditions of private parties' businesses, the Fifth Amendment to the Constitution comes into play.  And by permanently prohibiting Apple from

- 4 -

charging any commission for IAP, the District Court has trampled upon Apple's constitutional rights.

As we explain below, the District Court violated every basic principle of ratemaking when it imposed zero-price regulation on Apple. Among other violations, the District Court provided no cost analysis (including identifying its cost methodology) but simply chose a rate of zero out of thin air. But as the cost to Apple of running its App Store is obviously not zero, the District Court—by definition—arbitrarily imposed a "confiscatory" (*i.e.,* below cost) rate for the service Apple provides to third-party app developers.

The District Court also violated Apple's constitutional rights by failing to provide Apple with any notice that zero-price regulation was on the table. Compounding the notice problem, the District Court also failed to provide Apple with any opportunity to challenge its judicially-mandated rate of zero. If an administrative agency (*e.g.,* the Federal Energy Regulatory Commission or the Federal Communications Commission) had attempted to set a rate of zero without providing any notice or the opportunity to comment, this Court would not hesitate to reverse that agency for improperly engaging in arbitrary and capricious decision-making. The fact that this case involves a decision by a district judge—rather than an administrative agency—to impose a

regulated price of zero to punish a party for allegedly contemptable conduct offers no succor when it comes to ensuring the basic due process guaranteed by the Fifth Amendment. If the District Court believed it had authority to fix Apple's prices and that Apple's proposed response of 27% was inadequate to prevent "creamy returns," then additional litigation was required where the parties could have submitted cost studies, put on (and challenged opposing) witnesses, *etc.* to determine exactly what commission rate for IAP would fall within the "zone of reasonableness."

Finally, allowing the District Court to impose zero-price regulation without any cost analysis or adequate notice would create a horrible precedent with wide-ranging policy implications. The Fifth Amendment serves as the ultimate bulwark against the political siren call for government price controls. The problem, however, is that too many in government view the Fifth Amendment as a minor inconvenience that can be swept under the rug for what they perceive as the greater good. As a result, over the last several years, we have seen numerous attempts by the government—some successful; others not—to impose some sort of price regulation without going through the basic machinations required to ensure the procedural due process guaranteed by the Fifth Amendment. Upholding the District Court's arbitrary decision to impose zero-price regulation on Apple would simply add fuel to this fire.

- 6 -

## ARGUMENT:

**I.** **By Permanently Prohibiting Apple from Charging a Commission or Fee for Linked Purchases, the District Court Has Improperly Engaged in Rate Regulation and Deprived Apple of its Fifth Amendment Rights**

The facts of this case may be briefly summarized as follows: After trial, the District Court found in connection with Epic's antitrust claims that Apple's 30% commission on In-App Purchases ("IAP") "allowed it to reap supracompetitive operating margins" because the District Court believed that this commission rate was not tied to the value of Apple's intellectual property. *Contempt Order* at 2. But the District Court declined to disturb the commission because Apple had established procompetitive benefits, and Epic failed to prove a less restrictive alternative that would achieve those benefits. The District Court went on to hold that Apple's anti-steering rules—which limited the ability of developers to direct users to out-of-app purchasing mechanisms—violated the California UCL. The District Court then issued a narrow injunction limited to those anti-steering provisions. In response, Apple permitted developers to link out and imposed a 27% commission on such purchases. However, believing that Apple "willfully disregard[ed]" its original order, the District Court took umbrage at Apple's response. *Contempt Order* at 3. According to the District Court, "Apple selected a 3% discount

- 7 -

on its 30% IAP commission that it knew as anticompetitive. In so doing, Apple willfully set a commission rate that in practice made all alternatives to IAP economically non-viable." *Contempt Order* at 59. Moreover, the District Court believed that Apple's revised rate of 27% was "entirely manufactured." *Id.* at 60.

Piqued at Apple, the District Court held Apple in contempt. Yet rather than issue a measured response to coerce Apple into compliance, the District Court chose to throw the book at Apple: the District Court *permanently restrained and enjoined* "Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them, from [i]mposing any commission or any fee on purchases that consumers make outside an app…." *Contempt Order* at 75.

There is no legal logic to the District Court's punitive contempt sanction. The District Court conceded that it was Apple's prerogative in the first instance to set the price of its intellectual property. *See, e.g., Contempt Order* at 60 ("Apple was tasked with valuing its intellectual property…"). As the District Court correctly noted, it is not the job of the judiciary "to select a rate"; rather, a court's only responsibility is to evaluate whether the commission Apple chose to charge third-party app developers caused

- 8 -

anticompetitive harm in violation of California law. *Contempt Order* at 58. But what did the District Court do nonetheless? The District Court proceeded *to set a permanent, judicially-mandated rate of zero.* In other words, as a penalty for what the District Court viewed as contemptable behavior, the District Court presumed it had the authority to subject Apple to *price regulation*.

There are numerous problems with the district court's zero-commission injunction. One core problem with the District Court's draconian penalty is that whenever the government decides to regulate the rates, terms and conditions of private parties' businesses, the Fifth Amendment to the Constitution comes into play. And by permanently prohibiting Apple from charging any commission on linked purchases without any analytical explanation or adequate notice, the District Court has trampled upon Apple's constitutional rights.

    A.    *The District Court Failed to Show its "Why's and Wherefores" in Setting a Regulated Rate of Zero*

Let's start with a quick primer of "Ratemaking 101." The Fifth Amendment prohibits the government from taking any "private property … without just compensation." U.S. CONSTITUTION, ARTICLE V; *see also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (the Takings Clause

prohibits the government from directing private companies to permanently give away free access to their property).  As such, over the last century a rich body of caselaw has been developed on fundamental ratemaking principles that the government must follow, even when the government has a basis to tell private parties what they can charge for their products and services.

As a general proposition, it is widely acknowledged that that ratemaking is not "an exact science."  *See*, *e.g.*, *Fed. Power Comm'n. v. Conway Corp.,* 426 U.S. 271, 278 (1976); *WorldCom v. FCC,* 238 F.3d 449, 457 (D.C. Cir. 2001); *Southwestern. Bell Tel. Co. v. FCC*, 168 F.3d 1344, 1352 (D.C. Cir. 1999); *Time Warner Entm't Co. v. FCC,* 56 F.3d 151, 163 (D.C. Cir. 1995); *United States v. FCC,* 707 F.2d 610, 618 (D.C. Cir. 1983).  For this reason, the government generally tries to ensure that regulated rates are "just and reasonable."  *See, e.g.,* Communications Act, 47 U.S.C. § 201(b); Federal Power Act, 16 U.S.C. § 824d; Natural Gas Act, 15 U.S.C. § 717c.  That said, because the phrase "just and reasonable" is not "a mere vessel into which meaning must be poured," *see*, *e.g.*, *Farmers Union Cent. Exch. v. FERC,* 734 F.2d 1486, 1504 (D.C. Cir. 1984), *cert denied sub nom.*, 469 U.S. 1034 (1984), whenever government sets a regulated price, that regulated price must fall within a *zone of reasonableness*.  As illustrated in Figure 1, this zone of reasonableness lies between rates that are *confiscatory* at the low end (that is,

below cost and a "takings" under the Fifth Amendment) and rates that are *excessive* at the high end (that is, "creamy returns," the limit of which is defined in the figure by the markup *R*). *See*, *e.g.*, *Farmers Union,* 734 F.2d at 1502-03 (citations omitted).   As the Supreme Court held in its seminal *Permian Area Rate Cases* ruling, the zone of reasonableness is such that the rate "may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interest, both existing and foreseeable." *Permian Basin Area Rate Cases,* 390 U.S. 747, 792 (1968).  So, in attempting to set a "just and reasonable" rate, the government must set a rate that exceeds cost, but not by too much.



By its plain terms, the District Court's *Contempt Order* is specifically designed to prohibit Apple from charging third-party app developers a fee in

perpetuity—*i.e.,* a regulated price of "zero." *C.f., Verizon v. FCC,* 740 F.3d 623, 657 (D.C. Cir. 2014) (*citing Cellco P'ship v. FCC*, 700 F.3d 534, 548 (2012)) (noting how the Federal Communications Commission's *2010 Open Internet Order* imposed a "no blocking" rule that was specifically intended to "bar broadband providers from charging edge providers for using their service, thus forcing them to sell this service to all who ask at a price of $0." Thus, the D.C. Circuit found that the FCC's "no blocking" rule functionally established "a regulated price of zero." *Verizon*, 740 F.3d at 668 (Silberman J., concurring in part and dissenting in part).) In so doing, the *Contempt Order* has the unambiguous effect of requiring Apple to provide a service to third-party app developers (*i.e.,* access to the App Store and its millions of potential customers) without any compensation. *See Verizon*, *id.* at 654 (chastising the government for seeking to "compel[] an entity to continue furnishing service at no cost.").

But in setting a "zero-price" as a punishment for Apple's perceived contempt, the District Court violated many basic principles of ratemaking. Most notably, the government may not set a rate arbitrarily. Instead, the government must provide its "whys and wherefores" on how it derived the rate. *See*, *e.g.*, *Century Commc'ns Corp. v. FCC,* 835 F.2d 292, 300–02 (D.C. Cir. 1987) (rejecting a regulator's judgment where supported by "scant"

- 12 -

evidence), *cert. denied,* 486 U.S. 1032 (1988); *Cincinnati Bell Tel. Co. v. FCC,* 69 F.3d 752, 760, (6th Cir. 1995) (overturning a regulator's judgment when the agency "provide[d] to this Court nothing, no statistical data or even a general economic theory, to support its argument"). The District Court provided no such analysis in its *Contempt Order*.

Formulating rates is a complex and arduous task, but drudgery is no excuse for the District Court's avoidance of the requirements of its own choice to permanently enjoin Apple from ever charging a commission for linked-out purchases. Unquestionably, the cost to Apple of running its App Store is obviously not zero—there are no free lunches.

But the District Court failed to even consider such an inquiry in its *Contempt Order*. In fact, it did nothing. What cost standard did the District Court use to establish this zero price? Historical cost? Forward-looking cost? Marginal cost? Average cost? Embedded Costs? Fully Allocated Costs? Long Run Incremental Cost? We cannot know, because the District Court arbitrarily set a price of zero for linked-out purchases without a shred of

- 13 -

analysis.[2] *C.f. FTC v. Qualcomm, Inc.*, 969 F.3d 974, 999 (9th Cir. 2020) (a district court may not arbitrarily set a rate simply because the defendant could not prove that the "fair value" of its services "corresponds to the prices the market appears willing to pay" for those services).   Instead, in a fit of pique, the District Court bluntly told Apple that due to its contemptable behavior, it is now permanently prohibited from charging *any* commission on linked purchases (despite the fact that these third-party apps impose a cost on Apple's App Store).   Absent some cost analysis indicating otherwise, the District Court—by definition—arbitrarily established a "confiscatory" (*i.e.*, below cost) rate of zero for the service Apple offers to third-party app developers.

B.    *The District Court Failed to Give Apple Adequate Notice that Zero-Price Regulation was on the Table*

Equally as important, the Fifth Amendment prohibits the government from depriving private parties of property "without due process of law."   U.S.

---

[2]    Even in the case of Total Element Long Run Incremental Cost (TELRIC)—a cost methodology many argued produced a confiscatory rate for unbundled network elements required by the Telecommunications Act of 1996—the Federal Communications Commission demonstrated its "why's and wherefores" to the satisfaction of the courts. *See generally AT&T v. Iowa Utilities Board,* 525 U.S. 366 (1999); *Verizon Commc'ns Inc. v FCC,* 535 U.S. 467 (2002) (finding FCC had provided sufficient detail in establishing TELRIC rate for unbundled network elements).

CONSTITUTION ARTICLE V.  In this case, we are talking about the lack of any notice by the District Court that zero-price regulation was even on the table.

Let's imagine a hypothetical where Apple provides some sort of "public utility" service and is subject to regulatory oversight by a federal administrative agency (*e.g.*, something akin to the Federal Communications Commission, the Federal Energy Regulatory Commission or even the Copyright Royalty Board who is required to set royalty rates on five-year cycles for most statutory licenses, *see* 17 U.S.C. §804).  If this hypothetical administrative agency attempted to regulate the price, terms and conditions of Apple's service, then that agency would be required to give Apple adequate notice—including the opportunity for Apple to respond—to any proposed rate structure before that rate went into effect.  *See* L.J. Spiwak, *A Poor Case for a "Digital Platform Agency,"* PHOENIX CENTER POLICY PERSPECTIVE NO. 21-02 (March 9, 2021) and citations therein.  Indeed, this is the *raison d'être* of the Administrative Procedure Act. 5 U.S.C. §§ 553, 554.  And if this administrative agency failed to provide such basic procedural due process, then a reviewing court would not hesitate to reverse that agency for arbitrary and capricious decision-making.  *See, e.g., FCC v. Fox Television Stations, Inc.,* 567 U.S. 239, 253 (2012); *Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 156 (2012).

- 15 -

The fact that this case involves a decision by a district judge—rather than an administrative agency—to impose arbitrarily a regulated price of zero to punish a party for allegedly contemptable conduct offers no succor when it comes to ensuring the basic due process guaranteed by the Fifth Amendment. If the District Court believed Apple's proposed response of 27% was inadequate to prevent "creamy returns," then additional litigation was required where the parties could have disputed the basis for regulating Apple's rates, submitted cost studies, put on (and challenged opposing) witnesses, *etc.* to determine exactly what commission rate for external purchases outside of an app would fall within the "zone of reasonableness." *C.f.*, *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971); *United States v. Microsoft Corp.*, 147 F.3d 935, 943–44 (D.C. Cir. 1998). Instead, the District Court improperly imposed in perpetuity a regulated rate of zero by judicial fiat without providing Apple with any notice and opportunity to respond. *See, e.g., Contempt Order* at 3 ("This is an injunction, not a negotiation.").

## II.   Allowing the District Court's to Impose Zero-Price Regulation on Apple Will Set a Troubling Precedent

The Fifth Amendment serves as the ultimate bulwark against the political siren call for government price controls. The problem, however, is that too many in government view the Fifth Amendment as a minor inconvenience

that can be swept under the rug for what they perceive as the greater good.  As a result, over the last several years we have seen numerous attempts by the government—some successful; others not—to impose some sort of price regulation without going through the basic machinations required to ensure the procedural due process guaranteed by the Fifth Amendment.  *See, e.g.,* L.J. Spiwak, *Regulatory Implications of Turning Internet Platforms into Common Carriers,* 76 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2023); T.R. Beard, G.S. Ford, L.J. Spiwak, *Market Definition and the Economic Effects of Special Access Price Regulation,* 22 COMMLAW CONSPECTUS 237 (2014); G.S. Ford and L.J. Spiwak, *Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service,* 67 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2015); L.J. Spiwak, *USTelecom and its Aftermath,* 71 FEDERAL COMMUNICATIONS LAW JOURNAL 39 (2019); L.J. Spiwak, *Ensuring Due Process at the Surface Transportation Board,* 21 FEDERALIST SOCIETY REVIEW 136 (2020); G.S. Ford, *Middle-Class Affordability of Broadband:  An Empirical Look at the Threshold Question,* PHOENIX CENTER POLICY BULLETIN NO. 61 (October 2022).  Upholding the District Court's arbitrary decision to impose zero-price regulation on Apple would simply add fuel to this fire.

It is not the job of a generalist court to determine whether economic regulation is appropriate. *See California Grocers Ass'n v. Bank of Am.*, 27 Cal. Rptr. 2d 396, 405 (Ct. App. 1994) ("Judicial review of one service fee charged by one bank is an entirely inappropriate method of overseeing bank service fees.") That role is the exclusive purview of the legislative and executive branches. *See, e.g., Willard v. AT&T Commc'ns of Cal., Inc.*, 138 Cal. Rptr. 3d 636, 642 (Ct. App. 2012) ("'[T]he control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by ad hoc decisions of the courts.'" Issues of "'complex economic policy and regulation'"—including questions such as the "level of competition" and "whether market conditions require[] pricing regulation"— are reserved to the political branches of government.) Instead, the primary job of the judiciary is to ensure that the government does not infringe on the constitutional rights of its citizens. *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("the federal judiciary is supreme in the exposition of the law of the Constitution….").

In this particular case, the District Court seems to have forgotten this basic maxim. Rather than act as a protector of constitutional liberties, the District Judge has improperly acted as a member of one of the two political branches (*i.e.*, the Executive Branch and the legislature) by imposing zero-price

- 18 -

regulation on Apple without any analytical foundation or adequate notice.  It is thus up to this Court to rectify the situation and to restore Apple's constitutional rights.

## CONCLUSION:

For the reasons set forth herein, the Phoenix Center joins Appellants in urging this Court to reverse the District Court's *Contempt Order.*

Respectfully submitted,

<u>s/ *Lawrence J. Spiwak*</u>

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and
Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org

June 27, 2025

- 19 -

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Federal Rule of Appellate Procedure 32, the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32, this brief contains 3684 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Office 365) used to prepare this brief.

/s/ <em>Lawrence J. Spiwak</em>

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email: lspiwak@phoenix-center.org

June 27, 2025

- 20 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 27, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org