**No. 25-2935**

# In the United States Court of Appeals for the Ninth Circuit

_____

EPIC GAMES, INC.,
PLAINTIFF-CTR-DEFENDANT - APPELLEE,
*v.*
APPLE INC.,
DEFENDANT-CTR-CLAIMANT - APPELLANT.

_____

ON APPEAL FROM THE U.S. DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA, No. 4:20-cv-5640

_____

**BRIEF OF TECHNET & ASSOCIATION OF CORPORATE
COUNSEL AS *AMICI CURIAE*
IN SUPPORT OF DEFENDANT-COUNTER-CLAIMANT –
APPELLANT APPLE INC.**

_____

DREW HUDSON
TECHNET
1420 New York Avenue, N.W.
Suite 825
Washington, DC 20005

SUSANNA MCDONALD
AMY C. CHAI
ASSOCIATION OF CORPORATE
COUNSEL
1001 G Street N.W.
Suite 300W
Washington, DC 20001

R. TRENT MCCOTTER
BOYDEN GRAY PLLC
800 Connecticut Ave. NW
Suite 900
Washington, DC 20006
202.955.0620
tmccotter@boydengray.com

Counsel for *Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* certify that they have no parent corporation, and that no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

IDENTITY AND INTEREST OF THE *AMICI CURIAE* ........................ 1

SUMMARY OF THE ARGUMENT ............................................... 3

ARGUMENT ....................................................................... 4

I.  The Court Should Adopt the D.C. Circuit's Approach to the
    "Primary-Purpose" Test for Privilege, Which Reflects
    Common Sense About Dual-Purpose Communications ................. 4

II.  A Clear Rule for Dual-Purpose Communications Is
     Especially Valuable for Smaller Companies ................................ 10

    A.  Smaller Companies and Start-Ups Rely Extensively on
        In-House Counsel Who are More Likely to Engage in
        Dual-Purpose Communications ........................................... 10

    B.  Some Lower Courts Are Openly Hostile to Claims of
        Privilege by In-House Lawyers ........................................... 16

CONCLUSION ..................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3D Sys., Inc. v. Wynne,*
No. 21-cv-1141-AGS-DDL, 2024 WL 940318 (S.D. Cal.
Feb. 21, 2024) ........................................................................ 17

*Akamai Techs., Inc. v. MediaPointe, Inc.,*
No. 2:22-cv-06233-MCS-SHK, 2023 WL 8000278 (C.D.
Cal. Nov. 2, 2023) .................................................................. 17

*In re Cal. Bali Bond Antitrust Litig.,*
No. 19-cv-00717-JST, 2025 WL 1101522 (N.D. Cal. Apr.
14, 2025) ................................................................................ 17

*Dolby Laboratories Licensing Corp. v. Adobe Inc.,*
402 F. Supp. 3d 855 (N.D. Cal. 2019) ................................. 17

*Epic Games, Inc. v. Apple Inc.,*
No. 4:20-cv-5640 (N.D. Cal.) (Dec. 2, 2024) ......................... 7

*FTC v. Boehringer Ingelheim Pharms., Inc.,*
892 F.3d 1264 (D.C. Cir. 2018) ................................... 5, 6, 9

*In re Grand Jury,*
23 F.4th 1088 (9th Cir. 2021) ............................... 4, 6, 8, 10

*In re Kellogg Brown & Root, Inc.,*
756 F.3d 754 (D.C. Cir. 2014) ........................... 5, 6, 8, 15

*Kisor v. Wilkie,*
588 U.S. 558 (2019) .............................................................. 15

*L.D. v. United Behav. Health,*
No. 20-cv-02254-YGR, 2022 WL 3139520 (N.D. Cal. Aug.
5, 2022) .................................................................................. 17

*In re Teleglobe Commc'ns Corp.,*
493 F.3d 345 (3d Cir. 2007) ................................................ 15

iii

*United States v. Chen*,
99 F.3d 1495 (9th Cir. 1996) ............................................................ 7

*United States v. ChevronTexaco Corp.*,
241 F. Supp. 3d (N.D. Cal. 2002) .............................................. 17, 18

*United States v. Sanmina Corp.*,
968 F.3d 1107 (9th Cir. 2020) ...................................................... 4, 18

*Upjohn Co. v. United States*,
449 U.S. 383 (1981) ........................................................ 4, 9, 10, 16

## Other Authorities

Ass'n of Corp. Couns., *The 2019 General Counsel Landscape*,
https://perma.cc/86JZ-WEK4 ............................................................ 14

Ass'n of Corp. Couns., *U.S. In-House Counsel Population
Tracker* (Sept. 5, 2024), https://perma.cc/637T-J8CN ........................ 12

*Average Litigation Costs Between Large, Small Companies*,
Legal Dive (Oct. 24, 2022), https://perma.cc/5FFH-NG6X ............... 13

David Kim, *Ethical Lawyering, Attorney-Client Privilege,
and Dual-Purpose Communications in Light of In re
Grand Jury*, 36 Geo. J. Legal Ethics 707 (2023) .............................. 16

Grace M. Giesel, *The Ethics or Employment Dilemma of In-
House Counsel*, 5 Geo. J. Legal Ethics 535 (1992) ............................ 11

Grace M. Giesel, *The Legal Advice Requirement of the
Attorney-Client Privilege: A Special Problem for In-House
Counsel and Outside Attorneys Representing
Corporations*, 48 Mercer L. Rev. 1169 (1997) .................................... 19

Erin Mulvaney, *Rock-Star Law Firms Are Billing Up to
$2,500 per Hour. Clients Are Indignant*, Wall St. J. (Oct.
4, 2024) ..................................................................................... 12, 13

Jane Croft, *Start-Ups Attract Chief Legal Officers in Search
of a Challenge*, Fin. Times (July 25, 2024) ........................................ 14

iv

Jennifer M. Pacella, *The Regulation of Lawyers in Compliance*, 95 Wash. L. Rev. 947 (2020) ......................................... 15

*Legal Teams Are Bringing More Work In-House*, LegalDive (Nov. 21, 2023), https://perma.cc/X8JQ-33L9/ ................................... 13

Meenakshi Baddela, *The Tech GC Job Search: Skills, Responsibilities, and How to Get Hired*, The L Suite (Feb. 18, 2024), https://perma.cc/5MMW-DX7D .......................................... 12

*National Study Reveals In-House Legal Teams Face a Perfect Storm of Rising Law Firm Costs and Talent Shortages Amidst Increasing Workloads and Complexity*, Corp. Couns. Bus. J., https://perma.cc/9ZYC-TCQW .................................. 13

Paul R. Rice, *Attorney-Client Privilege in the United States* (2024) ............................................................................................. 4

Sarah H. Duggin, *The Pivotal Role of the General Counsel in Promoting Corporate Integrity and Professional Responsibility*, 51 St. Louis U. L.J. 989 (2007) .................................... 6

## IDENTITY AND INTEREST OF THE *AMICI CURIAE*[1]

TechNet is a national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes more than 100 dynamic American companies ranging from startups to the most iconic companies on the planet. Those companies represent more than 5 million employees and countless customers in the fields of information technology, AI, e-commerce, the sharing and gig economies, advanced energy, cybersecurity, venture capital, and finance. TechNet's members are at the forefront of developing new technologies, which often comes with rapidly evolving compliance and regulatory regimes. TechNet has unique expertise regarding how companies of all sizes manage compliance with these evolving regimes, including through the use of in-house counsel, and how weakening the attorney-client privilege for in-house counsel

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *Amici* and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Because Epic Games, Inc., declined to consent to the filing of this brief unless *Amici* agreed to Epic's unusual requests, *Amici* have filed a motion for leave to submit this brief.

would impact companies of different sizes and at different stages of growth.

The Association of Corporate Counsel (ACC) is a global legal association that promotes the common professional and business interests of in-house counsel who work for corporations, associations, and other organizations through information, education, networking, and advocacy. Founded as the American Corporate Counsel Association in 1981, it has grown from a small organization of in-house counsel to a worldwide network of more than 47,000 in-house lawyers employed by over 10,000 corporations, associations, and other organizations in more than 100 countries. It has long sought to aid courts, legislatures, regulators, and other law or policy-making bodies in understanding the role and concerns of in-house counsel, and is a frequent amicus participant in important cases affecting in-house counsel.

## SUMMARY OF THE ARGUMENT

*Amici* address the issue of attorney-client privilege, which the district court concluded did not apply to several important internal documents that simultaneously gave both business and legal advice, known as "dual-purpose communications." This Court has previously left open whether to adopt the D.C. Circuit's approach, which provides privilege where giving or soliciting legal advice was one of the significant purposes of the communications, even if business advice was also a significant purpose. This Court should adopt that framework, which recognizes that business advice and legal advice are often intertwined, and sometimes are even one and the same, like where the claims are about the legality of specific business methods.

For a variety of reasons, smaller businesses and start-ups rely extensively on in-house counsel who are likelier to give advice on the legality of certain business options and regulatory compliance. These companies should not have to choose between forgoing privilege in such scenarios or retaining expensive outside counsel to make the discussions look "more" privileged. Adopting the D.C. Circuit's framework will provide necessary protections for those small and innovative businesses.

3

## ARGUMENT

**I.    The Court Should Adopt the D.C. Circuit's Approach to the "Primary-Purpose" Test for Privilege, Which Reflects Common Sense About Dual-Purpose Communications.**

Attorney-client privilege exists to "encourage full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Accordingly, the privilege protects from disclosure statements made "for the purpose of giving legal advice." *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020).

To determine whether a communication is privileged, this Circuit (like several others) has adopted the "primary-purpose test," which typically "look[s] at whether the primary purpose of the communication is to give or receive legal advice, as opposed to business or tax advice." *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021). But in some circumstances, advice is given for both legal *and* business reasons, i.e., "dual-purpose communications." *Id.* at 1092. Because "business and legal advice may often be inextricably interwoven," it can be difficult in such cases to neatly separate business purposes from legal purposes. 1 Paul R. Rice, *Attorney-Client Privilege in the United States* § 7:6 (2024).

Recognizing that business and legal communications are often intertwined, the D.C. Circuit has held that "courts applying the primary purpose test should determine 'whether obtaining or providing legal advice was *one of* the significant purposes of the attorney-client communication.'" *FTC v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018) (Kavanaugh, J.) (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014)). In other words, the inquiry should be whether obtaining legal advice was *a* primary purpose of the communication, not whether it was *the* primary purpose. Any contrary approach would prove unworkable and improperly deny privilege protections. As then-Judge Kavanaugh noted, "trying to find *the* one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task." *Kellogg*, 756 F.3d at 759.

The *Kellogg* court was sensitive to the reality that when addressing communications about complying with and responding to a prior court order, "[i]t is often not useful or even feasible to try to determine whether the purpose was A or B when the purpose was A *and* B." *Id.* (emphasis added). Then-Judge Kavanaugh reached a similar conclusion in

5

*Boehringer*, finding that the "decision whether and at what price to settle ultimately was a business decision *as well as* a legal decision." 892 F.3d at 1268 (emphasis added).

In modern corporate environments, the overlap of the two only becomes more pronounced. The decision to begin new projects or overhaul existing products can hinge on "legal feasibility and risk"— fundamentally legal questions. Sarah H. Duggin, *The Pivotal Role of the General Counsel in Promoting Corporate Integrity and Professional Responsibility*, 51 St. Louis U. L.J. 989, 1015 (2007).

If in-house counsel wants to add value when assisting on the full range of corporate affairs, their legal advice may necessarily take on business undertones. *See* MODEL RULES OF PRO. CONDUCT R. 2.1, cmt. 2 ("Advice couched in narrow legal terms may be of little value to a client, especially where practical considerations … are predominant. Purely technical legal advice, therefore, can sometimes be inadequate.").

This Court has previously acknowledged "the merits" of that framework but has not yet decided whether to adopt it. *See In re Grand Jury*, 23 F.4th at 1094 ("We see the merits of the reasoning in *Kellogg*. But we see no need to adopt that reasoning in this case."). This Court has

also recognized that a client's right to have legal advice regarding business affairs kept secret has "long been the law." *United States v. Chen*, 99 F.3d 1495, at 1500–01 (9th Cir. 1996).

This Court should take this opportunity to adopt the D.C. Circuit's framework. In this case, the communications on which the district court's contempt order relied contained legal and business advice that were not just intertwined but were one and the same. *See* 1-ER-16–18.[2] The district court's own contempt order proves the point. It held that compliance with the injunction meant that "Apple was tasked with valuing its intellectual property," i.e., business determinations were literally legal ones, and then the court chastised Apple for adopting a 27% commission for off-app purchases without a sufficient business justification, which would render "all alternatives to [in-app purchases] economically non-viable," and thus (in the court's view) *a fortiori* illegal. 1-ER-60–61. The same is true for the district court's holding regarding

---

[2] *See also, e.g.*, Discovery Order 1–2, ECF No. 1056, *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-5640 (N.D. Cal.) (Dec. 2, 2024) (Magistrate Judge order repeatedly denying privilege for materials he acknowledged included "business analysis of ways to comply with a legal requirement" and "business analysis and recommendation for how to comply with a legal requirement").

other features, like external link design, where the court acknowledged that legality turned on technical issues like whether outside developers are "able to format these prompts as buttons or other calls to action, not just blue HTML links." 1-ER-32 (cleaned up). Accordingly, under the district court's own reasoning, the injunction tied the legality of Apple's actions to a detailed scrutiny of the business justifications for those actions.

Isolating a single, primary purpose of certain communications "can quickly become messy in practice," *In re Grand Jury*, 23 F.4th at 1094, but it would be impossible in cases where the district court's legal determinations expressly turn on business justifications. The *Kellogg* approach "would save courts the trouble of having to identify a predominate purpose among two (or more) potentially equal purposes." *Id.*

Any other rule would also have perverse effects. Even when the district court rules, as it had here, that legality turns largely on detailed business figures and rationales, lawyers would be unable to discuss those key facts without privileged legal advice being made public for the world to see. The district court's approach would discourage companies from

8

asking their lawyers for help in the first place, defeating the entire point of attorney-client privilege. *See Upjohn*, 449 U.S. at 392 (a narrow reading of the attorney-client privilege "not only makes it difficult for corporate attorneys to formulate sound advice when their client is faced with a specific legal problem but also threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law").

The D.C. Circuit's approach would "reduce uncertainty regarding the attorney-client privilege." *Boehringer*, 892 F.3d at 1268. That is crucial because "if the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn*, 449 U.S. at 393. Companies should not have to try and separate discussions that are inherently both business- and legal-oriented, nor—as discussed next—try to make those legal discussions "look" more privileged by involving expensive outside lawyers.

9

In short, the D.C. Circuit's approach has strong "merit[]," *In re Grand Jury*, 23 F.4th at 1094, and it should be adopted here, *see, e.g.*, Restatement of the Law Governing Lawyers § 72, Reporter's Note ("In general, American decisions agree that the privilege applies if one of the significant purposes of a client in communicating with a lawyer is that of obtaining legal assistance.").

## II.  A Clear Rule for Dual-Purpose Communications Is Especially Valuable for Smaller Companies.

### A.  Smaller Companies and Start-Ups Rely Extensively on In-House Counsel Who are More Likely to Engage in Dual-Purpose Communications.

The D.C.'s Circuit's approach to the primary-purpose test not only makes privilege determinations more predictable, but it also reflects how companies regularly conduct operations. Courts have long recognized the unique and vital role in-house counsel play in "ensur[ing] their client's compliance with the law," especially "[i]n light of the vast and complicated array of regulatory legislation confronting the modern corporation." *Upjohn*, 449 U.S. at 392.

As statutory and regulatory landscapes grow more complex, businesses are increasingly turning to in-house counsel to address legal questions, rather than hiring outside law firms. But modern in-house

attorneys do not deal with purely legal questions divorced from broader business questions. Business executives often do not know exactly what legal advice they are seeking, instead providing significant amounts of business information and relying on the issue-spotting skills of the in-house lawyer to step in and provide relevant advice and guidance.

An interpretation of attorney-client privilege that eliminates the privilege whenever other business concerns are seemingly part of requests for legal assistance would eviscerate the privilege entirely as to in-house counsel, eliminating the ability of in-house attorneys to carry out their duties.

That concern is especially pertinent for smaller companies and start-ups, which are more likely to rely on in-house attorneys rather than outside counsel. To be sure, companies have long seen in-house counsel as an "essential component" within their teams, Grace M. Giesel, *The Ethics or Employment Dilemma of In-House Counsel*, 5 Geo. J. Legal Ethics 535, 544 (1992), but the preference towards in-house counsel has grown sharply in recent years. According to Bureau of Labor Statistics data compiled and tracked by the Association of Corporate Counsel, the number of lawyers working as in-house counsel in the United States has

increased by 81% since 2008, growing nearly four times faster than the number of lawyers working for law firms. Ass'n of Corp. Couns., *U.S. In-House Counsel Population Tracker* (Sept. 5, 2024), https://perma.cc/637T-J8CN.

There are several reasons for this. In-house counsel can provide better and more informed legal advice than they otherwise would precisely because they have broader familiarity with the operations of the company. "A general counsel isn't just a lawyer, but a strategic partner across the organization. With a deep knowledge of the business, industry, and associated legal, regulatory, and compliance issues, a GC advises (and often guides) leadership on corporate planning, strategic decision-making, and growth." Meenakshi Baddela, *The Tech GC Job Search: Skills, Responsibilities, and How to Get Hired*, The L Suite (Feb. 18, 2024), https://perma.cc/5MMW-DX7D.

Another reason is the spiraling cost for many outside lawyers. In the last few years, hourly rates have increased dramatically, with some firms now charging $2,000 or more per hour for just one attorney's time. Erin Mulvaney, *Rock-Star Law Firms Are Billing Up to $2,500 per Hour. Clients Are Indignant*, Wall St. J. (Oct. 4, 2024), https://perma.cc/PBQ9-

2JWB. Hourly rates have increased at more than double the usual pace since 2023. *Id.*

As a result, hiring outside counsel is increasingly viewed as not routinely feasible. *See* Robert Freedman, *Big Discrepancy in Average Litigation Costs Between Large, Small Companies*, Legal Dive (Oct. 24, 2022), https://perma.cc/5FFH-NG6X (citing reports that ranked saving money as lowest-ranked reason to hire outside firms). The costs are so exorbitant that recent surveys report "[a]n astounding 100% of GCs reported cost, quality, and other challenges that made them regret those law firm engagements in some way." *National Study Reveals In-House Legal Teams Face a Perfect Storm of Rising Law Firm Costs and Talent Shortages Amidst Increasing Workloads and Complexity*, Corp. Couns. Bus. J. (last visited June 26, 2025), https://perma.cc/9ZYC-TCQW; *see also* Lyle Moran, *66% of Legal Teams Are Bringing More Work In-House*, LegalDive (Nov. 21, 2023), https://perma.cc/X8JQ-33L9/ (in 2023, 66% of legal teams said they planned to bring more legal work in-house to better control costs).

Smaller companies simply do not typically have the budgets to regularly hire outside lawyers, such as for routine or non-litigation

matters. As a result, such companies rely more on in-house lawyers who are necessarily involved in both legal issues and business matters. And during times of economic uncertainty, companies of all sizes would find in-house counsel not only more attractive but critical to their company's survival.

Further, start-ups often operate in fast-evolving areas like technology and life sciences, where in-house counsel are preferred because of their specialized knowledge, which can be crucial to navigating the "regulatory hurdles and approvals that are specific to that sector." Jane Croft, *Start-Ups Attract Chief Legal Officers in Search of a Challenge*, Fin. Times (July 25, 2024), https://perma.cc/5XYE-MJCA; *see also* Ass'n of Corp. Couns., *The 2019 General Counsel Landscape* 10 (last visited June 26, 2025), https://perma.cc/86JZ-WEK4 ("GC appointments at micro or small businesses in the United States reflect the fact that many US small businesses are concentrated in highly complex or regulated areas, such as professional, scientific, and technical services.").

Start-ups thus often rely on in-house counsel to "set up a legal function from scratch, and to shape a company's future direction." Croft, *Start-Ups Attract Legal Officers in Search of a Challenge*, *supra*.

14

Smaller companies' outsized reliance on in-house counsel is also necessary to deal with the increasing burden of government regulations, a quintessential example of an area that is simultaneously business- and legal-oriented. *See* Jennifer M. Pacella, *The Regulation of Lawyers in Compliance*, 95 Wash. L. Rev. 947, 949 (2020) (stating that forty-one percent of in-house counsel cite regulatory compliance as their "greatest priority"); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 369 (3d Cir. 2007) (describing "in-house counsel as the 'front lines' of the battle to ensure that compliance while preserving confidential communications").

That regulatory burden is significant. "[A]gencies add thousands more pages of regulations every year." *Kisor v. Wilkie*, 588 U.S. 558, 629 (2019) (Gorsuch, J., concurring in the judgment). The D.C. Circuit has recognized that corporate compliance with the law is "'hardly an instinctive matter.'" *In re Kellogg*, 756 F.3d at 757. It often makes little sense, either financially or practically, to pay an outside firm $2,000-plus per hour to help with routine but ever-growing compliance burdens.

The importance of the in-house counsel role is set to become only more entrenched. And because in-house counsel are often involved in evaluating the legal consequences of business decisions, their

communications are more likely to be dual-purpose in nature. Courts should not adopt a regime that causes companies to curtail the information they share with in-house counsel to try to preserve "pure" legal discussions.

The D.C. Circuit's approach to the "primary-purpose" test reflects that important balance and thereby provides especially valuable predictability and protections for in-house counsel. *See* David Kim, *Ethical Lawyering, Attorney-Client Privilege, and Dual-Purpose Communications in Light of In re Grand Jury*, 36 Geo. J. Legal Ethics 707, 713 (2023) (noting such uncertainty would likely lead to less candid communication between client and attorney).

**B.    Some Lower Courts Are Openly Hostile to Claims of Privilege by In-House Lawyers.**

The D.C. Circuit's approach to the primary-purpose test is necessary and beneficial for another reason: some district courts in this Circuit are overtly hostile to claims of privilege by in-house counsel. A lawyer's status as in-house shouldn't affect application of attorney-client privilege, which instead turns on the nature of the communication. *See Upjohn*, 449 U.S. at 395.

But a smattering of district courts in this Circuit have expressly held that in-house counsel are subject to a heightened burden for showing privilege. As one such court put it, "unlike communications with outside counsel, which are presumed to be made for the purpose of seeking legal advice, there is no presumption that communications with in-house counsel are protected by attorney-client privilege." *Dolby Laboratories Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 866 (N.D. Cal. 2019).[3]

Other courts hold that communications with in-house counsel "warrant[] heightened scrutiny." *In re Cal. Bali Bond Antitrust Litig.*, No. 19-cv-00717-JST, 2025 WL 1101522, at *3 (N.D. Cal. Apr. 14, 2025). To preserve privilege over in-house legal communications, the asserting party must make a "clear showing" that the communication was for the purpose of obtaining or providing legal advice. *United States v. ChevronTexaco Corp.*, 241 F. Supp. 3d, 1065, 1076 (N.D. Cal. 2002).

---

[3] *See also 3D Sys., Inc. v. Wynne*, No. 21-cv-1141-AGS-DDL, 2024 WL 940318, at *4 (S.D. Cal. Feb. 21, 2024); *Akamai Techs., Inc. v. MediaPointe, Inc.*, No. 2:22-CV-06233-MCS-SHK, 2023 WL 8000278, at *4 (C.D. Cal. Nov. 2, 2023); *L.D. v. United Behav. Health*, No. 20-cv-02254-YGR, 2022 WL 3139520, at *3 (N.D. Cal. Aug. 5, 2022).

These cases typically trace back to the district court decision in *ChevronTexaco Corp.*, which stated that "the presumption that attaches to communications with outside counsel does not extend to communications with in-house counsel," *id.* at 1076, but the opinion cited no Ninth Circuit or Supreme Court caselaw for the proposition. Indeed, there is no reason why the test for privilege would or should expressly turn on whether the attorney works in-house or is hired as outside counsel.

To be sure, this Court has noted that "[i]n general, … [i]f a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired 'as such' to give 'legal advice,'" *Sanmina Corp.*, 968 F.3d at 1116, but the Court did not say that a "hire[d]" lawyer necessarily means *outside* counsel, to the exclusion of in-house counsel. After all, companies routinely "hire[] a lawyer" in the form of in-house counsel. And in *Sanmina* itself, the Court held that certain communications with outside counsel were *not* privileged. *Id.* at 1119.

As one scholar has explained, "[t]here is no doubt that in-house attorneys do render nonlegal services to some extent," but "[t]here is also no doubt that outside attorneys do as well," and thus "any assumption"

18

that outside lawyers' communications "deserve a lesser level of scrutiny than in-house counsel communications … seems flawed." Grace M. Giesel, *The Legal Advice Requirement of the Attorney-Client Privilege: A Special Problem for In-House Counsel and Outside Attorneys Representing Corporations*, 48 Mercer L. Rev. 1169, 1211 (1997).

Adopting the D.C. Circuit's approach to the primary-purpose test would thus not only provide clarity and be of particular benefit to smaller businesses, but it would also rebuke the notion that in-house attorneys are somehow inherently less worthy of receiving privilege protections.

## CONCLUSION

This Court should hold that the District Court erred by relying on privileged materials in determining Apple's compliance with the prior injunction.

June 30, 2025                    Respectfully submitted,

                                /s/ R. Trent McCotter
                                R. TRENT MCCOTTER
                                BOYDEN GRAY PLLC
                                800 Connecticut Ave. NW
                                Suite 900
                                Washington, DC 20006
                                202.955.0620
                                tmccotter@boydengray.com

                                DREW HUDSON
                                TECHNET
                                1420 New York Avenue, N.W.
                                Suite 825
                                Washington, DC 20005

                                SUSANNA MCDONALD
                                AMY C. CHAI
                                ASSOCIATION OF CORPORATE
                                COUNSEL
                                1001 G Street N.W.
                                Suite 300W
                                Washington, DC 20001

                                Counsel for *Amici Curiae*

20

## CERTIFICATE OF SERVICE

I hereby certify that on this date, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the ACMS filing system and that service will be accomplished using the ACMS system.

<u>/s/ R. Trent McCotter</u>

## Form 8. Certificate of Compliance for Briefs

I am the attorney or self-represented party. **This brief contains 3522 words,** including zero words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **X** ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/R. Trent McCotter **Date** 6/30/2025

22