No. 25-2935

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE, INC.,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Northern District of California
(Hon. Yvonne Gonzalez Rogers), No. 4:20-cv-05640-YGR

_____

## BRIEF OF *AMICUS CURIAE* THE CENTER FOR CYBERSECURITY POLICY AND LAW IN SUPPORT OF DEFENDANT-APPELLANT

Sarah L. Scott
VENABLE LLP
750 East Pratt Street
Suite 900
Baltimore, MD 21202
(410) 528-4630
slscott@venable.com

Jennifer C. Daskal
J. Daniel Everson
VENABLE LLP
600 Massachusetts Ave, NW
Washington, DC 20001
(202) 344-8281
jdaskal@venable.com
jdeverson@venable.com

*Attorneys for The Center for Cybersecurity Policy and Law*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, counsel for the Center for Cybersecurity Policy and Law (the "Center") states:

*Amicus curiae* the Center is a section 501(c)(6) nonprofit organization. It has no parent corporations, and no publicly held corporation has a 10 percent or greater ownership interest in it.

/s/ *Jennifer C. Daskal*
Jennifer C. Daskal

## **<u>TABLE OF CONTENTS</u>**

**Page(s)**

STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* ...............1

SUMMARY OF ARGUMENT ...............................................................................2

ARGUMENT ......................................................................................................5

I. Cyber Threats Are Increasing.......................................................................6

    A. *Risks Associated with External Links* ..........................................................10

    B. *Additional Security and Privacy Risks Associated with Dynamic Links* ...................................................................................................12

II. Vetting, Centralized Controls, and Adequate Warnings Are Key Protections Against The Risks Posed By External Links ...................................................14

    A. *Value of Vetting and Centralized Controls* ..................................................15

    B. *Importance of Notice to Users of Potential Security Risks* ........................16

    C. *The Court Should Vacate the Parts of the Injunction that Increase Security, Privacy, and Public Safety Risks* ................................................18

CONCLUSION ..................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Epic Games, Inc. v. Apple, Inc.*,
　67 F.4th 946 (9th Cir. 2023) ...............................................................3, 5, 15, 16

*Shin v. Apple, Inc.*,
　Civ. No. 5:25-cv-5000 (N.D. Cal. June 12, 2025)..................................................5

**Rules**

Fed. R. App. P. 29(a)(4)(E)..................................................................................1

**Other Authorities**

Aiden Huang & Vishwa Thothathri, *Evolution of Sophisticated Phishing Tactics: The QR Code Phenomenon*, Unit 42 (Apr. 1, 2025), https://unit42.paloaltonetworks.com/qr-code-phishing/ ........................11

Andrew G. West & Adam J. Aviv, *On the Privacy Concerns of URL Query Strings*, IEEE CS Sec. & Privacy Workshops 1 (2014), https://www.ieee-security.org/TC/W2SP/2014/papers/privacy _query_strings.pdf ...........................................................................................13

Andy Greenberg, *How Spies Snuck Malware Into the Google Play Store—Again and Again*, Wired (Apr. 20, 2020), https://www. wired.com/story/phantomlance-google-play-malware-apt32/...........................14

Center for Cybersecurity Policy and Law, *Mobile Future: Pathways to Continued Improvement in Mobile Security and Privacy* (May 2021), https://assets.website-files.com/62715f02a51b614ce6 4867fd/628e6ba29361afc22807be6b_mobile-future-pathways-to-continued-improvement-in-mobile-security-and-privacy.pdf.................8, 15, 17

Center for Cybersecurity Policy and Law, *Trusted App Stores: Protecting Security and Integrity* (Feb. 2024), https://cdn.prod. website-files.com/660ab0cd271a25abeb800460/ 660ab0cd271a25abeb8005cc_CCPL_TrustedAppStore.pdf....................8, 15, 17

Charles Griffiths, *The Latest 2025 Phishing Statistics*, AAG (June 1, 2025), https://aag-it.com/the-latest-phishing-statistics/......................................10

Exec. Order No. 14,306, 90 Fed. Reg. 24727 (June 6, 2025),
    https://www.federalregister.gov/documents/2025/06/
    11/2025-10804/sustaining-select-efforts-to-strengthen-the-nations-
    cybersecurity-and-amending-executive-order-13694..........................................6

Fed. Bureau of Investigation, *Internet Crime Report 2024* (Apr. 23,
    2025), https://www.ic3.gov/AnnualReport/Reports/2024_
    IC3Report.pdf ...................................................................................................7

Fed. Trade Comm'n, *Combating Spyware and Malware* (June 16,
    2025), https://www.ftc.gov/news-events/topics/identity-
    theft/spyware-malware/ .....................................................................................9

Fed. Trade Comm'n, *Scammers Hide Harmful Links in QR Codes to
    Steal Your Information*, FTC Consumer Alert (Dec. 7, 2023),
    https://consumer.ftc.gov/consumer-alerts/2023/12/scammers-hide-
    harmful-links-qr-codes-steal-your-information................................................11

Global Anti-Scam Alliance, *Global State of Scams – 2023* (2023),
    https://www.scribd.com/document/679758338/Global-State-of-
    Scams-Report-2023-Global-GASA-final .......................................................9, 10

Jieshan Chen et al., *Towards Complete Icon Labeling in Mobile
    Applications*, CHI Conf. on Hum. Factors in Computing Sys. 1
    (Apr. 22, 2022), https://dl.acm.org/doi/pdf/10.1145/3491102.
    3502073..............................................................................................................4

Jim Bugel, Suja John, & Stacy Schwartz, *Ericsson Mobility Report*,
    Ericsson (Nov. 2020), https://www.ericsson.com/assets/local/
    reports-papers/mobility-report/documents/2020/november-2020-
    ericsson-mobility-report.pdf .............................................................................1

Lei Zhang, et al., *Identity Confusion in WebView-based Mobile App-
    in-app Ecosystem*s, USENIX Security Symposium 1601 (Aug.
    2022), https://www.usenix.org/system/files/sec22-zhang-lei.pdf .....................12

Michael Ogata et al., *Vetting the Security of Mobile Applications,*
    Nat'l Inst. of Standards & Tech. 29 (Apr. 19, 2019), https://
    nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-
    163r1.pdf...........................................................................................................15

Nur Farhana Samsudin et al., *Symbolism in Computer Security Warnings: Signal Icons and Signal Words*, 7 Int'l J. of Advanced Comput. Sci. & Applications 148 (2016), https://pdfs.semantic scholar.org/8aaf/c03e35839fa96ab5d151f511fff3f2fb1d31.pdf ........................4

Office of the Dir. Of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* (Mar. 2025), https://www.dni.gov/ files/ODNI/documents/assessments/ATA-2025-Unclassified-Report.pdf ..........................................................................................................7

Office of the Dir. of Nat'l Intel., *National Counterintelligence Strategy 2024* (July 30, 2024), https://www.dni.gov/files/NCSC /documents/features/NCSC_CI_Strategy-pages-20240730.pdf..........................7

Office of the Nat'l Cyber Director, *2024 Report on the Cybersecurity Posture of the United States* (May 2024), https:// bidenwhitehouse.archives.gov/wp-content/uploads/2024/05/2024-Report-on-the-Cybersecurity-Posture-of-the-United-States.pdf .....................6, 8

Omer Aslan & Refik Samet, *A Comprehensive Review on Malware Detection Approaches*, 8 IEEE Access 6249 (Jan. 3, 2020), https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber= 8949524..................................................................................................................11

Peter A. Jensen, *Estimated cost of cybercrime worldwide 2018–2029 (in trillion U.S. dollars)*, Biocomm AI (July 30, 2024), https://blog.biocomm.ai/2024/09/07/cnbc-estimated-cost-of-cybercrime-worldwide-2018-2029-in-trillion-u-s-dollars/..............................7, 8

Shalanda D. Young, *Delivering a Digital-First Public Experience*, Office of Management & Budget (Sept. 22, 2023), https://www. whitehouse.gov/wp-content/uploads/2023/09/M-23-22-Delivering-a-Digital-First-Public-Experience.pdf ...............................................................17

Shaurya Jain, *Privacy Vulnerabilities in Modern Software Development Cyber Security Solutions and Best Practices*, 2 Sarcouncil J. of Eng'g & Comp. Sciences 1 (Sept. 12, 2023), https://sarcouncil.com/download-article/SJECS-2023.pdf................................12

Sunil Gill, *How Many People Own Smartphones in the World? (2024–2029)*, Priori Data (Jan. 1, 2025), https://prioridata.com/data/smartphone-stats/......................................................1

Timur Mirzoev et al., *Mobile Application Threats and Security*, 2
    World of Comput. Sci. & Info. Tech. J. 1 (Feb. 2025),
    https://arxiv.org/pdf/2502.05685 .......................................................9

Univ. of Denv., *5 URL Warning Signs*, U. Denv. Info. Tech. (last
    visited June 17, 2025), https://www.du.edu/it/services/security/5-
    url-warning-signs ..........................................................................9

U.S. Web Design System, *Link Components*, General Services
    Administration (last visited June 23, 2025),
    https://designsystem.digital.gov/components/link/ ...........................17

World Econ. F., *Global Cybersecurity Outlook 2025* (Jan. 13, 2025),
    https://reports.weforum.org/docs/WEF_Global_Cybersecurity_
    Outlook_2025.pdf ..........................................................................6

Yutian Tang et al., *All Your App Links Are Belong to Us: Understanding
    the Threats of Instant Apps Based Attacks*, Association for Computing
    Machinery 914 (Nov. 8, 2020), https://www4.comp.polyu.edu.hk/
    ~csxluo/AppLink.pdf .....................................................................11

Zhibo Zhang et al., *The Dark Forest: Understanding Security Risks of
    Cross-Party Delegated Resources in Mobile App-in-App Ecosystems*,
    19 IEEE Transactions on Info. Forensics & Sec. 5434 (Apr. 19, 2024),
    https://ieeexplore.ieee.org/document/10506090................................14

## STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Center for Cybersecurity Policy and Law ("Center") is a nonprofit organization that develops, advances, and promotes best practices and educational opportunities among cybersecurity professionals. The Center has an interest in the security and public safety considerations arising from certain equitable remedies imposed by the district court in this case. *See* 1-ER-75–76.[2] The Center seeks to safeguard the security of mobile computing and protect against measures that introduce new vulnerabilities into connected devices that are used by billions of people worldwide.[3]

Specifically, the Center is concerned that the equitable remedies imposed by the district court do not sufficiently account for the potential security and privacy

---

[1]    Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparation or submission of the brief; and no person—other than the *amicus*, its members, or its counsel—contributed money that was intended to fund preparation or submission of this brief. All parties have consented to the filing of this brief.

[2]    Defendant-Appellant Apple is a member of the Center. Apple has paid general dues for its membership and has contributed financially to specific Center projects, including over the last year. Apple has not contributed any money that was intended to fund the preparation or submission of this brief.

[3]    *See* Sunil Gill, *How Many People Own Smartphones in the World? (2024–2029)*, Priori Data (Jan. 1, 2025), https://prioridata.com/data/smartphone-stats/ (estimating 4.88 billion smartphone users worldwide); Jim Bugel, Suja John, & Stacy Schwartz, *Ericsson Mobility Report*, Ericsson 5 (Nov. 2020), https://www.ericsson.com/assets/local/reports-papers/mobility-report/documents/2020/november-2020-ericsson-mobility-report.pdf (forecasting 6.4 billion unique mobile users worldwide by the end of 2026).

risks associated with external links and unduly preclude Apple from adequately notifying users of such risks in order to ensure informed decision-making. As a nonprofit organization dedicated to advancing cybersecurity best practices among cybersecurity professionals and the industry—with the aim of better protecting public safety and national security—the Center is uniquely positioned to aid the Court in understanding the security and related privacy considerations relevant to the equitable remedies under review.

Importantly, the Center is *solely* focused on the security, public safety, and related privacy considerations raised by the equitable remedies imposed in the April 30 injunction in this case. It takes no position on matters outside that scope, including Apple's fee structure or any other findings against Apple. In sum, the Center's exclusive concern is the security and related risks associated with external links; the importance of vetting and other security measures to limit such risks; and the need for adequate notice to users about the risks associated with such links, in order to ensure informed decision-making and protect user safety.

## SUMMARY OF ARGUMENT

As the Court reviews the equitable remedies imposed in this case, the Center urges careful evaluation of the security and privacy implications of unvetted external links. The Center is concerned that the updated injunction unduly restricts vetting and review of such links and, in so doing, risks undermining user safety and

2

privacy—and thus the security of the digital ecosystem. The concerns are exacerbated by the injunction's restrictions on Apple's ability to adequately warn users of these risks.

As this Court has previously concluded, implementation of security and privacy features are "plainly procompetitive rationales" that "create a heterogeneous market for app-transaction platforms, which, as a result, increase[] interbrand competition" and respond to consumer demand. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 987 (9th Cir. 2023). This Court further explained: "Users who value security and privacy can select (by purchasing an iPhone) Apple's closed platform and pay a marginally higher price for apps." *Id*. The Center is concerned that some of the remedies imposed by the April 30 injunction unduly restrict Apple's ability to protect user security and privacy—namely, the very things that this Court has defined as procompetitive forces.

Specifically, the Center is concerned with the provisions in the April 30 injunction that prohibit Apple from (i) taking steps to engage in post-purchase review of activity that consumers make outside an app (par. 1); (ii) excluding certain categories of apps and developers from obtaining link access—even if they are shown to be malicious (par. 4); (iii) restricting the use of dynamic links (par. 6); (iv) placing any conditions or limits on language used in links, buttons or calls to action that direct a user to external links (pars. 2, 3); and (v) providing users anything other

3

than "a neutral message apprising users that they are going to a third-party site" if they click on an external link (par. 5). 1-ER-75–76.

Collectively, these restrictions significantly limit Apple's ability to put in place critical vetting and security measures to protect users from phishing, malware, and privacy intrusions introduced from malicious external links. To be sure, Apple can continue to vet apps that are included in the app store. But only in part. The updated injunction restricts that vetting: it requires Apple to allow developers to add external links to apps while at the same time telling Apple that it cannot vet or monitor those links, even though such links are an integral part of the apps. There is, as a result, a meaningful risk that even vetted apps could link to risky, misleading, or malicious external sites. In addition, Apple is prohibited from requiring developers to report on how these external links operate, making it hard for Apple to assess and address the potential risk to users.

The injunction also restricts Apple from adequately informing users of these risks. First, the injunction prohibits Apple from requiring developers to include information that a link or button will lead a user to an external link or from otherwise standardizing the ways in which such links or buttons are displayed—thus increasing the likelihood of user confusion.[4] Second, once a user clicks on an external link, the

---

[4]     *See, e.g.*, Jieshan Chen et al., *Towards Complete Icon Labeling in Mobile Applications*, CHI Conf. on Hum. Factors in Computing Sys. 1 (Apr. 22, 2022), https://dl.acm.org/doi/pdf/10.1145/3491102.3502073; Nur Farhana Samsudin et al.,

injunction prohibits Apple from informing users of anything other than the fact the user "will leave the app and go to the developer's website"; this limited notice does not provide any information about the possibility of security or privacy vulnerabilities. 1-ER-76–77.

## **ARGUMENT**

This Court has recognized that users consider security and privacy in deciding what mobile devices to purchase and that those factors are a legitimate procompetitive consideration. *See Epic*, 67 F.4th at 987 (noting that "security and privacy is an important aspect of a device purchase for 50% to 62% of iPhone users and 76 to 89% of iPad users worldwide;" that "by improving security and privacy features, [Apple] is tapping into consumer demand and differentiating its products from those of its competitors—goals that are plainly procompetitive rationales.").[5]

By restricting Apple's ability to vet and review external links, the district court's injunction introduces new security and privacy risks into the mobile device

---

*Symbolism in Computer Security Warnings: Signal Icons and Signal Words*, 7 Int'l J. of Advanced Comput. Sci. & Applications 148 (2016), https://pdfs.semanticscholar.org/8aaf/c03e35839fa96ab5d151f511fff3f2fb1d31.pdf (highlighting the value of standardization as a means of increasing user understanding).

[5]   A recently filed lawsuit against Apple makes this point as well, emphasizing that consumers rely on the "perceived safety and reliability" of purchases in the App Store and that this reliance "incentivizes consumers to purchase Apple devices." *Shin v. Apple, Inc.*, No. 5:25-cv-5000 (N.D. Cal. June 12, 2025) par. 3–4 (suing Apple for an alleged failure to provide sufficient security).

ecosystem—thus undermining a core competitive element of the mobile phone market. The restrictions on adequately informing users of the potential risks exacerbate these risks and heighten the broader public safety concerns. These are particularly acute issues, as the number and sophistication of cyberattacks and cyber criminals have increased over time.

## I. Cyber Threats Are Increasing

Over the past decade, cyber threats have increased dramatically in both frequency and scale. Malicious actors are taking advantage of a growing number of vulnerabilities in systems and networks to intentionally cause harm, disrupt operations, steal sensitive data, and undermine trust. This strategic environment is driven by a complex mix of compounding factors, including escalating geopolitical tensions, growing dependence on opaque and interconnected supply chains, and the rapid adoption of emerging technologies—all of which create new entry points and expand the attack surface for cyber adversaries.[6]

---

[6] *See* World Econ. F., *Global Cybersecurity Outlook 2025* 4 (Jan. 13, 2025), https://reports.weforum.org/docs/WEF_Global_Cybersecurity_Outlook_2025.pdf; Office of the Nat'l Cyber Director, *2024 Report on the Cybersecurity Posture of the United States* 5 (May 2024), https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/05/2024-Report-on-the-Cybersecurity-Posture-of-the-United-States.pdf; *see also* Exec. Order No. 14,306, 90 Fed. Reg. 24727 (June 6, 2025), https://www.federalregister.gov/documents/2025/06/11/2025-10804/sustaining-select-efforts-to-strengthen-the-nations-cybersecurity-and-amending-executive-order-13694 (warning that "[f]oreign nations and criminals continue to conduct cyber campaigns targeting the United States and Americans.").

Nation-state actors and their proxies are particularly sophisticated in their ability to exploit vulnerabilities in the digital ecosystem.[7] Financially motivated criminals are also a growing threat, with ransomware actors increasing in scope and sophistication—aided in significant part by the ability to target identified victims. The FBI's Internet Crime Complaint Center reports year-over-year increases in business email compromise fraud and similar scams, driven in part by the availability of behavioral data that enables highly targeted deception.[8] Threat actors frequently use spoofed domains and malicious advertising to mislead users into clicking on fraudulent links.

The estimated global cost of cybercrime is projected to rise by over $6.4 trillion between now and 2029, reaching a staggering $15.6 trillion over the next four years.[9] Attackers are also adopting more aggressive tactics—including

---

[7] *See, e.g.,* Office of the Dir. of Nat'l Intel., *National Counterintelligence Strategy 2024* 11 (July 30, 2024), https://www.dni.gov/files/NCSC /documents/features/NCSC_CI_Strategy-pages-20240730.pdf ("Cyber threats from nation states and their surrogates remain acute. . . . They use technical—and often commercially available—tools to compromise computer networks and mobile and connected devices."); *see also* Office of the Dir. of Nat'l Intel., *Annual Threat Assessment of the U.S. Intelligence Community* (Mar. 2025), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2025-Unclassified-Report.pdf (discussing cybersecurity threats from China, Russia, Iran, North Korea, and individual actors).

[8] *See* Fed. Bureau of Investigation, *Internet Crime Report 2024* 13–15 (Apr. 23, 2025), https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

[9] *See* Peter A. Jensen, *Estimated cost of cybercrime worldwide 2018–2029 (in trillion U.S. dollars)*, Biocomm AI (July 30, 2024), https://blog.biocomm.ai/2024/

extortion schemes that combine threats to leak stolen information and doxing (a form of digital abuse that exposes sensitive personal information).[10]

Amid this challenging environment, mobile platforms stand out as one sector that has historically remained relatively secure.[11] This resilience is largely the result of careful, deliberate efforts by platform providers and app store operators, who have invested heavily in designing complex, multilayered security systems to protect users from a wide range of threats.[12] This security is particularly important given the dramatic increase in mobile device usage, the sheer quantity of personal and sensitive information that is stored or accessible on such devices, and the ways in which mobile devices can provide access points to other networks.

---

[10] *See* Office of the Nat'l Cyber Director, *2024 Report on the Cybersecurity Posture of the United States* 5 (May 2024), https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/05/2024-Report-on-the-Cybersecurity-Posture-of-the-United-States.pdf.

09/07/cnbc-estimated-cost-of-cybercrime-worldwide-2018-2029-in-trillion-u-s-dollars/.

[11] *See* Center for Cybersecurity Policy and Law, *Mobile Future: Pathways to Continued Improvement in Mobile Security and Privacy* 3 (May 2021), https://assets.website-files.com/62715f02a51b614ce64867fd/628e6ba29361afc22807be6b_mobile-future-pathways-to-continued-improvement-in-mobile-security-and-privacy.pdf [hereinafter "Center for Cybersecurity Policy and Law, *Mobile Future*"].

[12] *See* Center for Cybersecurity Policy and Law, *Trusted App Stores: Protecting Security and Integrity* 11 (Feb. 2024), https://cdn.prod.website-files.com/660ab0cd271a25abeb800460/660ab0cd271a25abeb8005cc_CCPL_TrustedAppStore.pdf [hereinafter "Center for Cybersecurity Policy and Law, *Trusted App Store*"].

These features also make mobile phones an increasingly important target of sophisticated adversaries and cybercriminals seeking to access information for national security advantage and personal, financial gain.[13] After all, a single malicious app can provide access to all of the personal, financial, and business data on a phone—as well as sensitive geolocation data tied to the phone user. In fact, recent studies indicate that more than three-quarters of mobile users encountered at least one phishing scam in the past year—*i.e.*, scams in which users are directed to a deceptive link.[14] After a user clicks on a malicious link, threat actors can deliver malware onto a device, which can include viruses and spyware that steals personal information. Spyware is particularly concerning because it operates silently, collecting sensitive personal information like contacts, call logs, location history, and browser activity, which can then be exploited for identity theft or surveillance.[15] Access to stored passwords or authentication on devices can be a gateway into otherwise closed and sensitive networks with which the mobile device interacts.

---

[13]  *See* Timur Mirzoev et al., *Mobile Application Threats and Security*, 2 World of Comput. Sci. & Info. Tech. J. 1 (Feb. 2025), https://arxiv.org/pdf/2502.05685 (warning that "[m]obile devices have become a big target for cyber criminals"); Univ. of Denv., *5 URL Warning Signs*, U. Denv. Info. Tech. (last visited June 17, 2025), https://www.du.edu/it/services/security/5-url-warning-signs (describing signs of malicious links).

[14]  *See* Global Anti-Scam Alliance, *Global State of Scams - 2023* 12–13 (2023), https://www.scribd.com/document/679758338/Global-State-of-Scams-Report-2023-Global-GASA-final [hereinafter "*Global State of Scams*"].

[15]  *See* Fed. Trade Comm'n, *Combating Spyware and Malware* (June 16, 2025), https://www.ftc.gov/news-events/topics/identity-theft/spyware-malware/.

Mobile devices' constant connectivity and integration with enterprise systems can make them particularly effective vectors for propagation, amplifying the scale of potential damage well beyond an individual user. Attackers can use access to mobile devices to gain access to organizational networks, confidential corporate information, and sensitive government systems—posing serious threats to informational security, national security, and public safety. The consequences of mobile security breaches extend far beyond the already significant impact on individual users.

### A.  Risks Associated with External Links

External links that are embedded in apps create security and privacy vulnerabilities. Tapping on such a link sends a user to third-party websites beyond the control of the app or platform. This can include websites that appear legitimate but are designed to deceive—prompting users to disclose sensitive credentials or download malicious software onto their devices. This is a particular concern given the reported increase in online deception.[16]

External links may also include features like Quick Response (QR) codes that are not human-readable, but instead translate camera input into web addresses or

---

[16]    *See, e.g.*, *Global State of Scams* at 12–13 ("Worldwide, an alarming 78% of participants experienced at least one scam in the last year."); Charles Griffiths, *The Latest 2025 Phishing Statistics*, AAG (June 1, 2025), https://aag-it.com/the-latest-phishing-statistics/ (describing an increase in online scams).

other data. Because QR codes are not human-readable, they obscure their destination. This lack of transparency increases security risk. Malicious actors can weaponize QR codes to direct users to harmful or compromised websites without their knowledge.[17]

Deep links are another form of external linking that raise potential security concerns. Deep links take a user to specific pages or functions within another app, rather than the app landing page. Such links can be hijacked such that a user is redirected to a malicious site, deceiving users into opening harmful applications.[18] Users think they are opening a trusted link, but instead launch a malicious one that looks similar but collects user data or performs unauthorized actions, such as downloading malware onto a phone.

---

[17] *See, e.g.,* Fed. Trade Comm'n, *Scammers Hide Harmful Links in QR Codes to Steal Your Information*, FTC Consumer Alert (Dec. 7, 2023), https://consumer.ftc.gov/consumer-alerts/2023/12/scammers-hide-harmful-links-qr-codes-steal-your-information; Aiden Huang & Vishwa Thothathri, *Evolution of Sophisticated Phishing Tactics: The QR Code Phenomenon*, Unit 42 (Apr. 1, 2025), https://unit42.paloaltonetworks.com/qr-code-phishing/.

[18] *See* Yutian Tang et al., *All Your App Links Are Belong to Us: Understanding the Threats of Instant Apps Based Attacks*, Association for Computing Machinery 914 (Nov. 8, 2020), https://www4.comp.polyu.edu.hk/~csxluo/AppLink.pdf (describing the kind of hijacking that occurs on linked apps); Omer Aslan & Refik Samet, *A Comprehensive Review on Malware Detection Approaches*, 8 IEEE Access 6249 (Jan. 3, 2020), https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=8949524 (describing a rise in sophisticated forms of malware, including hijacking).

## B. Additional Security and Privacy Risks Associated with Dynamic Links

The external links discussed above can be either static or dynamic. Static links are fixed and unchanging, pointing users only to the specific place intended by the developer. Because they are fixed, platforms like Apple's can vet the link to confirm that the destination is safe, accurate, and consistent with user expectations. Platforms can also detect if the initially identified destination has been changed—thus better enabling the identification of malicious activity. Apple, in fact, explained that is exactly what it intended to do—it sought to "check the destination URL against the actual landing page to ensure they sync up," thus "protecting against social engineering and other user-safety risks." 3-ER-593, 3-ER-609.[19] By vetting a static link before it is included in an app, a platform can ensure it does not contain disguised malicious links and help prevent the types of security and privacy risks that arise from external links.[20]

Dynamic links, by contrast, can change over time and can pass user-specific data such as location, login status, session history, or other identifiers to a third-party

---

[19]  *See also* 1-ER-41 (discussing Apple's security and privacy rationale in support of its static link requirement).

[20]  *See, e.g.*, Lei Zhang, et al., *Identity Confusion in WebView-based Mobile App-in-app Ecosystem*s, USENIX Security Symposium 1601 (Aug. 2022), https://www.usenix.org/system/files/sec22-zhang-lei.pdf; Shaurya Jain, *Privacy Vulnerabilities in Modern Software Development Cyber Security Solutions and Best Practices*, 2 Sarcouncil J. of Eng'g & Comp. Sciences 1, 1–2 (Sept. 12, 2023), https://sarcouncil.com/download-article/SJECS-2023.pdf.

site. Because the destination of a dynamic link may vary with each user or session, such links cannot be pre-vetted by Apple or any app store prior to distribution. While dynamic links have efficiency benefits for users, that efficiency comes at the cost of increased risk for users' privacy and security. Malicious actors can exploit this variability to redirect traffic to compromised sites, harvest personal data, or inject malware—all without the user realizing anything has changed.

Dynamic links also often use query strings—information appended to the web address—to transmit the relevant information. Query strings can also carry tracking tokens, usernames, email addresses, and other personal identifiers that users may not intend to disclose, or even know that they are sharing.[21] When exposed to third parties, this information can be used to obtain personal, private information about users, track them across services, or link their online activities without their knowledge or consent.

The risk that dynamic links could be used to exploit users has been demonstrated by analogous malicious activity in other app ecosystems. For example, Google's Play Store, which has historically provided a more open app environment, fell victim to a hacking campaign known as "PhantomLance," wherein state-sponsored spies hid malware in Play Store links to target users across Southeast

---

[21]    *See* Andrew G. West & Adam J. Aviv, *On the Privacy Concerns of URL Query Strings*, IEEE CS Sec. & Privacy Workshops 1 (2014), https://www.ieee-security.org/TC/W2SP/2014/papers/privacy_query_strings.pdf.

Asia.[22] The perpetrators, linked to the Vietnamese government, "smuggled in data-stealing apps" to the Play Store, using malicious links to direct targets into downloading the faulty apps capable of stealing contacts, call logs, and text messages from Android phones, trading on Google and the Play Store's credibility to do so.[23] They did this by passing "clean" apps through to users at the time of installation before later swapping in the malicious components, unbeknownst to the user.[24] Dynamic links make it easy to engage in this kind of deception, as it is hard to track changes in such links, and an initially "clean" link can be later updated to redirect the traffic to malicious locations.[25]

## II. Vetting, Centralized Controls, and Adequate Warnings Are Key Protections Against The Risks Posed By External Links

Centralized oversight—particularly vetting systems like Apple's that assess the security posture and privacy practices of content and services interacting with users—is an effective and important mechanism for minimizing the kind of risks

---

[22]    Andy Greenberg, *How Spies Snuck Malware Into the Google Play Store—Again and Again*, Wired (Apr. 20, 2020), https://www.wired.com/story/phantomlance-google-play-malware-apt32/.

[23]    *Id*.

[24]    *Id*.

[25]    *See* Zhibo Zhang et al., *The Dark Forest: Understanding Security Risks of Cross-Party Delegated Resources in Mobile App-in-App Ecosystems*, 19 IEEE Transactions on Info. Forensics & Sec. 5434, 5438–39 (Apr. 19, 2024), https://ieeexplore.ieee.org/document/10506090 (presenting an attack roadmap, including use of malicious deep links clicked on by users).

that external links might pose. Particularly in the absence of effective vetting, it is critical that users be adequately informed of the potential security and privacy risks that such links could pose.

### A. *Value of Vetting and Centralized Controls*

The Center has documented the ways in which certain app stores, including the Apple App Store and Google Play Store, impose various security, privacy, and transparency requirements for apps and also engage in their own vetting and reviews, to include searching for malware or other potentially harmful activity.[26] Such vetting and review has reduced security risks, improved app quality, and protected users from malicious software.[27] This Court has previously recognized that Apple's prioritization of vetting and review in its app store directly responds to the demands of its users. *Epic*, 67 F.4th at 987 ("[T]hroughout the record, Apple makes clear that by improving security and privacy features, it is tapping into consumer demand and differentiating its products from those of its competitors."); *id*. ("With Apple's restrictions in place, users are free to decide which kind of app-transaction platform

---

[26]    *See* Center for Cybersecurity Policy and Law, *Trusted App Store* at 10–12.

[27]    *See id*; Center for Cybersecurity Policy and Law, *Mobile Future* at 8–10; *see also* Michael Ogata et al., *Vetting the Security of Mobile Applications,* Nat'l Inst. of Standards & Tech. 29 (Apr. 19, 2019), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-163r1.pdf (emphasizing the value of the proactive approach to screening, which "can enable an enterprise system administrator to detect software or configuration flaws that may create vulnerabilities or violate enterprise security or privacy policies").

to use. Users who value security and privacy can select (by purchasing an iPhone) Apple's closed platform and pay a marginally higher price for apps."); *id.* at 985 ("The district court correctly held that Apple offered non-pretextual, legally cognizable procompetitive rationales for its app-distribution and [in-app payment processor] restrictions.").

This kind of vetting and review is equally important with respect to external links that are embedded into apps, which, as described above, carry potential security and privacy risks. Without sufficient scrutiny, these vectors can quietly bypass core safeguards, exposing users to surveillance, profiling, and exploitation. By precluding Apple from gathering information about how external apps are used, 1-ER-76 par. 1, restricting the use of categories of apps with poor security records, 1-ER-76 par. 4, and barring any restrictions on the use of dynamic links, 1-ER-76 par. 6, the injunction guts Apple's ability to put in place critically important vetting and controls.

## B. *Importance of Notice to Users of Potential Security Risks*

Users have been conditioned to trust that their software and hardware providers are taking key security steps to protect them. As the Center has written previously, it is therefore particularly important to build security into the hardware

and software itself, rather than to leave security decisions up to individual users.[28] That said, it is also important for users to be informed of relative security risks and empowered to make choices accordingly, particularly when expected security protections are diminished or removed.

Federal policy recognizes the importance of such notice. The U.S. Office of Management and Budget requires federal agencies to provide disclaimers for any external links—that is, links directing users to non-.gov or non-.mil websites. The memo instructs agencies to "[c]learly label non-governmental content . . . in a manner that minimizes the impact of such labeling on the usability of their websites and digital services."[29] According to the General Services Administration, these disclaimers must state that the content of external links to non-federal agency websites is not endorsed by the federal government and is not subject to federal information quality, privacy, security, and related guidelines.[30]

In this case, however, the district court's injunction precludes Apple from providing users key information to make informed choices. Paragraphs two and three

---

[28]    *See* Center for Cybersecurity Policy and Law, *Trusted App Store* at 9–10; Center for Cybersecurity Policy and Law, *Mobile Future* at 10–11.

[29]    Shalanda D. Young, *Delivering a Digital-First Public Experience*, Office of Management & Budget (Sept. 22, 2023), https://www.whitehouse.gov/wp-content/uploads/2023/09/M-23-22-Delivering-a-Digital-First-Public-Experience.pdf.

[30]    *See* U.S. Web Design System, *Link Components*, General Services Administration (last visited June 23, 2025), https://designsystem.digital.gov/components/link/.

of the injunction prohibit Apple from requiring that apps specify in the applicable button or link that they are being taken to an external app or websites. 1-ER-76. These provisions also prohibit Apple from requiring the use of buttons or links that are standardized across the platform and distinguishable from Apple's in-app purchasing link or including other requirements that would facilitate users' ability to assess whether they are using an in-app or out-of-app link. 1-ER-76 par. 2, 3, 5.

The injunction then approves a post-click warning that simply tells the user that "[y]ou will leave the app and go to the developer's website." 1-ER-76–77. This click-through pop-up does not include any of the key information required to convey that the external links are not subject to the privacy and security controls that apply to in-app purchases. It does not include any of the key information needed to alert users of the potential security and privacy risks.

### C. The Court Should Vacate the Parts of the Injunction that Increase Security, Privacy, and Public Safety Risks

Given the potential security, privacy, and related public safety risks outlined above, the Center urges the Court to vacate the parts of the injunction that preclude Apple from setting security requirements for external links, effectively vetting those links to ensure that they meet such requirements and restricting the use of dynamic links. The Center also urges the Court to vacate those provisions that prevent Apple from standardizing the form for external links and adequately informing users of the potential security and privacy risks associated with such links.

## **CONCLUSION**

The Center urges the Court to heavily weigh the security and privacy considerations in evaluating the April 30 injunction in this case, and to, as a result, vacate the second part of paragraph one and paragraphs two through six of the injunction. 1-ER-76–77. Doing so is consistent with the procompetitive justification for security and privacy protections and will help ensure better security for mobile device users and across the broader digital ecosystem.

Dated: June 30, 2025

Respectfully submitted,

/s/ *Jennifer C. Daskal*
Jennifer C. Daskal
J. Daniel Everson
VENABLE LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001

Sarah L. Scott
VENABLE LLP
750 E. Pratt St., Ste. 900
Baltimore, MD 21202

*Counsel for Amicus Curiae The Center for Cybersecurity Policy and Law*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25-2935_____

I am the attorney for *amicus curiae* The Center for Cybersecurity Policy and Law.

This brief contains 4,384 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __*/s/ Jennifer C. Daskal*___ **Date** ____June 30, 2025_____

## CERTIFICATE OF SERVICE

I certify that on June 30, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

Dated: June 30, 2025

/s/ *Jennifer C. Daskal*
Jennifer C. Daskal

*Counsel for Amicus Curiae The Center for Cybersecurity Policy and Law*