No. 25-2935

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC., et al.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Northern District of
California, No. 4:20-cv-05640-YGR (Hon. Yvonne Gonzalez Rogers)

**BRIEF OF *AMICUS CURIAE* ACT | THE APP ASSOCIATION IN
SUPPORT OF DEFENDANT-APPELLANT**

Mark G. Weiss
Creighton J. Macy
Kaitlyn E. Barry
Stephen T. Loertscher
BAKER MCKENZIE LLP
815 Connecticut Ave., NW
Washington, DC 20006
Telephone: (202) 452-7098
Facsimile: (202) 416-7177
Mark.Weiss@bakermckenzie.com

*Counsel for Amicus Curiae
ACT | The App Association*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, ACT | The App Association, by and through its undersigned counsel, hereby certifies that it is a non-profit entity, has no corporate parent company, and has no corporate stock.

Dated: June 30, 2025

*/s/ Mark G. Weiss*
Mark G. Weiss
BAKER MCKENZIE LLP
815 Connecticut Ave., NW
Washington, DC 20006
Telephone: (202) 452-7098
Facsimile: (202) 416-7177
Mark.Weiss@bakermckenzie.com

*Counsel for Amicus Curiae*
*ACT | The App Association*

i

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS .................................................................... ii

TABLE OF AUTHORITIES................................................................ iii

STATEMENT OF IDENTIFICATION ....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................3

ARGUMENT ...............................................................................5

   I.   THE DISTRICT COURT'S INJUNCTION UPENDS AN EFFECTIVE AND
   PROGRESSIVE PAYMENT STRUCTURE FOR SMALL APP COMPANIES ..5

   II.   THE DISTRICT COURT'S NEW INJUNCTION WILL RESULT IN
   UNEXPECTED AND HARMFUL OUTCOMES FOR SMALL APP
   COMPANIES.........................................................................12

CONCLUSION ...........................................................................15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Financial Information Technologies, LLC v. iControl Systems USA,
    LLC*,
    21 F.4th 1267 (11th Cir. 2021) ........................................................... 14

*National Collegiate Athletic Associaton v. Alston*,
    594 U.S. 69 (2021) ................................................................................ 14

**Other Authorities**

A. Douglas Melamed, *Afterword: The Purposes of Antitrust
    Remedies*, 76 ANTITRUST LAW JOURNAL 359, 368 (2009) ................................. 14

Alex Baggott, *Every Apple App Store fee, explained: How much, for
    what, and when*, APPLE INSIDER (Jan. 8, 2023),
    https://appleinsider.com/articles/23/01/08/the-cost-of-doing-
    business-apples-app-store-fees-explained ........................................................... 5

*App Store Small Business Program*, APPLE,
    https://developer.apple.com/app-store/small-business-program/
    (last visited June 30, 2025) ................................................................. 6

*Apple Developer Program: Membership Details*, APPLE,
    https://developer.apple.com/programs/whats-included/ (last visited
    June 30, 2025) ................................................................................ 8

*Apple supercharges its tools and technologies for developers to foster
    creativity, innovation, and design*, APPLE (June 9, 2025),
    https://www.apple.com/newsroom/2025/06/apple-supercharges-its-
    tools-and-technologies-for-developers/ ............................................................. 9

*Comments of ACT | The App Association to the Federal Trade
    Commission on Competition and Consumer Protection in the 21st
    Century*, ACT | THE APP ASSOCIATION, at 2 (August 20, 2018),
    https://actonline.org/wp-content/uploads/Q3-ACT-Comments-re-
    FTC-2018-Consumer-Protection-Hearings-082018-FINAL.pdf ........................ 2

*Developing for the App Store*, APPLE, https://www.apple.com/ae/app-store/developing-for-the-app-store (last visited June 30, 2025)......................3, 7

*The Digital Markets Act: ensuring fair and open digital markets*, EUROPEAN COMMISSION, https://commission.europa.eu/strategy-and-policy/priorities-2019-2024/europe-fit-digital-age/digital-markets-act-ensuring-fair-and-open-digital-markets_en (last visited June 30, 2025)....................................................................................10

Friso Bostoen & David van Wamel, *Antitrust Remedies: From Caution to Creativity*, 14 JOURNAL OF EUROPEAN COMPETITION LAW & PRACTICE 540, 548 (2023) ....................................................13

Friso Bostoen, *Understanding the Digital Markets Act*, 68 ANTITRUST BULLETIN 263 (2023), https://ssrn.com/abstract=4440819 ................................11

Harry First, *Antitrust remedies and the Big Tech platform cases* (New York University School Of Law Public Law and Legal Theory Research Paper Series, Working Paper No. 23-33. 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4324570 ........................13

*iOS App Development Tools - A Complete Guide*, ZAZZ (JAN. 15, 2025), https://www.zazz.io/blog/ios-app-development-tools/............................8

John E. Lopatka & William H. Page, *Devising a Microsoft Remedy That Serves Consumers*, 9 GEORGE MASON LAW REVIEW 691, 700 (2001), *available at* https://scholarship.law.ufl.edu/cgi/viewcontent.cgi?article=1634&context=facultypub ...............................................................13

Justin Cruz, 91% of App Revenue Comes from the Top 1% of Publishers, But That Share Is Shrinking, SENSOR TOWER (September 2022),  https://sensortower.com/blog/top-one-percent-downloads-1h-2022 .......................................................................7

Laura Ceci, *Distribution of free and paid iOS apps in the Apple App Store from June 2019 to May 2025*, STATISTA (May 2, 2025), https://www.statista.com/statistics/1020996/distribution-of-free-and-paid-ios-apps/....................................................................3

iv

Regulation (EU) 2022/1925 of the European Parliament and of the
    Council of 14 September 2022 on contestable and fair markets in
    the digital sector and amending Directives (EU) 2019/1937 and
    (EU) 2020/1828 (Digital Markets Act), 2022 O.J. (L 265) ................................10

Soujanya Boxy & Shourya Mitra, *Apple's Walled Garden: The Battle
    over Closed Ecosystem*, CENTRE FOR BUSINESS AND COMMERCIAL
    LAWS (April 1, 2024), https://cbcl.nliu.ac.in/competition-
    law/apples-walled-garden-the-battle-over-closed-ecosystem/ ............................8

*State of the App Economy*, ACT | THE APP ASSOCIATION (2023),
    *available at* https://actonline.org/wp-content/uploads/APP-
    EconomyReport-FINAL-1.pdf ...........................................................................1

Thomas Lambert, *Rent-Seeking and Public Choice in Digital Markets*,
    The Global Antitrust Institute Report on the Digital Economy
    15,32 (Nov. 2020),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2224179 ........................15

Tom Barnett, *Section 2 Remedies: What To Do After Catching The
    Tiger By The Tail*, U.S. Department of Justice (2009),
    https://www.justice.gov/archives/atr/speech/section-2-remedies-
    what-do-after-catching-tiger-tail........................................................................12

*Understanding the Core Technology Fee for iOS and iPadOS apps in
    the European Union*, APPLE,
    https://developer.apple.com/support/core-technology-fee/ (last
    visited June 30, 2025) .......................................................................................11

*What's new in Xcode,* APPLE
    https://developer.apple.com/wwdc25/guides/developer-tools/ (last
    visited June 30, 2025) .........................................................................................9

v

## <u>STATEMENT OF IDENTIFICATION</u>[1]

ACT | The App Association (the "App Association") is an international not-for-profit advocacy and education organization founded in 1998. It represents the small business developer, innovator, and entrepreneur community that creates countless software applications used on mobile devices and in enterprise systems. Organization members leverage the connectivity of smart devices to create innovative solutions that make our lives better. The software application economy represented by the App Association is valued at approximately $1.8 trillion and is responsible for 6.1 million U.S. jobs.[2]

The App Association is committed to efforts to promote innovation in the technology industry. The App Association's members, typically small to medium-sized app developers and technology companies (*hereinafter* "small app companies"), will be impacted by the outcome of this appeal which will have profound effects on Apple's App Store.

---

[1] No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than the *amicus*, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief. ACT | the App Association receives financial support from a large number of donors, including general support from Apple. Baker McKenzie represents Apple in other matters unconnected to this brief.

[2] *State of the App Economy*, ACT | THE APP ASSOCIATION (2023), *available at* https://actonline.org/wp-content/uploads/APP-EconomyReport-FINAL-1.pdf.

Today, developers overwhelmingly use mobile platforms—such as the App Store and Google Play—to distribute their applications. A mutually beneficial relationship has developed between developers and platform companies. Developers provide useful and enjoyable digital content, which draws consumers to the platform, while the platform provides developers with low overhead costs, simplified market entry, consumer trust, data analytics, flexible marketing and pricing models, and strengthened intellectual property protections.[3]

The App Association has a strong and long-standing interest in ensuring the antitrust laws are properly applied to these platforms to promote competition and increase output. The App Association has closely followed Epic's litigations against Apple in the present case, and separately against Google, and filed amicus briefs in each of those matters that explained the ways in which the App Store and Google Play are important to developers and end-users.

The App Association submits this amicus brief to highlight the symbiotic relationship between its member developers and Apple and to explain how Apple's business model specifically benefits small app developers who use the App Store to reach millions of iPhone and iOS users.

---

[3] *See Comments of ACT | The App Association to the Federal Trade Commission on Competition and Consumer Protection in the 21st Century*, ACT | THE APP ASSOCIATION, at 2 (August 20, 2018), https://actonline.org/wp-content/uploads/Q3-ACT-Comments-re-FTC-2018-Consumer-Protection-Hearings-082018-FINAL.pdf.

2

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's recent injunction has disrupted an effective and progressive payment structure for app developers. The App Association, on behalf of its small app company members, files this *amicus curiae* brief to raise concerns about the implications of the recent injunction. Apple's fee structure on its App Store supports a thriving app ecosystem and provides numerous supportive resources at no- or low-cost to small app companies. This low barrier to entry is of vital importance to small app companies as they enter the market because they have immediate access to tools, services, marketing, consumer trust, and a global market without having to expend upfront capital beyond their initial developer fee.

But the district court's newly-fashioned injunction threatens the innovative development of new apps and the current operations of thousands of small app companies. While the district court was focused on Apple's 30% and 27% commissions, these fees are rarely, if ever, applied to the majority of app developers. Over 85% of apps on the App Store are free and not subject to Apple's commission fees or subject to other reduced fee structures.[4] Even setting that aside, Apple's

---

[4] *Developing for the App Store*, APPLE, https://www.apple.com/ae/app-store/developing-for-the-app-store (last visited June 30, 2025). A Statista study of the App Store has also found that since 2023, over 95% of the apps on the App Store are free apps that are charged no commission. *See* Laura Ceci, *Distribution of free and paid iOS apps in the Apple App Store from June 2019 to May 2025*, STATISTA (May 2, 2025), https://www.statista.com/statistics/1020996/distribution-of-free-and-paid-ios-apps/.

3

commission structure provides a transparent and understandable fee system that helps to provide support services, low developer fees, and other resources to small app companies. The App Association is concerned that the district court's injunction will limit Apple's options to charging an upfront per download distribution fee, raising the developer registration fee (another form of upfront cost), or raising prices on other vital tools or services provided by Apple to small app companies. Analogies can be drawn to the European Union's Digital Markets Act (the "DMA"), where regulation has already resulted in Apple imposing new fee structures that could place new burdens on small app companies. The App Association fears that the district court's injunction will result in similar uncertain and dangerous consequences to the currently thriving U.S. market.

The district court's injunction is also an overreach that was fashioned by a single multi-billion-dollar party while impacting tens of thousands of small companies who had no say in crafting this new untested system. This is particularly concerning in the digital market space where the injunction relies on predictions of future competition.

The App Association asserts that the injunction will result in unexpected and devastating outcomes that may chill innovation and distort a properly functioning competitive ecosystem. The App Association urges this Court to consider the concerns of its many small app company members and reconsider the injunction.

4

<u>**ARGUMENT**</u>

I.   **THE DISTRICT COURT'S INJUNCTION UPENDS AN EFFECTIVE AND PROGRESSIVE PAYMENT STRUCTURE FOR SMALL APP COMPANIES**

The App Association recounts that Apple's fee structure is as follows. For apps that are freely available (85% of apps), the fee is 0%. For apps making less than $1 million per year, the fee is a 15% commission on app sales and in-app purchases. And for apps making more than $1 million per year, the fee is set at a 30% commission on app sales and in-app purchases.[5] Apple also charges a 30% fee on first-year subscriptions but reduces its subscription percentage to 15% after the first year.[6] Following the trial in this case, the district court imposed an injunction that required Apple to (i) allow app developers to include buttons, links, or other calls to action that redirect users to alternative purchasing mechanisms ("off-app purchases") and (ii) allow app developers to directly communicate with customers outside of the App Store. *Permanent Injunction* (the "original injunction"), ECF No. 813. After the original injunction, Apple adopted a 27% commission for off-app purchases which the district court prohibited and reduced to $0 in its new injunction.

---

[5] *See Rule 52 Order After Trial on the Merits* ("Rule 52 Order"), 3, Case: 4:20-cv-05640-YGR, ECF No. 812. Further, references to ECF filings will refer to this same district court docket of *Apple v. Epic* before Judge Yvonne Gonzalez Rogers, unless otherwise noted.

[6] *See* Alex Baggott, *Every Apple App Store fee, explained: How much, for what, and when*, APPLE INSIDER (Jan. 8, 2023), https://appleinsider.com/articles/23/01/08/the-cost-of-doing-business-apples-app-store-fees-explained.

5

*Order Granting Injunction* (the "new injunction"), 2, ECF No. 1508.

But for the majority of app developers, and nearly all small app companies who are members of the App Association, Apple does not impose these commissions on their apps. An often-overlooked fact is that Apple charges no commission on free apps, a rule which applies to the vast majority of app developers.

Even for paid apps, Apple charges a lower 15% commission on in-app purchases and a 12% commission on linked-out purchases for members of the App Store Small Business Program (those earning less than $1 million per year). Apple reports that "the vast majority of developers on the App Store who sell digital goods and services are eligible" for this program.[7]

The App Association supports Apple's commission structure prior to the district court's new injunction, including the 27% commission for off-app purchases. While the system is not traditionally progressive like the US tax structure (i.e. the fee does not increase with revenue), the result very much is. Apple has chosen to tailor its App Store payment structure to these more limited categories of fees because it is transparent, applied consistently, and, not surprisingly, draws the majority of its revenues from apps that generate the most money—typically multi-billion-dollar companies and established popular apps, like Epic's Fortnite, with

---

[7] *App Store Small Business Program*, APPLE, https://developer.apple.com/app-store/small-business-program/ (last visited June 30, 2025).

6

well-known brands and better capitalization.[8]

According to Apple, 85% percent of apps are free, and their developers pay no commission at all, with most revenue coming from the remaining 15%—made by primarily larger developers.[9] These include major companies like Netflix, Tencent, Spotify, and mobile game giants such as Supercell, Epic, and Activision Blizzard (now owned by Microsoft). Many of these large developers, like Epic, operate freemium models with in-app purchases or subscriptions which are subject to Apple's commission.

Apple is, of course, a private and profit-driven company. It is not improper for Apple to seek out payment for access to the products and services it provides. Apple's commitment to a contained, moderated, and curated experience—often referred to in academia as its "walled gardens"—is carefully designed to encourage a seamless user experience where Apple maintains control over the functions and properties available on its own products. Apple's efforts to "build[] a closed ecosystem" for "Apple's App Store has empowered developers of all sizes to create

---

[8] Various reports and legal disclosures confirm that the top 1% of developers generate a disproportionate share of the App Store's revenue. A 2021 analysis found that the top 1% of publishers accounted for 91% of App Store revenue. *See* Justin Cruz, 91% of App Revenue Comes from the Top 1% of Publishers, But That Share Is Shrinking, SENSOR TOWER (September 2022), https://sensortower.com/blog/top-one-percent-downloads-1h-2022.

[9] *Developing for the App Store*, APPLE, https://www.apple.com/ae/app-store/developing-for-the-app-store (last visited June 30, 2025).

7

and launch thriving businesses, connecting them with a global audience."[10]  But the App Association has concerns that the new injunction will result in unexpected outcomes and drive Apple to alternative payment systems that will harm its small app company members, undermine innovation, and impede the competitive nature of digital markets.

Currently developers who want to distribute apps on the App Store must enroll in the Apple Developer Program, which costs $99 USD per year.[11]  This remarkably low enrollment fee is widely available and accessible to nearly all app developers— no matter how small they are.  Apple's Developer Program provides numerous perks for developers including access to App Store distribution, use of Apple's development tools, including Xcode, TestFlight, and beta OS releases, access to developer support and analytics, and the ability to use Apple APIs and services, like Apple Pay, Game Center, and iCloud.[12]  This program serves the developer side

---

[10] *See, e.g.*, Soujanya Boxy & Shourya Mitra, *Apple's Walled Garden: The Battle over Closed Ecosystem*, CENTRE FOR BUSINESS AND COMMERCIAL LAWS (April 1, 2024),  https://cbcl.nliu.ac.in/competition-law/apples-walled-garden-the-battle-over-closed-ecosystem/.

[11] These fees are waived for nonprofits, educational institutions, and government entities in certain regions (upon approval).  *Apple Developer Program: Membership Details*, APPLE, https://developer.apple.com/programs/whats-included/ (last visited June 30, 2025).

[12] *See, e.g., iOS App Development Tools – A Complete Guide*, ZAZZ (JAN. 15, 2025), https://www.zazz.io/blog/ios-app-development-tools/ ("Developing apps for iOS has its advantages.  Apple's strict guidelines, developer-friendly frameworks, and a

8

of Apple's two-sided market and facilitates new entry and product development. And consumers benefit from this program through the development of new and innovative apps.

The low $99 fee is undoubtably subsidized by revenues generated from larger apps that drive traffic and money to the App Store. This is precisely what the App Association wants to preserve. By restricting Apple's commission structure, it will likely lose billions of dollars a year. The resulting limits will leave Apple with little choice but to adopt a regressive fee structure that raises prices or seeks revenue from other sources—including from those least able to afford higher commissions. While there are many ways Apple can adjust its fee structure, a highly probable change would be to drastically increase: (1) annual subscription fees; (2) charges on developers per download; or (3) adopt alternative fees for the uses of all of the services which Apple currently provides for a low annual fee (and sometimes for free) to small app companies. All of these changes devastate the members of the App Association who rely heavily on the App Store and its reasonable pricing for developer fees. Fee-shifting from multi-billion-dollar companies to smaller app

---

wide array of available APIs allow developers to create efficient, secure, and high-performing applications."); *Apple supercharges its tools and technologies for developers to foster creativity, innovation, and design*, APPLE (June 9, 2025), https://www.apple.com/newsroom/2025/06/apple-supercharges-its-tools-and-technologies-for-developers/; *What's new in Xcode,* APPLE https://developer.apple.com/wwdc25/guides/developer-tools/ (last visited June 30, 2025).

9

companies will impede development and entry of new apps causing numerous new and innovative apps to die on the vine—never coming to fruition.[13]

These concerns are not merely speculative.  A similar outcome has already occurred in Europe under the DMA, where the European Union has regulated large online platforms as "gatekeepers."[14]  These gatekeepers are defined as large tech companies that provide core platform services and hold significant influence over digital markets.  The European Commission has designated Apple as a gatekeeper.[15]

Under the DMA, Apple is required to make significant changes to the operations of its App Store, particularly around fees, commissions, and developer access.  Similar to the court's new injunction here, the DMA requires Apple to permit third-party app stores and direct app downloads (a process known as

---

[13] The App Association hopes this Court will pardon its fruit-related puns.

[14] Regulation (EU) 2022/1925 of the European Parliament and of the Council of 14 September 2022 on contestable and fair markets in the digital sector and amending Directives (EU) 2019/1937 and (EU) 2020/1828 (Digital Markets Act), 2022 O.J. (L 265).

[15] *The Digital Markets Act: ensuring fair and open digital markets*, EUROPEAN COMMISSION, https://commission.europa.eu/strategy-and-policy/priorities-2019-2024/europe-fit-digital-age/digital-markets-act-ensuring-fair-and-open-digital-markets_en (last visited June 30, 2025).  The DMA is enforced by the European Commission.  Violations can lead to fines of up to 10% of a company's global turnover, or 20% for repeated offenses.  *Id.*  Structural remedies (like breaking up businesses) are possible in severe cases.  *Id.*

10

"sideloading") on iOS devices.  Developers can distribute their apps outside the App Store, avoiding Apple's traditional commission structure.[16]

In response Apple has imposed a more regressive fee structure, the Core Technology Fee ("CTF") for apps distributed outside the App Store, that imposes a €0.50 per annual install after the first 1 million installs per year, even if the app is free or distributes via a third-party store.  The CTF imposes a significant cost on small app companies—if a free app is downloaded 2 million times, the developer would owe Apple 500,000 Euro despite not necessarily generating any direct revenue from app downloads.  To date, Apple has provided some exceptions to help protect small app companies, for example, developers with sales under €10 million in global revenue are provided a 3-year grace period before paying in order "to help them create innovative apps and rapidly grow their business"—but the concern remains.[17]  Apple currently includes numerous developer tools (like Xcode), APIs,

---

[16] For a detailed discussion of the DMA and a case study of Apple's App Store, *see* Friso Bostoen, *Understanding the Digital Markets Act*, 68 ANTITRUST BULLETIN 263 (2023), https://ssrn.com/abstract=4440819.  Bostoen argues that for developers "different paths may emerge: larger developers (e.g., . . . Epic) . . .  avoid App Store fees, relying on their brand name[s] . . . while smaller developers will want to continue benefitting from Apple's system and the concomitant consumer trust." *Id.* at 52 (pincites to SSRN version).  These stark changes "come[] with a high degree of uncertainty . . . [because] the DMA's obligations are untested in an app store context." *Id.* at 52.

[17] *Understanding the Core Technology Fee for iOS and iPadOS apps in the European Union*, APPLE, https://developer.apple.com/support/core-technology-fee/ (last visited June 30, 2025).

SDKs, and security and privacy protections in its low enrollment fee but each of these components could be charged separately in a new fee structure that could harm small app companies.

In short, the DMA has resulted in Apple re-distributing its generation of revenue in new ways that tend to impose more and higher fees on small app companies. These developments exemplify that artificial interference in competitive digital markets, whether by courts or regulation, rarely improve competition. Instead, this interference creates imbalances in markets, distorts free competition, and results in unexpected and often harmful outcomes.

## II.     THE DISTRICT COURT'S NEW INJUNCTION WILL RESULT IN UNEXPECTED AND HARMFUL OUTCOMES FOR SMALL APP COMPANIES

"Implementing a remedy that is too broad runs the risk of distorting markets, impairing competition, and prohibiting perfectly legal and efficient conduct."[18] The concern is most acute when courts take the role of policing everyday business conduct such as setting prices or interfering with established business operations. An antitrust remedy should not "reshape the market to approximate a competitive ideal" or "deprive the offender of . . . the benefits of lawful conduct. This means that

---

[18] Tom Barnett, *Section 2 Remedies: What To Do After Catching The Tiger By The Tail*, U.S. Dep't of Justice (2009), https://www.justice.gov/archives/atr/speech/section-2-remedies-what-do-after-catching-tiger-tail.

the remedy should not harm consumers by deterring hard competition, efficient arrangements, or innovation."[19]

This is all the more difficult in digital markets where the fast-paced nature of competition complicates the outcomes of any proposed remedies or injunctions. "In digital markets, the practical difficulties with remedies are exacerbated. Due to the complexity of platform business models, the information asymmetry is greater. Platforms have at least two sides, so a remedy needs to account for the impact on each side—and the feedback effects between them."[20]

Here, the original and new injunction are static rules that are incapable of reacting or changing to current market conditions. Such inflexible impositions on the behavior of private companies create market imbalances and prohibit active competition.[21] "[R]emedies are hard to get right and, when suboptimal, can

---

[19] John E. Lopatka & William H. Page, *Devising a Microsoft Remedy That Serves Consumers*, 9 GEO. MASON L. REV. 691, 700 (2001), *available at* https://scholarship.law.ufl.edu/cgi/viewcontent.cgi?article=1634&context=facultyp ub.

[20] Friso Bostoen & David van Wamel, *Antitrust Remedies: From Caution to Creativity*, 14 J. EUR. COMPETITION L. & PRAC. 540, 548 (2023).

[21] Commentators have noted a perpetual dissatisfaction with antitrust remedies that employ a "'a top-down' 'command and control' approach" where "an injunction intended to stop the particular practice that was the subject of the litigation . . . can suffer from information asymmetries between the defendant that knows its business better than anyone" and the plaintiff. Harry First, *Antitrust remedies and the Big Tech platform cases*, 31 (N.Y. Univ. Sch. Of L. Pub. L. and Legal Theory Rsch. Paper

undermine antitrust objectives by interfering with markets and prohibiting or deterring procompetitive conduct."[22]

The district court's decision here has all of the hallmarks of an overly-ambitious remedy that is likely to result in unanticipated and unwanted outcomes. In fact, the new injunction was crafted in large part by the plaintiff in this case—Epic Games—which is a single, profit-driven company. Unsurprisingly, the injunction shifts financial burden off of Epic and onto small app companies, leaving them in a much worse position.

The remedies suggested by Epic go far beyond redress and cause irreparable harm to the larger developer community. "[A]n injunction must be narrowly tailored to the proven legal violations and restrain no more conduct than reasonably necessary."[23] In particular, "courts must have a healthy respect for the practical limits of judicial administration: An antitrust court is unlikely to be an effective day-to-day enforcer of a detailed decree, able to keep pace with changing market

---

Series, Working Paper No. 23-33. 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4324570.

[22] A. Douglas Melamed, *Afterword: The Purposes of Antitrust Remedies*, 76 ANTITRUST L.J. 359, 368 (2009).

[23] *Fin. Info. Techs., LLC v. iControl Sys. USA, LLC*, 21 F.4th 1267, 1280 (11th Cir. 2021).

14

dynamics alongside a busy docket."[24]

Courts should steer clear of remedies or injunctions that have broader effects on third parties or that incentivize rent-seeking behavior—motivating companies to gain competitive advantages through adverse litigation rather than through innovation. Such strategies are low-cost and often result in artificial interference to competitive markets that re-align the playing field in a way that is beneficial to the litigant but not to competition. That's precisely what is happening here. As explained by Professor Thomas Lambert, Epic's lawsuit is "an effort to put public pressure on Apple and Google to revamp their app store policies . . . in a way that would advantage Epic at the expense of other app developers and the mobile app ecosystem itself. In short, Epic is engaged in rent-seeking."[25]

## CONCLUSION

For the foregoing reasons, the App Association urges this Court to vacate the new injunction and reverse the decision of the district court.

---

[24] *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 102–03 (2021) (internal citation and quotation marks omitted).

[25] Thomas Lambert, *Rent-Seeking and Public Choice in Digital Markets*, The Global Antitrust Institute Report on the Digital Economy 15,32 (Nov. 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2224179.

Dated: June 30, 2025

Respectfully submitted,

*/s/ Mark G. Weiss*

Mark G. Weiss
Creighton J. Macy
Stephen T. Loertscher
BAKER MCKENZIE LLP
815 Connecticut Ave., NW
Washington, DC 20006
Telephone: (202) 452-7098
Facsimile: (202) 416-7177
Mark.Weiss@bakermckenzie.com
Creighton.Macy@bakermckenzie.com
Stephen.Loertscher@bakermckenzie.com

Kaitlyn E. Barry
BAKER MCKENZIE LLP
800 Capitol Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 427-5000
Facsimile: (713) 427-5099
Kaitlyn.Barry@bakermckenzie.com

*Counsel for Amicus Curiae*
*ACT | The App Association*

16

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated       .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                       **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                        *Rev. 12/01/22*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on June 30, 2025, the foregoing was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

Dated: June 30, 2025

Respectfully submitted,

*/s/ Mark G. Weiss*

BAKER MCKENZIE LLP
Mark G. Weiss
815 Connecticut Ave., NW
Washington, DC 20006
Telephone: (202) 452-7098
Facsimile: (202) 416-7177
Mark.Weiss@bakermckenzie.com

*Counsel for Amicus Curiae*
*ACT | The App Association*