**No. 25-2935**

# In the United States Court of Appeals for the Ninth Circuit

EPIC GAMES, INC.,

    *Plaintiff-Appellee,*

*v.*

APPLE INC.,

    *Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California,
No. 4:20-cv-05640-YGR

**BRIEF OF AMICI CURIAE NETCHOICE AND
COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION
IN SUPPORT OF APPELLANT**

    Scott A. Keller
    Steven P. Lehotsky
    Jeremy Evan Maltz
    LEHOTSKY KELLER COHN LLP
    200 Massachusetts Ave. NW, Suite 700
    Washington, DC 20001
    (512) 693-8350
    scott@lkcfirm.com

    *Counsel for Amici Curiae*

CORPORATE DISCLOSURE STATEMENT

No. 25-2935

EPIC GAMES, INC.,
*Plaintiff-Appellee,*

*v.*

APPLE INC.,
*Defendant-Appellant.*

Under Federal Rule of Appellate Procedure 26.1, NetChoice and CCIA certify that they have no parent corporation, and that no publicly held company owns 10% or more of their stock.

/s/ *Scott A. Keller*
Scott A. Keller
*Counsel for Amici Curiae*

i

TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii
Interest of Amici Curiae ........................................................................................... 1
Introduction .............................................................................................................. 3
Argument .................................................................................................................. 5
    I.   Strict First Amendment scrutiny applies when the government compels speech. .............................................................. 5
    II.  Judicial injunctions compelling speech do not get a lower level of First Amendment scrutiny ..................................................... 10
Conclusion .............................................................................................................. 12
Certificate of Service ............................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bank of Hope v. Miye Chon*,
   938 F.3d 389 (3d Cir. 2019) .................................................................10

*Citizens United v. FEC*,
   558 U.S. 310 (2010) ..........................................................................3, 10

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) .................................................................................5

*CTIA - The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) ..............................................................8, 9

*Ent. Software Ass'n v. Blagojevich*,
   469 F.3d 641 (7th Cir. 2006) ..................................................................9

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
   515 U.S. 557 (1995) .............................................................................3, 6

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ...............................................................................10

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
   584 U.S. 617 (2018) .................................................................................6

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) .................................................................................6

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) .......................................................................2, 4, 5

*Nat'l Ass'n of Mfrs. v. SEC*,
   800 F.3d 518 (D.C. Cir. 2015) ............................................................4, 7

*Nat'l Ass'n of Wheat Growers v. Bonta*,
  85 F.4th 1263 (9th Cir. 2023) ..................................................................5, 9

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  585 U.S. 755 (2018) ........................................................................5, 6, 8, 9

*NCAA v. Alston*,
  594 U.S. 69 (2021) ..................................................................................10

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) ..................................................................9

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
  475 U.S. 1 (1986) ..................................................................................3, 6

*Phi Theta Kappa Honor Soc'y v. HonorSociety.org., Inc.*,
  2025 WL 1030240 (5th Cir. Apr. 7, 2025) ...........................................11

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ..............................................................................7, 9

*Spokane Arcades, Inc. v. Brockett*,
  631 F.2d 135 (9th Cir. 1980) ..................................................................10

*United States v. Nat'l Soc. of Prof'l Eng'rs.*,
  555 F.2d 978 (D.C. Cir. 1977) ................................................................10

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ..................................................................................5

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) ................................................................5, 9

*Zauderer v. Off. of Disciplinary Couns.*,
  471 U.S. 626 (1985) ..................................................................................8

iv

## INTEREST OF AMICI CURIAE

NetChoice is a national trade association of online businesses that share the goal of promoting free enterprise and free expression on the Internet.[1] A list of NetChoice's members is available at https://tinyurl.com/yuwv2eat. NetChoice fights to ensure the internet remains innovative and free. Toward those ends, NetChoice engages in litigation, amicus curiae work, and political advocacy.

CCIA is an international, not-for-profit association that represents a broad cross-section of communications, technology, and Internet industry firms that collectively employ more than 1.6 million workers, invest more than $100 billion in research and development, and contribute trillions of dollars in productivity to the global economy. For more than 50 years, CCIA has promoted open markets, open systems, and open networks, including as a party to or amicus in litigation. In addition, CCIA regularly advocates for the application of First Amendment protections for lawful online speech. A list of CCIA members is available at https://www.ccianet.org/members.

---

[1] Pursuant to this Court's June 30, 2025, order ECF 68.1, Amici Curiae make the following renewed disclosure: No party's counsel contributed money that was intended to fund preparing or submitting the brief. No person—other than amici, their members, or amici's counsel—contributed money that was intended to fund preparing or submitting the brief. Although Appellant Apple is a CCIA member, Appellant Apple did not contribute money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

1

Particularly relevant here, Amici litigated the Supreme Court's landmark case on the First Amendment's protections for online editorial discretion: *Moody v. NetChoice, LLC & NetChoice, LLC v. Paxton*, 603 U.S. 707 (2024). Accordingly, Amici are uniquely qualified to explain how that decision—and the Supreme Court's other First Amendment precedent—protects against any governmental action that "direct[s]" any private entity "to accommodate messages it would prefer to exclude." *Id.* at 731.

2

## INTRODUCTION

"Courts, too, are bound by the First Amendment." *Citizens United v. FEC*, 558 U.S. 310, 326 (2010). Their injunctions—no less than any legislative or executive action—must comply with the Constitution's stringent safeguards for free speech. Under the First Amendment, "the choice to speak includes within it the choice of what not to say," so "compelling a private corporation to provide a forum for views other than its own may infringe the corporation's freedom of speech." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 9, 16 (1986) (plurality op.) ("*PG&E*").[2] As a result, judicial injunctions compelling speech must meet the First Amendment's demanding requirements.

Unfortunately, as Apple's Brief demonstrates, some applications of the district court's new injunction in this case could compel speech without a showing that such compelled speech satisfies the First Amendment.[3] The injunction here implicates Apple's free-speech rights by potentially requiring "Apple to carry any and all developer speech, even if misleading or disparaging to Apple, in connection with links to external purchases" in In-App Purchasing (IAP). Apple Br.40. Specifically, the injunction imposed in this

---

[2] All subsequent citations to *PG&E* are to the plurality opinion. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573, 575-76, 580 (1995) (recognizing that *PG&E*'s plurality opinion is this case's holding).

[3] This brief does not address any potential applications of the new injunction that regulate only what app *developers* may say on their own services.

3

case prevents Apple from setting *any* restrictions on (1) "developers' style, language, . . . flow or placement of links for purchases outside an app"; and (2) "the content, . . . language, . . . flow or placement" of "calls to action" for "purchases outside an app." Apple Br.37-38. In particular circumstances, these requirements could compel Apple itself to disseminate speech on its own interface against its will. For example, "when customers arrive at the checkout aisle of the platform Apple built, Apple must permit unlimited advertisements for purchases elsewhere." Apple Br.2.

But the First Amendment does not permit any governmental actor to "direct[]" a private entity "to accommodate messages it would prefer to exclude," without satisfying heightened First Amendment scrutiny. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). A governmental compelled-speech requirement is all the "more constitutionally offensive" when a company must accommodate speech that would "condemn" itself. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015). Yet that is precisely what the district court's new injunction would require Apple to do to the extent it compels Apple to disseminate particular messages from app developers.

Accordingly, this Court should closely consider the First Amendment implications of the district court's new injunction and subject to scrutiny all provisions of the injunction that compel speech.

4

## ARGUMENT

## I. Strict First Amendment scrutiny applies when the government compels speech.

**A.** Under the First Amendment, the government cannot "direct[]" a private entity "to accommodate messages it would prefer to exclude." *Moody*, 603 U.S. at 731. The freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *e.g.*, *X Corp. v. Bonta*, 116 F.4th 888, 900 (9th Cir. 2024) ("The First Amendment's guarantee of freedom of speech makes no distinction of 'constitutional significance' 'between compelled speech and compelled silence.'" (citation omitted)); *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1275 (9th Cir. 2023) ("Indeed, in the context of protected speech, the First Amendment's guarantee of freedom of speech makes no distinction of constitutional significance between compelled speech and compelled silence." (cleaned up)).

In "a slew of individual cases," the Supreme Court has consistently reaffirmed that the government cannot compel private entities to disseminate the speech of others. *Moody*, 603 U.S. at 727-31 (collecting cases). After all, when the government compels speech dissemination, that necessarily alters the content of the speech that the private entity *does* want to disseminate. *E.g.*, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*"). Attempts to compel speech dissemination trigger "strict scrutiny," which is "the most demanding test known to constitutional law." *City*

5

*of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Strict scruitny requires the government to "prove[]" that its requirements "are narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766.

*PG&E* held that the government cannot compel private entities to carry particular messages. There, the Supreme Court invalidated a requirement mandating a company "to use *its* property"—a billing envelope with a newsletter that PG&E transmitted to each customer—"as a vehicle for spreading a message with which [the company] disagree[d]." 475 U.S. at 17. As *PG&E* observed, it does not matter that a private entity can respond with its own speech, because merely being put to the choice of "'be[ing] forced either to appear to agree . . . or to respond'" is unconstitutional in its own right. *Hurley*, 515 U.S. at 575-76 (quoting *PG&E*, 475 U.S. at 15). Justifying compelled speech dissemination based on the premise that speakers can "dissociat[e]" themselves from the compelled speech with "a disclaimer" would unconstitutionally "justify any law compelling speech." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 584 U.S. 617, 663 (2018) (Thomas, J., concurring in part). Likewise, governments cannot justify compelled speech by arguing that there are no space constraints. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (compelled speech dissemination is unconstitutional "[e]ven if a newspaper would face no additional costs to comply with a compulsory access law and would not be forced to forgo publication of news or opinion by the inclusion of a reply").

6

This kind of coerced speech—which Supreme Court precedent condemns—is precisely what the new injunction here might require in some circumstances. In particular, the injunction prohibits Apple from imposing *any* restrictions on developers' "style, language, . . . flow or placement" of links and "calls to action" for purchases outside an app. Apple Br.37-38. Importantly, this will regulate Apple's speech in some cases. Primarily, the "IAP operates as a one-stop, checkout-aisle interface for purchases of digital content within iOS apps." Apple Br.8. Thus, Apple's decision not to disseminate particular app-developer speech in the IAP is "[l]ike a store's decision not to advertise competitors' prices in its own checkout aisle." Apple Br.18. As Apple notes, the new injunction, taken to its logical conclusion, could require Apple itself to disseminate speech on its own interface that contravenes its style guidelines—or even "speech . . . misleading or disparaging to Apple," Apple Br.40—without any connection to the circumstances that gave rise to the injunction. The possibility that Apple may need to disseminate messages and calls to action that "condemn" itself and its services "makes the requirement more constitutionally offensive." *Nat'l Ass'n of Mfrs.*, 800 F.3d at 530.

**B.** The fact that the district court's injunction arguably operates in the commercial context does not negate the First Amendment's protections. As in other contexts, the "commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011). Private entities

7

cannot be compelled to disseminate the speech of others, even if that compelled speech touches on commercial subjects, without satisfying First Amendment scrutiny. Thus, neither commercial speech intermediate scrutiny nor the more lenient "*Zauderer* standard . . . apply" to any compelled-speech applications of the new injunction. *NIFLA*, 585 U.S. at 768 (citing *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985)).

Apple cannot be required to disseminate the commercial speech of *other* private entities. The speech the new injunction compels Apple to disseminate on app developers' behalf "in no way relates to the services that" *Apple* itself provides—which *Zauderer* demands. *Id.* at 769. This Court has noted that compelled speech must "relate to the product or service that is provided by an entity subject to the requirement." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) ("*CTIA II*"). Yet the injunction here "requires" Apple "to disclose information about" *others'* services. *NIFLA*, 585 U.S. at 769. Specifically, it requires Apple to disseminate potentially "any and all developer speech" through Apple's own service. Apple Br.40. This is a significant intrusion on Apple's First Amendment right to be free from government compelled speech.

The injunction is also not "limited to 'purely factual and uncontroversial information about the terms under which [Apple's] services will be available.'" *NIFLA*, 585 U.S. at 769 (cleaned up) (quoting *Zauderer*, 471 U.S. at 651). It forces Apple to accommodate third-party messages that could bear on Apple's reputation—and even untrue or potentially misleading statements by

8

app developers. For instance, "speech . . . misleading or disparaging to Apple," Apple Br.40, would not be "uncontroversial," *NIFLA*, 585 U.S. at 769 (citation omitted). Nor are statements or stylistic choices about other entities' services that Apple has no opportunity to vet or constrain, yet Apple is required to disseminate those through the app store too. The injunction could require Apple to lend the significant trust *it* has accrued to the statements made by third-party app developers. As this Court has recognized, States cannot "compel[] statement[s]" that require private entities to "t[ake] sides in a . . . controversy" and "forc[e]" them "to convey a message fundamentally at odds with [their] mission." *CTIA II*, 928 F.3d at 845; *see Nat'l Ass'n of Wheat Growers*, 85 F.4th at 1279 (same).

Because the aspects of the new injunction that compel Apple to disseminate speech on its own service do not belong within *Zauderer*'s ambit, this Court should apply strict scrutiny to those applications. *E.g., X Corp.*, 116 F.4th at 903; *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 651-52 (7th Cir. 2006).[4]

---

[4] Even if strict scrutiny did not apply, regulations of commercial speech trigger intermediate scrutiny, which itself is a demanding standard. *Sorrell*, 564 U.S. at 571-72. Because the speech compelled by the injunction is unrelated to the Apple services, the injunction flunks this level of scrutiny as well.

9

## II. Judicial injunctions compelling speech do not get a lower level of First Amendment scrutiny.

The First Amendment equally applies when the *judiciary* compels speech. *E.g.*, *Citizens United*, 558 U.S. at 326. "When it comes to . . . antitrust remed[ies], . . . caution is key." *NCAA v. Alston*, 594 U.S. 69, 106 (2021). Nowhere is that more true than when an antitrust remedy compels speech. *E.g.*, *United States v. Nat'l Soc. of Prof'l Eng'rs*, 555 F.2d 978, 984 (D.C. Cir. 1977), *aff'd*, 435 U.S. 679 (1978). This Court should therefore closely analyze the First Amendment implications posed by the district court's order.

Other courts have recognized that compelled-speech injunctions—even as remedies for purported antitrust violations—must comply with the First Amendment. *Id.* ("To force an association of individuals to express as its own opinion judicially dictated ideas is to encroach on that sphere of free thought and expression protected by the First Amendment. Any such regulation by the state should not be more intrusive than necessary to achieve fulfillment of the governmental interest. The decree provision commanding the Society to state that in its view certain practices were not unethical goes beyond this.").

More generally, judicial injunctions are subject to the First Amendment's stringent limitations. *E.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764-66 (1994) ("Injunctions . . . carry greater risks of censorship and discriminatory application than do general ordinances."); *Bank of Hope v. Miye Chon*, 938 F.3d 389, 397 (3d Cir. 2019); *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135,

10

138 (9th Cir. 1980), *aff'd*, 454 U.S. 1022 (1981). That includes injunctions compelling speech. *See, e.g., Phi Theta Kappa Honor Soc'y v. HonorSociety.org., Inc.*, 2025 WL 1030240, at *3 (5th Cir. Apr. 7, 2025) ("[T]he disclaimer [compelled by injunction] constitutes impermissible compelled speech.").

Under this precedent, the district court's injunction must satisfy First Amendment strict scrutiny to the extent that it compels Apple to disseminate speech. But the district court did not even attempt this analysis, which alone is enough to vacate the compelled-speech part of the court's new injunction. In any event, this broad, compelled-speech mandate in the new injunction is not the least restrictive means of—or even narrowly tailored to—furthering a sufficient governmental interest. It should therefore be reversed.

## Conclusion

This Court should vacate the district court's new injunction to the extent it unconstitutionally compels Apple to disseminate speech.

Dated: July 1, 2025           Respectfully submitted.

/s/ *Scott A. Keller*
Scott A. Keller
Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
(512) 693-8350
scott@lkcfirm.com

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

On July 1, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Scott A. Keller*
Scott A. Keller

13

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 24-6256**

I am the attorney or self-represented party.

**This brief contains 2414 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.
[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
[x] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), as calculated under Cir. R. 32-3.
[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.
[ ] complies with the length limit designated by court order dated _____.
[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Scott A. Keller*   **Date** July 1, 2025

14