No. 25-2935

---

IN THE

# United States Court of Appeals for the Ninth Circuit

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR
Hon. Yvonne Gonzalez Rogers

---

## ANSWERING BRIEF OF APPELLEE EPIC GAMES, INC.

---

Gary A. Bornstein
Yonatan Even
Lauren A. Moskowitz
Michael J. Zaken
M. Brent Byars
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

Paul J. Riehle
FAEGRE DRINKER BIDDLE &
REATH LLP
Four Embarcadero Center
San Francisco, CA 94111
(415) 591-7500

*Counsel for Plaintiff-Appellee Epic Games, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Epic Games, Inc. ("Epic") states that it has no parent corporation and that Tencent Holdings Limited owns more than 10% of Epic stock.

# TABLE OF CONTENTS

INTRODUCTION ......................................................................1

STATUTORY AND REGULATORY PROVISIONS .............................6

JURISDICTIONAL STATEMENT ..............................................6

STATEMENT OF ISSUES FOR REVIEW ....................................6

STATEMENT OF THE CASE......................................................7

    **I.**    **Epic and Its Case Against Apple**..................................**8**

    **II.**    **The District Court's 2021 Order and Injunction.**............**9**

    **III.**    **This Court's Affirmance.**..........................................**10**

    **IV.**    **Apple's Response.**.................................................**12**

    **V.**    **Apple's Notice of Compliance.**..................................**19**

    **VI.**    **Epic's Motion to Enforce.**.........................................**19**

    **VII.**    **The Evidentiary Hearing and Apple's Document Production.**................................................................**19**

    **VIII.**    **The Enforcement Order.**..........................................**22**

        A.    Apple Imposed a Commission To Prevent Use of the Link Entitlement Program.........................................23

        B.    Apple Used Link Placement, Design and Content Restrictions To Prevent Steering. ..............................24

        C.    Apple Increased Purchase Flow Friction with Scare Screens. ...............................................................26

        D.    Apple Used Static Links to Increase Purchase Flow Friction. ...............................................................27

        E.    Apple Prohibited Other Calls to Action...................28

F.     Apple Excluded the Largest Developers from the Program to Protect Its Bottom Line. .........................................29

G.     Developers Did Not Adopt the Link Entitlement Program. ...................................................................................29

H.     Apple Abused Privilege to Conceal and Mislead. ....................30

I.     The District Court Issued a Remedy to Prevent Apple from Violating the Injunction. ..................................................30

SUMMARY OF ARGUMENT ................................................................31

ARGUMENT .........................................................................................35

I.     **The District Court Properly Held Apple in Civil Contempt.........35**

A.     The District Court Properly Found that Apple Violated the Injunction. ......................................................................35

1.     The District Court Found Apple Violated the Injunction's Express Terms. ...........................................36

2.     The District Court Properly Used Its Contempt Power to Remedy Apple's Deliberate Circumvention of the Injunction. ...................................40

B.     The District Court Was Entitled to Consider Apple's Bad Faith. ..................................................................................45

C.     The District Court Properly Overruled Apple's False Claims of Privilege. ...............................................................47

D.     Even If the EO Modified the Injunction, the Modification Was Within the Discretion of the District Court. ....................51

II.     **The District Court Crafted an Appropriate Remedy. ...................54**

A.     The EO Targets Specific Violative Conduct. ...........................54

B.     The District Court Properly Ordered Apple To Stop Imposing a Commission On Out-of-App Transactions. ...........59

1.    The EO Does Not Bar Apple from Being
      Compensated for Its Services or IP. ...........................59

2.    The District Court Did Not Engage in
      Rate-Setting. ...................................................61

3.    The EO Is Not a Taking.....................................63

4.    The EO Is Not Punitive. ...................................65

C.    The Other Provisions of the EO Were Well Within the
      District Court's Authority. ........................................67

**III.   Apple's Challenges to the Underlying Injunction Fail. .................70**

A.    Beverage is Not a Conflicting State Judgment. .......................70

B.    The Injunction's Scope is Proper.............................................75

**IV.    Apple's Request for a New Judge Fails.............................................76**

CONCLUSION ................................................................................78

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122 (9th Cir. 2013) ................................................................57, 66

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ........................................................52, 54

*BankDirect Cap. Fin. LLC v. Cap. Premium Fin., Inc.*,
912 F.3d 1054 (7th Cir. 2019) (Br.48)..................................................44

*Beasley v. Wells Fargo Bank*,
235 Cal. App. 3d 1383 (1991) ...............................................................62

*Beverage v. Apple*,
320 Cal. Rptr. 3d 427 (Ct. App. 2024) .........................................*passim*

*Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*,
516 F. Supp. 3d 1202 (W.D. Wash. 2021) ............................................38

*Brown v. Plata*,
563 U.S. 493 (2011)...............................................................................51

*Cal. Grocers Ass'n v. Bank of Am., Nat'l Tr. & Sav. Ass'n*,
27 Cal. Rptr. 2d 396 (Ct. App. 1994) ...................................................62

*Califano v. Yamasaki*,
442 U.S. 682 (1979)...............................................................................76

*California ex rel. Becerra v. EPA*,
978 F.3d 708 (9th Cir. 2020) .................................................................71

*Carter v. Local 556, Transp. Workers Union of Am.*,
138 F.4th 164 (5th Cir. 2025) ........................................................56, 57

*Casey v. Albertson's Inc.*,
362 F.3d 1254 (9th Cir. 2004) ...............................................................70

v

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021)................................................................63

*Chavez v. Whirlpool Corp.*,
  113 Cal. Rptr. 2d 175 (Ct. App. 2001) ...........................71, 72, 73, 74

*Chrysler Corp. v. United States*,
  316 U.S. 556 (1942)................................................................51

*Cintron v. Union Pac. R. Co.*,
  813 F.2d 917 (9th Cir. 1987) ..................................................77

*City & County of San Francisco v. Trump*,
  2025 WL 1358492 (N.D. Cal. May 9, 2025).....................................44

*Clark v. Coye*,
  60 F.3d 600 (9th Cir. 1995) .....................................................58

*Cunningham v. David Special Commitment Ctr.*,
  158 F.3d 1035 (9th Cir. 1998) ..................................................59

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ...........................................*passim*

*Epic Games, Inc. v. Google LLC*,
  No. 24-6256, slip op. (9th Cir. July 31, 2025)..........................*passim*

*Epona LLC v. Cnty. of Ventura*,
  2019 WL 4187393 (C.D. Cal. Apr. 12, 2019)....................................44

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ..................................................55

*Forever 21, Inc. v. Ultimate Offprice, Inc.*,
  2013 WL 4718366 (C.D. Cal. Sept. 3, 2013)....................................65

*Greer v. Cnty. of San Diego*,
  127 F.4th 1216 (9th Cir. 2025) ................................................47

*Griffith v. Dep't of Pub. Works*,
  296 P.2d 838 (Cal. Dist. Ct. App. 1956) ......................................73

*Hicks v. Feiock*,
    485 U.S. 624 (1988)................................................................56, 66

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015)........................................................................64

*In re Grand Jury*,
    23 F.4th 1088 (9th Cir. 2021) ...............................................48, 49, 50

*In re Kellogg Brown & Root, Inc.*,
    756 F.3d 754 (D.C. Cir. 2014)..............................................49, 50, 51

*In re Pac. Pictures Corp.*,
    679 F.3d 1121 (9th Cir. 2012) ......................................................50

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
    774 F.3d 935 (9th Cir. 2014) ...........................................................40, 44

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
    512 U.S. 821 (1994)............................................................56, 57, 66

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ........................................................57

*Lemon v. Kurtzman*,
    411 U.S. 192 (1973)........................................................................57

*McComb v. Jacksonville Paper Co.*,
    336 U.S. 187 (1949)..................................................................*passim*

*Milliken v. Bradley*,
    418 U.S. 717 (1974)....................................................................57, 58

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)........................................................................69

*Nat'l Abortion Fed'n v. Ctr. for Med. Progress*,
    926 F.3d 534 (9th Cir. 2019) ........................................................66

*NLRB v. Deena Artware, Inc.*,
    361 U.S. 398 (1960)........................................................................42

*Obrey v. Johnson*,
 400 F.3d 691 (9th Cir. 2005) ..............................................51

*Oracle USA, Inc. v. Rimini Street, Inc.*,
 81 F.4th 843 (9th Cir. 2023) ...........................................7, 35

*Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of Calif.*,
 475 U.S. 1 (1986)..........................................................69, 70

*Parsons v. Ryan*,
 949 F.3d 443 (9th Cir. 2020) ...........................55, 56, 58, 66

*Penthouse Int'l, Ltd. v. Barnes*,
 792 F.2d 943 (9th Cir. 1986) ..............................................52

*Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v.
 Labrador*,
 122 F.4th 825 (9th Cir. 2024) .............................................76

*Ruckelshaus v. Monsanto Co.*,
 467 U.S. 986 (1984)...........................................................64

*S.E.C. v. Hickey*,
 322 F.3d 1123 (9th Cir. 2003) ............................................54

*Schering Corp. v. Ill. Antibiotics Co.*,
 62 F.3d 903 (7th Cir. 1995) ...............................................42

*Schmidt v. Lessard*,
 414 U.S. 473 (1974)...........................................................44

*Simon v. City & Cnty. of San Francisco*,
 2024 WL 4314207 (N.D. Cal. Sept. 26, 2024)...................44

*Spinner Corp. v. Princeville Dev. Corp.*,
 849 F.2d 388 (9th Cir. 1988) ..............................................72

*Stone v. City & Cnty. of San Francisco*,
 968 F.2d 850 (9th Cir. 1992) ..............................................59

*Taggart v. Lorenzen*,
 587 U.S. 554 (2019)......................................................45, 46

*Terminal R.R. Ass'n v. United States*,
266 U.S. 17 (1924) ...................................................................40

*Trump v. CASA, Inc.*,
606 U.S. __ (2025) ..............................................................75, 76

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ...............................................................54

*United States v. Colgate & Co.*,
250 U.S. 300 (1919) ...................................................71, 73, 74

*United States v. DAS Corp.*,
18 F.4th 1032 (9th Cir. 2021) ...........................................41, 43

*United States v. Gementera*,
379 F.3d 596 (9th Cir. 2004) .................................................75

*United States v. Powers*,
629 F.2d 619 (9th Cir. 1980) ...........................................66, 67

*United States v. Sanmina Corp.*,
968 F.3d 1107 (9th Cir. 2020) ...............................................47

*United States v. Walker River Irrigation Dist.*,
890 F.3d 1161 (9th Cir. 2018) ...........................................76, 77

*Whaley v. Belleque*,
520 F.3d 997 (9th Cir. 2008) .................................................72

*Wolfard Glassblowing Co. v. Vanbragt*,
118 F.3d 1320 (9th Cir. 1997) ...............................................58

## Statutes & Rules

Fed. R. Civ. P. 60(b) .........................................................70, 71

Fed. R. Civ. P. 65(d) ...............................................................43

## Other Authorities

*Black's Law Dictionary* (10th ed. 2014).................................36, 38

ix

Kif Leswing, *Apple can no longer force developers to use in-app purchasing, judge rules in Epic Games case* ...................................................77

Principal and Response Brief for Apple, *Epic Games, Inc. v. Apple Inc.*, D.E.80, No. 25-2935 ......................................................................11, 74

## INTRODUCTION

The district court's September 10, 2021 Injunction (the "Injunction"), which this Court already affirmed, gave Apple a simple and clear mandate: stop prohibiting iOS app developers from using buttons, links or other calls to action to steer consumers to alternative payment solutions outside their apps. 1-ER-5-8. The Injunction was based on extensive factual findings, after trial, that Apple's rules prohibiting such buttons, links or other calls to action (the "Anti-Steering Rules") unfairly prevented consumers from making informed choices about where and how to buy digital goods. This raised developers' costs, blocked competing payment providers and insulated Apple's extraordinarily high profits from competition. *Id.* To address this, the Injunction required Apple to remove the obstacles to competition Apple had erected in the Anti-Steering Rules. 1-ER-17; 1-ER-28; 1-ER-62.

Apple had years to plan its response to the Injunction. 1-ER-4. But Apple did not use that time to plan for compliance. Instead, Apple spent months analyzing and developing a plan to violate and circumvent the Injunction. *See, e.g.*, 1-ER-3. Apple removed the Anti-Steering Rules, but in their place imposed a complex set of restrictions and conditions (the "Link Entitlement Program" or "Program") to block steering as effectively as the Anti-Steering Rules did. 1-ER-14. Apple did this because it knew that the steering mandated by the

1

Injunction would allow some developers and consumers to switch away from Apple's In-App Purchase ("IAP"), raising a competitive threat that would drive down Apple's supracompetitive 30% commission. 1-ER-63-64.

In short, Apple designed the Program to fail. 1-ER-3-4. Apple's Program included a gantlet of obstacles that separately and jointly prevented steering, blocked competition and protected Apple's bottom line. *Id*. *First*, for the first time in its history, Apple imposed a commission on out-of-app transactions. This commission applied to *all* out-of-app purchases, for the next seven days, by any consumer who clicked a steering link. 1-ER-15. Apple set the commission at 27%—a rate that Apple "reverse engineer[ed]" to make steering *more expensive* for developers than IAP's 30%, because it knew that even the largest, most cost-efficient developers pay more than 3% to process their own payments. 1-ER-18-19, 61. Apple thus sought to *increase* developers' cost, contrary to the Injunction's express intent to create downward pricing pressure—which Apple witnesses understood and acknowledged. *Id.* Apple imposed this commission not to obtain compensation for its services or intellectual property, but to prevent steering altogether. *Id.*

*Second*, although Apple knew that the commission alone would block steering, Apple CEO Tim Cook decided to take a belt-and-suspenders approach and impose further restrictions. 1-ER-30-34. In direct contravention of the

2

Injunction's plain text, Apple prohibited the use of "buttons" and "other calls to action", restricting steering to "links" with language that Apple dictated and that Apple had sole discretion to approve or reject.  1-ER-32-33, 42.

*Third*, Apple implemented restrictions on link placement, design and content to hide the links from consumers.  1-ER-34.  Among other things, Apple prohibited developers from including links in the "buy flow"—the exact place consumers would expect to see their payment options.  It forced developers to bury the links elsewhere in their apps, where users making a purchase would not find them.  1-ER-30-31.

*Fourth*, Apple required developers to display "scare screens" every time a user clicked an out-of-app purchase link, to make steering appear dangerous and deter consumers from completing purchases.  1-ER-35-40.

*Fifth*, to further increase "breakage"—Apple's term for users abandoning purchases mid-stream—Apple required developers to use static links that take users to a generic web page, where they need to sign in and then navigate manually to the purchase they wish to make, rather than dynamic links that would take users right to the purchase page for the desired item.  1-ER-40-42.

*Sixth*, Apple targeted the largest, most sophisticated video streaming and news developers that it knew were most likely to steer and threatened them with the loss of millions of dollars in discounts if they used steering.  1-ER-43-44.

3

Apple's express purpose was to use these discounts as an exclusivity "tool" to keep these developers on IAP.  1-ER-44.

*    *    *

Apple's non-compliance Program succeeded:  no developer ever steered under Apple's Program, and the Injunction became a dead letter.  1-ER-46. To make matters worse, Apple took deliberate efforts to hide its disobedience.  On the day the Injunction became effective, Apple submitted a so-called "Notice of Compliance" purporting to show why the Program complied with the Injunction and served legitimate business goals.  1-ER-12; 4-ER-749 (the "Notice of Compliance").  Its executives and managers then testified, under oath, about Apple's "compliance".  1-ER-12-13.  But even without discovery, that testimony was not credible.  When Apple was forced to produce internal documents, the documents showed that Apple's "compliance" was a made-for-litigation sham. Apple's plan was to block steering, not enable it.  1-ER-3.

Apple's Notice of Compliance—and subsequent filings made in defense of its Program—did not reflect Apple's real decision-making process. That process was instead recorded in a series of "Price Committee" presentations and related documents, 1-ER-15-25, which Apple tried to hide.  Apple spent months delaying and then withholding those documents through baseless privilege claims.  1-ER-12-14.  Apple's attempt to conceal and falsify the real facts about its

4

Program would not have been uncovered without the extensive efforts of three special masters, the magistrate judge and the district court—and the persistence of a determined litigant like Epic. *Id.* For Apple, this obstruction was a win-win situation: each day that it delayed compliance was another day it continued to profit from its unlawful conduct. 2-SER-279.

Eventually, both testimony and the extensive documentary record proved, by clear and convincing evidence, that Apple violated the Injunction—and that it did so knowingly and purposefully. 1-ER-63-64. Yet Apple's attempts to evade responsibility for its contempt continue in this Court, where it again presents an alternative version of the facts, completely untethered from the evidence and findings below. None of Apple's challenges comes close to showing that the district court made any error, much less a reversible abuse of discretion. The extent, effectiveness and brazenness of Apple's contempt required the district court to use its equitable discretion to enforce the Injunction to stop that conduct. The district court did so by identifying the specific conduct through which Apple violated the Injunction and ordering Apple to cease that conduct. 1-ER-76-77.

Finally, Apple's attempt to annul the Injunction is unavailing. *Beverage v. Apple* does not hold or even suggest that Apple's Anti-Steering Rules are lawful. Rather, Apple opportunistically misreads the *Beverage* decisions, and its arguments contradict Apple's filings in the *Beverage* case itself.

5

## STATUTORY AND REGULATORY PROVISIONS

Apple's Addendum reproduces the pertinent statutory and regulatory provisions.

## JURISDICTIONAL STATEMENT

Epic agrees with Apple's jurisdictional statement, except Epic disagrees with Apple's contention that the district court's order granting Epic's Motion to Enforce (the "Enforcement Order" or "EO") should be viewed as having modified the Injunction but agrees this Court would have jurisdiction on that basis.

## STATEMENT OF ISSUES FOR REVIEW

1.    Whether the district court abused its discretion in finding Apple in contempt by considering (a) Apple's violation of the Injunction's express terms and intentional frustration of the Injunction's purposes; and (b) Apple's efforts to deceive the district court.

2.    Whether the district court abused its discretion by considering contemporaneous documents recording Apple's financial and technical planning, while redacting and not considering portions of such documents reflecting legal advice.

3.    Whether the district court abused its discretion in issuing an EO that requires Apple to cease the conduct Apple engaged in to violate and/or circumvent the Injunction.

6

4.      Whether the district court abused its discretion in declining to vacate the Injunction based on *Beverage v. Apple*, 320 Cal. Rptr. 3d 427 (Ct. App. 2024).

## STATEMENT OF THE CASE

Apple ignores the district court's factual findings and the contemporaneous documentary record, in favor of a fictional recounting of its response to the Injunction that the district court already rejected as false.  For example, Apple claims that it based its new commission for linked purchases on a report obtained from Analysis Group (the "AG Report").  (Br.15.)  But based on Apple's own documents, the district court found that the AG Report "did not materially factor into Apple's decision-making process", that "Apple's reliance thereon is a sham" and that the AG Report was "created as a show piece for the Court".  1-ER-61.  It further found that Apple's testimony about the AG Report was "replete with misdirection and outright lies".  1-ER-26.

On appeal, this Court defers to the "district court's view of the facts" unless that view is "clearly erroneous".  *Oracle USA, Inc. v. Rimini Street, Inc.*, 81 F.4th 843, 854 (9th Cir. 2023).  Besides a handful of half-hearted quibbles, Apple does not argue clear error.  Accordingly, Epic presents below the relevant facts found by the district court and proven by the supporting evidence.

7

## I.   Epic and Its Case Against Apple.

Epic is a leading developer of video games such as *Fortnite* and of 3D graphics engine technology.  5-ER-802, 804.  Epic also operates the Epic Games Store, which distributes Epic's and third parties' apps.  5-ER-812-15.  And Epic provides a payment solution that developers with apps on the Epic Games Store may (but are not required to) use for in-app purchases.  5-ER-814.

On August 13, 2020, Epic sued Apple, alleging violations of the Sherman Act, Cartwright Act and California's Unfair Competition Law ("UCL").  4-SER-562.  Epic challenged portions of Apple's Developer Program License Agreement (the "DPLA") and the accompanying App Review Guidelines (the "Guidelines").  *Id*.  Among other things, Epic challenged Apple's requirement that developers use Apple's IAP for all purchases of digital content within iOS apps, with Apple charging up to a 30% commission.  *See, e.g.*, 4-SER-591-602.  Epic also challenged the Anti-Steering Rules.  5-ER-829-33.  Specifically, the Guidelines, which are binding on all developers, prohibited developers from including in their apps "buttons, external links, or other calls to action that direct customers to purchasing mechanisms other than" IAP.  5-ER-829.

## II.     The District Court's 2021 Order and Injunction.

On September 10, 2021, after a sixteen-day trial, the district court issued a Rule 52 Order After Trial on the Merits (the "Rule 52 Order"), which rejected Epic's Sherman Act challenge to the IAP requirement for purchases *within* iOS apps but found that Apple's Anti-Steering Rules regarding purchases *outside* iOS apps violated the UCL.  5-ER-799; 5-ER-961-62.

The district court found that Apple's Anti-Steering Rules improperly insulated Apple from competition by preventing developers from "communicat[ing] lower prices on other platforms either within iOS or to users obtained from the iOS platform" and that Apple's conduct "'threaten[ed] an incipient violation of an antitrust law' by preventing informed choice among users of the iOS platform".  *Id.*  The court explained that "[i]n the context of technology markets, the open flow of information becomes even more critical ... [because] information costs may create 'lock-in' for platforms", and "the ability of developers to provide cross-platform information is crucial" to facilitate competition.  5-ER-962.  As a result of Apple's Anti-Steering Rules, "competition is not driving the commission rate", allowing Apple to extract "excessive operating margins".  5-ER-961.[1]

---

[1] The district court also found that Apple's 30% commission was "set by historic gamble [that] has apparently allowed [Apple] to reap supracompetitive

9

Along with the Rule 52 Order, the district court issued the Injunction barring Apple from enforcing its Anti-Steering Rules. 4-ER-796. The court found that through the Anti-Steering Rules, "Apple contractually enforces silence … and gains a competitive advantage". 5-ER-964. Thus, an "injury has occurred and continues and can best be remedied by invalidating the offending provisions". *Id.* Mirroring the language in the Guidelines quoted above (*see supra* § SOTC.I), the Injunction "restrained and enjoined" Apple "from prohibiting developers from … including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms" other than IAP. 4-ER-796.

## III. This Court's Affirmance.

Both parties appealed. This Court held that the district court did not clearly err in holding that Apple's 30% commission for in-app purchases was supracompetitive. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984-85 (9th Cir. 2023) ("*Apple II*"). And it likewise accepted the district court's assessment that "Apple has for years charged a supracompetitive commission on App Store transactions that it set 'without regard' for competition. That commission, in turn,

---

operating margins". 5-ER-890. "Apple has actually never correlated the value of its intellectual property to the commission it charges." 5-ER-892. In fact, "the record is devoid of evidence that Apple set its 30% commission rate as a calculation related to the value of its intellectual property rights". 5-ER-912.

creates an 'extraordinarily high' operating margin of 75% for App Store transactions." *Id*. at 971.

Apple "d[id] not directly challenge the district court's application of the UCL's tethering and balancing tests to the facts of this case", *id.* at 1001, but made two legal arguments relevant here. *First*, Apple argued that Epic's loss on the federal claims precluded UCL liability for the same conduct. *Id.* This Court found Apple's position contrary to California law. While a "categorical legal bar" that affirmatively immunized the conduct under federal law would preclude UCL liability, a "proof deficiency" (as the Court found here) does not. *Id.*

*Second*, Apple argued that Epic lacked standing to obtain the full scope of the Injunction because Epic was not entitled to obtain "relief for anyone other than Epic". (Principal and Response Brief for Apple, *Epic Games, Inc. v. Apple, Inc*., D.E.80 at 109-11, No. 25-2935.) This Court again disagreed, finding that applying the Injunction to Apple's treatment of all developers was necessary to provide complete relief for *Epic's* injuries: "Because Epic benefits ... from consumers of other developers' apps making purchases through the Epic Games Store, an injunction limited to Epic's subsidiaries would fail to address the full harm caused by the anti-steering provision." *Apple II* at 1003.

This Court upheld the Injunction and later stayed it pending Apple's ultimately unsuccessful petition for certiorari. 1-ER-9 n.4.

11

## IV.    Apple's Response.

Immediately after the Injunction issued in 2021, Apple began discussing how it would respond.  1-ER-15.  Apple had never before in its history imposed a commission on purchases made outside an app.  1-ER-15.  But in response to the Injunction, Apple employees "raised the question of whether imposing a commission on linked-out purchases is a permissible option", 6-SER-1215-16, and noted the district court "opinion needs to be taken into account; charging for commission – is it fine to do?!".  1-ER-15-16 (citing 8-SER-1591-92).

Apple paused its Injunction-response planning when this Court stayed the Injunction but renewed its efforts after this Court's affirmance in April 2023. 1-ER-16.  When it resumed planning, Apple considered two options.  Under Proposal 1, Apple would not charge a commission on linked purchases but would restrict the design and content of links and prohibit developers from placing links in the product purchasing flow, where customers would be most likely to find them.  1-ER-16-17 (citing 3-ER-389).  Under Proposal 2, Apple would allow developers more flexibility to choose the link's placement, design and content but would charge a brand new out-of-app commission.  1-ER-16-17 (citing 3-ER-393).

Phil Schiller, who was in charge of the Injunction-response plan, had serious concerns about charging a commission, which he communicated to other

Apple employees, 1-ER-22; 6-SER-1073, stating in one email "I am not on team commission/fee" and "I have already explained my many issues with the commission concept", 1-ER-22 (citing 2-ER-263).  On the witness stand, Schiller confirmed that one of his "concerns" was that Apple was "not allowed to charge a commission".  6-SER-1089.

 In considering whether to introduce a new commission, "Apple investigated the landscape, knew how it would harm developers, and understood it would not comply with the goal of the Injunction".  1-ER-23.  Apple modeled "that as of May 2023 the revenue impact of a no-commission option with placement restrictions (Proposal 1) posed a significantly larger hit to Apple than the impact of a 27% commission option without placement restrictions (Proposal 2)".  1-ER-18. Apple understood that the Injunction was intended to create "competitive pressure on IAP", but Apple treated the introduction of effective competition to IAP as a "risk factor" that Apple needed to mitigate.  1-ER-17.  Apple was also concerned that if it "adopted a no-commission approach on link-outs in the United States, it would be harder to justify a commission elsewhere in the world".  1-ER-17 n.16. Apple CFO Luca Maestri thus advocated for imposing a commission.  1-ER-22. Cook sided with Maestri and overruled Schiller's warnings, leading Apple to impose a new 27% commission on out-of-app purchases.  1-ER-23-24.  Apple

applied this new commission to *all* out-of-app purchases made within seven days after a user clicks on an external link.  1-ER-15.

Apple arrived at 27% by taking its 30% commission on in-app purchases and implementing a 3% "cost of payments discount".  1-ER-20 (citing 3-ER-521).[2]  At least one major developer, Bumble, "explained to Apple that a '3% discount' was not economically viable for a developer because the external cost of payments exceeds 3%".  1-ER-18-19 (citing 9-SER-1896); *see also* 3-ER-519.  That was consistent with Apple's own analysis, which showed that "external costs of payments for developers on link-out purchases would exceed Apple's 3% discount".  1-ER-19 (citing 9-SER-1930); *see also* 7-SER-1352-53.  Indeed, Apple knew that these external costs—payment processing fees, fraud detection and customer service costs—would be "significantly higher" than 3% for its largest developers and even more for smaller developers.  1-ER-18 & n.21 (quoting 9-SER-1896).

Apple considered and discussed charging lower commissions but "struggled to land on ironclad pricing rationales".  1-ER-22-23 (citing 10-SER-2063-64).  Ultimately, it rejected any lower commission, because charging

---

[2] In reality, this was not a "discount" from an existing price.  It was a brand new charge on out-of-app transactions that had previously been commission-free.  1-ER-3, 8.

less "doesn't represent a material improvement in the logical grounding relative to the 27%, continues to place the lion's share of the financial risk and calculus on Apple, and just makes us less money". *Id.*

On top of the 27% commission from Proposal 2, Apple also imposed the most stringent restrictions on placement, design and content it had considered as part of Proposal 1, making its Program the worst of all worlds. 1-ER-29. Apple did so knowing that "more restrictive … rules about how developers can format links" would make it "less likely those links would be seen and used"—and therefore "lower a developer's link-out share and adverse impact on Apple's revenue". 1-ER-28-29.

While it was weighing the two Proposals, Apple was also determining how to optimize for "breakage" in the use of external purchase links, *i.e.*, maximize "customer[s] drop[ping] off during the buy-flow process due to a less seamless experience compared to Apple's IAP". 1-ER-35. Apple understood that external links create more breakage than IAP because they require the extra steps of exiting the app and transitioning to a web browser. *Id.*; 2-ER-277. To prevent steering, Apple modeled "the tipping point where external links would cease to be advantageous for developers due to friction in the purchase flow", 1-ER-35, and then designed its Link Entitlement Program to meet or exceed that tipping point, recognizing that "increased friction decreases competition". 1-ER-40.

15

*First*, Apple designed "a warning message, referred to as a 'scare screen,' to deter users from using third-party payment options".  1-ER-35.  When designing the scare screen, Apple employees egged each other on to make the warning screen appear as "scary" to consumers as possible, because Apple "execs will love it".  1-ER-37 (citing 1-SER-41; 6-SER-1186).  Apple also considered different "[w]arning [o]ptions" involving "escalating levels of warning messages".  1-ER-36.  Apple ultimately chose the "most anticompetitive option" of a "full screen takeover", 1-ER-37-38; 2-ER-99, with Cook personally directing the addition of even more dire language, 1-ER-39; 2-ER-352.  The final version is depicted below:



2-ER-99.

        *Second*, Apple increased breakage by prohibiting dynamic links,

which would send users to a personalized webpage displaying the item the user

wished to purchase with the user already logged into her account.  1-ER-40.  Under

the Link Entitlement Program, Apple required developers to use a static link that

instead would send users to a generic page where they would need to log in and

then find the item they wished to purchase.  *Id.*

Apple also made certain developers ineligible for the Link Entitlement Program. 1-ER-43-45. Developers in Apple's Video Partner Program ("VPP") and News Partner Program ("NPP") had a commission of 15% instead of 30% during the first year of subscriptions. 1-ER-44. Apple decreed that if VPP or NPP developers used steering links, they would lose that discount. *Id.* Apple did this because it knew that "very large developers like those participating in VPP and NPP were the most likely to use linked purchases if Apple charged a commission". *Id.* Thus, Apple intended VPP/NPP to be a "tool for retaining developers exclusively on Apple IAP", preventing some of the most valuable app developers from steering. *Id.* (citing 9-SER-1764; 7-SER-1391).

Ultimately, Apple enacted "an elaborate new scheme that [was] guaranteed to continue extracting excessive commissions from developers and prevent developers from 'communicat[ing] lower prices on other platforms'". 4-ER-726 (internal citation omitted). Under this scheme, Apple:

- imposed a new 27% commission on all out-of-app purchases occurring within seven days of a user's clicking on a steering link;

- imposed strict restrictions on the placement and design of the links, including by (i) prohibiting the placement of links near items offered for purchase and (ii) prohibiting the use of buttons or other graphic elements;

- required developers to introduce purchase flow friction, including by presenting a full-page "scare screen" to dissuade users from proceeding with out-of-app purchases and by mandating the use of static links instead of dynamic links;

18

- prohibited calls to action that did *not* include a link (*e.g.*, a sentence indicating that purchases are available on the developer's website) and limited developers to using a few pre-ordained templates to communicate with users; and

- prohibited developers participating in other programs (VPP and NPP) from using links at all.

1-ER-14.

## V.    Apple's Notice of Compliance.

On January 16, 2024, the Supreme Court denied Apple's certiorari petition, 2-SER-428, at which point the Injunction became effective.  That same day, Apple filed its Notice of Compliance contending that it had updated its policies to comply.  4-ER-749.

## VI.    Epic's Motion to Enforce.

On March 13, 2024, Epic filed a Motion to Enforce Injunction. 4-ER-720 (the "Motion to Enforce").  Epic argued that the Link Entitlement Program both violated the letter of the Injunction and was a transparent attempt to thwart its effectiveness.  *Id.*  Epic sought an order finding Apple in civil contempt and requiring "Apple to promptly bring its policies into compliance with the Injunction".  4-ER-727.

## VII.    The Evidentiary Hearing and Apple's Document Production.

After full briefing, the district court found that Epic "made a sufficient preliminary showing that, viewed holistically, Apple's practice changes undermine

the spirit of the injunction by limiting competition, impeding the free flow of information, and constraining user choice" and ordered an evidentiary hearing. 4-ER-717, 719.

The first phase of the hearing began on May 8, 2024, and lasted for six court days. "[A]s testimony unfolded and Apple attempted to justify its response", the district court "became increasingly concerned that Apple was not only withholding critical information about its business decision for complying with the Injunction, but also that it had likely presented a reverse-engineered, litigation-ready justification for actions which on their face looked to be anticompetitive". 1-ER-12-13. Thus, the district court ordered Apple to produce all documents related "to the decision-making process leading to the link entitlement program and associated commission rates". 2-SER-371.

Out of approximately 150,000 responsive documents, Apple withheld approximately 57,000 on assertions of privilege and work product. 1-ER-13. Epic raised with the magistrate judge concerns about Apple's unusually high withholding rate, highlighting 11 exemplar documents that Epic believed were indicative of systemic over-use of privilege to shield documents from production. 2-SER-363-64; 1-ER-13. The magistrate judge overruled virtually all of Apple's privilege claims Epic had challenged in those documents. 2-SER-358-61; 1-ER-13. Apple appealed to the district court, arguing that many of the documents

20

were privileged "as they were drafted *because of* the very litigation here" and served a dual legal and business purpose.  2-SER-354.  The district court rejected this argument and upheld the magistrate judge's determinations in full, finding that "many of Apple's claims d[id] not even rise to the level of 'dual purpose'" but were pure business communications.  4-ER-644; 1-ER-13.

Apple was forced to agree to re-review the documents and submit all privilege assertions it maintained to a panel of special masters.  1-ER-13.  Apple then produced 30,104 documents it had previously withheld for privilege (nearly 56% of those re-reviewed), having concluded that they were not privileged under Ninth Circuit law and "should have never been withheld in the first instance".  *Id.*; 2-SER-340-41; 1-ER-13 & n.8.  Of those, Apple conceded that 24,103 documents (or 42.1% of the documents over which it originally asserted privilege) were not privileged under *any* standard, and thus were not properly withheld.  Apple maintains 7,059 documents are privileged under the D.C. Circuit standard it urges the Court to adopt in this appeal.  2-SER-340-41.

In addition to over-withholding for privilege, the magistrate judge found that Apple had engaged in "bad behavior" by delaying its document production to forestall the resumption of the contempt proceedings.  1-ER-13-14; 2-SER-370 ("[T]his document production is all downside for Apple .... It is not in Apple's interest to do any of this quickly.  This is a classic moral hazard.").  Put

21

simply: for Apple, "delay equaled profits". 1-ER-13. The district court eventually found that Apple's "dilatory tactics were unwarranted, wasted party and judicial resources, and delayed the Court's ability to effectuate relief". 1-ER-66.

While discovery was ongoing, Apple filed a motion for relief from judgment under Federal Rule of Civil Procedure 60(b). 4-ER-666. In relevant part, Apple argued that a California decision, *Beverage v. Apple*, had changed California law in a way that invalidated the Injunction. 4-ER-666.

The evidentiary hearing resumed on February 24, 2025 and lasted for three additional court days. 1-ER-14.

## VIII. The Enforcement Order.

On April 30, 2025, the district court issued its EO, finding "Apple in willful violation of this Court's 2021 Injunction which issued to restrain and prohibit Apple's anticompetitive conduct and anticompetitive pricing". 1-ER-2. The district court found that Apple's Link Entitlement Program was designed "to dissuade customer usage of alternative purchase opportunities and maintain its anticompetitive revenue stream". 1-ER-3. Specifically, the district court found that Apple intentionally devised a scheme to prevent developers from steering and both violated the text and frustrated the purpose of the Injunction. 1-ER-63-64.

### A.    Apple Imposed a Commission To Prevent Use of the Link Entitlement Program.

The district court found that Apple violated the Injunction by imposing a commission—for the first time ever on out-of-app transactions, 1-ER-15—in order to "foreclose competitive alternatives", 1-ER-61.  Apple calculated that at 27%, the commission would "dissuade any real developer participation" in steering, "to Apple's economic advantage".  1-ER-19.  Thus Apple's "commission rate, on its own, forecloses a developer's use of link-out purchases".  1-ER-64.[3]  The commission also ensured that developers could not offer lower prices on out-of-app purchases, making links less attractive to users. *Id.*

As explained above, the district court also determined that Apple falsely testified about the AG Report.  In May 2024, Apple witnesses testified that the decision to charge a 27% commission was "based on" an analysis—supported by AG—that purported to establish the value of services provided to developers who steer.  5-ER-1050; 6-ER-1134-35.  The district court found that this testimony was false and that the AG Report was a "made-for-litigation" sham.  1-ER-60.  The

---

[3] Apple contested that the commission was 27%, arguing instead that its "effective commission" was 18% based on assumptions about out-of-app purchases a consumer would make after the expiration of the seven-day commission period.  (Br.15-16.)  The district court found no evidence showing that Apple actually selected its rate on that basis.  1-ER-20 n.25.

court also found that Apple misrepresented when it made its decision on what commission to charge. 1-ER-26-27. Apple finance executive Alex Roman testified that "up until January 16, 2024"— the day the Injunction became effective—"Apple had no idea what" fee "to impose on linked purchases". 1-ER-26 (quoting 5-SER-812). Based on contemporaneous documents, as well as the implausibility of Apple's making such a significant decision that very day, the district court rejected that testimony as false and found that, as of July 2023—well before the AG analysis was completed—"the decision had been made, and all else being equal, nothing would change"; "[t]o suggest otherwise was to manifest an intent to mislead, misdirect and lie". 1-ER-26-27 & n.34.

### B. Apple Used Link Placement, Design and Content Restrictions To Prevent Steering.

The district court found that Apple's restrictions on link placement, design and content violated the Injunction by preventing effective steering. 1-ER-27-34.

*Placement.* As noted above, Apple prohibited developers from placing an external link "on any page that is part of an in-app flow to merchandise". 1-ER-30. In other words, Apple prohibited purchase links in the places where users make purchases. As the district court found, "the most useful time for a user to know their purchase options" is "precisely when Apple instruct[ed] developers that they *cannot* share alternative purchase information

24

with users".  1-ER-31.  The district court thus found that Apple's restrictions on link placement "present[ed] serious problems for developers' ability to compete with Apple's IAP and Apple knew it".  *Id.*  The court found Apple's assertion that this restriction "protect[s] against 'security risks'" to be an "attempt[] to mislead". *Id.*  "Given the lack of any document identifying this alleged concern, the Court finds these justifications pretextual; said differently, the proffered rationales are nothing more than after-the-fact litigation posturing or outright misrepresentations to the Court."  1-ER-32.

    ***Design.***  The district court found that the Link Entitlement Program's significant restrictions on link design were also intended to make steering prohibitively difficult.  1-ER-32-34.  For example, the court found that Apple knew "the Injunction requires that '[d]evelopers must be able to ... format these prompts as buttons or other calls to action, not just blue HTML links'".  1-ER-32.  But Apple prohibited any link that "appears to be a 'button,' by the ordinary usage and understanding of the word".  1-ER-33.  The "plain style" design that Apple did allow "is the least visually prominent of the button styles that Apple's guidelines provide" and is not a "button" under any reasonable understanding of that word, *id.*

(citations omitted), as shown below:



1-ER-34 (only permitted style in red enclosure).  At the hearing, an Apple

executive "could think of no other reason to require developers to use a

plain-link-style 'button' other than to stifle competition".  1-ER-34 (citing

5-SER-777, 778).

### C.    Apple Increased Purchase Flow Friction with Scare Screens.

The district court found that Apple used "purchase flow friction" in

the form of scare screens to prevent users who clicked external links from

completing purchases.  1-ER-35-40.  As the district court found, "friction in

transactions matter", 1-ER-29, and "Apple understood, and used to its advantage,

that the more friction in a purchase flow, the more breakage a developer faces",

1-ER-35.

26

With respect to the scare screen, the district court found that "Apple chose the most anticompetitive option, namely the full screen takeover", 1-ER-37, which was designed to "chill[] consumer conduct", 1-ER-40.  The court rejected Apple's contention that it imposed the scare screen to protect user security and privacy, noting internal discussions about how to make the scare screen "even worse" to frighten away users.  1-ER-37-38.  The court also noted that external links that compete with IAP were being singled out, whereas Apple "does not require developers selling physical goods to display any warning at all before users proceed to make a payment with a third-party payment solution".  1-ER-35 (citing 5-SER-764).

### D.    Apple Used Static Links to Increase Purchase Flow Friction.

The district court found that Apple intentionally required the use of static links because "static URLs can introduce friction in a purchase flow where dynamic URLs do not".  1-ER-40.  Again, Apple made that choice because "increased friction decreases competition".  *Id.*  The district court rejected Apple's argument that "the static URL requirement protects users' security and privacy", 1-ER-41, finding it pretextual because Apple allowed developers to "program dynamic links for any other purpose"—but prohibited dynamic links *only* when they compete with IAP.  1-ER-41.

### E.    Apple Prohibited Other Calls to Action.

The district court found that—in violation of the Injunction's requirement that Apple permit "buttons, external links, or other calls to action"—Apple prohibited all "calls to action" other than links. 1-ER-42. "Despite testimony to the contrary", Apple was aware that "developers would like to include calls to action directing users to their websites, including through text without a link". 1-ER-42-43. But the district court found that Apple recognized "unlinked and unrestricted calls to action could foster competition against Apple's IAP by causing customer migration to developer websites". 1-ER-43. To avoid this revenue hit, Apple prohibited all such unlinked calls to action, in direct contravention of the Injunction. 1-ER-42.

The district court further found that, even with links, Apple prohibited any text other than prescribed template language, 1-ER-42, which impacted developers' ability to communicate competitive alternatives to their customers—and further violated the Injunction's requirement that Apple permit "other calls to action". For example, "[i]f a developer wanted to compete on price not by offering lower prices but by offering other products or benefits on the web, there is no way to communicate that to a user in-app" under the Link Entitlement Program. *Id.*

28

### F.    Apple Excluded the Largest Developers from the Program to Protect Its Bottom Line.

The district court found that Apple "specifically excluded certain developers, namely those in" VPP and NPP, from the Program.  1-ER-43-45.  Put simply, for VPP and NPP developers, "including an external purchase link in their app doubles their commission rate".  1-ER-44.  The district court found that "this loss of program benefits highlights Apple's clear design to forbid competitive alternatives to IAP".  1-ER-45 n.49.

### G.    Developers Did Not Adopt the Link Entitlement Program.

The district court found that, as Apple intended, developers did not adopt steering links.  1-ER-45-46.  As of May 2024, "only 34 developers out of the approximately 136,000 total developers on the App Store applied for the [P]rogram, and seventeen of those developers had not offered in-app purchases in the first place".  1-ER-46.  While Apple argued that "it would take more time for developers to take advantage of the Link Entitlement and that the adoption rates could not be known", *id.* (citing 5-SER-858; 5-SER-978-79), the district court found this was another area in which Apple tried to mislead the court.  Apple knew full well "it was choosing a course which would fail to stimulate any meaningful competition to Apple's IAP" in order to "maintain its revenue stream".  *Id.*  And indeed, during the February 2025 evidentiary hearing (almost a year later), Apple did not introduce evidence that *any* developer had adopted steering.  *Id.*

29

### H.    Apple Abused Privilege to Conceal and Mislead.

The district court found that to prevent discovery of documents revealing its decision-making process, Apple intentionally misused the attorney-client privilege.  1-ER-66-68.  "Apple integrated the presence of legal personnel into documentation of business decisionmaking"—and then claimed privilege over those documents—despite the fact the documents "did not involve the provision of legal advice".  1-ER-66.  This reflected "a desire to conceal Apple's real decisionmaking process".  1-ER-67.[4]

### I.    The District Court Issued a Remedy to Prevent Apple from Violating the Injunction.

The district court held Apple in contempt.  To enforce the Injunction, the court enjoined Apple from engaging in six "specific actions Apple took to violate [the] Court's Injunction".  1-ER-77.  The district court imposed this remedy to force Apple to comply and to prevent "a 'whack-a-mole' game to require compliance".  1-ER-58.

The district court observed that further sanctions on Apple may be warranted, but "[d]ue process and a potential punitive sanction require

---

[4] Apple even manipulated how documents were labeled.  For example, an internal lawyer at Apple instructed an Apple businessperson to make what she called a "procedural tweak", which was to change a "Prepared at the Request of Counsel" label to "Prepared at the Request of *External* Counsel", even though external counsel made no such request.  1-ER-66 (emphasis added) (citing 10-SER-2065).

government, not private, involvement". 1-ER-78. The court accordingly referred Apple and Apple witness Alex Roman to the United States Attorney for potential investigation. 1-ER-79. The court took "no position on whether a criminal prosecution is or is not warranted". *Id.*[5]

## SUMMARY OF ARGUMENT

Part I of Apple's brief challenges the scope of the remedies the district court ordered to address Apple's contempt. (Br.25-41.) Part II argues that the district court was wrong to hold Apple in contempt in the first place. (Br.42-62.) This flipping of the order is intentional; Apple asks the Court to consider the district court's enforcement measures in the abstract, untethered from its findings of Apple's scheme to violate and circumvent the Injunction. But context matters. Acting well within its discretion to compel compliance with the Injunction, the district court tailored its EO to the specific conduct in which Apple engaged.

Epic thus addresses Apple's arguments by putting the horse back in front of the cart. In Part I, Epic shows that the district court's contempt finding

---

[5] On April 30, 2025, Apple updated its Guidelines as directed by the EO. Epic notified Apple on May 1, 2025, of its intent to submit *Fortnite* for review and to avail itself of the Injunction and the new Guidelines. Apple refused the submission. Epic thus filed a second motion to enforce, 1-SER-8, and the district court issued a show-cause order and set a hearing. The parties subsequently resolved the matter, and *Fortnite* is now available on the App Store. 1-SER-12-14; 1-SER-7; 1-SER-2.

31

was within the district court's discretion, based on factual findings with ample evidentiary support. *First*, the district court appropriately found that Apple violated the Injunction by continuing to prohibit steering mechanisms that the Injunction expressly required it to allow. Apple did this both explicitly in newly adopted rules and by erecting obstacles that were designed to and did prevent the practical use of steering. (Part I.A.) In making those determinations, the district court appropriately consulted the language of the Injunction, the Injunction's stated purpose and the post-trial findings underlying it.

*Second*, Apple claims that the district court erred by considering Apple's bad faith, but Apple injected its subjective intent into these proceedings by urging the district court to excuse its conduct based on its purported good faith. (Part I.B.) The contemporaneous evidence unequivocally established Apple's bad faith: Apple intentionally sought to violate the Injunction and deceive the district court.

*Third*, the district court properly considered documents that Apple claimed were privileged. (Part I.C.) Apple intentionally misused privilege to try to conceal its misconduct and was caught. Apple initially withheld a trove of documents based on the sweeping claim that *any* communication regarding its response to the Injunction was privileged because it pertained to a court order. The district court correctly applied longstanding Ninth Circuit precedent to reject that

32

radical argument. Apple's call for a change to Ninth Circuit law regarding dual-purpose communications is a red herring, because the core documents Apple identifies are not dual-purpose communications. The documents are multi-page presentations with a handful of discrete pages containing legal advice (which the district court allowed Apple to redact) and multiple dozens of pages containing business and financial advice, which the district court appropriately found not to be privileged. The legal advice is easily severable from the business analysis, so the "dual-purpose" doctrine is not implicated; the presentations contain a mix of legal and business communications that can and should be assessed individually—which is what the district court did, upholding Apple's privilege claims over the legal communications. Regardless, even under the D.C. Circuit's dual-purpose standard for which Apple advocates, Apple's privilege claims would fail or, at best, change only at the margins. It would not have changed the outcome.

In Part II, Epic shows that the district court acted well within its discretion in tailoring the EO to address each specific act Apple employed to violate and circumvent the Injunction. (Part II.A.) Apple first complains about a so-called "zero-commission injunction" that supposedly prevents Apple from receiving compensation for the use of its services or intellectual property (Br.27, 34), but it attacks a strawman. Prior to the Injunction, Apple *never* charged a commission on out-of-app transactions. Apple introduced a new commission in

33

direct response to the Injunction, and that context cannot be ignored. Based on the evidence, the district court found that Apple imposed the new commission on out-of-app transactions to make steering less attractive than using IAP. By doing so, the new commission was intended to—and did—frustrate the Injunction's mandate to allow steering and its purpose to expose IAP to competition. The EO thus prohibits the new charge that Apple used to undermine the very activity that the Injunction was intended to foster. Apple's complaints about judicial rate-setting and the Takings Clause are thus meritless. By contrast, the procedure Apple proposes in its brief would wrongly force the district court to select a rate. And Apple's contention that the EO's commission provision is improperly "punitive" is meritless. Apple was not subjected to sanctions like fines or imprisonment; it was merely ordered to stop engaging in conduct that violated the Injunction.

Apple's complaints about the portions of the EO that prohibit Apple's use of other techniques to deter steering ignore the factual findings. (Part II.B.) The district court correctly found that Apple's privacy and security justifications for the restrictions were pretextual. And Apple's claim that the First Amendment required the district court to permit Apple to interfere with developers' communications to their own users would turn First Amendment law on its head.

Finally, in Part III, Epic responds to Apple's challenges to the validity of the Injunction.  Nothing has changed since this Court last affirmed the Injunction.  The cases Apple relies on merely confirm the law this Court previously (and correctly) applied.

## ARGUMENT

### I.    The District Court Properly Held Apple in Civil Contempt.

A trial court's finding of civil contempt is reviewed for abuse of discretion and its findings of fact for clear error.  *See Oracle*, 81 F.4th at 850.  The district court was well within its discretion to find that Apple violated the express terms of the Injunction and to use its contempt power to stop Apple's attempts to circumvent the order.

#### A.    The District Court Properly Found that Apple Violated the Injunction.

Apple's primary argument against the contempt finding is that the district court relied on violations of the "spirit" of the Injunction rather than its express terms.  Apple claims that, consequently, Apple supposedly did not receive "explicit notice" of what was prohibited.  (Br.43.)  This argument completely ignores the district court's findings that Apple violated the Injunction's express terms.  It is also wrong as a matter of law.

35

1.    **The District Court Found Apple Violated the Injunction's Express Terms.**

The district court found that, "even limited to the four corners of the Injunction, Apple violated the literal text". 1-ER-58. That finding was amply supported. The Injunction expressly "restrained and enjoined" Apple "from prohibiting developers from … including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms" other than Apple's IAP. 4-ER-796. The district court rightly held that Apple "prohibit[ed] developers" from including such steering methods by outright forbidding some of them and by imposing obstacles that made steering so unattractive to consumers and so expensive for developers that the "overall effect" was "quite literally, intentional *de facto* prohibition". 1-ER-34; 1-ER-63 n.66; *see, e.g.*, *Prohibit*, *Black's Law Dictionary* (10th ed. 2014) ("Prohibit" defined to include "To prevent, preclude, or severely hinder").

*First*, Apple prohibited the use of "buttons", a steering method explicitly mandated by the Injunction. 1-ER-63. Although Apple allowed links formatted in what Apple called the "plain" button, that label did not match reality. 1-ER-32. Under Apple's regulations, "plain" buttons "may not be enclosed in a shape that uses a contrasting background fill" but must "match the background of [the] app's page", *id.*—meaning they are just a link, with no graphical delineation. As a result, developers could not use "what their consumers would expect to see as

36

an actual 'button'". 1-ER-34. This was no technical or *de minimis* violation. Apple barred buttons because it knew (and explained elsewhere) that buttons are more "visually prominent" than links and thus more likely to be used. *Id.* Indeed, the Head of the Worldwide App Store could think of no reason for this restriction except "to stifle competition". 1-ER-34 & n.38.

*Second*, Apple prohibited "other calls to action", such as statements in an app (without a link) that purchases are available on the web. 1-ER-63. Apple barely defends this prohibition, noting only that links may "be accompanied by" specified template language. (Br.45.) In other words, Apple admits that calls to action may not appear on their own, without a link. The Injunction barred Apple from prohibiting "buttons, external links, *or other* calls to action". 4-ER-796 (emphasis added). "Calls to action" are distinct from "links"—Apple may not prohibit either.

This violation was also intentional. Documentary evidence revealed that, despite testimony to the contrary, Apple considered allowing "in-app text communications" without a link but concluded that could cost Apple "hundreds of millions" to "over a billion" in revenue "as more customers might migrate to the web with this additional information being presented to them". 1-ER-43. In other words, Apple prohibited "calls to action" because they could spur out-of-app purchases, as the Injunction intended.

37

*Third*, as noted above, the new out-of-app commission so "severely hindered" effective steering as to "prohibit" it. *See, e.g.*, *Black's Law Dictionary*, *supra*, at 1405. That was the commission's intended and actual effect, for which no other reasonable justification was produced.

Moreover, the combination of restrictions in the Link Entitlement Program *as a whole* created a particularly effective prohibition on steering, in direct defiance of the Injunction's literal terms. 1-ER-63-64; *see, e.g.*, *Black Lives Matter Seattle-King Cnty. v. City of Seattle, Seattle Police Dep't*, 516 F. Supp. 3d 1202, 1208–09 (W.D. Wash. 2021) (applying Ninth Circuit law to consider whether party complied "based on the totality of the circumstances"). The district court found that, with the express purpose of frustrating the Injunction, Apple created a series of restrictions and obstacles, including, but not limited to, the commission, that made steering prohibitively expensive and technically infeasible. 1-ER-63-64 & n.66. That combination of restrictions had its intended effect: not a single developer used the Program. The Injunction against "prohibiting" steering clearly gave Apple notice that it could not nominally allow some steering but then impose policies and fees that were intended to, and in fact did, preclude it.

Apple's responses are unavailing. *First*, Apple argues that, rather than "prohibit" steering, its new restrictions merely set "terms, conditions, or guidelines ... designed to promote user safety and privacy and to avoid confusion".

38

(Br.45.)  But the district court found that Apple's safety and privacy justifications were a sham:  the Program had nothing to do with making steering safe and everything to do with preventing steering altogether.  *See, e.g.*, 1-ER-31-32 (safety and privacy rationales for Apple's placement restrictions are pretextual); 1-ER-41 & n.46 (security rationales for static URL requirement are pretextual).

*Second*, Apple asserts the Injunction did not prohibit a commission on linked purchases because this Court and the district court previously observed that Apple could charge a commission even in the absence of IAP.  (Br.46, 51.)  That is deeply misleading.  Those statements were directed at *in-app* transactions—for which Apple still compels the use of IAP and charges a commission.  What Apple cannot do is impose a new commission on *out-of-app* transactions, in response to the Injunction, thereby defeating both its letter and its purpose.  Neither court previously addressed, let alone condoned, such a targeted out-of-app commission. Apple nevertheless protests that the Injunction does not *explicitly* prohibit a commission, but that misses the point.  The Injunction does explicitly enjoin Apple from prohibiting steering—and Apple introduced its new out-of-app commission to do precisely that.  (*See supra* §§ SOTC.IV, VIII.A.)  Indeed, Apple succeeded. Apple nowhere reconciles its suggestion that steering was not prohibited with the fact that no developer *ever* steered pursuant to the Program.  1-ER-46.

39

Apple resists this conclusion by citing this Court's observation at the merits stage that some developers might choose alternative in-app payment solutions *even if* they were subject to a commission. (Br.52.) But that observation simply reflected the fact that developers make decisions based on both price and non-price product features, such that *some* developers might opt for alternatives to IAP if the cost were similar. *Apple II* at 996. But here, Apple made steering *more* expensive than IAP *and* imposed restrictions degrading its quality—so no developer used steering at all. Apple's speculation about a peculiar developer that might wish to pay more for a lower-quality product is unavailing; as real-world experience shows, Apple imposed a *de facto* prohibition.

## 2. The District Court Properly Used Its Contempt Power to Remedy Apple's Deliberate Circumvention of the Injunction.

In addition to addressing Apple's literal violations, the district court properly used its contempt authority to address Apple's effort to circumvent its Injunction. For over a century, courts have construed injunctions "in the light of the issues and the purpose for which the suit was brought". *Terminal R.R. Ass'n v. United States*, 266 U.S. 17, 29 (1924). Thus, "it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded". *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,

40

774 F.3d 935, 949 (9th Cir. 2014).  The district court correctly observed that "other courts within this and other circuits will look to the spirit of the injunction when a litigant applies a dubiously literal interpretation of the injunction, particularly where that interpretation is designed to evade the injunction's goals".  1-ER-58 (citing cases).[6]

Apple argues that, despite these decisions, courts have no contempt authority to deal with evasions that do not violate the express terms of an injunction.  (Br.47-50.)  But the Supreme Court has explicitly rejected that position.  In *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949), the Court explained that "[i]t does not lie in [respondents'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined" when their goal is an obvious evasion of the court's order.  The contrary rule "would give tremendous impetus to the program of experimentation with disobedience of the law which we condemned".  *Id.*

> Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan.  Thereafter the defendants work out a plan that was not specifically enjoined.  Immunity is once more obtained because the new plan was not specifically enjoined.  And

---

[6] Similarly, when a judgment is ambiguous, a court's "obligation is to construe the judgment so as to give effect to the intention of the issuing court, considering the entire record".  *United States v. DAS Corp.*, 18 F.4th 1032, 1041 (9th Cir. 2021) (cleaned up).

41

> so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.

*Id.* at 192-93. If courts were powerless to hold such evasion in contempt, injunctions would "spring loopholes … and parties in whose favor injunctions run will be inundating courts with requests for modification in an effort to plug the loopholes". *Schering Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995) (Posner, C.J.). Accordingly, as Justice Frankfurter once put it, "[e]very affirmative order in equity carries with it the implicit command to refrain from action designed to defeat it". *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 413 (1960) (Frankfurter, J., concurring).

There is nothing unfair in applying these principles here. The district court examined the practices challenged at trial and enjoined what it found unlawful—the then-existing Guidelines against steering. Apple admits that rather than simply eliminate the offending Guidelines, which Apple easily could have done, Apple *chose* to "fill the resulting vacuum" and adopt new conduct. (Br.14.) While Apple contends the district court was powerless to assess whether Apple's replacement rules circumvented the Injunction, the cases cited above say otherwise—as does basic common sense. Apple fully understood this. It knew the Injunction was intended to foster competition to IAP; it identified fulfillment of that purpose as a "risk" to mitigate; and it deliberately designed new rules to prevent steering and the competition it would engender. 1-ER-17.

42

Apple's clear knowledge of the Injunction's goal also answers Apple's argument that it lacked notice under Federal Rule of Civil Procedure 65(d) of what the Injunction prohibited.  (Br.47.)  Rule 65(d) requires only "reasonable detail", which the Injunction provides.  The Injunction expressly bars Apple from prohibiting buttons, links or other calls to action—and longstanding law, against which every injunction must be read, provided Apple ample notice that it could not actively seek to circumvent that prohibition.  The district court "cannot be expected to give [Apple] a cookbook on the specifics of complying with the injunction". *Epic Games, Inc. v. Google LLC*, No. 24-6256, slip op. at 56 (9th Cir. July 31, 2025) ("*Google II*").  To require more would "go well beyond the 'reasonable detail' required by Rule 65(d)". *Id.*

Apple makes much of Rule 65(d)'s requirement that an injunction describe its prohibitions or requirements without "referring to the complaint or other document".  (Br.43 (quoting Fed. R. Civ. P. 65(d)(1)).)  Apple contorts the Rule to mean it forbids a court from even considering the opinion explaining why the court issued the injunction.  (Br.47-48.)  That is plainly wrong.  The written "intention of the issuing court" may inform an injunction's interpretation. *DAS Corp.*, 18 F.4th at 1041.  Indeed, in assessing whether an injunction gave "explicit notice of precisely what conduct is outlawed", the Supreme Court has considered

43

both the text of the injunction *and* "the accompanying opinion". *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).[7]

Apple's effort to distinguish cases cited by the district court is unavailing. For example, Apple incorrectly asserts that *Sea Shepherd* is limited to circumstances in which an enjoined party abets another to violate an injunction, rather than doing so itself. (Br.49-50.) While the facts of that case involved aiding and abetting, the principle articulated by this Court was not so cabined. *Sea Shepherd*, 774 F.3d at 949 (citing cases). Apple relies heavily on an unpublished decision, *Epona LLC v. County of Ventura*, 2019 WL 4187393 (C.D. Cal. Apr. 12, 2019), which, as the district court here aptly stated, is "one district court case that appears to have tried to limit *Sea Shepherd* to its facts". 1-ER-57. But, consistent with *Sea Shepherd*'s origins in general contempt principles, many courts subsequently applied it outside the aiding-and-abetting context. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 2025 WL 1358492, at *3 (N.D. Cal. May 9, 2025); *Simon v. City & Cnty. of San Francisco*, 2024 WL 4314207, at *3 (N.D. Cal. Sept. 26, 2024). The district court here properly did the same.

---

[7] Apple's citation to *BankDirect Cap. Fin. LLC v. Cap. Premium Fin., Inc.*, 912 F.3d 1054 (7th Cir. 2019) (Br.48), is distinguishable. Unlike here, the court there failed to enter its injunction on the docket "as a separate document". *Id.* at 1057.

Apple's fallback argument that its conduct did comply with the purpose and spirit of the Injunction (Br.51) is meritless. The Injunction was designed to enable developers to steer users to alternative payment options, spurring competition and driving Apple's supracompetitive margins down. 1-ER-3. There was no "'fair ground of doubt'" about these goals. (*Contra* Br.43 (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019)).) Apple's witnesses testified that they fully understood that "creating … competitive pressure" on IAP was the "goal of the [I]njunction". 7-SER-1255. And they conceded that Apple's measures severely limited or eliminated that competitive pressure. *See, e.g.*, 5-SER-778.

### B.    The District Court Was Entitled to Consider Apple's Bad Faith.

Apple argues that the district court erred by assessing compliance "based on subjective evidence of Apple's intent, rather than on objective evidence of Apple's compliance plan". (Br.54.) That argument is both incorrect and disingenuous. Apple invoked a good-faith defense, arguing below that "[i]n seeking to hold Apple in contempt, Epic has assumed the burden of showing, by clear and convincing evidence, that Apple did not make good-faith efforts to substantially comply with the Injunction". 2-SER-396. Having made the argument, Apple cannot now fault the district court for considering the extensive evidence of Apple's bad faith.

45

Apple distorts *Taggart*, 587 U.S. at 561-62, which is its sole binding precedent on this issue. *Taggart* holds that *good* faith may not excuse a violation, but it states that "civil contempt sanctions may be warranted when a party acts in bad faith". *Id.* Thus, *Taggart* supports the district court's consideration of Apple's bad faith here.

Apple's alternative argument that the district court clearly erred in finding bad faith (Br.55-58) is frivolous. The record amply demonstrates Apple's deliberate effort to make steering useless and "continue[] its anticompetitive conduct solely to maintain its revenue stream", as well as its effort to shield its conduct from scrutiny. 1-ER-3; *see also supra* §§ SOTC.IV, VI, VIII. Apple makes three points to argue that the district court "unfairly impugned Apple's motives". (Br.56-58.) Each fails.

*First*, Apple claims that it "did not hide" any information from the district court but rather filed a "transparent 'Notice of Compliance'". (Br.56.) Apple ignores the district court's finding that Apple's Notice of Compliance was a fabricated, made-for-litigation sham. 1-ER-31-32. The problem was not that Apple failed to provide "additional details about its internal deliberations" (Br.56), but that what Apple provided was false. 1-ER-61-62.

*Second*, Apple argues it should not be "penalized ... for choosing what Apple understood to be the most advantageous option for its business". (Br.57.)

Apple was not penalized for that; it was penalized for deliberately constructing a program to make steering *totally non-viable*, with the express goal of nullifying the Injunction.  1-ER-3.

 *Third*, Apple claims that it was clear error for the district court to reject the AG Report as pretextual.  (Br.57-58.)  But the facts speak for themselves. Senior Apple executives met repeatedly to discuss whether to charge a commission and what commission to charge.  1-ER-15-27 & n.34.  The documentary record of those meetings shows zero consideration of the AG Report, which was managed separately.  1-ER-25, 62.  The district court recognized the AG Report for what it was:  a "show piece" for the court.  1-ER-61.

## C. The District Court Properly Overruled Apple's False Claims of Privilege.

 Apple argues that the district court improperly relied on privileged documents (Br.58), but the court carefully examined Apple's privilege assertions, upholding some and rejecting many others where Apple overstepped.  This Court "has stated two different standards of review" for such determinations.  *Greer v. Cnty. of San Diego*, 127 F.4th 1216, 1222 (9th Cir. 2025).  In some instances, the Court has considered it a mixed question of fact and law and applied *de novo* review, and in others it has "review[ed] for clear error a district court's factual findings for attorney-client privilege".  *Id.* (quoting *United States v. Sanmina Corp.*, 968 F.3d 1107, 1116 (9th Cir. 2020)).  Regardless of which standard

applies, there was no error in the district court's legal or factual determinations, and any error would be harmless.

*First*, Apple assumes that the documents the district court relied on are "dual-purpose communications" that simultaneously reflect both business advice and legal advice (Br.60); they are not. "Dual-purpose communications" are communications between a client and an attorney who "wear[s] dual hats" as both lawyer and business advisor, where the advice sought or provided serves more than one purpose. *In re Grand Jury*, 23 F.4th 1088, 1090 (9th Cir. 2021). In contrast, the documents here are multi-page presentations containing *separate* legal and business communications, not "dual-purpose" communications.

To argue otherwise, Apple observes that some presentations "began by covering the key prohibitions imposed by the district court" and then "walked through a variety of potential compliance options Apple was considering". (Br.61.) But that just means there are *multiple* communications within the document; it does not make any *individual* communication dual-purpose. Lawyers prepared some slides, which the district court allowed Apple to redact, but the portions that "walked through" Injunction-response options were created by businesspeople, presented to business audiences and focused on quintessentially business topics, such as the expected effect of various steering restrictions on Apple's revenue. *See, e.g.*, 2-ER-234, 277-78, 292-93.

48

In practice, the district court thoughtfully considered each communication within each document and individually addressed each for privilege, allowing Apple to redact any discussion of legal topics, 2-ER-235, 251, 256, 261, 298, 311-13, 322, 351, and ordering Apple to produce only portions concerning business topics. For example, although Apple observes that a June 2023 presentation's first slide, 2-ER-267, "walked through benefits and risks associated with various compliance routes" (Br.59), it ignores that the discussion focused on *business* "benefits and risks", such as how different options would impact Apple's revenue, 2-ER-292-96, 300-01, 303-04. The district court allowed Apple to redact the few instances where the presentation addressed *legal* "benefits and risks". 2-ER-279, 298, 306. Apple presents no basis to retread that ground.

*Second*, as to the few documents that contained dual-purpose communications, the district court properly applied Ninth Circuit law to assess whether legal advice was "the primary purpose". *In re Grand Jury*, 23 F.4th at 1091. Apple does not argue otherwise. Instead, it contends that the district court should have followed D.C. Circuit law, which considers whether legal advice was "*a* primary purpose", rather than *the* primary purpose, of any dual-purpose communication. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014). Although this Court "left open the question" of applying the *Kellogg* standard in a future case (Br.60), it noted that *Kellogg* dealt "with the very specific

49

context of corporate internal investigations" and that other Circuits had not embraced it (and still have not). *In re Grand Jury*, 23 F.4th at 1094-95. The district court did not err by following this Court's precedent, rather than out-of-Circuit precedent that this Court "s[aw] no need to adopt". *Id.* And Apple does not show that the circumstances of this case—involving records that extensively document Apple's *business* and *financial* motivations for violating the Injunction—require this Court to choose a "more protective version of the primary purpose test". *Id.* at 1094-95 & n.5.

> *Third*, Apple does not show that applying *Kellogg* would change any of the district court's privilege determinations. *Kellogg* "would only change the outcome of a privilege analysis in truly close cases". *Id.* at 1095. In contrast, Apple adopts—with no precedent to support it—the radical position that nearly every major business planning document concerning its Injunction response is privileged, *see, e.g.*, 2-SER-354, on the theory that privilege attaches to every business communication that is "prompted by a Court order" (Br.59 (quoting 4-ER-645))—or, presumably, a statute or regulation. But privilege is an exception to be construed narrowly, *see In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012), and Apple's argument would result in a breathtaking expansion of privilege that goes far beyond *Kellogg*.

*Fourth*, Apple's conclusory assertion that the district court's privilege determinations require reversal (Br.62) is baseless.  Even if *Kellogg* controlled, and even if that made a difference as to any document, no such hypothetical, unidentified documents would be so central to the district court's finding of contempt so as to alter its ultimate outcome.  Rather, on this extensive record, "it is more probable than not" that the district court "would have reached the same verdict even if the evidence had [not] been admitted".  *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005).

### D. Even If the EO Modified the Injunction, the Modification Was Within the Discretion of the District Court.

Alternatively, even if the EO is viewed as modifying some aspect of the Injunction, that modification was appropriate.

It is undisputed—and Apple and its *amici* concede (Br.36)—that the district court *could* modify the Injunction to ensure its effectiveness in the face of factual developments.  *See, e.g.*, *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942).  "The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible."  *Brown v. Plata*, 563 U.S. 493, 542 (2011) (citation omitted).  And contrary to Apple's suggestion (Br.28-29), the court is not limited to enjoining independently unlawful conduct; instead, the "test to be applied … is whether the change served to effectuate or to thwart the basic purpose of the original … decree".  *Chrysler Corp.*, 316 U.S. at 562.  Accordingly, even if

51

the district court had issued a modified injunction (it did not), that would not be reversible error.  Because the EO falls easily within the district court's modification power, the district court's supposed failure to name it a "modification" is a matter of semantics, not substance.  This Court can affirm on the alternative ground that a modification was proper.

Apple argues that the district court should "have instituted proceedings to modify the injunction consistent with due process".  (Br.36.)  But Apple identifies no way in which such a proceeding would have differed from those actually held; Apple identifies no additional evidence it would have presented, no argument it would have made.  Moreover, Apple acknowledges that, to afford due process, the district court was required only to provide Apple with "notice and an opportunity to be heard" before modifying the Injunction.  (*Id.* (citing *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014)).)  Apple received both.

As to notice, Apple's cases make clear that modified "injunctive relief [i]s proper [if] the defendant was aware of the potential injunction based on various filings by the parties and arguments", even if the court does not provide formal notice of its precise intent.  *Armstrong*, 768 F.3d at 980 (relying on *Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 950 (9th Cir. 1986)).  Epic was unequivocal in its Motion to Enforce.  4-ER-720.  It argued that "[a]llowing Apple to charge *any*

52

fee for these alternative purchasing mechanisms interferes with th[e] goals" of the Injunction "because it gives Apple complete control over the price of the competitive alternative to IAP", 4-ER-739, and sought an order "requiring Apple to promptly bring its policies into compliance with the Injunction", 4-ER-727. In its opposition, Apple argued that it "was not required to leave a vacuum, as Epic suggests" and could "seek compensation" on linked purchases. 2-SER-404-05. And in its reply, Epic again requested that "Apple should be ordered to remove any commission from the in-app steering mechanisms that the Injunction mandates Apple to permit". 2-SER-379. In setting the evidentiary hearing, the district court reiterated Epic's requested order and stated that "Epic Games requests that this Court invoke its 'inherent authority to enforce compliance'". 4-ER-718-19. Apple was fully on notice.

Apple likewise had ample opportunity to be heard. The court held a nine-day evidentiary hearing, at which Apple called witnesses and examined Epic's. 1-ER-12-14. Apple's commission was central to the hearing. 1-ER-3; 3-ER-593-94 (detailing Apple's internal discussions and arguments that its "intellectual property, services, userbase and platform justify a commission"). Apple was heard. *See, e.g.*, 3-ER-601 (Apple arguing "[i]t was objectively reasonable for Apple to conclude that a commission on linked transactions is not prohibited by the Injunction"); 2-SER-406 (Apple arguing "the injunction does not

prohibit Apple from charging a competitive commission for its tools and technologies"). Thus, the district court did "adjudicate Apple's arguments and defenses to the specific restrictions proposed", including as to the commission. (Br.41.) Apple now laments that the district court found its evidence incredible and its arguments unpersuasive. That is not a due process issue. Apple had a year-long judicial process, with an evidentiary hearing and extensive briefing, while the district court considered what relief would be appropriate.[8]

Whether that relief reflects an application of the Injunction or a modification thereof, it was proper.

## II.    The District Court Crafted an Appropriate Remedy.

### A.    The EO Targets Specific Violative Conduct.

District courts have "broad equitable power to order appropriate relief in civil contempt proceedings" to prevent further violations. *S.E.C. v. Hickey*,

---

[8] Apple's precedent, *United States v. Armour & Co.*, does not establish that Apple was entitled to "full litigation" to modify the Injunction. 402 U.S. 673, 681 (1971). In *Armour*, the Supreme Court addressed a consent decree that was "carefully worked out between the parties in exchange for their right to litigate the issues". *Id.* at 677-78. In that context, the Court responded to an effort to expand the decree by observing that the plaintiff's position "might be a persuasive argument for modifying the original decree, after full litigation". *Id.* at 681. But the Court's observation was specific to stipulated consent decrees, where the plaintiff had never "established [its] factual claims and legal theories in litigation" and the defendant had *agreed* to the terms of the decree. *Id.* at 682. *Armour* does not limit courts' authority to modify *litigated* injunctions. This Court has made clear that, to modify a litigated injunction, a court need provide only "notice and an opportunity to be heard". *Armstrong*, 768 F.3d at 980.

322 F.3d 1123, 1128 (9th Cir. 2003).  Here, the district court fashioned equitable relief targeting the specific measures Apple took to violate the Injunction.  By prohibiting those specific measures, the EO prevents further violations and "compel[s] obedience to a court order".  *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 778 (9th Cir. 1983).  Courts routinely require contemnors to cease violating the order *and* the particular violative conduct.  *See, e.g.*, *Parsons v. Ryan*, 949 F.3d 443, 470 (9th Cir. 2020) (affirming order requiring contemnor to comply with the original decree, in part, by ordering specific actions to address violations of decree).

Rather than address this straightforward principle, Apple mischaracterizes the EO as a "new injunction" (Br.27) and seeks to characterize it as a "punitive" remedy outside the civil contempt power (Br.26-27).  Apple's re-branding of the EO misstates what the district court did.  In Apple's telling, the district court acted in a fit of pique and imposed "six prohibitions with requirements that appear nowhere in the original order".  (Br.26-27.)  Not so.  Instead, the district court painstakingly reviewed "the specific actions Apple took to violate [the] Injunction" and then prohibited that conduct.  1-ER-77.  In so doing, the district court enforced its existing Injunction.  Courts are not required to be clairvoyant; they need not anticipate—and specifically address—every way a recalcitrant party may try to circumvent a prohibition.  *See McComb*, 336 U.S.

55

at 192.  If a district court cannot use its civil contempt power to require a party to

cease proven violations, its ability to ensure compliance would be gutted.  *See id.*

at 194 (if a court is "powerless" to order a contemnor to comply, "it has lost the

most effective sanction for its decree and a premium has been placed on

violations").

Because the EO simply prevents violation of the Injunction, Apple's

repeated claim that the EO constitutes "punishment" (Br.3, 34-36, 40-41) is

baseless.  As Apple's cases demonstrate, the civil/criminal distinction applies to

"sanctions" for contempt, such as fines and imprisonment.  (Br.26 (citing *Int'l*

*Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994) (fines); *Hicks*

*v. Feiock*, 485 U.S. 624, 640-41 (1988) (imprisonment); *Parsons*, 949 F.3d at 443

(fines)).)[9]  The district court here expressly declined to impose such sanctions.

1-ER-78-79.

Instead, the EO targets the ways in which Apple violated the

Injunction and prohibits those actions, thereby ensuring compliance, as civil

contempt is designed to do.  *See Parsons*, 949 F.3d at 455.  The EO "'seeks only to

---

[9] While *Carter v. Local 556, Transp. Workers Union of Am.*, 138 F.4th 164 (5th Cir. 2025), did not involve fines or imprisonment, it too addressed an extrinsic sanction—mandatory religious liberty training for company employees—rather than an order requiring compliance with, and preventing circumvention of, the original injunction.

coerce [Apple] to do what [the district] court had previously ordered [Apple] to do'". (Br.26 (quoting *Carter*, 138 F.4th at 208-09).) "A criminal sanction, in contrast, generally seeks to punish a 'completed act of disobedience.'" *Ahearn ex rel. N.L.R.B. v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1129 (9th Cir. 2013) (citing *Bagwell*, 512 U.S. at 828). Although criminal sanctions for Apple's willful disobedience may be appropriate, the district court left that determination for the Executive Branch. 1-ER-79. It refrained from extracting a penalty for the past and limited its relief to measures ensuring Apple complies with the Injunction moving forward.

Apple also wrongly contends that each element of the EO "requires direct support in the court's original liability opinion", asserting that the "original judgment of liability" must have determined that "the matter later enjoined violated [the] law". (Br.28-29 (internal quotation marks omitted).) But even at the *initial* injunction stage—let alone a contempt proceeding—the fit between liability and remedy need not be exact; injunctive relief need only "'be tailored to remedy the specific harm alleged'". (Br.28 (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)); *see also Lemon v. Kurtzman*, 411 U.S. 192, 200-01 (1973) (noting that, in issuing equitable relief, courts "eschew rigid absolutes and look to the practical realities and necessities"); *Milliken v. Bradley*, 418 U.S. 717, 738 (1974) ("[E]quity has been characterized by a practical

flexibility in shaping its remedies."); *Google II* at 48-49 (holding the law "does not require that an injunction only touch the consequences of a defendant's conduct…. Rather it asks for a 'reasonable method' of redressing problems 'with a significant causal connection to that conduct'").) The Injunction satisfied that test, as affirmed by this Court at the merits stage.[10]

At the contempt phase, the focus shifts, and remedies are directed at "coerc[ing] compliance" with the original order. *Parsons*, 949 F.3d at 455. For example, this Court held that to assess contempt in a trademark infringement case, the issue is whether the defendant violated a decree, not whether it infringed a trademark. *See Wolfard Glassblowing Co. v. Vanbragt*, 118 F.3d 1320, 1322-23 (9th Cir. 1997). The same principle applies here. The district court was not required to find that each of Apple's efforts to frustrate the Injunction violated the UCL. Instead, it needed to—and did—find that Apple's restrictions violated the Injunction's command that Apple not prohibit steering. The EO then appropriately targets the specific violations the district court found.

---

[10] Most of Apple's cases do not address contempt remedies but instead merits relief. (Br.28-29.) *Clark v. Coye*, the only case involving a contempt motion, is predicated on the federalism principle whereby "the scope of federal injunctive relief against an agency of state government must always be narrowly tailored to enforce federal constitutional and statutory law only". 60 F.3d 600, 604 (9th Cir. 1995). That rule obviously does not apply to remedial relief against Apple.

Finally, Apple mischaracterizes the standard of review as *de novo*. (Br.44.)  But "[t]his court reviews a district court's contempt finding and imposition of sanctions for abuse of discretion".  *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992).  Apple relies on *Cunningham v. David Special Commitment Center*, 158 F.3d 1035 (9th Cir. 1998), but there the district court *denied* a motion for contempt yet allowed a non-party to intervene, and this Court reviewed *de novo* only the intervention decision.  *See id.* at 1037-38. Nothing in that case suggests *de novo* review of the contempt finding is appropriate here.

Apple's challenges to specific provisions of the EO are addressed below.

## B.    The District Court Properly Ordered Apple To Stop Imposing a Commission On Out-of-App Transactions.

### 1.    The EO Does Not Bar Apple from Being Compensated for Its Services or IP.

Apple challenges the district court's order that Apple not impose "any commission or any fee on purchases that consumers make outside an app". 1-ER-76.  Apple is wrong to characterize this order as setting a rate (of zero) or as denying Apple compensation for Apple's "services and underlying IP-protected technologies".  (Br.27-28.)  The EO did not disturb any manner in which Apple historically has charged for its services or IP, including through commissions on

59

IAP, developer fees, selling hardware and more.  Pre-Injunction, Apple *never* charged any commission on out-of-app purchases or, for that matter, on any purchase not using IAP.  1-ER-15, 59.[11]

Apple's new commission expressly, and unlawfully, targets the out-of-app purchases that are the focus of the Injunction.  It is undisputed that the Injunction prompted Apple to start charging a commission on transactions outside the app, which Apple had never charged a commission on before.  1-ER-15.  After a decade without commissions on out-of-app transactions, Apple changed course precisely when the Injunction threatened to make such transactions more accessible.  And as the district court found based on the evidence, Apple imposed this new charge in order to deter developers from steering.  1-ER-63-64 & n.66. This defied the Injunction, which required Apple to allow steering for the express purpose of exposing IAP to competition from alternative payment solutions outside the app.  1-ER-7.  By imposing a new commission on out-of-app purchases in order to raise their cost, Apple frustrated that purpose—and the district court appropriately ordered Apple to stop.

---

[11] Indeed, except for steering under the Program, Apple still does not charge a commission when users purchase an item outside the app but then use it in the app, *e.g.*, a *Fortnite* player can use on her iPhone an item she independently purchased on the web without commission.  5-SER-985.

60

As discussed above, Apple's attempts to find support for its commission in the district court's Rule 52 Order and this Court's prior opinion are unavailing.  While both decisions noted that Apple was not required to make its services and IP available for free, 5-ER-948; *Apple II* at 986, the EO imposes no such requirement, as shown above.  The numerous ways in which Apple has long earned a return on its services and IP remain untouched.  All that the EO prohibits is levying a new charge directed at out-of-app transactions, which the district court found to have the intent and effect of prohibiting steering, in violation of the Injunction.  That is not a bar on compensation; it is a bar on circumvention.[12]

### 2.    The District Court Did Not Engage in Rate-Setting.

Apple claims the district court should have allowed Apple to charge a link-specific commission at a rate lower than 27%, and that its failure to do so somehow constitutes impermissible judicial rate-setting.  (Br.32.)  But the EO's bar on out-of-app commissions does *not* set a rate.  Rather, it prohibits Apple from circumventing the Injunction with a brand new category of charge imposed on transactions that compete with IAP.  By contrast, Apple's proposal *would* call for

---

[12] Apple misrepresents Epic's statement in a letter pertaining to litigation against Google, suggesting Epic acknowledged the Injunction did "not prevent [Apple] from … introducing a new fee" on linked purchases.  (Br.30 n.3.)  What Epic actually said was that "absent a strong anti-circumvention measure", an anti-steering injunction could be abused and frustrated by fees; Epic did not say that the Injunction here permitted them.  4-ER-782.

impermissible rate-setting, requiring the district court to reject certain rates and bless others. To be clear, Apple's argument is that following 15 months of litigation, the district court should have ordered Apple to *adjust* the commission it uses to prevent steering. (Br.37.) Apple would then present a revised plan—say, one that imposes a 26.5% commission. The parties would then litigate again (and again) until the district court approved some rate—which invariably would still penalize only developers attempting to take advantage of out-of-app alternatives.

Such litigation over whether a rate is "too high" is the hallmark of rate-setting, as shown by Apple's precedent. *See Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1391 (1991) (identifying rate-setting concerns when court is asked to "regulat[e] retail bank pricing via injunction on an ongoing basis"); *see also Cal. Grocers Ass'n v. Bank of Am.*, *Nat'l Tr. & Sav. Ass'n*, 27 Cal. Rptr. 2d 396, 405 (Ct. App. 1994) (setting specific price for ten years). Apple's suggestion would also ensure Apple's continued "experimentation with disobedience" for years to come. *McComb*, 336 U.S. at 192; 1-ER-76 (rejecting such "whack-a-mole"). Furthermore, Apple never proposed to the district court any commission rate other than 27%. The district court thus had no reason even to consider going down that path.

### 3.  The EO Is Not a Taking.

Apple's Takings Clause objection is even more spurious.  Contrary to Apple's assertion, the EO does not require Apple "to afford all developers open and unconditional use" of its platform.  (Br.34.)  The EO disallows Apple only from imposing a commission on the out-of-app purchases covered by the Injunction.  Apple has long allowed a wide range of developers to use its platform without a commission, including for out-of-app transactions; that is how Apple's platform worked when the Injunction was entered, not something the EO caused.  Once Apple's mischaracterization of the EO's effects is corrected, rejecting its Takings Clause argument is simple.

Apple relies on *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021), for its claim that the court "permanently depriv[ed] Apple of the right to exclude".  (Br.33-34.)  As noted above, the court has done no such thing.  In any event, *Cedar Point Nursery* is inapposite because it addresses "physical takings" such as "physical invasions" onto property, holding that "[w]henever a regulation results in a physical appropriation of property, a *per se* taking has occurred".  594 U.S. at 149.  That *per se* rule was expressly confined to physical takings.  *See id.*  Apple does not cite any precedent applying the *per se* takings doctrine without a physical invasion of property.

63

By contrast, when the Supreme Court applies the Takings Clause to intellectual property, its analysis focuses on *regulatory* takings. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984); *Horne v. Dep't of Agric.*, 576 U.S. 350, 353 (2015). Here, Apple does not attempt to establish that a regulatory taking has occurred, nor can it: Apple cannot show that the "character of the governmental action", here an order that Apple comply with a valid Injunction, points toward a taking. *Ruckelshaus*, 467 U.S. at 1005. Apple cannot show that the "economic impact" on Apple "depriv[es Apple] of all or most of [its] interest in the subject matter", given Apple's myriad other ways to obtain billions in revenue notwithstanding the EO. *Id.* And Apple cannot show that the EO interfered with its "reasonable investment-backed expectation", *id.*, because Apple never before levied charges on out-of-app purchases and because the district court found—and this Court affirmed—that absent steering, Apple was able to extract from developers far *more* than a "reasonable investment-backed expectation". 5-ER-890; *Apple II* at 984.

Even aside from Apple's baseless arguments, its constitutional arguments are misplaced because "it is well established that antitrust remedies can and often must proscribe otherwise lawful conduct to unwind and further prevent violators' anticompetitive activity", even when constitutional protections are

64

implicated. *Google II* at 46. Apple's Takings Clause arguments should be rejected.

### 4.    The EO Is Not Punitive.

Taking aim at the district court's subjective motivations, Apple next argues that the "only way to understand the prohibition" on commissions for linked purchases "is as a punishment" for Apple's violation of the Injunction. (Br.34 (formatting omitted).) Apple cites to the district court's finding that "Apple flouted the Court's order" (Br.35 (citing 1-ER-61 n.65)), but that is entirely consistent with (and an element of) civil contempt. Apple also suggests the district court's analogy to the trademark context—where repeat infringers are "allowed less leniency" than first-time infringers—indicates an intent to punish. (*Id.*) But the referenced trademark cases articulating this principle involved civil contempt proceedings. *See, e.g.*, *Forever 21, Inc. v. Ultimate Offprice, Inc.*, 2013 WL 4718366, at *1 (C.D. Cal. Sept. 3, 2013). Apple ultimately postulates that the EO must be punitive because the district court supposedly "offered no legal or economic basis" for prohibiting a commission. (Br.34.) That argument ignores the district court's extensive findings on how Apple's commission violated the Injunction. 1-ER-15-27. And as noted above, any commission on out-of-app transactions, regardless of rate, would still undermine the steering protected by the Injunction.

In any event, the presumed subjective intent of the court is irrelevant to assessing whether a contempt remedy is civil or criminal. *See Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 926 F.3d 534, 538 (9th Cir. 2019) ("[W]e determine the civil or criminal nature of a contempt sanction not by focusing on the court's subjective intentions, but instead by examining the character of the relief itself.") (internal quotation marks omitted); *see also Hicks*, 485 U.S. at 635 ("[T]his Court has never undertaken to psychoanalyze the subjective intent of a State's laws and its courts, not only because that effort would be unseemly and improper, but also because it would be misguided."). Instead, "conclusions about the purposes for which relief is imposed are properly drawn from an examination of the character of the relief itself". *Id.* at 636. Here, as discussed above, the "character of the relief" is a prohibition on actions Apple took to violate the Injunction. Compelling compliance is a quintessential feature of civil contempt. *Parsons*, 949 F.3d at 455.

Apple nevertheless argues that the EO is criminal in nature because its prohibition on charging a commission is "unconditional and fixed", such that it cannot be purged. (Br.35.) But Apple draws this principle from cases assessing additional sanctions—like imprisonment and fines—to decide whether they punish past conduct or compel future compliance. (Br.34-35 (citing *Bagwell* (fines); *Ahearn* (damages); *United States v. Powers*, 629 F.2d 619, 627 (9th Cir. 1980)

66

(imprisonment)).)  By contrast, the EO does not impose an extrinsic sanction; it just prohibits the measures Apple took to violate the Injunction, thus enforcing the underlying Injunction itself.  Apple cites no case supporting the idea that an order requiring a contemnor to cease violative conduct is a criminal sanction just because it lacks an expiration date.

Apple also asserts that the EO should be considered criminal because the district court "anticipated an immense financial impact" to Apple.  (Br.35.)  But the "financial impact" at issue flows from the underlying Injunction.  Both the district court and this Court found that the steering enabled by the Injunction would divert transactions from Apple and force it—for the first time ever—to contend with competitive pressure.  5-ER-942-43; *Apple II* at 984.  The "financial impact" here is not a sanction like a fine (*contra* Br.35-36); it is the consequence of the Injunction's requirement that Apple allow steering and competition.

### C.  The Other Provisions of the EO Were Well Within the District Court's Authority.

Apple's arguments about the remaining provisions of the EO fail.

*First*, the EO's other restrictions are not "new provisions" unconnected to the Injunction.  (Br.26-27, 37.)  Rather, they are "restrictions on the specific actions Apple took to violate th[e] Injunction".  1-ER-77.  Apple's focus on whether individual components violated the Injunction on their own (Br.38) is a red herring.  Apple adopted the Link Entitlement Program as a package, which—as

67

intended—had the effect of prohibiting developers from steering. 1-ER-63-64 & n.66. Apple cannot now complain that, before ordering a remedy, the district court should have disaggregated the restrictions and tested, one by one, whether each would "constitute a violation of the Injunction". (Br.38 (citing 1-ER-63 n.67).) Apple's plea to be allowed to try again with a narrowed set of restrictions is inconsistent with *McComb*'s rejection of "experimentation" by a contemnor, 336 U.S. at 192—and it is especially inappropriate for a party, like Apple, that "knew it was violating the Injunction". 1-ER-60.

> *Second*, the Injunction's other restrictions do not conflict with Apple's interest in maintaining security and privacy. The district court rejected those purported justifications for Apple's conduct as "pretextual", and that finding was not clear error. 1-ER-31-32 (noting "Apple attempted to mislead" the court about the security motivations behind its external link placement restrictions); 1-ER-41 & n.46. As "[n]o real-time business documents credit[ed]" Apple's security and privacy arguments, the district court found these "proffered rationales ... [were] nothing more than after-the-fact litigation posturing or outright misrepresentations to the Court". 1-ER-32. Moreover, Apple imposed these restrictions only on linked purchases. *See, e.g.*, 1-ER-41 ("Apple in general only prohibits the use of dynamic links for external links for link-out purchases."). Contemporaneous notes show that the restrictions' purpose was to "limit the ruling" in the Injunction and

"'lock [the app] down' to protect Apple from … the competition the Injunction sought to stimulate".  1-ER-28.

*Third*, the EO does not violate the First Amendment because it neither compels nor improperly restricts Apple's speech.  To start, the EO does not compel *Apple* to speak.  1-ER-77 (noting the EO "require[s] no affirmative action on Apple's part").  Instead, it prohibits Apple from interfering with *developers'* communications to developers' own users in developers' own apps.  Thus, the EO does not require Apple to "post an advertisement in its own check-out line". (Br.40.)  Rather, it prohibits Apple from interfering with developers' ability to post signs to *their own* "check-out lines" (while still allowing Apple to require that developers display Apple's IAP too).  Apple's contracts make clear that developers, not Apple, own and are responsible for the content of their apps. 3-SER-441; 3-SER-516.  Any app's link-related speech, then, is the developer's speech, not Apple's.  Apple is not "engaged in its own expressive activity". *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024).

Moreover, Apple is wrong to argue that the EO "tilt[s] the playing field" against Apple and thus "must survive strict scrutiny".  (Br.41.)  Apple's precedent, *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986), overturned a regulator's order that a private utility disseminate the opinions of the utility's political opponent in the utility's own correspondence

69

to its customers.  The Court applied strict scrutiny because that order had the

purpose of co-opting the utility's resources to benefit the utility's political

opponents—which was viewpoint discrimination against the utility.  *Id.* at 13-14.

Because the order did not "equally constrain both sides", it impermissibly

burdened the utility's First Amendment rights.  *Id.*  The EO does not require Apple

to use its own resources to publish its opponents' messages, but only requires that

Apple permit developers to use *their* own resources to deliver such messaging.

And the Injunction does not single out messages opposing Apple, but rather is

content-neutral, allowing developers to provide whatever messaging each

developer prefers about the available payment options.[13]

### III.    Apple's Challenges to the Underlying Injunction Fail.

#### A.    *Beverage* is Not a Conflicting State Judgment.

The district court did not abuse its discretion in denying Apple's

Federal Rule of Civil Procedure 60(b)(5) motion to vacate the Injunction.  *See*

*Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004) (decisions on

Rule 60(b) motions "will not be reversed absent an abuse of discretion").

Under Rule 60(b)(5), courts can grant the extraordinary remedy of

vacating a final injunction when "applying it prospectively is no longer equitable".

---

[13] In addition, as noted above, this Court recently held that "antitrust remedies can and often must proscribe otherwise lawful conduct", even when constitutional protections are implicated.  *Google II* at 46.

Relying on *California ex rel. Becerra v. EPA*, 978 F.3d 708, 718-19 (9th Cir.

2020), Apple argued below that this Rule requires courts to vacate an injunction

that is "based solely on law that has since been altered to permit what was

previously forbidden". 4-ER-674 (internal citation omitted). Apple argued that

decisions by a California trial court and intermediate appellate court in litigation

called *Beverage v. Apple* changed California law and deemed Apple's

Anti-Steering Rules lawful. 4-ER-681-83. The district court disagreed,

concluding that *Beverage* (1) did not change California law, (2) does not conflict

with the judgment in this case and (3) does not deem Apple's Anti-Steering Rules

lawful. 1-ER-49-51.

The district court was correct. In fact, Apple itself previously

advocated these very points before the California Supreme Court, where it

successfully opposed review of *Beverage*. There, Apple contended:

1. *Beverage* did not change California law, but rather "relied on settled
   principles"—primarily, *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d
   175 (Ct. App. 2001)[14]—which California courts have followed "for
   more than two decades", 1-ER-50 & n.53; 4-ER-653;

2. the *Beverage* plaintiffs were "wrong" to argue on appeal "that *Chavez*
   and the [*Beverage*] decision below are inconsistent with decisions in a
   federal court lawsuit involving Epic Games", 1-ER-51; 4-ER-657-58;
   and

---

[14] *Chavez* held that unilateral conduct immunized from antitrust scrutiny under
*United States v. Colgate & Co.*, 250 U.S. 300, 307-08 (1919), cannot form the
basis of a claim under the UCL's "unfair" prong.

3.     the appellate decision in *Beverage* did not address whether Apple's conduct complied with the UCL because plaintiffs had *conceded* "that the *Chavez* decision [if followed] would bar their 'unfair' claim under the UCL", 1-ER-50 n.53; 4-ER-652, 655.

Having successfully opposed review of the intermediate appellate decision in *Beverage* in the California Supreme Court, Apple now tries to run from the arguments it made there. (Br.69 n.7.) This Court should reject Apple's opportunistic attempt to gain a strategic advantage by "playing fast and loose with the courts". *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) ("Judicial estoppel ... precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.").

Regardless of judicial estoppel, Apple's prior characterization of *Beverage* was correct on the merits—dooming Apple's Rule 60(b) motion. In *Beverage*, the state trial court dismissed claims concerning Apple's Anti-Steering Rules. 320 Cal. Rptr. 3d at 434. That trial court decision cannot create a conflict with the Injunction for two reasons. *First*, unpublished state trial court decisions are not binding precedent. *See Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 390 n.2 (9th Cir. 1988). Apple's invocation of *Erie* (Br.64, 70) is thus misplaced: *Erie* concerns are triggered only when a published decision by a state's highest court or intermediate appellate court announces binding state law. *See Spinner*, 849 F.2d at 390 n.2. *Second*, the trial court's dismissal decision necessarily addressed only the sufficiency of the allegations in the *Beverage*

72

complaint, not the lawfulness of Apple's Anti-Steering Rules as a general matter. *See Griffith v. Dep't of Pub. Works*, 296 P.2d 838 (Cal. Dist. Ct. App. 1956) (holding "the only issue involved in a demurrer hearing [is] whether the complaint, as it stands, unconnected with extraneous matters, states a cause of action").

There is likewise no conflict with the appellate decision in *Beverage*. At the California Court of Appeal, the *Beverage* plaintiffs accepted the trial court's decision that *Chavez* barred their UCL claims, arguing only that *Chavez* should be overruled. *Beverage*, 320 Cal. Rptr. 3d at 439. Thus, the Court of Appeal "*presume[d]* the trial court correctly found" that the UCL claims were "legally insufficient" under existing law. *Id.* (emphasis added). Thus, Apple's argument—that *Beverage* "held that the very same anti-steering provisions at issue in this case do *not* violate the UCL" (Br.63)—is wrong: the *Beverage* appellate decision did not address the lawfulness of the Anti-Steering Rules. (*See, e.g.*, D.E.72.1.)

Apple's assertion that the Court of Appeal in *Beverage* identified a conflict with this Court's decision misleadingly truncates the *Beverage* court's comments. The *Beverage* court "decline[d]" to follow this case (Br.65) but explained it did so only because it did not "find the [*Epic*] decisions persuasive *on the precise issue presented by this appeal*". *Beverage*, 320 Cal. Rptr. 3d at 442 n.6 (emphasis added). The "precise issue presented" was whether plaintiffs could state a UCL claim *even if* the Anti-Steering Rules were protected under *Colgate*. *Id.*

at 439.  That issue was not presented here, where Epic made no such concession and where this Court held that Apple's developer agreements were *not* unilateral conduct to which *Colgate* even applied.  *Apple II* at 982.  This Court therefore had no reason to undertake a "rigorous analysis of the *Colgate* doctrine and its effect on UCL claims".  (Br.66.)

Nor did Apple ask this Court to undertake that analysis.  Apple now tries to unearth such an argument in its prior papers, contending that its merits brief (1) invoked *linkLine* "to defend a unilateral refusal to deal" and then, 43 pages later, (2) explained "that *Chavez* precluded UCL liability".  (Br.69.)  But Apple's UCL argument did not focus on *Colgate* or *linkLine*; rather, Apple argued that *any* failure to prove an antitrust claim conferred UCL immunity.  (Principal and Response Brief for Apple, *Epic Games, Inc. v. Apple, Inc.*, D.E.80 at 105, No. 25-2935.)  This Court rejected that sweeping argument, *Apple II* at 1001, and the *Beverage* Court of Appeal agreed that this Court properly applied California law on this issue, *Beverage*, 320 Cal. Rptr. 3d at 441.[15]

Apple separately challenges the district court's decision to deny vacatur based on the court's conclusion—consistent with Apple's admission in the

---

[15] Apple's suggestion that *Beverage* mandated that every court undertake a "rigorous analysis of the *Colgate* doctrine" before imposing UCL liability (Br.67-68) is incorrect.  Given plaintiffs' concession that *Colgate* applied, *Beverage* had no reason to—and did not—pronounce such a rule.

California Supreme Court—that "*Beverage* 'did not change California law'".

(Br.67.)  There was no error:  Apple is unable to cite a single case supporting

vacatur of a final judgment based on a trial court's non-binding decision or based

on any decision that merely reaffirmed existing law.  The only cases it cites

involved dispositive changes of law announced in binding appellate precedent,

something not present here.  (Br.67-68.)

### B.    The Injunction's Scope is Proper.

Following the Supreme Court's decision in *Trump v. CASA, Inc.*, 606

U.S. __ (2025), Apple and its *amici* argue that the Injunction is invalid because of

its "nationwide" scope.  (D.E.76.1 at 8; D.E.108.1.)[16]  However, as set forth in

Epic's Rule 28(j) letter (D.E.109.1), this Court properly rejected that overbreadth

argument at the merits stage.  *See Apple II* at 1002-03.  "Because Epic

benefits … from consumers of other developers' apps making purchases through

the Epic Games Store, an injunction limited to Epic's subsidiaries would fail to

address the full harm caused by the anti-steering provision."  *Id.* at 1003.  Thus,

this Court held the Injunction is "no 'more burdensome to [Apple] than necessary

---

[16] Some *amici* raise arguments not even mentioned by Apple.  (*See, e.g.*, D.E.66.2.)  Such arguments cannot provide a basis for reversal.  *See, e.g.*, *United States v. Gementera*, 379 F.3d 596, 607 (9th Cir. 2004).

to provide complete relief'" to Epic. *Id.* at 1002 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

CASA does not undermine that conclusion, as this Court recently recognized. *See Google II* at 65-66. *CASA* dealt with the potential overbreadth of universal injunctions but did "nothing to change the fact that 'a traditional, parties-only injunction can apply beyond the jurisdiction of the issuing court'". *Google II* at 65-66 (quoting *CASA*, 606 U.S. at n.1). Here, as in *Google II*, while other developers may benefit from it, the Injunction is a parties-only injunction; indeed, consistent with *CASA*, the district court authorized only "plaintiff" (*i.e.*, Epic) to enforce it. 4-ER-796 ¶ 3.

## IV.    Apple's Request for a New Judge Fails.

Apple argues that "[t]o the extent this Court determines that a remand is required ... it should assign the case to a different district judge". (Br.72.) But courts will reassign cases only in "rare and extraordinary circumstances". *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 844 (9th Cir. 2024). In weighing reassignment, this Court considers, "(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and

76

(3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving appearance of fairness". *United States v. Walker River Irrigation Dist.*, 890 F.3d 1161, 1173 (9th Cir. 2018).

Apple has not come close to meeting that standard. Apple rightfully concedes that the district court is not biased, meaning factors one and two weigh against reassignment. (Br.73 ("Apple does not question the district court's motives in taking these actions.").) Indeed, until recently, Apple was a proponent of the district court's rulings in this case, calling the merits ruling a "huge win" for Apple. (Kif Leswing, *Apple can no longer force developers to use in-app purchasing, judge rules in Epic Games case*, CNBC (September 10, 2021, at 4:04 PM EDT).) Apple's change of heart is driven entirely by disagreement with the substance of the district court's more recent decisions; Apple made no showing that, on remand, the district court would have "substantial difficulty" in fairly and impartially following any directive of this Court.

As for the third factor, the long and complex history of this action—including "a sixteen-day bench trial involving dozens of witnesses and nine hundred exhibits" and "a 180-page order", *Apple II* at 966, 970, and the nine-day evidentiary hearing on contempt—points strongly against reassignment, which would waste immeasurable judicial resources. *See Cintron v. Union Pac. R. Co.*,

77

813 F.2d 917, 921 (9th Cir. 1987). Apple's request should be seen for what it is:

an attempt at a do-over before a new finder of fact.

## CONCLUSION

The Enforcement Order should be affirmed.

August 15, 2025                          Respectfully submitted,

                                         /s/ *Gary A. Bornstein*

                                         Gary A. Bornstein
                                         Yonatan Even
                                         Lauren A. Moskowitz
                                         Michael J. Zaken
                                         M. Brent Byars
                                         CRAVATH, SWAINE & MOORE LLP
                                         Two Manhattan West
                                         375 Ninth Avenue
                                         New York, NY 10001
                                         (212) 474-1000

                                         Paul J. Riehle
                                         FAEGRE DRINKER BIDDLE
                                         & REATH LLP
                                         Four Embarcadero Center
                                         San Francisco, CA 94111
                                         (415) 591-7500

                              *Counsel for Plaintiff-Appellee Epic Games, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief contains 16,996 words, excluding the items exempted by Fed. R. App. P. 32(f).  (D.E.62.1.)  I certify that this brief complies with the type size and typeface requirements of Fed R. App. P. 32(a)(5) and (6).


August 15, 2025                          /s/ *Gary A. Bornstein*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system on August 15, 2025. All participants in the case are registered ACMS users, and service will be accomplished by the appellate ACMS system.

/s/ *Gary A. Bornstein*