**No. 25-2935**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

EPIC GAMES, INC.,
*Plaintiff-Appellee,*

v.

APPLE INC.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR
Hon. Yvonne Gonzalez Rogers, District Judge

---

**BRIEF OF Y COMBINATOR, LLC AS *AMICUS CURIAE* IN SUPPORT OF
PLAINTIFF-APPELLEE EPIC GAMES, INC.'S ARGUMENT FOR
AFFIRMANCE OF THE DISTRICT COURT'S ENFORCEMENT ORDER**

---

Catherine S. Simonsen
SIMONSEN SUSSMAN LLP
418 Bamboo Lane, Suite C-18
Los Angeles, CA 90012
(917) 747-5196
catherine@simonsensussman.com

Shaoul Sussman
Nicolas A. Stebinger
SIMONSEN SUSSMAN LLP

*Counsel for* Amicus Curiae
*Y Combinator, LLC*

*Of Counsel*

August 21, 2025

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1-1, Y Combinator, LLC states it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Date:        August 21, 2025

By:  /s/ Catherine S. Simonsen
          Catherine S. Simonsen
          SIMONSEN SUSSMAN LLP
          *Counsel for* Amicus Curiae
          *Y Combinator, LLC*

i

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICUS CURIAE*..............................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ......................................................................................................4

    I.   Apple's New Link Entitlement Program Prohibited Steering in Violation of the Injunction .....................................................................................4

    II.  Apple's New 27% Link-Out Penalty Was a Tax on Innovation, Not a Fair Recoupment of Value Provided by Apple......................................10

    III. Without the Enforcement Order, Startup Investment and Innovation Will Be Chilled, to the Significant Detriment of the Public Interest ..................13

    IV. Far from Threatening Small Businesses' Access to Apple's Platform, the Enforcement Order Benefits Small Businesses...........................................16

CONCLUSION ................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*,
  388 F.2d 272 (2d Cir. 1967)............................................................6

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ...................2

*Epic Games, Inc. v. Google LLC (In re Google Play Store Antitrust Litig.)*,
  Nos. 24-6256, 24-6274 25-303, 2025 U.S. App. LEXIS 19185
  (9th Cir. July 31, 2025) ...........................................................15

*Int'l Boxing Club of New York, Inc. v. United States*,
  358 U.S. 242 (1959) ...............................................................9

*Int'l Salt Co. v. United States*,
  332 U.S. 392 (1947) ...............................................................15

*United States v. Topco Assocs.*, *Inc.*, 405 U.S. 596 (1972) .......................4

**Other Authorities**

Andrew Liszewski, *Amazon Now Has a 'Get Book' Button in Its iOS Kindle App*,
  The Verge (May 6, 2025), https://www.theverge.com/news/661719/amazon-app-
  ios-apple-iphone-ipad-kindle-buy-books...........................................8

*Big Fixes for Big Tech: Hearing Before the Subcomm. on Antitrust,
  Competition Pol'y, and Consumer Rights of the S. Comm. on the Judiciary*,
  119th Cong. (2025) (testimony of Garry Tan, Pres. & CEO of Y Combinator)....3

*Black's Law Dictionary* (10th ed. 2014) ............................................6

Sarah Perez, *Substack Writers Can Now Direct US Readers to (Often Cheaper)
  Web-Based Subscriptions on iOS*, TechCrunch (Aug. 18, 2025),
  https://techcrunch.com/2025/08/18/substack-writers-can-now-direct-u-s-readers-
  to-often-cheaper-web-based-subscriptions-on-ios/...................................12

U.K. Competition & Markets Authority, *Mobile Ecosystems: Market Study Final
  Report* 161–62 § 5.70 (June 10, 2022),
  https://assets.publishing.service.gov.uk/media/63f61bc0d3bf7f62e8c34a02/Mobi
  le_Ecosystems_Final_Report_amended_2.pdf.........................................12

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

Y Combinator's decades-long experience on the front lines of startup development and expansion—including in digital technology markets—gives us a valuable perspective on the anticompetitive restraints at issue in this case. We submit this brief to share this perspective with the Court.[1] In our experience, Apple's anti-steering restraints have profoundly inhibited the growth and development of technology companies that deliver and monetize the value of their goods and services through apps. The district court's Injunction, affirmed by this Court, was meant to put an end to Apple's anticompetitive block on entry and expansion. Instead, Apple implemented its new Link Entitlement Program (the "Program") which, from Y Combinator's perspective, blatantly violated the Injunction's requirement that Apple stop prohibiting steering. The district court's Enforcement Order was welcome relief. For the first time in nearly two decades, Y Combinator can seriously consider investing in innovative businesses that would have been impossible in the past because of the "Apple Tax." An affirmance from this Court would make that relief certain and permanent, with significant benefits for competition, innovation, and the digital economy.

---

[1] Apple and Epic consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than Y Combinator or its counsel contributed money that was intended to fund preparing or submitting the brief.

Y Combinator is a startup accelerator and venture capital firm launched in 2005 and headquartered in San Francisco. Since Y Combinator's founding, we have selected, funded, and fostered more than 5,000 startups and entrepreneurs and created hundreds of thousands of jobs. From household names like Airbnb, DoorDash, and Dropbox, to disruptive innovators like Coinbase and Stripe, Y Combinator's alumni network represents the best of American entrepreneurship. This experience and perspective inform the input and analysis we submit as *amicus*.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's Injunction against Apple's anti-steering policies served a vital public interest in preserving competition among transaction platforms. *See* Rule 52 Order, 5-ER-961–64; *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000–01 (9th Cir. 2023). This in turn created a groundbreaking opportunity for technology startups to enter and thrive. But from the moment the Injunction issued, Apple sought to evade it by creating new mechanisms to inhibit competition. The district court properly entered the Enforcement Order in the face of Apple's successful efforts to violate the Injunction and—less successfully—conceal that violation. Y Combinator submits this brief to share our perspective, based on decades of experience nurturing technology startups, that the Enforcement Order is

essential to serve the public interests in competition and innovation that undergird the district court's original Injunction.

Apple's anti-steering restraints that the district court found unlawful are part and parcel of Apple's broader and longstanding strategy to stifle innovation from disruptive firms.[2] Consistent with that approach, when enjoined by the district court from prohibiting competition directly, Apple pivoted: It charged new fees specifically designed to make out-of-app transactions so prohibitively expensive that they would not pose a true alternative to in-app payments, and imposed onerous technical conditions to prevent consumers from following links to out-of-app transactions. Enforcement Order, 1-ER-15–46. Apple's executives then lied when confronted with these measures. 1-ER-3.

From the perspective of Y Combinator, Apple's 27% fee on out-of-app transactions and other anti-link-out measures were functionally identical to Apple's original restraints and violated the express terms of the Injunction. The fee was not justified to compensate Apple for value it provides but was instead a naked tax on developers' revenues and a penalty for linking-out. The sheer magnitude of

---

[2] For example, Garry Tan, President and CEO of Y Combinator, recently testified in Congress about the direct harm Apple's anticompetitive practices have on startups, using the Y Combinator-backed company Beeper as a prime example. *See Big Fixes for Big Tech: Hearing Before the Subcomm. on Antitrust, Competition Pol'y, and Consumer Rights of the S. Comm. on the Judiciary*, 119th Cong. (2025) (testimony of Garry Tan, Pres. & CEO of Y Combinator).

revenues Apple sought to extract with its new Program would have made the difference between viable and infeasible business models for countless developers. If the district court had allowed Apple's fees and other tactics to stand, they would have continued to chill investment in app-development startups and would have resulted concretely in fewer American businesses being created.

Thankfully, the district court saw Apple's violation of the Injunction for what it was and put an end to it. This Court should affirm the district court's Enforcement Order, and end Apple's anticompetitive anti-steering restraints once and for all. This relief will finally enable technology startups to freely exercise their "vigor, imagination, devotion, and ingenuity," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972), substantially less constrained by one of the most abusive gatekeepers in our economy.

## ARGUMENT

### I. Apple's New Link Entitlement Program Prohibited Steering in Violation of the Injunction

A central issue in this appeal is whether Apple's Link Entitlement Program violated the district court's original Injunction, thus warranting the district court's Enforcement Order. Apple's Program combined new fees on out-of-app purchases with other technical restrictions on links to out-of-app transaction platforms. *See* Enforcement Order, 1-ER-14–43. The Program clearly violated the literal terms of the Injunction and constituted a de facto prohibition on steering.

Apple's most direct violation was its adoption of a new 27% fee on linked-out transactions. Apple argues the Injunction did not prohibit this new fee because, by its text, the Injunction only requires Apple to allow developers (i) to include links and calls to action to external purchasing mechanisms and (ii) to communicate with customers through voluntary points of contact. *See* Enforcement Order, 1-ER-8. Since the Injunction does not expressly forbid Apple from charging out-of-app commissions, Apple urges, such fees are permitted. *See* Apple Br. at 26–27.

As an initial matter, Apple ignores that its new 27% fee on linked-out transactions was, in substance, simply a fee to link-out.  In other words, Apple began charging developers to do something the Injunction expressly requires Apple to allow developers to do: include "links . . . to external purchasing mechanisms" in their apps. 1-ER-8. But the Injunction requires Apple not to prohibit linking-out—period, full stop.  It does not permit Apple to condition the right to link-out on the payment of a fee. Indeed, had Apple begun charging developers a fee to include links to external purchasing mechanisms in their apps—links the Injunction expressly requires Apple to allow—there would have been very little dispute that Apple had violated the Injunction. Because Apple's 27% linked-out transaction commission was in substance a punitive fee and deterrent to link-out, it violated the terms of the Injunction Order.

5

Further, Y Combinator agrees with Epic that "the new out-of-app commission so 'severely hindered' effective steering as to 'prohibit' it," and "the combination of restrictions in the Link Entitlement Program *as a whole* created a particularly effective prohibition on steering, in direct defiance of the Injunction's literal terms." Epic Br. at 38 (quoting *Prohibit*, *Black's Law Dictionary* 1405 (10th ed. 2014)).

As noted in analogous antitrust contexts, a firm cannot evade prohibitions on illegal restraints by setting prices so high that nobody would ever pay them in lieu of imposing an outright restraint. *See, e.g.*, *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 284 (2d Cir. 1967) ("[T]o hold that a seller can avoid [prohibitions on restraints] merely by setting a pre-established price . . . even if that price is rarely if ever charged . . . would mean that the antitrust laws could be flouted at will."). But here, Apple deliberately designed its 27% link-out fee to raise costs for linked-out transactions so high that they would *exceed* the 30% in-app purchase fee, and thus it would never make economic sense for app developers to use out-of-app transaction platforms. *See* Enforcement Order, 1-ER-22–24, 60 & n.64. This is because payment processing fees alone—not to mention fraud detection and customer service costs—generally amount to at least 3%. 1-ER-60 & n.64. The 27% link-out fee thus constituted a de facto prohibition on steering. Consistent with the intent and effect of Apple's Program, and as Epic

6

reported to this Court, "no developer ever steered pursuant to the Program." Epic Br. at 39.

Apple's new link-out fee also guaranteed that no competing transaction processing platform would ever pose a competitive threat to Apple's 30% in-app purchase fee. Developers would have continued to absorb or pass through a charge equal to nearly one-third of the value of the actual products and services being purchased, even though other transaction platforms may provide similar or better functionality at a lower price. *See* Rule 52 Order, 5-ER-916–17. As explained in Section III, *infra*, this would have had profound negative implications for investment in innovative startups.

Further, Apple layered additional anti-steering technical and design restrictions—similarly violative of the express provisions of the Injunction—on top of its 27% fee. *See* Enforcement Order, 1-ER-27–43. These additional restrictions amplified the effect of Apple's already prohibitive 27% fee.

For example, imagine a person who typically reads books in e-book format on an e-reader (e.g., Kindle or Nook). The person is on their public transit commute to work. They see an ad promoting a new book they would like to read. They wish to purchase the e-book in that moment, before they forget the title, with the intent to download and read it later on their e-reader. They open an online shopping app on their iPhone, search for and find the book, and pull up the product

detail page in the app. Today, with the Enforcement Order in effect, they can click on a prominent button to "Get book," which dynamically links them to and signs them into the online shopping provider's website and takes them directly to the book's product detail page where they can click "Buy now" (with nearly 100% of the revenues going to the online shopping provider).[3]

By contrast, under Apple's Link Entitlement Program, there would have been no "Get book" button in the app, because Apple's Program prevented purchase links from appearing as buttons or near the product being sold. *See* Enforcement Order, 1-ER-29–33. So, after painstakingly searching for, identifying, and clicking on a link (which would not have looked like a button) to where they could purchase the e-book outside of the app, and after clicking through the "scare screen" that Apple superimposed specifically to intimidate them from completing the out-of-app purchase (Enforcement Order, 1-ER-35–39), the user would have been taken to the online shopping provider's website in their iPhone's browser. Because the Program did not allow dynamic links (Enforcement Order, 1-ER-40–42), the user would have been required to manually log into their account with the online shopping provider in the browser and conduct a new search for the e-book

---

[3] *See* Andrew Liszewski, *Amazon Now Has a 'Get Book' Button in Its iOS Kindle App*, The Verge (May 6, 2025), https://www.theverge.com/news/661719/amazon-app-ios-apple-iphone-ipad-kindle-buy-books.

before they could have made the purchase. (And 27% of the purchase price would have gone to Apple.)

As this example illustrates, Apple's new Program was an elaborate, Rube Goldberg-esque set of mechanisms intended to impose enough friction that consumers would simply give up before leaving Apple's ecosystem. *Accord* Enforcement Order, 1-ER-35, 62–64. The convoluted nature of this arrangement stands in stark contrast to the alternative, which is consumer-friendly and intuitive—the prominent, orange "Get book" button dynamically linking the consumer straight to a product detail webpage where they can easily purchase the book.

It is therefore not surprising that not a single developer took Apple up on this new "entitlement."  Epic Br. at 38. Apple's new Program, involving prohibitive fees and requiring intentionally deprecated links, was a full ban on steering by another name. It violated the Injunction, and the district court, consistent with long-established principles of equity, properly entered the Enforcement Order to stop it. *See, e.g.*, *Int'l Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 258–60 (1959) (holding district court was fully entitled to adopt a more assertive approach to its ordered remedy when "two and a half years after our opinion in the former appeal . . . it appears that appellants had continued exercising their unlawful control long after they well knew that this activity was within the

9

coverage of the [competition laws] . . . [and] from all appearances it is continuing to this day").

## II. Apple's New 27% Link-Out Penalty Was a Tax on Innovation, Not a Fair Recoupment of Value Provided by Apple

Apple claims its new 27% link-out fee was not an anti-steering restraint, but rather a lawful mechanism for Apple to recoup a fair rate of compensation for the value Apple provides in "enabling" consumers' in-app enjoyment of digital goods and services. Apple Br. at 30–31 (discussing hypothetical example of user purchasing costume for virtual character). In other words, Apple states, without Apple, the digital goods and services delivered through apps would be of little to no value to consumers—and therefore, Apple was "justified" in charging a link-out fee, to "[]compensat[e]" Apple for "use of its intellectual property." *Id.* at 30.

Y Combinator does not dispute that Apple has introduced innovations in its long and lucrative history. But Apple's claims of entitlement to more than one-quarter of the revenues from every linked-out transaction within seven days of a link-out are overstated. An example beyond Apple's virtual character costume hypothetical (Apple Br. at 30–31) serves to illustrate the point.

Dropbox (a 2007 graduate of the Y Combinator program) offers a cloud storage and file synchronization service. Dropbox works in the background of a consumer's computer, backing up files saved to the computer's hard drive to Dropbox's cloud. If their device is lost or broken, their files are still safe and secure

10

in the Dropbox cloud. Some consumers use Dropbox almost exclusively on their computers and never access Dropbox via an app on an Apple device. However, Dropbox does offer an app, available in the Apple App Store, which allows customers to interact with their files saved to the Dropbox cloud from their Apple device. Imagine a Dropbox customer finds themself without their computer, needing to access a file. They download the Dropbox app on their iPhone, log in, and encounter a pop-up message from Dropbox alerting them that they are running low on space and offering them a promotional price for a basic paid subscription. Not wanting to miss out on the deal, they decide to upgrade there and then. Apple designates the upgrade a "digital good" and charges Dropbox a double-digit percentage-point commission on the entire subscription. The user remains a satisfied paying customer of Dropbox for years, but never accesses Dropbox from their iPhone again.

As this example makes clear, Apple's new link-out fee bore no proportional relationship to the value Apple did (or did not) provide to the users to whom it was inevitably passed on. There are many additional examples of high-value digital goods and services that developers—not Apple—have poured millions of dollars and untold hours into innovating and bringing to market. These are products that anyone can access with an internet connection and a web browser. That these developers were forced to build an app that runs on iOS through which consumers

11

could access their creations—forced because Apple doggedly directs users away from browsers and towards apps so it can monetize them[4]—does not somehow transform Apple's forcing into value creation for which it is entitled to an over one-quarter share of developers' revenues. Apple does not enable these consumers' enjoyment of the fruits of developers' investments and innovation in any way that is even remotely proportional to the value Apple sought to extract with its out-of-app fee.[5] Apple's fee was not "justified" fair compensation, but rather a steering penalty, a punitive tax on innovation, and a mechanism for insulating Apple's IAP fee from competition.

---

[4] *See* U.K. Competition & Markets Authority, *Mobile Ecosystems: Market Study Final Report* 161–62 § 5.70 (June 10, 2022), https://assets.publishing.service.gov.uk/media/63f61bc0d3bf7f62e8c34a02/Mobile _Ecosystems_Final_Report_amended_2.pdf ("Apple is able to exert control over the maximum functionality of all browsers on iOS and, as a consequence, hold up the development and use of web apps. This limits the competitive constraint that web apps pose on native apps, which in turn protects and benefits Apple's App Store Revenues.").

[5] As another example, Apple cannot with a straight face argue it is entitled to 27% of an online writer's or journalist's income merely because one of the many ways their readers can access their work is through an app. But only now, with the Enforcement Order in place, can those writers and journalists enable subscription payments through an iPhone without paying over one-quarter of those revenues over to Apple. *See* Sarah Perez, *Substack Writers Can Now Direct US Readers to (Often Cheaper) Web-Based Subscriptions on iOS*, TechCrunch (Aug. 18, 2025), https://techcrunch.com/2025/08/18/substack-writers-can-now-direct-u-s-readers-to-often-cheaper-web-based-subscriptions-on-ios/.

### III. Without the Enforcement Order, Startup Investment and Innovation Will Be Chilled, to the Significant Detriment of the Public Interest

If this Court does not affirm the Enforcement Order, the promise of the original Injunction—affirmed by this Court—to unfetter the market from Apple's longstanding anti-steering restraints will be lost. An understanding of how startups evolve into significant engines of growth and change in our economy helps to explain why the Enforcement Order is so crucial to promoting competition and innovation. Other *amici*, such as Spotify, have explained the immediate impact the Enforcement Order had on their businesses. Spotify *Amicus* Br. at 10–12; DCN *Amicus* Br. at 10–11. But the Enforcement Order will have a longer-term—and much more significant—beneficial impact on investment in innovation if this Court affirms.

Y Combinator's investment strategy focuses on identifying startups with a strong founding team, a compelling idea, and a large potential market. We look for founders who have a deep understanding of a problem and are determined to solve it. When we evaluate digital-products companies, we consider how a startup's monetization model will fare under the rules of major app ecosystems, including Apple's. Historically, it was crucial to identify business models that could thrive despite the 30% Apple Tax and Apple's anti-steering restraints. Accordingly, we primarily focused on startups whose products were exempt from the Apple Tax and

13

Apple's anti-steering restraints, or their products were only marginally or incidentally consumed (and purchased) through an app.

For example DoorDash (a 2013 graduate of Y Combinator) is a food delivery service that connects users to local restaurants and delivery drivers. DoorDash's category exemption from the Apple Tax as an app that facilitated the delivery of real-world services was a significant factor in its favor when Y Combinator was considering investing in the company: Doordash could invest more of every dollar it earned back into the business rather than giving Apple a 30¢ cut off the top, enabling what has proven to be explosive growth. Another example is Dropbox. For the many consumers who largely use Dropbox on their computers, they can and do pay for their subscriptions via a browser at www.dropbox.com, enabling Dropbox to substantially avoid the 30% Apple Tax applied to in-app purchases. As a result, the Apple Tax has not compromised Dropbox's business model.

In contrast to these types of businesses, Y Combinator—and the larger venture capital community—have long been hesitant to back app-based businesses that were poor investments due to the Apple Tax. A 30% revenue share can easily be the difference between a company that can afford to scale, hire new employees, and reinvest in its product, and one that is perpetually struggling to stay afloat. Understood in this light, the 30% Apple Tax—protected from erosion by Apple's

14

anti-steering restraints—is not merely a cost of doing business; it is a profound and often insurmountable barrier to entry that stifles competition and innovation at its source.

Recent legal developments and a renewed focus on platform fairness have, however, created a palpable change in the market. *See, e.g.*, *Epic Games, Inc. v. Google LLC (In re Google Play Store Antitrust Litig.)*, Nos. 24-6256, 24-6274 25-303, 2025 U.S. App. LEXIS 19185, *48, *83 (9th Cir. July 31, 2025) (upholding in full injunction prohibiting anticompetitive arrangements that insulated Google's Play Store and Google Play Billing from competition). Since the district court issued its Enforcement Order, we have witnessed a surge of interest from investors and founders in business models that previously were considered too risky or simply not viable in light of the Apple Tax. Market participants are seeing the writing on the wall: If this Court affirms, Apple will finally be forced to comply with the Injunction. Apple will permit steering to lower-cost options, which will put downward pressure on the Apple Tax and will open up the possibility of becoming the next DoorDash or Dropbox to entire new categories of businesses. *See Int'l Salt Co. v. United States*, 332 U.S. 392, 401 (1947) (effective antitrust remedy should "pry open to competition a market that has been closed by defendants' illegal restraints").

## IV. Rather than Threatening Small Businesses' Access to Apple's Platform, the Enforcement Order Benefits Small Businesses

Contrary to the commonsense principles discussed above, backed by decades of Y Combinator's experience incubating small businesses, *amicus* ACT | The App Association ("ACT") argues that allowing the Enforcement Order to remain in place will be "devastat[ing]" for small businesses. ACT *Amicus* Br. at 9. ACT's argument seems to be that if Apple cannot charge a 27% fee on linked-out transactions, Apple will have to get that money from somewhere else, and Apple will have no alternative but to take it from the hands of small businesses. *See id.*

In Y Combinator's experience, these concerns are misplaced. First, there is no reason to believe Apple will depart from its longstanding tradition of charging small and low-revenue-generating businesses lower fees. If Apple really had "no choice" but to raise fees on small businesses as a result of the Enforcement Order, Apple would have sounded that alarm in its own brief, and would have explained why the only option left to this immensely profitable company—with a market capitalization of nearly $3.5 *trillion*—would be to wring incremental loose change from developers with the lowest revenues. Indeed, the amount by which Apple would have to raise fees on small businesses to make up for its 27% out-of-app commission "loss" on its largest apps would self-defeatingly drive small businesses out of the App Store altogether. In other words, from a practical perspective, it will never happen.

16

But more to the point, the argument that the App Store's commission structure, with its reduced rate for developers earning annual revenues under $1 million, protects and nurtures small developers is fundamentally flawed. This perspective, often advanced by Apple and other Big Tech-funded groups, misunderstands the fundamental orientation of tech startups. Startups are not founded with the ambition to remain small businesses; rather, they seek exponential, uncapped growth, and a trajectory that quickly exceeds $1 million in revenues per year. Their savings resulting from a temporary exemption from the Apple Tax while their annual revenues briefly hover below $1 million are a rounding error at most. What will drive true value to these important small businesses is the ability to scale, free of the 30% Apple Tax, as a result of the steering that the district court's Enforcement Order, if affirmed, will enable.

## CONCLUSION

The Court should affirm the district court's Enforcement Order and the Injunction's continued prohibition on Apple's anti-steering restraints.

//

//

//

//

//

17

Date:        August 21, 2025            Respectfully submitted,

By:  /s/ Catherine S. Simonsen
      Catherine S. Simonsen
      SIMONSEN SUSSMAN LLP
      418 Bamboo Lane, Suite C-18
      Los Angeles, CA 90012
      Tel: (917) 747-5196
      catherine@simonsensussman.com
      *Counsel for* Amicus Curiae *Y Combinator, LLC*

      Shaoul Sussman
      Nicolas A. Stebinger
      SIMONSEN SUSSMAN LLP
      *Of Counsel*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-2935

I am the attorney or self-represented party.

**This brief contains** | 3,952 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Catherine Simonsen | **Date** | 8/21/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at *forms@ca9.uscourts.gov*

**Form 8**                                                        *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2025, I caused to be filed electronically the foregoing Brief of Y Combinator, LLC as *Amicus Curiae* in Support of Plaintiff-Appellee Epic Games, Inc.'s Argument for Affirmance of the District Court's Enforcement Order with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

Date:    August 21, 2025

By:  /s/ Catherine S. Simonsen
Catherine S. Simonsen
SIMONSEN SUSSMAN LLP
*Counsel for* Amicus Curiae *Y Combinator, LLC*