**No. 25-2935**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

EPIC GAMES, INC.,
*Plaintiff-Appellee,*

v.

APPLE INC.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Northern District of California (Hon. Yvonne Gonzalez Rogers)
No. 4:20-cv-05640-YGR

---

**AMICI CURIAE CIVIL PROCEDURE AND ANTITRUST
PROFESSORS BRIEF IN SUPPORT OF
PLAINTIFF-APPELLEE, EPIC GAMES, INC.**

---

Professor Jennifer Sturiale
Delaware Law School
Widener University
4601 Concord Pike
Wilmington, DE 19803
(646) 660-1834

H. Hunter Bruton
N.C. State Bar No. 50601
Edward F. Roche
N.C. State Bar No. 55434
Noel F. Hudson
N.C. State Bar No. 59776
SMITH, ANDERSON, BLOUNT,
DORSETT, MITCHELL &
JERNIGAN, LLP
P.O. Box 2611
Raleigh, NC 27602
919-821-1220
*Counsel for Civil Procedure and
Antitrust Professors*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF AMICI CURIAE .............................................................. 1

SUMMARY OF ARGUMENT ................................................................. 1

ARGUMENT ......................................................................................... 2

    I.   The district court appropriately implemented its contempt power to induce compliance after efforts to sidestep the injunction ........................................................................... 2

    A.   The district court correctly found both literal and practical-effect violations of the injunction's text. .................................... 2

    B.   Every affirmative equitable order presumes a duty to avoid evading its effect. ....................................................................... 6

    II.   Alternatively, this Court should affirm based on the district court's modification power. ............................................. 9

    A.   Courts have broad authority to modify injunctive decrees. ..... 10

    B.   Party behavior that circumvents the injunction's purpose constitutes a valid basis to modify the injunction. ................... 11

    C.   Apple's read of *United States v. Armour* narrows courts' modification power where the Supreme Court has refused to do so. ........................................................................................ 13

    III.   The district court's antitrust injunction provides complete relief to Epic and, in so doing, permissibly bestows incidental effects on third parties. .......................................... 16

    A.   Injunctions can permissibly provide benefits to third parties. 16

    B.   Incidental effects are explicitly contemplated by competition and antitrust statutes that address market harms. ................ 18

CONCLUSION ..................................................................................... 21

APPENDIX A ....................................................................................... 22

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............... 23

CERTIFICATE OF SERVICE ................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M v. Pribyl,*
  259 F.3d 587 (7th Cir. 2001) .................................................................. 8

*Alley v. U.S. Dep't of Health & Hum. Servs.,*
  590 F.3d 1195 (11th Cir. 2009) ............................................................. 8

*Brown v. Plata,*
  563 U.S. 493 (2011) .............................................................................. 10

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,*
  618 F.3d 1066 (9th Cir. 2010) .............................................................. 18

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) .............................................................................. 19

*Chambers v. NASCO,*
  501 U.S. 32 (1991) ............................................................................ 7, 10

*Chrysler v. United States,*
  316 U.S. 556 (1942) ......................................................... 11, 12, 14, 15

*Epic Games v. Apple,*
  67 F.4th 946 (9th Cir. 2023) ................................................................ 20

*Epic Games v. Apple,*
  73 F.4th 785 (9th Cir. 2023) ................................................................ 19

*Epic Games v. Apple,*
  No. 4:20-CV-05640-YGR, 2025 WL 1260190 (N.D. Cal. Apr. 30, 2025) ....................................................................................... *Passim*

*In re Google Play Store Antitrust Litigation* ("*Google Play*"),
  2025 WL 2167402 (9th Cir. July 31, 2025) .................................*Passim*

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014)..........................................................6, 7, 8

*Kinney-Coastal Oil v. Kieffer*,
  277 U.S. 488 (1928)..............................................................................16

*McComb v. Jacksonville Paper*,
  336 U.S. 187 (1949).........................................................................*Passim*

*N.L.R.B. v. Deena Artware*,
  361 U.S. 398 (1960) ...............................................................................6

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992) ................................................................. 10, 11, 12

*Schering v. Illinois Antibiotics*,
  62 F.3d 903 (7th Cir. 1995)................................................................8, 9

*Shaw v. Hunt*,
  517 U.S. 899 (1996)..............................................................................17

*Taggart v. Lorenzen*,
  587 U.S. 554 (2019) ...............................................................................7

*Trump v. CASA*,
  145 S. Ct. 2540, No. 24A884 (June 27, 2025)..............................*Passim*

*United States v. Armour*,
  402 U.S. 673 (1971)........................................................................*Passim*

*United States v. E.I. du Pont de Nemours*,
  366 U.S. 316 (1961) ...............................................................................5

iv

## Other Authorities

Herbert Hovenkamp, *Antitrust Harm and Causation*,
   99 Wash. U.L. Rev. 787 (2021) ...........................................................18

Michal S. Gal & Nicolas Petit, *Radical Restorative Remedies for Digital Markets*,
   36 Berkeley Tech. L.J. 617 (2021) ......................................................18

Julia Levine, *There's an "App"Le for That: The Dangers of A Potentially Monopolized Marketplace for Consumers and App Developers*,
   18 J. Bus. & Tech. L. 115 (2022)...........................................................5

## INTEREST OF AMICI CURIAE

Amici curiae are professors of civil procedure, antitrust law, and remedies, who have taught, written, and/or litigated on subjects relevant to this case. Amici have no interest, financial or otherwise, in this case, and counsel for Apple Inc. has consented to Amici filing this brief. Neither party's counsel in this case authored the brief in whole or in part. Neither party, nor its counsel in this case, contributed money that was intended to fund preparing or submitting the brief. And no person—other than Amici or its counsel—contributed money that was intended to fund preparing or submitting the brief. Amici file this brief solely to provide the Court with their analysis of the district court's contempt and modification powers, which support affirming the district court's contempt order or, alternatively, affirming based on the district court's modification power.

## SUMMARY OF ARGUMENT

Courts rely on contempt powers as a vital tool to compel obedience, ensure the smooth functioning of legal proceedings, and reinforce the authority of judicial mandates. Courts are not powerless to enforce their orders when a party crafts a workaround aimed at undermining court

authority.  Instead, courts have the power to impose contempt sanctions and modify existing orders to further compel compliance.  Weakening the courts' contempt power is misaligned with precedent, incentivizes gamesmanship, and dilutes the effectiveness of injunctive relief.

## ARGUMENT

### I. The district court appropriately implemented its contempt power to induce compliance after efforts to sidestep the injunction.

The district court validly exercised its contempt power to compel compliance after Apple attempted to subvert the injunction.  First, the district court found that Apple violated the injunction's textual prohibitions—both in letter and in effect.  Second, the district court was further empowered to administer contempt sanctions since every affirmative equitable order carries with it the inherent prohibition against engaging in actions designed to defeat the order's purpose.  The district court's response was both necessary and appropriate to preserve the integrity of its judgment.

### A. The district court correctly found both literal and practical-effect violations of the injunction's text.

The district court found that Apple's actions fell explicitly within the scope of the actions the district court had enjoined.  Order Granting

2

Epic Games, Inc.'s Motion to Enforce Injunction, *Epic Games v. Apple*, No. 4:20-CV-05640-YGR, 2025 WL 1260190, 37–38 (N.D. Cal. Apr. 30, 2025). The district court enjoined Apple's restrictions on developers' ability to direct consumers to purchase directly from developer websites, known as Apple's anti-steering provisions. Specifically, the injunction prevented Apple from stopping developers from "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms" other than in-app purchasing ("IAP"). *Id.* at 37. The process of navigating out-of-app to purchase directly from the developer is referred to as a "link-out."

The district court found that Apple then imposed serious measures to circumvent the injunction. It found that Apple deliberately convoluted the linking-out process to present as problematic, perplexing, and alarming to consumers—a direct violation of the injunction. *Id.* at 19–20, 22–24. For example, Apple banned developers from inserting an external purchase link near the app's purchase flow. *Id.* at 19–20. This meant that when a user perused an in-app storefront, Apple prohibited developers from sharing alternative purchase information at that time. *Id.* Apple thereby effectively limited a user's purchase option to IAP only.

3

*See id.* If users nonetheless discovered and clicked the developer's link-out option, Apple implemented a "scare" screen—a warning message encompassing the full phone screen to deter users from leaving the app. *Id.* at 22. Additionally, the district court found Apple's anti-steering provisions restricted information flow to consumers regarding purchasing possibilities and the payment structure related to IAP. *See id.* at 3, 21–22. These restrictions increased the number of transactions processed through Apple's payment processor, increasing profits and reinforcing Apple's market power. *See id.* at 35.

The district court also found that participation in Apple's link-out program became inordinately expensive to developers. *Id.* at 36. Where previously no charge had been imposed on purchases that were made after the customer left the app to purchase on the developer's site, developers were now charged a twenty-seven percent commission on all the customers' purchases on the developer's site for seven days after the consumer link-out. *Id.* at 1, 35. As the district court found, the new link-out program was "not economically viable" for developers. *Id.* at 38 n.67.

The district court additionally found practical-effect violations of the injunction. The district court found that the restrictions above

4

worked in tandem to cause the same result as the anti-steering provisions: "[T]he overall effect is quite literally[] intentional *de facto* prohibition." *Id.* at 37 n.66. This exclusionary effect on app developers' ability to offer their own payments in competition with IAP causes harm to newer developers entering the marketplace. Julia Levine, *There's an "App"Le for That: The Dangers of A Potentially Monopolized Marketplace for Consumers and App Developers*, 18 J. BUS. & TECH. L. 115, 134 (2022) (noting anti-steering practices work against the central tenant of antitrust law—"ensur[ing] a fair and equitable marketplace"); *see also United States v. E.I. du Pont de Nemours*, 366 U.S. 316, 326 (1961) ("The key to the whole question of an antitrust remedy is of course the discovery of measures effective to restore competition."). Likewise, consumers are harmed by reduced innovation and higher prices, as the developer only has two options: (1) absorb Apple's IAP fee, resulting in less capital and associated business growth, or (2) pass the IAP fee onto the consumer, increasing prices.

In sum, Apple's actions violated the injunction's provision against "prohibiting developers" from linking customers out of the app to purchase goods on the developer's website. *Epic Games*, No. 4:20-CV-

05640-YGR, 2025 WL 1260190, at 34–38.    While not officially implementing another anti-steering policy in prose, Apple developed one in practice.    As the district court aptly noted, "even limited to the four corners of the Injunction, Apple violated the literal text."    *Id.* at 34.

### B. Every affirmative equitable order presumes a duty to avoid evading its effect.

Party actions that aim to undermine a court's authority to carry out its orders are inappropriate.    *See McComb v. Jacksonville Paper*, 336 U.S. 187, 192 (1949); *see also N.L.R.B. v. Deena Artware*, 361 U.S. 398, 414 (1960) (Frankfurter, J., concurring) (reasoning a party's attempt to "frustrate" the court's "power to effectuate enforcement" is improper). "[E]very affirmative order in equity carries with it the implicit command to refrain from action designed to defeat it."    *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 948 (9th Cir. 2014) (quoting *Deena Artware*, 361 U.S. at 413 (Frankfurter, J., concurring)). And this principle holds true even when the evasive behavior is not explicitly barred in the injunction, as explained in the seminal case, *McComb v. Jacksonville Paper*.    336 U.S. 187 (1949).

*McComb* explains that when a party intentionally engages in conduct that defeats the objectives of an injunction—especially in a

6

manner designed to create plausible deniability—contempt sanctions are appropriate. The *McComb* Court affirmed a contempt order against a company ordered to compensate employees time and a half for overtime. 336 U.S. at 193–95. Instead of compensating employees as instructed, the company allocated raises disguised as bonuses and excluded those increases from the regular wage rate used to calculate overtime. *Id.* at 190. The employer asserted that, because the injunction did not *explicitly* prohibit this practice, the employer was not in contempt of the court's order. *See id.* at 192. The Supreme Court rejected the employer's argument: "It does not lie in [the employers'] mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined." *Id.* The *McComb* Court noted that the employer's argument "would give tremendous impetus to the program of experimentation with disobedience of the law." *Id.* at 192.

The principle underlying the contempt sanctions in *McComb* inheres in multiple contexts. *See, e.g., Taggart v. Lorenzen*, 587 U.S. 554, 562 (2019) (bankruptcy); *Chambers v. NASCO*, 501 U.S. 32, 50 (1991) (contract); *Inst. of Cetacean Rsch.*, 774 F.3d at 952, 954–55 (torts). And this principle holds for good reason—permitting party malfeasance would

create an ineffective and unmanageable enforcement framework. Defendants would be permitted to avoid contempt by crafting new plans that, while violative of a court's order, were not specifically enjoined. *Id.* at 192–93. Instead of holding the defendants in contempt, the court would enter another order enjoining the new plan. *Id.* This iterative process would effectively and indefinitely undermine the court's authority. *Id.*

Judge Posner similarly rejected an overly narrow interpretation of injunctions, noting the resultant futility of enforcement. Requiring courts to predict all potential evasions would allow injunctions to "spring loopholes, and parties in whose favor injunctions run will be inundating courts with requests for modification in an effort to plug the loopholes." *Schering v. Illinois Antibiotics*, 62 F.3d 903, 906 (7th Cir. 1995); *see also Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1206 (11th Cir. 2009) (approving of Judge Posner's "loophole" reasoning in *Schering*); *3M v. Pribyl*, 259 F.3d 587, 598 (7th Cir. 2001) (same). Entertaining arguments to the contrary risks preventing accountability for sustained contemptuous behavior, indefinitely delaying relief for plaintiffs, and

overwhelming the courts. *See McComb*, 336 U.S. at 192; *Schering*, 62 F.3d at 906.

As this Court previously reasoned, "no injunction can explicitly prohibit every conceivable plan designed to defeat it." *Inst. of Cetacean Rsch.*, 774 F.3d at 954. Assuming otherwise unduly constrains court authority and violates the principle that affirmative orders inherently prohibit actions designed to undermine their purpose. Courts are bound by the principles espoused in *McComb* and reaffirmed since.

## II. Alternatively, this Court should affirm based on the district court's modification power.

As suggested by other Amici, the district court retained power to modify the injunction separate from a contempt determination. Brief of Amici Curiae Law Professors Samuel L. Bray, F. Andrew Hessick, and Michael T. Morley in Support of Neither Party, *Epic Games v. Apple*, No. 25-2935 (9th Circ. 2025), ECF No. 80. We agree.

But Amici also suggests that courts should impose modification of orders *before* exercising their contempt power. *Id.* That presumption flips the order of operations—and resulting burden of responsibility—from the parties to the court. Importantly, Amici do not dispute that this Court may alternatively affirm based on the district court's modification

9

power; Amici highlight that its brief "takes no position" on whether the district court's order can be "affirmed on alternative grounds (i.e., as a modification of the injunction)." *Id.* at 15. Additionally and alternatively to the arguments presented in Section I, the injunction could be upheld based solely on the district court's authority to modify its orders, without reaching the issue of contempt.

### A.    Courts have broad authority to modify injunctive decrees.

A court's power to modify an existing injunction is "long-established, broad, and flexible." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (cleaned up). Like the contempt power, the power to modify an existing order lies within the district court's fundamental, inherent authority. *See id.* at 538; *see also Chambers*, 501 U.S. at 43. A district court may modify its order when the facts "at the time of its [order's] issuance have changed, or new ones have since arisen." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992). Incumbent with the power to modify is the obligation to continually assess the outcomes and effectiveness of the relief imposed. *Brown*, 563 U.S. at 542. Modification, however, does not undermine a court's contempt finding.

**B.    Party behavior that circumvents the injunction's purpose constitutes a valid basis to modify the injunction.**

A district court may modify its injunction to respond to a party's subversive actions as evaluated in *United States v. Armour.  See generally* Brief for *Amici Curiae* Law Professors Samuel L. Bray, F. Andrew Hessick, and Michael T. Morley in Support of Neither Party, *Epic Games v. Apple*, No. 25-2935 (9th Circ. 2025), ECF No. 80.  Lower courts may "modify [an] original decree, after full litigation, on a claim that unforeseen circumstances now made additional relief desirable to prevent the evils aimed at by the original complaint." *United States v. Armour*, 402 U.S. 673, 681 (1971).  The changed circumstances can present themselves as either changes in law or fact.  *Rufo*, 502 U.S. at 384.  Logically following, a party's behavior may be a factual development that justifies revisiting and modifying the court's order.

The Supreme Court has articulated a malleable test to evaluate whether an injunction should be modified.  The "test to be applied is whether the change served to effectuate or to thwart the basic purpose of the original . . . decree." *Chrysler v. United States*, 316 U.S. 556, 562 (1942).  The behavior at issue need not be illegal, violative of the direct

11

language of the injunction, nor constitute behavior worthy of contempt—the action need only violate the purpose of the injunction. For example, in *Armour*, the Supreme Court held that the district court had authority to modify an injunction based on the defendant's sale to a third party, even though the original order did not explicitly forbid such a transaction. 402 U.S. at 681.

Here, Apple's post-injunction conduct provides a basis for both contempt and, as an alternative, modification. Since the injunction had been entered, substantive changes in fact occurred: Apple instituted more anticompetitive restrictions than had been previously enjoined. *See Rufo*, 502 U.S. at 384. As the district court found, the revised policies directly violated the district court's order. And Apple's response in subverting the injunction maintained and even increased its anticompetitive revenue stream. These actions thwarted the district court order that curbed Apple's anticompetitive behavior related to IAP. *See Chrysler*, 316 U.S. at 562. As such, the district court had the ability both to hold Apple in contempt and, alternatively, to modify the original order. *Armour*, 402 U.S. at 681.

12

### C.    Apple's read of *United States v. Armour* narrows courts' modification power where the Supreme Court has refused to do so.

*Armour* solidified the district court's ability to "modify[] the original decree, *after full litigation*, on a claim that unforeseen circumstances now made additional relief desirable to prevent the evils aimed at by the original complaint."  402 U.S. at 681 (emphasis added).

Apple has urged this Court to read "after full litigation" as requiring a new trial before a court can enjoin activity not formerly forbidden. Emergency Motion Under Circuit Rule 27-3 for a Partial Stay Pending Appeal, *Epic Games v. Apple*, No. 25-2935 (2025).  But this explanation does not align with *Armour* or the law more generally.

The Supreme Court specified "after full litigation" to differentiate between two types of decrees being discussed in *Armour*—litigated decrees and consent decrees.  402 U.S. at 681.  Litigated decrees are reached when the parties participate in the adversarial process.  *See id.* at 681–82.  Consent decrees, on the other hand, are instead reached by the parties' bargained-for mutual agreement, usually in part to avoid litigation expenses.  *Id.* at 681.  The Supreme Court explained in *Armour* that lower courts may more easily modify decrees that have been subject

13

to the adversarial process, unlike consent decrees. *Id.* Review of consent decrees should be treated like a contract—cabined to the four corners of the document "and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* at 681–82. The Supreme Court noted that claiming consent decrees should be subject to the same review as litigated decrees was correspondingly "out of place." *Id.* at 681.

That is, the Supreme Court used the expression "after full litigation" to clarify which of the two types of decree may be easily modified by a lower court. *Id.* The *Armour* Court did not require additional proceedings before enjoining behavior not explicitly covered by the injunction.

In contrast to Apple's interpretation, *Armour* clarified only notice and an opportunity to be heard is necessary to modify a litigated decree. 402 U.S. at 681. *Armour* referenced *Chrysler v. United States* to illustrate a correct modification in a similar context. *See id.* at 681 n.9 (cross-referencing *id.* at 675 n.2). In *Chrysler*, the district court modified an existing injunction more than once after notice and a hearing—without conducting a full trial or extensive evidentiary proceedings. 316 U.S. at

560–61.  The Supreme Court deemed the decree properly modified; it accordingly affirmed the district court.[1]  *Id.*

The animating principle across these cases is deference to the district court.  The district court must have latitude to issue contempt findings, modify injunctions, and respond to enterprising behavior.  A contrary conclusion would render injunctions meaningless.

*** 

The district court ensured Apple could fully litigate both the question of contempt and the breadth of any supplemental injunctive relief.  As demonstrated in both *Armour* and *Chrysler*, the courts possess sweeping modification power.  While the district court properly deployed contempt proceedings against Apple, the district court's action can also

---

[1] Furthermore, Apple received substantially more process than that required by *Armour* and *Chrysler*.  Here, Apple produced thousands of documents in discovery and participated in evidentiary hearings spanning nine days and involving thirteen witnesses' testimony, all of which consumed almost one year in time.  *Epic Games*, No. 4:20-CV-05640-YGR, 2025 WL 1260190 at 11–13.  In contrast, the process afforded in *Chrysler* was significantly less comprehensive.  *See* 316 U.S. at 560–61.  The process afforded Apple provided more than adequate procedural safeguards to satisfy due process in granting prospective relief.

be affirmed under its broad modification power without determining whether the court's contempt finding was merited.

## III. The district court's antitrust injunction provides complete relief to Epic and, in so doing, permissibly bestows incidental effects on third parties.

### A. Injunctions can permissibly provide benefits to third parties.

Traditionally, courts' remedial authority has encompassed a wide scope. The breadth of a court's civil contempt power "is determined by the requirements of *full* remedial relief" to "effect compliance with its decree." *McComb*, 336 U.S. at 193–94 (emphasis added). Specifically, in administering equitable relief, a court is empowered to grant "complete relief" to the parties before it. *Trump v. CASA*, 145 S. Ct. 2540, 2557 (U.S. June 27, 2025) (quoting *Kinney-Coastal Oil v. Kieffer*, 277 U.S. 488, 507 (1928)).

This Court recently acknowledged the broad scope of injunctions available to afford complete relief in *In re Google Play Store Antitrust Litigation* ("*Google Play*"). No. 24-6256, 2025 WL 2167402, at *25 (9th Cir. July 31, 2025) (discussing *CASA* and antitrust injunctions). In *Google Play*, Epic suffered, among other injuries, harm stemming from Google's billing and anti-steering policies. *Id.* The district court granted

16

Epic appropriate injunctive relief, including prohibiting the Google Play Store from necessitating or otherwise showing preference to Google Play Billing. *Id.* Google challenged the scope of relief, invoking the Supreme Court's recent decision *CASA* to limit the relief granted. *Id.*

This Court rejected Google's challenge. It further explained that the added dimension of antitrust, not present in *CASA*, further supported the injunction's scope: "[The] anticompetitive effects, if the restrictions were not enjoined, would continue to harm competition in the defined markets of Android in-app billing and Android app distribution, in which Epic is undisputedly a player." *Id.* The relief was consistent with *CASA*, which did not break new ground in this context. *Id.*

Rather, *CASA* further affirmed the district court's authority in prescribing complete relief to the parties before it. While *CASA* explained that a court's power to grant complete relief extends only to the named parties to the case, sometimes the remedy will incidentally affect parties *not* before the court. *Id.* at 2552. The Supreme Court acknowledged that it would sometimes be "all but impossible" to administer complete relief to the plaintiff only. *Id.* at 2565, n.12 (citing *Shaw v. Hunt*, 517 U.S. 899 (1996)). Remedies should not be eschewed

17

because non-parties receive incidental benefit. *See also Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1084 (9th Cir. 2010).

### B. Incidental effects are explicitly contemplated by competition and antitrust statutes that address market harms.

Remedying violations of competition and antitrust laws inherently entails incidental benefits to third parties. Competition and antitrust violations often disrupt entire markets and competitive dynamics, creating harms that cannot be neatly confined to individual plaintiffs. *See* Herbert Hovenkamp, *Antitrust Harm and Causation*, 99 WASH. U.L. REV. 787, 800 (2021) (discussing identifying antitrust harm and noting that "antitrust's dominant concern [is] with the preservation of competitive *markets*" (emphasis added)). Because these injuries are systemic by nature, granting meaningful relief to a single plaintiff frequently requires remedies that address broader market conditions. *See* Michal S. Gal & Nicolas Petit, *Radical Restorative Remedies for Digital Markets*, 36 BERKELEY TECH. L.J. 617, 634–35 (2021). One of the main purposes of adjudicating competition and antitrust violations is the public interest in ensuring legal market competition. As members of this

18

Court acknowledged earlier in this case, "in an antitrust suit brought by a competitor, injunctive relief will almost by definition have incidental benefits to non-parties—since antitrust law protects competition, not individual market participants." *Epic Games v. Apple*, 73 F.4th 785, 788 (9th Cir. 2023) (Smith, J., concurring in the granting of a motion for stay of the mandate pending the filing of a petition for certiorari).

Trying to limit relief strictly to a plaintiff's immediate circumstances would undermine courts' longstanding ability to redress harm and restore fair competition. Preserving courts' authority to enact broad injunctions conserves its capacity to "offer complete relief *to the plaintiffs before the court*." *CASA*, 145 S. Ct. at 2557 (emphasis in original). *CASA* adhered to established jurisprudence, confirming the principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* 145 S. Ct. at 2589 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)) (alteration removed). And *Google Play* demonstrated *CASA*'s principle that awarding complete relief to a plaintiff can permissibly

bestow incidental benefits on third parties when remedying the harm requires restoring balance to a market. 2025 WL 2167402 at *25.[2]

Here, the district court's broad-scope injunction is also necessary to award complete relief. Apple's new policies regarding IAP were designed to render outside payment options economically infeasible for app developers. Epic has suffered competition-related harm, which reverberates across the marketplace. It is impossible to award Epic complete relief without tackling the market-wide evasion methods— competition must be restored across the market to allow developers and consumers to freely and knowledgeably choose among payment options beyond Apple's IAP. Due to Epic's position as an app distributor and payment services provider, achieving complete relief requires allowing other developers access to Epic's services. Awarding complete relief for Epic's harms incidentally benefits those non-parties—a result contemplated and approved by *Google Play* and *CASA*.

---

[2] Further, the Ninth Circuit also employed this analytical framework in an earlier appeal *in this case*, noting the breadth of equitable relief awarded should not exceed the burden necessary to supply complete relief. *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023).

This Court and the Supreme Court refused to unduly hinder courts' discretion in awarding complete relief to plaintiffs, and arguments to the contrary do not find binding support.

## CONCLUSION

The district court acted within its contempt and modification powers in administering injunctive relief. As such, the relief administered is aligned with Ninth Circuit and Supreme Court precedent, most recently demonstrated in *Google Play* and *CASA*. This Court's review is welcome to affirm the judiciary's power to craft broad equitable remedies in awarding plaintiffs complete relief.

Respectfully submitted, this the 22nd of August, 2025.

/s/ *H. Hunter Bruton*
H. Hunter Bruton
N.C. State Bar No. 50601
Edward F. Roche
N.C. State Bar No. 55434
Noel F. Hudson
N.C. State Bar No. 59776

SMITH, ANDERSON, BLOUNT,
DORSETT, MITCHELL &
JERNIGAN, LLP
P.O. Box 2611
Raleigh, NC 27602
919-821-1220
*Counsel for Civil Procedure and Antitrust Professors*

21

# APPENDIX A

*Amici curiae* are professors of civil procedure, antitrust law, and remedies. Their titles and institutional affiliations are provided for identification purposes only. Amici's views are their own and do not reflect those of their employers.

Shubha Ghosh, Crandall Melvin Professor of Law, Syracuse University College of Law

John B. Kirkwood, William C. Oltman Professor of Teaching Excellence, Seattle University School of Law

Caprice L. Roberts, J.Y. Sanders Professor of Law, Paul M. Hebert Law Center Louisiana State University

Jennifer E. Sturiale, Associate Professor of Law, Widener University Delaware Law School

Arthur E. Wilmarth, Jr., Professor Emeritus of Law, George Washington University Law School

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** <u>No. 25-2935</u>

I am the attorney or self-represented party.

This brief contains <u>3,817 words</u>, including words manually counted

in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

23

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ *H. Hunter Bruton*            **Date** August 22, 2025

## CERTIFICATE OF SERVICE

I hereby certify I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeal for the Ninth Circuit, which will electronically serve all participants in the case.

Respectfully submitted, this the 22nd day of August, 2025.

/s/ *H. Hunter Bruton*
H. Hunter Bruton
N.C. State Bar No. 50601
Edward F. Roche
N.C. State Bar No. 55434
Noel F. Hudson
N.C. State Bar No. 59776
SMITH, ANDERSON, BLOUNT,
DORSETT, MITCHELL &
JERNIGAN, LLP
P.O. Box 2611
Raleigh, NC 27602
919-821-1220
*Counsel for Civil Procedure and Antitrust Professors*

25