No. 25-2935

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR
Hon. Yvonne Gonzalez Rogers

———————————

**BRIEF FOR THE AMERICAN ANTITRUST INSTITUTE AS AMICUS
CURIAE IN SUPPORT OF PLAINTIFF-APPELLEE**

———————————

JOHN M. NEWMAN
HERBERT HERFF CHAIR OF EXCELLENCE
UNIVERSITY OF MEMPHIS SCHOOL OF LAW
1 N. Front Street
Memphis, TN 38103
(901) 678-3224
jmnwman1@memphis.edu
*On the brief*

RANDY M. STUTZ
 *Counsel of Record*
PRESIDENT
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Suite 1000
(202) 905-5420
rstutz@antitrustinstitute.org

*Counsel for Amicus Curiae*

August 22, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Appellate Rule 26.1(a), the American Antitrust Institute states that it is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

Date: August 22, 2025

AMERICAN ANTITRUST INSTITUTE

*/s/ Randy M. Stutz*
Randy M. Stutz

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF CONTENTS....................................................... ii

TABLE OF AUTHORITIES ................................................. iv

INTEREST OF AMICUS CURIAE ........................................... 1

SUMMARY OF ARGUMENT ............................................... 1

ARGUMENT.................................................................. 2

    I.    APPLE'S MALICIOUS COMPLIANCE PRESERVED THE UNFAIR ECONOMIC MECHANISM OF ITS ILLEGAL CONDUCT. ........... 2

        A.    Apple's Initial Conduct Used an Unfair Mechanism to Achieve Harmful Outcomes................................................... 3

        B.    Apple's Replacement Conduct Used the Same Unfair Mechanism to Achieve the Same Harmful Outcomes .............. 4

    II.    ANTITRUST AND UNFAIR COMPETITION LAW WOULD BE UNWORKABLE IF COURTS COULD NOT PREVENT DEFENDANTS FROM END-RUNNING REMEDY ORDERS. ........ 6

        A.    If Courts Could Not Prevent Defendants from Using Tools Like Fees and Pricing to Accomplish Anticompetitive Ends, Much of Antitrust and Unfair Competition Law Would Be Unworkable................................................... 6

        B.    If Development-and-Maintenance Expenditures Created Universal Justifications and Absolute Rights, Many Antitrust and Competition Prohibitions Would Be Toothless. ................. 8

        C.    If Remedial Orders Could Not Require Particular Types of Communication, Many Traditional Antitrust and Competition Remedies Would Be Ineffective............................... 12

    III.    THIS COURT SHOULD NOT CREATE A NEW RULE THAT WOULD GIVE DEFENDANTS A SECOND BITE AT (RE)LITIGATING LIABILITY. ........................................ 15

        A.    Conflating Liability with Remedy and Compliance Would Be Bad Law. .................................................... 15

B.     Relitigating Liability at the Remedy and Compliance Stage Would Be Bad Policy. ............................................................... 17

CONCLUSION ....................................................................................... 18

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Am. Bank & Trust Co. v. Fed. Rsrv. Bank of Atlanta*,
   256 U.S. 350 (1921) ................................................................... 15

*Apple, Inc. v. Pepper*,
   587 U.S. 273 (2019) ..................................................................... 2

*Associated Press v. United States*,
   326 U.S. 1 (1945) ....................................................................... 15

*Bates v. State Bar of Ariz.*,
   433 U.S. 350 (1977) ..................................................................... 3

*Besser Mfg. Co. v. United States*,
   343 U.S. 444 (1952) ..................................................................... 6

*Caldera, Inc. v. Microsoft Corp.*,
   87 F. Supp. 2d 1244 (D. Utah 1999) ...........................................11

*Calif. v. Am. Stores Co.*,
   495 U.S. 271 (1990) ................................................................... 18

*Carter Carburetor Corp. v. FTC*,
   112 F.2d 722 (8th Cir. 1940) .................................................. 4, 5

*Chi. Prof'l Sports Ltd. P'ship v. NBA*,
   961 F.2d 667 (7th Cir. 1992) ..................................................... 10

*Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy*,
   6 Cal. Rptr. 2d 193 (Cal. Ct. App. 1992) ..................................... 2

*Conwood Co. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ....................................................... 5

*Epic Games, Inc. v. Apple Inc.*,
   559 F. Supp. 3d 898 (N.D. Cal. 2021) .................................. 3, 10

iv

*Freeman v. S.D. Ass'n of Realtors*,
 322 F.3d 1133 (9th Cir. 2003)............................................................11

*FTC v. Brown Shoe Co.*,
 384 U.S. 316 (1966) ...................................................................... 1

*FTC v. Ind. Fed'n of Dentists*,
 476 U.S. 447 (1986) ...................................................................... 4

*Giboney v. Empire Storage & Ice Co.*,
 336 U.S. 490 (1949). ...................................................................... 14

*In re Google Play Store Antitrust Litig.*,
 No. 24-6256, 2025 U.S. App. LEXIS 19185 (9th Cir. July 31, 2025) ......8, 11

*In re Surescripts Antitrust Litig.*,
 608 F.Supp.3d 629 (N.D. Ill. 2022) .................................................. 4

*Int'l Boxing Club, Inc. v. United States*,
 358 U.S. 242 (1959) ...................................................................... 1

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003)............................................................ 4

*Lorain J. Co. v. United States*,
 342 U.S. 143 (1951). ...................................................................... 14

*Moody v. Netchoice, LLC*,
 603 U.S. 707 (2024)). ...................................................................... 13

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
 435 U.S. 679 (1978) ...................................................... 12, 13, 14, 17

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
 20 F.4th 466 (9th Cir. 2021) .................................................. 16, 17

*Standard Sanitary Mf'g Co. v. United States*,
 226 U.S. 20 (1912) ...................................................................... 10

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) .......................................................... 12

*United States v. Dentsply Int'l, Inc.*,
   No. 99-005 (SLR), 2006 U.S. Dist. LEXIS 94907 (D. Del. Apr. 26, 2006)... 8

*United States v. E. I. du Pont de Nemours & Co.*,
   366 U.S. 316 (1961). ......................................................... 15, 16, 18

*United States v. Glaxo Grp., Ltd.*,
   410 U.S. 52 (1973) ...................................................................... 6

*United States v. Jos. Schlitz Brewing Co.*,
   253 F. Supp. 129 (N.D. Cal. 1966) ............................................ 18

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) (en banc) ...................................... 5

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940). ................................................................ 13

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972) .................................................................. 12

*United States v. United States Gypsum Co.*,
   340 U.S. 76 (1950) ................................................................... 16

## STATUTES

15 U.S.C. § 14................................................................................... 8

## OTHER AUTHORITIES

Gregory Day & Abbey Stemler, *Are Dark Patterns Anticompetitive?*, 72 Ala. L.
   Rev. 1 (2020) ........................................................................... 5

Erik Hovenkamp & Steven C. Salop, *Litigation with Inalienable Judgments*, 52 J.
   Legal Stud. 1 (2023) ............................................................... 17

Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986)............ 3

John M. Newman, *Procompetitive Justifications in Antitrust Law*, 94 Ind. L.J. 501 (2019). ..................................................................................... 9

Martin Watzinger et al., *How Antitrust Enforcement Can Spur Innovation: Bell Labs and the 1956 Consent Decree*, 12 Am. Econ. J. Econ. Policy 328 (2020). ..................................................................................... 7

Oliver E. Williamson, *Why Law, Economics, and Organization?*, 1 Ann. Rev. L. & Soc. Sci. 369 (2005) ..................................................................... 10

## INTEREST OF AMICUS CURIAE[1]

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. See http://www. antitrustinstitute .org.[2]

## SUMMARY OF ARGUMENT

This case presents issues of fundamental importance to American competition policy. Where a court finds liability under antitrust or unfair competition law but cannot issue a remedy that effectively restores competition, the American public has "won the battle but lost the war." *Int'l Boxing Club, Inc. v. United States*, 358 U.S. 242, 259 (1959). Antitrust and unfair competition law therefore preserve broad remedial authority for courts. *E.g.*, *FTC v. Brown Shoe*

---

[1] All parties have consented to the filing of this amicus brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than amicus curiae or its counsel—has contributed money that was intended to fund preparing or submitting this brief.

[2] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions.

1

*Co.*, 384 U.S. 316, 320–21 (1966); *Consumers Union of United States, Inc. v. Alta-Dena Certified Dairy*, 6 Cal. Rptr. 2d 193, 198 (Cal. Ct. App. 1992). Several of the positions Apple urges upon this Court would severely erode that authority. They do not reflect the law as it stands, and they would run afoul of sound policy considerations.

## ARGUMENT

### I. APPLE'S MALICIOUS COMPLIANCE PRESERVED THE UNFAIR ECONOMIC MECHANISM OF ITS ILLEGAL CONDUCT.

Sound competition analysis involves understanding the underlying marketplace dynamics. Unsurprisingly, defendants in antitrust and unfair competition cases often urge courts instead to engage in highly formalistic analyses—as Apple does here. *E.g.*, Opening Br. at 42 (arguing that the "plain text" of the initial order did not specifically bar the particular form of Apple's replacement conduct). But, as the Supreme Court has instructed, competition analysis must focus on substance, not form. *See Apple, Inc. v. Pepper*, 587 U.S. 273, 284 (2019) ("Apple's rule would elevate form . . . over substance . . . ."). As the following discussion explains, Apple's initial unlawful conduct and its replacement conduct both leveraged the same underlying economic mechanism to achieve the same harmful outcomes.

### A. Apple's Initial Conduct Used an Unfair Mechanism to Achieve Harmful Outcomes.

Leading up to the extensive liability proceeding in this case, Apple engaged in a suite of practices that all leveraged the same unfair economic mechanism: impeding the "open flow of information" between app developers and their users. 1-ER-6. Apple's original strategy used a set of contractual provisions that limited all "calls to action," "encourag[ing]" the use of alternative payment options, and even communicating truthful information about Apple's 30% commission rate. *Id.*

Those contractual restrictions carried a threat of negative action by Apple that was, in economic terms, a cost to app developers. *See generally* Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986) (describing how a variety of raising-rivals'-cost strategies can maintain an incumbent's market power). Imposing that cost economically disincentivized app developers from communicating with their users about alternative payment options. Apple's initial unfair tactics thus leveraged a familiar economic mechanism: "increas[ing] the difficulty of discovering the lowest cost seller." *Bates v. State Bar of Ariz.*, 433 U.S. 350, 377 (1977). That, in turn, "ha[d] the effect of preventing substitution." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1056 (N.D. Cal. 2021), *aff'd in part, rev'd in part and remanded*, 67 F.4th 946 (9th Cir. 2023) [hereinafter "Rule 52 Order"]; 1-ER-6. As a result, Apple's conduct deprived consumers of

3

meaningful choice—an archetypical harm, long familiar to antitrust and unfair competition law. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986).

## B. Apple's Replacement Conduct Used the Same Unfair Mechanism to Achieve the Same Harmful Outcomes

In the wake of the trial court's initial order, Apple devised and deployed a replacement set of practices. These fell into two main buckets. The first was a pricing tactic: a new fee levied on off-platform transactions. 1-ER-3.

Antitrust and unfair competition law and economics have long recognized that defendants can use pricing tactics to accomplish precisely the same anticompetitive ends as contractual restrictions. For example, firms can use contractual exclusive dealing restrictions to disincentivize counterparties from dealing with rivals, or, alternatively, firms can use pricing tactics to cause the very same outcome. *In re Surescripts Antitrust Litig.*, 608 F.Supp.3d 629, 646 (N.D. Ill. 2022) (finding that "loyalty discounts" caused exclusivity); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 154, 158 (3d Cir. 2003) (affirming that contractual restraints and bundled rebates both "effectuat[ed] exclusive dealing arrangements because of the way in which they were structured"); *Carter Carburetor Corp. v. FTC*, 112 F.2d 722, 732 (8th Cir. 1940) (holding that a preferential discount was "as fully effective as" a contractual restriction). Before the liability order, Apple used contractual restrictions to disincentivize app developers from informing their users

4

about less costly options. After the order issued, Apple simply switched to a pricing tactic that effectively accomplished the same end.

The second bucket of Apple's replacement conduct was a suite of design tactics, some of which are commonly referred to as "dark patterns." *See generally* Gregory Day & Abbey Stemler, *Are Dark Patterns Anticompetitive?*, 72 Ala. L. Rev. 1, 35 (2020) (describing situations in which design tactics can be anticompetitive). Apple deployed these tactics "to dissuade customer usage of alternative purchase opportunities." 1-ER-3. Like contractual restrictions, design tactics can impede the free flow of information. An incumbent firm can, for example, conceal or bury information about rival offerings to boost usage of the incumbent's product. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 65–66 (D.C. Cir. 2001) (en banc) (affirming liability where defendant comingled web-browsing code with operating-system code); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783–84, 788 (6th Cir. 2002) (affirming liability where defendant removed rivals' point-of-sale advertisements and concealed rivals' products below retail counters). Such conduct effectively raises the cost of competing against the incumbent, thereby propping up demand for the incumbent's product. *See* Day & Stemler, *supra*, at 35. Alongside its pricing tactics, Apple's design tactics helped to ensure that its post-order conduct would be "as fully effective" at accomplishing the same end as its pre-order conduct. *Carter Carburetor*, 112 F.2d at 732.

5

## II. ANTITRUST AND UNFAIR COMPETITION LAW WOULD BE UNWORKABLE IF COURTS COULD NOT PREVENT DEFENDANTS FROM END-RUNNING REMEDY ORDERS.

Apple advances several positions in briefing to this Court that would, if adopted as law, render much of antitrust and unfair competition law unworkable and ineffective. *First*, Apple urges this Court to adopt a blanket rule that judicial remedies cannot reach defendants' pricing practices. *Second*, Apple argues that expending resources to maintain an ecosystem gives rise to a generic, universal justification to engage in unfair practices—and, going further still, that such expenditures give defendants an inviolable constitutional right to levy a particular type of fee on behavior that occurs outside their ecosystems. *Third*, Apple argues that it has an absolute First Amendment right to impede the flow of information from app developers to their users. None of these positions finds support in antitrust or unfair competition law or policy.

### A. If Courts Could Not Prevent Defendants from Using Tools Like Fees and Pricing to Accomplish Anticompetitive Ends, Much of Antitrust and Unfair Competition Law Would Be Unworkable.

Injunctions that prohibit or require certain price-related behavior have long been an important part of the antitrust and unfair competition remedies toolkit. *See, e.g.*, *United States v. Glaxo Grp., Ltd.*, 410 U.S. 52, 62 (1973); *Besser Mfg. Co. v. United States*, 343 U.S. 444, 448–49 (1952). An antitrust consent decree issued in 1956, for example, required AT&T to make its entire massive patent portfolio available to other firms free of charge—in other words, the decree capped

AT&T's royalty rates at zero. Today, that decree is widely recognized as one of the most procompetitive antitrust enforcement actions in U.S. history. *See, e.g.*, Martin Watzinger et al., *How Antitrust Enforcement Can Spur Innovation: Bell Labs and the 1956 Consent Decree*, 12 Am. Econ. J. Econ. Policy 328, 332 (2020).

Nonetheless, Apple here repeatedly argues that remedial orders in antitrust and unfair competition cases cannot address a defendant's pricing tactics. Emergency Mot'n for Stay at 14, ECF No.7.1 ("Neither federal law nor the California UCL permit courts to set prices for private companies."); Opening Br. at *32 ("[T]he zero-commission requirement is judicial ratemaking that is not permitted under the UCL."); *id.* ("Rate-setting is a legislative, rather than a judicial function . . . ."). According to Apple, courts cannot specify a price level or cap. Nor can courts proscribe a defendant from levying a particular type of fee. *Id.* ("This case involves rate-setting in its most extreme form.").

Apple's position is out of step with both case law and sound policy considerations. If adjudicators lacked any remedial power over pricing-related conduct, many defendants found liable for violating antitrust and unfair competition laws could simply use pricing tactics and fees to sidestep court orders. Suppose, for example, that a defendant manufacturer entered into illegal exclusive-dealing contracts with distributors. If a court's authority were limited to prohibiting the express contractual restraints, the defendant could leverage with

7

impunity the same economic mechanism (raising its rivals' costs) by offering preferential discounts to distributors who carry only the defendant's products. Century-old prohibitions on anticompetitive exclusive-dealing arrangements, *see, e.g.*, 15 U.S.C. § 14, would become impossible to administer effectively. Or suppose a defendant engaged in an anticompetitive refusal to deal. Under Apple's logic, the defendant could "comply" with a court order to deal by setting a price of $100 trillion for its product—and the court would be powerless to do anything about it. Fortunately for the American public, courts' authority is not so limited. *See, e.g.*, *In re Google Play Store Antitrust Litig.*, No. 24-6256, 2025 U.S. App. LEXIS 19185, at *76–78 (9th Cir. 2025) (affirming order that mandated open access and also capped fees for same); *United States v. Dentsply Int'l, Inc.*, No. 99-005 (SLR), 2006 U.S. Dist. LEXIS 94907, at *1–3 (D. Del. Apr. 26, 2006), *on remand from* 399 F.3d 181 (3d Cir. 2005) (imposing broad limits on both direct and indirect means of excluding rivals).

## B. If Development-and-Maintenance Expenditures Created Universal Justifications and Absolute Rights, Many Antitrust and Competition Prohibitions Would Be Toothless.

Apple contends that its general expenditures on developing and maintaining a smartphone ecosystem give Apple a universal justification for anticompetitive conduct. *See, e.g.*, Opening Br. at *27 ("Apple provides app developers with products and services of immense value, without which developers would be

unable to sell the digital content subject to the commission.").  These expenditures (the argument runs) thereby insulate Apple from any judicial remedy that involves any of the fees Apple charges.  To support that remarkable position, Apple portrays the district court as having prohibited Apple from charging any fees whatsoever to developers.  Opening Br. at 2 ("Apple . . . cannot recoup any fee for the investments that attracted customers to Apple's platform in the first place."); Emergency Mot'n for Stay at 3 ("A federal court cannot force Apple to permanently give away free access to its products and services, including intellectual property.").

Here again, Apple's argument does not reflect sound competition law or policy.  A defendant's procompetitive justification for otherwise harmful conduct must be specific to that conduct.  *See* John M. Newman, *Procompetitive Justifications in Antitrust Law*, 94 Ind. L.J. 501, 540–41 (2019).  It is true that Apple expends considerable resources developing and maintaining its sprawling ecosystem.  But that general fact alone cannot justify particularized, harmful conduct.  *Id.* (explaining the rigorous three-step test for assessing proffered justifications).

Apple does at one point make a vague free-rider argument.  Opening Br. at *33 ("[T]he court has absolutely forbidden Apple from charging any commission on linked transactions, thereby enabling developers to free ride on Apple's

9

proprietary platform without paying any commission on transactions for digital content."). But Apple can still charge developers fees, including processing fees for the transactions that Apple actually processes. "Where, as here, payment is possible, free-riding is not a problem because the 'ride' is not free." *Chi. Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 675 (7th Cir. 1992) (Easterbrook, J.); *see also* Oliver E. Williamson, *Why Law, Economics, and Organization?*, 1 Ann. Rev. L. & Soc. Sci. 369, 383 (2005) ("[U]nspecific free-rider claims are too often used as a shibboleth.").[3]

For much the same reason, Apple's constitutional takings argument fails. Apple goes so far as to urge this Court to hold that its general expenditures on ecosystem development and maintenance give Apple an absolute constitutional right to charge a particular type of fee on a particular type of transaction: sales that occur outside Apple's ecosystem. Opening Br. at *33 ("[T]he new, zero-commission injunctive term is so extreme that it violates the Fifth Amendment's Takings Clause."). A court order that affects only one specific type of fee does not unconstitutionally take away that defendant's property. To the contrary, court

---

[3] The district court in this case already considered, and rightly rejected at the liability stage, Apple's "generic intellectual property claims." Rule 52 Order at 1054. It is a longstanding, bedrock principle that intellectual property rights do not convey a universal right to charge whatever prices a defendant wishes to charge. *Standard Sanitary Mf'g Co. v. United States*, 226 U.S. 20, 49 (1912) ("Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights [a] universal license against positive prohibitions.").

orders for antitrust violations can constitutionally require defendants to divest entire businesses. *See, e.g.*, *In re Google Play Store Antitrust Litig.*, 2025 U.S. App. LEXIS 19185, at *56 ("[T]he Court in *Ford Motor* affirmed an order forcing Ford . . . to divest an illegally acquired spark-plug manufacturer . . . .").

A great deal of antitrust and unfair competition law would become toothless in Apple's preferred world. Under Apple's logic, for example, any monopolist that expends some resources on developing and maintaining its product could levy exorbitant fees on customers who dare to deal with the monopolist's rivals. Even a cartel of competitors, each of whom expend some resources on internal product development and maintenance, might agree to charge a fixed price with impunity. Courts would lack the power to prohibit the monopolistic conduct, and perhaps even the cartel agreement, because doing so would (in Apple's view) unconstitutionally deprive the defendants of their "right" to recoup investments through artificially high prices. That is plainly not the case. *See, e.g.*, *Caldera, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 1244, 1249–50 (D. Utah 1999) (holding similar monopolistic conduct could violate antitrust law); *see also, e.g.*, *Freeman v. S.D. Ass'n of Realtors*, 322 F.3d 1133, 1149, 1154 (9th Cir. 2003) (holding that a similar cartel agreement was illegal *per se*).

Apple portrays the district court as having "set its own rate by mandating that Apple's commission rate be set at zero, in perpetuity . . . without any finding

that competition requires a rate of zero." Opening Br. at *32. But the order restores competition precisely because it does *not* freeze Apple's ability to compete. Apple has always been free to charge any commission rate the market will bear for transactions on Apple's platform, and equally free to compete on the merits by designing and offering the best possible transaction processing service. The order leaves Apple entirely free—and gives Apple a stronger incentive—to compete with rival processors by offering a better transaction processing service, better prices for in-app transaction processing, or both.

At its core, Apple's zero-rate-setting argument boils down to a complaint that some rivals, by competing, will offer prices that Apple considers too low. That argument is "nothing less than a frontal assault on the basic policy of the Sherman Act." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972) ("[T]he freedom guaranteed each and every business, no matter how small, is the freedom to compete . . . ."); *see also United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015) ("[I]t is particularly ironic … that Apple . . . err[s] . . . in equating a symptom (a single-retailer market) with a disease (a lack of competition), and then err[s] again by prescribing the disease itself as the cure."). Fortunately for the American public, "[Congress] has not permitted the age-old cry of ruinous

12

competition." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221–22 (1940).

### C. If Remedial Orders Could Not Require Particular Types of Communication, Many Traditional Antitrust and Competition Remedies Would Be Ineffective.

Apple also argues that it violates the First Amendment for a court to order a defendant to stop limiting or refusing to display information from third parties. Opening Br. at 40 ("[T]hese new prohibitions are so broad that they violate Apple's First Amendment rights."); *id.* ("The new injunction effectively compels Apple to post an advertisement in its own check-out line directing customers to a competitor . . . ."); Emergency Motion for Stay at 4 ("It also violates the First Amendment by requiring Apple to 'accommodate messages it would prefer to exclude.'") (quoting *Moody v. Netchoice, LLC*, 603 U.S. 707, 731 (2024)).

Here yet again, Apple's argument is at odds with antitrust and unfair competition law and policy. Court orders in antitrust and unfair competition cases often include requirements that defendants make or refrain from prohibiting certain communications. In *National Society of Professional Engineers v. United States*, for example, the Supreme Court affirmed an injunction that forbade a professional organization from promulgating an ethics rule that limited competitive bidding. "While the resulting order may curtail the exercise of liberties that the Society might otherwise enjoy," the Court explained, "that is a necessary and, in cases such

13

as this, unavoidable consequence of the violation." 435 U.S. at 697. "The First Amendment does not 'make it . . . impossible ever to enforce'" antitrust laws. *Id.* (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Of course, a district court has discretion to *consider* a remedy's effects on rights "that would otherwise be constitutionally protected, but those protections do not prevent it from remedying the antitrust violations." *Id.* at 697–98.

Remedies like those at issue in the present case can be necessary where, as here, the defendant was refusing to permit certain communications that would have increased competition with the defendant's product. In *Lorain Journal*, the Supreme Court approved an injunction that enjoined a newspaper from refusing to print advertisements for customers who also dealt with a rival radio station. *Lorain J. Co. v. United States*, 342 U.S. 143, 144 (1951). That injunction broadly prevented the defendant from "refusing to publish any advertisement . . . or discriminating as to price, space, arrangement, location, commencement or period of insertion or any other terms or conditions of publication" on the basis that the advertiser also dealt with the defendant's rival. *Id.* at 157. Like Apple here, the newspaper defendant argued that the order violated the First Amendment. The Court's response bears quoting in full:

> The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. 'But the word "right" is one of the most deceptive of pitfalls; it is so easy to slip from a qualified

14

meaning in the premise to an unqualified one in the conclusion. Most rights are qualified.' The right claimed by the publisher is neither absolute nor exempt from regulation.

*Id.* at 155 (quoting *Am. Bank & Trust Co. v. Fed. Rsrv. Bank of Atlanta*, 256 U.S. 350, 358 (1921)); *see also Associated Press v. United States*, 326 U.S. 1, 20 (1945) ("Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom.").

## III. THIS COURT SHOULD NOT CREATE A NEW RULE THAT WOULD GIVE DEFENDANTS A SECOND BITE AT (RE)LITIGATING LIABILITY.

The liability stage of an antitrust or unfair competition case is distinct from the remedy and compliance stage. Different legal standards apply, and prohibiting a particular type of conduct at the remedy stage does not require a separate liability finding as to that conduct. Antitrust and unfair competition cases have already become notoriously resource-intensive and time-consuming. Letting defendants relitigate liability at the remedy and compliance stage, as Apple requests, would inappropriately and unnecessarily compound those administrative costs.

### A. Conflating Liability with Remedy and Compliance Would Be Bad Law.

It is a bedrock tenet of antitrust and unfair competition law that liability is legally distinct from remedy. *See, e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 334 (1961). And courts' remedial power extends well

beyond the particular conduct found to be illegal at the liability stage. *United States v. United States Gypsum Co.*, 340 U.S. 76, 90 (1950) ("[R]elief, to be effective, must go beyond the narrow limits of the proven violation."); *see also E. I. du Pont de Nemours*, 366 U.S. at 326 ("[C]ourts are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests.").

Despite this, Apple appears to argue that a court cannot issue an order prohibiting a particular type of conduct without first (re)adjudicating liability as to that conduct. *See, e.g.*, Opening Br. at 23 ("The district court did not make any determination that Apple's compliance measures violated the UCL or any other law."); Emergency Motion for Stay at 1 (complaining that the order prohibits "conduct that has never been adjudicated to be . . . unlawful"); *id.* at 13 (protesting that "charging a commission on linked transactions . . . is an entirely new practice whose legality has never been adjudicated").

Requiring plaintiffs to separately prove—and courts to separately find—that any conduct prohibited by a remedy order also constitutes a separate statutory violation would be out of step with the Supreme Court's clear guidance. *Gypsum Co.*, 340 U.S. at 88–90. It would be equally out of step with the law of this Circuit. "[A] district court may order an injunction 'beyond a simple proscription against the precise conduct previously pursued'" at the liability stage. *Optronic Techs.,*

16

*Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 486 (9th Cir. 2021) (quoting *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 698).

### B. Relitigating Liability at the Remedy and Compliance Stage Would Be Bad Policy.

Relitigating liability every time a defendant operating under court order devises a nominal workaround would be unsound as a policy matter. For one thing, antitrust and unfair competition law liability proceedings are already notoriously lengthy and resource-intensive. Holding what would amount to a second (or third, or fourth, or fifth, etc.) trial would compound those administrative costs considerably. More discovery, expert testimony, motions practice, and the like would stretch compliance proceedings out for years. Defendants who enjoy market power may be perfectly happy with such a system. *See* Erik Hovenkamp & Steven C. Salop, *Litigation with Inalienable Judgments*, 52 J. Legal Stud. 1, 18 (2023) (explaining that antitrust defendants with market power generally have an asymmetrically strong incentive to expend resources litigating to maintain the status quo). But many plaintiffs, both public and private, would find it cost-prohibitive.

Moreover, a standard that would require any prohibited conduct to constitute a separate antitrust or unfair competition law violation would severely hinder courts' ability to provide effective redress. For example, suppose a court were to hold at the liability stage that a defendant illegally acquired its direct competitor.

17

The traditional remedy in such a case would be divestiture: ordering the defendant to sell off the acquired business. *E.g.*, *Calif. v. Am. Stores Co.*, 495 U.S. 271, 280–81 (1990); *E. I. du Pont de Nemours*, 366 U.S. at 329–31. Prospective buyers would naturally need some access to the acquired business's financial information to perform due diligence before bidding. Of course, refusing to grant third parties access to financial information would not have been part of the court's liability finding, nor would it likely constitute a separate violation. According to Apple's preferred test, then, a court in that situation would lack authority to order the defendant to grant access. Prospective buyers would understandably be quite reluctant to bid, undermining the court-ordered divestiture remedy. Fortunately, Apple's test does not reflect the law. *E.g.*, *United States v. Jos. Schlitz Brewing Co.*, 253 F. Supp. 129, 184 (N.D. Cal. 1966), *aff'd*, 385 U.S. 37 (1966) (requiring defendant to grant access to information on similar facts).

## CONCLUSION

Statutory prohibitions against unfair and anticompetitive practices have been a cornerstone of this nation's competition policy for well over a century. When enforced, these laws help to ensure a thriving, vibrant economy that benefits all consumers, workers, and honest businesses. Serving that role requires not only robust liability standards, but also effective remedy and compliance authority.

In an attempt to excuse its bad-faith tactics, Apple asks this Court to severely cabin judicial authority, to declare a wide swath of routine remedial tools unconstitutional, and to require burdensome relitigation of liability each time a defendant flouts a court order. AAI respectfully urges the Court to decline those invitations to depart from longstanding precedent and sound legal principles.

Dated: August 22, 2025                    Respectfully submitted,

                                          */s/ Randy M. Stutz*

JOHN M. NEWMAN                            RANDY M. STUTZ
HERBERT HERFF CHAIR OF EXCELLENCE           *Counsel of Record*
UNIVERSITY OF MEMPHIS SCHOOL OF LAW        PRESIDENT
1 N. Front Street                         AMERICAN ANTITRUST INSTITUTE
Memphis, TN 38103                         1025 Connecticut Avenue, NW
(901) 678-3224                            Suite 1000
jmnwman1@memphis.edu                      (202) 905-5420
*On the brief*                            rstutz@antitrustinstitute.org

                    *Counsel for Amicus Curiae*

19

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s) 25-2935**

I am the attorney or self-represented party.

**This brief contains 5,427 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

Date: August 22, 2025

AMERICAN ANTITRUST INSTITUTE

*/s/ Randy M. Stutz*
Randy M. Stutz

*Counsel for Amicus Curiae*