No. 25-2935

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff/counter-defendant/Appellee,*

v.

APPLE INC.,

*Defendant/counter-claimant, Appellant*

On Appeal from the United States District Court for the
Northern District of California
No. 4:20-cv-05640-YGR (Hon. Yvonne Gonzalez Rogers)

**BRIEF OF *AMICI CURIAE* CONSUMER FEDERATION OF AMERICA
AND PUBLIC KNOWLEDGE IN SUPPORT OF EPIC GAMES, INC.'S
BRIEF ON APPEAL**

MARGARET MACLEAN
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Email: mmaclean@lowey.com

Attorneys for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *amici curiae* state that they have no parent corporation and no publicly held corporation owns 10% or more of their stock.

Dated:       August 22, 2025

/s/  *Margaret MacLean*
Margaret MacLean

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

FED. R. APP. P. 29(a)(4)(E) STATEMENT ......................................................... vi

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE ............. vii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT ..........................................................................................................2

I.      THE SPECIFIC HARMS SUFFERED BY CONSUMERS AND APP DEVELOPERS AS A RESULT OF APPLE'S CONDUCT ...............3

Apple's evasion of the district court's injunction increases consumer costs.........................................................................................4

Apple's policies restrict innovation and reduce consumer choice.........7

Apple's policies damage the consumer experience—and the inability to steer users to alternatives traps them in this broken system...8

Apple's policies impose significant switching costs on consumers—and without meaningful steering, these costs lock users into Apple's payment ecosystem with no escape route. ..................11

II.     APPLE EVADES DISCLOSURE RULES TO MANUFACTURE SUPPORT FOR ITS ANTICOMPETITIVE PRACTICES ...............13

CONCLUSION .....................................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Epic Games, Inc. v. Apple Inc.,*
  ("Apple I"), 559 F. Supp. 3d 898 (N.D. Cal. 2021)..................................... passim

**Rules**

Fed. R. App. P. 29(a)(4)(E) ...................................................................... vi

Fed. R. App. P. 32(a)(5) ............................................................................17

Fed. R. App. P. 32(a)(6) ............................................................................17

Fed. R. App. P. 32(a)(7) ............................................................................17

Fed. R. App. P. 32(a)(7)(B) .......................................................................17

Fed. R. App. P. 32(f) .................................................................................17

Federal Rule of Appellate Procedure 26.1(a) ............................................. i

**Other Authorities**

Andrew Webster, *Epic offers new direct payment in Fortnite on iOS and Android to get around app store fees*, THE VERGE, Aug. 13, 2020,
  https://www.theverge.com/2020/8/13/21366259/epic-fortnite-vbucks-mega-drop-discount-iphone-android................................................................. 4

Andrew Liszewski, *Amazon now has a 'Get book' button in its iOS Kindle app, The Verge* (May 6, 2025),
  https://www.theverge.com/news/661719/amazon-app-ios-apple-iphone-ipad-kindle-buy-books...................................................................................... 6

Certain Mobile Telephones, Tablet Computers with Cellular Connectivity, and Smart Watches with Cellular Connectivity, Components Thereof, and Products Containing Same,
  337-TA-1299 (2022) ............................................................................. 14

Damien Geradin and Dimitrios Katsifis, *The Antitrust Case against the Apple App Store* (Revisited), TILEC Discussion Paper No. DP2020-035, December 7, 2020, https://ssrn.com/abstract=3744192 or http://dx.doi.org/10.2139/ssrn.3744192 ............................................................ 4, 12

Emily Birnbaum, *Apple Flexes Muscle as Quiet Power Behind App Group Bloomberg* (Sept. 19, 2022), https://www.bloomberg.com/news/articles/2022-09-19/apple-flexes-muscle-as-quiet-power-behind-app-developer-group ............................................................ 14

Eingestellt von Florian Mueller, U.S. Government Officials Insist on Knowing How Much 'Monetary or Nonmonetary Consideration' Apple Provides to ACT | The App(le) Association: Public Version of Motion to Compel, Foss Patents (Sept. 7, 2022), http://www.fosspatents.com/2022/09/us-government-officials-insist-on.html ...... ............................................................ 15

Jason Fried, *Our CEO's take on Apple's App Store payment policies, and their impact on our relationship with our customers*, Jun. 19, 2019, https://hey.com/apple/iap/. ............................................................ 9

Jay Peters, *Read Steve Jobs' emails about why you can't buy digital books in Amazon's apps*, THE VERGE, Jul. 30, 2020, https://www.theverge.com/2020/7/30/21348130/apple-documents-steve-jobs-email-books-amazon-apps-antitrust-investigation-schiller .................................... 12

Kristin Broughton, *Match Group Hopes for Savings From Looser App-Store Payment Rules*, THE WALL STREET JOURNAL, Sept. 16, 2021, https://www.wsj.com/articles/match-group-hopes-for-savings-from-looser-app-store-payment-rules-11631793601. ............................................................ 5

L. Ceci, *Worldwide gross app revenue of the Apple App Store from 2017 to 2021*, Statista, December 13, 2021, https://www.statista.com/statistics/296226/annual-apple-app-store-revenue/#:~:text=Apple%20App%20Store%3A%20annual%20gross%20app%20revenue%202017%2D2021&text=Between%202017%20and%202021%2C%20global,and%20premium%20apps%20in%202021 ............................................................ 3

Mark Cooper, *Antitrust as Consumer Protection in the New Economy: Lessons from the Microsoft Case*, 52 HASTINGS L.J. 813 (2001) ............................................................ vii, 2

iv

Michael Tsai, Phil Schiller on *App Store Upgrade Pricing*, May 6, 2017)*,*
    https://mjtsai.com/blog/2017/05/06/phil-schiller-on-app-store-upgrade-
pricing/...... ...................................................................................................7

*Public Policy Advocacy: Indirect Advocacy,* APPLE,
    https://www.apple.com/public-policy-advocacy/ ............................................. 14

Report, *The Netherlands Authority for Consumers and Markets, Market study into
mobile app stores*, Apr. 19, 2019*,*
    69 J. OF IND. ECON. 33, 41 (2021) ............................................................... 11

Sergei Klebnikov, *Apple Becomes First U.S. Company Worth More Than $2
Trillion*, FORBES, Aug. 19, 2020*,*
    https://www.forbes.com/sites/sergeiklebnikov/2020/08/19/apple-becomes-first-
us-company-worth-more-than-2-trillion/?sh=4b36b58d66e6. ................................ 2

## SOURCE OF AUTHORITY TO FILE

Apple has consented to the filing of this brief.

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici curiae* declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (3) no person—other than the amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

*Amicus Curiae* Consumer Federation of America ("CFA") is an association of non-profit consumer organizations that was established in 1968 to advance consumer interests through research, advocacy, and education. For over two decades, CFA has supported meaningful consumer protection in digital markets, in particular through the advocacy of its Senior Fellow Mark Cooper.[1]

*Amicus Curiae* Public Knowledge ("PK") is a non-profit public interest organization that works at the intersection of technology, law, and policy to defend consumer rights and promote competition, innovation, and access to knowledge. PK regularly advocates before Congress, the courts, and agencies to ensure that consumers are protected from unfair practices in digital markets.

---

[1] *See* Mark Cooper, *Antitrust as Consumer Protection in the New Economy: Lessons from the Microsoft Case,* 52 HASTINGS L.J. 813 (2001) (article written by CFA's Director of Research, analyzing the antitrust implications of the *Microsoft* decision).

*Amici curiae* Consumer Federation of America and Public Knowledge respectfully submit this brief in support of Epic Games, Inc. ("Epic"). *Amici curiae* fully support and incorporate by reference all arguments made by Epic in its Answering Brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici curiae* submit this brief as advocacy groups dedicated to promoting consumer interests in order to present the Court with the views of significant economic victims of Apple's restrictive practices relating to the use of apps on its iOS system used on its popular iPhone. The district court made factual findings supporting Epic's argument that Apple's conduct violated long-standing principles of unfair competition law, correctly concluding that app developers paid billions of dollars of supracompetitive rents to Apple and properly enjoining Apple from blocking app developers from presenting alternative payment options. And it correctly held Apple in contempt when Apple engineered an elaborate scheme to evade compliance.

In this brief, *amici* seek to alert the Court to the magnitude of the harm to consumers, developers, and competition itself caused by Apple's misconduct—and to balance out the voices of Apple's purportedly independent amici, several of whom are in reality funded by Apple. The district court's contempt order provided critical relief to consumers that Apple now seeks to undo on appeal. Apple's

limitations on alternative payment options increase consumer costs; reduce consumer choice; reduce the quality of the consumer experience; and reduce innovation. All these harms to over one hundred million U.S. consumers who use Apple's iPhone are equally harmful to app developers, who are prevented from using more, better, and cheaper options to facilitate payments for digital goods and services. Apple's anti-steering policies precluding app developers from communicating with consumers about alternative payment options inflict staggering damage on the market. The district court correctly recognized that these policies were anticompetitive and harmful, and needed to be enjoined, as this Court already affirmed. The district court also correctly recognized that Apple violated and circumvented the injunction, and this Court should affirm again.

## ARGUMENT

In August 2020, Apple became the first U.S. company worth more than $2 trillion.[2] Its astronomical and ever-climbing profits (leading its valuation to double in just two years, from $1 trillion in 2018[3]) come straight from the pockets of over a billion consumers worldwide. Even with over 80% of apps available to download

---

[2] Sergei Klebnikov, Apple *Becomes First U.S. Company Worth More Than $2 Trillion*, FORBES, Aug. 19, 2020, https://www.forbes.com/sites/sergeiklebnikov/2020/08/19/apple-becomes-first-us-company-worth-more-than-2-trillion/?sh=4b36b58d66e6 (last visited Aug. 22, 2025)

[3] *Id.*

for free, consumers still managed to spend an estimated $85.1 billion in 2021 on in-app purchases, subscriptions, and premium apps on iOS.[4] Every one of those transactions is tainted by the restrictions Apple places on app developers' ability to offer consumers alternative payment options.

The district court correctly found "that common threads run through Apple's practices which unreasonably restrain[] competition and harm consumers, namely the lack of information and transparency about policies which [a]ffect consumers' ability to find cheaper prices, increased customer service, and options regarding their purchases. Apple employs these policies so that it can extract supracompetitive commissions from this highly lucrative gaming industry." *Epic Games, Inc. v. Apple Inc.* ("*Apple I*"), 559 F. Supp. 3d 898, 1013-14 (N.D. Cal. 2021), *aff'd in relevant part*, 67 F.4th 946 (9th Cir. 2023).

## I.     THE SPECIFIC HARMS SUFFERED BY CONSUMERS AND APP DEVELOPERS AS A RESULT OF APPLE'S CONDUCT

Apple's policies are premised on treating a customer's general-purpose smartphone as if it were not the mainstream, general-purpose computing platform that it is. Apple thus requires anyone writing software of any kind for use on iOS to

---

[4] L. Ceci, *Worldwide gross app revenue of the Apple App Store from 2017 to 2021*, Statista, December 13, 2021, https://www.statista.com/statistics/296226/annual-apple-app-store-revenue/#:~:text=Apple%20App%20Store%3A%20annual%20gross%20app%20revenue%202017%2D2021&text=Between%202017%20and%202021%2C%20global,and%20premium%20apps%20in%202021 (last visited Aug. 22, 2025).

obtain Apple's permission and routing through Apple's business rules. This model is ill-suited to a mainstream, general-purpose computing platform: it burdens developers, removes consumers' rights to use their expensive devices as they wish, and harms competition and consumer welfare.

**Apple's evasion of the district court's injunction increases consumer costs.**

Cost of course is a crucial consideration for consumers. Since the district court entered the contempt order, Epic is now back on iOS for the first time in years, and is finally able to inform consumers of and provide a link to its own payment system—where consumers can earn 20% back in rewards they cannot receive by purchasing through Apple's in-app alternative.[5] Research indicates that absent the relief in the district court's contempt order, other developers similarly pass Apple's increased costs on to consumers.[6] Another app developer Down Dog testified at trial in the district court that 90% of its Android users purchased on the web (when Google allowed Down Dog to advertise lower web prices in the app),

---

[5] Andrew Webster, *Epic offers new direct payment in Fortnite on iOS and Android to get around app store fees*, THE VERGE, Aug. 13, 2020, https://www.theverge.com/2020/8/13/21366259/epic-fortnite-vbucks-mega-drop-discount-iphone-android (last visited Aug. 22, 2025).

[6] Damien Geradin and Dimitrios Katsifis, *The Antitrust Case against the Apple App Store (Revisited)*, TILEC Discussion Paper No. DP2020-035, December 7, 2020, at 2, Available at SSRN: https://ssrn.com/abstract=3744192 or http://dx.doi.org/10.2139/ssrn.3744192. *See also Apple I*, 559 F. Supp. 3d at 1037 ("High commission rates certainly impact developers, and some evidence exists that it impacts consumers when those costs are passed on.").

but only 50% of iOS users previously did so because of Apple's anti-steering restrictions. The district court accordingly concluded that "evidence shows Apple's anti-steering restrictions artificially increase Apple's market power by preventing developers from communicating about lower prices on other platforms." *Apple I*, 559 F. Supp. 3d at 993. Unsurprisingly, then, as soon as the district court issued its initial injunction (that Apple violated) against Apple's anti-steering provision, app developer Match announced plans to offer lower prices to customers who pay directly.[7] That developers are able to offer discounts or rewards as high as 15% and 20% outside of Apple's In-App Purchase system ("IAP") gives a sense of the sheer magnitude of the profits that Apple is skimming from consumers in the absence of the district court's contempt order—recall that consumers spent over $85 billion through IAP in 2021 alone.[8]

Meanwhile, years of experience show the practical effect on real services. Flagship "reader" apps like Kindle and Spotify historically removed or avoided in-app payment altogether rather than force Apple's commission onto users, degrading the user experience by keeping users in the dark about how to make

---

[7] Kristin Broughton, *Match Group Hopes for Savings From Looser App-Store Payment Rules,* THE WALL STREET JOURNAL, Sept. 16, 2021, https://www.wsj.com/articles/match-group-hopes-for-savings-from-looser-app-store-payment-rules-11631793601 (last visited Aug. 22, 2025).

[8] *See supra* n.5.

5

purchases.[9] Only after Epic's successful legal challenge and the resulting injunction and enforcement order were Apple's link-out restrictions relaxed. For example, Amazon has since added a "Get Book" button that opens a browser purchase flow—a direct result of the district court's injunction and enforcement order that require Apple to permit external purchase links. Now that Apple's attempts to evade the injunction have been halted, competition can finally flourish to correct the distorted prices and user experience Apple inflicted for years until this case.[10]

In short, the increased costs to consumers arising from Apple's restrictions are not just theoretically logical: they are real. And given the enormous volume of consumers and sums of money involved, the damage done by those increased costs is correspondingly enormous, and will continue to grow without enforcement of the district court's contempt order.

---

[9] Daniel Ek, Consumers and Innovators Win on a Level Playing Field, Spotify (March 13. 2-19), https://newsroom.spotify.com/2019-03-13/consumers-and-innovators-win-on-a-level-playing-field (last visited Aug. 22, 2025); *see also* Dkt. 27.2, Brief of Amicus Curiae Spotify USA Inc. In Support of Appellee Epic Games, Inc.'s Opposition to Appellant Apple Inc.'s Motion for Partial Stay Pending Appeal ("Spotify Br."), at 9 (explaining that Spotify opted to forego IAP altogether and to avoid applying for an external link under Apple's injunction-evasion scheme to avoid passing on Apple's surcharge to customers).

[10] Andrew Liszewski, Amazon now has a 'Get book' button in its iOS Kindle app, The Verge (May 6, 2025), https://www.theverge.com/news/661719/amazon-app-ios-apple-iphone-ipad-kindle-buy-books (last visited Aug. 22, 2025).

**Apple's policies restrict innovation and reduce consumer choice.**

The increased costs that Apple's provisions impose on app developers (to then pass on to consumers) represent wasted funds that could otherwise be used far more productively. News of the district court's injunction on Apple's anti-steering provisions immediately led developers to make plans to use "any potential savings from the payment changes to invest in new products or hire more people."[11] And beyond cost alone, Apple's restrictions constrain developers' business strategies and sustainable business models. As app developer Spotify explained in connection with Apple's motion for a stay, the new freedom to communicate with customers that the district court's contempt order paves the way for has enabled Spotify to introduce new features to its users. *See* Spotify Br. at 12.[12] Everyone suffers from the artificial restrictions Apple imposes on communications and payment methods in apps absent the relief the district court's contempt order offers.

---

[11] *Id.*

[12] To take another example, because the App Store does not allow developers to offer the option of paid upgrades in-app, developers are nudged toward subscriptions or ads instead—even when a one-time purchase plus occasional paid upgrades would be more consumer-friendly and privacy-preserving. Developers and commentators have complained about this structural gap for years. *See* Michael Tsai, Phil Schiller on App Store Upgrade Pricing, (May 6, 2017), https://mjtsai.com/blog/2017/05/06/phil-schiller-on-app-store-upgrade-pricing/ (last visited Aug. 22, 2025)

**Apple's policies damage the consumer experience—and the inability to steer users to alternatives traps them in this broken system.**

The problems with Apple's IAP demonstrate precisely why steering is essential: developers need the ability to inform users about alternative payment options where they can provide better customer service, more flexible pricing, and direct support. By prohibiting app developers from informing users of alternative payment options, Apple reduces the quality of the customer experience—to the consumers' own detriment and to the detriment of the app developers, who would like to compete to earn customer goodwill by providing the best service. Apple's IAP restrictions force app developers to outsource several aspects of consumer support to Apple. If users have any issues related to billing, such as needing a refund or a payment cancellation, they are forced to speak with an Apple employee, who necessarily has less familiarity with the goods and services involved than the app developer would—not to mention less incentive to impress the customer with the quality of service. Apple's employees also have less access to the underlying transaction than the developer has: they can neither verify delivery of a digital good nor take action to correct a digital good-related issue other than offering a refund. The district court acknowledged these difficulties when it found that "Apple does a poor job of mediating disputes between a developer and its customer. Consumers do not understand that developers have effectively no control over payment issues . . . or even access to consumers'

information. Consequently, it can be frustrating for both sides when issues arise relating to the inability to issue and manage the legitimacy of requests for refunds." *Apple I*, 559 F. Supp. 3d at 951.

As Jason Fried, CEO of app developer Basecamp, has explained, Apple's policies block developers from helping users with a variety of issues, including "[r]efunds, credit card changes, discounts, trial extensions, hardship exceptions, comps, partial payments, nonprofit discounts, educational discounts, downtime credits, tax exceptions, etc."[13] When approached by users, the developer can only answer "Go Ask Apple." Simply put, Apple's policies undermine the experience of app users and the relationship between users and developers.

This results in a complex and poor user experience, as well as additional inefficiencies. For instance, app developers have no visibility into the reason why a customer stops paying a subscription, a crucial piece of information (*e.g.*, if the customer has failed to make a payment because her credit card has expired, the developer might wish to make a new offer).[14] In addition, developers are precluded

---

[13] Jason Fried, *Our CEO's take on Apple's App Store payment policies, and their impact on our relationship with our customers*, Jun. 19, 2019, https://hey.com/apple/iap/ (last visited Aug. 22, 2025).

[14] Report, The Netherlands Authority for Consumers and Markets, Market study into mobile app stores, Apr. 19, 2019, at 94, https://www.acm.nl/sites/default/files/documents/2019-04/marktstudies-appstores.pdf (last visited Aug. 22, 2025)

from offering customers extra services (*e.g.*, allowing them to carry over unused credits to subsequent months), as they cannot identify their own customers.[15] Moreover, if the app developer suspends a subscriber's account (*e.g.*, for violating its terms of use), Apple continues to charge the user until the user (who in the case of card fraud may not be the same person that purchased a subscription) contacts Apple.

As Basecamp's CEO has explained, Apple's IAP is about so much more than simply money: it is about Apple inserting itself between businesses and their customers.[16] At its core, Apple's IAP forcibly separates the provision of a good or service (for which the app developer is responsible) and the provision of customer support (which is handed over to Apple), resulting in a diminution in quality of the customer's experience with the good or service in question. Without the ability to steer users to web-based alternatives where developers control the entire customer relationship, consumers remain trapped in this inferior experience—which is why meaningful steering is essential to restore competition and consumer choice.

---

[15] *Id.*

[16] Fried, *supra* n.11.

**Apple's policies impose significant switching costs on consumers—and without meaningful steering, these costs lock users into Apple's payment ecosystem with no escape route.**

The ability to steer users to web-based payment options would help mitigate switching costs by allowing developers to maintain direct billing relationships that persist across platforms. Instead, Apple's anti-steering rules artificially compound the problem for users: Consumers face extensive switching costs that prevent them from leaving the iOS ecosystem and making use of alternatives to Apple's IAP. On top of the expense of purchasing a costly new smartphone and replacing all the accessories (*e.g.* extra chargers) that go with it, consumers experience switching costs in the form of: (1) learning costs, from the effort that consumers must expend to learn to use an unfamiliar operating system; and (2) transaction costs, from the time involved in researching and purchasing an appropriate replacement smartphone model and then transferring a user's data and applications.[17] These costs are significant enough that, without them, Apple would be incapable of maintaining its market share.[18] For this reason, Apple has adopted a strategy of maximizing switching costs for consumers— studies have found that switching

---

[17] Lukasz Grzybowski and Ambre Nicolle, *Estimating Consumer Inertia in Repeated Choices of Smartphones*, 69 J. OF IND. ECON. 33, 41 (2021).

[18] *Id.* at 54.

from iOS to Android imposes substantially higher costs than switching in the other direction.[19]

The centralized way that Apple's payment system functions further increases the already sky-high cost to consumers of switching from Apple to Android. When consumers use Apple's payment system, only Apple gains access to their payment information—the app developers lack the ability to see that information or transfer it to an application on an Android device.[20] This is precisely why steering matters: If developers could direct users to web-based payment systems, users could maintain their subscriptions and payment relationships directly with developers, making platform switching far easier. If app developers want to provide a subscription service that is available through both Apple and Android apps, they need to spend time and effort developing additional infrastructure to do so—at additional cost that makes its way through to consumers. However, if app payments could be made through a platform-agnostic billing system accessible through steering, the user could more easily switch to another operating system and immediately access its subscription.[21] Apple, of course, knew that increased

---

[19] *Id.* at 50.

[20] Fried, *supra* n.11.

[21] Damien Geradin and Dimitrios Katsifis, *The Antitrust Case against the Apple App Store (Revisited)*, TILEC Discussion Paper No. DP2020-035, December 7, 2020, at 2, Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3744192 (last visited Aug. 22, 2025).

switching costs would result from its payment system restrictions, and imposed

them for precisely this reason, as demonstrated by Steve Jobs' candid comment in

an internal email in response to the threat of competition from Android: "The first

step might be to say they must use our payment system for everything, including

books (triggered by the newspapers and magazines). If they want to compare us to

Android, let's force them to use our far superior payment system. Thoughts?"[22]

Meaningful steering would break this lock-in strategy by allowing developers to

maintain direct, portable customer relationships outside Apple's walled garden.

## II.  APPLE EVADES DISCLOSURE RULES TO MANUFACTURE SUPPORT FOR ITS ANTICOMPETITIVE PRACTICES

Apple seeks to shield itself from competition not only through preventing

effective steering but also by funding advocacy groups that predictably support its

anticompetitive practices in court. This strategy includes skirting disclosure rules

by funding these organizations generally rather than for specific briefs, even

though these groups routinely file *amicus* briefs supporting Apple.

At the time Apple served its opening brief, Epic consented to *amicus* briefs

supporting Apple on the condition that the *amici* disclose any recent funding they

---

[22] Jay Peters, *Read Steve Jobs' emails about why you can't buy digital books in Amazon's apps*, THE VERGE, Jul. 30, 2020, https://www.theverge.com/2020/7/30/21348130/apple-documents-steve-jobs-email-books-amazon-apps-antitrust-investigation-schiller (last visited Aug. 22, 2025).

had received from Apple or from other *amici*. Four *amici* did make the disclosure[23] and *ten* of the remainder moved for leave to file (the State of California being the only exception), which this Court granted. *See* Dkt. 111. It turns out that these *amici* had good reason to skirt the question of independence. Apple is itself a member of a number of the organizations and trade associations that filed *amicus* briefs on Apple's behalf (none of whom agreed to disclose their funding): ACT | The App Association; Chamber of Progress; Computer & Communications Industry Association (CCIA); Software & Information Industry Associations (SIIA); and TechNet.[24] Another Apple *amicus*, Informational Technology and Innovation Foundation, identifies Apple on its website as a "supporter contributing more than $10,000 in the past fiscal year."[25]

Most concerning of all, *Bloomberg* has reported that Apple funds *more than half* of ACT | The App Association's budget, as the "quiet power" shaping the association's goals behind the scenes.[26] This is a pattern: ACT has supported Apple

---

[23] The Atlantic Legal Foundation (Dkt. 78.1), Center for Cybersecurity (Dkt. 81.1), Lawyers for Civil Justice (Dkt. 86.1), and the Law Professors (Dkt. 80.1) all received consent to file from both parties.

[24] *Public Policy Advocacy: Indirect Advocacy,* APPLE, https://www.apple.com/public-policy-advocacy/ (last visited Aug. 5, 2025). This list includes trade associations that Apple belonged to in 2023—also including Apple *amicus* NetChoice, though Apple does not appear to be a member of NetChoice currently. *Association Members*, NetChoice https://netchoice.org/about/#association-members (last visited Aug. 6, 2025).

[25] *See* https://itif.org/our-supporters/.
[26] Emily Birnbaum, *Apple Flexes Muscle as Quiet Power Behind App Group Bloomberg* (Sept. 19, 2022), https://www.bloomberg.com/news/articles/2022-09-

14

in other litigations as well, including a case before the United States International Trade Commission.[27] Apple's evasive responses to the government's interrogatories regarding ACT led government officials to move to compel Apple to produce information regarding Apple's current and historic relationship with ACT and whether Apple had directly or indirectly contributed money to ACT, as well as the role Apple played in the preparation of ACT's declaration supporting Apple.[28] The court ordered Apple to "explain its historic and current relationship with [ACT], and state the amount Apple pays or otherwise describe its 'direct or indirect financial contributions or payments . . . over the last five years'…and [to] further provide any non-privileged documents or communications exchanged between Apple, or Apple's attorneys, and ACT | The App Association…regarding the submitted public interest statements." Order No. 18 at 2-3. Unfortunately, Apple's response is not publicly available.

---

19/apple-flexes-muscle-as-quiet-power-behind-app-developer-group (last visited Aug. 22, 2025).

[27] *See* Certain Mobile Telephones, Tablet Computers with Cellular Connectivity, and Smart Watches with Cellular Connectivity, Components Thereof, and Products Containing Same, 337-TA-1299 (2022).

[28] *See generally* Staff Mot. to Compel; *see also* Eingestellt von Florian Mueller, *U.S. Government Officials Insist on Knowing How Much 'Monetary or Nonmonetary Consideration' Apple Provides to ACT | The App(le) Association: Public Version of Motion to Compel*, Foss Patents (Sept. 7, 2022) http://www.fosspatents.com/2022/09/us-government-officials-insist-on.html (last visited Au. 22, 2025)

By funding these groups generally rather than for specific briefs, Apple exploits a loophole in disclosure requirements while ensuring routine, ongoing support for its monopolistic practices. Apple's behavior is not only the epitome of anticompetitive behavior, but a clear example of its disregard for the rule of law. Epic's *amici curiae* raise this issue simply to alert this Court to the reality that Apple's *amici* touting the purported benefits of Apple's policies may have ulterior motives for doing so.

## CONCLUSION

The Court should affirm as set forth in Epic's Answering Brief.

Dated: August 22, 2025

Respectfully submitted,

/s/ *Margaret MacLean*
Margaret MacLean
**LOWEY DANNENBERG, P.C.**
44 South Broadway
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
Email: mmaclean@lowey.com

Attorneys for *Amici Curiae*

John Bergmayer
**PUBLIC KNOWLEDGE**
1818 N St. NW Suite 410
Washington DC 20036
Telephone: (202) 540-9113
Facsimile: (202) 861-0040
Email: john@publicknowledge.org

Legal Director for *Amicus Curiae* Public
Knowledge

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3453 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated:  August 22, 2025          /s/  *Margaret MacLean*

Margaret MacLean
**LOWEY DANNENBERG, P.C.**
44 South Broadway
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
Email:      mmaclean@lowey.com

Attorneys for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  August 22, 2025          /s/  *Margaret MacLean*
                                 Margaret MacLean