**No. 25-2935**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR
Hon. Yvonne Gonzalez Rogers

**BRIEF OF MICROSOFT CORPORATION AS *AMICUS CURIAE*
IN SUPPORT OF PLAINTIFF-APPELLEE EPIC GAMES, INC.**

Aaron M. Panner
Alex A. Parkinson
Sven E. Henningson
Jared M. Stehle
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae
Microsoft Corporation*

August 22, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Microsoft Corporation states that it does not have a parent corporation and that no publicly held corporation holds 10 percent or more of its stock.  Microsoft Corporation's stock is publicly listed on the NASDAQ Stock Market, and its symbol or ticker is MSFT.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES ............................................................................ iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .............................................1

INTRODUCTION ........................................................................................3

BACKGROUND ..........................................................................................5

    1.    Epic's Lawsuit.................................................................................5

    2.    Apple Flouts the Injunction...............................................................11

    3.    The District Court Enforces the Injunction.........................................14

ARGUMENT ............................................................................................17

    APPLE'S ATTEMPT TO IMPOSE A COMMISSION FOR
    OFF-PLATFORM TRANSACTIONS IS ANTICOMPETITIVE...............17

CONCLUSION ..........................................................................................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898
(N.D. Cal. 2021) ....................................................................4, 7, 8, 9, 10, 20

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ...............3, 4, 8, 9, 11

*Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ........................................................10

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969) ..........................19

## OTHER MATERIALS

Dep't of Commerce, *Competition in the Mobile Application
Ecosystem* (Feb. 2023), https://www.ntia.gov/sites/
default/files/publications/mobileappecosystemreport.pdf?_
ga=2.84811728.813216929.1677623123-
2030698341.1675111518 ...................................................................6

Eric Enge, *Mobile vs. Desktop Usage in 2020*, Perficient
(Mar. 23, 2021), https://www.perficient.com/insights/
research-hub/mobile-vs-desktop-usage ..........................................................5

Andrew Liszewski, *Amazon Now Has a 'Get Book' Button in Its
iOS Kindle App*, Verge (May 6, 2025),
https://www.theverge.com/news/661719/amazon-app-ios-
apple-iphone-ipad-kindle-buy-books ..........................................................8

Pew Rsch. Ctr., Internet & Tech., *Mobile Fact Sheet* (Nov. 13,
2024), https://www.pewresearch.org/internet/fact-
sheet/mobile/............................................................................................6

*Phones: Dumb Handsets Outsmart High-Tech Alternatives*,
Fin. Times (Aug. 12, 2023), https://www.ft.com/content/
17ebfb78-5590-49d7-9b2c-ac33ab8d54a3 ....................................................5

Spotify, *Following Landmark Court Ruling, Spotify Submits New App Update to Apple to Benefit U.S. Consumers* (May 2025), https://newsroom.spotify.com/2025-05-01/following-landmark-court-ruling-spotify-submits-new-app-update-to-apple-to-benefit-u-s-consumers/ ....................................................16

Tushar Thakur, *App Store Statistics 2025: Revenue, Downloads, and Market Shifts*, SQ Mag. (July 22, 2025), https://sqmagazine.co.uk/app-store-statistics/ ................................................8

Chance Townsend, *You Can Finally Buy Books in the Kindle App, Thanks to a California Judge*, Mashable (May 6, 2025), https://mashable.com/article/kindle-books-avaliable-for-purchase-on-app ...........................................................................16

Tom Warren, *Microsoft's New Xbox Mobile Gaming Store Is Launching in July*, Verge (May 9, 2024), https://perma.cc/S4KE-Y2S5 .......................................................17

Lance Whitney, *iOS vs Android Market Share: Do More People Have iPhones or Android Phones?*, TechRepublic (July 25, 2024), https://www.techrepublic.com/article/ios-vs-android-market-share/ ....................................................................6

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

Microsoft Corporation ("Microsoft") is a leading innovator in computer hardware, software, and security features; it has been creating software platforms and application programming interfaces for application developers for more than 40 years. Microsoft's mission is to enable individuals and businesses throughout the world to realize their full potential by creating technology that transforms the ways people work, play, and communicate. Microsoft develops, manufactures, licenses, sells, and supports a wide range of programs, devices, and services, including Windows, Microsoft Azure, Microsoft 365, Surface, Xbox and Xbox Game Pass, and Bing, in addition to a variety of commercial and enterprise technologies powered by artificial intelligence. Microsoft invests billions of dollars in the research and development of new technologies, products, and services to compete in dynamic technology markets.

Microsoft brings a unique and balanced perspective to the legal, economic, and technological issues in this case. As part of its business, Microsoft sells hardware devices and one of the leading operating systems for personal computers.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no counsel for any party to this appeal has authored this *amicus* brief, in whole or in part, nor has any party to this appeal or their respective counsel contributed money to fund the preparation or submission of this brief. No other person or entity other than Microsoft contributed money that was intended to fund preparing or submitting this brief. All parties consented to its filing.

Microsoft also provides online stores for applications that run on its consumer operating systems. In other parts of its business, Microsoft sells applications, software, and services that run on mobile operating systems produced by Apple Inc. ("Apple"). Microsoft offers products that compete with Apple, including – like Epic Games, Inc. ("Epic") – games for distribution on iOS devices. Microsoft also is a global leader in digital, online, and computer security, protecting a significant amount of critical internet and computing infrastructure throughout the United States and the world.

Among its other provisions, the order challenged in this appeal addresses measures that Apple took to prevent app developers (like Microsoft) from steering users to alternative platforms, other than Apple's App Store, for the purchase of digital goods or services for use within iOS apps. In part as a response to the district court's injunction, which took effect more than a year ago, Microsoft undertook significant work to prepare new consumer offerings. Apple's failure to comply with the injunction prevented Microsoft from delivering these offerings, as described in Microsoft's earlier submission to the district court urging the enforcement of the ordered equitable relief. *See generally* Br. of *Amici Curiae* Meta Platforms, Inc., Microsoft Corporation, X Corp., and Match Group, LLC in Supp. of Epic Games, Inc.'s Mot. To Enforce Inj., No. 4:20-cv-05640-YGR, ECF No. 904-1 (N.D. Cal. Mar. 20, 2024).

2

Microsoft has a keen interest in the implementation of the court's remedy to Apple's anti-steering activities, which will enable innovation, spur technological development, and promote competition, thereby benefiting consumers.

## INTRODUCTION

Epic's Sherman Act claim against Apple focused on "three provisions" of the Developer Program Licensing Agreement: (1) the "distribution restriction," which bars developers from distributing iOS apps other than through Apple's App Store; (2) the "IAP requirement," which requires developers to "use Apple's IAP to process in-app payments"; and (3) the "anti-steering provision," which prohibits developers from communicating "out-of-app payment methods through certain mechanisms." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 968 (9th Cir. 2023) ("*Epic I*"). Although the district court found that Apple's restrictions caused "substantial anticompetitive harms," it further found that "Apple established non-pretextual, legally cognizable procompetitive rationales for its app-distribution and IAP restrictions" and that Epic's "proposed less restrictive alternatives" were "severely underdeveloped." *Id.* at 971. Accordingly, the district court rejected Epic's Sherman Act claim under the Rule of Reason; it also rejected Epic's claims under California's Unfair Competition Law ("UCL") based on the distribution and IAP restrictions. The district court also held, however, that Apple offered no pro-competitive justification for the anti-steering restrictions, "other than to argue

entitlement," and that those anti-steering provisions violated the UCL. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1057 (N.D. Cal. 2021) ("*Epic v. Apple*"). The district court entered an injunction prohibiting Apple from enforcing the anti-steering provision, which this Court affirmed. *See Epic I*, 67 F.4th at 999.

Rather than comply with that injunction, Apple recreated the anti-steering provision in two ways: First, it severely limited developers' ability to inform their users about off-app alternatives for mobile purchases of in-app content and features in addition to including multiple warnings to discourage users from taking advantage of such alternatives. Second, even though Apple had never imposed a fee on developers for purchases of digital content made outside of iOS apps, Apple imposed a punitive 27 percent commission on developers for all purchases made on the developer's website within seven days after the user accesses the website using a link in the developer's app. Apple thereby eliminated any possible savings – and then some – from completing mobile purchases on a competing platform, thereby precluding the very price competition that the district court had held was permitted. As Apple intended, this provision made it uneconomic for virtually all developers, including Microsoft, to implement links within their apps to alternative payment platforms.

The district court's determination that Apple's conduct violated the terms of its injunction is correct and should be affirmed. The anti-steering provisions that

Apple imposed are as effective a prohibition on steering to off-app payment methods as the outright ban that they replaced.  This brief focuses in particular on Apple's requirement that developers pay commissions for purchases of digital content made on alternative platforms after users click on a link-out within an iOS app.  Apple contends (at 1) that the district court – and this Court – endorsed the imposition of a commission on purchases made using off-app payment methods.  But Apple confuses alternative, non-App Store *in-app* payment methods with *off-app* payments.  The district court's clarification that Apple may not charge a commission on off-app sales appropriately implements the plain import of its injunction.

## BACKGROUND

1.    ***Epic's Lawsuit***:  Mobile devices and their operating systems have become the primary way that people access the internet.[2]  On average, U.S. adults spend over four hours a day on their mobile devices;[3] more than 90 percent of

---

[2] Eric Enge, *Mobile vs. Desktop Usage in 2020*, Perficient (Mar. 23, 2021), https://www.perficient.com/insights/research-hub/mobile-vs-desktop-usage.

[3] *See Phones: Dumb Handsets Outsmart High-Tech Alternatives*, Fin. Times (Aug. 12, 2023), https://www.ft.com/content/17ebfb78-5590-49d7-9b2c-ac33ab8d54a3 ("Americans spent 4.4 hours a day on average looking at their mobile phones in 2022.").

Americans own a smartphone,[4] and more than 60 percent of those smartphone users use Apple's iPhones and its iOS operating system.[5]

Smartphone apps are critical to the utility of mobile phones.[6]  As the National Telecommunications and Information Administration explained in a recent report, "[t]he model of having a platform . . . on top of which other applications can be developed is not an innovation novel to mobile devices."[7] What is unique about mobile app ecosystems, however, is that Apple – and Google, which controls the only alternative mobile operating system in the United States (Android) – maintain virtually exclusive control over the distribution of mobile apps for use with their respective operating systems.  As a result of this gatekeeper power, Apple has "an outsized impact on the form, capabilities, and access method for millions of apps."[8]

---

[4] Pew Rsch. Ctr., Internet & Tech., *Mobile Fact Sheet* (Nov. 13, 2024), https://www.pewresearch.org/internet/fact-sheet/mobile/ ("91%[ ] own a smartphone").

[5] Lance Whitney, *iOS vs Android Market Share: Do More People Have iPhones or Android Phones?*, TechRepublic (July 25, 2024), https://www.techrepublic.com/article/ios-vs-android-market-share/.

[6] *See* Dep't of Commerce, *Competition in the Mobile Application Ecosystem* (Feb. 2023), https://www.ntia.gov/sites/default/files/publications/ mobileappecosystemreport.pdf?_ga=2.84811728.813216929.1677623123- 2030698341.1675111518.

[7] *Id.* at 4.

[8] *Id.*

Epic's 2020 lawsuit against Apple sought to address the anticompetitive effects of Apple's gatekeeper power by targeting three types of restrictions that Apple places on application developers and iPhone owners:

*First*, Epic challenged Apple's restrictions preventing users from accessing apps through distribution methods other than purchase through the App Store. The district court found that the ban on alternative app stores allowed Apple to "collect extraordinary profits" by virtue of its supracompetitive commissions; if not prohibited by Apple's restrictions, then alternative app stores "could compete on features, including 'search and discoverability,' in-app payment processing, and security," which could enhance innovation. *Epic v. Apple*, 559 F. Supp. 3d at 1037-38. Notwithstanding Epic's "direct and indirect evidence of anticompetitive effects," the district court found that Apple had put forward a "valid and nonpretextual business reason for restricting app distribution" – enhanced security and efficient compensation for Apple's intellectual property – that Epic failed to rebut on the trial record. *Id.* at 1038-39. And Epic likewise failed to put forward a less-restrictive alternative that would be "virtually as effective as the current distribution model." *Id.* at 1041 (citation omitted). This Court, while finding that the district court should have proceeded to "balanc[e] the anticompetitive effects of Apple's conduct against its procompetitive benefits," held that the district court's

7

failure to do so "was harmless in this case," upheld the district court's fact-finding, and affirmed the district court. *Epic I*, 67 F.4th at 993.

*Second*, Epic challenged Apple's restriction on alternative in-app purchase methods. In-app purchases refer specifically to purchases of digital content "*within an app*." *Id.* at 967 (emphasis added). According to one public source, in-app purchases account for 72 percent of all revenue generated through the App Store.[9] Typical in-app purchases might include gaming content, like virtual currencies or cosmetic items like "skins," or premium features on health and fitness apps; other types of digital content – for example, digital books on the Kindle app – were often unavailable to users for in-app purchase because it was uneconomic for app developers to pay Apple's commission (e.g., 30 percent on all e-book sales).[10] As with Apple's restrictions on app distribution, the district court found that Apple's prohibition on alternative in-app purchase methods caused anticompetitive harm. *See Epic v. Apple*, 559 F. Supp. 3d at 1042. But the district court agreed with Apple that "IAP is the mechanism by which Apple can easily

---

[9] *See* Tushar Thakur, *App Store Statistics 2025: Revenue, Downloads, and Market Shifts*, SQ Mag. (July 22, 2025), https://sqmagazine.co.uk/app-store-statistics/. The 72 percent figure apparently does not include subscriptions, which are also in-app purchases; the actual figure is likely much higher.

[10] *See* Andrew Liszewski, *Amazon Now Has a 'Get Book' Button in Its iOS Kindle App*, Verge (May 6, 2025), https://www.theverge.com/news/661719/amazon-app-ios-apple-iphone-ipad-kindle-buy-books.

receive its commission and is further how Apple collects a royalty for the use of its intellectual property." *Id.* Accordingly, as to the 30 percent IAP tax that Apple charges for in-app payments *within* iOS native apps downloaded from the App Store, the district court again found, "based on the current record," that Epic had identified no equally effective less-restrictive alternatives. *Id.* Again, this Court affirmed. *See Epic I*, 67 F.4th at 994.

*Third*, the district court separately evaluated Apple's anti-steering restrictions under California's UCL. Unlike Apple's prohibitions on alternative app-distribution and in-app purchase mechanisms, anti-steering restrictions do not govern how developers' apps are installed and operate on Apple's iOS; rather, they seek to restrict developers' ability to encourage users to take advantage of *non-iOS* platforms that may be less expensive or higher quality than what Apple allows developers to offer on Apple's platform. For example, Microsoft offers many of its products, including Microsoft Office, Teams, the Xbox app, and games that include popular titles like Candy Crush and Minecraft, on multiple operating system platforms. Apple's anti-steering provision prevented Microsoft from directing users of its iOS mobile apps to alternative purchase methods on, for example, Microsoft's website or the Microsoft Store.

Before addressing those anti-steering restrictions, the district court first found that Epic's UCL claims "based on the app distribution and in-app payment

9

processing restrictions fail for the same reasons as stated for the Sherman Act" –
that, despite "real anticompetitive effects," Apple had "proffered mostly valid and
non-pretextual procompetitive justifications." *Epic v. Apple*, 559 F. Supp. 3d
at 1054. With respect to Apple's anti-steering restrictions, however, the district
court found that further analysis was required. The court began by noting that
Apple's conduct had produced "anticompetitive effects and excessive operating
margins," and that the lack of competition has resulted in "decreased innovation"
and higher costs to developers. *Id.* Unlike the distribution and IAP restrictions,
the anti-steering provision prevented developers from "communicat[ing] lower
prices on *other* platforms," which "has the effect of preventing substitution *among*
platforms for transactions." *Id.* at 1055-56 (emphases added). The district court
further held that "Apple's market power and resultant ability to control how
pricing works for digital transactions" distinguished its anti-steering provision
from the type of anti-steering rules upheld in *Ohio v. American Express Co.*, 585
U.S. 529 (2018). Apple offered no pro-competitive justification for the anti-
steering provision "other than to argue entitlement." *Id.* at 1056-57.

   The district court accordingly enjoined Apple from enforcing its anti-
steering provisions, making clear that developers would be permitted to "direct
customers to purchasing mechanisms, in addition to IAP." *Id.* at 1058. On appeal,
Apple did not challenge the district court's "application of the UCL's tethering and

balancing tests to the facts of this case," and this Court affirmed the district court's liability holding. *Epic I*, 67 F.4th at 1001. Again, this Court affirmed the injunction and its scope.

>     **2.**      ***Apple Flouts the Injunction***:  Compliance with the terms of the injunction should have been straightforward.  Apple should simply have informed developers that it would no longer enforce its prohibition on steering users to alternative platforms for purchase of digital content.

But that is not what Apple did.  On January 16, 2024 – the same day that the U.S. Supreme Court declined to hear Apple's appeal of this Court's affirmance of the district court's injunction – Apple filed a notice with the district court identifying its approach to implementing the injunction (the "Apple Plan").  *See* Notice of Compliance with UCL Inj., *Epic v. Apple*, No. 4:20-cv-05640-YGR, ECF No. 871 (N.D. Cal. Jan. 16, 2024).  The Apple Plan made crystal clear that, notwithstanding the district court's order, Apple had no intention of allowing developers to steer iOS app users to off-platform alternatives for purchases of digital content.

Apple's anti-steering restrictions are described in the district court's detailed opinion. They fall into two basic categories.[11] *First*, Apple placed several restrictions on the manner in which developers could communicate the availability of alternative purchase methods within iOS apps. With respect to external links – which can be clicked to direct the user off the app to a website – the Apple Plan barred developers from displaying such links "on any page that is part of an in-app flow to merchandise" or other in-app purchase. 1-ER-30. One developer explained how that restriction "inhibits our ability to give users a choice" and would "likely . . . lead to user confusion." 1-ER-31. Apple also restricted the design of such links, prohibiting developers from presenting users with "buttons" (which is what users expect to see). 1-ER-34. Apple also implemented full-screen warnings to discourage users from following through after clicking on a link to an external purchase method – "scare" screens, *see* 1-ER-3, -35[12] – well aware that such warning screens would increase the "friction" associated with shifting

---

[11] A third category of restriction is a continuation on an outright ban on steering for participants in two of Apple's discounted commission programs, the Video Partner Program and the News Partner Program. This brief does not address that aspect of the Apple Plan.

[12] *See also* 1-ER-35-38 (collecting evidence about Apple's deployment of the "scare" screen, including internal discussions at Apple among executives about "how to make the language 'scarier'" to users – "the most anticompetitive option," as the district court found).

purchases outside the app.  1-ER-40.  Apple imposed additional technical restrictions (requiring "static URLs," which prevents communication of information that can improve the customer experience), making it less convenient for users to complete purchases outside of the app.  1-ER-40-42.  And Apple imposed further restrictions on communication with iOS app users about the availability of off-app purchase options, limiting developers to a single link and Apple's mandated language.

*Second*, beyond virtually eliminating developers' ability to promote external purchase options effectively, Apple eliminated their economic incentive to do so by imposing a 27 percent commission on any purchase by a user made *within seven days* of linking out from the iOS app.  To begin with, developers incur costs to process transactions that *exceed* the three-percentage-point discount off of Apple's 30 percent commission rate; in other words, as a result of the obligation to pay Apple a commission, it is *more* expensive for a developer to process a transaction on its own platform than to simply pay the 30 percent commission for use of Apple's IAP.  1-ER-23.  Furthermore, because Apple imposes its commission for all transactions completed within seven days of a user clicking on a link, developers with cross-platform applications risk incurring liability for commissions on purchases of digital content that are not the result of the user clicking on an in-app link.

**3.** *The District Court Enforces the Injunction*:  The district court correctly determined that Apple's foregoing conduct, far from complying with the terms of the injunction, violated its letter and spirit.  With respect to Apple's restrictions on the design of link-outs and other "calls to action" directing consumers to alternatives to IAP, the district court held that Apple had "replace[d] the explicit anti-steering provisions the Injunction prohibited with a mosaic of the same."  1-ER-62.  And, with respect to the imposition of the 27 percent commission on out-of-app purchases, the district court noted that Apple had "set a commission rate that in practice made all alternatives to IAP economically non-viable."  1-ER-60.

Accordingly, the district court adopted express provisions to address the anti-steering policies that Apple implemented to evade the district court's injunction:

- The prohibition from "[i]mposing any commission or any fee on purchases that consumers make outside an app," 1-ER-76, responds directly to Apple's imposition of commissions for any new purchase within seven days of a user linking out of the app, *see* 1-ER-15.

- The prohibition from "[r]estricting or conditioning developers' style, language, formatting, quantity, flow or placement of links for purchases outside an app[,]" 1-ER-76, responds directly to the "variety of restrictions"

14

that Apple imposed "on developers' ability to craft a link-out program,"
1-ER-62.

- And the prohibition from "[i]nterfering with consumers' choice to proceed in or out of an app by using anything other than a neutral message," 1-ER-76, responds directly to Apple's imposition of a "scare screen" – a "full screen takeover" that the district court found Apple engineered to be "the most anticompetitive option," 1-ER-35-40.

Events since the district court ruled in April further confirm just how effectively Apple's post-injunction conduct has prevented developers from directing users to alternative platforms – the very conduct the injunction barred. Prior to the district court's April order, neither Microsoft nor any other major developer was able to implement any significant changes to their iOS apps to facilitate off-platform purchases. *See* 1-ER-46 ("As of the May 2024 hearing, only 34 developers out of the approximately 136,000 total developers on the App Store applied for the program, and seventeen of those developers had not offered in-app purchases in the first place."). That, of course, was the whole point of Apple's restrictions: to protect 100 percent of Apple's IAP-based revenues. *See* 1-ER-46 ("Apple knew it was choosing a course which would fail to stimulate any meaningful competition to Apple's IAP and thereby maintain its revenue stream.").

By contrast, since April 2025, developers have been able to make customers aware of additional purchase options for digital content that have enhanced the consumer experience.  For example, Spotify announced that it would update its iOS app to show pricing details and provide links to make purchases, "fostering transparency and choice for U.S. consumers."[13]  The Kindle app now permits users to click a link to purchase books on Amazon's website; previously, not only was there no link within the app to Amazon's website, but Amazon could not include information about off-app purchase options in the app.[14]  Microsoft, too, intends soon to implement plans to make off-app purchase options more convenient for users of its iOS apps.

In short, the district court's April 2025 order finally gives effect to the district court's injunction against Apple's anti-steering provisions.

---

[13] Spotify, *Following Landmark Court Ruling, Spotify Submits New App Update to Apple to Benefit U.S. Consumers* (May 2025), https://newsroom.spotify.com/2025-05-01/following-landmark-court-ruling-spotify-submits-new-app-update-to-apple-to-benefit-u-s-consumers/.

[14] Chance Townsend, *You Can Finally Buy Books in the Kindle App, Thanks to a California Judge*, Mashable (May 6, 2025), https://mashable.com/article/kindle-books-avaliable-for-purchase-on-app.

# ARGUMENT

## APPLE'S ATTEMPT TO IMPOSE A COMMISSION FOR OFF-PLATFORM TRANSACTIONS IS ANTICOMPETITIVE

Microsoft's experience as a developer of iOS apps confirms that the district court correctly determined that the Apple Plan made it impracticable and uneconomic for developers to offer alternatives to Apple's IAP for the hundreds of millions of U.S. consumers who use iOS apps. Microsoft long has wished to offer users of its apps an alternative to Apple's IAP *in the apps themselves*, but Apple's policies have prohibited such alternatives. The district court's April 2025 injunction allows Apple to maintain its *in-app* payment exclusivity but, for the first time, also allows developers to offer consumers a workable solution by launching their own online store – accessible via link-out – for digital content to be purchased *off-app* at better prices.[15]

Under the Apple Plan – with its 27 percent tax on *off-app* transactions – Microsoft had been unable to implement linked-out payments. Indeed, Microsoft could not even inform customers that alternative purchase methods exist because the anti-steering measures Apple took to avoid the injunction effectively restricted Microsoft's communication to users. In Microsoft's experience, in-app links are

---

[15] *See* Tom Warren, *Microsoft's New Xbox Mobile Gaming Store Is Launching in July*, Verge (May 9, 2024), https://perma.cc/S4KE-Y2S5.

crucial to the discoverability and viability of Microsoft's online store.  Without a link, few users ever learn that an external alternative to IAP exists, and even fewer make use of that alternative.  Apple's monetary penalty on the use of link-outs is hardly different from the outright prohibition that the injunction barred.

In challenging the district court's most recent order, Apple focuses its complaint on the provision barring Apple from imposing a commission on purchases of digital content on alternative platforms, going so far as to claim that the "district court's original decision was explicit that Apple *could* charge a commission" for external purchases.  Apple Br. 1 ("This Court recognized much the same thing in affirming[.]").  But Apple's argument deliberately conflates two very different issues:  whether Apple is permitted to charge a commission for *in-app purchases* that are accomplished using an alternative payment method instead of the App Store – which the district court and this Court indicated would be permissible (if Apple allowed such in-app alternatives) – and the imposition of a commission for purchases made *on different platforms entirely*.  As the district court pointed out, Apple had never before attempted to exact a commission when developers used their own websites, instead of native iOS apps, to process digital content transactions.  *See* 1-ER-59.

The distinction is fundamental because Apple's insistence on payment of commissions on off-app sales tends to foreclose lower-cost alternatives (as it did in

this case). As the district court noted, any developer incurs costs to create an alternative payment platform and to process each transaction on the platform. By imposing a 27 percent commission on off-platform sales on top of those development costs, Apple ensured that no developer could reap *any* cost advantage from directing users to its own platform. But even if the commission were less prohibitive, any such commission would erode (even if not eliminate entirely) the relative cost advantage that alternative platforms could provide.

Moreover, Apple's effort to exact a commission for off-app sales reflects improper leveraging that has long been prohibited as anticompetitive. For example, in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969), the Court recognized that a patent owner "may not condition the right to use [a] patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of [the] patent monopoly." *Id.* at 136. By the same token, a patent owner may not leverage its legitimate right to exclude others from practicing its patent to "garner as royalties a percentage share of the licensee's receipts from sales of other products." *Id.* Apple's effort to impose commissions on off-platform sales – for which it never previously charged a commission – likewise reflects the improper leveraging of monopoly power to foreclose effective competition.

Apple now argues (at 27) that it must be permitted to charge *some* commission even if the 27 percent rate was excessive. But, in defending its anti-steering restrictions, Apple never claimed that they were justified by Apple's need to obtain compensation for use of its intellectual property; rather, it simply claimed that it was entitled to bar developers from promoting alternative platforms from within iOS apps – an argument that both the district court and this Court rejected. *See Epic v. Apple*, 559 F. Supp. 3d at 1057. Apple had every reason to argue that its anti-steering provisions were justified by the need to obtain adequate compensation for its IP – for example, by arguing that in the absence of anti-steering provisions, it would instead impose additional charges. Yet Apple made no such claim.

Absent Apple's unlawful anti-steering restrictions, alternative payment mechanisms for digital content have the potential to offer consumers genuine choices, with the result that Apple's IAP will, for the first time, face significant and potentially constraining competition for processing in-app purchases, which are a significant part of the mobile app economy (totaling billions of dollars annually). To be sure, for many applications, in-app purchase offers formidable advantages to off-app purchase; for example, gamers may be reluctant to interrupt play to make purchases on a separate platform. Moreover, the in-app purchase requirement creates technical problems, particularly for cross-platform developers that likewise

prefer to implement in-app purchase mechanisms that can be adapted to multiple platforms. Microsoft accordingly continues to believe that Apple's restrictions on alternative *in-app* purchase mechanisms – among other App Store rules – are anticompetitive. But the district court's April order is nevertheless a significant step forward in ensuring a more competitive and pro-consumer digital ecosystem.

## CONCLUSION

The order of the district court should be affirmed.

Respectfully submitted,

/s/ *Aaron M. Panner*

Aaron M. Panner
Alex A. Parkinson
Sven E. Henningson
Jared M. Stehle
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com

*Counsel for Amicus Curiae*
*Microsoft Corp.*

August 22, 2025

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** 25-2935 _____

I am the attorney or self-represented party.

**This brief contains 4,371 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3), as calculated under Cir. R. 32-3.

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the lengths limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ *Aaron M. Panner*        **Date** August 22, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 22, 2025, I caused to be filed electronically the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. Participants in the case who are registered ACMS users will be served by the appellate ACMS system.

 /s/ *Aaron M. Panner*         
Aaron M. Panner