No. 25-2935

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640
Hon. Yvonne Gonzalez Rogers

---

## BRIEF OF *AMICUS CURIAE* SPOTIFY USA INC. IN SUPPORT OF
## APPELLEE EPIC GAMES, INC

---

Renata B. Hesse
Brendan P. Cullen
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, California 94301-2010
Tel: (650) 461-5600
Fax: (650) 461-5700

Shane M. Palmer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel: (212) 558-4000
Fax: (212) 558-3588

*Attorneys for* Amicus Curiae
*Spotify USA Inc.*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Spotify USA Inc. certifies that it is a wholly owned subsidiary of Spotify Technology S.A., a publicly traded company that does not have a parent corporation.  No publicly traded corporation owns 10% or more of the common stock of Spotify Technology S.A.

DATE:      August 22, 2025          /s/ *Brendan P. Cullen*

                                                        Brendan P. Cullen

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ................................................................... 1

INTRODUCTION ........................................................................................... 2

ARGUMENT .................................................................................................. 7

    I.    The 2025 Order Provides Developers with the Benefits of the
Injunction .................................................................................................. 7

        A.    The Link Restrictions are necessary to ensure price transparency. 7

        B.    The Fee Prohibition is necessary to effectuate price competition. .11

        C.    Preliminary data indicate that the 2025 Order is achieving the
Injunction's intended goals ................................................................ 15

    II.    The 2025 Order Does Not Violate the U.S. Constitution ..................... 20

        A.    The Link Restrictions do not implicate, let alone violate, the First
Amendment. ......................................................................................... 20

        B.    The Fee Prohibition does not violate the Fifth Amendment's
Takings Clause. ................................................................................... 25

CONCLUSION ............................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariix, LLC* v. *NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021)...........................................................24

*Cedar Point Nursery* v. *Hassid*,
  594 U.S. 139 (2021)...........................................................................27

*Central Hudson Gas & Elec. Corp.* v. *Pub. Servs.*
  *Comm'n of N.Y.*,
  447 U.S. 557 (1980).............................................................23, 24, 25

*Epic Games, Inc.* v. *Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021)....................................*passim*

*Epic Games, Inc.* v. *Apple Inc.*,
  67 F.4th 946 (9th Cir. 2023) .................................................................3

*Int'l Franchise Ass'n, Inc.* v. *City of Seattle*,
  803 F.3d 389 (9th Cir. 2015)...........................................................20

*Moody* v. *NetChoice, LLC*,
  603 U.S. 707 (2024)..............................................................21, 22, 23

*PruneYard Shopping Center* v. *Robins*,
  447 U.S. 74 (1980)....................................................22, 23, 25, 27

*Rumsfeld* v. *Forum for Acad. and Inst. Rights, Inc.*,
  547 U.S. 47 (2006)............................................................................ 22

*Sorrell* v. *IMS Health Inc.*,
  564 U.S. 552 (2011)..................................................................20, 21

*Stop the Beach Renourishment, Inc.* v. *Fla. Dep't of Env't Prot.*,
  560 U.S. 702 (2010)..................................................................25, 26

*Tahoe-Sierra Pres. Council, Inc.* v. *Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002).........................................................................27

iii

## INTEREST OF *AMICUS CURIAE*

Spotify operates one of the world's most popular audio-streaming subscription services.[1]  Spotify's audio-streaming app has been available on the Apple App Store in the United States since 2011.  Spotify has been subject to Apple's anti-steering restrictions for many years, and is covered by the district court's September 10, 2021 injunction (the "Injunction") against Apple and the April 30, 2025 Order that Apple challenges through this appeal (the "2025 Order").  Accordingly, Spotify has a substantial interest in ensuring that the Injunction and 2025 Order are enforced.

Spotify can offer the Court an important perspective because it falls within a category of apps, called "reader" apps under Guideline 3.1.3(a) of Apple's App Review Guidelines, that do not utilize Apple's In-App Purchase payment mechanism ("IAP").  Apple historically has prohibited reader apps like Spotify from providing basic pricing information about products in their iOS apps and from using any language that Apple unilaterally deems

---

[1]      Apple and Epic consented to the filing of this brief.  No party's counsel authored this brief in whole or in part, no party or its counsel contributed money intended to fund the preparation or submission of this brief, and no person other than Spotify or its counsel contributed money that was intended to fund preparing or submitting the brief.

"steering" to alternative purchasing mechanisms.  The Injunction, however, proscribed Apple's anticompetitive behavior, and the 2025 Order enforces that decision.  Together, they have enabled Spotify, for the first time in nearly a decade, to communicate basic pricing and purchase information in the Spotify app to its United States users.  Spotify can thus aid the Court in its resolution of Epic's motion by explaining how Apple's response to the Injunction continued to restrict the flow of price and purchasing information to consumers, thereby preventing them from learning about the low-cost options offered by reader apps and inhibiting the price competition that the district court and this Court sought to enable.  Spotify can further explain how the 2025 Order addressed these issues, and to date has ensured that the Injunction has its intended pro-competitive effects.

## INTRODUCTION

The district court's ruling in 2021 was clear:  Apple's anti-steering provisions violate California law and cause "considerable" harm to app developers and Apple mobile-device users.  *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 1056 (N.D. Cal. 2021).  The district court found that this harm could "best be remedied by invalidating the offending provisions" in Apple's Guidelines.  *Id.* at 1057.  To that end, the district court entered the

2

Injunction to "uncloak[] the veil hiding pricing information on mobile devices and bring[] transparency to the marketplace." *Id.* And to achieve this goal, the Injunction prevented Apple from prohibiting app developers from including in their apps "buttons, external links, or other calls to action that direct customers to purchasing mechanisms" other than Apple's proprietary IAP. *Id.* at 1058. This Court affirmed, recognizing that Apple's anti-steering provisions reduced consumer choice by excluding would-be-competitors to IAP enabling Apple to reap a supracompetitive 30% commission on IAP. *Epic Games, Inc.* v. *Apple Inc.*, 67 F.4th 946, 1000–02 (9th Cir. 2023).

During the 16 months after it went into effect, Apple flouted the Injunction "at every step" by choosing "to maintain its anticompetitive revenue stream over compliance." 2025 Order at 59. Although Apple's response to the Injunction (the "Apple Plan") nominally allowed app developers to include within their apps links to external purchase mechanisms, it imposed restrictions on the use of those links to ensure that they could never be a viable alternative to IAP. Apple also levied a 27% commission on *external* web purchases—effectively a rebrand (and expansion) of its 30% IAP commission—made within seven days after a user tapped on a link.

Collectively, these restrictions ensured that external links could not be a viable alternative to IAP, foiling the Injunction's goal of fostering price competition.

Epic moved to enforce the Injunction in the district court. After two sets of evidentiary hearings, the district court entered the 2025 Order, which found that Apple had intentionally thwarted the Injunction. Apple appealed the 2025 Order and filed an emergency motion to stay two components of the 2025 Order pending appeal—(i) the prohibition on charging any commission or fee for any web or out-of-app transactions (the "Fee Prohibition"); and (ii) the prohibition on restricting the language or placement of external purchase links (the "Link-Out Prohibition")—which this Court denied on June 4, 2025.

In the four months since the 2025 Order was entered, Apple's long-belated compliance has already had a demonstrably positive effect on competition. Before the 2025 Order, Apple prohibited Spotify from including language in its app to inform iOS users about how to upgrade to a paid subscription; it could only hope that app users would navigate on their own to Spotify's website to purchase a subscription. This created a confusing user experience that prevented many users from signing up for free trials and/or the paid subscription of their choice. The 2025 Order enabled Spotify to update its iOS app to inform users about the price of paid subscriptions and to

4

use convenient buttons to direct users to Spotify's website to purchase them. Spotify's internal data show a significant increase in the rate of conversion to a Premium subscription for iOS users who are exposed to the new iOS app experience. Apple's compliance has also enabled Spotify to inform consumers about new product innovations like additional audiobook listening hours, that would not have been possible without the Injunction. Importantly, for "reader" apps such as Spotify that do not utilize Apple's IAP, these gains inure to consumers and developers without any corresponding loss to Apple.

Apple seeks to unwind these public benefits and return to its anticompetitive practices. In its opening brief ("Brief"), Apple first contests the merits of the 2025 Order—challenging the Fee Prohibition, the Link-Out Prohibition, and several other related provisions of the 2025 Order. The related provisions challenged by Apple limit Apple's ability to restrict the use of dynamic links or otherwise interfere with consumers' choice of payment mechanism (together with the Link-Out Prohibition, the "Link Restrictions"). In particular, Apple claims that the 2025 Order's Fee Prohibition and Link Restrictions constitute an entirely new injunction that is outside the scope of the district court's 2021 ruling. Brief at 26. That argument is simply incorrect. The Fee Prohibition and Link Restrictions are necessary remedies that the

district court tailored to stop Apple's prior, intentional circumvention of the Injunction and to ensure that app developers and consumers can benefit from the price transparency that the Injunction was intended to create.

Apple also argues that the 2025 Order violates the First and Fifth Amendments to the United States Constitution. Specifically, Apple argues that the Link Restrictions violate Apple's First Amendment rights to free speech and that the Fee Prohibition violates the Fifth Amendment's Takings Clause. Brief at 33, 40. These arguments are nonsense. Apple's attempt to regulate third-party links in the App Store is not expressive activity subject to First Amendment protection. Even if Apple's conduct was expressive (and it is not), it is commercial conduct that the district court has already found to be unlawful, taking it outside the First Amendment's reach. But even if it were lawful, the government has a substantial interest in promoting fair competition and consumer choice, and its regulation of Apple's conduct directly advances that interest in a narrow way—by prohibiting Apple from continuing to interfere with developers' ability to speak to consumers. In addition, even presuming a judicial taking were viable under the Takings Clause, due process has been fully observed and even Apple cannot legitimately claim it is entitled to a commission on payments made to third parties for purchases made on

6

those third parties' own websites utilizing their own payment processing systems.

If the 2025 Order were undone, Apple would be permitted to re-institute the Apple Plan—reimposing the same anticompetitive harms the Injunction was designed to prevent and unwinding the critical public benefits that already have resulted from Apple's brief (if long-overdue) compliance. Spotify respectfully requests that this Court uphold the 2025 Order because it is necessary to preserve and ensure the utility of the Injunction and its pro-competitive benefits.

## ARGUMENT

### I. The 2025 Order Provides Developers with the Benefits of the Injunction.

#### A. The Link Restrictions are necessary to ensure price transparency.

The Apple Plan imposed a multitude of new restrictions that severely limited developers' ability to communicate with consumers about their purchase options. In particular, the Apple Plan limited developers to a single link that was subject to restrictions as to the location, appearance, and technical implementation of that link. Crucially, Apple prevented developers from displaying that link in a payment flow, at the moment when users were

7

contemplating making a purchase. The district court found Apple's justifications for these restrictions—including those it continues to advance on appeal—to be "pretextual," and that Apple's true intent was "to stifle competition by cabining developers' ability to attract users to alternate payment methods[.]" 2025 Order at 31, 33.

Spotify, like many other developers, offers its content through different service tiers with varying price points and features. Such apps typically offer a variety of subscription options, including free/ad-supported tiers, paid tiers that unlock certain features or content, and other plans like Family, Duo, or Student that offer particular value to some consumers. To encourage consumers to subscribe to these services, developers must be able to communicate with consumers about their apps' paid features and how to access them. Indeed, developers' ability to successfully meet the needs of their users depends on being able to inform users about the options and benefits of each subscription offering, and to make paying for those features as convenient as possible. This communication is most useful and relevant when a user is considering whether to access a paid feature of the app.

The Apple Plan imposed substantial harm on both the developer community (including Spotify) and consumers by introducing friction into

8

every aspect of a developer's attempt to provide useful price or purchasing information to consumers. For example, because Apple prohibited external links from appearing within the in-app payment flow, the Apple Plan prohibited developers from informing consumers about alternate purchase options at the point when they were actually trying to access a paid feature of the app. As a result, Apple's restrictions wholly undermined the Injunction's goal of "bringing transparency to the marketplace." *Epic Games*, 559 F. Supp. 3d at 1057.

Apple argues that these restrictions were appropriate because the Injunction did not forbid Apple from placing restrictions on the placement or language of links within an app. Brief at 37–38. Put differently, Apple contends that the Injunction merely bars Apple from prohibiting steering language and thus Apple was free to "regulate" links through its link-out entitlement program—even if that program imposed a series of extremely onerous restrictions that achieved the same result. *Id.* Apple fails to grapple with the fact that these restrictions introduced significant friction into communications between developers and consumers that the district court found to be purposely designed to "decrease the attractiveness of competitive alternatives . . . and increase breakage in a purchase flow." 2025 Order at 63.

9

And because Apple prohibited external links from appearing within the in-app payment flow *at the moment* when consumers were contemplating a purchase, the Apple Plan wholly undermined the Injunction's goal of increasing transparency and consumer choice. *Id.* at 61. To remedy that continued harm, the district court imposed the Link Restrictions to prevent Apple from using these measures to achieve what its anti-steering rules had accomplished through outright prohibition.

Apple now also claims that, because it cannot control precisely how developers such as Spotify communicate with their users, the Link Restrictions "run[] roughshod" over Apple's privacy, security, and other supposedly user-related concerns. Brief at 39. Not only that, Apple asserts that the Link Restrictions permit developers to create links that "elevate the external link over Apple's IAP mechanism" and "trample Apple's right to offer IAP entirely." *Id.* These arguments do not withstand scrutiny. Apple's desire to avoid competition is not a legitimate basis to strike down any aspect of the Link Restrictions. The 2025 Order specifically found that the concerns expressed by Apple were "pretextual" and rooted in Apple's desire to "stifle competition by cabining developers' ability to attract users to alternate payment methods." 2025 Order at 31, 33. To put it plainly, the Link

10

Restrictions do not impact Apple's ability to offer IAP or inform consumers about IAP—they merely prevent Apple from discouraging competing alternatives.

Because of the Link Restrictions, Spotify and other developers are able to inform consumers about alternate purchasing options at the moment of purchase and in a manner that improves the user experience by making it easier for consumers to understand their options and buy what they want— exactly the sort of "open flow of information" that the Injunction sought to engender. *See Epic Games*, 559 F. Supp. 3d at 1055.  If the Link Restrictions were struck down, Apple could, and likely would, reinstate its limitations and stop Spotify from deploying this simple and obvious approach to informing consumers about the prices and discounts for Premium Spotify subscriptions—effectively undermining any competition between Apple's IAP and other payment mechanisms on the web and returning developers (including Spotify) to the pre-Injunction status quo.

### B.    The Fee Prohibition is necessary to effectuate price competition.

The Apple Plan also imposed a 27% commission (or 12% for certain qualifying purchases) on any out-of-app purchases made within seven days after a user tapped on an external purchase link within an iOS app.  This fee

is an obvious and expanded version of the 30% commission charged on transactions made through IAP, which the district court (and this Court) already found to be "excessive" and unjustified. *Epic Games*, 559 F. Supp. 3d at 1054. As the district court recognized, the supposed discount from 30% to 27% was meaningless—Apple knew that developers' external costs (like credit-card fees) would exceed 3% when utilizing link-out transactions, meaning that the Apple Plan's fees on link-out transactions were effectively *higher* than the 30% commission on transactions through IAP. *See* 2025 Order at 22.

The district court clearly intended that the Injunction would enable actual price competition, which would exert pressure on Apple to lower its IAP commission, benefitting Epic Games, Inc. and other developers, and ultimately benefit consumers forced to bear the brunt of those costs. *See Epic Games*, 559 F. Supp. at 1054 ("The lack of competition has resulted in decrease[d] information . . . . The costs to developer[s] are higher because competition is not driving the commission rate."); *id.* at 1037 ("High commission rates certainly impact developers, and some evidence exists that it impacts consumers when those costs are passed on."). Instead, under the Apple Plan, Apple thwarted competition by imposing restrictions that

maintained the status quo before the Injunction. A little math would confirm to developers that accepting payments outside IAP still would be untenable (and in fact, even more expensive than IAP).[2]

On appeal, Apple claims the Fee Prohibition is beyond the scope of the Injunction because the Injunction did not prohibit Apple from charging a link-out commission and it recognized that *some* commission would be acceptable. Brief at 30. But that argument entirely misses the point. As an initial matter, the Injunction did not address whether Apple could charge a commission on linked-out transactions because Apple did not permit linked-out transactions at all. But, more importantly, the district court found that the Apple Plan's 27% commission on linked-out transactions was functionally the same as its 30% commission on IAP transactions—eliminating any potential consumer

---

[2] Although the Apple Plan did not allow reader apps like Spotify even to apply for an external link, Spotify would not have done so in any event, for the same reason that it opted to forgo IAP in 2016—it was unwilling to pass Apple's unjustified tax onto its consumers, who ultimately bear the costs of Apple's anticompetitive conduct. When Epic moved to enforce the Injunction, Spotify filed an *amicus* brief in the district court to establish that the Injunction was intended to apply to all app developers, which the 2025 Order confirmed. But the Apple Plan would not have enabled price transparency within Spotify's app in any event. After the European Commission found that Apple's anti-steering rules had violated EU competition laws, Apple introduced a similar 27% fee scheme. Because of those fees, Spotify has never included external links in its EU app.

benefit provided by an external link because it guaranteed that a developer's out-of-app prices would be the same as or higher than the prices that developer would charge using IAP. 2025 Order at 22. Explicitly finding that Apple set the 27% commission on out-of-app purchases for the specific purpose of maintaining its anticompetitive IAP profit stream and circumventing the 2021 Injunction, the district court imposed the Fee Prohibition to give effect to the Injunction. *Id.* at 59–60. Without the Fee Prohibition, Apple may continue to violate the Injunction by imposing charges that undermine any attempts by developers who seek to direct consumers to alternative payment mechanisms, thus sabotaging the Injunction's intended procompetitive effects.

Apple otherwise argues that the district court has engaged in impermissible rate setting that is inconsistent with the UCL, and that the Fee Prohibition is "economically backwards and substantively unjustified" because "Apple provides app developers with products and services of immense value, without which developers would be unable to sell the digital content subject to the commission." Brief at 27, 32–33. But that argument does not withstand scrutiny. Instead of adhering to the Injunction, Apple thwarted competition for well over a year by imposing restrictions that maintained the status quo before the Injunction. Accordingly, the district court simply prohibited Apple

14

from imposing a fee that was intended to prevent developers from effectively directing developers to alternative payment options. Apple had never before imposed such a fee. More broadly, there is no reason why developers should not be subject to the same commission on link-out transactions that Apple already applies for purchases of physical goods and services through mechanisms other than IAP—*i.e.*, 0%. 2025 Order at 45.

The district court's Fee Prohibition is necessary to effectuate the Injunction's goal of fostering price competition. Without the Fee Prohibition, Apple can continue to insulate itself from price competition by imposing fees that make alternatives to IAP uneconomical. Under such a scenario, developers' payment-processing costs will remain artificially inflated and consumers will be worse off.

### C. Preliminary data indicate that the 2025 Order is achieving the Injunction's intended goals.

Spotify has noticed a significant difference in consumer behavior following the implementation of the Link Restrictions and Fee Prohibition. Shortly after the 2025 Order issued, Spotify submitted an app update to Apple that included a revised "Premium Destination Page" where Spotify informs users of its Free service about how to upgrade to a paid Premium subscription. In accordance with the 2025 Order, this updated page includes basic

15

information about the prices of different Premium subscriptions (*e.g.*, individual and family plans, and certain student discounts), and includes a button containing a link to a checkout page on Spotify's website where the user can purchase a Premium subscription. The Injunction enabled all of this, but the Apple Plan barred it. Hemmed in by the 2025 Order, Apple approved Spotify's update. On May 2, 2025, Spotify, for the first time in nearly a decade, began informing users within its iOS app about where and how to purchase a Premium subscription and including a link directing users to an out-of-app purchase mechanism. Spotify has also been able to send users in-app messages and promotions that link to a web checkout experience.

The effects of these changes are clear. After Apple's rules changed, Spotify observed a notable uplift in users' rate of conversion from Free to Premium services in the United States compared to users who are not exposed to this experience, which can, in part, be attributed to Spotify's new avenue to communicate with its users. Indeed, a comparison of app data—from iOS users who see Spotify's new interface, which includes updated marketing language and link-outs, to those who do not—clearly shows that the Link Restrictions and Fee Prohibition are directly responsible for much of this growth. Spotify's preliminary data shows that iOS users of Spotify's Free-tier

16

service who are exposed to this new interface have a substantially higher rate of conversion to Premium than iOS users who were not exposed to the new interface. This data demonstrates that the Link Restrictions and Fee Prohibition—which increase price transparency and direct communications with users—give users the information that they need to make informed decisions about whether any specific app provides sufficient value, which evens the playing field.

Comparing this data to Spotify's app on the Android mobile platform— where Spotify has long been able to provide basic pricing information—further demonstrates that these changes in iOS user behavior are the result of the recent updates.[3] In the months since Spotify updated its iOS app in accordance with the 2025 Order, the rate of conversions from the Free- to Premium-tier service has remained relatively constant on Android, while the rate of conversion among iOS users has increased substantially. This strongly

---

[3]    On its Android app, Spotify has long been able to provide the same basic pricing information that it has only just started providing in its iOS app. Furthermore, and unlike on iOS, Spotify is even able to process in-app payments on its Android app through payment mechanisms other than Google's proprietary Google Play Billing.

17

suggests that the increase is due to Apple finally complying with the Injunction thanks to the 2025 Order.

Because it can now communicate special offers and promotions to its iOS users in-app, Spotify also has turned its attention to introducing users to its newer product features.  For example, on May 16, 2025, Spotify launched another app update that:  (i) allows iOS users who are exposed to the new user interface to buy individual audiobooks, separately from a monthly Premium subscription; (ii) allows eligible Premium users to purchase additional "Top Up" hours for audiobook listening beyond the 15 hours per month that are part of their Premium subscriptions; and (iii) allows qualifying Premium Individual subscribers to use a link to transition to a Duo, Family, or discounted Student Plan (with lower per-user pricing).  Absent the 2025 Order, Apple would have continued to prevent Spotify from informing iOS users about the prices of these features and how to purchase them.[4]

Consumers benefit from this increased price transparency and product innovation.  The immediate and substantial increase in the rate of conversions

---

[4]     *See* Spotify, "Following Landmark Court Ruling, Spotify Submits New App Update to Apple to Benefit U.S. Consumers" (last visited August 22, 2025),     https://newsroom.spotify.com/2025-05-01/following-landmark-court-ruling-spotify-submits-new-app-update-to-apple-to-benefit-u-s-consumers/.

to Spotify's Premium service on iOS following the recent app update demonstrates the procompetitive impact of the Link Restrictions and Fee Prohibition.  As a result of the purchase friction and/or lack of price transparency created by Apple's restrictions, many iOS users experienced substantial difficulties when attempting to select the service that was most suitable for them, and were unable to benefit from any associated cost savings. The changes benefit not only Spotify and its consumers, but competition more generally, as Spotify and other developers who compete with various Apple product offerings may now do so on equal footing.  Moreover, because both IAP and the Apple Plan were unworkable for Spotify's business and Spotify would not have participated in either, Apple is not losing anything that could offset these public gains.  If a stay were granted, millions of Spotify users—and presumably many more millions of users of other developers' apps—would be denied the benefits of the Injunction and would be prevented from making fully informed choices about which products and payment methods are most suitable to them.

19

## II.    The 2025 Order Does Not Violate the U.S. Constitution.

### A.    The Link Restrictions do not implicate, let alone violate, the First Amendment.

Apple argues that the Link Restrictions violate its First Amendment rights by *compelling* Apple to permit "any and all developer speech, even if misleading or disparaging to Apple, in connection with links to external purchases." Brief at 40. Apple's argument is unavailing. The Link Restrictions do not compel Apple to speak or engage in any expressive conduct. Rather, they prevent *Apple* from restricting *developers'* ability to speak with consumers. The Link Restrictions neither implicate nor violate the First Amendment.

As this Court has previously explained, the threshold question is "whether conduct with a 'significant expressive element' drew the legal remedy or the [Link Restrictions] ha[ve] the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n, Inc.* v. *City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara* v. *Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986)). Apple's argument fails at that threshold inquiry. The Link Restrictions regulate Apple's nonexpressive (and economic) conduct: Apple's restriction of developers' ability to communicate to consumers about alternative payment mechanisms. *See Sorrell* v. *IMS Health*

20

*Inc.*, 564 U.S. 552, 567 (2011) ("[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct.") "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Id.* To the extent the 2025 Order imposes any burden on Apple's speech, it is at most incidental.

Apple argues that the 2025 Order "imposes an exceptionally intrusive compelled speech obligation" that "requires Apple to carry any and all developer speech," but that is not supported by the facts or the law. Brief at 40. As a factual matter, the Apple Plan restricted and regulated *in-app* elements of developer's apps—*e.g.*, whether a user can see a button *inside* the Spotify app offering a subscription option. That means that Apple's argument is really that it is being "compelled" to speak by *not* preventing developers from communicating within developers' own apps to developers' own consumers about developers' own products and offerings. That is absurd. Apple is not being compelled to say anything, there is no risk of misattribution, and Apple is not making any expressive choice about what messages are displayed or otherwise performing any editorial function. *See Moody* v. *NetChoice, LLC*, 603 U.S. 707, 728 (2024) ("We have repeatedly faced the

21

question whether ordering a party to provide a forum for someone else's views implicates the First Amendment. And we have repeatedly held that it does so *if, though only if,* the regulated party is engaged in its own expressive activity, which the mandated access would alter or disrupt.") (emphasis added).

Two decisions—*Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) and *PruneYard Shopping Center* v. *Robins*, 447 U.S. 74 (1980)—are particularly instructive. In *Rumsfeld*, the Supreme Court evaluated whether requiring law schools to host military recruiters violated the First Amendment. The Court noted that "[u]nlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive[,]" and "[a] law school's recruiting services lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper[.]" 547 U.S. at 64. Relatedly, in *PruneYard*, the Supreme Court held that a privately-owned mall could be required to permit individuals who distributed handbills or other forms of third-party speech because the mall was open to the public. "The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition [were] not likely [to] be identified with those of the owner," and, as the Supreme Court noted in *Moody*, the mall owner did not claim that he (or the

22

mall) was engaged in any expressive activity.  447 U.S. at 87; *see also Moody*, 603 U.S. at 731 (characterizing *PruneYard*).  Apple's argument suffers the same fatal flaw—it is not engaging in any expressive activity.  And to minimize any risk of misattribution and to account for the safety interests touted by Apple, the 2025 Order expressly permits Apple to display a "neutral message apprising users that they are going to a third-party site[.]" 2025 Order at 75.

Apple also complains that the 2025 Order impermissibly requires Apple to broadcast competing developer speech, including disparaging statements about Apple itself, in the middle of the proverbial checkout aisle.  Brief at 40–41.  But the "First Amendment is not implicated merely because a host objects to a particular message or viewpoint." *Moody*, 603 U.S. at 784 (U.S., 2024) (J. Alito concurrence) (citation omitted).

Finally, even if the Link Restrictions *did* regulate Apple's expressive conduct (and they do not), the First Amendment does not prohibit regulation of that conduct under the commercial speech doctrine.  *See Central Hudson Gas & Elec. Corp.* v. *Pub. Servs. Comm'n of N.Y.*, 447 U.S. 557, 563–64 (1980) (creating a four-part test to determine whether restrictions on commercial speech are constitution:  (1) whether the speech is lawful and not misleading; (2) whether the asserted government interest is substantial; (3) whether the

23

regulation directly advances that interest; and (4) whether the regulation is not more extensive than necessary); *id.* at 566 (noting that, at the threshold, "[f]or commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."); *Ariix, LLC* v. *NutriSearch Corporation*, 985 F.3d 1107, 1115-16 (9th Cir. 2021) ("Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation.") (citation omitted). As an initial matter, Apple's purportedly expressive conduct fails the threshold inquiry of the *Central Hudson* test because the district court already found that Apple's prohibition of developers' speech and anti-steering provisions was unlawful. Therefore, Apple's conduct, even if expressive, does not implicate the First Amendment. But even assuming that conduct was lawful and not misleading, the government has a substantial interest—promoting fair competition and consumer choice—and the Injunction and 2025 Order materially and effectively advance that interest by simply requiring that Apple not restrict developers from communicating with consumers. Under these circumstances,

24

commercial speech can be regulated. *See Central Hudson Gas & Elec. Corp.*, 447 U.S.563-64, 566.

### B. The Fee Prohibition does not violate the Fifth Amendment's Takings Clause.

Apple's Fifth Amendment claim fares no better. As a threshold matter, the Supreme Court has not decided whether any judicial action can even qualify as a taking under the Fifth Amendment. *See, e.g.*, *Stop the Beach Renourishment, Inc.* v. *Fla. Dept. of Environmental Protection*, 560 U.S. 702, 719 (2010) (plurality of four justices contemplated the possibility of a judicial taking). But even assuming a district court's order *could* constitute a taking, the 2025 Order does not violate the Takings Clause.

Apple asserts that Fee Prohibition violates the Takings Clause by depriving Apple of its right to control access to the App Store on its own terms. More specifically, Apple claims that the Fee Prohibition deprives Apple of its right to exclude through its "total ban on Apple's ability to regulate apps now using its property for free." Brief at 33–34. This argument mischaracterizes the scope of the 2025 Order, and it was also squarely rejected by the Supreme Court in *PruneYard*, where a mall owner argued that being required to permit pamphleteers and other third-party speech violated the Fifth Amendment as a "taking" of the mall owner's "right to exclude." 447 U.S. at 82-85.

25

As an initial matter, assuming judicial takings exist, there has been no cognizable "taking" here.   Under the terms of the 2025 Order's Fee Prohibition, Apple may still charge a commission on payments it processes through the App Store on IAP.   Likewise, Apple still owns its intellectual property and may still commercialize it in other contexts.  The Fee Prohibition simply prohibits Apple from charging commissions on payments that are made on the websites of third-party developers within seven days of linking out from the developers' apps.  Such a prohibition is entirely appropriate.  The links permitted by the 2025 Order—which are displayed within the apps of third-party developers and direct users to a third-party website—contain none of Apple's intellectual property.  Indeed, Apple already permits such links for a certain category of apps—those selling physical goods and services, as well as reader apps that seek to direct users to content purchased elsewhere.

Accordingly, the 2025 Order certainly did not violate Apple's Fifth Amendment rights because there can be no taking unless a court decision "contravene[s] established property law. . . ." *Stop the Beach Renourishment, Inc.* v. *Fla. Dept. of Environmental Protection*, 560 U.S. 702, 732–33 (2010).

Although "[i]t is true that one of the essential sticks in the bundle of property rights is the right to exclude others[,]" "it is well established that not

every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *PruneYard*, 447 U.S. at 82 (quoting *Armstrong* v. *United States*, 364 U.S. 40, 48 (1960)) (internal quotations omitted). Like in *PruneYard*, Apple has "failed to demonstrate that the 'right to exclude others' is so essential to the use or economic value of [its] property that the [Fee Prohibition's] limitation of it amounted to a 'taking.'" *Id.* at 84; *see also Tahoe-Sierra Preservation Council, Inc.* v. *Tahoe Regional Planning Agency*, 535 U.S. 302, (2002) ("where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking.") (cleaned up) (citation omitted).[5]

Further, Apple can hardly argue that it has been denied its property without due process of law. *See PruneYard*, 447 U.S. at 84-85. There was a multi-week trial leading to the Injunction, which this Court affirmed. Then, leading to the 2025 Order, the district court held two sets of evidentiary hearings.

---

[5]    Apple's cited authority on this point—*Cedar Point Nursery* v. *Hassid*, 594 U.S. 139, 143, 150 (2021)—is entirely inapposite and does not warrant a contrary result. That case involves "per se physical takings" that cannot be analogized to the facts at hand here.

27

Rather than constituting a judicial taking (presuming such a taking even exists), the Fee Prohibition is an appropriately limited remedy intended with procompetitive benefits, and Apple's due process rights were adequately protected.  As the 2025 Order correctly explains:  "Apple does not have an absolute right to the intellectual property that it wields as a shield to competition without adequate justification of its value.  Apple was provided with an opportunity to value that intellectual property and chose not to do so." 2025 Order at 60 n.65.

## CONCLUSION

For the reasons described above, the Court should affirm the 2025 Order.  The Fee Prohibition and Link Restrictions are necessary remedies that the district court tailored to prevent Apple's circumvention of the Injunction.  In just a short period of time, these measures have already demonstrated substantial procompetitive benefits for both app developers and users.  If the 2025 Order were undone, Apple would be free to re-institute the Apple Plan, undermining the Injunction's intended effects.  Apple should not be permitted to reverse these public benefits and return to its anticompetitive practices.

28

Date:        August 22, 2025        Respectfully submitted,

                        By:    */s/ Brendan P. Cullen*
                               Renata B. Hesse
                               Brendan P. Cullen
                               SULLIVAN & CROMWELL LLP
                               550 Hamilton Avenue
                               Palo Alto, California 94301-2010
                               Tel: (650) 461-5600
                               Fax: (650) 461-5700

                               Shane M. Palmer
                               SULLIVAN & CROMWELL LLP
                               125 Broad Street
                               New York, New York 10004-2498
                               Tel: (212) 558-4000
                               Fax: (212) 558-3588

*Attorneys for* Amicus Curiae *Spotify USA Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)** ___25-02935_____

I am the attorney or self-represented party.

**This brief contains 5,885 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ **X** ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __*/s/ Brendan P. Cullen*___          **Date** __August 22, 2025_

A1

## CERTIFICATE OF SERVICE

I hereby certify that, on August 22, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: August 22, 2025

By:    */s/ Brendan P. Cullen*
Brendan P. Cullen

A2