# No. 25-2935

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

EPIC GAMES, INC.,

*Plaintiff-Appellee,*

v.

APPLE INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of California,
No. 4:20-cv-05640-YGR
Hon. Yvonne Gonzalez Rogers

---

## BRIEF OF AMICUS CURIAE DIGITAL CONTENT NEXT
## IN SUPPORT OF APPELLEE EPIC GAMES, INC.

---

Karl Huth
Matthew Reynolds
J. Lee Hill
Jack Mitchell
HUTH REYNOLDS LLP
41 Cannon Court
Huntington, NY 11743
(631) 263-3648
*Counsel for Amicus Curiae*
*Digital Content Next*

**CORPORATE DISCLOSURE STATEMENT**

No. 25-2935

EPIC GAMES, INC.,
*Plaintiff-Appellee,*

v.

APPLE INC.,
*Defendant-Appellant.*

Under Federal Rule of Appellate Procedure 26.1, Digital Content Next certifies that it has no parent corporation, and that no publicly held company owns 10% or more of its stock.

Date: August 22, 2025

HUTH REYNOLDS LLP

*/s/ Karl Huth*
Karl Huth
*Counsel for Amicus Curiae*
*Digital Content Next*

i

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ................................................................... 1

INTRODUCTION ........................................................................................... 3

ARGUMENT ................................................................................................. 4

**I.    Apple's Conduct Improperly Prevented Developers from "Steering" Customers to Lower-Cost Purchasing Platforms ............................... 4**

A.  Apple's conduct had the practical effect of prohibiting the "steering" the district court ordered Apple to allow. ............................................... 4

B.  The law entitles publishers and other developers to engage in "steering" to competitive pricing options. ................................................................. 6

C.  Apple's dominance of the App Store platform and vertical integration across news, media, and smartphone services create substantial risks of additional harm if Apple's anticompetitive conduct is not enjoined. ................. 7

**II.   The Injunction and Enforcement Order Properly Remedied Apple's Anticompetitive Actions and Protected the First Amendment Interests of Publishers. ..................................................................................... 12**

A.  Competition law remedies have long been held compatible with the First Amendment. ............................................................................................... 12

B.  Apple's conduct injured core First Amendment interests. ........................ 18

CONCLUSION ............................................................................................. 19

# TABLE OF AUTHORITIES

## Cases

*Am. Soc'y of Journalists & Authors Inc. v. Bonta*, 15 F.4th 954 (9th Cir. 2021) ....13

*Assoc. Press v. NLRB*, 301 U.S. 103 (1937)............................................................13

*Assoc. Press v. United States*, 326 U.S. 1 (1945) .........................................3, 12, 18

*Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174 (2d Cir. 1990) ...............................................................................................................11

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)..........................................15

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023)................................................8

*In re Google Play Store Antitrust Litig.*, No. 24-6256, 2025 WL 2167402 (9th Cir. July 31, 2025) ................................................................................................6, 14

*In the Matter of Illumina, Inc. and GRAIL, Inc.*, No. 9401, 2023 WL 2823393 (F.T.C. March 31, 2023)...................................................................................8, 9

*Leathers v. Medlock*, 499 U.S. 439 (1991)............................................................14

*Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994)..............................17

*National Institute of Family and Life Advocates v. Becerra,* 585 U.S. 755 (2018).14

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...........................................19

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186 (1946)...................................13

*Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367 (1969) .....................................19

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...................................................13

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001)................................................18

*United States v. Utah Soc'y for Healthcare Human Res. Admin.*, No. 94C282G, 1994 WL 729931 (D. Utah Sept. 14, 1994) ........................................................18

*Yankees Entertainment & Sports Network, LLC v. Cablevision Systems Corp.*, 224 F.Supp.2d 657 (S.D.N.Y. 2002) ..........................................................................11

Digital Content Next ("DCN") submits this brief[1] as amicus curiae in support of Appellee Epic Games, Inc.[2]

## INTEREST OF AMICUS CURIAE

Founded in 2001, DCN is a trade organization dedicated to serving the needs of digital content companies that enjoy trusted, direct relationships with consumers and advertisers. DCN's members include many of the most trusted and well-respected publishing brands in the United States. Together, DCN's members have an unduplicated audience of 259 million unique visitors and reach 95 percent of the U.S. online population. DCN's member list is a "who's who" of the American media and publishing industry:

---

[1] Apple and Epic consented to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or their counsel contributed money intended to fund the preparation or submission of this brief, and no person other than DCN or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] Unless otherwise indicated herein, all defined terms take on the meaning given to them in Epic's Answering Brief, Dkt. No. 124-1.

1

## DCN Member Organizations



Vibrant competition in media and publishing is necessary to support the broad dissemination of speech and ideas. DCN's members, which span the ideological spectrum and reach every corner of American society, rely on the marketplace of information to perform their First Amendment function as members of a free press.

DCN plays a critical role in facilitating a free and open press in the United States. DCN is nonpartisan and serves the needs of members with diverse editorial perspectives and types of content. DCN's members have directly experienced the impact of Apple's App Store policies, and know from experience the harm Apple's anticompetitive conduct has inflicted on publishers.

## INTRODUCTION

*It would be strange indeed [] if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom. The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary.*

*Associated Press v. United States*, 326 U.S. 1, 20 (1945).

DCN submits this brief to draw the Court's attention specifically to how Apple's illegal App Store policies have restrained trade and competition in the media and publishing market—and will again, if the district court's Enforcement Order ("EO") granting Epic's motion to enforce the Injunction is reversed. This impact on the press is important because the health of a democracy depends on the circulation of ideas from different sources and perspectives. By forcing the press to conform to anticompetitive App Store rules, Apple limited consumer choice and reduced the public's access to news and other content from publishers. By limiting developers' ability to signal consumers about alternative (potentially discounted) payment and subscription options outside of the App Store, Apple restricted consumers' access to information at competitive prices, and chilled publishers' ability to invest in their core publishing businesses. Reversing the Enforcement Order could allow Apple to reimpose its abusive practices and cause significant harm to competition.

Ironically, Apple and several of its amici assert that the First Amendment is a bar to the judiciary's enforcement of competition law against Apple. Yet the

Injunction does not restrict Apple's speech at all; it limits Apple's ability to ***interfere with the speech of others***. As the Injunction and Enforcement Order recognize, the speech affected by Apple's anticompetitive conduct is accurate information about pricing—*i.e.*, commercial information that will advance the healthy functioning of a free and independent press. Apple and several Apple-allied amici assert that the Injunction and Enforcement Order violate Apple's First Amendment rights by coercing Apple to disseminate speech with which it may not agree and restricting Apple's own speech by placing regulations on Apple's "scare screen" tactics. But that is a cynical, self-serving misrepresentation of the facts: in reality, ***Apple has sought to place limits on publishers' speech*** and to force publishers to say things about their own products or services that are deceptive or misleading. The Constitution does not protect this anticompetitive activity and does not grant Apple the right to violate the rights of others.

## ARGUMENT

### I. Apple's Conduct Improperly Prevented Developers from "Steering" Customers to Lower-Cost Purchasing Platforms.

#### A. Apple's conduct had the practical effect of prohibiting the "steering" the district court ordered Apple to allow.

Apple's original anti-steering provisions were unlawful, as this Court has previously affirmed. This appeal involves Apple's noncompliance with the Injunction. Apple responded to the Injunction by introducing a new set of policies

4

that operated as a "*de facto* prohibition" on steering. (EO at 62 n.66.) For the first time, Apple also imposed fees on transactions made outside of the app, not through IAP, including transactions made on a developer's website within seven days after the consumer linked out of the app. (EO at 14.) Apple set the commission for such fees at a 27% rate that Apple "reverse-engineered" to make it more costly for developers to process such out-of-app transactions than IAP. (EO at 22, 63.) That new policy came with onerous accounting requirements to enable Apple to reverse-engineer its commission. Apple also imposed "scare screens" (warning messages about proceeding to an external website designed to deter users from proceeding to the external payment system), restrictions and conditioning of developers' style, language, formatting, quantity, flow or placement of links for out-of-app purchases, limitations on "calls to action" and buttons and restrictions on the content, style, language, formatting, flow or placement of these buttons and calls to action, exclusions of certain categories of developers from obtaining link access, and restrictions on developers' use of dynamic links that bring consumers to a specific page in a logged-in state. The practical effect of the new policies implemented after the Injunction was more of the same: preventing developers from actually using links to facilitate out-of-app purchases, thereby protecting Apple's supracompetitive profits.

**B.      The law entitles publishers and other developers to engage in "steering" to competitive pricing options.**

California competition law entitles DCN's members, like other developers, to use "steering" mechanisms to direct users to out-of-app payment platforms. *See In re Google Play Store Antitrust Litig.*, No. 24-6256, 2025 WL 2167402, at *25 (9th Cir. July 31, 2025). Thanks to the Enforcement Order, developers and consumers no longer have to apply to Apple for "entitlements" to include buttons, external links, and other calls to action in their apps. The ability to use "steering" mechanisms to process payments is especially important in the media and publishing industry, where digital subscriptions are a key component of many organizations' business models. In the district court's Rule 52 Order, based on the court's review of over 900 exhibits and a sixteen-day bench trial, the court found:

- "[E]vidence shows Apple's anti-steering restrictions artificially increase Apple's market power by preventing developers from communicating about lower prices on other platforms." (Dkt. No. 812 ("Rule 52 Order") at 94.)

- "[B]y [Apple's] employing anti-steering provisions, consumers do not know what developers may be offering on their websites, including lower prices." (Rule 52 Order at 118.)

Thus, the district court found that the harms of Apple's anti-steering policies outweighed any benefits, and that developers were entitled to let users know about the existence of options to pay outside of Apple's IAP system. (Rule 52 Order at 165–66.)

For DCN's members, the freedom to use links, buttons, and other calls to action is essential to inform users about cheaper external payment processing. As one app developer expert wrote in his declaration, "over two thirds of users who subscribe in-app do so when the purchase page is presented as a 'pop-up' after they create their account or after their trial has ended." (EO at 30.) Links and buttons can also be woven directly into in-app content, becoming an integral part of the message itself. Apple's request to reverse the Enforcement Order—and to allow Apple complete control to approve, and chill, the use of such calls to action—would not just protect Apple's anticompetitive fee structure; it would give Apple editorial control and the right to interfere with DCN members' core First Amendment activities.

### C.  Apple's dominance of the App Store platform and vertical integration across news, media, and smartphone services create substantial risks of additional harm if Apple's anticompetitive conduct is not enjoined.

Accepting Apple's "compelled speech" argument—which, at bottom, seeks to allow Apple to constrain the speech of others on its platform and prohibit them from informing customers about non-Apple payment options—would pose great dangers to the competitive landscape. The risk is especially severe because Apple is firmly entrenched in every aspect of the Apple smartphone ecosystem, controlling the operating system and controlling many of the preinstalled apps that iPhones are sold with. Apple's vertical integration means that Apple controls access to the App Store

while simultaneously competing directly with publishers for customers through apps like Apple News and Apple TV. Apple's integrated control could allow it to injure competition in several ways if Apple's "compelled speech" argument were accepted.

*First*, because Apple is vertically integrated and competes directly with publishers via its proprietary Apple News and Apple TV apps, allowing Apple to constrain competition in the App Store could allow Apple to injure downstream competition on its platform in favor of its proprietary apps and aggregators.

The Fifth Circuit's decision in *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1048 (5th Cir. 2023), is instructive. In *Illumina*, the Fifth Circuit upheld the FTC's action to block Illumina's acquisition of GRAIL, Inc., on the theory that Illumina's market position in an upstream market could allow it to foreclose competition in a downstream market. *See id*. at 1052. Like Apple here, Illumina provided a platform—specifically, industry-leading gene sequencing machines that read the order of nucleotides in DNA or RNA—used by GRAIL and its competitors, which competed in developing genetic cancer screening tests. *See In the Matter of Illumina, Inc. and GRAIL, Inc.*, No. 9401, 2023 WL 2823393, at *4 (F.T.C. March 31, 2023). The FTC determined that the proposed merger would give "Illumina incentives to favor GRAIL over its rivals by providing GRAIL preferential access or preferential terms"—preferences that "could distort competition in the research, development, and commercialization" of tests developed by GRAIL and its rivals. *Id*. at *1. The

FTC found that Illumina's position in the upstream market would allow Illumina "to quietly and without fanfare undercut those [] customers that pose the greatest threat to GRAIL" by discriminating against key rivals on timing of services, reducing the level of service to which a rival is accustomed, or providing reduced product development support. *Id.* at *45–46. Apple's vertical integration here—as the controller of a critical upstream platform that also competes downstream through its Apple News and Apple TV offerings—creates the same risk to competition. The Injunction and Enforcement Order currently operate to preserve aspects of competition that Apple previously foreclosed, including the ability to steer customers to non-Apple payment options, and the reversal Apple seeks would immediately chill competition, while opening the door to the risk of long-term foreclosure recognized by the FTC in *Illumina.*

***Second***, because of Apple's gatekeeping function as controller of the App Store, reversing the Enforcement Order could give Apple unfair leverage to coerce publishers into joining programs like Apple News on unfavorable terms.

Apple News is a first-party app and news aggregator that markets itself as "One trusted subscription." *See* Apple News, https://www.apple.com/apple-news/ (last visited Aug. 17, 2025). Apple News pitches the value proposition of receiving aggregated news from different media and journalism brands for the price of one subscription. Apple News seeks to lure customers who might have multiple

9

individual digital subscriptions on third-party apps to replace those subscriptions with a single subscription to Apple News. Moreover, as an Apple product, Apple News can also provide convenient integration with the iOS interface. (For example, Apple News articles show up in Spotlight Search results, get special placement on the Lock Screen widget display, and allow for "family sharing" of subscriptions. Competitor third-party apps cannot provide these integrations.)

If this Court vacates the Enforcement Order, Apple will have more leverage over developers than ever before in negotiations about being included in Apple News, or on the video content side, Apple TV+. This leverage is particularly concerning to publishers and media companies whose apps directly compete with Apple News and Apple TV+. Apple could seek to leverage its App Store commission as both a "carrot" and "stick," providing lower or zero commission to developers that avoid competing directly with Apple News or Apple TV+, and punishing developers who compete with or refuse to provide content to Apple News or Apple TV+ by charging exorbitant commissions on both in-app and out-of-app purchases and subscriptions for those rival developers. These developments would not be unprecedented; Apple has already sought to exploit its power over publishing customers via its News Partner Program and Video Partner Program, which specifically prohibited participants from engaging in the price steering protected by the initial Injunction. (EO at 42–44, 62 n.67.)

**Third**, the steering rights the Injunction preserves are consistent with antitrust law's recognition that a single company's control over a means of distribution can create grave harm to competition and the public interest. Control of an information distribution platform that serves as a critical "bottleneck" for downstream companies creates the danger that a monopolist in control of the distribution platform might impede access to it in order to expand monopoly power. *See Yankees Entertainment & Sports Network, LLC v. Cablevision Systems Corp.*, 224 F.Supp.2d 657, 674–75 (S.D.N.Y. 2002) (denying motion to dismiss YES Network's claim that Cablevision's refusal to carry YES Network's programming constituted a denial of access to an essential facility; finding that it is "sufficient if the terms of the offer to deal are unreasonable" and there does not have to be an outright refusal to deal) (citing *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 179–80 (2d Cir. 1990)).

Through its initial 30% App Store fee—and through its attempt to circumvent the initial Injunction by imposing fees virtually identical to the anticompetitive 30% fee—Apple has already demonstrated that it will exploit its control over the App Store. Apple's request to reverse the Enforcement Order would only embolden Apple in its efforts to exploit its dominant position and further injure competition.

11

II.    **The Injunction and Enforcement Order Properly Remedied Apple's Anticompetitive Actions and Protected the First Amendment Interests of Publishers.**

A.    **Competition law remedies have long been held compatible with the First Amendment.**

Apple's First Amendment argument is wrong both as a matter of law and as a matter of common sense. The First Amendment does not give corporations immunity to engage in anti-competitive conduct. To the contrary, competition law is not just compatible with the First Amendment, it helps to advance it. Apple's strained arguments about "compelled speech" are groundless because the Injunction and Enforcement Order do not regulate Apple's speech but rather stop Apple from interfering with speech between developers and developers' customers.

Competition law furthers the Free Speech and Free Press interests of publishers and creators. The seminal case explaining this principle is *Associated Press v. United States*, 326 U.S. 1 (1945). In *Associated Press*, the Associated Press ("AP"), a news aggregator and syndicator, advanced similar First Amendment theories to the ones Apple seeks to resurrect in this appeal. *Id*. at 19. Like Apple, AP sought a ruling that the First Amendment immunized it from competition law. *Id*. The Supreme Court rejected this argument as a perverse inversion of the meaning of the First Amendment:

> *It would be strange indeed however if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to*

12

> **protect that freedom. The First Amendment, far from providing an argument against application of the Sherman Act, here provides powerful reasons to the contrary.** That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society. Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. **Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests**.

*Id.* at 20 (emphasis added). The Court reasoned that AP's conduct in pursuit of monopoly profits, far from being shielded by the First Amendment, in fact harmed the freedom of the press. *Id*. As a result, the Court concluded that the First Amendment "affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity." *Id.* The harm to the freedom of the press, and free speech of numerous content creators, is not trumped by Apple's desire for supracompetitive profits.

Moreover, the Injunction and Enforcement Order regulate Apple's **conduct**, not speech. The "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech". *Sorrell v. IMS Health Inc*., 564 U.S. 552, 567 (2011); *see also Am. Soc'y of Journalists & Authors Inc. v. Bonta*, 15 F.4th 954, 961 (9th Cir. 2021); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 192–94 (1946); *Assoc. Press v. NLRB*, 301 U.S. 103, 130–33 (1937);

*Leathers v. Medlock*, 499 U.S. 439, 447–49 (1991). A court order prohibiting specific conduct—not speech—taken by a private corporation to evade the court's injunction is an example of a restriction on commercial conduct that, at most, incidentally burdens speech. "While drawing the line between speech and conduct can be difficult," *National Institute of Family and Life Advocates v. Becerra,* 585 U.S. 755, 769 (2018), this is not a difficult line-drawing case.

The argument that the Enforcement Order constitutes "compelled" speech by a government, or is tantamount to a governmental abridgement of "speech", is incorrect on every level. All of the Apple rules at issue in the Enforcement Order concern Apple's rules constraining the formatting, content, or messages on **developers' own apps**.

Nonetheless, Apple-allied amici NetChoice and CCIA argue that the Enforcement Order exceeds judicial authority by purportedly forcing Apple to disseminate speech that it would prefer not to carry. A similar argument was proposed in *In re Google Play Store*, 2025 WL 2167402, at *17. There, as here, Google argued that the injunction entered against it exceeded the court's authority by compelling Google to deal with competitors and restricting Google from disallowing apps that competed with the Google Play Store. *See id*. This Court rejected that argument, explaining that the "particular characteristics of digital markets" meant district courts needed "'large discretion' to meet the 'special needs'

14

of the case." *Id.* at *16-17 (*quoting Ford Motor Co. v. United States*, 405 U.S. 562, 573, 577–78 (1972)). This Court further noted the well-established rule that antitrust remedies can proscribe otherwise lawful conduct to end and prevent anticompetitive conduct. *In re Google Play Store*, 2025 WL 2167402, at *17. Accordingly, this Court held that the district court was only obligated to ensure "that the conduct enjoined or mandated . . . had a significant causal connection to ***the violation found***," and that the remedy was a "reasonable method of redressing problems with a significant causal connection to that conduct." *In re Google Play Store*, 2025 WL 2167402, at *18. As in *Google*, the remedy here (the Injunction and Enforcement Order) constitutes a reasonable method directly tailored to address Apple's anticompetitive conduct. Nothing in the First Amendment requires a contrary result.

Fundamentally, regulating Apple's ability, as a private corporation, to impose restrictions on the style, language, flow or placement of links and calls to action app developers may use to facilitate out-of-app purchases is not a regulation of Apple's speech, at all, but an injunction against Apple's actions to ***restrict the speech of others***. There is no "compelled" speech here, whether of speech that disparages Apple or speech that praises Apple. The Enforcement Order simply restricts Apple from prohibiting ***others*** from using "buttons or other calls to action" to communicate with customers and from placing other kinds of limits on ***others'*** "content, style,

language, formatting, flow or placement of these devices for purchases outside an app". (EO at 75.)

It is utterly disingenuous for Apple to claim that any message on a third-party app is a message that Apple is forced to "accommodate" when no user of such apps would attribute sentiments or words in such an app to Apple itself (and Apple itself has already argued to this Court that it has total discretion whether or not to carry third-party apps). Indeed, Apple's contracts and instructions for minimum terms in developers' end-user license agreements disclaim all responsibility for content on developers' apps, including push notifications. (3-SER-479 ("You acknowledge and agree that any Push Notifications are sent by You, not Apple, to the end-user of Your Application, Pass or Site, and You are solely liable and responsible for any data or content transmitted therein"); 3-SER-532 ("You and the End-User must acknowledge that . . . You, not Apple, are solely responsible for the Licensed Application and the content thereof").) The fact that Apple considers push notifications to be developers' speech is particularly striking because push notifications show up *outside* of the app. Buttons and links appearing *within* an open app would thus even more plainly be developers' speech, not Apple's. Apple's own words, once again, undercut its argument.

The argument that the Enforcement Order's prohibition on Apple "[i]nterfering with consumers' choice to proceed in or out of an app by using

anything other than a neutral message apprising users that they are going to a third-party site" violates Apple's First Amendment rights fares no better. (EO at 75.) This requirement in the Enforcement Order restricts Apple's ability to compel ***developers*** to convey a message to end-users proceeding out of an app. It does not compel ***Apple*** to speak. Nor does it dictate a specific viewpoint: Any such message that Apple requires developers to convey must be "neutral". Of course, this enforcement measure was only necessary because Apple was improperly compelling developers' speech, by forcing developers to publish misleading "scare screens", as part of a deliberate strategy to circumvent the Injunction.

The Injunction is narrowly and appropriately tailored to enjoin Apple's specific wrongful acts. Courts have the authority to issue injunctions to enforce competition law, just like they do with other generally applicable laws. The Injunction is directed narrowly at Apple because "[a]n injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 762 (1994). But the party-specific nature of an injunction does not, as Apple contends, turn the judicial duty to enforce laws into a form of viewpoint or content-based discrimination. As such, the Enforcement Order cannot be considered a governmental regulation of speech. But even if the Enforcement Order ***were*** found

to regulate speech, speech that is used to circumvent a lawful court injunction or violate competition laws is not protected by the First Amendment.[3]

Under longstanding precedent, the Enforcement Order thus did not violate the First Amendment. Instead, as in *Associated Press*, Apple may not use the First Amendment as a shield for its anticompetitive efforts to suppress ***others'*** speech and keep ***others*** from publishing. 326 U.S. at 20.

### B. Apple's conduct injured core First Amendment interests.

In its Opening Brief, Apple complains of purported constraints on its speech, but fails to engage with how Apple's own actions constrained freedom of the press and the free speech of developers and the public. Apple's enjoined conduct injured the First Amendment interests of DCN's members, and those of the public, in three main ways:

- ***First***, Apple strictly regulated the actual language and appearance that developers could use on external links and calls to action.

- ***Second***, Apple limited developers' ability to integrate links and calls to action into their apps.

- ***Third***, Apple imposed high out-of-app commissions, thus thwarting the ultimate benefit that developers can communicate to their app users through

---

[3] *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) (frequent meetings during which defendants discussed compensation information was factor suggesting an anticompetitive information exchange); *United States v. Utah Soc'y for Healthcare Human Res. Admin.*, No. 94C282G, 1994 WL 729931, at *2 (D. Utah Sept. 14, 1994) (alleging conspiracy to restrain nurse's wages that unfolded through a series of telephone calls, information surveys, and HR association meetings).

links—namely, alerting them to out-of-app payment systems that avoided Apple's excessive and supracompetitive in-app commission rates. Collectively, these policies interfered with core speech and press interests by limiting what customers could say, while imposing an anticompetitive tax to chill the use of alternative payment options.

At stake is "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial" to the vibrant public discourse both the First Amendment and our antitrust laws are designed to foster. *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969). The First Amendment's protection of "free speech" has long been recognized to apply to press organizations and publishers, including paid content. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 265-67 (1964) (freedom of speech and freedom of the press applied to paid advertisement printed in newspaper). Apple's practices of limiting, constraining, and burdening speech on its App Store platform directly constrain the First Amendment activities of publishing customers, including DCN members.

## CONCLUSION

Publishers must be able to reach their audience, or they cannot survive. Apple's dominance of the App Store marketplace and control over the content of media apps has placed Apple in a powerful and dangerous position, allowing Apple

to interfere with publishers' relationships with their customers and ultimately chill the dissemination of information and ideas.

Apple has repeatedly abused its market power. Even after the initial Injunction in this case forbade Apple from pursuing its anticompetitive policies, and even after Apple appealed (and lost) all the way to the Supreme Court (which denied certiorari), Apple immediately, and deliberately, sought to circumvent the injunction. Apple was caught, its misconduct specifically enjoined again in the Enforcement Order, and now it has begun the cycle of appeal and resistance all over again. Apple's dedication to maintaining its anticompetitive policies—even in open violation of the initial injunction—demonstrates that the Enforcement Order is a vital, and necessary, means to protect competition.

Apple's argument that the First Amendment protects its anticompetitive conduct is meritless. It is Apple—through its obdurate insistence on limiting its customers' speech and options—that has interfered with the free exercise of its customers' First Amendment rights, and the First Amendment does not protect conduct that violates the competition laws.

The Enforcement Order properly addressed Apple's specific anticompetitive conduct and is narrowly tailored to enjoin further violations of the law and protect the competitive landscape. Accordingly, this Court should affirm the district court's well-reasoned Injunction and Enforcement Order.

Dated: August 22, 2025                    Respectfully submitted,

                                          */s/ Karl Huth*

                                          Karl Huth
                                          Matthew Reynolds
                                          J. Lee Hill
                                          Jack Mitchell
                                          HUTH REYNOLDS LLP
                                          41 Cannon Court
                                          Huntington, NY 11743
                                          (631) 263-3648

                                          *Counsel for Amicus Curiae*
                                          *Digital Content Next*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system on August 22, 2025. All participants in the case are registered ACMS users, and service will be accomplished using the ACMS system.

*/s/ Karl Huth*
Karl Huth

*Counsel for Amicus Curiae*
*Digital Content Next*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number 25-2935**

I am the attorney or self-represented party.

**This brief contains <u>4,576</u> words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Karl Huth*_____    **Date** August 22, 2025