No. 25-2935

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### EPIC GAMES, INC.,

*Plaintiff-ctr-defendant - Appellee*,

v.

### APPLE INC.,

*Defendant-ctr-claimant - Appellant*.

Appeal from the United States District Court
for the Northern District of California
No. 4:20-cv-05640-YGR (Yvonne Gonzalez Rogers, District Judge)

## REPLY BRIEF FOR APPLE INC.

Mark A. Perry
Zachary D. Tripp
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7511

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Theodore J. Boutrous Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

August 29, 2025

Gregory G. Garre
Roman Martinez
Soren J. Schmidt
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

Ben Harris
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Sarah M. Ray
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for Apple Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION .................................................................................. 1

ARGUMENT ........................................................................................ 3

I.  THE DISTRICT COURT'S NEW ZERO-COMMISSION RULE IS
    INDEFENSIBLE ............................................................................ 3

    A.  The Zero-Commission Rule Impermissibly Denies Apple
        Compensation For Use Of Its IP-Protected Innovations ...................... 4

    B.  The Zero-Commission Rule Is Untethered To Epic's Claimed
        Harm, Punitive, And Unconstitutional .................................................. 6

II. THE NEW INJUNCTION IS OVERBROAD IN OTHER RESPECTS
    AND STEMS FROM A FLAWED CIVIL CONTEMPT ANALYSIS ....... 10

    A.  The New Injunction Impermissibly Rewrites The Original
        Injunction .......................................................................................... 10

    B.  The District Court's Civil Contempt Analysis Was Legally
        Flawed ................................................................................................ 16

    C.  The Contempt Order Was Impermissibly Predicated On
        Privileged Documents ....................................................................... 23

III. THE ORIGINAL INJUNCTION CANNOT SURVIVE *BEVERAGE* ........ 24

IV. THE INJUNCTION IS FATALLY OVERBROAD UNDER *CASA* ........... 29

CONCLUSION ..................................................................................... 34

i

# TABLE OF AUTHORITIES

**Page(s)**

*Armstrong v. Brown,*
    768 F.3d 975 (9th Cir. 2014) ..........................................................8, 14

*Beverage v. Apple, Inc.,*
    320 Cal. Rptr. 3d 427 (Ct. App. 2024) ........................................2, 24

*Brown v. Arizona,*
    82 F.4th 863 (9th Cir. 2023) ...................................................................29

*Carter v. Local 556, Transport Workers Union of America,*
    138 F.4th 164 (5th Cir. 2025) .................................................................15

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021)...................................................................................9

*Chavez v. Whirlpool Corp.,*
    113 Cal. Rptr. 2d 175 (Ct. App. 2001) ............................................28

*Epic Games, Inc. v. Apple, Inc.,*
    67 F.4th 946 (9th Cir. 2023) .........................................................*passim*

*Epic Games, Inc. v. Apple, Inc.,*
    73 F.4th 785 (9th Cir. 2023) ..........................................................30, 32

*FTC v. Trudeau,*
    579 F.3d 754 (7th Cir. 2009) ...........................................................9, 15

*Galbraith v. County of Santa Clara,*
    307 F.3d 1119 (9th Cir. 2002) ...............................................................30

*In re Grand Jury,*
    23 F.4th 1088 (9th Cir. 2021) ................................................................23

*Gucci America, Inc. v. Weixing Li,*
    768 F.3d 122 (2d Cir. 2014) .....................................................................8

*Hecht Co. v. Bowles,*
    321 U.S. 329 (1944)...................................................................................33

**Page(s)**

*In re Highland Capital Management, L.P. (Charitable DAF Fund,*
  *L.P. v. Highland Capital Management, L.P.)*,
  98 F.4th 170 (5th Cir. 2024) ...................................................................22

*Horne v. Department of Agriculture*,
  576 U.S. 350 (2015) ..............................................................................9

*Hunter v. Hamilton County Board of Elections*,
  635 F.3d 219 (6th Cir. 2011) ...............................................................14

*Institute of Cetacean Research v. Sea Shepherd Conservation Society*,
  774 F.3d 935 (9th Cir. 2014) ...............................................................21

*International Union, United Mine Workers of America v. Bagwell*,
  512 U.S. 812 (1994).............................................................8, 9, 15, 22

*In re Kellogg Brown & Root, Inc.*,
  756 F.3d 754 (D.C. Cir. 2014)........................................................23, 24

*King v. Allied Vision, Ltd.*,
  65 F.3d 1051 (2d Cir. 1995) ................................................................17

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ...............................................................8

*Kwan v. SanMedica International*,
  854 F.3d 1088 (9th Cir. 2017) .............................................................26

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
  941 F.2d 970 (9th Cir. 1991) .................................................................6

*McComb v. Jacksonville Paper Co.*,
  336 U.S. 187 (1949).........................................................................20, 21

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024).............................................................................16

*New York State Association for Retarded Children Inc. v. Carey*,
  706 F.2d 956 (2d Cir. 1983) ................................................................27

**Page(s)**

*Parsons v. Ryan*,
   949 F.3d 443 (9th Cir. 2020) ....................................................................8

*Portland Feminist Women's Health Center v. Advocates for Life, Inc.*,
   859 F.2d 681 (9th Cir. 1988) ...........................................................17, 18

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)...........................................................................16, 21

*Stone v. City & County of San Francisco*,
   968 F.2d 850 (9th Cir. 1992) ..................................................................22

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) ................................................................15

*Sugar v. Burnett*,
   130 F.4th 358 (4th Cir. 2025) .................................................................22

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019).................................................................................22

*Toscano v. Professional Golfers' Association*,
   258 F.3d 978 (9th Cir. 2001) ..................................................................27

*Trump v. CASA, Inc.*,
   606 U.S. __, 145 S. Ct. 2540 (2025)...................................3, 29, 32, 33

*United States v. Armour & Co.*,
   402 U.S. 673 (1971).................................................................................14

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919).................................................................................27

*United States v. DAS Corp.*,
   18 F.4th 1032 (9th Cir. 2021) .................................................................17

*United States v. Saccoccia*,
   433 F.3d 19 (1st Cir. 2005).....................................................................17

*United States v. United Mine Workers of America*,
   330 U.S. 258 (1947)...................................................................................8

**Page(s)**

*Venoco, LLC v. Plains Pipeline, L.P.*,
No. 21-55193, 2022 WL 1090947 (9th Cir. Apr. 12, 2022)....................3, 25, 26

*Western Water Management, Inc. v. Brown*,
40 F.3d 105 (5th Cir. 1994) ................................................................14

*Ysleta del Sur Pueblo v. Texas*,
596 U.S. 697 (2022)............................................................................11

## CONSTITUTIONAL PROVISIONS

U.S. Const., art. VI, cl. 2 ....................................................................10

## OTHER AUTHORITIES

Fed. R. Civ. P. 60(b)(5)..................................................................3, 25

Fed. R. Civ. P. 65(d)(1)......................................................................16

# INTRODUCTION

Epic's brief is long on rehashing the district court's civil contempt finding, but it does not seriously grapple with the substantive and procedural flaws with the new, punitive injunction at issue here. Apple strongly disputes the district court's civil contempt finding. But even if it could stand, Epic has not justified the extreme new injunction imposed by the district court. Ultimately, Epic's attempt to deflect attention from that injunction only exposes the weakness of its case in defending the fundamental legal flaws with that order. The injunction breaches well-established guardrails on the civil contempt power, and its sweeping new restrictions on Apple violate several independent limits, including the Constitution itself.

*First*, Epic fails to seriously defend the district court's zero-commission rule on linked-out purchases, which in effect imposes a perpetual penalty on Apple. That rule has no footing in the terms of the original injunction and flouts the district court's own prior acknowledgements that Apple is entitled to compensation for providing developers with technological tools and access to Apple's user base. The fact that Apple's commission on linked-out purchases is new is no response at all, because Apple had never previously *allowed* linked-out purchases before the original injunction in this case. And the very same rationale permitting compensation for use of Apple's IP-protected innovations that this Court explicitly approved applies with full force to linked-out purchases. Epic does not address that

1

undeniable fact, much less the unconstitutional taking that arises from stripping Apple of its exclusionary rights.  The zero-commission rule cannot stand.

*Second*, Epic cannot justify the new injunction's other restrictions and the district court's underlying contempt findings.  The new injunction imposes, in meticulous detail, new design and formatting rules and dictates the messages that Apple may convey to its own users on its own platform.  These requirements represent an improper expansion and modification of the original injunction—rather than an attempt to enforce compliance with the *original* injunction—and violate the First Amendment by forcing Apple to convey messages it disagrees with.  Epic doubles down on the district court's emphasis on the "spirit" of the original injunction and Apple's supposed bad faith, but civil contempt turns on whether a party has violated the actual terms of an injunction—which Epic does not meaningfully try to show.  The new injunction is also fatally infected by the district court's erroneous privilege rulings, which Epic does not seriously attempt to defend under the dual-purpose approach that this Court should adopt.

*Third*, Epic fails to confront the fact that the California courts' intervening judgment in *Beverage v. Apple, Inc.*, 320 Cal. Rptr. 3d 427 (Ct. App. 2024)—allowing Apple to apply the challenged anti-steering provisions to Epic under the UCL—directly conflicts with the district court's judgment here, premised on the same California law.  It is inequitable for a federal court to enforce an injunction

2

against Apple in perpetuity that state courts have conclusively held is unjustified under the same state law, as applied to the same circumstances, regarding the same defendant. *See* Fed. R. Civ. P. 60(b)(5). This Court recently reached that result on almost identical facts in *Venoco, LLC v. Plains Pipeline, L.P.*, No. 21-55193, 2022 WL 1090947, at *3 (9th Cir. Apr. 12, 2022)—a case Epic simply ignores.

*Fourth*, Epic urges this Court to ignore the Supreme Court's landmark decision in *Trump v. CASA, Inc.*, 606 U.S. __, 145 S. Ct. 2540 (2025), which, at a minimum, requires substantially narrowing the scope of the district court's injunction. *CASA* announces critical limits on both the scope of injunctions and the complete-relief principle, heightening the burden a plaintiff must meet to secure relief running to nonparties. Here, the district court afforded Epic much more than complete relief by enjoining Apple's conduct as to *all* developers (rather than gaming app developers who use, or are reasonably likely to use, the Epic Games Store); and requiring Apple, for free, to permit linked-out purchases via *all* third-party platforms (rather than just the Epic Games Store). At a minimum, Epic has not carried *CASA*'s heavy burden in justifying such sweeping relief. The district court's universal injunction cannot survive *CASA*.

## ARGUMENT

## I. THE DISTRICT COURT'S NEW ZERO-COMMISSION RULE IS INDEFENSIBLE

The most extreme component of the district court's new injunction is the

categorical prohibition on commissions for linked-out purchases. Epic's failure to muster any serious defense of that prohibition is therefore especially striking.

### A. The Zero-Commission Rule Impermissibly Denies Apple Compensation For Use Of Its IP-Protected Innovations

Epic ignores the harshly penal nature of the zero-commission rule. As the district court recognized in its September 2021 order, Apple's platform investments benefit developers and "justif[y] a commission." 5-ER-916. The same holds true for linked-out purchases: "*Even in the absence of IAP*," the district court observed that "Apple could still charge a commission on developers." 5-ER-948 (emphasis added). That is not surprising. Apple built iOS, iPhone, and the App Store— technologies that are secured by Apple's intellectual property rights and serve both developers and users alike. Apple's Opening Brief (AOB) 7-9. Without Apple's multi-billion-dollar investments in its platform, Epic and other developers could not connect with users on iOS devices, and there could be no linked-out purchases at all.

Epic's main defense of the zero-commission rule is that Apple had "*never* charged any commission on out-of-app [i.e., linked-out] purchases" before the original injunction. Epic Answering Brief (EAB) 60; *see also id.* at 2, 12, 23, 33, 64. That is a non-sequitur. Apple never previously charged a commission on such purchases for an obvious reason: Before the original injunction took effect, Apple "did not allow" them. 1-ER-15. Developers' only option was Apple's in-app purchase (IAP) program—which "guard[ed] against the uncompensated use of

4

[Apple's] intellectual property." 5-ER-948. Linked-out purchases, in other words, are a product of the original injunction. By forcing Apple to facilitate such purchases for free, the district court has now "create[d] a pathway for developers to bypass" compensating Apple for the benefits they receive—exactly what this Court warned against. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 970 (9th Cir. 2023).

According to Epic, even though the district court expressly concluded that Apple could charge a commission "even in the absence of IAP," 5-ER-948, the court's statement was "directed at *in-app* transactions," EAB39. Not true. The court's analysis was not tied to whether purchases are in-app or out-of-app. Instead, the court recognized that regardless of the particular method, "Apple is entitled to *some* compensation for the use of its intellectual property." 5-ER-948. For good reason: Apple maintains the App Store platform for the benefit of developers, who get a license to use Apple's IP-protected innovations and access to Apple's invaluable user base. 5-ER-916. The IP rights underpinning Apple's innovations, and the exclusionary rights they confer, reserve to Apple the ability to determine whether to grant access to its unprecedented innovations, and if so on what terms. As the district court recognized, these significant investments to benefit developers "justif[y] a commission," albeit (in the district court's view) at a lower rate. *Id.*

Epic offers no reason why the district court's original reasoning does not extend to linked-out purchases—and there is none. Developers who enable users to

link out of Apple's ecosystem to make purchases still benefit from Apple's IP-protected technologies and services. *See* AOB30-31. Epic does not—and cannot—deny that reality. Again, Epic and other developers could not connect with Apple users to begin with without benefiting from Apple's multi-billion-dollar investments. Epic offers no defensible explanation for why, when it comes to linked-out purchases, Apple's interest in compensation for the use of its innovations and the intellectual property underpinning them suddenly vanishes.

As this Court recognized, Epic conceded at trial that its requested relief would still "allow Apple to collect a commission," even though it enables developers to "use any in-app payment processor they choose." *Epic Games*, 67 F.4th at 970. As Epic put it: "Apple can charge. Okay? Full stop." 1-FER-14.

## B. The Zero-Commission Rule Is Untethered To Epic's Claimed Harm, Punitive, And Unconstitutional

The district court's sweeping new zero-commission rule also is not tailored to Epic's claimed harm, improperly imposes a punitive sanction, and effects an unconstitutional taking. Epic's responses fail on all three fronts.

1. Epic agrees (EAB57) that injunctive relief "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991). Yet forcing Apple to forgo *any* compensation for linked-out purchases is not remotely tailored to the harm purportedly caused by Apple's anti-steering provisions under the UCL. The harm identified by the district court was

6

developers' inability to inform users about alternative purchasing methods. 5-ER-964. As the district court, this Court, and Epic itself previously acknowledged, that harm could be addressed by eliminating Apple's anti-steering provisions *without* giving developers an unfettered right to "benefit[] from Apple's innovation and intellectual property free of charge." 5-ER-948 n.617.

In Epic's view, the new injunction does not create "a bar on compensation" for linked-out purchases but merely a "bar on circumvention." EAB61. The new injunction, however, forever prevents Apple from charging commissions on all linked-out purchases—a complete bar on compensation. Nor is the rule a "bar on circumvention." The district court found that Apple's 27% commission made linked-out transactions "more expensive" to developers than "IAP transaction[s] at 30% commission." 1-ER-23. That finding, even if credited, cannot justify setting Apple's commission at *zero* instead. Epic does not and cannot dispute that, as the district court previously found, "Apple is entitled to *some* compensation for the use of its intellectual property." 5-ER-948. And Epic fails to explain why, even under its theory that Apple's 27% commission effectively bars steering, Apple must be permanently barred from charging any commission whatsoever.

Epic resorts to practical difficulties, arguing that no court could determine whether Apple could charge any given rate. EAB62. Nonsense. Epic, not Apple, bears "the general burden of establishing the elements necessary to obtain injunctive

relief." *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). Even if Epic showed that Apple's 27% commission was too *high*, that would by no means justify a ban on *any* commission. Instead of imposing a total ban, the court should have put Epic to its burden and allowed Apple to adjust the rate as necessary through a modification proceeding. *See Armstrong v. Brown*, 768 F.3d 975, 979-80 (9th Cir. 2014) (contemplating the process for modifying an injunction).

2. There is only one plausible explanation for why the district court imposed its new zero-commission rule without any such process: The district court sought to punish Apple for what the court perceived as intentional noncompliance with its original injunction. Apple vigorously disputes the civil contempt finding. *See infra* at 16-24. Even if upheld, however, that finding cannot justify imposing the zero-commission rule as punishment, for "a civil contempt sanction must only be compensatory or coercive, and may not be punitive." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 144 (2d Cir. 2014); *see United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947); AOB26 (citing additional cases). Where a court imposes a fine for noncompliance, a fine is "civil only if the contemnor is afforded an opportunity to purge" by coming into compliance. *International Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 812, 829 (1994).

All agree that, "[t]o determine whether contempt sanctions are civil or criminal," this Court "examine[s] 'the character of the relief itself.'" *Parsons v.*

*Ryan*, 949 F.3d 443, 455 (9th Cir. 2020) (citation omitted). The relief here is permanent and punitive: The new injunction zeroes out Apple's compensation for use of its IP-protected technology in connection with linked-out transactions, extends that condition to all developers, and applies in perpetuity. As the district court recognized, this "no-commission" mandate will inflict on Apple a "revenue impact of hundreds of millions to billions" of dollars. 1-ER-17–18. What is more, Apple has no opportunity to "purge" that sanction through compliance because the zero-commission rule will remain in effect no matter what Apple does. *Bagwell*, 512 U.S. at 829. As the Supreme Court made clear in *Bagwell*, a "fixed" fine that cannot be purged by compliance with the original decree is the antithesis of a proper exercise of the civil contempt power. *Id.* at 837; *see FTC v. Trudeau*, 579 F.3d 754, 777 (7th Cir. 2009) ("[T]he Supreme Court has made clear that an essential ingredient to any coercive contempt sanction is the opportunity to purge.").

3. The zero-commission rule is also an unconstitutional taking. AOB33-34. The new injunction's command that Apple allow any developer to use its IP-protected innovations for free and forever is a taking—plain and simple. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). Epic protests that Apple "does not cite any precedent applying the *per se* takings doctrine without a physical invasion of property." EAB63. In *Horne v. Department of Agriculture*, 576 U.S. 350, 359-60 (2015), however, the Supreme Court specifically pointed to

the "appropriation of a patent" as a *per se* taking. By requiring Apple to give developers unfettered access to Apple's technologies and user base at no cost, the zero-commission rule appropriates Apple's innovations in the same unconstitutional way. And contrary to Epic's bizarre suggestion that the zero-commission rule is valid because antitrust remedies can "proscribe otherwise lawful conduct," EAB64-65 (citation omitted), Epic did not "prove[] a present antitrust violation." 5-ER-962. The only basis for the injunction here is the UCL, and state-law remedies cannot override federal constitutional rights. *See* U.S. Const., art. VI, cl. 2 (Supremacy Clause). The zero-commission rule is indefensible.

## II. THE NEW INJUNCTION IS OVERBROAD IN OTHER RESPECTS AND STEMS FROM A FLAWED CIVIL CONTEMPT ANALYSIS

Epic devotes most of its brief to defending other aspects of the new injunction and the contempt finding more generally. In doing so, it largely doubles down on the district court's own legal errors—ignoring the actual terms of the original injunction and rehashing the supposed "spirit" of the original injunction. All of this contravenes settled law and tradition governing civil contempt.

### A. The New Injunction Impermissibly Rewrites The Original Injunction

Epic and its amici repeatedly suggest that this case involved a conventional exercise of the contempt power. Far from it. As Professor Bray and the amici law professors have explained, the background principles governing civil contempt are

well-settled. First, "[f]ederal courts may enjoin only particular, specifically described categories of acts." Bray Amici Br. 12-13, ECF No. 80. Second, "because of its severity, contempt is limited to only violations of an injunction's commands." *Id.* at 9. As the Bray amici explain (at 10-11), the district court's original injunction enjoined Apple from prohibiting developers from doing two things—most notably, "including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing." 4-ER-796. Yet, "there is no allegation that Apple *prohibited* any of these actions." Bray Amici Br. 11. And of course, there is a difference between regulating conduct and prohibiting it. *See Ysleta del Sur Pueblo v. Texas*, 596 U.S. 697 (2022). Epic's brief does not seriously dispute any of these legal premises.

The district court's new injunction is radically different from its original decree. Not only does the new injunction prohibit Apple from charging any commission—a term with no root in the original injunction—it also imposes a detailed set of brand-new rules as to exactly what kinds of restrictions Apple may impose. Apple may not: (1) "audit, monitor, track, or require developers to report purchases or any other activity that consumers make outside an app"; (2) "[r]estrict or condition[]" the "style, language, formatting, quantity, flow or placement of links for purchases" or of "buttons or other calls to action"; (3) "[e]xclud[e] certain categories of apps and developers from obtaining link access"; (4) use anything

11

"other than a neutral message apprising users that they are going to a third-party site"; and (5) "[r]estrict[] a developers' use of dynamic links." 1-ER-76–77. This goes far beyond enforcing the limited prohibitions in the initial injunction.

The detailed "button" rules illustrate how the new injunction departs from the original. The original injunction provided that Apple could not prohibit developers from including "buttons, external links, or other calls to action." 4-ER-796. Apple's longstanding design guidelines provide for "four button styles." 1-ER-34. In setting up its Link Entitlement Program for developers, Apple provided that developers could use the "[p]lain" button style for linked-out purchases "so that the external link would look like hyperlinks or other internet links that consumers are used to seeing." *Id.* Yet the district court faulted Apple's decision to use the plain button style because it lacks "a contrasting background fill"—a condition nowhere alluded to in the original injunction or the September 2021 order. 1-ER-32 (citation omitted). Then, the court imposed a brand-new rule that prohibits Apple from "conditioning the content, style, language, formatting, flow or placement" of buttons in any way. 1-ER-76. What started as a simple prohibition against barring the use of "buttons"—one that left Apple room to make design choices to preserve the user experience—has evolved into a judicially mandated graphic design manual.

Moreover, neither the district court nor Epic has explained how any of these reticulated terms is tied to the state-law UCL violation that gave rise to the original

injunction. In its September 2021 order, the district court reasoned that Apple violated the UCL by "contractually enforc[ing] silence, in the form of anti-steering provisions" that limited "information" for consumers. 5-ER-964. Yet the new injunction goes beyond this *informational* harm and, instead, seeks to promote "competitive alternatives to IAP." 1-ER-63–64. Epic and its amici trumpet this "pro-competition" theme in defending the new injunction. But Epic *lost* its antitrust claims, including its tying claim, because, as this Court held, tying IAP to the App Store was "procompetitive" on balance. *Epic Games*, 67 F.4th at 997-98. Neither the district court nor Epic has attempted to justify the new injunction based on the information-based UCL violation the court found. *See* Chamber of Progress Amicus Br. 10-11, ECF No. 85 (zero-commission rule "implements a remedy for which there was no underlying antitrust violation"); Int'l Center for Law & Economics Amicus Br. 11, ECF No. 97 (enjoined practices "were not found unlawful").

Epic argues that "the district court fashioned equitable relief targeting the specific measures Apple took to violate the injunction." EAB55. That is wrong. Apple did not violate the terms of the original injunction. *See infra* at 17-20. But even if it did, the new injunction still goes well beyond enjoining Apple's "violative conduct." EAB54-55. The court found that Apple's 27% commission could not stand but enjoined Apple from charging *any* commission. And the court found that Apple's design rules were too rigorous but enjoined Apple from imposing *any* such

13

limitations.  In other words, to the extent the district court concluded that Apple's actions—in toto—violated the spirit of the injunction, the new injunction does not require Apple simply to halt its combined conduct and comply with the original injunction.  Instead, the new injunction mandates that Apple cannot charge *any* commission and cannot impose *any* restrictions—in perpetuity.

The new injunction, in other words, is not a tailored contempt remedy aimed at enforcing compliance with the terms of the initial decree; it is a far-reaching modification of that decree.  Seizing on this fact, Epic argues that, because district courts can modify injunctions, this appeal is about "semantics, not substance," and this Court can simply affirm on that alternative ground.  EAB52.  Not so.  Modifying an injunction requires "full litigation" concerning whether any proposed "additional relief" is "desirable to prevent the evils aimed at."  *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971).  And the same protections afforded by Federal Rule of Civil Procedure 65 attach to modification proceedings.  *See Western Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 109 (5th Cir. 1994); *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 246 (6th Cir. 2011).  Process matters.

The district court flouted these requirements.  The court should have provided "notice and an opportunity to be heard" that alerted Apple to "specific concerns with [its]" supposed noncompliance and that "explained the particular changes" the court "intended to make."  *Armstrong*, 768 F.3d at 980.  The court should have also

required Epic to show that any relief was tied to the "specific harm[s]" flowing from Apple's actual UCL violation, as opposed to the antitrust claims on which Epic lost. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009). Only then could the district court have modified the injunction. Instead, the court simply adjudged Apple in contempt and installed a punitive and overbroad injunction without the requisite process. There is no basis for this Court to affirm on the ground that the district court might have modified the injunction after a different process, since that process could well have changed the injunction. *See Trudeau*, 579 F.3d at 778 (refusing to treat district court's contempt order as "a *sua sponte* modification").

Maintaining the distinction between a contempt proceeding and modification proceeding is critical. Not only is the process different, but as the Supreme Court has recognized, contempt proceedings are "uniquely" susceptible to abuse, given that they "leave the offended judge solely responsible for identifying, prosecuting adjudicating, and sanctioning the contumacious conduct." *Bagwell*, 512 U.S. at 831. Contempt orders therefore must be carefully tailored to addressing violations in the original decree. *See Carter v. Local 556, Transp. Workers Union of Am.*, 138 F.4th 164, 208-09 (5th Cir. 2025). Giving the "offended judge" carte blanche to completely rewrite a decree is, as this case shows, a recipe for even greater abuse.

Indeed, the new injunction's prohibitions violate the Constitution itself. In addition to the takings problem, the new restrictions violate the First Amendment by

forcing Apple to "accommodate messages it would prefer to exclude." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024); *see* AOB40.  Epic protests that Apple is not "engaged in its own expressive activity."  EAB69 (quoting *NetChoice*, 603 U.S. at 728).  But the new injunction permits Apple to express only "a neutral message apprising users that they are going to a third-party site"—a direct regulation on the messages Apple can convey to its own users.  1-ER-76.  Apple also must allow developers to include "language" in apps distributed on Apple products, via Apple's operating system, from Apple's App Store.  *Id.*  That undercuts Apple's ability to guard against malicious or misleading speech, requires Apple to disseminate speech with which it disagrees, and distorts "the overall speech environment" on Apple's platform.  *NetChoice*, 603 U.S. at 739; *see also* NetChoice and Computer & Communication Industry Ass'n Amici Br. 3-11, ECF No. 89; Software & Information Industry Ass'n Amicus Br. 12-15, ECF No. 71.

### B.    The District Court's Civil Contempt Analysis Was Legally Flawed

The district court's civil contempt finding is itself legally flawed.

1.  Epic does not dispute that injunctions must provide "explicit notice of precisely what conduct is outlawed" so as to "prevent uncertainty and confusion on the part of those faced with injunctive orders." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam); *see* Fed. R. Civ. P. 65(d)(1).  Yet it ignores caselaw from

16

this Circuit and beyond explaining that civil contempt can be founded only upon clear and unambiguous violations of the actual *terms* of an injunctive decree.

A civil contempt finding requires "clear and convincing evidence" that an enjoined party "failed to comply with [a] clear and unambiguous" order. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *see United States v. DAS Corp.*, 18 F.4th 1032, 1039-40 (9th Cir. 2021); *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 859 F.2d 681, 685 (9th Cir. 1988) (holding that "ambiguities" must be construed "in favor of the enjoined party"). Unless the actual "words of the court's" injunctive decree "clearly and unambiguously forbid[] *the precise conduct on which the contempt allegation is based*," civil contempt is not proper. *United States v. Saccoccia*, 433 F.3d 19, 28 (1st Cir. 2005).

Here, Epic itself agrees that the original injunction's "simple and clear mandate" was to "stop prohibiting iOS app developers from using buttons, links or other calls to action to steer consumers to alternative payment solutions outside their apps." EAB1. Apple did exactly that—removing the anti-steering requirements and implementing new App Review Guidelines that allow "[d]evelopers [to] apply for an entitlement to provide a link in their app" to external websites. 4-ER-755. Those links can "inform users about where and how to purchase . . . in-app purchase items" and can tell users that "such items may be available for a comparatively lower

price." *Id.* Before the injunction, Apple decided whether steering could occur; after the injunction, Apple allowed developers to decide for themselves.

That is all the original injunction required. As the district court recognized, it could "envision numerous avenues for Apple to comply with the injunction and yet take steps to protect users"—the court was not "here to micromanage." 4-ER-794. And as even Epic concedes on page one of its brief, after the original injunction took effect, "Apple removed the Anti-Steering Rules" held in violation of the UCL. EAB1. For purposes of civil contempt, that should have been the end of the story.

Epic's attempt to justify the district court's new injunction as to button styles underscores the problems with straying from the injunction's actual terms. According to Epic, Apple violated the original injunction's text because, by requiring developers to use a "'plain' button" style lacking "'a contrasting background fill,'" Apple effectively "prohibited the use of 'buttons.'" EAB36 (citations omitted). Yet, as explained, the original injunction said nothing about contrasting background fills, "graphical delineation," *id.*, or anything else about the appearance or design of "buttons." *See supra* at 12-13. At a minimum, it was not *clear and unambiguous* that the injunction proscribed button styles.

Epic's quibbles about Apple's "plain button" style—which has been part of Apple's design guidelines since long before the original injunction—do not support a violation of the injunction's terms, let alone an *unambiguous* violation. *Portland,*

18

859 F.2d at 685. Not even the district court found that Apple violated the original injunction's text by using the plain button style: The court explicitly *declined* to "decide whether these restrictions alone violate the Injunction." 1-ER-63.

Epic's attempt to suggest other textual violations fares no better. According to Epic, Apple "prohibited 'other calls to action', such as statements in an app (without a link) that purchases are available on the web." EAB37 (quoting 1-ER-63). That is wrong: Apple provided five separate templates developers could use for directing users to out-of-app links, including telling users that "[l]ower prices" are elsewhere available, or "[t]o get XX% off," click the link. 1-ER-42. Indeed, the district court acknowledged that it was "literally true" that Apple did not prohibit other calls to action. 1-ER-63. As for Apple's commission, Epic argues only that the commission "'hindered' effective steering," EAB38, but it does not explain how the commission violated the *terms* of the original injunction, which says nothing about how effective (or widely adopted) developer steering must be.

Epic makes much of the district court's stray comment that the "overall effect" of Apple's design restrictions amounted to a "*de facto* prohibition," 1-ER-63 n.66, on developers using "steering methods," EAB36. Seizing on this comment, Epic says Apple's *commission* made steering more "expensive than IAP," such that the commission itself is a "*de facto* prohibition." EAB40. Yet, the court's "*de facto* prohibition" comment appears only in a footnote addressing Apple's arguments

19

concerning its design rules, AOB52; it has nothing to do with Apple's commission on linked-out purchases. And even as to Apple's design rules, the district court's analysis is impermissibly infected by its reliance on findings about Apple's alleged intent. *See infra* at 22; 1-ER-63 n.66 (referencing Apple's "intentional" prohibition). The court also failed to articulate how Apple's design rules constituted a prohibition, rather than merely a regulation, of developers' use of buttons and other calls to action, given that the court elsewhere acknowledged that Apple *permitted* the use of links, buttons, and calls to action. AOB44-46, 52.

2. Epic's attempts to defend the district court's repeated reliance on the "spirit" of the injunction and Apple's supposed bad faith fare no better.

As to "spirit," Epic relies on *McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949), arguing that courts may use the civil contempt power to coerce compliance with an injunctive decree. EAB41-42. In *McComb*, however, the respondents violated the actual terms of an injunction prohibiting the respondent employer from "violating the [Fair Labor Standards Act]." 336 U.S. at 189; *see* AOB50. The employer "set up a completely false and fictitious method of computing compensation," undercut overtime pay, misclassified employees, and refused to pay "overtime compensation." 336 U.S. at 190. The Supreme Court found that the injunction, "*[b]y its terms*," "enjoined any practices which were violations of" the FLSA's "statutory provisions." *Id.* at 192 (emphasis added). And

20

the Court cited the respondent's "continuing and persistent violations of the Act" in holding the respondent in civil contempt. *Id.* *McComb*'s civil contempt finding thus rested on clear violations of the injunction's actual terms—which are absent here.

The same goes for *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935 (9th Cir. 2014). The injunction there prohibited defendants from "physically attacking" whaling vessels and from approaching any whaling ship "on the open sea." *Id.* at 941. By transferring corporate assets, the defendants allowed an entity different in name only to engage in the precise conduct outlawed by the injunction—physically attacking whaling vessels. *Id.* at 941-42. As Apple explained, AOB49, *Sea Shepherd* held that a party may not escape an injunctive decree by aiding and abetting another entity in violating an injunction's terms, 774 F.3d at 948. It did not purport to upset the established rule that an injunction must provide "explicit notice of precisely what conduct is outlawed." *Schmidt*, 414 U.S. at 476. And, even if *Sea Shepherd* allows a court to consider the amorphous "spirit" of an injunctive decree as *part* of a civil contempt inquiry, it does not authorize a court to ignore the text and rely solely on spirit, as happened here.

Nor can bad faith justify civil contempt where a party otherwise complies with an injunction's clear command. Apple strongly disagrees with Epic's characterization of the record evidence concerning Apple's efforts to comply with the injunction, as well as the conduct of Apple's personnel, who conscientiously

21

sought to do the same. Apple and its personnel devoted thousands of hours to devising a new plan for its developer guidelines that faithfully complied with the injunction, while balancing legitimate business objectives. AOB55-58.

But these disputes are beside the point—"[i]ntent is irrelevant to a finding of civil contempt." *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992). *Taggart v. Lorenzen*, 587 U.S. 554, 561-62 (2019), does not, as Epic suggests, hold that bad faith *alone* is sufficient to find civil contempt. Instead, *Taggart* reaffirms that the standard is "an *objective* one" because civil contempt is not appropriate "where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct." *Id.* at 561 (alteration in original) (citation omitted). Following *Taggart*, courts have recognized that intent is irrelevant in deciding whether to hold a party in civil contempt in the first place. *See In re Highland Cap. Mgmt., L.P. (Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.)*, 98 F.4th 170, 176 (5th Cir. 2024); *Sugar v. Burnett*, 130 F.4th 358, 377 (4th Cir. 2025). Epic has no response to these cases. But they reveal the fundamental flaw with the contempt order here: Civil contempt must be based on a party's violation of an order's unambiguous terms, not on a court's belief that a party violated an order's "spirit" or acted in bad faith. The risk of abuse is too great to allow the civil contempt inquiry to be decided by such subjective concepts. *See Bagwell*, 512 U.S. at 831.

22

### C.    The Contempt Order Was Impermissibly Predicated On Privileged Documents

The district court also impermissibly relied on privileged documents in holding Apple in civil contempt, which alone requires reversal.  Epic concedes that the court relied on documents containing "dual-purpose communications" that contained advice relating both to legal compliance with the original injunction and to Apple's business decision-making.  EAB49.  Under the dual-purpose standard, that determination ends the matter: The documents are privileged.

It cannot be seriously disputed that at least "*a* primary purpose" of those documents was obtaining legal advice.  *In re Grand Jury*, 23 F.4th 1088, 1094 (9th Cir. 2021) (quoting *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014) (Kavanaugh, J.)).    For instance, one of the documents is an internal presentation to senior executives, "[p]repared at the [r]equest of [c]ounsel," regarding "[p]roposed responses to [the] Epic injunction," 3-ER-384—and that presentation began with a chart covering what conduct is "require[d]," "allow[ed]," and "ambiguous" under the terms of the injunction, 3-ER-385.  There is no dispute that "obtaining or providing legal advice" was "one of the significant purposes" of this communication.  *Kellogg*, 756 F.3d at 760.  Same for the other documents at issue.  They therefore are privileged under the dual-purpose test.

The only question is whether the Court should adopt the *Kellogg* standard.  As Epic acknowledges, this Court "left open" the question whether to adopt that test in

23

*In re Grand Jury*, but Epic provides no real reason for rejecting *Kellogg*'s analysis other than saying it is "out-of-Circuit." EAB49-50. There are strong reasons supporting the *Kellogg* rule given that there exists no "rigid distinction between a legal purpose on the one hand and a business purpose on the other," such that it is often "an inherently impossible task" to determine *the* one true primary purpose of a communication. 756 F.3d at 759. Indeed, this case offers a ready-made example of why *Kellogg*'s approach is appropriate. This Court should embrace *Kellogg* as to the kinds of dual-purpose communications at issue in this case.[1]

## III. THE ORIGINAL INJUNCTION CANNOT SURVIVE *BEVERAGE*

Epic fares no better in defending the district court's refusal to vacate its original injunction under Rule 60(b)(5) given the California courts' intervening decisions in *Beverage v. Apple, Inc.*, 320 Cal. Rptr. 3d 427 (Ct. App. 2024). EAB70-75. Epic spills much ink mining various nuanced differences in the way the cases were litigated. It has little to say, by contrast, about the stark conflict between the judgments in the cases—one (*Beverage*'s) allows Apple to impose the same steering restrictions at issue in this case under the UCL, and the other (the district court's) bars just that. That undeniable conflict requires relief under Rule 60.

---

[1] Epic speculates (at EAB50-51) that application of the *Kellogg* standard would not change the outcome here. But at Epic's urging, the district court relied heavily on the privileged documents at issue in finding that Apple acted in bad faith, which factored heavily into its contempt analysis. This error was far from harmless.

The only claim on which Epic prevailed in this case required the federal courts to make a classic "*Erie* guess" as to how California courts would apply the UCL to Apple's anti-steering provisions. The district court guessed that the California courts would invalidate Apple's anti-steering provisions under the UCL as applied to Epic. *Beverage* establishes that the district court guessed wrong. In *Beverage*, California courts applied the UCL to a claim involving the same conduct (Apple's anti-steering provisions), against the same party (Apple), under the same law (the UCL), at issue in this case. And the judgment in *Beverage* permitted Apple to leave its anti-steering rules in place under the UCL. That conflict makes it fundamentally inequitable to continue enjoining Apple's conduct under the UCL. *See* Fed. R. Civ. P. 60(b)(5).

This Court recently dealt with a directly analogous case in which a party was subject to opposing judgments in two cases applying the same "doctrine to the same defendant on the basis of virtually identical facts." *Venoco, LLC v. Plains Pipeline, L.P.*, No. 21-55193, 2022 WL 1090947, at *3 (9th Cir. Apr. 12, 2022); *see* AOB70-71. Just like the district court, Epic simply ignores *Venoco*. Yet it involved the same fact pattern here: The federal courts made one *Erie* guess and the state courts ultimately reached a different result under state law as applied to the same facts. *See* 2022 WL 1090947, at *1-3. The only difference is *Venoco* involved a request for relief under Rule 60(b)(6)—which includes a heightened, "extraordinary circumstances" requirement. *Id.* at *2. There, this Court explained that, given "the

25

direct relationship between the original judgment and the change in law" (where the cases involved "the same [underlying act], the same legal doctrine, and the same defendant"), it was clear that the extraordinary circumstances requirement was met. *Id.* It follows that subsection (b)(5)'s lower standard is met here. Epic's silence on *Venoco*—and the inequity of the result here—is deafening.

Even beyond inequity to Apple, the district court's refusal to vacate the original injunction following *Beverage* also "injure[s] comity interests." *Id.* at *3; see AOB71; Wash. L. Found. & TechFreedom Amici Br. 11-12, ECF No. 66. A federal court applying state law must "approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1093 (9th Cir. 2017) (citation omitted). As *Venoco* teaches, it is error to leave a federal injunction based on state law in place when the state courts have found that state law is not violated in the same circumstances as to the same defendant.

Epic's attempt to use the *Colgate* doctrine to drive a wedge between this case and *Beverage* fails. To begin, any variance in the reasoning of the decisions does not erase the fundamental conflict in the judgments. In any event, the treatment of *Colgate* is a feature of that conflict. The California Court of Appeal—not merely the trial court—held that a court must consider whether an antitrust defendant has engaged in unilateral conduct protected under the Supreme Court's decision in

26

*United States v. Colgate & Co.*, 250 U.S. 300 (1919), before the court can hold such conduct "unfair" under the UCL. *See* AOB67-69; *Beverage*, 320 Cal. Rptr. 3d at 442 & n.6. The federal courts in this case did not conduct that analysis, and that is itself grounds for Rule 60(b) relief. *See New York State Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956, 971 (2d Cir. 1983) (Friendly, J.).

Epic's attempt to answer *Colgate* on the merits fares no better. In Epic's telling, this case involved only concerted action—and not unilateral conduct— obviating the need for any *Colgate* analysis. EAB74. But in *Beverage*, the trial court considered the same UCL claim and the same anti-steering provisions at issue here, and found that Apple engaged in unilateral conduct shielded by *Colgate*. That is correct. The existence of a contract between two parties does not mean action is concerted, rather than unilateral. *See Toscano v. Professional Golfers' Ass'n*, 258 F.3d 978, 983-84 (9th Cir. 2001); *see also* Apple Principal/Response Br. 58, *Epic Games, Inc. v. Apple Inc.*, No. 21-16506 (9th Cir. Mar. 24, 2022), ECF No. 93 (explaining that point). And the anti-steering rules that are the subject of the original injunction appear only in the App Store Review Guidelines, which are unilateral.

Epic's stab at manufacturing a procedural barrier to Rule 60(b) relief likewise fails. Epic first invokes judicial estoppel (EAB71-72), but Apple's position here is fully consistent with its opposition to further state-court review in *Beverage*—a case Apple won. There, Apple argued that this Court's *Epic Games* decision "did not

disagree with" *Chavez v. Whirlpool Corp.*, 113 Cal. Rptr. 2d 175 (Ct. App. 2001)—which, like *Beverage*, held that unilateral conduct under *Colgate* cannot be "unfair" for UCL purposes.  4-ER-658.  Apple further explained that this Court did not "address the applicability of the *Colgate* doctrine to the conduct challenged in that case."  *Id.*  That is all true: This Court's prior decision accepted *Chavez*'s premise but failed to analyze whether Apple's anti-steering provisions fell beyond *Colgate*'s reach.  *See Epic Games*, 67 F.4th at 1001.  As *Beverage* illuminated, it was error to skip over the *Colgate* analysis.  Apple did not tell the California Supreme Court otherwise.  *See* 4-ER-657–58.  Nor is Apple's argument here inconsistent with its prior representation that California courts have long followed *Chavez*.  *See* 4-ER-653.  As Apple explained, *Beverage* is consistent with *Chavez*; but it further clarifies California law, which is the critical point here.  *See* AOB67.

Nor did Apple forfeit its *Colgate* argument here.  *Contra* EAB74.  Apple argued that its anti-steering provisions are lawful unilateral conduct regardless of whether the DPLA could be considered a "contract" for Section 1 purposes.  Apple No. 21-16506 Principal/Response Br. 56-66.  And its argument that "conduct that is not anticompetitive under the Sherman Act" is not "unfair" under the UCL, *id.* at 105, clearly encompasses the narrower proposition that conduct protected by the *Colgate* doctrine—a subset of "conduct that is not anticompetitive under the Sherman Act"—cannot support UCL liability.  That argument eliminates Epic's

28

forfeiture claim. *See, e.g.*, *Brown v. Arizona*, 82 F.4th 863, 873 (9th Cir. 2023) (en banc) (party who "made a narrower argument" had not "raised a new claim").

In short, Epic cannot erase the fundamental conflict—and inequity—in forever subjecting Apple to an injunction in this case under the UCL for the same exact conduct that the state courts have held *cannot* be enjoined under the UCL.

## IV.  THE INJUNCTION IS FATALLY OVERBROAD UNDER *CASA*

At a minimum, the district court's new injunction is overbroad and must be reconsidered under the Supreme Court's intervening decision in *Trump v. CASA*—a legal earthquake that Epic remarkably gives the back of the hand.

*CASA* establishes that an injunction ordinarily may provide relief only to the plaintiff(s) before a court, not to others.  145 S. Ct. at 2548 & n.1.  As the Court explained, "'[c]omplete relief' [to the plaintiff] is not synonymous with 'universal relief.'"  *Id.* at 2557 (citation omitted).  Instead, it "is a narrower concept" that contemplates relief only "'*between the parties*.'"  *Id.* (citation omitted).  Thus, in *CASA*, the Court held that, "to the extent respondents argue that [the complete-relief principle] justifies the award of relief to nonparties, they are mistaken."  *Id.* at 2556; *see id.* at 2556 n.11 (explaining that a nonparty covered by a "universal injunction is likely to reap both the practical benefit and the formal relief of the injunction").  The appropriate way to secure relief extending to nonparties, *CASA* explains, is through a class action subject to Rule 23's careful requirements.  *Id.* at 2555-56.

29

In responding to Apple's notice of supplemental authority, Epic defended the injunctions in this case on the theory that, "to remedy Epic's injuries, the Injunction must allow [all] other developers to steer users to Epic's payment services" on the Epic Games Store.  Epic Rule 28(j) Response 1, ECF No. 109.  This Court similarly concluded that an injunction may remedy Epic's "full harm" by addressing harms to Epic as a games *distributor*.  *Epic Games*, 67 F.4th at 1003; *see Epic Games, Inc. v. Apple, Inc.*, 73 F.4th 785, 787 (9th Cir. 2023) (M. Smith, J., concurring in the granting of the motion for a stay).  *CASA*, however, sheds new light on the complete-relief principle and heightens a party's burden to justify relief extending to nonparties.  It requires re-examination of the scope of the injunctions here.  *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1123-24 (9th Cir. 2002).

Epic cannot justify under *CASA* injunctions extending relief to *all* developers—of game and non-game apps alike—even though the district court was "not persuaded that the Epic Games Store is anything but a game store."  5-ER-814 n.108.  Moreover, even as to game developers, the injunctions apply regardless of whether developers steer payments to the Epic Games Store or elsewhere—instead requiring Apple to permit steering to *all* third-party payment-processing services, not only to "the Epic Games Store."  EAB75; *see* AOB41 n.4.  This relief goes much further than necessary to remedy any harm to Epic as a "game distributor."  *Epic Games*, 67 F.4th at 1003.  Indeed, the breadth of the injunctions could only *harm*

Epic by allowing third-party developers to steer to places *other than* the Epic Games Store. That mismatch requires vacatur of the new injunction and, at minimum, a remand for the district court to revisit the original injunction under *CASA*.

This shortcoming is especially stark as to the zero-commission rule, which was not considered in the prior appeal. Epic has never demonstrated how requiring Apple to permit all manner of linked-out purchases from *any* developer—and prohibiting Apple from collecting *any* commission on such purchases—is necessary to remedy *Epic's* full harm, particularly for linked-out transactions that do not involve *Epic*. Just the opposite, Epic has lined up amici to describe how they wish to steer on the back of Apple's IP-protected technologies at zero cost to themselves, and not to the Epic Games Store. Spotify wishes to implement "convenient buttons to direct users to *Spotify's website* to purchase" "paid subscriptions." Spotify Amicus Br. 4-5, ECF No. 142 (emphasis added). Microsoft stresses that "in-app links are crucial to the discoverability and viability of *Microsoft's* online store." Microsoft Amicus Br. 17-18, ECF No. 135 (emphasis added). And Y-Combinator LLC cites benefits not to Epic, but instead to Amazon and Barnes & Noble. Y-Combinator Amicus Br. 7-8, ECF No. 128. Requiring Apple to permit linked-out

transactions to Spotify, Microsoft, or Amazon does not benefit Epic in any way and is not necessary to remedy any harm suffered by Epic.[2]

Nor is it "all but impossible for courts to craft relief that is complete *and* benefits only [Epic]." *CASA*, 145 S. Ct. at 2557 n.12. For example, Apple could be precluded from prohibiting attempts to steer *by* Epic and its subsidiaries, as well as attempts by other developers to steer *to* the Epic Games Store—the only harms that this Court suggested could support the original injunction. *Epic Games*, 67 F.4th at 1003; *Epic Games*, 73 F.4th at 787 (M. Smith, J., concurring in the granting of the motion for a stay). Nor does anything in this Court's previous decision prevent reaching the correct conclusion here: At that time, this Court and the parties did not yet have the benefit of *CASA*'s additional guidance on the complete-relief principle, or the parties' more detailed arguments under the refined standard.

Enjoining Apple's conduct as to *all* developers is therefore not necessary to provide Epic complete relief. But that is not the end of the matter. *CASA* also holds that just because "a court *can* award complete relief is not to say that it *should* do so." 145 S. Ct. at 2558. Rather, courts must balance the sweep of the requested

---

[2]    More than 99% of all U.S. developers separately settled a class action against Apple that echoed Epic's claims; that settlement—which was approved as fair, reasonable, and adequate by the same district court—said nothing about linked-out transactions or Apple's ability to charge a commission on linked-out purchases. *See* Order Granting Prelim. Approval of Class Action Settlement, *Cameron v. Apple Inc.*, ECF 453, No. 19-cv-3074 (N.D. Cal. Nov. 16, 2021), ECF No. 453.

remedy against the needs for expansive relief and the burdens that such relief imposes on the defendant: "[T]he broader and deeper the remedy the plaintiff wants, the stronger the plaintiff's story needs to be." *Id.* (citation omitted).  A plaintiff must show that complete relief is justified by "the necessities of the particular case." *Id.* (quoting *Hecht Co. v. Bowles*, 321 U.S. 329 (1944)).  Epic has never met this burden. And under *CASA*, there is no plausible—much less "strong"—"story" that Epic could spin to justify such "broad[] and deep[]" relief as zeroing out Apple's commission on *all* linked-out purchases.  *Id.* (citation omitted).  Certainly there are no judicial findings or record evidence that would support this relief.

Because Epic cannot meet *CASA*'s heightened burden, it briefly suggests that *CASA* is inapplicable because the injunction is a "parties-only injunction," in the sense that it authorizes the plaintiff to enforce it (as is true for most if not all injunctions).  EAB76 (citing 4-ER-796).  This argument is mistaken.  The key question under *CASA* is whether the injunction extends "relief to nonparties."  145 S. Ct. at 2556.  The district court's new injunction—like its original injunction—plainly does.  It applies to *all* developers—literally millions—and prohibits Apple from regulating attempts to steer by non-Epic developers to places *other than* the Epic Games Store.  Moreover, *CASA* expressly rejected the *dissent's* argument (reprised by Epic here) that courts can grant more than complete relief so long as only the plaintiff can enforce an injunction.  *Id.* at 2556 n.11.  In any event, *CASA*'s

guidance on the equitable limits of the complete-relief principle applies to the far-reaching injunction in this case, regardless of who can directly enforce it.

*CASA* makes clear that the new injunction is fatally overbroad. At a minimum, *CASA* requires vacating the new injunction and remanding for reconsideration under *CASA*'s heightened standard. Apple reserves the right to challenge the original injunction as insupportable under *CASA*, too.[3]

## CONCLUSION

This Court should reverse the district court's contempt order and denial of Apple's Rule 60(b)(5) motion. In the alternative, the court should vacate the new injunction and reassign this case to a different district judge for any further proceedings necessitated by this Court's decision.

---

[3]  As discussed, any remand proceedings require a reassignment. AOB72-73. Epic says that the lengthy contempt proceedings below point against reassignment as a matter of "judicial resources." EAB77. That is backwards. The lengthy nature of those proceedings, coupled with the district court's findings of bad faith, make it all but impossible for it to fairly proceed further in this case.

Dated:  August 29, 2025

Mark A. Perry
Zachary D. Tripp
Joshua M. Wesneski
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Suite 600
Washington, DC 20036
(202) 682-7511

Cynthia E. Richman
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8500

Theodore J. Boutrous Jr.
Daniel G. Swanson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Respectfully submitted,

*s/ Gregory G. Garre*

Gregory G. Garre
Roman Martinez
Soren J. Schmidt
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Ben Harris
Kristin C. Holladay
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Sarah M. Ray
Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for Defendant-ctr-claimant - Appellant Apple Inc.*

35

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  25-2935 _____

I am an attorney for Defendant-ctr-claimant - Appellant Apple Inc.

This brief contains 8,339 words, including 0 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[x] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties.
    [x] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Gregory G. Garre* _____  **Date** _August 29, 2025_