# Exhibit A

DANIEL G. SWANSON, SBN 116556
    dswanson@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:    213.229.7000
Facsimile:    213.229.7520

CYNTHIA E. RICHMAN (*pro hac vice*)
    crichman@gibsondunn.com
ZACHARY B. COPELAND (*pro hac vice* pending)
    zcopeland@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
Telephone:    202.955.8500
Facsimile:    202.467.0539

JULIAN W. KLEINBRODT, SBN 302085
    jkleinbrodt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant Apple Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PURE SWEAT BASKETBALL INC., on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC., a California corporation,<br><br>Defendant. | Case No. 4:25-cv-03858-YGR<br><br>**DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT, STRIKE CLASS ALLEGATIONS, OR STAY PROCEEDINGS**<br><br>**Hearing:**<br>Date:      September 2, 2025<br>Time:      2:00 p.m.<br>Place:      Courtroom 1<br>Judge:    Hon. Yvonne Gonzalez Rogers |

Gibson, Dunn &
Crutcher LLP

**NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT**

 **PLEASE TAKE NOTICE THAT** on September 2, 2025, at 2:00 PM, in Courtroom 1, Fourth Floor, before the Honorable Yvonne Gonzalez Rogers, Defendant Apple Inc., by and through its counsel of record, will and hereby does move under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(f) to dismiss Plaintiff Pure Sweat Basketball Inc.'s complaint with prejudice and to strike Plaintiff's class allegations, or in the alternative to stay proceedings pending issuance of the mandate in *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir.). This Motion is supported by this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities and supporting Declaration of Julian W. Kleinbrodt and attached exhibits; all documents on file in this action; argument of counsel; and such other matters as the Court may consider.

Dated: June 30, 2025       GIBSON, DUNN & CRUTCHER LLP

              */s/ Julian W. Kleinbrodt*
              Julian W. Kleinbrodt

## STATEMENT OF ISSUES TO BE DECIDED

I.    Whether the Complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because:

    A.    The Complaint fails for the threshold reasons that (i) Plaintiff does not allege any actual and concrete injury traceable to Apple, as required for Article III standing (all Counts); (ii) Plaintiff's claims are precluded by the settlement agreement in *Cameron v. Apple Inc.*, No. 4:19-cv-03074 (N.D. Cal.) (all Counts); and (iii) Plaintiff improperly seeks to enforce the injunction in *Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-5640 (all Counts).

    B.    Plaintiff's equitable claims fail for multiple, independent reasons:  They (i) are precluded by the parties' express contract; (ii) do not constitute standalone causes of action under California law; (iii) fail on the merits; and (iv) are barred by Plaintiff's failure to plead the inadequacy of legal remedies (Counts I and II).

    C.    Plaintiff fails to plausibly plead facts necessary to support a claim for tortious interference with business expectancy, including (i) the loss of an almost-certain economic benefit, (ii) an independently wrongful act, and (iii) an extracontractual duty to prevent pure economic loss (Count III).

II.    Whether Plaintiff's putative class allegations should be struck under Federal Rule of Civil Procedure 12(f) because no class can be certified on the facts alleged.

III.    Whether this case should be stayed in light of Apple's pending appeal in *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir.).

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND ............................................................................................. 2

III.  LEGAL STANDARD...................................................................................... 4

IV.   ARGUMENT .................................................................................................. 5

      A.    Plaintiff's Claims Have Multiple Threshold Defects................................. 5

            1.    Plaintiff Lacks Article III Standing............................................... 5

            2.    The *Cameron* Settlement Precludes Plaintiff's Claims...................... 9

            3.    Plaintiff—A Nonparty To *Epic*—Cannot Enforce The *Epic* Injunction......... 11

      B.    Plaintiff Fails To State A Claim.............................................................. 12

            1.    Plaintiff's Equitable Claims Fail On Four Grounds (Counts I and II)............ 13

                  a.    The DPLA Bars Plaintiff's Equitable Claims (Counts I and II). ........ 13

                  b.    Constructive Trust Is Not A Standalone Claim And Fails On
                        The Merits (Count I). ...................................................... 14

                  c.    Unjust Enrichment Is Not A Standalone Claim (Count II). ............... 16

                  d.    Plaintiff's Failure To Plead The Inadequacy Of Legal Remedies
                        Also Bars Its Equitable Theories (Counts I and II)............................. 16

            2.    Count III Fails Because Plaintiff Does Not Plausibly Allege Tortious
                  Interference With Any Business Expectancy................................................ 17

                  a.    Plaintiff Fails To Plausibly Allege The Loss Of Practically
                        Certain  Economic Benefits. ............................................. 18

                  b.    Plaintiff Pleads No Independently Wrongful Acts............................. 19

                  c.    The DPLA Bars Plaintiff From Asserting Non-Contractual
                        Causes Of Action For Economic Loss. ................................. 20

      C.    The Complaint's Class Allegations Should Be Struck Under Rule 12(f).................. 21

      D.    This Case Should Be Stayed Pending Resolution Of The *Epic* Appeal. ................... 23

V.    CONCLUSION ............................................................................................. 25

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ace Am. Ins. Co. v. Accellion, Inc.*,
2022 WL 2341155 (N.D. Cal. Apr. 11, 2022) ........................................................................20

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) .................................................................................................5

*Adams v. Wells Fargo Bank, N.A.*,
2015 WL 1434599 (N.D. Cal. Mar. 30, 2015) ......................................................................11

*Allen v. Wright*,
468 U.S. 737 (1984) .................................................................................................................9

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ...............................................................................................................22

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) .............................................................................................................20

*Asia Inv. Co. v. Borowski*,
133 Cal. App. 3d 832 (1982) ..................................................................................................18

*Bain v. Cal. Teachers Ass'n*,
891 F.3d 1206 (9th Cir. 2018) .................................................................................................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................................................5, 16

*Berlanga v. Univ. of S.F.*,
100 Cal. App. 5th 75 (2024) ..................................................................................................13

*BGJ Assocs., LLC v. Superior Ct.*,
75 Cal. App. 4th 952 (1999) ..................................................................................................14

*Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*,
94 Cal. App. 4th 151 (2001) .............................................................................................13, 14

*California v. Texas*,
593 U.S. 659 (2021) .................................................................................................................9

*Carney v. Adams*,
592 U.S. 53 (2020) ...................................................................................................................6

*Castillo v. Bank of Am., NA*,
980 F.3d 723 (9th Cir. 2020) .............................................................................................22, 23

*Cedar Park Assembly of God of Kirkland v. Kreidler*,
130 F.4th 757 (9th Cir. 2025) ..............................................................................................6, 9

Gibson, Dunn &
Crutcher LLP

ii

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*City of Oakland v. Oakland Raiders,*
  83 Cal. App. 5th 458 (2022) .....................................................................................16

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013).....................................................................................................9

*Clark v. Cal. Dep't of Forestry & Fire Prot.,*
  212 F. Supp. 3d 808 (N.D. Cal. 2016) ................................................................14, 16

*CMAX, Inc. v. Hall,*
  300 F.2d 265 (9th Cir. 1962).....................................................................................24

*Communist Party v. 522 Valencia, Inc.,*
  35 Cal. App. 4th 980 (1995) ......................................................................................14

*Crown Imps., LLC v. Superior Ct.,*
  223 Cal. App. 4th 1395 (2014) ..................................................................................18

*Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Reconstruction, Inc.,*
  57 Cal. App. 5th 1108 (2020) ....................................................................................17

*Davies v. Krasna,*
  14 Cal. 3d 502 (1975) ................................................................................................14

*Durell v. Sharp Healthcare,*
  183 Cal. App. 4th 1350 (2010) ..................................................................................14

*Epic Games, Inc. v. Apple Inc.,*
  2025 WL 1260190 (N.D. Cal. Apr. 30, 2025) ...............................................1, 3, 6, 12

*Epic Games, Inc. v. Apple Inc.,*
  559 F. Supp. 3d 898 (N.D. Cal. 2021) .........................................................................3

*Epic Games, Inc. v. Apple Inc.,*
  67 F.4th 946 (9th Cir. 2023) .....................................................1, 2, 3, 8, 12, 22

*Epic Games, Inc. v. Apple Inc.,*
  73 F.4th 785 (9th Cir. 2023) ......................................................................................12

*Everett v. Mountains Recreation & Conservation Auth.,*
  239 Cal. App. 4th 541 (2015) ....................................................................................16

*Fischer v. Machado,*
  50 Cal. App. 4th 1069 (1996) ....................................................................................15

*Fulbright v. Jones,*
  2012 WL 4470632 (W.D. Okla. Aug. 13, 2012) .......................................................11

*George v. eBay, Inc.,*
  71 Cal. App. 5th 620 (2021) ......................................................................................19

iii

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Gonzales v. JPMorgan Chase Bank, N.A.*,
  2021 WL 1091886 (N.D. Cal. Mar. 22, 2021)................................................................11

*Grecia v. Adobe Inc.*,
  2018 WL 6523983 (N.D. Cal. Dec. 12, 2018)................................................................24

*Greenstein v. Noblr Reciprocal Exch.*,
  585 F. Supp. 3d 1220 (N.D. Cal. 2022) .........................................................................7

*Haltigan v. Drake*,
  2024 WL 4805371 (N.D. Cal. Nov. 15, 2024)................................................................7

*Hartman v. Summers*,
  120 F.3d 157 (9th Cir. 1997)...........................................................................................6

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010)...........................................................................................9

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000)...........................................................................................9

*Kamm v. Cal. City Dev. Co.*,
  509 F.2d 205 (9th Cir. 1975)...........................................................................................5

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006).........................................................................................22

*Korea Supply Co. v. Lockheed Martin Corp.*,
  29 Cal. 4th 1134 (2003) ..........................................................................14, 15, 16, 17, 19

*Lance Camper Mfg. Corp. v. Republic Indemn. Co.*,
  44 Cal. App. 4th 194 (1996) .........................................................................................13

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936).......................................................................................................23

*Leyva v. Certified Grocers of Cal., Ltd.*,
  593 F.2d 857 (9th Cir. 1979).........................................................................................24

*Lockyer v. Mirant Corp.*,
  398 F.3d 1098 (9th Cir. 2005).......................................................................................25

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)......................................................................................................7, 9

*Madsen v. Boise State Univ.*,
  976 F.2d 1219 (9th Cir. 1992).........................................................................................6

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994).......................................................................................................11

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Margolis v. Apple Inc.*,
   743 F. Supp. 3d 1124 (N.D. Cal. 2024) ..................................................................17

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011)..................................................................................4

*McBride v. Boughton*,
   123 Cal. App. 4th 379 (2004) ...............................................................................16

*McDonnell-Douglas Corp. v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
   523 F.2d 1083 (9th Cir. 1975)................................................................................21

*McElrath v. Uber Techs., Inc.*,
   2017 WL 1175591 (N.D. Cal. Mar. 30, 2017)........................................................25

*Meister v. Mensinger*,
   230 Cal. App. 4th 381 (2014) ...............................................................................16

*Meland v. WEBER*,
   2 F.4th 838 (9th Cir. 2021) .....................................................................................4

*Metro Servs. Grp. v. Travelers Cas. & Sur. Co. of Am.*,
   2021 WL 2633416 (N.D. Cal. June 25, 2021) .......................................................19

*Michaelian v. State Comp. Ins. Fund*,
   50 Cal. App. 4th 1093 (1996) .........................................................................14, 15

*Moose Lodge No. 107 v. Irvis*,
   407 U.S. 163 (1972)................................................................................................6

*Navarro v. Block*,
   250 F.3d 729 (9th Cir. 2001)...................................................................................4

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)..............................................................................................16

*Optional Cap., Inc. v. DAS Corp.*,
   222 Cal. App. 4th 1388 (2014) .............................................................................14

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)..............................................................................................21

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) .........................................................................................17

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014).................................................................................21

*Phan v. Transamerica Premier Life Ins. Co.*,
   2023 WL 7597464 (N.D. Cal. Nov. 13, 2023)..................................................24, 25

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Pinkert v. Schwab Charitable Fund*,
  48 F.4th 1051 (9th Cir. 2022) ...................................................................................7

*Portnoy v. United States*,
  507 F. App'x 736 (9th Cir. 2013) ............................................................................11

*Prescott v. Nestle USA, Inc.*,
  2020 WL 7053317 (N.D. Cal. Nov. 25, 2020).........................................................24

*Progressive W. Ins. Co. v. Superior Ct.*,
  135 Cal. App. 4th 263 (2005) ..................................................................................20

*Rattagan v. Uber Techs., Inc.*,
  17 Cal. 5th 1 (2024) ...........................................................................................12, 20

*Rattagan v. Uber Techs., Inc.*,
  19 F.4th 1188 (9th Cir. 2021) ..................................................................................20

*Republican Nat'l Comm. v. Google LLC*,
  742 F. Supp. 3d 1099 (E.D. Cal. 2024)..............................................................18, 19

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
  442 F.3d 741 (9th Cir. 2006)....................................................................................10

*In re RH S'holder Derivative Litig.*,
  2019 WL 580668 (N.D. Cal. Jan. 23, 2019) ...........................................................24

*Robinson v. Dignity Health*,
  2016 WL 7102832 (N.D. Cal. Dec. 6, 2016) ..........................................................24

*Robledo v. Randstad US, LP*,
  2017 WL 4934205 (N.D. Cal. Nov. 1, 2017).....................................................24, 25

*Roffman v. Rebbl, Inc.*,
  653 F. Supp. 3d 723 (N.D. Cal. 2023) .....................................................................17

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
  2 Cal. 5th 505 (2017) ..........................................................................................18, 19

*Rutherford Holdings, LLC v. Plaza Del Rey*,
  223 Cal. App. 4th 221 (2014) ..................................................................................13

*Sanders v. Apple Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009) ..................................................................5, 21

*Santore v. Cuomo*,
  2020 WL 9810016 (S.D.N.Y. Aug. 14, 2020) ........................................................11

*Sepanossian v. Nat'l Ready Mixed Concrete Co.*,
  97 Cal. App. 5th 192 (2023) ....................................................................................16

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Sharma v. Volkswagen AG,*
524 F. Supp. 3d 891 (N.D. Cal. 2021) ............................................................17

*Shin v. Wash. Mut. Bank, F.A.,*
2018 WL 4491185 (N.D. Cal. Sept. 19, 2018) .................................................13

*Soil Retention Prods., Inc. v. Brentwood Indus., Inc.,*
521 F. Supp. 3d 929 (S.D. Cal. 2021) .............................................................18

*Somers v. Apple Inc.,*
729 F.3d 953 (9th Cir. 2013).........................................................................5, 7

*Sonner v. Premier Nutrition Corp.,*
971 F.3d 834 (9th Cir. 2020)......................................................................16, 17

*SST Millennium LLC v. Mission St. Dev. LLC,*
2019 WL 2342277 (N.D. Cal. June 3, 2019) ..................................................25

*Stansfield v. Starkey,*
220 Cal. App. 3d 59 (1990).............................................................................14

*Stromberg v. Qualcomm Inc.,*
14 F.4th 1059 (9th Cir. 2021) ...........................................................................8

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009)........................................................................................6, 7

*Thomas v. Anchorage Equal Rts. Comm'n,*
220 F.3d 1134 (9th Cir. 2000)...........................................................................6

*Tritz v. U.S. Postal Serv.,*
721 F.3d 1133 (9th Cir. 2013)...........................................................................9

*Trump v. CASA, Inc.,*
2025 WL 1773631 (U.S. June 27, 2025) .....................................................11, 12

*Turtle Island Restoration Network v. U.S. Dep't of State,*
2010 WL 2836911 (N.D. Cal. July 19, 2020)..................................................10

*Twitter, Inc. v. Paxton,*
56 F.4th 1170 (9th Cir. 2022) ...........................................................................9

*United States v. Am. Soc'y of Composers, Authors & Publishers,*
341 F.2d 1003 (2d Cir. 1965)............................................................................12

*United States v. FMC Corp.,*
531 F.3d 813 (9th Cir. 2008).............................................................................11

*United States v. Ritchie,*
342 F.3d 903 (9th Cir. 2003)..............................................................................3

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Vu v. Cal. Com. Club., Inc.*,
    58 Cal. App. 4th 229 (1997) ........................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................................21

*Washington v. FDA*,
    108 F.4th 1163 (9th Cir. 2024) ......................................................................8

*Welborne v. Ryman-Carroll Found.*,
    22 Cal. App. 5th 719 (2018) ........................................................................16

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ........................................................................18

*Woulfe v. Universal City Studios LLC*,
    2023 WL 6151727 (C.D. Cal. Aug. 28, 2023) ...............................................9

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................21, 22

**Rules**

Fed. R. Civ. P. 23 ...............................................................................................22

Fed. R. Civ. P. 71 ..........................................................................................2, 12

L.R. 3-12(a)(1) ...................................................................................................10

# I.    INTRODUCTION

Plaintiff Pure Sweat Basketball—the developer of two basketball-training apps—"forever released" "any and all" claims against Apple based on allegations that Apple's App Store commissions are "supracompetitive" or "otherwise set at unlawful amounts." *Cameron v. Apple Inc.*, No. 4:19-cv-3704, Dkt. 491, at 4, 44 (N.D. Cal. June 10, 2022). Notwithstanding that settlement, Plaintiff filed this suit two days after the Court issued a contempt ruling in *Epic Games, Inc. v. Apple Inc.*, alleging under state equity and tort law that it would have paid less in commissions had Apple further loosened its "restrictions" on linked-out payments pursuant to the *Epic* injunction. Yet Plaintiff never applied for the link entitlement, much less tried to offer linked-out payments. The Court should reject Plaintiff's attempt to piggyback on *Epic* to obtain gratuitous monetary relief: A nonparty cannot seek to enforce an injunction entered for another's relief, using causes of action it extinguished through settlement, premised on the speculative theory that it lost revenue from linked-out payments it never tried to offer.

Several threshold obstacles bar Plaintiff's claims. First, Plaintiff lacks Article III standing, which requires a concrete injury traceable to the defendant's conduct. Plaintiff alleges that it continued to pay Apple ordinary in-app purchase commissions, and imagines—without supporting allegations—that some customers may have chosen a different payment path if Plaintiff had made such a hypothetical path available. Plaintiff does not suggest that it ever intended to offer external links, let alone took concrete steps to do so. Nor does Plaintiff specify what its links would have looked like, how they would have functioned differently than available payment options, where they would have been placed, how many customers would have used them, or what commissions Plaintiff would have avoided. This abstract, contingent theory does not amount to injury in fact, much less support traceability.

Even if Plaintiff could establish standing, its claims collide with its own prior settlement. As a member of the *Cameron* class, Plaintiff released "all past, present, and future" claims challenging Apple's App Store commission practices. The Complaint attacks those very same practices and therefore is barred by *res judicata*. Plaintiff also lacks any right to enforce the *Epic* injunction. *Epic* was a single-plaintiff lawsuit, and the resulting injunction was a remedy "tied to *Epic*'s injuries." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 1003 (9th Cir. 2023) (emphasis added). This Court rejected the notion that the injunction was issued "on behalf of third parties." *Epic Games, Inc. v. Apple Inc.*,

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

2025 WL 1260190, at *1, *32 (N.D. Cal. Apr. 30, 2025).  Plaintiff cannot use state-law claims to do indirectly what the Federal Rules of Civil Procedure bar it from doing directly.  *See* Fed. R. Civ. P. 71.

Each cause of action also fails on the merits.  Equitable theories like unjust enrichment, quasi-contract, and constructive trust are remedies, not causes of action, and cannot be deployed where the parties' relationship is governed by contract and adequate legal remedies allegedly exist.  Plaintiff's tortious interference claim fails because the Complaint identifies no business expectancy that was disrupted, no wrongful act, and no legal duty that Apple breached.  And the same problems that foreclose Plaintiff's claims—including its speculative causal theory that turns on potentially hundreds of thousands of individualized inquiries into developer intent, customer behavior, and payment-processing costs—makes class treatment unmanageable and inappropriate on the face of the Complaint.

The Complaint is built on conjecture, barred by settlement, and foreclosed by contract.  It should be dismissed and the class allegations struck.  In the alternative, Apple respectfully requests that the Court stay the case in full pending the Ninth Circuit's expedited review of the contempt ruling in *Epic*.

## II.    BACKGROUND

"In 2007, Apple entered, and revolutionized, the smartphone market with the iPhone—offering consumers, through a then-novel multi-touch interface, access to email, the internet, and several preinstalled 'native' apps that Apple had developed itself."  *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 966 (9th Cir. 2023).  Soon after, Apple opened iPhone to apps created by third-party developers.  *Id.* Developers have since been able to "distribute their apps to iOS devices only through Apple's App Store," subject to Apple's review of "security, privacy, content, and reliability."  *Id.* at 967.  This relationship is "symbiotic": "Apple provides app developers with a substantial consumer base," while "ever-expanding" third-party apps boost Apple products' "consumer appeal."  *Id.* at 966.

To distribute apps on the App Store, developers must execute a standard Developer Program Licensing Agreement ("DPLA") with Apple.  *Epic Games*, 67 F.4th at 968; *accord* Compl. ¶ 73.  Together, the DPLA and the App Store Review Guidelines (the "Guidelines") govern how developers may distribute and administer their apps using Apple's proprietary tools and software.[1]  As relevant

---

[1]  The DPLA and the Guidelines, attached as Exhibits 1–2, may be considered as incorporated by reference in the Complaint, *see* Compl. ¶¶ 13, 16, 25 & n.8, 73, or as judicially noticeable facts not

here, although neither document "prohibit[s] app developers from selling content consumable within an app from their own websites," Compl. ¶ 23, the Guidelines—in former Section 3.1.1—previously restricted developers from including in their apps "buttons, external links, or other calls to action that direct[ed] customers to purchasing mechanisms other than in-app purchase," *id.* ¶ 25.

In 2020, Epic Games, Inc. challenged Apple's App Store business practices, particularly its distribution and in-app payment ("IAP") requirements, under federal and California law. *See Epic Games*, 67 F.4th at 966. After a bench trial, this Court rejected all of Epic's federal and state antitrust claims. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1007 (N.D. Cal. 2021). As to Epic's claim under California's Unfair Competition Law ("UCL"), the Court held that former Section 3.1.1 was "unfair" and entered an injunction (the "Injunction") providing, in relevant part, that:

> Apple Inc. and its officers, agents, servants, employees, and any person in active concert or participation with them ("Apple"), are hereby permanently restrained and enjoined from prohibiting developers from . . . including in their apps and their metadata buttons, external links, or other calls to action that direct customers to purchasing mechanisms, in addition to In-App Purchasing.

*Epic Games, Inc. v. Apple Inc.*, No. 4:20-cv-5640 (N.D. Cal. Sept. 10, 2021), ECF No. 813.

Apple responded to the Injunction by creating a "[L]ink [E]ntitlement program," *Epic Games, Inc. v. Apple Inc.*, 2025 WL 1260190, at *9, *11 (N.D. Cal. Apr. 30, 2025), through which developers could apply to implement linked-out payments subject to a reduced commission rate relative to IAP payments. *See id.* Epic moved to enforce the Injunction in March 2024, asserting that Apple's changes were insufficient to comply with the Injunction. *See id.* at *7–27. After evidentiary hearings, the Court held Apple in civil contempt and ordered Apple to stop enforcing its Link Entitlement program. *Id.* at *1. Apple immediately complied with the Court's order, appealed that ruling, and the Ninth Circuit has expedited review. *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir.).

Two days after the contempt order, Pure Sweat Basketball filed this suit. Compl. ¶ 14. Plaintiff operates two basketball-training apps on the App Store, one of which features in-app subscription purchases. *Id.* ¶¶ 14–16. Plaintiff was one of the named plaintiffs in *Cameron v. Apple Inc.*, No. 4:19-cv-3074 (N.D. Cal.). *See* Ex. 3, ¶¶ 1, 18–20. That case, which involved a class of small developers earning

---

subject to reasonable dispute, *see United States v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003). Exhibit citations are to the Declaration of Julian W. Kleinbrodt.

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

below $1 million in U.S. App Store revenue per year during the relevant period, alleged that Apple charged developers supracompetitive commissions. *Id.* ¶¶ 131, 143. *Cameron* settled shortly after the close of class-certification briefing, with all class members—including Plaintiff—releasing "any and all past, present, and future claims" challenging Apple's commission structure, including any claims under the UCL. Ex. 4 at 2, 5, 26.

Neither of Plaintiff's apps has ever offered a linked-out payment option, and Plaintiff never alleges it sought to offer such an option between when the Injunction went into effect (January 17, 2024) and when the Court struck down the Link Entitlement program (April 30, 2025). Compl. ¶ 18. Nevertheless, Plaintiff asserts a hodgepodge of claims arising from this Court's determination that Apple did not comply with the Injunction, including unjust enrichment, quasi-contract, constructive trust, and tortious interference with business expectancy. *Id.* ¶¶ 76–109. The Complaint does not assert that Apple breached the DPLA, with Plaintiff or any other developer. Nor does the Complaint allege that Apple violated the terms of the *Cameron* settlement. Instead, it expressly pleads that "[a]ll claims for relief . . . arise" from Apple's purported violation of the Injunction entered in *Epic*—to which Plaintiff was not a party—because Plaintiff says it "intends" to provide a link-out option at an unspecified point in the future. *Id.* ¶¶ 18, 75. Plaintiff seeks the return of commissions that hypothetically it might not have paid to Apple *if* Plaintiff had offered linked-out payments from January 2024 to "the date on which Apple fully complies with the injunction"—and *if* customers had used that option. *Id.* ¶¶ 65, 88, 91. Plaintiff seeks to represent not just a putative class of developers who actually intended to offer linked-out payments, but "[a]ll developers of any iOS or iPadOS app" distributed through the App Store that "offered in-app products . . . for a non-zero price." *Id.* ¶ 64.

### III.    LEGAL STANDARD

"The party invoking federal jurisdiction bears the burden of establishing the elements of standing." *Meland v. WEBER*, 2 F.4th 838, 843 (9th Cir. 2021) (quotation marks omitted). And "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (emphasis omitted).

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is proper when the complaint

1  either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable

2  legal theory." *Somers v. Apple Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *accord Bell Atl. Corp. v.*

3  *Twombly*, 550 U.S. 544, 570 (2007). Mere "conclusory allegations of law and unwarranted inferences

4  are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

5  Under Federal Rule of Civil Procedure 12(f), a court may "strike class allegations prior to dis-

6  covery" "[w]here the complaint demonstrates that a class action cannot be maintained on the facts

7  alleged." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009); *see also Kamm v. Cal.*

8  *City Dev. Co.*, 509 F.2d 205, 212–13 (9th Cir. 1975) (affirming order striking class allegations).

### IV.    ARGUMENT

The Complaint should be dismissed because Plaintiff fails to plausibly establish Article III

standing, asserts claims precluded by the parties' *Cameron* settlement agreement, and improperly seeks

to enforce the Injunction (§ IV.A). Nor does Plaintiff plausibly state any claim. (§ IV.B). Its equitable

claims are doomed because the relevant conduct is governed by an express contract, the DPLA; are not

standalone causes of action; are implausibly pleaded; and are defective for failure to allege the inade-

quacy of legal remedies (§ IV.B.1). Plaintiff likewise fails to plead the elements of a tortious-interfer-

ence claim (§ IV.B.2). Plaintiff's class allegations should be struck in any event under Rule 12(f)

because no class can be certified on the facts alleged (§ IV.C). And because "[a]ll" of Plaintiff's claims

rest on the *Epic* Injunction, Compl. ¶ 75, this case should be stayed (either now or after this motion is

resolved) pending issuance of the mandate in *Epic*, which may clarify or foreclose the claims (§ IV.D).

### A.    Plaintiff's Claims Have Multiple Threshold Defects.

Plaintiff's claims should be rejected at the outset because of three insurmountable threshold

flaws. *First*, Plaintiff has no standing: Its theory of economic harm rests on speculation and the inde-

pendent actions of third-party customers, rather than an actual and concrete injury traceable to Apple.

*Second*, the Complaint is barred by Plaintiff's prior settlement agreement, where it agreed to release all

present and future claims arising from Apple's App Store commission policies. *Third*, Plaintiff is not

entitled to enforce the *Epic* Injunction as a nonparty to that decree.

### 1.    Plaintiff Lacks Article III Standing.

Plaintiff's alleged injury rests entirely on speculation. Plaintiff contends that, had Apple

1     adopted different policies after the Injunction went into effect, Plaintiff might have offered an external

2     payment option, some customers might have used it, and Plaintiff thereby might have avoided paying

3     certain commissions to Apple.  But Article III requires a plaintiff to allege: (1) "an 'injury in fact' that

4     is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the

5     injury is fairly traceable to the challenged action of the defendant," rather than the "actions of inde-

6     pendent [parties]," and (3) that "it is likely, as opposed to merely speculative, that the injury will be

7     redressed by a favorable decision." *Cedar Park Assembly of God of Kirkland v. Kreidler*, 130 F.4th

8     757, 764–65 (9th Cir. 2025).  Plaintiff never offered linked-out payments and pleads no facts showing

9     any concrete monetary loss, let alone one that is traceable to Apple's conduct rather than Plaintiff's

10    own choices or those of independent customers.  Plaintiff's hypothetical and contingent theory of harm

11    falls short of Article III's injury-in-fact and traceability requirements.

12         ***No Actual, Concrete Injury.***  A plaintiff cannot be injured by a restriction it never encountered.

13    *See Carney v. Adams*, 592 U.S. 53, 61 (2020); *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th

14    Cir. 1992) ("[A] plaintiff lacks standing to challenge a rule or policy to which he has not submitted

15    himself.").  Here, Plaintiff challenges Apple's alleged restrictions on linked-out payments.  But Plain-

16    tiff *never offered* linked-out payments in the first place, so it cannot have been subject to any restrictions

17    on that option.  Compl. ¶¶ 15, 18; *see Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 167 (1972) (no

18    standing to challenge membership restriction where plaintiff "never sought to become a member").

19         Nor has Plaintiff alleged that it ever had any "concrete plans" to offer linked-out payments after

20    the Injunction went into effect.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Standing

21    doctrine is clear:  A plaintiff must implement a concrete plan and have its efforts frustrated by the

22    defendant to have an actual injury, which Plaintiff does not allege here.  *See Bain v. Cal. Teachers

23    Ass'n*, 891 F.3d 1206, 1214 (9th Cir. 2018); *Hartman v. Summers*, 120 F.3d 157, 160 (9th Cir. 1997).

24    Plaintiff alleges that it now "intends to modify its apps to offer linked-out payments" at a future date.

25    Compl. ¶ 18.  That theory fails for two reasons.  First, Apple's policies have since changed, and the

26    purported restrictions from which Plaintiff claims injury are no longer in effect.  *See Epic Games, Inc.

27    v. Apple Inc.*, 2025 WL 1260190, at \*46 (N.D. Cal. Apr. 30, 2025).  Second, "expressed 'intent,'" by

28    itself, "can hardly qualify as a concrete plan."  *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d

6

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

1134, 1140 (9th Cir. 2000) (en banc).  Plaintiff does not allege that it applied to offer linked-out pay-ments or took a single step to design and implement them.  Absent any "details necessary to show that [its] plans are" or were "concrete," *Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1055 (9th Cir. 2022), vague "'some day' intentions" do not give Plaintiff standing, *Earth Island Inst.*, 555 U.S. at 496; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).[2]

Plaintiff tries to excuse its inaction by suggesting that Apple's "restraints" somehow prevented Plaintiff from offering linked-out payments or made doing so futile.  Compl. ¶ 18.  That suggestion is beside the point and baseless.  A plaintiff cannot manufacture standing by asserting futility without having concrete plans to engage in the restricted action, *Earth Island Inst.*, 555 U.S. at 496, and, as noted, Plaintiff took no steps after the Injunction went into effect to implement linked-out payments. In any case, Plaintiff's allegations undermine its conclusory excuse for failing to apply for the link entitlement.  The Complaint pleads that (1) Apple did not forbid linked-out payments, Compl. ¶ 23; (2) Apple provided tools to facilitate linked-out payments, *id.* ¶ 47; and (3) other developers applied to use that option, *id.* ¶ 6.  Any argument that Plaintiff was prevented from formulating plans to offer linked-out payments "is thus implausible in the face of contradictory . . . facts alleged in [the] com-plaint."  *Somers v. Apple Inc.*, 729 F.3d 953, 964 (9th Cir. 2013); *cf. Haltigan v. Drake*, 2024 WL 4805371, at *6 (N.D. Cal. Nov. 15, 2024) (no standing where asserted futility was contradicted by allegations that "it was possible [plaintiff] could have proceeded past" application "process").  Article III does not permit a developer to sit on the sidelines, taking no steps to use the program, and then co-opt the asserted injuries of a different party in a different case to claim monetary relief for itself.

Not only did Plaintiff fail to take the concrete actions necessary for standing, but the damages it claims as a result are likewise far too "hypothetical" to support "actual injury."  *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1228–29 (N.D. Cal. 2022).  Resolving this question— "[w]hether" Apple wrongfully earned any commissions, "and, if so, in what amount," Compl. ¶ 68(f)— requires an impermissible degree of guesswork.  As the Ninth Circuit confirmed in *Epic Games, Inc.*

---

[2] The Complaint references an instance in 2023 when Apple rejected one of Plaintiff's apps because it "contained links to purchase content outside of the app."  Compl. ¶ 17.  But that incident is irrelevant because the Injunction did not take effect until January 17, 2024, *id.* ¶ 2, and Plaintiff seeks damages only for conduct after that date, *id.* ¶¶ 65, 75.

*v. Apple Inc.*, "[c]alculating the damages caused by the anti-steering provision would require a pro-tracted and speculative inquiry" into how users might have responded to alternative payment options, including whether and to what extent "users who multi-home and can therefore substitute" would take advantage of those alternatives. 67 F.4th 946, 1003 (9th Cir. 2023). Plaintiff pleads nothing about the availability of its apps on other platforms or how multi-homing users might change their behavior if link-outs were implemented. It would be incongruous to issue an injunction in *Epic* because "the un-derlying injury does not readily lend itself to calculable money damages," *id.*, only to then allow a different developer to seek money damages based on the same kind of speculation. Plaintiff's Com-plaint not only fails to identify an "extraordinary difference" distinguishing its claims from *Epic*, *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1075 (9th Cir. 2021), but underscores why attempting to calculate damages in this context is hopelessly speculative.

Plaintiff alleges that it paid IAP commissions it supposedly could have avoided had it offered linked-out payments. *See, e.g.*, Compl. ¶¶ 8–9, 51, 58. But even setting aside all the problems above, Plaintiff never plausibly pleads that it would have saved money even if it had offered linked-out pay-ments. Setting up those linked-out payments would have entailed their own expenses to Plaintiff, and if setting up linked-out payments would have been more costly to Plaintiff than simply paying com-missions, Plaintiff necessarily cannot have suffered a financial injury (and in fact may have been better off) by not offering linked-out payments. And even if Plaintiff had set up those linked-out payments, it offers no plausible facts demonstrating what sums it would have saved. Customers presented with a hypothetical link-out option would have had a "choice between payment options": they *might* have paid externally, or they might have continued to pay in-app. *Id.* ¶ 3. Customers may have chosen to use IAP for any number of reasons, such as convenience or security. *See Epic Games*, 67 F.4th at 997; *cf. Washington v. FDA*, 108 F.4th 1163, 1175 (9th Cir. 2024) (no standing where alleged injuries hinged on "a wide range of individualized considerations that are difficult to predict"). Without any well-pleaded facts to estimate how many users would have behaved differently in the but-for world, Plain-tiff's asserted injury rests on pure conjecture.

***No Traceability.*** For similar reasons, Plaintiff's damages theory fails to satisfy Article III's traceability requirement. Even if Plaintiff suffered monetary losses, they must be "fairly traceable" *to*

8

*Apple's* challenged conduct, *Cedar Park Assembly of God*, 130 F.4th at 764–65, not to "the independent action[s] of some third part[ies] not before the court," *Defs. of Wildlife*, 504 U.S. at 560.  When a plaintiff alleges that the defendant affected the behavior of third parties, courts do not assume traceability.  To the contrary, standing in this context "is ordinarily 'substantially more difficult' to establish." *California v. Texas*, 593 U.S. 659, 675 (2021).  A causal chain with "numerous third parties . . . whose independent decisions" have a "significant effect" on a plaintiff's injuries is "far too weak" to support standing.  *Allen v. Wright*, 468 U.S. 737, 759 (1984).  Here, Plaintiff's claimed damages depend on "speculation" and "guesswork," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013)—nothing plausibly establishes whether and how frequently customers would have made external payments.  And if those consumers would have made in-app purchases regardless, then Plaintiff's commission payments were the result of intervening, independent choices—destroying any link to *Apple's* conduct.

Article III also bars standing where the alleged injury is "self-inflicted"; that is, traceable to the plaintiff's own choices rather than the defendant's conduct.  *Clapper*, 568 U.S. at 418; *accord Woulfe v. Universal City Studios LLC*, 2023 WL 6151727, *1, *4 (C.D. Cal. Aug. 28, 2023) ("To the extent that an injury is self-inflicted or due to the plaintiff's own fault, the causal chain is broken.").  That principle, too, forecloses standing here.  No customers made linked-out payments to Plaintiff because Plaintiff *did not offer* linked-out payments.  Plaintiff's "voluntary" decision not to apply for a link-out entitlement—as some other developers allegedly did, Compl. ¶ 50—is a "self-inflicted" harm that cannot "create an Article III injury."  *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1176 (9th Cir. 2022).

## 2.  The *Cameron* Settlement Precludes Plaintiff's Claims.

Plaintiff's claims are barred for another threshold reason: they were released and are precluded by Plaintiff's participation in the class-action settlement in *Cameron v. Apple Inc.*, No. 4:19-cv-03074 (N.D. Cal.).  Court-approved settlements "have res judicata effect," *Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1141 (9th Cir. 2013), and may preclude later claims "even though the claim was not presented and might not have been presentable in the [prior] class action," so long as the new claim arises from the same "factual predicate," *Hesse v. Sprint Corp.*, 598 F.3d 581, 590–91 (9th Cir. 2010); *see also Howard v. Am. Online Inc.*, 208 F.3d 741, 747 (9th Cir. 2000) (settlement "unequivocally bars" claims based on identical billing practices).  Preclusion applies even where a plaintiff's later claim is premised

1   on a different theory of anticompetitive conduct, if the factual predicate remains identical. *See Reyn's*

2   *Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006).

3       These standards are met here.  In *Cameron*, Plaintiff and other developers challenged Apple's

4   App Store commission structure under federal antitrust law and California's UCL.  As part of the Au-

5   gust 2021 settlement, approved by the Court in June 2022, those developers "settle[d] the Action in its

6   entirety with respect to all potential claims arising out of the same facts," and "forever released" "any

7   and all past, present, and future claims" that "were brought, could have been brought, or arise from the

8   same facts underlying the claims asserted in the [*Cameron*] Action," including any claims alleging that

9   "commissions charged by Apple on paid downloads or in-app purchases of digital content (including

10   subscriptions) through the App Store are supracompetitive, inflated, or otherwise set at unlawful

11   amounts."  Ex. 4 at 26, 44.  Plaintiff was a member of the class and agreed to these terms. *Id.* at 18.

12       Although Plaintiff now tries to frame its claims around Apple's conduct after the Injunction in

13   *Epic*, the Complaint makes clear that its alleged injury purportedly results from the same commission

14   practices challenged in *Cameron*.  *Compare* Compl. ¶¶ 15, 21, 30, *with* Ex. 3, ¶¶ 3–4, 6, 31, 36, 41,

15   155, 157.  Indeed, Plaintiff's theory here is that "Apple schemed to maintain the status quo, as if no

16   Injunction had entered," Compl. ¶ 51, and that Plaintiff remained subject to the "prior regime" of com-

17   mission rates, *id.* ¶ 30.  The only new element is the assertion that Apple should have further changed

18   those practices in light of the *Epic* Injunction—an allegation that presupposes the same factual predi-

19   cate (Apple's commission model) as *Cameron*.  A post-settlement court order does not reopen claims

20   the parties already resolved, and Plaintiff "cannot artfully plead [its] theories to elude the res judicata

21   bar of its claims." *Turtle Island Restoration Network v. U.S. Dep't of State*, 2010 WL 2836911, at *1,

22   *4 (N.D. Cal. July 19, 2020).  That bar is especially important here:  While Epic obtained an injunction

23   based on its UCL claim, Plaintiff specifically *released* its own UCL claim—yet now invokes Epic's

24   UCL injunction to press claims that arise from the same underlying practices.  Such a maneuver un-

25   dermines the settlement's finality.

26       The relation history of *Cameron*, *Epic*, and this case confirms their factual overlap.  Cases are

27   "related" when they "concern substantially the same parties, property, transaction, or event."  L.R. 3-

28   12(a)(1).  On Plaintiff's motion, this Court related this case with *Epic*.  *See Epic Games, Inc.*, Dkts.

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

1537, 1577. And *Cameron* and *Epic* have likewise been related. *Cameron*, Dkt. 107. All three cases have thus been deemed to concern the same transactions or events. That procedural backdrop illustrates the point: Despite new legal theories, Plaintiff's claims target the same core practices it challenged in *Cameron*. The Complaint is therefore precluded and should be dismissed with prejudice. *See Portnoy v. United States*, 507 F. App'x 736, 737 (9th Cir. 2013) (dismissal with prejudice "proper[]" where complaint is "barred by the doctrine of res judicata"); *Gonzales v. JPMorgan Chase Bank, N.A.*, 2021 WL 1091886, at *2–3 (N.D. Cal. Mar. 22, 2021) (Gonzalez Rogers, J.) (dismissing complaint with prejudice on *res judicata* grounds). Moreover, even if *res judicata* did not cover Plaintiff's claims here, the broad release provision certainly does and equally bars the claims. *See Adams v. Wells Fargo Bank, N.A.*, 2015 WL 1434599, at *2–3 (N.D. Cal. Mar. 30, 2015) (Gonzalez Rogers, J.) (dismissing claim with prejudice because it was "released" as part of a "court-approved class action settlement").

### 3. Plaintiff—A Nonparty To *Epic*—Cannot Enforce The *Epic* Injunction.

All of Plaintiff's claims fail for the additional threshold reason that they seek to enforce an injunction issued in a separate case to which Plaintiff was not a party. That is not a valid basis for suit. An injunction is designed to resolve "a specific dispute between real parties," and the court issuing it "is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762 (1994). As a result, remedies granted in cases cannot be enforced by strangers in collateral proceedings. Just days ago, the Supreme Court affirmed this principle in *Trump v. CASA, Inc.*, stating that "[w]hile party-specific injunctions sometimes advantage nonparties, they do so only incidentally." 2025 WL 1773631, at *11 (June 27, 2025) (quotation marks omitted). "As a matter of law," therefore, an "injunction's protections extend[] only to the suing plaintiff—as evidenced by the fact that *only the plaintiff can enforce the judgment against the defendant*." *Id.* (emphasis added). Accordingly, courts have repeatedly held that nonparty incidental beneficiaries of injunctions "lack standing to enforce" them. *Santore v. Cuomo*, 2020 WL 9810016, at *1–2 (S.D.N.Y. Aug. 14, 2020); *see Fulbright v. Jones*, 2012 WL 4470632, at *1, *4 (W.D. Okla. Aug. 13, 2012) (nonparty "lack[ed] standing" to "enforce the permanent injunction"). Similarly, "*incidental* third-party beneficiaries may not enforce consent decrees." *United States v. FMC Corp.*, 531 F.3d 813, 820 (9th Cir. 2008).

Here, Plaintiff was not a party to *Epic*, was not "named in the" Injunction, and was not "specifically granted" any relief under it. *United States v. Am. Soc'y of Composers, Authors & Publishers*, 341 F.2d 1003, 1008 (2d Cir. 1965). And nothing in the Injunction authorizes enforcement by third parties—nor, as *CASA* makes clear, could it. To the contrary, this Court emphasized that the Injunction was designed to remedy Epic's "*own injuries*" and *disclaimed* that the Injunction was issued "*on behalf of* third parties." *Epic Games*, 2025 WL 1260190, at *1, *32. The Ninth Circuit likewise held the Injunction's scope was "tied to *Epic's* injuries" alone. *Epic Games*, 67 F.4th at 1003 (emphasis added). And Judge Smith, who authored that decision, later reiterated that the Injunction conferred only "incidental benefits to non-parties"—a result that is "inevitable" when a "competitor-plaintiff" wins an injunction regulating a complex marketplace. *Epic Games, Inc. v. Apple Inc.*, 73 F.4th 785, 788 (9th Cir. 2023) (Smith, M., J., concurring in granting motion for stay of mandate).

Assuming that the *Epic* Injunction survives *CASA* at all, Plaintiff cannot invoke those incidental benefits common to all developers to leverage the Injunction into its own nonparty bid for damages. The Complaint masquerades as a series of equitable and tort theories, but those theories require identifying a particular "legal duty." *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 37 (2024); *see also infra* at 19–21. The only purported duty Plaintiff identifies is Apple's obligation to comply with the *Epic* Injunction, mentioning it over 100 times and admitting that "[a]ll claims . . . below and herein arise from Apple's defiance of the Injunction." Compl. ¶ 75; *accord id.* ¶¶ 85, 107. That's the fundamental problem: Plaintiff is not asserting a right conferred by statute, contract, or the Constitution; it is concededly asserting violations of someone else's injunction. Whether Apple complied with that Injunction is relevant in *Epic* itself, where appropriate parties can seek to enforce it. *See CASA*, 2025 WL 1773631, at *10 n.11 (citing Fed. R. Civ. P. 71). But it cannot give rise to a private lawsuit by a nonparty seeking monetary recoveries.

## B. Plaintiff Fails To State A Claim.

Plaintiff's Complaint fails to state a claim for several reasons. The parties' express contract, the DPLA, bars Plaintiff's equitable theories—two of which are not even standalone causes of action. Plaintiff's failure to plead the inadequacy of legal remedies likewise precludes any request for equitable relief. And Plaintiff fails to plausibly allege the basic requirements for a tortious-interference claim,

such as the loss of an almost-certain benefit, the commission of any independently wrongful act, or the presence of any extracontractual duty supporting claims for pure economic loss.

### 1. Plaintiff's Equitable Claims Fail On Four Grounds (Counts I and II).

#### a. The DPLA Bars Plaintiff's Equitable Claims (Counts I and II).

Plaintiff alleges the DPLA "applies to the claims asserted by Plaintiff and the proposed class." Compl. ¶ 73. That concession is fatal to Plaintiff's equitable theories, none of which may proceed under California law in the face of a valid contract. Counts I and II should be dismissed with prejudice.

Start with Plaintiff's quasi-contract claim. Under California law, "a claim for quasi-contract 'cannot lie where there exists between the parties a valid express contract covering the same subject matter.'" *Shin v. Wash. Mut. Bank, F.A.*, 2018 WL 4491185, at *10 (N.D. Cal. Sept. 19, 2018) (Gonzalez Rogers, J.) (quoting *Lance Camper Mfg. Corp. v. Republic Indemn. Co.*, 44 Cal. App. 4th 194, 203 (1996)). Thus, a party to an express contract can maintain a quasi-contract theory only when it alleges "that the express contract is void or was rescinded," *Lance Camper Mfg. Corp.*, 44 Cal. App. 4th at 203; for instance, if "'procured by fraud,'" *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014).

Yet rather than pleading the absence of an express contract, Plaintiff pleads its presence. Compl. ¶¶ 13, 73 & n.59. On its face, the DPLA governs "the same subject matter" as this suit. *Berlanga v. Univ. of S.F.*, 100 Cal. App. 5th 75, 89 (2024). Section 3.4 of the DPLA's "Additional Terms" describes the commissions that Apple collects when developers sell products in-app and that Plaintiff challenges in this suit. *See* Ex. 1, Schedule 3, § 3.4; Compl. ¶¶ 21, 30, 51. And nowhere does Plaintiff plead supporting facts establishing—or even asserting—that the DPLA is "void or was rescinded." *Lance Camper Mfg. Corp.*, 44 Cal. App. 4th at 203. To the contrary, Plaintiff alleges that the DPLA *continues* to bind the parties. Compl. ¶ 73. California law thus bars Plaintiff's quasi-contract theory.

The same is true for Plaintiff's unjust enrichment and constructive-trust claims. Under California law, "[w]hen parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract." *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 172 (2001). Accordingly, "[a]s a matter of law," unjust enrichment is inapplicable

"where the parties have an enforceable express contract." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010); *accord Cal. Med. Ass'n, Inc.*, 94 Cal. App. 4th at 172. That goes for constructive trust under California law too, which is merely a mechanism to redress unjust enrichment. *See Communist Party v. 522 Valencia, Inc.*, 35 Cal. App. 4th 980, 990 (1995) ("The essence of the theory of constructive trust is to prevent unjust enrichment."). The DPLA unambiguously provides that Apple can receive commissions from in-app purchases. There is therefore no "unjust enrichment" when Apple received sums to which the parties agreed in their express contract. *See Cal. Med. Ass'n, Inc.*, 94 Cal. App. 4th at 172.

### b.    Constructive Trust Is Not A Standalone Claim And Fails On The Merits (Count I).

Plaintiff's constructive-trust theory fails on an additional ground: "constructive trust" is not even a standalone cause of action under California law. As noted, "[a] constructive trust is not a substantive device but merely a *remedy*." *Davies v. Krasna*, 14 Cal. 3d 502, 515 (1975). Plaintiff's standalone claim for constructive trust is therefore foreclosed as a matter of law and should be dismissed with prejudice. *See Clark v. Cal. Dep't of Forestry & Fire Prot.*, 212 F. Supp. 3d 808, 812 (N.D. Cal. 2016) (when a "defect is legally incurable, the claim is dismissed with prejudice").

But even if constructive trust were an independent cause of action, Plaintiff fails to plausibly plead either of its key elements: that (1) the defendant possesses specific identifiable property, and (2) such property can be traced back to Plaintiff. Constructive-trust claims are not merely damages claims against general assets, *see BGJ Assocs., LLC v. Superior Ct.*, 75 Cal. App. 4th 952, 968–69 (1999), but instead are designed to secure the return of "*specific identifiable property*" of the plaintiff in the defendant's possession, *Michaelian v. State Comp. Ins. Fund*, 50 Cal. App. 4th 1093, 1114 (1996) (emphasis added). As a result, the "[p]leading requirements" for constructive trust include alleging the "specific identifiable property" at issue. *Id.*; *see also Stansfield v. Starkey*, 220 Cal. App. 3d 59, 76 (1990) ("specific identifiable property is a prerequisite" for "a constructive trust" theory). And for funds to be recoverable under a constructive-trust theory, the plaintiff must show that the misappropriated funds can "*clearly* be traced to particular funds or property in the defendant's possession." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003) (emphasis added); *see Optional*

*Cap., Inc. v. DAS Corp.*, 222 Cal. App. 4th 1388, 1402 (2014) (plaintiff must "trace the funds to monies in the defendant's possession"). Thus, when "[t]he recovery requested … cannot be traced to any particular funds in [the defendant's] possession," those funds are "not the proper subject of a constructive trust." *Korea Supply Co.*, 29 Cal. 4th at 1150. The Complaint fails each requirement.

**No Specific, Identifiable Property.** The Complaint never pleads that Apple misappropriated any specific asset or identifiable tranche of funds belonging to Plaintiff. Instead, the Complaint's constructive-trust count vaguely pleads that Plaintiff was "deprived of . . . direct engagement with [its] own customers." Compl. ¶ 91. But abstract "engagement" is not specific, identifiable property. And the Complaint *never enumerates* the amount of funds in Apple's possession that supposedly belongs to Plaintiff. At most, the Complaint offers far-reaching claims about vague, speculative amounts of funds that *all developers* were collectively deprived of as a result of Apple's asserted noncompliance with the *Epic* Injunction. *See id.* ¶ 51 ("billion dollar . . . revenue stream"); ¶ 58 ("'hundreds of millions to billions'"); ¶ 59 ("potentially billions"); ¶ 79 ("hundreds of millions or even billions"). And the Complaint eventually admits that Plaintiff simply does not know whether Apple possesses *any* wrongfully earned commissions. *See id.* ¶ 68(b). It is no wonder that Plaintiff cannot describe any "specific identifiable property" in Apple's possession that was misappropriated from Plaintiff. *Michaelian*, 50 Cal. App. 4th at 1114. As discussed above, Plaintiff's theory of economic harm amounts to a thought experiment about the number of customers that *might have* used Plaintiff's linked-out payments *if* Plaintiff had offered them. *See supra* at 5–9.

That Plaintiff seeks the return of fungible dollars, rather than any individual assets, further undermines the notion that Plaintiff seeks the return of specific, identifiable property. Of course, "it is not necessary that each coin or bill be earmarked." *Fischer v. Machado*, 50 Cal. App. 4th 1069, 1072 (1996). But Plaintiff must at least assert "a specific sum" that Apple misappropriated for any amount of money to be "capable of identification" as Plaintiff's. *Id.* At best, Plaintiff asserts a "generalized claim for money," which is *not* a claim for "specific, identifiable sums" that Apple wrongfully obtained. *Vu v. Cal. Com. Club., Inc.*, 58 Cal. App. 4th 229, 235 (1997).

**No Tracing.** To sustain a constructive-trust theory, a plaintiff must establish that some property originally "belonging in good conscience to the plaintiff" can "*clearly* be traced to particular funds or

property in the defendant's [wrongful] possession." *Korea Supply Co.*, 29 Cal. 4th at 1150 (emphasis added). For the reasons already stated, *no* specific funds are alleged to be in Apple's possession that can be traced to the challenged conduct. Whether and how many customers would have used Plaintiff's hypothetical link-out option, had Plaintiff even offered it, requires extensive speculation—necessarily defeating the notion that funds "clearly" can be traced *from* Plaintiff's possession *to* Apple's. And the mere fact that Apple *received* commissions does nothing to show that those commissions belonged *to Plaintiff*. Bare receipt of commissions has a perfectly lawful "obvious alternative explanation"—consumer choice—which belies the notion that Plaintiff plausibly pleaded that Apple is the constructive trustee of *wrongfully* received sums. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 557 (2007).

### c.  Unjust Enrichment Is Not A Standalone Claim (Count II).

Plaintiff's purported "cause of action" for unjust enrichment, Compl. p. 22, should likewise be dismissed—independent of the DPLA—because it is well-established that "there is no cause of action in California for unjust enrichment," *Everett v. Mountains Recreation & Conservation Auth.*, 239 Cal. App. 4th 541, 553 (2015) (affirming dismissal of unjust-enrichment claim); *accord City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477 (2022). Nor is unjust enrichment "even a remedy." *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004). Rather, it is simply "a general principle" that underlies various *other* "legal doctrines and remedies." *Id.* (quotation marks omitted). Plaintiff's assertion of a standalone cause of action for unjust enrichment is thus barred as a matter of law and should be dismissed with prejudice. *See Clark*, 212 F. Supp. 3d at 812.

### d.  Plaintiff's Failure To Plead The Inadequacy Of Legal Remedies Also Bars Its Equitable Theories (Counts I and II).

A party seeking equitable relief "must establish that she lacks an adequate remedy at law" to redress the asserted harm. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020); *see O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). Plaintiff's claims for constructive trust, unjust enrichment, and quasi-contract are each equitable in nature. *See Sepanossian v. Nat'l Ready Mixed Concrete Co.*, 97 Cal. App. 5th 192, 207 (2023) ("[A]n unjust enrichment claim is grounded in equitable principles."); *Welborne v. Ryman-Carroll Found.*, 22 Cal. App. 5th 719, 725 (2018) ("A cause of action for quasi-contract invokes consideration of equitable principles."); *Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (2014) ("The issue of whether to impose a constructive trust is an equitable issue for the

court."). So too are the demanded equitable remedies of restitution and disgorgement. *See Sonner*, 971 F.3d at 844 (restitution); *Ctr. for Healthcare Educ. & Rsch., Inc. v. Int'l Cong. for Joint Recon-struction, Inc.*, 57 Cal. App. 5th 1108, 1125 (2020) (disgorgement). But Plaintiff has not alleged that legal remedies would be inadequate to address its purported harms.

The Complaint does not allege that monetary damages would be inadequate to redress the com-missions Plaintiff claims it should not have paid. To the contrary, Plaintiff requests money damages, presumably under its tort theory, *see* Compl. Prayer for Relief—and nowhere alleges, as required, that those legal damages are inadequate. That pleading failure is fatal. *See Margolis v. Apple Inc.*, 743 F. Supp. 3d 1124, 1138 (N.D. Cal. 2024) (dismissing equitable claim where plaintiffs did not allege "that damages or other legal remedies are inadequate to remedy the harms they allegedly suffered"); *Roffman v. Rebbl, Inc.*, 653 F. Supp. 3d 723, 731 (N.D. Cal. 2023) (similar); *Sharma v. Volkswagen AG*, 524 F. Supp. 3d 891, 909 (N.D. Cal. 2021) (similar). Because Plaintiff has failed to plead that legal remedies are insufficient, its equitable claims should be dismissed, and its requests for equitable remedies denied.

## 2. Count III Fails Because Plaintiff Does Not Plausibly Allege Tortious Interference With Any Business Expectancy.

Plaintiff's claim for tortious interference with business expectancy, Compl. ¶¶ 104–09, should also be dismissed with prejudice. Plaintiff asserts that Apple acted tortiously by enacting policies that supposedly affected "expected business relationships" between developers and customers. *Id.* ¶¶ 106, 108. But a generalized duty not to "interfere" with business relationships is nowhere in the DPLA, in which Plaintiff agreed that Apple has discretion to curate the App Store in a variety of ways, *see, e.g.*, Ex. 1, §§ 2.1, 2.6, 2.8, 3.1(c), 3.2, 3.3.3(C)–(D), even if those measures may disrupt developers' incho-ate business hopes. Nor does tort law supply such a duty. Indeed, California has long recognized "the dangers inherent in imposing tort liability" on businesses for their decisions about how to compete in the marketplace. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1137 (1990).

Consistent with that warning, courts enforce a "rigorous pleading burden" on plaintiffs asserting interference claims. *Korea Supply Co.*, 29 Cal. 4th at 1158. A plaintiff must establish "'(1) an eco-nomic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [or negligent]

acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the rela-

tionship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.'"

*Crown Imps., LLC v. Superior Ct.*, 223 Cal. App. 4th 1395, 1404 (2014) (alteration in original).  The

Complaint fails to satisfy those standards.  It fails to plead that Plaintiff lost any cognizable business

expectancy, that any alleged "interference" was unlawful under California law, or, relatedly, that its

claims for pure economic loss may proceed in the absence of any duty by Apple to prevent it.

### a.  Plaintiff Fails To Plausibly Allege The Loss Of Practically Certain Economic Benefits.

The Complaint fails to establish the loss of any potential economic benefit cognizable under

California law.  "[C]ourts have narrowly construed this element," *Republican Nat'l Comm. v. Google

LLC*, 742 F. Supp. 3d 1099, 1122 (E.D. Cal. 2024), "to avoid promoting speculative claims," *Roy Allan

Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 518 (2017).  Courts thus "requir[e] specific

facts to show that a benefit was almost certain," *Republican Nat'l Comm.*, 742 F. Supp. 3d at 1122,

such as "which entities" the plaintiff "was negotiating with," "the terms" of their agreement, and "how

much money, if any, Plaintiff lost as a result" of the defendant's interference, *Soil Retention Prods.,

Inc. v. Brentwood Indus., Inc.*, 521 F. Supp. 3d 929, 962 (S.D. Cal. 2021).  An interference claim is not

available as a matter of law when a plaintiff's theory "hinge[s] on a high degree of uncertainty," such

as when third parties "retain[] discretion" to reject a business offer, *Roy Allan Slurry Seal, Inc.*, 2 Cal.

5th at 519 (affirming dismissal on pleadings), or when the plaintiff claims the loss of access to "un-

known purchasers," *Asia Inv. Co. v. Borowski*, 133 Cal. App. 3d 832, 841 (1982); *see Westside Ctr.

Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 524 (1996) (interference tort does not protect

the "speculative expectation that a potentially beneficial relationship will eventually arise").

The Complaint fails those pleading requirements.  As explained above (*see supra* at 5–9), Plain-

tiff never offered linked-out payments; merely "intends" to at some unspecified future point, Compl.

¶ 18; never plausibly pleads that this option would have saved it money; admits that even had it offered

linked-out payments, customers would have retained a "choice" whether to use them, *id.* ¶ 3; and never

pleads how many customers would have used this hypothetical linked-out payment option or why they

would have done so.  Indeed, a key question to be resolved, according to Plaintiff's own allegations, is

1    "[w]hether" it was even "harmed," given the complexities of consumer behavior. *Id.* ¶ 68(d).

2         Plaintiff's claim is thus far afield from the typical tortious-interference scenario involving a

3    contract with a known counterparty to achieve a determinable economic expectancy. *Korea Supply*

4    *Co.*, 29 Cal. 4th at 1164. Quite the opposite: Far from alleging "specific facts" to substantiate the loss

5    of an "almost certain" benefit, *Republican Nat'l Comm.*, 742 F. Supp. 3d at 1122, the Complaint results

6    in precisely the "high degree of uncertainty" that dooms tortious interference claims, *Roy Allan Slurry,*

7    *Inc.*, 2 Cal. 5th at 519. California courts have not hesitated to dismiss complaints containing analogous

8    pleading defects. *See, e.g.*, *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 639 (2021) ("Merely referring

9    to unidentified 'repeat buyers' is insufficient, when there are no facts to show that the unidentified

10   buyers were likely to purchase the unidentified listings that were supposedly 'hidden.'").

11                   **b.    Plaintiff Pleads No Independently Wrongful Acts.**

12        The Complaint also fails to plead that Apple engaged in any independently wrongful act sepa-

13   rate from the alleged interference itself. To distinguish lawful competitive behavior from illegitimate

14   interference, the "plaintiff must plead that the defendant engaged in an independently wrongful act."

15   *Korea Supply Co.*, 29 Cal. 4th at 1158; *see Metro Servs. Grp. v. Travelers Cas. & Sur. Co. of Am.*,

16   2021 WL 2633416, at *5 (N.D. Cal. June 25, 2021) (Gonzalez Rogers, J.). In other words, the defend-

17   ant's behavior must not only interfere with an economic relationship, but also must be "proscribed by

18   some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea*

19   *Supply Co.*, 29 Cal. 4th at 1159.

20        The Complaint pleads no independently wrongful act. Plaintiff complains that Apple sought to

21   "illicitly retain [its] revenue stream," Compl. ¶ 4, but a purportedly "improper motive" alone cannot

22   demonstrate an independently wrongful act for purposes of an interference claim, *Korea Supply Co.*,

23   29 Cal. 4th at 1158. And the Complaint makes no attempt to show that Apple transgressed "some

24   constitutional, statutory, regulatory, common law, or other determinable legal standard," *id.* at 1159,

25   aside from the *Epic* Injunction. *See* Compl. ¶ 75. As explained, *see supra* at 11–12, Plaintiff is not

26   entitled to collaterally enforce that Injunction in a separate lawsuit for damages. Plaintiff therefore

27   fails to identify any applicable legal standard in support of its interference claim.

28

### c.     The DPLA Bars Plaintiff From Asserting Non-Contractual Causes Of Action For Economic Loss.

Similarly, Plaintiff fails to identify any recognized "legal duty" that Apple violated—a prereq-uisite for tort liability. *Rattagan*, 17 Cal. 5th at 37.  Identifying such a duty is crucial when the parties' relationship is governed by an express contract and the plaintiff, as here, sues for economic loss.  That is because California's economic-loss rule generally bars parties to a contract from recovering "dam-ages that are solely monetary" through anything other than a breach-of-contract claim.  *Rattagan v. Uber Techs., Inc.*, 19 F.4th 1188, 1191 (9th Cir. 2021).  An extra-contractual claim for economic loss is permitted only if a plaintiff can demonstrate the "violation of some independent duty arising in tort." *Id.*; *see, e.g.*, *Ace Am. Ins. Co. v. Accellion, Inc.*, 2022 WL 2341155, at *6 (N.D. Cal. Apr. 11, 2022) (Gonzalez Rogers, J.) (dismissing claim that was "not independent of" underlying contract).

Yet the only source of duty Plaintiff conjures—the Injunction—is plainly deficient.  Apple does not owe a duty *to Plaintiff* to abide by the Injunction.  As explained above, Plaintiff is neither a party to *Epic* nor an intended beneficiary of the Injunction.  And Plaintiff offers no backstop to remedy that defect.  Plaintiff does not assert a breach-of-contract claim, nor could it.  Apple received exactly what the DPLA entitles it to—commissions for in-app purchases.  Having entered the DPLA with Apple, Plaintiff is limited to enforcing "such obligations as each party voluntarily assumed." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 517 (1994).  Nor is there any basis to imply some duty *beyond* the DPLA or the U.S. StoreKit Addendum to the DPLA, whereby Apple would owe Plain-tiff some special duty to facilitate external links.  Apple is not a fiduciary, nor does it owe Plaintiff a professional standard of care; much less do any other recognized "special duties" apply here. *Progres-sive W. Ins. Co. v. Superior Ct.*, 135 Cal. App. 4th 263, 277 (2005).  Plaintiff cannot invent a tort duty to facilitate a standalone case where precedent forecloses its ability to rely on the Injunction directly.

This case illustrates why courts do not permit tort claims for economic loss where the chal-lenged conduct is authorized by contract.  Were Plaintiff's theory accepted, any new Guideline that might affect a developer's revenue, even if permitted by the DPLA, could be labeled "tortious" and be used as a springboard for litigation.  And *any* antitrust injunction against a tech platform would invite suit from third-party developers for alleged non-compliance.  That would gut the economic-loss rule

1    and erase the line between contract and tort.  California law does not allow that result.

2        **C.    The Complaint's Class Allegations Should Be Struck Under Rule 12(f).**

3        Even if the Court concludes that Plaintiff can proceed on some of its claims, the Court should

4    nonetheless strike Plaintiff's class allegations under Rule 12(f) because it is facially apparent that "a

5    class action cannot be maintained on the facts alleged." *Sanders*, 672 F. Supp. 2d at 990.  Plaintiff

6    seeks certification of both injunctive and damages classes. *See* Compl. ¶ 63.  But the threshold require-

7    ments for either are unsatisfied.

8        *No Injunctive Class.*  The Complaint never actually requests an injunction or even a declaratory

9    judgment. *See* Compl. Prayer for Relief.  But Plaintiff does (vaguely) suggest that it seeks certification

10   of an injunctive class under Rule 23(b)(2), and possibly under Rule 23(b)(1).  *See id.* ¶ 63 (broadly

11   citing Rule 23(b)(1), (2), and (3) with no explanation).  To be clear: as a matter of law, neither basis

12   for an injunctive class is available here.  Rule 23(b)(1)(A) does not permit certification in an "action

13   for damages," *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001), and Rule 23(b)(2)

14   likewise does not permit certification "when each class member would be entitled to an individualized

15   award of monetary damages," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360–61 (2011).  Nor does

16   the Complaint describe the "contours of an injunction that would provide relief to the whole class."

17   *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014).  Instead, Plaintiff's remedial theory turns

18   entirely on the notion that Apple must pay money for commissions it allegedly wrongfully obtained.

19   *See* Compl. Prayer for Relief.  The injunctive-class allegations should be struck.

20       *No Rule 23(b)(1)(B) Damages Class.*  Certification under Rule 23(b)(1)(B) is similarly inap-

21   propriate.  That Rule is narrowly construed because of its mandatory consequences on absent class

22   members. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845–46 (1999).  It applies only where "separate

23   actions inescapably will alter the substance of the rights of others having similar claims." *McDonnell-*

24   *Douglas Corp. v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 523 F.2d 1083, 1086 (9th Cir. 1975) (quotation

25   marks omitted).  In practical terms, Rule 23(b)(1)(B) is restricted to "limited fund" scenarios—where

26   a capped pool must be distributed among claimants pro rata—because distribution of a zero-sum fund

27   to some individuals necessarily prejudices others with competing claims. *Zinser*, 253 F.3d at 1197.

28   But Plaintiff identifies no such fund, never suggests Apple is "[in]solvent" (nor could it), and makes

1    no attempt to explain why this Rule applies here. *Id.* These allegations should also be struck.

2        ***No Rule 23(b)(3) Damages Class.*** Finally, the Complaint seeks certification of a damages class

3    under Rule 23(b)(3). That rule requires not just common, classwide "questions of law or fact" but also

4    that those questions "predominate over any questions affecting only individual members" of the class.

5    Fed. R. Civ. P. 23(b)(3).[3] The predominance standard is "far more demanding" than commonality

6    alone—and bars certification where there are a "great[] number of questions peculiar" to individual

7    class members. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). A proposed class also

8    fails predominance when the plaintiff "cannot prove that damages resulted from the defendant's con-

9    duct" for portions of the class. *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020).

10       Plaintiff's proposed damages class fails those standards. "Calculating the damages" for the sort

11   of harm at issue here was too "speculative" even on an *individual* basis in *Epic*, which was the only

12   reason an injunction could issue there in the first place. 67 F.4th at 1003. Plaintiff's classwide damages

13   theory, premised on a hypothetical alternate universe, turbocharges that problem. While it is "entirely

14   speculative and beyond the competence of a judicial proceeding to create in hindsight a technological

15   universe that never came into existence"—and "even more speculative to determine the relevant ben-

16   efits," including "monetary value," that might have resulted—doing so as to *thousands* of developers

17   is infinitely more complicated still. *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006).

18       This Court need not undertake that Sisyphean task because Plaintiff's invitation to do so is

19   riddled with procedural flaws. Its proposed class includes *all* app developers who "offered in-app

20   products (including subscriptions) for a non-zero price during the Class Period" (that is, after January

21   17, 2024). Compl. ¶¶ 64–65. But it contains no requirement that class members ever intended or

22   wanted to offer linked-out payments. The proposed class is thus "defined so broadly" as to sweep in

23   developers who were content with in-app payments, never had any intention of offering linked-out

24   payments, and suffered no possible injury from Apple's purported suppression of linked-out payments.

25   *Castillo*, 980 F.3d at 730 (rejecting overbroad class that included uninjured members).

26       Even among developers who might have wished to offer linked-out payments, individualized

27   _____

28   [3] Though Apple focuses on predominance here, it reserves all rights to challenge class certification on additional bases at appropriate stages of the case.

issues abound on the face of the Complaint. For example, developers would vary in:

- Whether, when, and for how many apps they sought to implement linked-out payments;
- How they would have implemented link-outs, which the Complaint says would have been non-standardized and independently designed, Compl. ¶¶ 46–47;
- How they would have priced link-out transactions;
- Whether their implementation would have been attractive enough to shift consumer behavior;
- If so, how many customers would have shifted their behavior;
- The rates charged by whichever payment-processing service the developer elected to use, which the Complaint admits can vary, *id.* ¶ 30; and
- Whether they (especially small developers) would have saved money after expending the costs to design and implement linked-out payments, including payment of external processing fees.

These inquiries cannot be answered on a classwide basis. In short, because of the layers of variation among class members, determining whether and to what extent any given class member was economically harmed "would require" an enormous series of "highly individualized inquiries." *Castillo*, 980 F.3d at 730. That defeats predominance on the face of the Complaint and precludes certification under Rule 23(b)(3). These allegations, too, should be struck.

**D.    This Case Should Be Stayed Pending Resolution Of The *Epic* Appeal.**

The Court should also stay all further proceedings—including, if it wishes, this motion to dismiss—until the Ninth Circuit's mandate issues in the expedited appeal in *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir.). That appeal concerns the meaning and enforceability of the same Injunction on which Plaintiff's claims depend. Its resolution will almost certainly clarify—or foreclose—key claims in this case, and it may materially alter the legal framework for evaluating Apple's threshold defenses. At a minimum, it is likely to narrow the scope of discovery and the legal issues in dispute. A stay is thus warranted—whether now (as an alternative to deciding this motion to dismiss) or after this motion is decided.

Courts have broad discretion to "stay proceedings" where doing so would promote "economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A court may "find it is efficient for its own docket and the fairest course for the parties to enter

1   a stay of an action before it, pending resolution of independent proceedings which bear upon the case."

2   *Robinson v. Dignity Health*, 2016 WL 7102832, at *2 (N.D. Cal. Dec. 6, 2016) (Gonzalez Rogers, J.)

3   (quoting *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979)). In deciding

4   whether to exercise its discretion, a court assesses "[1] the possible damage which may result from the

5   granting of a stay, [2] the hardship or inequity which a party may suffer in being required to go forward,

6   and [3] the orderly course of justice measured in terms of the simplifying or complicating of issues,

7   proof, and questions of law which could be expected to result from a stay." *Id.* (quoting *CMAX, Inc.*

8   *v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962)). All three factors strongly favor a stay here.[4]

9       First, and most crucially, staying this case until *Epic* is resolved would simplify the issues and

10  promote the orderly course of justice. "Considerations of judicial economy are highly relevant" in

11  evaluating this factor. *Prescott v. Nestle USA, Inc.*, 2020 WL 7053317, at *5 (N.D. Cal. Nov. 25,

12  2020). All three of Plaintiff's claims are built on Apple's alleged failure to comply with the Injunction

13  issued in *Epic* after the 2021 bench trial. Its theory relies not just on the existence of that Injunction,

14  but on the interpretation of its scope reflected in this Court's April 2025 contempt order—an order now

15  on expedited appeal. Setting aside the merits of that order here, the Ninth Circuit may ultimately adopt

16  a different view of what the Injunction required and whether Apple violated it. If so, that ruling may

17  eliminate or at least narrow Plaintiff's claims, thus "simplify[ing] issues, proof, and questions of law."

18  *In re RH S'holder Derivative Litig.*, 2019 WL 580668, at *4 (N.D. Cal. Jan. 23, 2019) (Gonzalez Rog-

19  ers, J.). The likelihood that "major issues in this case will be clarified by a ruling" in *Epic* supports a

20  stay. *Phan*, 2023 WL 7597464, at *4; *cf. Grecia v. Adobe Inc.*, 2018 WL 6523983, at *3 (N.D. Cal.

21  Dec. 12, 2018) (Gonzalez Rogers, J.) (granting stay where appellate "ruling will directly and preceden-

22  tially inform this Court's analysis"); *Robinson*, 2016 WL 7102832, at *2 (granting stay given "high

23  likelihood" that decision in related case would "affect the decision" on plaintiff's claims).

24       Second, forcing the parties to press forward now would impose significant burdens, further

25  supporting a stay. Litigating class allegations, responding to discovery, and engaging in potentially

---

[4] The standard for stays pending decision in a "separate action" is "different" than the standard for
stays "pending an appeal *in the same action*." *Robledo v. Randstad US, LP*, 2017 WL 4934205, at *4
(N.D. Cal. Nov. 1, 2017). The standard applicable here does *not* involve assessing the "likelihood of
success" in *Epic*. *Phan v. Transamerica Premier Life Ins. Co.*, 2023 WL 7597464, at *4 (N.D. Cal.
Nov. 13, 2023). And staying this case poses no risk of Apple's underlying conduct continuing.

DEFENDANT APPLE INC.'S MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

Gibson, Dunn &
Crutcher LLP

1   unnecessary motions practice would require substantial time and expense by Apple and the Court alike.

2   Those "efforts" could be "rendered moot and unnecessary" if the Ninth Circuit reverses or narrows the

3   contempt ruling. *Phan*, 2023 WL 7597464, at *4 (holding that "both parties and the Court would be

4   harmed if the stay is denied"). Denying a stay in such circumstances therefore "risks forcing the parties

5   to expend resources that could have been avoided." *Robledo*, 2017 WL 4934205, at *4. Moreover, if

6   this Court issues rulings that turn out to "conflict[]" with the Ninth Circuit's eventual decision in *Epic*,

7   including on possible privilege issues, the Court would "need to reconsider its ruling[s]," further wast-

8   ing judicial resources. *Phan*, 2023 WL 7597464, at *4. Apple has also requested reassignment in *Epic*,

9   and it makes little sense for the Court to devote resources to this related case if it travels with the *Epic*

10  reassignment. Avoiding such wasteful outcomes is precisely the role of a discretionary stay.

11  Third, Plaintiff, by contrast, would suffer no material harm from a stay. This case remains at

12  the pleading stage. No discovery has begun, no class has been certified, and no deadlines have been

13  set. Plaintiff identifies no time-sensitive interest that would be impaired by a short delay. There is no

14  claim of ongoing harm, and no form of urgent relief requested. In any event, as this Court has recog-

15  nized, delay alone does not defeat a stay. *See SST Millennium LLC v. Mission St. Dev. LLC*, 2019 WL

16  2342277, at *5 (N.D. Cal. June 3, 2019) (Gonzalez Rogers, J.) (harm from delay minimal where sepa-

17  rate proceedings "likely will conclude within a reasonable time"); *see also McElrath v. Uber Techs.,*

18  *Inc.*, 2017 WL 1175591, at *5 (N.D. Cal. Mar. 30, 2017) (any harm resulting from stay pending Su-

19  preme Court decision would be "minimal"). Moreover, the "Ninth Circuit has made clear" that "mon-

20  etary recovery cannot serve as the foundation for the denial of a stay." *Robledo*, 2017 WL 4934205,

21  at *3 (citing *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1100 (9th Cir. 2005)).

22  Because staying this case would promote judicial efficiency, reduce unnecessary burdens, and

23  clarify the governing legal framework, the Court should exercise its discretion to stay all further pro-

24  ceedings—including, if it wishes, this motion to dismiss—pending final resolution of the *Epic* appeal.

## V.    CONCLUSION

26  For these reasons, the Court should dismiss the Complaint with prejudice under Rules 12(b)(1)

27  and 12(b)(6) and strike Plaintiff's class allegations under Rule 12(f) or, in the alternative, stay

28  proceedings pending issuance of the mandate in *Epic*.

1

2    Dated:  June 30, 2025                                    GIBSON, DUNN & CRUTCHER LLP

3

4                                                             */s/ Julian W. Kleinbrodt*
                                                             Julian W. Kleinbrodt

5                                                             *Attorney for Defendant Apple Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit B

1  DANIEL G. SWANSON, SBN 116556
       dswanson@gibsondunn.com
2  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
3  Los Angeles, CA  90071
   Telephone:    213.229.7000
4  Facsimile:    213.229.7520

5  CYNTHIA E. RICHMAN (*pro hac vice*)
       crichman@gibsondunn.com
6  ZACHARY B. COPELAND (*pro hac vice*)
       zcopeland@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   1700 M Street, N.W.
8  Washington, DC  20036
   Telephone:    202.955.8500
9  Facsimile:    202.467.0539

10  JULIAN W. KLEINBRODT, SBN 302085
        jkleinbrodt@gibsondunn.com
11  GIBSON, DUNN & CRUTCHER LLP
    One Embarcadero Center, Suite 2600
12  San Francisco, CA  94111
    Telephone:    415.393.8200
13  Facsimile:    415.393.8306

14

15  *Attorneys for Defendant Apple Inc.*

16  **UNITED STATES DISTRICT COURT**

17  **NORTHERN DISTRICT OF CALIFORNIA**

18  **OAKLAND DIVISION**

| | |
|---|---|
| 19  PURE SWEAT BASKETBALL INC., on behalf of itself and all others similarly situated, | Case No. 4:25-cv-03858-YGR |
| 20                          Plaintiff, | **DEFENDANT APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT, STRIKE CLASS ALLEGATIONS, OR STAY PROCEEDINGS** |
| 21          v. | |
| 22  APPLE INC., a California corporation, | |
| 23                          Defendant. | **Hearing:** |
| 24 | Date:      September 23, 2025 |
|    | Time:      2:00 p.m. |
| 25 | Place:     Courtroom 1 |
|    | Judge:     Hon. Yvonne Gonzalez Rogers |

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  I.    INTRODUCTION ........................................................................................................... 1

4  II.   ARGUMENT ................................................................................................................... 2

5        A.   Plaintiff Fails To Overcome The Complaint's Multiple Threshold Defects. .............. 2

6             1.   Plaintiff Concededly Cannot Enforce The *Epic* Injunction. ............................ 2

7             2.   Plaintiff's Opposition Confirms Its Standing Arguments Are
                   Speculative. ....................................................................................................... 3

8
9             3.   *Cameron* And This Suit Have An Identical Factual Predicate. ....................... 6

10       B.   Plaintiff Fails To State A Claim..................................................................................... 8

11            1.   Plaintiff's Quasi-Contract Claim Fails (Counts I and II). ................................. 8

12                 a.   The DPLA Bars Plaintiff's Quasi-Contract Claim ............................... 8

                       b.   Plaintiff's Requested Equitable Remedies Fail.................................... 10

13            2.   Count III Fails Because Plaintiff Does Not Plausibly Allege Tortious
                   Interference With Any Business Expectancy.................................................... 12

14
15                 a.   Plaintiff Identifies No Practically Certain Economic Benefits It
                       Lost...................................................................................................... 12

16                 b.   Alleged Violations Of The Injunction Cannot Support
                       Plaintiff's Claim. ................................................................................. 13

17                 c.   The DPLA Bars Plaintiff From Pursuing Claims For Economic
                       Loss. .................................................................................................... 13

18       C.   The Complaint's Class Allegations Should Be Struck Under Rule 12(f).................... 14

19       D.   This Case Should Be Stayed Pending Resolution Of The *Epic* Appeal. ................... 15

20  III.  CONCLUSION ............................................................................................................. 15

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ......................................................................................................... 5

*Bain v. Cal. Teachers Ass'n*,
891 F.3d 1206 (9th Cir. 2018) ....................................................................................... 4

*Barrientos v. Wells Fargo Bank, N.A.*,
633 F.3d 1186 (9th Cir. 2011) ....................................................................................... 3

*Becker v. North Dakota Univ. Sys.*,
112 F.4th 592 (8th Cir. 2024) ........................................................................................ 5

*Berlanga v. Univ. of San Francisco*,
100 Cal. App. 5th 75 (2024) ........................................................................................... 8

*Birdsong v. Apple Inc.*,
590 F.3d 955 (9th Cir. 2009) .......................................................................................... 6

*Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*,
94 Cal. App. 4th 151 (2001) ........................................................................................ 10

*Cepelak v. HP Inc.*,
2021 WL 5298022 (N.D. Cal. Nov. 15, 2021) .............................................................. 11

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ........................................................................................ 7

*Diamond Alt. Energy LLC v. Env't Prot. Agency*,
145 S. Ct. 2121 (2025) .................................................................................................... 6

*Eisenberg v. Alameda Newspapers, Inc.*,
74 Cal. App. 4th 1359 (1999) ......................................................................................... 9

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ..................................................................................... 6, 12

*Falkowski v. Imation Corp.*,
132 Cal. App. 4th 499 (2005) ......................................................................................... 9

*Feller v. Transamerica Life Ins. Co.*,
2016 WL 6602561 (C.D. Cal. Nov. 8, 2016) ................................................................. 7

*Grecia v. Adobe, Inc.*,
2018 WL 6523983 (N.D. Cal. Dec. 12, 2018) .............................................................. 15

*Greer's Ranch Café v. Guzman*,
540 F. Supp. 3d 638 (N.D. Tex. 2021) ........................................................................... 5

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010)..................................................................................7

*Isaacson v. Mayes*,
84 F.4th 1089 (9th Cir. 2023).................................................................................4

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) .........................................................................11, 12, 13

*Lance Camper Mfg. Corp. v. Republic Indemn. Co.*,
44 Cal. App. 4th 194 (1996)..................................................................................8

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).................................................................................................4

*Madsen v. Boise State Univ.*,
976 F.2d 1219 (9th Cir. 1992).................................................................................5

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994).................................................................................................3

*Malfatti v. Mortg. Elec. Registration Sys.*,
2012 WL 440718 (N.D. Cal. Feb. 10, 2012).........................................................8

*Michaelian v. State Comp. Ins. Fund*,
50 Cal. App. 4th 1093 (1996)...............................................................................11

*Murthy v. Missouri*,
603 U.S. 43 (2024)...................................................................................................5

*O'Shea v. Littleton*,
414 U.S. 488 (1974)......................................................................................10, 11

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999).............................................................................................14

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001)..................................................................................7

*Peterson v. Cellco P'ship*,
164 Cal. App. 4th 1583 (2008).............................................................................10

*Peterson v. Highland Music, Inc.*,
140 F.3d 1313 (9th Cir. 1998)................................................................................3

*Pulte Home Corp. v. Am. Safety Indemn. Co.*,
14 Cal. App. 5th 1086 (2017)................................................................................5

*Rattagan v. Uber Techs., Inc.*,
19 F.4th 1188 (9th Cir. 2021)...............................................................................14

# TABLE OF AUTHORITIES
### (Continued)

<u>Page(s)</u>

*Reis v. McKinsey & Co.*,
   2025 WL 1809737 (N.D. Cal. June 30, 2025) ................................................................11

*Repub. Nat'l Comm. v. Google LLC*,
   742 F. Supp. 3d 1099 (E.D. Cal. 2024) ..................................................................12, 13

*Sanders v. Apple Inc.*,
   672 F. Supp. 2d 978 (N.D. Cal. 2009) ...........................................................................14

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) .........................................................................................10

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .........................................................................................................4

*Thomas v. Anchorage Equal Rts. Comm'n*,
   220 F.3d 1134 (9th Cir. 2000) .........................................................................................4

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540 (2025) ...........................................................................................1, 2, 13

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
   42 Cal. App. 4th 507 (1996) ....................................................................................12, 13

*Yearby v. Am. Nat'l Ins. Co.*,
   2021 WL 3855833 (N.D. Cal. Aug. 30, 2021) .................................................................7

*Zinser v. Accufix Rsch. Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) .......................................................................................14

*Zumbrun v. Univ. of S. Cal.*,
   25 Cal. App. 3d 1 (1972) ...............................................................................................11

### Rules

Fed. R. Civ. P. 8(a)(3) .............................................................................................................11

APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

# I.    INTRODUCTION

Plaintiff's opposition trips over itself in running away from the claims Plaintiff actually brought. The Complaint roots every cause of action in "the [*Epic*] Injunction," asserting that "[a]ll claims for relief … arise from Apple's defiance of th[at] Injunction."  Compl. ¶¶ 75, 78, 100, 107.  Yet in the wake of *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), Plaintiff tries to disclaim any intent to "'enforce obedience' with the *Epic* injunction," admits that it is "foreclosed" from doing so, and retreats to "'general dut[ies]'" supposedly found in California law, Opp. 10—only to then swing back to arguing that the "operative facts" are "Apple's scheme to defy the injunction" and the Injunction is the "independent legal standard" on which Plaintiff's claims are premised.  *Id.* at 8, 17.  That incoherence exposes this lawsuit's chief flaw:  Plaintiff cannot circumvent its inability to enforce the Injunction by bootstrapping claims from "'general dut[ies]'" based on the same Injunction.  *Id.* at 10.

Plaintiff's responses to the Complaint's other threshold defects fare no better.  On standing, Plaintiff can only rehash its allegation that it "intends to modify its apps" in the future, Opp. 4—unvarnished some-day intentions that are a textbook example of how *not* to plead standing.  Nor can Plaintiff escape the *Cameron* settlement:  The settlement releases "'future claims,'" *id.* at 7, and Plaintiff's entire theory of damages is that Apple allegedly maintained its "status quo" commission structure after the *Epic* Injunction, Compl. ¶ 51, meaning this case "'arise[s] from the same facts'" as *Cameron*.  Opp. 8.

Plaintiff also revises (and abandons) much of its case on the merits.  Plaintiff concedes that neither constructive trust nor unjust enrichment are "standalone" causes of action.  Opp. 11, 19-20.  Plaintiff also disclaims injunctive relief, foreclosing Rule 23(b)(2) certification, while claiming that such certification could be appropriate for "declaratory relief"—which the Complaint *also* does not seek.  *Id.* at 22.  And where Plaintiff does attempt to defend the Complaint, its responses are no more compelling.  Plaintiff seeks to forestall dismissal of its quasi-contract theory by arguing the DPLA, an express contract, is inapposite because it does not address the Injunction (*i.e.*, an "external legal mandate").  *Id.* at 13.  That argument is not only inconsistent with Plaintiff's protestations that it is not attempting to enforce the Injunction, but it also ignores that the DPLA applies to "[a]ny litigation" "relating to this Agreement, the App Software, or Your Relationship with Apple" including claims for "commercial damages" "however caused."  ECF 32-2, §§ 14.10, 13, Schedule 3 § 3.4 (emphasis

1

1    added).  Finally, Plaintiff fails to rehabilitate its tortious-inference claim, identifying no practically

2    certain economic benefits it lost and no independently wrongful act aside from purported violations of

3    the Injunction, which Plaintiff concededly cannot enforce.  Dismissal of all claims is thus warranted.

4    **II.     ARGUMENT**

5    **A.     Plaintiff Fails To Overcome The Complaint's Multiple Threshold Defects.**

6          Plaintiff fails to rebut the three threshold defects in this case.  *See* Mot. 5-12.  Plaintiff concedes

7    that it is unable to enforce the *Epic* Injunction, restates the Complaint's defective standing theory, and

8    garbles the *Cameron* release.  *See* Opp. 4-10.

9    **1.     Plaintiff Concededly Cannot Enforce The *Epic* Injunction.**

10          Plaintiff's suit fails at the outset because Plaintiff cannot enforce compliance with the Injunction

11    as a non-party.  Mot. 11-12.  *CASA* makes clear that an "injunction's protection extends only to the

12    suing plaintiff," and thus "only the plaintiff can enforce the judgment" granting the injunction.  145 S.

13    Ct. at 2552, 2557.  Apple thus could not have violated the Injunction *as to Plaintiff*, which enjoyed no

14    "protection" from that decree.  *Id.* at 2557.  Plaintiff begrudgingly concedes the point in its lone, passing

15    citation to *CASA*—admitting it is "foreclosed from bringing" any "action to compel Apple's compli-

16    ance with the injunction."  Opp. 10 (emphasis deleted).[1]

17          Plaintiff responds to *CASA* (and its own case-ending concessions) by disclaiming any attempt

18    "to compel Apple's *compliance* with the injunction" and instead seeking to enforce "'general dut[ies]'"

19    allegedly found elsewhere in California law.  Opp. 10.  That argument cannot be squared with the (pre-

20    *CASA*) Complaint, which mentions the Injunction over 100 times, admits that "[a]ll claims for relief

21    asserted … arise from Apple's defiance of the Injunction," purports to remedy "the harm caused by

22    Apple's willful noncompliance" with the Injunction, and defines the Class Period to run "through the

23    date on which Apple fully complies with the Injunction."  Compl. ¶¶ 75, 62, 65.  It also is short-lived:

24    Once Plaintiff tries to explain how Apple violated purported general duties, it shifts right back to claim-

25    ing "the injunction" is the "independent legal norm" that "Apple violated" for purposes of tortious

---

26    [1] To be clear, the *Epic* Injunction nonetheless imposes enormous burdens on Apple with respect to

27    developers across the country.  While Apple maintains those burdens are unjustified, those issues are
before the Ninth Circuit in *Epic Games*.  *See* Apple 28(j) Letter, *Epic Games, Inc. v. Apple Inc.*, No.

28    25-02935 (9th Cir. July 22, 2025), Dkt. 108.  What matters for present purposes is that Plaintiff lacks
any authority to enforce that sweeping injunction, thus warranting dismissal.

2

APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

interference, Opp. 17, and argues that the "external legal mandate" imposed by "this Court's injunction" is the key mechanism to circumvent the DPLA under quasi-contract, *id.* at 13; *see also infra* 8-9. Plaintiff's case thus relies entirely on alleged violations of the Injunction.

Plaintiff's attempt to circumvent the limits on who may enforce injunctions is not merely an abstract legal issue but would have serious (and bizarre) practical consequences. Under Ninth Circuit precedent, *parties* to an injunction must enforce it through contempt, rather than a collateral lawsuit pressing derivative causes of action. *See, e.g.*, *Barrientos v. Wells Fargo Bank, N.A.*, 633 F.3d 1186, 1190 (9th Cir. 2011). And they can obtain contempt sanctions "only" if proving a violation "by clear and convincing evidence." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998). Yet under Plaintiff's theory, *non-parties* enjoy *more* protection than the party who secured the decree: Rather than proceeding in contempt (and having to meet a heightened burden of proof), non-parties could select derivative causes of action and obtain *de facto* contempt sanctions under a mere preponderance standard. That absurd result would transform injunctions into quasi-legislation conferring a cause of action on any non-party aggrieved by the defendant's alleged conduct—contrary to *CASA* and longstanding equitable principles. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762 (1994) (injunction is not "a statute addressed to the general public").

## 2.    Plaintiff's Opposition Confirms Its Standing Arguments Are Speculative.

This suit also fails because the Complaint alleges no concrete plan by Plaintiff to develop linked-out payments (defeating injury in fact), and Plaintiff's theory of harm hinges on third parties' independent choices (defeating traceability). Mot. 5-12. Plaintiff refuses to engage on either front, simply rehashing the Complaint's deficient allegations as "more than enough." Opp. 4. Not so.

***No Actual, Concrete Injury.*** Plaintiff does not and cannot contest its failure to plead any concrete plan to offer linked-out payments *after* the Injunction's effective date. Instead, Plaintiff relies on (1) its 2023 attempt to offer linked-out payments (well *before* the Injunction's effective date in 2024), and (2) its purported "inten[t] to modify its apps" at some undisclosed time. Opp. 4. Neither suffices.

Plaintiff's 2023 attempt to offer linked-out payments cannot constitute the requisite injury in fact because the Complaint seeks damages only for Apple's alleged conduct *after* the Injunction became "effective" on "January 16, 2024." Compl. ¶ 75; *see also id.* ¶¶ 2, 18, 57, 65, 75, 78. The relevant

1    question is thus whether Plaintiff had a concrete plan to offer linked-out payments that Apple allegedly

2    frustrated after that date.  And on that critical question, Plaintiff's prior effort "proves nothing."  *Lujan*

3    *v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).  That a plaintiff has done something "before … is simply

4    not enough" to establish future action without an accompanying "description of concrete plans, or in-

5    deed even any specification of *when* the some day will be."  *Id.*; *see, e.g.*, *Bain v. Cal. Teachers Ass'n*,

6    891 F.3d 1206, 1214 (9th Cir. 2018) (no standing for plaintiff with "no concrete plan" to "return to her

7    old job" despite long track record of teaching).

8    Plaintiff's supposed "inten[t] to modify its apps to again include linked-out payments," Opp. 4,

9    comes no closer to alleging those concrete plans.  Plaintiff does not allege that *after* the Injunction's

10   effective date, it once again took any of the concrete steps it took during its 2023 effort, like developing

11   code for a new app, reaching an agreement with a payment processor, or attempting any engagement

12   with Apple.  *Cf.* Compl. ¶¶ 15-17.  Likewise, Plaintiff does not allege that it pursued an appeal of

13   Apple's 2023 denial before or after the Injunction's effective date, despite its prior settlement in *Cam-*

14   *eron* specifically conferring the right "to appeal the rejection of an app based on unfair treatment … by

15   Apple."  *See Cameron* Settlement at 13, ECF 32-4.  Paragraph 18's bare allegation of "intent" is thus

16   a classic example of the "some day intentions" the Supreme Court has repeatedly explained do not

17   suffice to show injury.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  As the Ninth Circuit

18   put it, "expressed 'intent' … can hardly qualify as a concrete plan."  *Thomas v. Anchorage Equal Rts.*

19   *Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000) (en banc).  Plaintiff labels these cases as "not remotely

20   analogous," Opp. 6, but purports to distinguish them with the circular assertion that the Complaint

21   alleges a bare intent to offer link-outs in the future—the *very allegations* those cases hold insufficient.

22   Plaintiff (at Opp. 4, 6) mischaracterizes three decisions that it says absolve it of any obligation

23   to allege future concrete plans to offer linked-out payments.  The court in *Isaacson v. Mayes*, 84 F.4th

24   1089, 1097 (9th Cir. 2023), did not hold that a party has standing even if it does not engage in an

25   activity if the reason the party doesn't is because it would "los[e] money."  Opp. 6.  Rather, it finds that

26   doctors who "regularly performed abortions" had standing to challenge an abortion restriction because

27   the restriction caused them to "los[e] money"—not that doctors who do *not* perform abortions due to

28   cost concerns nonetheless also have standing.  *Isaacson*, 84 F.4th at 1094, 1097.  Similarly, the plaintiff

1   in *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 646 (N.D. Tex. 2021), *had* "prepared an

2   application" for a government benefit and was "'able and ready'" to submit it.  Imminent submission

3   of an actually prepared application is precisely what Plaintiff admits it *did not* do here.  *See*

4   Compl. ¶ 18.  Likewise, the Eighth Circuit *rejected* the standing of a plaintiff in *Becker v. North Dakota*

5   *University System*, 112 F.4th 592, 596-97 (8th Cir. 2024), who simply claimed she "'would enroll'" if

6   the school brought back women's hockey, but who failed to allege "key facts" demonstrating she was

7   qualified for and committed to doing so.  Plaintiff's claims here suffer from the same defect.

8        Unable to explain how the Complaint accords with basic standing principles, Plaintiff relies on

9   a wholesale reinvention of the doctrine.  It posits that *all* developers—even those who did not attempt

10  to offer linked-out payments—necessarily have standing because link-outs generally are "attractive"

11  for developers.  Opp. 5 (citation omitted).  But such a "boundless theory of standing" would eviscerate

12  the "concrete pla[n]" requirement.  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 94, 99 (2013).  Plaintiff

13  must identify an injury "'concrete and particularized'" *to it*, *Murthy v. Missouri*, 603 U.S. 43, 75

14  (2024)—not merely pronounce an opportunity "attractive" but then fail to allege a concrete plan to

15  obtain it.  There is thus nothing remarkable about denying standing to a developer (like Plaintiff) that

16  failed to plausibly allege any concrete effort to undertake those necessary steps.  To the contrary, doing

17  so accords with the traditional rule that "a plaintiff lacks standing to challenge a rule or policy to which

18  he has not submitted himself."  *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992).

19      ***No Traceability.***  Plaintiff also fails to explain how its alleged injuries can be traced to *Apple's*

20  conduct, ignoring that whether Plaintiff would have avoided any commissions hinges entirely on third-

21  party behavior.  *See* Mot. 8-9.  Plaintiff claims that the "independent actions of third parties" are rele-

22  vant only to a "proximate-cause analysis" or "the *quantum* of injury."  Opp. 6.  That is a strange defense

23  as Plaintiff must allege proximate causation "'in any tort case,'" including this one, to state a claim.

24  *Pulte Home Corp. v. Am. Safety Indemn. Co.*, 14 Cal. App. 5th 1086, 1127-28 (2017).  Regardless,

25  Plaintiff simply ignores the mountain of Article III precedent Apple cited making clear that when third-

26  party "'independent decisions'" have a "'significant effect'" on the existence of a purported injury, the

27

28

asserted causal chain is "'far too weak'" for traceability. Mot. 9 (collecting cases).[2] Indeed, allegations about a payment option that "consumers … may or may not choose to use" are far too "hypothetical" for Article III standing. *Birdsong v. Apple Inc.*, 590 F.3d 955, 961 (9th Cir. 2009).

Plaintiff attempts to appeal to "'commonsense economic principles'" to fill the Complaint's gaps about customer behavior. Opp. 7. But those principles apply only when "third party behavior is predictable." *Diamond Alt. Energy LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2136 (2025). The Complaint never explains why customers predictably would have shifted to link-outs. To the contrary, as the Ninth Circuit recognized in *Epic*, Apple's "platform" offers greater "security and privacy" and other "non-price features," and thus the "rate" at which consumers would shift to link-outs is too "speculative" to support "calculable money damages." *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 987-88, 1003 (9th Cir. 2023). Moreover, Plaintiff claimed in *Cameron* that the ability to steer customers to its website through *email* would be the "game changer" to "reduce commissions paid to Apple"—not that it also needed link-outs to remedy purported economic injuries. Czeslawski Decl. ¶ 12, *Cameron v. Apple Inc.*, 19-cv-3074 (N.D. Cal. Aug. 26, 2021), ECF 396-4. While Plaintiff bargained for relief that allowed steering communications in *Cameron* (on top of a $5,000 incentive award, access to a $100 million developer fund, and reduced commissions, *see* ECF 32-4, at 5, 8, 24), the Complaint nowhere sets out a coherent, well-pleaded theory by which Plaintiff suffered injury from the absence of link-outs. Plaintiff thus cannot show either the injury or traceability that standing doctrine requires.

### 3. *Cameron* And This Suit Have An Identical Factual Predicate.

Plaintiff's attempt to sidestep the *Cameron* settlement also fails. Plaintiff admits it released "'any and all … *future* claims'" against Apple that "'arise from the same facts underlying the claims'" in *Cameron*. Opp. 7 (emphasis added). Ninth Circuit precedent makes clear that such releases are enforceable even as to claims "not presented" and that "'*might not have been presentable in the class action*.'" *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992).

Plaintiff retorts that the *Cameron* settlement should be "narrow[ly]" construed because it only

---

[2] Relatedly, Plaintiff complains that its refusal to re-apply was not "self-inflicted" because Apple purportedly rendered the option "'non-viable.'" Opp. 7. But the Complaint acknowledges that nearly three-dozen developers did apply. Compl. ¶ 50. Nor, as explained above, does Plaintiff allege any efforts short of applying for the entitlement to show a concrete commitment to enabling link-outs.

1  releases claims that "*arise* from the same facts" rather than a subsequent suit that merely "'relate[s]' to

2  the *Cameron* claims." Opp. 8. But Plaintiff's current claims "arise from" the same facts as *Cameron*

3  because each suit shares "the same transactional nucleus of facts": Apple's allegedly supracompetitive

4  30% commission. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001).

5  Plaintiff attempts to manufacture daylight between the two suits by saying *Cameron* involved Apple's

6  "supracompetitive commissions," while this suit concerns efforts "to prevent developers from avoiding

7  those commissions," Opp. 8—a longwinded way of saying the case likewise concerns imposition of

8  supracompetitive commissions. Indeed, Plaintiff's *Cameron* complaint charged that Apple forces it to

9  "pa[y a] supra-competitive 30% commission on each sale," *Cameron* Compl. ¶ 18, ECF 32-4, and the

10  Complaint here now attacks the same 30% commission, Compl. ¶¶ 2, 21, 30, 34, 48, 59. Moreover,

11  the Complaint's entire damages theory is that Apple "*maintain[ed] the status quo*, as if no Injunction

12  had entered," thereby protecting its preexisting "revenue stream." Compl. ¶ 51 (emphasis added). It

13  is thus little surprise that *Cameron*, *Epic*, and this case have all been deemed related—the latter two

14  cases at Plaintiff's own urging. *See* Mot. 10-11.

15        Plaintiff's continued attack on the "status quo" commission structure at issue in *Cameron* easily

16  distinguishes this case from Plaintiff's cited decisions. In *Hesse*, for example, the later suit concerned

17  a completely different "statewide surcharge" than the "specific nationwide surcharges" at issue in the

18  prior settlement. *Hesse v. Sprint Corp.*, 598 F.3d 581, 591 (9th Cir. 2010). *Feller* involved suits prem-

19  ised on fundamentally different conduct and injuries—a "fraudulent marketing and sales scheme" to

20  initially induce contracting, versus subsequent rate increases under that contract. *Feller v.

21  Transamerica Life Ins. Co.*, 2016 WL 6602561, at *8 (C.D. Cal. Nov. 8, 2016). And *Yearby* involved

22  new economic injuries (the "failure to reduce" insurance costs) that did not "exis[t]" as of the initial

23  settlement. *Yearby v. Am. Nat'l Ins. Co.*, 2021 WL 3855833, at *15 (N.D. Cal. Aug. 30, 2021). Thus,

24  none of those cases involved a continued attack on the same commissions likewise attacked in the first

25  lawsuit. Plaintiff's assertion that Apple seeks immunity from "any legal claim" that "tangentially"

26  concerns its "commissions," Opp. 9, is a strawman. What Apple actually seeks is straightforward

27  application of the *Cameron* release to the current challenge to the same commissions.

28

**B.**     **Plaintiff Fails To State A Claim.**

Plaintiff narrows its claims to two—one for quasi-contract and the other for tortious interference, *not* for constructive trust (which Plaintiff concedes is "merely a [r]emedy"), unjust enrichment (which Plaintiff concedes is not "a standalone cause of action"), or anything else. Opp. 11, 20.[3]  Plaintiff's opposition only underscores why those two remaining claims fail.

**1.**     **Plaintiff's Quasi-Contract Claim Fails (Counts I and II).**

Plaintiff first fails to salvage its quasi-contract claim. Plaintiff ignores the relevant provisions of the DPLA barring its claims and nowhere explains how the Complaint pleads the inadequacy of legal remedies—much less entitlement to a constructive trust as an equitable remedy.

**a.**     **The DPLA Bars Plaintiff's Quasi-Contract Claim**

The DPLA forecloses Plaintiff's quasi-contract claim and its requested equitable remedies of unjust enrichment and constructive trust. *See* Mot. 13-14. As Apple explained, California law bars a quasi-contract theory when the parties have a valid contract. Mot. 13. Here, Plaintiff admits the DPLA "applies to [its] claims," Compl. ¶ 73, is "a binding contract" that cannot be "circumvent[ed]" in equity, Opp. 14, and was not breached by Apple, *id.* at 18. Because Plaintiff pleads the applicability of an express contract, its quasi-contract claim is "internally inconsistent" and could be sustained only if Plaintiff alleged the agreement was "void" or "rescinded"—which Plaintiff does not and could not do. *Lance Camper Mfg. Corp. v. Republic Indemn. Co.*, 44 Cal. App. 4th 194, 203 (1996); *accord Berlanga v. Univ. of San Francisco*, 100 Cal. App. 5th 75, 89 (2024) ("'[A] plaintiff may not plead the existence of an enforceable contract and simultaneously maintain a quasi-contract claim unless the plaintiff also pleads facts suggesting that the contract may be unenforceable or invalid.'").

Plaintiff seeks to sidestep those concessions by defining the "'subject matter'" of this lawsuit in minute, artificial specificity (how "Apple complies with an external legal mandate") and then claiming the DPLA has "nothing to do with" that topic. Opp. 13. First, that argument cannot be squared

---

[3] Plaintiff maintains that it is permissible "'as a matter of practice'" to plead constructive trust as a separate claim. Opp. 20. But this Court does not indulge that practice. *See, e.g., Malfatti v. Mortg. Elec. Registration Sys.*, 2012 WL 440718, at *1 n.2 (N.D. Cal. Feb. 10, 2012) (Gonzalez Rogers, J.) (dismissing "claim to the extent it was based on constructive trust because it is not a claim for relief in itself"). Plaintiff similarly acknowledges Count II is styled as an "Unjust Enrichment/Quasi-Contract" claim but now disclaims any "attemp[t]" to plead a "standalone cause of action" for unjust enrichment, clarifying that it only pursues "unjust enrichment under a quasi-contract theory." Opp. 11 & n.5.

1    with Plaintiff's representations elsewhere that it does not seek to "compel compliance" with the In-

2    junction. *Id.* at 3.  Second, it is inconsistent with the DPLA's terms and California law.  The DPLA

3    forecloses Plaintiff's attempt to excise particular litigation theories (*i.e.*, whether Apple "complie[d]

4    with an external legal mandate," *id.* at 13) from that agreement's coverage because it applies to "[*a*]*ny*

5    *litigation* … between You and Apple … arising out of or relating to this Agreement, the Apple Soft-

6    ware, or Your relationship with Apple." ECF 32-2, § 14.10 (emphasis added).  Plaintiff obviously is

7    aware of this provision since the Complaint itself cites Section 14.10 when *admitting* that the DPLA

8    governs Plaintiff's claims. Compl. ¶ 73.  Plaintiff's opposition ignores the rest of Section 14.10's crit-

9    ical language (and Plaintiff's earlier concession in the Complaint of the DPLA's applicability).

10        The DPLA also unambiguously covers the same "'subject matter'" as Plaintiff's claims.  To

11    start, the DPLA expressly *authorizes* the same commissions, *see* Mot. 13, that Plaintiff now deems

12    "profits unjustly received," Compl. Prayer for Relief.  And the DPLA expressly forecloses Plaintiff's

13    requested remedies.  When an express contract and an allegedly implied contract would "compe[l]

14    different results," each covers "the same subject" under California law.  *Eisenberg v. Alameda News-*

15    *papers, Inc.*, 74 Cal. App. 4th 1359, 1387 (1999).  Here, Section 13 of the DPLA *prohibits* Apple's

16    liability for "punitive damages," "damages for loss of profits," or "any other commercial damages or

17    losses arising out of or related to … your development efforts or participation in the [developer] pro-

18    gram, however caused." ECF 32-2, § 13 (capitalization altered).  Yet the Complaint expressly seeks

19    damages for lost "profits," "punitive damages," and other "damages" for Apple's alleged conduct.  *See*

20    Compl. Prayer for Relief.  Permitting those remedies would be directly contrary to the DPLA—and

21    thus that agreement and Plaintiff's equitable theories necessarily cover "the same subject." *Eisenberg*,

22    74 Cal. App. 4th at 1387; *accord Falkowski v. Imation Corp.*, 132 Cal. App. 4th 499, 518 (2005) ("[A]n

23    implied contract cannot override the terms of an express agreement between the parties.").

24        Plaintiff retorts that Apple's motion did "not even address" the elements of its newly clarified

25    "quasi-contract claim for unjust enrichment." Opp. 11-12.  But those elements are irrelevant when the

26    claim is foreclosed as a threshold matter, *see supra* 8-9, and Plaintiff's assertion is false in any event.

27    As Apple's motion explained, Apple could not have "unjustly" retained commissions Plaintiff *agreed*

28    to pay in the parties' "express contract." Mot. 14.  Indeed, Plaintiff never suggests that Apple's receipt

of these commissions violates the DPLA and disclaims any "alleg[ation] that Apple violated any duties stemming from the DPLA." Opp. 18. Unable to pursue the obvious claim (breach of contract), Plaintiff casts its suit as a unicorn that does "not fit neatly under other legal doctrines." *Id.* at 12. But California law is clear that where, as here, the plaintiff "received the benefit of the bargain" as embodied in the parties' agreement, unjust enrichment is not a viable theory. *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008); *accord Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 172-73 (2001) (court may not, "even under the guise of equity jurisprudence[,] substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract"). Permitting an unjust-enrichment theory despite the conceded lack of any actual breach would flagrantly "circumvent" the DPLA—which Plaintiff concedes it may not do. Opp. 12.

        **b.**      **Plaintiff's Requested Equitable Remedies Fail**

              **(i)**      **Plaintiff Undisputedly Failed To Plead The Inadequacy Of Legal Remedies, Barring Equitable Relief (Counts I and II).**

Plaintiff's pursuit of equitable relief is independently barred because the Complaint fails to allege the inadequacy of legal remedies. *See* Mot. 16-17. Plaintiff first responds by misrepresenting governing precedent. It claims that the Ninth Circuit's decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), does not embody a pleading requirement and instead merely requires a plaintiff to "'*establish*'" the inadequacy of legal remedies before final judgment. Opp. 13. Wrong. *Sonner* faulted "the operative complaint" for failing to "allege that Sonner lacks an adequate legal remedy," 971 F.3d at 844, and itself applied the Supreme Court's decision in *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974), which affirmed dismissal of a complaint where the plaintiffs "did not *plead* 'the basic requisites of the issuance of equitable relief' including 'the inadequacy of remedies at law.'" *Sonner*, 971 F.3d at 844 (quoting *O'Shea*, 414 U.S. at 502) (emphasis added).[4]

Lacking any basis to escape that basic pleading requirement, Plaintiff departs on an irrelevant tangent about whether litigants can plead legal and equitable remedies "in the alternative." Opp. 15. That is not the issue. Plaintiffs can plead equitable remedies in the alternative to legal remedies like

---

[4] Plaintiff cites various district court cases, Opp. 14 & n.6, which merely stand for the irrelevant proposition that legal and equitable remedies can be pleaded in the alternative. Those cases do not (and could not) relieve Plaintiff of its distinct obligation to plead the *inadequacy* of legal remedies.

1  damages, Fed. R. Civ. P. 8(a)(3), but equitable remedies (whether asserted in the alternative or alone)

2  require allegations about why those legal remedies are inadequate. *See* Mot. 16-17. Plaintiff's own

3  case, *Cepelak v. HP Inc.*, 2021 WL 5298022, at *1 (N.D. Cal. Nov. 15, 2021), proves the point. As it

4  explains, "[t]he relevant inquiry is not what other claims the plaintiffs have raised, but whether they

5  have plausibly alleged the inadequacy of legal remedies for each claim for equitable relief that they

6  seek." *Id.* at *2. The problem with the Complaint is not that it lacks a talismanic statement that it seeks

7  remedies "in the alternative"—which Plaintiff recognizes would be an empty "formality," Opp. 15

8  n.7—but that it nowhere alleges why legal remedies are inadequate to redress its purported injuries.

9  Plaintiff does not even suggest the Complaint alleges the inadequacy of legal remedies, much

10  less contend it could cure that defect through amendment. "The failure to address an argument is a

11  concession of it," *Reis v. McKinsey & Co.*, 2025 WL 1809737, at *3 n.16 (N.D. Cal. June 30, 2025),

12  and the proper consequence for that undisputed failure to plead the "basic requisit[e] of the issuance of

13  equitable relief," *O'Shea*, 414 U.S. at 502, is dismissal of Plaintiff's equitable claims.

14  **(ii)      Plaintiff Cannot Establish A Constructive Trust.**

15  Plaintiff likewise fails to show either key requirement for constructive trust: (1) specific, iden-

16  tifiable property in Apple's possession (2) that can be traced from Plaintiff to Apple. *See* Mot. 14.

17  ***No Specific, Identifiable Property.*** Plaintiff's opposition confirms that the Complaint fails to

18  allege the "specific identifiable property" in Apple's possession that supposedly belongs to Plaintiff.

19  *Michaelian v. State Comp. Ins. Fund*, 50 Cal. App. 4th 1093, 1114 (1996). Plaintiff fights state law,

20  claiming it was not required to identify "a 'specific sum'" that *Plaintiff* lost, Opp. 21, and instead may

21  rely on vague ranges of loss allegedly suffered by *all* developers. But California precedent requires

22  identification of "a quantifiable sum owed by defendants *to plaintiff*" for constructive-trust claims.

23  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150 (2003) (emphasis added); *accord*

24  *Zumbrun v. Univ. of S. Cal.*, 25 Cal. App. 3d 1, 14 (1972) (requiring identification "of a sum certain in

25  money"). And Plaintiff does not even contend its Complaint meets that standard: It says that "Apple

26  itself ran the numbers and estimated the revenue impact with specificity," Opp. 21, but never explains

27  what specific impact Plaintiff suffered. Indeed, it bases that claim not on the Complaint, but a line

28  from this Court's *Epic* decision—which simply described a range of potential impacts to *all* developers.

1    *Id.* Thus, Plaintiff supplies no basis to divine the "specific identifiable property" it supposedly lost.

2    ***No Tracing.*** Nor does Plaintiff allege the required tracing of specific funds from Plaintiff's

3    coffers to Apple's. Plaintiff broadly references "analysis Apple has already performed" as to the impact

4    of link-outs on *all* developers, Opp. 21, but nowhere explains how that general analysis shows the

5    movement of funds from *Plaintiff* to Apple. Nor, given the nature of its claims, could Plaintiff ever

6    make that showing—much less "'clearly'" so, as California law requires. *Korea Supply Co.*, 29 Cal.

7    4th at 1150. Plaintiff's theory is not that Apple directly stole funds in Plaintiff's possession, but that it

8    frustrated Plaintiff's ability to offer link-outs, which customers might (or might not) have chosen to

9    use. Thus, Plaintiff at best had merely a speculative "'expectancy'" that some customers would use

10   linked-out payments. *Id.* at 1149. California law bars reliance on speculative "expectancy interest[s]"

11   for constructive-trust claims, instead restricting the tort to the loss of "vested" property. *Id.* at 1150.

12           **2.      Count III Fails Because Plaintiff Does Not Plausibly Allege Tortious Interference
                       With Any Business Expectancy.**

13           Plaintiff also does not satisfy any of the requirements for tortious interference—identifying no

14   practically certain benefits it lost, no basis (other than the *Epic* Injunction) to deem Apple's acts "in-

15   dependently wrongful," and no grounds to impose extracontractual damages for economic loss.

16                   **a.      Plaintiff Identifies No Practically Certain Economic Benefits It Lost.**

17           Plaintiff does not dispute that tortious interference entails a "rigorous pleading burden." *Korea*

18   *Supply Co.*, 29 Cal. 4th at 1158. To elide that standard, Plaintiff again bypasses any discussion of its

19   own allegations and instead resorts to broad statements about "the factual record" from *Epic* and the

20   impact of link-outs on developers generally. Opp. 16. But the Ninth Circuit said it is too "speculative"

21   to "calcula[te] money damages" for this conduct, *Epic Games*, 67 F.4th at 1003, and Plaintiff never

22   points to anything from *Epic* identifying a "specific" benefit "almost certain" to accrue *to Plaintiff.*

23   *Repub. Nat'l Comm. v. Google LLC*, 742 F. Supp. 3d 1099, 1122 (E.D. Cal. 2024); *see also* Mot. 18.

24           Plaintiff suggests that vague estimates of loss covering all "136,000 developers," Compl. ¶ 6,

25   suffice because Plaintiff was not "required to '*name*'" individual customers that might have used its

26   link-outs, Opp. 16. But while Plaintiff was not required to literally mention potential customers'

27   names, it *was* required to identify "*specific*, albeit unnamed" customers who would have done so,

28   *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996), in addition to a host

1   of other requirements, like "what the terms" would have been of its link-out offers, why customers

2   "likely" would have used them, and "'how much money, if any, Plaintiff lost as a result'" of Apple's

3   purported conduct, *Repub. Nat'l Comm.*, 742 F. Supp. 3d at 1123; *Westside Ctr. Assocs.*, 42 Cal. App.

4   4th at 527.  Plaintiff never suggests the Complaint makes any of those critical allegations.  It does not.

### b.    Alleged Violations Of The Injunction Cannot Support Plaintiff's Claim.

6   Plaintiff's discussion of the independently wrongful act requirement also makes clear that Plain-

7   tiff is attempting to do precisely what it elsewhere disclaims: "compel compliance" with the Injunction.

8   Opp. 3.  Plaintiff's principal argument is that the "independent legal norm Apple violated was the

9   injunction." *Id.* at 17.  But that argument fails for all the reasons discussed above.  *See supra* 2-3.

10  Because the Injunction's protection extends only to the plaintiff who obtained it—*i.e.*, Epic—Apple

11  could not have violated the Injunction *as to Plaintiff*, defeating any claim that Apple's conduct was

12  "independently wrongful" under California law.  *See Korea Supply Co.*, 29 Cal. 4th at 1158-59 ("[A]n

13  act is independently wrongful if it is unlawful," not "merely because" of an allegedly "improper

14  motive").

15  Betraying its lack of confidence in that argument, Plaintiff tacks to the newfound theory that its

16  quasi-contract claim *itself* embodies an "independent legal standard" because Apple allegedly "inter-

17  fered with Plaintiff's business expectancy through a scheme to unjustly enrich itself."  Opp. 17.  That

18  argument fails on multiple levels.  For one, it appears nowhere in the Complaint, which is premised

19  entirely on Apple's alleged "efforts to circumvent the Injunction."  Compl. ¶ 107; *accord id.* ¶¶ 104-

20  109.  For another, Plaintiff "must plead" an allegedly wrongful act that is "'wrongful by some legal

21  measure other than the fact of interference itself,'" *Korea Supply Co.*, 29 Cal. 4th at 1153, so it is no

22  answer to say Apple's supposed interference was wrongful *because* it "interfered with Plaintiff's busi-

23  ness expectancy," Opp. 17.  And, most importantly, Plaintiff's quasi-contract theory *also* is wholly

24  reliant on the Injunction, since the only basis Plaintiff invokes to escape the DPLA is Apple's purported

25  noncompliance "with an external legal mandate (this Court's injunction)."  Opp. 13.  Thus, all of Plain-

26  tiff's theories collapse back into the Injunction—which it concededly may not enforce.

### c.    The DPLA Bars Plaintiff From Pursuing Claims For Economic Loss.

28  Finally, the economic-loss rule independently bars Plaintiff's tortious-interference claim.

Under that rule, a contractual counterparty may not sue for extracontractual damages unless it identifies the "violation of some independent duty arising in tort." *Rattagan v. Uber Techs., Inc.*, 19 F.4th 1188, 1191 (9th Cir. 2021). Plaintiff here *concedes* that Apple has complied with its "duties stemming from the DPLA," Opp. 18, and points to no other independent duty aside from a "general duty" not to tortiously interfere, *id.* at 18-19 (emphasis deleted), the relevance of which hinges entirely on the Injunction, *see supra* 13. Unable to enforce the Injunction, *see supra* 2-3, Plaintiff has no basis as a contractual counterparty to mount extracontractual claims for economic loss.

### C. The Complaint's Class Allegations Should Be Struck Under Rule 12(f).

Plaintiff's opposition also confirms that its class allegations cannot be maintained "on the facts alleged." *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 990 (N.D. Cal. 2009).

***No Injunctive Class.*** Plaintiff concedes that the Complaint "does not request injunctive relief," which destroys any ground for the Complaint's express request for certification under Rule 23(b)(2) and its implicit request for certification under Rule 23(b)(1)(A). Opp. 22. Plaintiff strangely posits that certification under those Rules could be appropriate for "declaratory relief," *id.*, which the Complaint *also* does not seek, Compl. Prayer for Relief. And Plaintiff ignores precedent proscribing certification under either Rule when plaintiffs, as here, seek individualized damages. *See* Mot. 21. The Complaint's invocation of Rules 23(b)(1)(A) and 23(b)(2) thus should be stricken.

***No Rule 23(b)(1)(B) Damages Class.*** Plaintiff also admits that there is no basis for Rule 23(b)(1)(B) certification. Contrary to Plaintiff's assertion, *cf.* Opp. 22, a limited-fund scenario is "presumptively necessary" absent a strong "justification" to "depar[t] from the traditional norm," *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842 (1999), and thus Plaintiff was required to allege why Apple's "assets" are "so limited" that absent class members' rights would be "'inescapably'" altered by awarding relief to class members, *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1197 (9th Cir. 2001). Yet Plaintiff now admits that this is *not* a limited-fund case, Opp. 22, and never explains (nor could it) how Apple's "assets" are "so limited" that absent class members would necessarily be prejudiced, *Zinser*, 253 F.3d at 1197. There is accordingly no basis for Rule 23(b)(1)(B) certification, either.

***No Rule 23(b)(3) Damages Class.*** Plaintiff's non-response to the foundational issues Apple raised with Rule 23(b)(3) certification likewise reflects that such certification is impossible. As

Apple's motion explained, Plaintiff's proposed class is so haphazardly defined—reaching "[a]ll developers" who "offered in-app products" even if they had no desire to offer link-outs, Compl. ¶ 64—that it necessarily includes swaths of developers who could not have suffered any injury from Apple's alleged conduct, *see* Mot. 22.  And even as to developers who wished to offer link-outs, Plaintiff's proposed class would not require merely "calculating" their individual damages, Opp. 22, but making up those awards wholesale according to a host of individualized and speculative inquiries about hypothetical transactions that never occurred, Mot. 22-23.  Plaintiff has no meaningful rejoinder.

Plaintiff's only response is to request a rain check, deeming Apple's arguments "'premature.'" Opp. 23.  But Plaintiff's conclusory discussion never explains how "'discovery'" or unspecified "'arguments,'" *id.* at 22-23, could remedy its speculative damages theory about an unknown number of transactions that never occurred.  Plaintiff's refusal to engage with those issues demonstrates that the putative class on its face fails Rule 23(b)(3)'s "'demanding'" predominance standard.  Mot. 22.

### D.    This Case Should Be Stayed Pending Resolution Of The *Epic* Appeal.

Finally, Plaintiff's arguments against Apple's commonsense request of a stay pending the *Epic* appeal fail.  Plaintiff complains that a stay would "dela[y]" this case, Opp. 24, ignoring precedent that delayed monetary relief is not grounds "'for the denial of a stay,'" Mot. 25, and that *Epic* is scheduled for argument in October—shortly after the hearing for this case.  Plaintiff also admits that Apple "need not establish a 'likelihood of success'" for a stay, but then claims there is no "'likelihood'" the Ninth Circuit will reverse the contempt order.  Opp. 24.  Apple respectfully disagrees, but Plaintiff's argument misses the point.  While a reversal "will dispose of this case," even an affirmance will lead toward "finalization" that clarifies the legal landscape.  *Grecia v. Adobe, Inc.*, 2018 WL 6523983, at *3 (N.D. Cal. Dec. 12, 2018) (Gonzalez Rogers, J.).  A stay pending the *Epic* appeal is thus a sensible approach regardless of the perceived "'merits'" of those proceedings.  Opp. 24.

### III.    CONCLUSION

For these reasons, the Court should dismiss the Complaint with prejudice under Rules 12(b)(1) and 12(b)(6) and strike Plaintiff's class allegations under Rule 12(f) or, in the alternative, stay proceedings pending issuance of the mandate in *Epic*.

1  Dated:  August 20, 2025                          GIBSON, DUNN & CRUTCHER LLP

2

3                                                   */s/ Julian W. Kleinbrodt*
                                                    Julian W. Kleinbrodt

4                                                   *Attorney for Defendant Apple Inc.*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

APPLE INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS CLASS ACTION COMPLAINT
CASE NO. 4:25-cv-03858-YGR

# Exhibit C

**PAGES 1 – 43**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

PURE SWEAT BASKETBALL, INC.,          )
                                      )
                  Plaintiff,          )
                                      )
v.                                    )  **No. 4:25-cv-03858-YGR**
                                      )
APPLE INC., et al.,                   )
                                      )
                  Defendant.          )
_____)


Oakland, California

Tuesday, September 23, 2025

**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**

For Plaintiffs:

        Hagens Berman Sobol Shapiro LLP
        715 Hearst Avenue, Suite 300
        Berkeley, CA 94710
    **BY:  BEN M. HARRINGTON, ATTORNEY AT LAW**

        Hagens Berman Sobol Shapiro
        1301 2nd Avenue, Number 2000
        Seattle, WA 98101
    **BY:  TED WOJCIK, ATTORNEY AT LAW**


(Appearances continued on the following page)


**REPORTED BY:  April Wood Brott, CSR No. 13782, Official United States Reporter**

2

**APPEARANCES (continued):**

For Defendants:

                    Gibson, Dunn & Crutcher LLP
                    One Embarcadero Center, Suite 2600
                    San Francisco, CA 94111
      BY:  **JULIAN W. KLEINBRODT, ATTORNEY AT LAW**

                    Gibson, Dunn & Crutcher LLP
                    333 South Grand Avenue
                    Los Angeles, CA 90071
      BY:  **DANIEL G. SWANSON, ATTORNEY AT LAW**

```
1    TUESDAY - SEPTEMBER 23, 2025                      2:13 P.M.

2                      P R O C E E D I N G S

3                           ---o0o---

4         THE COURTROOM DEPUTY:  All rise.  The United States

5    District Court is now in session, the Honorable Yvonne Gonzalez

6    Rogers presiding.

7         THE COURT:  Okay.  Good afternoon.

8         THE COURTROOM DEPUTY:  Please be seated.  Thank you.

9      Calling the civil matter 25-cv-3858-YGR, Pure Sweat

10   Basketball, Incorporated verus Apple Incorporated.

11       Parties, please step forward and state your appearances

12   for the record, starting with the plaintiff.  Lecterns, please.

13        MR. HARRINGTON:  Good afternoon, Your Honor.  Ben

14   Harrington of Hagens Berman for Plaintiffs.

15        MR. WOJCIK:  Good afternoon, Your Honor.  Ted Wojcik

16   for the plaintiffs, from Hagens Berman.

17        THE COURT:  Okay.

18        MR. KLEINBRODT:  Good afternoon, Your Honor.  Julian

19   Kleinbrodt from Gibson Dunn on behalf of Apple.

20        THE COURT:  Okay.

21        MR. SWANSON:  Good afternoon, Your Honor.  Dan Swanson

22   for Apple Inc.

23        THE COURT:  Good afternoon.

24      Okay.  Who's arguing?

25        MR. KLEINBRODT:  I will be for Apple, Your Honor.
```

```
 1              THE COURT:  Okay.  That's Mr. --

 2              MR. KLEINBRODT:  Kleinbrodt.

 3              THE COURT:  Kleinbrodt?

 4              MR. HARRINGTON:  And I'll be arguing for Plaintiffs,

 5    Ben Harrington.

 6              THE COURT:  All right.  Come on forward, both of you.

 7         Okay.  So we'll go ahead and start with you,

 8    Mr. Kleinbrodt.  It's your motion.

 9              MR. KLEINBRODT:  Thank you, Your Honor.

10         The fundamental premise of this case is that Plaintiff is

11    an intended beneficiary of the Epic injunction.  Plaintiff

12    claims that any developer can sue Apple for noncompliance with

13    the Epic injunction, even if that developer was not a party to

14    the Epic case --

15              THE COURT:  Are the words "intended beneficiary" --

16              MR. KLEINBRODT:  Excuse me, Your Honor?

17              THE COURT:  Are those words in the complaint?

18              MR. KLEINBRODT:  They are, Your Honor, at paragraph

19    77.

20         And Plaintiff claims that any developer can sue Apple even

21    if it was not a party to the Epic case, even if it settled its

22    own claims against Apple for different relief.

23              THE COURT:  So Mr. Kleinbrodt, I know what the basics

24    are of this case.  I've lived with these cases and have lived

25    with them for years.  So don't repeat what -- that kind of
```

5

```
1    basic information.  Get to the point.
2          MR. KLEINBRODT:  Yes, Your Honor.
3       I'd like to cover three points, in addition to answering
4    any questions that the Court has today, and the first point
5    that I'd like to emphasize is that the limits on federal
6    courts' remedial powers and the limits imposed by state law
7    preclude a plaintiff like Pure Sweat Basketball from seeking to
8    enforce the Epic injunction.
9       As I just mentioned --
10         THE COURT:  Well, what are they enforcing?  They're
11   not enforcing -- they're not seeking to enforce anything.
12   They're seeking to recover what they believe are ill-gotten
13   gains.
14         MR. KLEINBRODT:  Your Honor, as --
15         THE COURT:  So let's assume, for purposes of argument,
16   that Apple loses its appeal at the Ninth Circuit and that their
17   attempt to violate the injunction has been stopped by the
18   courts.  During that interim period, weren't moneys received?
19   During the appellate period and the challenge, weren't moneys
20   received?
21         MR. KLEINBRODT:  There were commissions that were paid
22   to Apple during that interim period.
23         THE COURT:  Right.  So why should they be entitled to
24   keep them if that was deemed an adjudicated violation of the
25   injunction?
```

6

1         **MR. KLEINBRODT:**  Your Honor, whether there are

2  potential remedies or arguments for --

3         **THE COURT:**  No.  Just answer my question.

4         **MR. KLEINBRODT:**  They cannot be disgorged under the

5  claims that Pure Sweat Basketball brings in this case, which

6  is --

7         **THE COURT:**  So they should keep them?

8         **MR. KLEINBRODT:**  They should not be disgorged under

9  the claims here.  I can't speak to --

10         **THE COURT:**  Do I --

11         **MR. KLEINBRODT:**  -- whether there is --

12         **THE COURT:**  Do I -- okay.  So you're not saying that

13  they should be entitled to keep them.  You're saying that they

14  can't keep them, based upon the theory?

15         **MR. KLEINBRODT:**  That's correct, Your Honor.  We're

16  seeking dismissal only of the claims that Pure Sweat has

17  brought.  There are, as you noted, a number of issues that are

18  pending in other cases, and there are conceivably other legal

19  theories that could be brought by other plaintiffs in other

20  circumstances.

21         **THE COURT:**  Like who?

22         **MR. KLEINBRODT:**  Well, for example, a plaintiff that

23  actually paid commissions under the link-out program, the 27

24  and 12 percent commission that this court was focused on in the

25  Epic proceedings, but Pure Sweat Basketball is not one of those

1    plaintiffs.  It did not apply for the link-out entitlement.  It

2    did not implement link-outs.  The only commissions it paid were

3    the commissions under the preexisting regime for subscriptions

4    in its -- one of its two apps.

5        And there are two theories that Plaintiff has put forward

6    in this case to recover money.  One is the quasi-contract

7    theory of restitution, and one is a tortious interference

8    claim.

9        The claim that seeks restitution most directly is the

10    unjust enrichment or quasi-contract claim, and the clearest bar

11    there is the fact that the DPLA covers the payment of

12    commissions.  That's section -- schedule 2, section 3.4 of the

13    DPLA expressly covers commissions that are paid for

14    subscriptions under that, the legacy 30 percent/15 percent

15    scheme.

16        Because of the existence of an actual express contract,

17    there cannot be, as a matter of law, any quasi-contract --

18        **THE COURT:**  What is your --

19        **MR. KLEINBRODT:**  -- claim.

20        **THE COURT:**  -- response on that, response on that

21    point?

22        **MR. HARRINGTON:**  On that point, Your Honor, if you

23    look at the DPLA, there's absolutely nothing in that agreement

24    that governs these claims or spells out the parties' rights in

25    any way in regards to these claims.  Apple has pointed only to

8

1    a provision in the DPLA that authorizes Apple to charge

2    commissions on in-app payments.

3         We're not challenging that.  We're not challenging the

4    commissions Apple charges.  We're not challenging the amount

5    Apple charges.  The theory of this case is that Apple, in

6    willfully violating this court's injunction, prevented

7    developers from linking outside of apps where they can make

8    transactions where the commissions don't even apply.

9         So there's nothing Apple can point to in the DPLA that

10   says one way or another who should prevail in this case.  It

11   just doesn't speak to the issues in this case.  The only other

12   provision beyond the basic provision that authorizes Apple to

13   charge fees that Apple has pointed to is a liability waiver.

14        Apple raises this on reply, so we haven't had a chance to

15   respond to it, but we think that liability waiver is void as a

16   matter of law under -- it's California Code 1668, I believe,

17   which bars contracting parties from waiving liability for

18   willful injury, and the California Supreme Court just upheld

19   this principle a few weeks ago in a case called New England

20   Country Foods v. Vanlaw, which is 17 Cal. 5th 703.

21        So those are the two provisions that Apple has pointed to,

22   a basic provision that authorizes Apple to charge fees, which

23   we're not challenging anyway, and a liability waiver that's

24   unenforceable as a matter of law.  So there's nothing in the

25   DPLA governing this case one way or the other.

1      **MR. KLEINBRODT:**  Your Honor, may I respond to that?

2      **THE COURT:**  In a moment.

3      Are you seeking to enforce the injunction as an intended

4  beneficiary pursuant to paragraph 77 of the complaint?

5      **MR. HARRINGTON:**  No, Your Honor.  I think it's more

6  apt to say we're incidental beneficiaries to the injunction.

7  We're not seeking to enforce it.  It's already been enforced by

8  the Court.

9      All we're saying is that as a matter of state law, we're

10  entitled to a remedy for the harm that we've suffered, and that

11  claim rises or falls not on any abstract question of whether

12  we're enforcing the injunction or not, because we're not.

13  We're not bringing contempt proceedings.  We're not bringing an

14  action to compel compliance with the injunction.

15      We're just saying Apple should be held liable under the

16  state law tort doctrines we've invoked, and our claims rise and

17  fall on those causes of action.  And there's nothing in unjust

18  enrichment law or California law or tortious interference law

19  that would preclude us from recovering, just because Apple's

20  wrongful conduct in this case happened to violate an

21  injunction.  There's no principle of state law that says that,

22  and --

23      **THE COURT:**  Is there a reason you used the phrase

24  "intended beneficiary" in paragraph 77?

25      **MR. HARRINGTON:**  I don't -- you know, I looked at it.

1    I don't think that was intentional, Your Honor.  In our

2    briefing, we call ourselves "incidental beneficiaries," and I

3    think that's more apt because I understand that's how the Court

4    described nonparty developers as well.  Ultimately, it's not --

5    because we're not enforcing the injunction, I don't think it

6    ultimately depends on our status under the injunction.

7         The question, I think ultimately, is a state law question

8    of whether or not we've pleaded and can prove the elements of

9    the state law rights of action, and we think this is a

10   paradigmatic example of unjust enrichment.  We're in a

11   situation where Apple has received a benefit from developers in

12   violation of a court order, and we think it's unjust for Apple

13   to retain that benefit.

14        And similarly, with respect to tortious interference, this

15   really looks like a paradigmatic example of tortious

16   interference.  We have developers who are -- you know, linked

17   out payments are supposed to facilitate a direct commercial

18   arrangement between developers and their consumers where they

19   can transact on their own commercial terms that they see fit.

20   And by violating the injunction, Apple severed that

21   relationship and precluded developers from entering into those

22   agreements.  That is tortious interference.

23            **THE COURT:**  Well, they argue that you can't establish

24   the probable economic benefit because yes, you have customers,

25   but you don't have any way of showing or proving that anybody

11

1    would have used the link-out.

2           **MR. HARRINGTON:**  A couple of points on that, Your

3    Honor.

4           First, there is plenty of evidence that Pure Sweat would

5    have offered linked-outs because Pure Sweat tried to offer

6    linked-outs even before the injunction, and that was rejected.

7    And we've alleged that Pure Sweat would have done so promptly

8    in response to the injunction but for Apple's conduct making it

9    commercially nonviable.  So I think that piece is adequately

10   pleaded in the complaint.

11          And then with respect to whether consumers would use

12   link-outs, Apple's own studies showed how popular linked-outs

13   were going to be and how many developers would invoke them and

14   how many consumers would use them and how much revenue would

15   shift from Apple to developers if linked-outs were permitted

16   under the terms of the injunction.  And we're talking about

17   millions and millions of dollars at that issue.

18          I think, you know, on a motion to dismiss, we're entitled

19   to every reasonable inference, and it is not an unreasonable

20   inference to suggest that one of, at least one of Pure Sweat's

21   customers would have used a link-out.  And we don't have to

22   prove at this stage how many or the amount.  That's a damages

23   question.

24          Right now on the issue of standing and the issue of

25   whether there was an economic benefit under the injunction to

1    Pure Sweat and other developers, it's just one customer.  I

2    think we --

3         **THE COURT:**  And why isn't that sufficient, given the

4    case law, that they've identified their own customers and

5    there's case law that suggests that that's sufficient, and

6    Apple itself concedes or has -- their records indicate that use

7    of that program had value?  And identified in dollars, the

8    value that was associated with that particular program?  So why

9    isn't that sufficient for purposes of allegations at a motion

10   to dismiss stage for tortious interference?

11        **MR. KLEINBRODT:**  The requirement, Your Honor, requires

12   the identification of specific customers who had a preexisting

13   commercial relationship that was --

14        **THE COURT:**  Well, they say that.  All of their

15   existing customers.

16        **MR. KLEINBRODT:**  That kind of interference with the

17   market theory or a lost opportunity to a generalized but

18   undefined set of buyers is exactly what the California Court of

19   Appeals rejected in the Westside Center case.

20        And that case involved a very similar theory to what the

21   plaintiffs are purchasing here where they were trying to sell a

22   property, and they said there were lots of buyers, but they

23   didn't identify specifically which potential customers would

24   have matured into a contractual sale of the relative property.

25   And the California Supreme Court rejected that and said that is

1    too expansive a view of the tort.

2         **THE COURT:**  All right.  Okay.  Your response on the

3    other side?

4         **MR. HARRINGTON:**  I don't think the case law requires

5    that, Your Honor.  I don't think the case law requires that we

6    identify specific customers in the sense that we name them, and

7    we've cited case law in our brief as well going the other way.

8    That is such a high burden that no one could satisfy.  What

9    developer at this point, having been prevented from offering

10   linked-outs, is going to be able to say, "Oh, I know that

11   customer X, Y, or Z would have used link-outs"?

12        What we know is that these are very popular tools.  We

13   know that Apple modeled how popular they would be.  We know

14   that Apple modeled a ton of revenue shifting from Apple to

15   developers because people would use that.  And we're entitled

16   to all inferences of this.  It just -- it is a very reasonable

17   inference that one developer, even if we can't -- or one

18   customer -- even if we can't name who that would be, would use

19   a link-out.

20        I think what Apple is trying to erect is a pleading burden

21   that would just be prohibitive for any developer to sue on

22   these claims.

23        **THE COURT:**  Okay.  Is that the best you have on

24   tortious interference?  What else do you have?

25        **MR. KLEINBRODT:**  The Republican National Committee

1    case is a similar case.  That involved email recipients of --

2    who were past donors, and the allegation from the RNC was that

3    Google sent the emails to spam, which tortiously interfered in

4    their ability to donate in the future.  That was an

5    insufficiently direct expectancy.

6        Despite the fact that these are individuals who donated in

7    the past and were being solicited to donate again, the Court

8    said that that kind of undifferentiated request to a class of

9    customers is not sufficient for a tortious interference claim.

10   So I think both of those cases stand for the principle that we

11   are discussing here.

12       I would add that in some ways, this point dovetails with

13   the lack of allegations of a sufficiently concrete plan under

14   the standing law.  Counsel is asking what kind of developer

15   could identify particular --

16           **THE COURT:**  Have you moved --

17           **MR. KLEINBRODT:**  -- customers.

18           **THE COURT:**  -- off tortious interference?

19           **MR. KLEINBRODT:**  I --

20           **THE COURT:**  That's the best you have?

21           **MR. KLEINBRODT:**  Those two cases, I would submit are

22   the most analogous on that point, Your Honor.

23       With respect to the standing point, if a developer had a

24   concrete plan, had put effort into considering how it would

25   implement link-outs, what kind of link-outs it would offer,

1    what price it would do it, doing any market study or promotion

2    to its customers, then it should be able to identify, if not by

3    name, at least with some detail, particular customers that are

4    interested in using the link-outs.

5         But the only allegations that Plaintiff points to for its

6    offer on this is paragraphs 16 through 18 of the complaint, and

7    the allegations there are wholly conclusory.  Setting aside the

8    2023 app submission, which is well before the injunction became

9    effective, the only allegation is in paragraph 18, and it's a

10   few words of a general intent that they would implement

11   link-outs going forward.

12        And there are a number of cases from the Supreme Court in

13   the Ninth Circuit that stand both for the proposition that a

14   past attempt at something is insufficient to allege standing

15   and that a few generalized words of an intent to encounter a

16   policy or barrier in the future is insufficient, even on the

17   pleadings.  That's Lujan.  That's Pinkert.  That's Madsen.

18   That's Thomas.  All of these cases are cited in our brief.

19            **THE COURT:**  Any response?

20            **MR. HARRINGTON:**  Yeah.

21        I think on the issue of standing, we need to take a step

22   back and look at what Apple's scheme to violate this court's

23   injunction was intended to do.  As this court already found, it

24   was intended to dissuade developers from even applying for

25   linked out payments.

```
 1        Why?  Because it would be commercially unreasonable to

 2    offer them.  Apple was going to charge them a 27 percent fee on

 3    top of the payment processing costs they were going to already

 4    pay.  And so they'd be underwater on these transactions, as the

 5    Court already knows.

 6        So what developer, what rational developer, would go

 7    through the steps of offering -- of applying for linked out

 8    payments when doing so would have harmed them economically

 9    because they'd be worse off under the regime that Apple

10    erected?

11        So Apple basically developed a program to dissuade

12    developers from applying for linked out payments and is now

13    arguing that the fact that people were dissuaded precludes them

14    from having a justiciable claim.

15            THE COURT:  How do you respond to that, the fact you

16    created a scheme to dissuade, and it was successful?

17            MR. KLEINBRODT:  Well, Your Honor, I obviously --

18            THE COURT:  That's the allegation.

19            MR. KLEINBRODT:  I understand, and I --

20            THE COURT:  And that allegation is accepted as true

21    for purposes of this proceeding.

22            MR. KLEINBRODT:  That is correct, Your Honor.  I

23    understand that the fact of that matter is subject to a

24    different proceeding.

25        Accepting that allegation as true, the precedent from the
```

1    Supreme Court down on requires allegations of some concrete

2    steps to encounter the policy.  There is no necessary bar that

3    they actually have to engage in link-out payments and pay the

4    27 or 12 percent commission.

5         But the Ninth Circuit tells us in Madsen that is a

6    presumptive matter.  Applying to the challenged program is

7    required to state a concrete plan.  That's the presumption in

8    this circuit.

9         And there may be exceptions to that presumption, but here,

10   if you look at the allegations in paragraph 16, 17, and 18,

11   there is not one whit of anything that Pure Sweat basketball

12   says it did to consider, to plan, or to take any steps towards

13   implementing link-outs.  If it underwent a serious analysis and

14   determined that it was commercially unreasonable, that would be

15   a different set of allegations than what we face in this case.

16        The allegations in paragraph 16, 17, and 18 are frankly

17   too conclusory to give rise to Article III standing, much less

18   the higher burdens that must be pled for the --

19             **THE COURT:**  But why is --

20             **MR. KLEINBRODT:**  -- claims on the merits.

21             **THE COURT:**  -- it not sufficient that the sales that

22   were made were subject to an inflated price?

23             **MR. KLEINBRODT:**  So I think we need to separate the

24   two claims here.  The --

25             **THE COURT:**  For purposes of standing, why isn't that

18

```
 1    sufficient?
 2          MR. KLEINBRODT:  For purposes of standing, the -- why
 3    are the purchases that were of the --
 4          THE COURT:  So because you --
 5          MR. KLEINBRODT:  -- in-app subscriptions --
 6          THE COURT:  Because your scheme worked -- according to
 7    the complaint, because your scheme worked, they couldn't link
 8    out, and as a consequence, they were injured because they had
 9    to pay Apple more.
10          MR. KLEINBRODT:  Your Honor, the allegations don't
11    assert any attempt by Plaintiffs to have considered linking out
12    for the only app on which they paid transactions.  So there are
13    two apps here.  There's the original app and a new app that was
14    developed in 2023.  The new app, which is the one they say they
15    tried to offer link-outs for, they've never offered in-app
16    purchase for.  They've paid no commissions on it.
17          The only app -- this is, again, in paragraph 15 -- under
18    which they've ever paid commissions is the app in which they
19    sell in-app subscriptions, and there's not a single allegation
20    concerning that app that they ever tried or considered a
21    different business model.
22          MR. HARRINGTON:  If I may, Your Honor?
23          THE COURT:  You may.
24          MR. HARRINGTON:  Paragraph 17 of the complaint
25    discusses Pure Sweat's attempt in September '23 to offer linked
```

1   out payments through the app counsel is referencing, and Apple

2   rejected that.  So there is a demonstrated history of Pure

3   Sweat trying to use link-outs in its app.  The injunction -- it

4   gets entered, and Apple imposes commercial impediments that

5   make it unreasonable for developers to offer link-outs, and

6   Pure Sweat didn't do that.

7       But Pure Sweat has alleged in paragraph 18 that Pure Sweat

8   would have taken these steps promptly.  And "these steps"

9   refers back to steps to offer link-outs in response to the

10  injunction, which became effective on January 17th, 2024, had

11  Apple complied with the injunction from day one and not imposed

12  the economic and noneconomic restraints that have now been set

13  aside.

14          THE COURT:  Under Carney vs. Adams, 592 U.S. 53, a

15  plaintiff can show that concrete injury exists, whether it's

16  actual or imminent, by showing that they were able and ready to

17  comply.  The 2023 app, for purposes, again, of this motion,

18  seems to be sufficient to comply with Carey.  Why not?

19          MR. KLEINBRODT:  Two responses, Your Honor.

20          THE COURT:  Or Carney, I would say, C-A-R-N-E-Y.

21          MR. KLEINBRODT:  Yes, Your Honor.  Two responses to

22  that.

23      First, I would note that that has -- the allegations about

24  that app cannot support the restitution and implied contract

25  claim because there was never any payments of in-app

1    subscriptions under there.  There's nothing --

2           **THE COURT:**  Well, there was never any payments of

3    anything because of what you did.  That's the point.

4           **MR. KLEINBRODT:**  Your Honor --

5           **THE COURT:**  Understand that is the point, that you

6    kept all the money for yourselves.  And I don't mean you

7    specifically.  I mean your client.

8           **MR. KLEINBRODT:**  I appreciate that, Your Honor.

9        I'm simply pointing out that with respect to the

10   allegations we're focused on, those can only support the

11   tortious interference claim, which is about a lost opportunity.

12   It cannot support a restitution, which is about the return of

13   money, because --

14          **THE COURT:**  Okay.  Now we're jumping around again.

15   We're going back -- I thought we were back at the threshold

16   issue of standing.

17          **MR. KLEINBRODT:**  We are, but standing is not dispensed

18   in gross.  And so the allegations to which we're pointing to, I

19   just want to focus the inquiry to point out that the

20   allegations about the 2023 app submission, which refer to only

21   one of the apps, that categorically cannot support a

22   restitution claim because there have never been any commissions

23   paid to Apple related to the second app.

24       Now, you asked why are those allegations insufficient --

25          **THE COURT:**  Hold on.

```
 1          Your response?  I don't understand.

 2          MR. HARRINGTON:  I think this is a new argument, Your

 3     Honor.  The theory of restitution under our complaint is that

 4     where Apple defied this court's injunction, money that

 5     developers would have received directly from their own

 6     consumers, using linked out payments that would have been more

 7     cost effective, went to Apple.

 8          THE COURT:  Right.

 9          MR. HARRINGTON:  Right?  And that is the corpus of

10     money that we are seeking -- we're asking Apple to disgorge.

11     And that is money that Pure Sweat lost on its app that it

12     wanted to link out on, because the whole theory was Apple's

13     going to -- or sorry -- Pure Sweat was going to use the

14     link-outs to transact directly with its customers, where it

15     would have to pay Apple's commissions.  And under the scheme,

16     there was no way for Pure Sweat to do that.

17          And so the transactions that would have been linked out

18     transactions became in-app transactions, and Apple charged fees

19     on those transactions illicitly and kept the money.  And the

20     theory is that that money should be returned under unjust

21     enrichment and tortious interference.  That's a restitution

22     claim.

23          MR. KLEINBRODT:  Your Honor, respectfully, it's not a

24     restitution claim.  Korea Supply Corporation from the

25     California Supreme Court says, quote, "Compensation for a lost
```

1    business opportunity is a measure of damages and not

2    restitution to the alleged victim."

3        But I do want to return to your question about why these

4    allegations are insufficient under Carney.  It has to be read

5    in connection with other Supreme Court precedent.  Lujan says

6    that a past encounter with an unlawful policy, quote, "counts

7    for nothing."  What Carney then said is that -- and Carney also

8    reaffirms that a few words of general intent are insufficient.

9        **THE COURT:**  Well, these aren't a few words.  They

10   actually submitted a program that you rejected, that Apple

11   rejected.

12       **MR. KLEINBRODT:**  And Your Honor, they then allege that

13   they redid the app, offered it without link-outs or in-app

14   purchases.  There are no allegations, again, that they --

15       **THE COURT:**  But because of -- I don't have to ignore

16   the scheme.  I don't have to do that.  I don't have to ignore

17   the intentional scheme that Apple engaged in to undermine

18   developers.

19       **MR. KLEINBRODT:**  Your Honor, we're not asking you to

20   ignore anything.

21       Now, obviously I would be remiss if I did not say that

22   Apple objects to certain findings and conclusions, but even if

23   we accept those and even if the Court takes as true all of the

24   allegations in the complaint, including those that are taken

25   from the Court's order in Epic, what the concrete plan

1    requirement under standing law requires are some allegations

2    that they had a concrete plan, took some affirmative steps,

3    once the injunction became effective, to encounter, again, the

4    policy.

5         If they --

6         **THE COURT:**  He's arguing you had to resubmit after the

7    injunction.  Do you have to?

8         **MR. HARRINGTON:**  No, not when the whole point of the

9    scheme was to make it economically irrational to submit an app.

10   Under that theory, the only people who would have standing

11   would be people who acted irrationally and submitted an app for

12   linked out payments that would have harmed them.

13        **THE COURT:**  All right.  Your response to that theory?

14        **MR. KLEINBRODT:**  I'm not arguing that --

15        **THE COURT:**  I'm asking -- do you have a response to

16   that?  Because that seems rational to me.

17        **MR. KLEINBRODT:**  My response, Your Honor, is that

18   we're not saying that resubmission of the app is required.

19   What is required are some allegations of some steps taken to --

20   towards that effort or towards considering encountering the

21   policy.

22        **THE COURT:**  So they had to act irrationally and to

23   their detriment in order to have standing, under your theory?

24        **MR. KLEINBRODT:**  Not that they had to act

25   irrationally.  They had to have taken some step --

24

```
 1            THE COURT:  Like what?  Like what?
 2            MR. KLEINBRODT:  For example, Your Honor, they have to
 3   allege that they looked at the link entitlement program,
 4   determined whether it was rational or irrational, that they
 5   have some kind of business plan to offer link-outs now that
 6   the --
 7            THE COURT:  Okay.  Can you do that?
 8            MR. KLEINBRODT:  -- most recent order --
 9            THE COURT:  Can your client do that?  Can your client
10   allege that they looked at this plan and realized that by
11   engaging in it, they would -- they would have to pay more?
12   What can your client say?
13            MR. HARRINGTON:  I feel like we've said all that we
14   need to say in the complaint already, but in addition, we could
15   describe the thought process of our client.  I mean, in
16   paragraph 18, we state, "Pure Sweat would have taken these
17   steps promptly" -- that is, steps to offer linked-outs -- "in
18   response to the injunction," which became effective on January
19   17th, 2024, had Apple complied with the injunction from day one
20   and not imposed economic and noneconomic restraints that have
21   now been set aside.
22        And we state that Pure Sweat is going through the steps
23   now, in the preceding paragraph, to offer those linked out
24   payments, and if we needed to, we could describe what's going
25   on more with Pure Sweat in that process.  But frankly, Your
```

25

1   Honor, I think there's enough in the complaint now to allege
2   standing.
3       **THE COURT:**  All right.  So next issue.  Is this
4   lawsuit precluded by the Cameron settlement?  So the release --
5   let's talk about the release.  Why aren't you precluded?  You
6   knew about the linked out program in advance.  You knew that
7   this other case was going on.
8       You were on all sorts of notice, and you all entered into
9   a nice, large settlement with Apple, and settlements include
10  this general release language that says, "Okay.  It's not
11  perfect, but we're releasing all claims, current and future,
12  that arose out of this situation," or arose out of the
13  underlying lawsuit.  So why aren't you precluded under the
14  Cameron settlement?
15      **MR. HARRINGTON:**  Because of the identical factual
16  predicates test that governs releases that are governed
17  themselves by California law.  So for a claim to be released --
18  it doesn't have to be a claim obviously that was asserted in
19  Cameron.  It could be a claim that could have been asserted.
20  But it has to be a claim that arises from the identical factual
21  predicates.  That's the test.  And it flows from the Hesse
22  decision that both parties cite, and Your Honor discussed it at
23  some length in the -- I think it's the Stonehocker case from
24  2019.
25      Here, the claims in this case don't arise from the

1    identical factual predicates as Cameron, and there are two

2    reasons.  One is purely timing.  The factual predicates for

3    this action are Apple's conduct in violation of an injunction

4    that was issued after the Cameron settlement under a scheme

5    that was hatched and executed after the Cameron settlement.

6        And as a matter of law, parties can't release claims.  You

7    can release future claims arising from the same facts, but you

8    can't release claims where the predicate facts don't even

9    exist.  That's just not a metaphysical possibility.  And we

10   cited the Feller and Yearby cases in our papers.  They both

11   stand for that timing proposition that when a claim is

12   predicated on post-settlement conduct, that claim does not

13   arise from identical factual predicates as a predecessor claim.

14       But even separate and apart from the timing, the claim

15   here arises from new and different conduct that doesn't satisfy

16   the identical factual predicates test.  So looking at the first

17   page of this court's contempt order, the Court stated that

18   Apple had engaged in conduct by -- or engaged in misconduct by

19   erecting new barriers and new requirements.

20       And the Court further stated, "Apple willfully chose not

21   to comply with this court's injunction.  It did so with express

22   intent to create new anticompetitive barriers."  And later the

23   Court discussed Apple's efforts to create a new, de facto,

24   anticompetitive structure by charging developers new policy --

25   by its new policy of charging developers 27 percent.

1     So all this conduct of charging Apple -- of charging

2 developers for linked out payments, for erecting all the

3 frictions that the Court went through in its contempt order --

4 all that is new conduct that did not exist when the Cameron

5 settlement was executed, and this case arises from that

6 conduct.

7     **THE COURT:** Response?

8     **MR. HARRINGTON:** And so --

9     **MR. KLEINBRODT:** Your Honor, I would point to sections

10 5.2 --

11     **THE COURT:** Well, first talk about the -- is it an

12 identical factual predicate or not?

13     **MR. KLEINBRODT:** Your Honor, I believe that the

14 payment of the commissions here by Pure Sweat Basketball are an

15 identical factual predicate, because again, they were not

16 payments made under the linked entitlement program under the

17 27/12 percent commission. The payments that are alleged to

18 have been made by Pure Sweat Basketball were the subscription

19 in-app purchases that it had -- that it has been charging

20 allegedly all along, since well before the link-out program --

21     **THE COURT:** What if I don't agree with you, with your

22 premise of how this -- of the fundamental basis for the

23 lawsuit? That is, I want you to respond directly to

24 Plaintiff's counsel, assuming, for purposes of argument, that

25 the conduct at issue is, in fact, all the conduct that

1    happened, well, after the fact.  Does the test apply or not?

2         **MR. KLEINBRODT:**  I'm sorry.  I missed the last part of

3    your question.

4         **THE COURT:**  Does the test apply or not?

5         **MR. KLEINBRODT:**  Yes, Your Honor.  The identical

6    factual predicate test -- it does apply.  We believe it is

7    satisfied here most clearly for the restitution theory, but

8    taking all of the assumptions that Your Honor gave -- and I

9    think, again, there are two claims here, and it is helpful to

10   look at each one to understand, I think, a bit more precisely

11   how the release operates.

12        With the first claim, restitution, it has to be based on

13   the moneys that were actually paid.  Those are legacy payments

14   under the legacy regime, and in its --

15        **THE COURT:**  They're not asking for restitution of

16   legacy payments.

17        **MR. KLEINBRODT:**  Your Honor, that is what they are.

18   That's in paragraph --

19        **THE COURT:**  Is that what you're asking for?  I thought

20   we were not talking about -- maybe it's a definition of what

21   "legacy" means.  How do you define legacy?  How do you define

22   legacy?

23        **MR. KLEINBRODT:**  Your Honor, the legacy payments, what

24   I mean by that is that they are the payments made under the

25   preexisting commission structure.

29

1          **THE COURT:**  All right.  Stop.

2      When did the damages, or the restitution, the

3  disgorgement, whatever you want to call it, for -- we've got

4  different terms being bandied around.  So when did they start?

5          **MR. KLEINBRODT:**  Your Honor, the complaint -- oh.

6          **MR. HARRINGTON:**  That's a question for me.

7      So the period that we're seeking restitution for is the

8  period between the effective date of the injunction.  So that's

9  January -- I think it's 27th, 2024.  I'm sorry if I have that

10  wrong -- through the date at which Apple opened up linked out

11  payments in compliance with this court's contempt order, which

12  would have been in May 2025.

13      So it's about a 15-month period in which Apple was, in

14  defiance of this court's order, preventing developers from

15  linking out.

16          **THE COURT:**  So is that what you're calling legacy

17  payments?

18          **MR. KLEINBRODT:**  I am --

19          **THE COURT:**  Because I understood -- the phrase "legacy

20  payments," to me, does not seem to incorporate this period.  So

21  I just want to make sure we're talking --

22          **MR. KLEINBRODT:**  Yes, Your Honor.  I would include in

23  what I'm discussing payments that were made under the

24  preexisting commission structure during that time period since

25  the injunction became effective, until the date of the Court's

1      contempt order.

2              **THE COURT:**  All right.  Go ahead.

3              **MR. KLEINBRODT:**  Your Honor, in sections 5.2 and 11.3

4      of the release, Plaintiff expressly agreed to the

5      appropriateness of Apple's commission structure, and it also

6      expressly agreed that this could be pleaded as a full and

7      complete defense to a future suit.  The case that counsel

8      cited, Yearby, expressly disclaimed future claims from the

9      settlement agreement there.

10             The release here is different.  Under Plaintiff's view, a

11     future claims release would be completely unworkable.  It would

12     undermine the global peace that is the entire purpose of Rule

13     23 settlements.  If we settled, we agreed to the

14     appropriateness of the structure.  We engaged in all of the

15     extensive releases that went into that settlement, but they

16     paid a 30 percent commission the next day.

17             Counsel is suggesting that that is future conduct that

18     could give rise to another suit.  I don't believe that the

19     release operates that way, and I don't believe that California

20     law compels that result.

21             **THE COURT:**  So 5.2 is not a release provision.  It's a

22     covenant not to sue.  And 11.3?

23             **MR. HARRINGTON:**  The release is section --

24             **THE COURT:**  I know what it is.

25             **MR. HARRINGTON:**  Oh.

1    **THE COURT:** That's why I was surprised when he quoted

2    sections 5.2 and 11.3, and I went to look at them because

3    that's not the release provisions.

4    **MR. KLEINBRODT:** Your Honor, I know that you are very

5    familiar with the release provisions. I wanted to cite those

6    because it is -- section 11 is the agreement as defense in

7    future proceedings, and I think it is important and

8    illustrative in construing the scope of the release and the

9    nature of the settlement as a defense in future cases like this

10   one.

11   **THE COURT:** Do you have anything to say about section

12   10, which is the release provision?

13   **MR. KLEINBRODT:** Yes, Your Honor. I believe that it

14   is a comprehensive and extensive release that extends to, as is

15   stated there --

16   **THE COURT:** But it doesn't extend to factual

17   situations that are not identical, right?

18   **MR. KLEINBRODT:** Your Honor, that -- it does not, I

19   think, speak to the language of the identical factual

20   predicate. It releases claims that arise from the same facts.

21   So in that sense, that is what the release says.

22   In understanding the scope of the release and the extent

23   to which the settlement agreement can be used as a defense in

24   cases like this one, I think that section 10.1, in addition to

25   section 5.2, which is a covenant not to sue, as you said, and

1    11.3, which is the agreement to which the settlement can be

2    used as a defense in future proceedings, are all relevant.

3            **THE COURT:**  Okay.

4            **MR. HARRINGTON:**  If I may, Your Honor?

5            **THE COURT:**  You may.

6            **MR. HARRINGTON:**  Looking at the release, I think at

7    the very end of counsel's points, I think counsel made the most

8    important point, which is the release is limited to claims

9    that, quote, "arise from the same facts."  And I will say that

10   that language was included -- you'll see how it's been drafted,

11   and it was included at the Court's direction.

12       So when we initially submitted the settlement for

13   preliminary approval, the Court flagged this as being the prior

14   language which would have released all claims related to the

15   same facts as being overbroad, and the parties went back and

16   narrowed the release to limit the release to claims that arise

17   from the same facts.

18       And even if the release didn't have that language, as a

19   matter of law, a release simply cannot extend to claims that do

20   not arise from the identical factual predicates.  And for the

21   points I raised earlier, I really do not think that the claims

22   in this case arise from the same factual predicates, both

23   because of timing and because the claims here are based on new

24   facts that are different from the claims asserted in Cameron.

25       This is a lot like the Hesse case itself, which announced

1    the identical factual predicates test.  In that case, there was

2    -- Sprint was the defendant, and the claims asserted in the

3    action were that Sprint was unlawfully charging certain

4    government fees to consumers.

5        And there had been a prior release and an action involving

6    that same basic issue of Sprint charging fees, government fees,

7    to consumers illicitly.  And the Court said that similarity of

8    subject matter -- that's not enough under the identical factual

9    predicates, because there's different facts involved in this

10   case.

11       It's the same situation here.  Counsel's arguing that

12   because somehow this case relates to fees, and fees were

13   involved in Cameron, that satisfies the nexus that you need,

14   and I submit that it doesn't.  You need identical factual

15   predicates, which are the same facts.  And the facts pleaded in

16   our complaint are not facts that were asserted in Cameron or

17   could not have been asserted in Cameron because they all arise

18   from Apple's defiance of an injunction that did not exist when

19   Cameron settled.

20            **THE COURT:**  Trump v. Casa.  Any argument?

21            **MR. HARRINGTON:**  From Plaintiffs?

22            **THE COURT:**  Either one.

23            **MR. HARRINGTON:**  Well, I will say -- so Trump v. Casa,

24   this goes back to the injunction enforcement issue, and Trump

25   v. Casa and dicta states that parties cannot enforce

1   injunctions to which they're not a party.  We're not disputing

2   that, right?  We're not trying to enforce the injunction in the

3   way that Casa or the other cases Apple cites prohibit by

4   seeking a contempt order or trying to compel Apple's compliance

5   with the injunction.

6       All we're saying is that Apple's conduct, in violation of

7   the injunction, supports a right of action under state law.

8   And whether we have pleaded that claim or not rises or falls

9   under state law, and there's no principle of California law

10  that says you can't bring an unjust enrichment claim when the

11  conduct at issue violates an injunction.  That's just not an

12  element of California law.  It's the opposite.

13      **THE COURT:**  Is this -- is there any claim being

14  asserted that this is a continued UCL violation, or is this a

15  new violation?

16      **MR. HARRINGTON:**  We're not asserting a UCL claim.  But

17  it's a new violation.  We're not alleging it's just a

18  continuation of something.  The basis of this claim is the

19  conduct in violation of this court's order.

20      **THE COURT:**  Okay.  Any comment?

21      **MR. KLEINBRODT:**  Yes, Your Honor.

22      I think that Trump v. Casa is instructive, A, that this

23  could not be a case to enforce the injunction.  We covered that

24  at the beginning.  I think that is how the case is pled.

25  Counsel seems to be disclaiming that theory, but I certainly

1    think that insofar as Plaintiff --

2         **THE COURT:** Well, what if -- when you say that, I'm

3    not frankly sure exactly what you mean.  That is, the

4    injunction's been enforced.  They aren't asking for relief in

5    the frame of some order from this court to force Apple to do

6    something.  This is a damages case.  It's not a -- it's not an

7    enforcement case.  So I don't know what you mean when you say

8    that.

9         **MR. KLEINBRODT:** Your Honor, Plaintiff is saying that

10   the injunction provides the duty and measure of wrongfulness

11   for their tort claim.  It is the violation of the injunction

12   that they seek to leverage, as they --

13        **THE COURT:** They may seek to leverage it, but you keep

14   saying that it's an enforcement action, and I'm asking you to

15   specify what kind of enforcement you think is being sought,

16   because I don't see enforcement.  What I see is recovery.

17   They're two entirely different things, in my mind.

18        So tell me what a -- tell me what you think their order

19   would say at the end of the -- at the end of the case when you

20   claim that there's some enforcement issue going on.

21        **MR. KLEINBRODT:** Well, one of the things that their

22   order would say, they tell us in the complaint, is that Apple

23   violated the injunction.  This would be a collateral proceeding

24   about -- to litigate that issue.

25        **THE COURT:** They've also -- you were also talking

36

```
1      about standing.  I mean, that's not something that a jury is
2      going to decide.  That's not a jury issue.
3           MR. KLEINBRODT:  I think it has to be a jury issue if
4      the measure of wrongfulness is whether Apple complied with the
5      injunction.  That is an element of their tort claim for
6      damages.  That would be a jury issue.
7           THE COURT:  Well, I think it would be summary
8      judgment.
9           MR. KLEINBRODT:  Well, I'll set aside the --
10          THE COURT:  Because I'm looking at the prayer for
11     relief in the complaint -- well, maybe it is.  You're asking
12     for injunctive relief in your complaint.
13          MR. HARRINGTON:  I don't think so, Your Honor.
14          THE COURT:  Well, maybe I'm looking at the wrong
15     complaint.
16          MR. HARRINGTON:  We do not have a claim for injunctive
17     relief.
18          THE COURT:  Wrong complaint.  All right.  I'll figure
19     it out.
20          MR. HARRINGTON:  I'll just say, Your Honor, in our
21     prayer for relief, we expressly excluded and purposefully
22     excluded injunctive relief, and we disclaim in our briefing any
23     request for injunctive relief.
24          THE COURT:  So then back to my question.  Do you want
25     to say anything about enforcement, given that that's not in the
```

1    prayer?

2    **MR. KLEINBRODT:**  Your Honor, when I referred to it, I

3    did not mean that they are seeking an injunction.  What they

4    are seeking to prove as an element of their case -- and this is

5    at paragraph 68.A -- that one of the allegedly common questions

6    they intend to prove is whether Apple violated the injunction.

7    So proof of Apple's compliance with the injunction is, in

8    Plaintiff's view, an element of the case.

9        Now, as I mentioned --

10   **THE COURT:**  All right.  Your response on that?

11   **MR. HARRINGTON:**  It goes back to the Court's first

12   point.  The injunction has already been enforced.  So the

13   findings that would be required, if they were required at all,

14   have already been made.  What we're alleging is that Apple's

15   adjudicated conduct, in violation of the injunction, supports

16   the claims we've asserted.  That's not an illicit action to

17   enforce a judgment.  It's just an action under state law for

18   damages we think we're entitled to.

19       And I don't think the Court has to ignore the injunction

20   or the findings it's made to adjudicate those state law claims.

21   It's -- you know, you can even look back to Casa for support

22   for this.  You know, the Supreme Court in Casa said that the

23   plaintiff there -- it was a hypothetical situation where

24   there's a lawsuit for nuisance, and neighbor A sues neighbor B,

25   and then neighbor C comes along and wants -- the nuisance

1    continues and wants it to stop.

2       And the Court said neighbor C can bring their own cause of

3    action, and in that cause of action, the neighbor C can use the

4    judgment from before for collateral estoppel purposes.  It's

5    not as though a judgment in a different case is a legal nullity

6    in another case.  It has legal significance.  But that doesn't

7    transform this somehow into an action to enforce in the

8    judgment.  That's already happened.

9        **THE COURT:**  So constructive trust is a remedy.  Do you

10    agree?

11        **MR. HARRINGTON:**  Agree.

12        **THE COURT:**  So it's not a cause of action?

13        **MR. HARRINGTON:**  We agree.

14        **THE COURT:**  And it is a remedy you are seeking under

15    the constructive trust?

16        **MR. HARRINGTON:**  I believe it's a remedy that would be

17    certainly applicable under the quasi-contract claim, and I

18    think it could be a remedy entered for tortious interference

19    too.

20        **THE COURT:**  Unjust enrichment is a remedy as well?

21        **MR. HARRINGTON:**  We pleaded that as a

22    quasi-contract/unjust enrichment claim, and there's a pretty

23    rich and, I would say, somewhat confusing body of law.  But I

24    think the upshot, Your Honor, is that unjust enrichment

25    technically is a remedy, but it can be awarded in an action for

1    quasi-contract, which has the same elements, and that's how

2    we've pleaded it here.  In the complaint, it's labeled a

3    quasi-contract/unjust enrichment claim.

4          **THE COURT:**  That's how I've dealt with it recently.

5    So is there an adequate remedy at law or not?

6          **MR. HARRINGTON:**  No, I don't think there is an

7    adequate remedy at law.  The question is -- that Apple's raised

8    is whether or not we have to affirmatively plead that.  And

9    this is -- this gets to the Sonner case.  In our view, we do

10    not have to affirmatively plead in the complaint an inadequate

11    remedy at law.

12          **THE COURT:**  So I've found in the past that you do.

13          **MR. HARRINGTON:**  The case that I looked at recently is

14    the Carroll case that this court adjudicated, where the Court

15    said you do not necessarily have to plead an inadequate remedy.

16    You can also plead your claims in the alternative, the logic

17    being that Sonner is a case that was decided closer to trial,

18    and it wasn't speaking directly to the inadequate legal

19    remedies issue.

20    I will say if the Court believes -- and I think there's a

21    split of authority on this.  I can see that.  And I can see the

22    Court going either way on it.  If the Court wants us to plead

23    inadequate legal remedies, we can certainly do that.  I think

24    this is a case where, you know -- well, I think one, that's not

25    a very high burden.

1    We just have to show that an equitable remedy would be

2    more efficient or would award greater relief or could be more

3    easily administrable.  I think all of those things are true

4    here because we're in a situation where, under the theory of

5    our case, Apple has received essentially a corpus of funds that

6    belong to developers, and that's a very well-suited case for

7    disgorgement.

8    And the measure of disgorgement is -- can be guided by

9    Apple's own analyses that it's done already where it modeled

10   the effect of its scheme on revenues and concluded that if it

11   were to pursue the course of action it pursued, how much money

12   it would essentially receive from developers.  That's a

13   disgorgement measure of harm, and I think it feeds directly

14   into a model that we could develop.

15   So I think there's a lot of ways that we could plead, if

16   we had to, inadequate legal remedies.  I don't think

17   necessarily the case law requires that, but we could if the

18   Court instructs us to.

19   **THE COURT:**  All right.  Any comments?

20   **MR. KLEINBRODT:**  Your Honor, I think the Ninth Circuit

21   has resolved any split of authority in the recent Ruiz v.

22   Bradford Exchange case, where it expressly said this is a

23   pleadings issue that does need to be resolved on the pleadings

24   if it's raised there, and I think it squarely has been here.

25   So I do think that the lack of allegations, whether in the

1      alternative or not, are dispositive of Plaintiff's request for

2      equitable remedies.

3              **THE COURT:**  The motion to strike is denied.  I never

4      grant them.  I have stock language.  I'll put it in an order.

5      At some point I hope people will start reading these things.

6      Every single time I get them, I deny them.  I'll do it at the

7      appropriate time, and in my view, at the start of the case,

8      it's not an appropriate motion, and it's not the appropriate

9      use of 12(f).  That motion is denied.

10         Stay pending appeal comments?

11             **MR. KLEINBRODT:**  Would you like to hear from Plaintiff

12     or Defendant first, Your Honor?

13             **THE COURT:**  I don't care.

14             **MR. KLEINBRODT:**  Briefly, Your Honor, the Ninth

15     Circuit will be hearing argument very soon.  It has expedited

16     the appeal, and so I think we can expect a fairly prompt

17     ruling, given everything we've heard today about the

18     significance of the injunction to this case.  It seems to be

19     appropriate and in the interest of judicial economy to see what

20     result the Ninth Circuit reaches, and whether it provides any

21     further guidance on the scope of the injunction or the

22     interpretation thereof.

23         I don't see any prejudice, given that Plaintiff does not

24     allege any ongoing harm since the entry of the contempt order.

25     And therefore, we think it would be appropriate to stay the

42

1  case, whether before or after the entry of a dismissal order,

2  pending the appeal in Epic.

3      **MR. HARRINGTON:**  It's -- we certainly acknowledge that

4  the appeal in Epic could impact this case in one way or

5  another, but I don't think that warrants an all-out stay.  At a

6  minimum, we think the Court can resolve this motion to dismiss.

7  We don't have a case management conference or any of that.  We

8  can get things rolling.  And I will say this is a case where,

9  in terms of discovery and ongoing burden on Apple, I think it

10  can be quite limited.

11      You know, I won't foreswear further discovery, but I think

12  most of what we want in discovery are going to be documents

13  that Apple already produced to Epic in the contempt phase of

14  the Epic case, and reproducing that to us would obviously cause

15  minimal, to say the least, burden.

16      You know, if down the road, we need more data, I think so.

17  But I think there would be a way to certainly get this case

18  rolling and moving forwards and be poised to really proceed

19  once there's an order in the appeal.  And we could tee that up

20  for the Court in a joint case management proposal where we lay

21  out our thoughts.

22      And, you know, it sounds like Apple's proposal would be

23  for an all-out stay.  I think we would suggest something a

24  little more iterative, but, you know, a process that could get

25  this case without -- while avoiding unnecessary burden.

1          **THE COURT:**  Okay.  Anything else?

2          **MR. KLEINBRODT:**  Your Honor, I would simply say it

3     seems like counsel's suggesting some meet and confer so that

4     there's potential daylight between an all-or-nothing option on

5     the stay.  I certainly don't oppose to conferring with opposing

6     counsel and, if we can reach an agreement, submitting something

7     to Your Honor to that effect.

8          **THE COURT:**  It's always appreciated.

9       Okay.  Anything else?

10         **MR. HARRINGTON:**  No.  Thank you, Your Honor.

11         **MR. KLEINBRODT:**  Thank you, Your Honor.

12         **THE COURT:**  All right.  You'll hear from me in

13    writing.  Court's adjourned.

14         **THE COURTROOM DEPUTY:**  Court is adjourned.

15       (The proceedings concluded at 3:12 P.M.)

16                          ---o0o---

17

18

19

20

21

22

23

24

25

1                **CERTIFICATE OF REPORTER**

2         I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5    DATE:  Thursday, September 25, 2025

6

7         _____

8              April Wood Brott, CSR No. 13782

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25